UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X
SAMUEL KELLNER,                                              Civil Action No.

                                    Plaintiff,

                    -against-                               **COMPLAINT**

THE CITY OF NEW YORK and
CHARLES J. HYNES, in his
individual capacity,                                        **Jury Trial Demanded**

                                    Defendants.
--------------------------------------------------------------------------X

Plaintiff, by and through his attorney, NIALL MACGIOLLABHUÍ, ESQ.,
complaining of the Defendants herein, alleges as follows:

## INTRODUCTION

1.      This is a civil rights action, pursuant to 42 U.S.C. §§ 1983 and 1988,

arising from a criminal conspiracy to pervert the course of justice for victims of a notorious,

decades-long pedophile in Brooklyn's ultra-Orthodox community. One such victim was

Plaintiff's son. In 2008, Plaintiff brought the case of his son, and of two other victims, to the

office of the Brooklyn District Attorney, Charles J. Hynes, resulting in the conviction of the

pedophile in relation to the second of the other victims, and his imprisonment for a term of $10\,^2/_3$

– 32 years. The conviction was obtained despite blatant witness tampering and intimidation,

conducted in full view of the District Attorney, which forced the first of the other victims to

discontinue his cooperation with the prosecution. However, the pedophile was connected to

powerful and wealthy interests within the Plaintiff's community, and they enlisted the District

Attorney in a successful effort to overturn the conviction and prevent a re-trial. The cornerstone

of this conspiracy was the malicious prosecution of Plaintiff. Though the prosecution ultimately

collapsed, the conspiracy succeeded: the District Attorney surreptitiously dismissed the case of

Plaintiff's son, and orchestrated a pay-off of the other victim, with the result that a serial predator and rapist of children served a paltry 86 days in prison. The present action seeks some measure of redress for this undeniable outrage.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction under 28 U.S.C. § 1343, which provides for original jurisdiction in this court of all suits brought pursuant to 42 U.S.C. § 1983, and under 28 U.S.C. § 1331, which provides for jurisdiction over all claims brought pursuant to the Constitution and laws of the United States.

3.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## JURY DEMAND

4.    Plaintiff respectfully demands a trial by jury on all issues in this matter.

## THE PARTIES

5.    Plaintiff is a resident of Borough Park, County of Kings.  He is a member of the Satmar sect within Brooklyn's ultra-Orthodox community.

6.    Defendant THE CITY OF NEW YORK, of which the County of Kings is a subdivision, is a municipal corporation organized under the laws of the State of New York.

7.    Defendant CHARLES J. HYNES was, at all relevant times, the District Attorney of Kings County, employed by Defendant THE CITY OF NEW YORK.

## STATEMENT OF FACTS

### A serial pedophile is exposed

8.    Sam Kellner's ordeal began in early 2008, when his son was molested by Baruch Lebovits.  His son reported the incident to his yeshiva teacher, Rabbi Chaim Hager, who instructed him that Lebovits was a respected person and that he was forbidden from speaking

further of the incident. Rabbi Hager also threatened to expel him from the yeshiva. He confided in his father, who decided to report the incident to the police with the permission of Rabbi Chaim Flohr – a highly respected rabbi who presides over a rabbinical court in Monsey, Rockland County (home to a large Satmar community) – after Rabbi Flohr learned that Baruch Lebovits was known for decades in Sam's community as a relentless pedophile.

9.      Shortly afterwards, Sam met with a prosecutor in the Brookyn District Attorney's office, who interviewed Sam's son, but informed him that the office would not proceed with a prosecution, primarily because the alleged offense was a misdemeanor and there were no other known victims. Unhappy with this outcome, Sam spoke to Henna White, the office's liaison to his community, who put him in contact with Detective Steve Litwin, a longtime investigator of sexual abuse of children. Detective Litwin interviewed Sam's son and concluded that Baruch Lebovits was a serial predator. He told Sam that a case against him would be viable if other victims could be found and encouraged to report their abuse.

10.     Sam was soon given the name of "MT" – a victim of Baruch Lebovits who had reported being repeatedly raped by him as a child – by the Williamsburg Va'ad HaTznius (modesty committee). Sam met MT and encouraged him to report his abuse to Detective Litwin, which he did. In March 2008, MT and Sam's son testified before a Grand Jury, and Baruch Lebovits was indicted. MT described how Lebovits started following him when he was 12 years old, and then, for the next four years, perpetrated countless horrific acts of oral and anal rape upon him.

11.     Subsequently, Sam was given the name of another victim of Lebovits, YR, whom he also helped to report his abuse to Detective Litwin. In September 2008, under Detective Litwin's supervision, YR recorded a conversation he had with Lebovits, in which he

told Lebovits that he had been contacted by a member of Assemblyman Dov Hikind's office after finding out he was an abuse victim. He further told him that he believed a witness to the abuse may have spoken about it. Lebovits instructed him as follows: "You'll say you were alone, you had nobody with you"; "You'll deny it"; "[The witness] didn't see anything."

12.   In November 2008, MT testified a second time before a Grand Jury, along with YR, which resulted in a superseding indictment being filed against Baruch Lebovits. The court reporter wept as she transcribed his testimony.

### Attempts to pay off Sam

13.   By this time, Sam was experiencing severe harassment and intimidation in his community for his act of "mesirah" – namely, informing on Baruch Lebovits, a fellow Jew. Substantial monetary offers were also being made to him by various people to drop his son's case. He rejected all of them. The pressure then took a different form whereby it was demanded that he submit to adjudication in a Beit Din, or rabbinical court. One rabbi in particular, Rabbi Yisroel Makevetzky, was relentless in his pursuit of Sam, demanding that his son's case against Baruch Lebovits be adjudicated before him. Sam, knowing that to live in his community meant to live according to its rules, agreed in principle to go the Beit Din but set two pre-conditions: Rabbi Flohr (who had given him permission to report his son's abuse) and Michael Dowd, Esq., would be allowed to attend, and he would not be responsible for any expenses or legal fees charged by the court and by Mr. Dowd. An associate of Lebovits, Wolf Wertzberger, became involved and promised to pay Sam's share of the expenses and fees. However, Sam's other pre-conditions were rejected. Yet, he received a bill from Makevetzky in the amount of $1,800 for the Beit Din's work "in the matter between Shlomo Aaron Kellner and the Lebovits family related to damages to his son." When Sam asked Wertzberger to honor his promise to pay the

bill, Wertzberger told him that he was merely a front for Baruch Lebovits's son, Meyer, whom he would need to ask directly.

14.     Before Sam met Meyer Lebovits, he received another payoff offer from Moshe Friedman, a first cousin through marriage of Baruch Lebovits. For decades, Friedman was the right hand man of Rabbi Moshe Teitelbaum, the leader of the Satmar community until his death in 2006. Friedman was someone of huge power and influence, both inside and outside of his community. In 2009, a profile of him described "many senators and politicians flocking to his door throughout the year, especially before elections." He was also the editor of the main Satmar newspaper, Der Yid. Friedman contacted Sam to offer him a job selling advertising for Der Yid, which Sam accepted; he began making calls on the paper's behalf. Friedman demanded that Sam drop his son's case against Baruch Lebovits, and told him that the family was willing to offer $250,000. Sam refused the offer, and the job abruptly ended.

15.     Throughout this time, Sam kept Detective Litwin apprised of the various attempts to buy him off. He also met with prosecutors Rhonnie Jaus and Miss Gregory – Chief and First Deputy Chief of the Sex Crimes Bureau, respectively – and Christopher Laline, and informed them about what was taking place.

### Tape recorded meeting

16.     In May 2009, Sam met with Meyer Lebovits concerning the Beit Din bill from Makevetzky. Meyer secretly recorded the meeting (and later provided the recording to HYNES). At the outset, he insisted to Sam that had he approached him instead of reporting the matter to the police, "[t]he problem would have been taken care of," and "[w]e would have handled the [problem], we would have done everything." Meyer continued: "If somebody did what was done to your child, I would have wanted to kill him." Nonetheless, he stressed, Sam

was wrong to report the matter to the police: "Why didn't you call me, "Meyer, I heard your father is going to be in trouble. We should have seen what could have been done."" According to Meyer, Sam violated the command of the Torah by not warning him about his father in advance of the police report, and stated indignantly: "There is no justification for that. In this crime I don't forgive anything. Nothing. Am I some bum? Should such things be done?"

17.    Sam told Meyer he had asked for his father to be told "to leave my child alone," meaning that Baruch Lebovits should not force him to testify; his son "[had gone] through enough." Later, Sam spoke about being pressured and threatened to attend the rabbinical court proceedings presided over by Rabbi Makevetzky. Meyer was initially evasive about these proceedings: "I wasn't told anything. It's not coming from me." However, when Sam reminded him that he was directly involved – "[j]ust a minute. I spoke with you on the phone. You called me on the phone … [Makevetzky] told me, "I'm transferring you to Meyer" – Meyer admitted he was there: "I remember I was talking from Makevetsky's." Sam described Makevetzky as follows: "Here is Rabbi Makevetsky who's been chasing me so long, telling me I should drop the case…" Meyer Lebovits took a very different view: "He is a good man, Makevetsky."

18.    Later in the conversation, Sam stated the origin of the issue between them: "After all, my child was hurt"; "True," Meyer responded. Meyer said that he "thought we'll settle it, we'll settle the matter…." Sam expressed his objection to the threats he was receiving to force him into dropping his son's case, by analogy with a person who breaks into the home of another, and then, after being arrested, threatens the person whose home he broke into that "if you don't back off, I'll fix you." Meyer pleaded ignorance of the threats – "Who wants to fix you?" – but then justified his actions: "I must defend myself."

19.     Sam pointed out that had Baruch Lebovits pleaded guilty in the case of his son, he would not have faced time in jail.  Meyer responded: "He wanted to plead guilty." However, it is then clarified that Baruch Lebovits wanted to plead guilty in both Sam's son case and the case of MT, but only if he was given an overall non-jail disposition; Meyer concluded: "They didn't give him what he wanted."  At the end of the conversation Meyer reiterated that he couldn't forgive Sam, though "not because you put [Baruch Lebovits] in jail," asking instead: "Why didn't you come to us?"

### Betrayal of MT

20.     By November 2009, MT's case had been severed from that of YR.  In an affidavit submitted by the lead prosecutor, ADA Gregory, she stated that she spoke to MT on November 4, 2009, informed him that his case was scheduled to begin on December 3, 2009, and was told by MT in return that he would be ready to testify against Baruch Lebovits.  Later that month, she received a call from an attorney named John Lonuzzi, informing her that MT was no longer cooperating with the prosecution, because, Lonuzzi claimed, the case was causing MT "severe stress" and "he was suffering from a variety of psychological issues."  Lonuzzi also claimed that MT would plead the Fifth Amendment privilege against self-incrimination if called to testify, because parts of his "grand jury testimony "might" have been embellished."  ADA Gregory arranged multiple appointments to meet with MT and Lonuzzi; all of them were cancelled by Lonuzzi.  On March 3, 2010, counsel for Baruch Lebovits, Arthur Aidala, represented in court that he had been contacted by Lonuzzi and told that Lonuzzi had been retained by MT's family, who heard that Lebovits was willing to plead guilty to abusing MT (but only if he didn't go to jail), and that the family was no longer willing for MT to continue his

7

cooperation with the prosecution. In response, ADA Gregory told the court that Lonuzzi had told her no such thing.

21.     Already, the orchestrated tampering with MT was being openly conducted in front of HYNES by Lonuzzi and Aidala (the then current and future presidents of the Brooklyn Bar Association; Aidala was also HYNES' former campaign manager and registered agent of the "Charles J. Hynes Association"). Yet, there was more. According to an affidavit from Detective Litwin, he too was contacted by Lonuzzi in November 2009 and instructed to have no further contact with MT. Subsequently, however, he was contacted by MT. MT told him that he had not retained Lonuzzi, that some unknown person had retained him (later reported to be Zalmen Ashkenazi, a felon convicted of bank fraud, and associate of the Lebovits family), and that his family could not know he contacted Detective Litwin, with whom his father did not want him to speak (it was later revealed that MT's father received a substantial pay-off). Detective Litwin arranged to meet MT the following day, and MT reiterated that he had not retained Lonuzzi, "had been pressured and was afraid to say what had happened," and "had been told not to talk to [Detective Litwin] or to go to the District Attorney's office."

22.     Faced with such clear evidence of witness tampering and intimidation of a victim, raped by a serial pedophile for years as a child, an uncompromising response might have been expected. ADA Gregory attempted unsuccessfully to subpoena the testimony of MT, and brought her concerns of witness tampering and intimidation to HYNES' Chief Assistant, Amy Feinstein; she was told by Feinstein that HYNES was unwilling to do anything about it. HYNES' deliberate indifference towards MT's plight and failure to protect him was part of a policy, custom and practice of deliberate indifference towards witness tampering and intimidation of victims of pedophiles and their families within the ultra-Orthodox community.

### Lebovits trial

23.    The Lebovits family and their associates were unable, though, to stop YR from testifying against Baruch Lebovits.  In March 2010, because of that testimony, Lebovits was convicted; he was sentenced the following month to a term of $10\,{}^2/_3 - 32$ years in prison. Counsel for Lebovits argued that YR had fabricated the allegations as part of an extortion plot. The truth was obvious to the jury, which needed only a few hours to reach its verdict.

24.    During the trial, the jury heard of efforts by the sole defense witness, Berel Ashkenazi (brother of Zalmen, who paid for Lonuzzi to "represent" MT) to pay off YR – a former pupil of his – and stop his testimony.  Contemporaneous notes from Detective Litwin detailed these efforts, as well as Sam's counter-efforts to assure YR – who suffered from a serious drug addiction and was in dire financial straits – that he would receive support and compensation without having "to sign anything" – i.e. without agreeing to drop the case.  YR later reported being similarly advised, by ADA Gregory, that he was entitled to pursue a civil case separate from the criminal one.  When Berel Ashkenazi took the stand, he was confronted with a rabbinical court ruling, also delivered by Rabbi Makevetzky, that forbade YR from reporting Ashkenazi's attempts to bribe him and stop him from testifying, while allowing Ashkenazi to "help" YR if he removed "himself altogether from the courts of the goyim." Ashkenazi had no answer to what was more blatant evidence of witness tampering and attempted bribery.  Regardless, HYNES continued to stand idly by.

25.    Following the conviction, Baruch Lebovits and his supporters began an intensive campaign to overturn it by any means possible.  In the serial child rapist's hour of need, they found that HYNES was willing to take a leading role in their criminal conspiracy to pervert the course of justice.  HYNES had long cultivated Sam's community and harvested their votes.

In return, he pursued a policy, custom and practice of granting undue access and influence to community leaders and other powerful and wealthy interests within the community. He also provided a special, preferential system of "justice" for pedophiles within the community. As defendants, their names were sheltered from public disclosure, they routinely received sweetheart deals with little or no imprisonment, and their victims (and the families of their victims) were left unprotected. The sentence received by Baruch Lebovits threatened HYNES' squalid arrangement. On April 14, 2010, two days after the sentence was imposed, Moshe Friedman visited the Brooklyn District Attorney's office and demanded action.

### Simon Taub

26.     An immediate opportunity presented itself to HYNES and his co-conspirators in the form of Simon Taub, a prominent member of Sam's community whom he had asked for assistance in the past with regard to the harassment and intimidation faced by him and his family. Later, Sam told him that one of Taub's sons had reported being molested by Meyer Lebovits. Instead of going to the police, however, as Sam had done, Taub used the information to demand money. In a recorded phone call on April 23, 2010, Taub told Meyer that he was willing to treat him as a person who "made a mistake and would like to straighten it out." He asked for "doctor's fees" for his son, while Meyer pressed him to accept $400,000. In another recorded conversation later that day, Meyer stated to Taub: "I never touched your son." Taub responded that he was "not getting into this point now." Meyer persisted, asking: "You don't care whether it's true or not?" Taub responded: "Listen, I don't care at all. I know everything. I know more than you think. Let me tell you one thing, I know a lot more than you think. Right now, I don't want to go into…" Lebovits pressed again: "I'm telling you clearly, I never touched your children." Taub responded: "In that case good bye." However, Meyer demurred when

given the opportunity to follow through on his claim of innocence: "Let's talk. You won't let me speak for a minute." He again pressed the figure of $400,000, but Taub insisted: "I never told you $400,000." Meyer conceded the point: "All right. Who did say? What's the difference?" (The difference is that Meyer was trying desperately to concoct a claim that Sam demanded the same $400,000 for his son through Taub.)

27.     Later in the conversation, Meyer returned to the topic of whether or not he abused Taub's son and Taub again responded: "I don't want to get into it. If you want to do it, you'll have to go and explain yourself before the DA, not before me." He complained about the publication of the molestation allegations by Sam and Rabbi Nuchem Rosenberg, a prominent community activist against the sexual abuse of children who maintained a "hotline" providing information on topics of concern to the community. Taub assured Meyer that he would take care of Sam and Rabbi Rosenberg. In fact, when Sam learned of Taub's plan, he reported it to Detective Litwin and to Rabbi Rosenberg, who broadcast on his hotline that Taub was attempting to extort money from Meyer, and that both would be arrested. The effort to deter Taub was successful. On April 27, 2010, Taub contacted Meyer Lebovits and told him that he was no longer pursuing him for money.

28.     Nonetheless, the conspirators saw an opportunity. On April 27, 2010, Aidala met with ADA Michael Vecchione, Rackets Bureau Chief, and Detective Investigator Stephanie Green-Jones, on the 17th floor of the Brooklyn District Attorney's office. Detective Investigator Green-Jones noted the meeting and the presence of Aidala and Vecchione. Omitted from her note, but not by that day's visitor log, was another attendee on the 17th floor: Moshe Friedman. A further meeting was arranged in Aidala's office that night at 9 p.m. with Detective Investigator Green-Jones, Assistant Chief Investigator George Terra, and Chaim Lebovits,

another son of Baruch Lebovits. Chaim had taken the place of Meyer (whose alleged abuse of

Taub's son was conveniently ignored). According to Detective Investigator Green-Jones, Chaim

"requested that we assist him in trying to bring justice for his family." It was a remarkably

brazen request (and a remarkably asinine note), considering that little more than a month has

passed since Baruch Lebovits had been convicted of raping a child.

29. Even more remarkable, within 45 minutes of the meeting having begun,

the effort by HYNES to assist the Lebovits family and the convicted child rapist was underway,

with a direction that Chaim re-instigate contact with Simon Taub. On June 4, 2010, a lengthy

meeting ensued between Chaim and Taub, recorded by Detective Investigator Green-Jones ("I'm

with Stephanie," Chaim breezily told someone who called him as the recording began). Chaim

complained that Rabbi Rosenberg sat behind him during a recent court appearance and kept

loudly announcing to Sam that Taub was planning to "take money, $250,000 from Chaim

Lebovits. The nut who's sitting here in front of me." Chaim begged Taub to involve Sam in

their transaction: "[W]hy can't you try…At least try to bring him, just try." But Taub responded:

"He won't come." Chaim returned to what Rabbi Rosenberg was saying to him in court: "Simon

[Taub] can open up bank accounts, receive a quarter million dollars. I just stick with Kellner.

Kellner isn't here. Kellner is not going to come." Nonetheless, Chaim insisted to Taub: "I want

to be able to sit down with him…. Try to call him now." Taub said no. Chaim continued: "Try.

You can try him one more time. Tell him that my mother requested." The answer remained no.

After discussing the first payment to Taub, Chaim tried a different approach: "After the first

payment though, there will be no second payment if you don't bring Kellner." Only then did

Taub agree, but stated that he didn't want Kellner to be present for the exchange of money: "No,

no. I don't want to do it this way, for him to see that." Chaim responded that Sam "doesn't have

to see it" and suggested that "he'll come half an hour later," concluding: "You don't have to tell him. He doesn't have to be told anything." Chaim was puzzled by Sam's approach to the prosecution of his father and his refusal to accept a settlement: "Okay, we lost. But he didn't win anything either. What does he have now? … What did he gain from it?"

30.     The conversation next turned to MT, who by then had been forced to end his cooperation with the prosecution of Baruch Lebovits but whose case had not yet formally ended. He "is a good boy," Chaim remarked. After discussing whether the case against his father would be dismissed if MT didn't appear on the next court date, Chaim confidently stated: "He's not coming even with the subpoena." He then praised Lonuzzi: "He has a good lawyer, thank God."

31.     On June 18, 2010, Chaim called Taub and asked him repeatedly whether he was "bringing [Kellner] to the meeting." Taub equivocated: "I told him yesterday. I don't know myself what's going on." On June 29, 2010, Taub came up with an excuse, telling Chaim that Sam would not be there for the first meeting because "he's afraid, he tells me he's shaking with fear," but that he would be present at a second meeting if "the first time goes well." Taub assured Chaim that he "surely can't lose … [b]ecause if he doesn't come the second time, you're released the first time." (In other words, Taub could be paid the first time with only an empty promise that Sam would come the next time, and, when he didn't, no further payment by Chaim would be required.) The meeting ultimately occurred on July 7, 2010, around 4 p.m. Sam was not present. Taub claimed again that he was afraid to come to the meeting and claimed to call him, telling him to come to his home at 8 p.m. It was unclear if Taub in fact called Sam, in that the conversation was a few seconds in length, and one-sided, but whoever answered the phone was certainly not expecting a call from Taub, who stated: "[D]on't you recognize my voice, are

you crazy?"  Shortly afterwards, Taub was arrested.  By 5.20 p.m., he was sitting in a conference

room on the 17th floor of the Brooklyn District Attorney's office, without an attorney, facing the

following cast, including some of the most senior of HYNES' cronies: Rackets Bureau Chief

Vecchione, Deputy District Attorney Joseph Petrosino, Assistant Chief Investigator Terra,

Deputy Chief Investigator Gregory DeBoer, Assistant Deputy Chief Investigator Anthony

Nelson, Detective Investigator Green-Jones, and ADA Nicholas Batsidis (who, though assigned

to prosecute Taub and later Sam, was not part of the conspiracy).  The level of commitment to

securing the freedom of a convicted pedophile was breathtaking in its dark corruption.  Taub was

told that if he implicated Sam, he would be home within an hour.  Unable to implicate Sam, he

was prosecuted instead.  He ultimately pleaded guilty to attempted extortion.

### Sam is framed, and Lebovits is released from prison

      32.    In June 2010, as the effort with Taub floundered, the conspirators

manufactured an affidavit from a person named Sholem Weisner, yet another convicted felon,

claiming to be a friend of YR.  According to Weisner, YR told him that he had been paid off by

Sam, that he was making it "big time" financially, and that he had perjured himself at the

Lebovits trial.  Next, an affidavit appeared from Moshe Friedman and, on July 22, 2010, yet

another one materialized from MT – faxed to the Brooklyn District Attorney's office by counsel

for Lebovits – in which MT stated that he had been "brainwashed" by Sam and paid $10,000 by

him to fabricate his allegations (even though he was known to have made his allegations before

he ever met Sam).  On July 30, 2010, Moshe Friedman paid another visit to the office.

      33.    On August 4, 2010, HYNES dismissed MT's case against Lebovits, and,

in September 2010, counseled by Lonuzzi, MT was interviewed by ADA Batsidis.  ADA

Batsidis did not ask why MT had not previously made these claims when, with Lonuzzi's

counsel, he stopped cooperating less than a year earlier.  Nor did he raise the subsequent interactions of MT and Lonuzzi with ADA Gregory and Detective Litwin.  Nor did he question why Baruch Lebovits had offered repeatedly to plead guilty with respect to heinous sexual offenses against a child of which he was now supposedly innocent.  The reason for the absence of these obvious inquiries is that HYNES had purposely excluded the Sex Crimes Bureau and Detective Litwin from the "investigation" into Sam.

34.     In October 2010, HYNES also surreptitiously dismissed the case of Sam's son, without telling him or his father, against Lebovits.  The suffering and courage of a victim in coming forward to report his abuse meant nothing to HYNES.  Sam and his son's misfortune was that they sought justice and placed their trust in a District Attorney that regarded the children of their community as children of a lesser God, when it came to justice for victims of pedophiles.

35.     While MT was helpful to the cause, the main prize for HYNES and his co-conspirators was YR.  In December 2010, he was interviewed as part of the "investigation" into Sam, and stated unequivocally that he did not lie and was not paid for his testimony.  Weisner was encouraged by HYNES to continue in his efforts to make him crack.  According to Meyer Lebovits, HYNES personally counseled his family on what "evidence" to obtain, and a trip was planned to Florida, on which YR would be lured with the pretense of making a movie about his life.  While the Sex Crimes and Appeals Bureaus were supposed to uphold the conviction (an appeal having been initiated by Lebovits) of a convicted pedophile, HYNES was simultaneously coordinating with the same pedophile in order to get his victim to recant; a grotesque, unbelievable, bizarre and surely unprecedented role for a District Attorney.          .

36.     YR agreed to go to Florida, and, after being first plied with drugs, gave a number of video-recorded interviews.  In the interviews, Weisner tried repeatedly, but in vain, to

make him implicate Sam. It is very obvious from the recordings that Weisner is speaking to him for the first time about Sam; in particular, there is no reference to the statements that Weisner claimed in his affidavit YR had previously made to him, about being paid off by Sam, making it "big time" financially, or lying at trial.

37.     YR, oblivious to the malign forces plotting against him, simply told the truth throughout the interviews. When he is asked why MT "g[o]t out" of the Lebovits case, he replied that "[t]hey scared him, they scared him," that the "Lebovitses" "did this." He continued: "They, they terrorized him. You have no idea what they did to him." More specifically, "they came to tell him that, "[i]f you're coming to court to testify against my father you're going to be arrested for the cases in which you molested two children." YR also stated that "they" paid for [MT]'s lawyer – Lonuzzi – and promised him money.

38.     When asked whether Sam ever tried to "shut him up," or offer him money to drop the case, YR responded, "No … [Sam] always told me, [YR], go to court, you're going to tell the truth, tell the truth." Sam, he said, "let me go the truthful way. I proceeded truthfully and honestly." He also recounted Baruch Lebovits attempting "to manipulate [his] father," along with numerous attempts to pay him off, including a payment of $50,000 in "forgiveness" money, and his initial reaction: "Wow, I don't know, $50,000, and I don't have a penny to my name." He didn't accept it, nor would he accept any amount: "My blood is not for sale … my blood has no price."

39.     The attempt to turn YR inside out had failed, but the Lebovits family persisted nonetheless. They claimed to ADA Batsidis that YR had implicated Sam in Florida but refused to disclose the recordings. Appellate counsel for Lebovits, Alan Dershowitz, demanded to be allowed testify before the Grand Jury about their contents. This demand was too farfetched

for even Vecchione and the Rackets Bureau ("What law school did Dershowitz go to?" someone remarked with grim irony). Yet, HYNES pushed forward; the patience of the Lebovits family and their powerful supporters was spent, and the need to secure the release of the convicted pedophile couldn't wait any longer. According to Avraham Lehrer a.k.a. Joe Levin, who is presently cooperating with federal law enforcement authorities, a substantial payment by the Lebovits family was made to ensure Sam's prosecution. The effort to crack YR would continue after Sam was indicted.

### Grand Jury presentation

40.     The case against Sam before the Grand Jury had three witnesses: MT, Meyer Lebovits, and Moshe Friedman (ADA Gregory also provided background information about the cases against Baruch Lebovits). Each one of these three witnesses committed perjury.

41.     Under Indictment No. 2538/11, Sam was charged with one count of Conspiracy in the Fourth Degree (Count 1); five counts of Attempted Grand Larceny in the Second Degree by Extortion (Counts 2 to 6); two counts of Perjury in the First Degree (Counts 7-8), and two companion counts of Criminal Solicitation in the Fourth Degree (Counts 9-10).

42.     The Indictment alleged that, between March 2008 and March 2010, Sam made repeated monetary demands – through five unindicted co-conspirators, including Simon Taub – to Meyer Lebovits, in exchange for which he would (1) cause the dismissal of the pending charges against Baruch Lebovits, through his "ability to control the cooperation and content of the testimony of [MT, YR, and his son]"; (2) direct an additional alleged victim of Baruch Lebovits not to make a complaint; and (3) cause the publication of Lebovits' alleged abuse of children within the community to cease.

43.     The overt acts alleged to have occurred in furtherance of the charged conspiracy consisted of five extortionate demands made to Meyer Lebovits, on Sam's behalf, one by each of the five unindicted co-conspirators (Overt Acts 1-5), solicitation by Sam of Moshe Friedman to act as a further emissary for his alleged extortion (Overt Act 6), payments by Sam to MT to secure his false testimony in the two separate Grand Jury proceedings against Baruch Lebovits (Overt Acts 7-8), and the re-iteration of the earlier extortionate demands made by his co-conspirators in the May 2009 (recorded) conversation between Sam and Meyer Lebovits (Overt Act 9).  Counts 2 to 6 of the Indictment arose from Overt Acts 1-5, and Counts 7 to 10 arose from Overt Acts 7 and 8.

44.     On April 12, 2011, Sam was arrested and imprisoned.  Bail was set at $25,000 and his passport was confiscated.  A news conference convened personally by HYNES followed, and Sam and his son were denounced in front of the media.  According to HYNES, "child abuse has to be prosecuted vigorously, but we also have to be very, very careful about false complaints."  The next day, as a result, Lebovits was released on $250,000 bail pending the appeal of his conviction and placed under house arrest.

45.     On April 25, 2012, Lebovits' conviction was overturned (because of the prosecution's untimely disclosure of certain incriminating material concerning Berel Ashkenazi), meaning that YR would be required to testify at a retrial.  HYNES though was determined to make the case go away.

### The case against Sam falls apart

46.     Surprisingly, events took a different turn within the Rackets Bureau.  As a result of information he received in March 2012 from YR, ADA Batsidis interviewed a woman named Natalie, described as MT's best friend, who told him that MT fled to Israel "out of fear".

She also "recalled the conversation she and [MT] had prior to the [Lebovits] trial when he told her that [Lebovits's] oldest daughter called [MT] and told him that if he testifies against her father, he [MT] would immediately be arrested for molestation." According to Natalie, Lebovits's "daughter said they would bring in the two little boys [MT] molested as witnesses against him."

47.     In September 2012, ADA Batsidis obtained travel and bank records that showed MT did in fact go to Israel and that his flights were being paid for by Zalmen Ashkenazi – the same person who paid for Lonuzzi to end MT's cooperation and the brother of Berel Ashkenazi, the sole defense witness at the Lebovits trial who tried to pay YR off (and faced no sanction for doing so). Records of monthly payments by Ashkenazi to MT's father were also obtained.

48.     The Lebovits family reacted furiously, demanding that ADA Batsidis be removed from the case. Vecchione tried to replace him with ADA Joseph Alexis, but ADA Alexis only agreed to be assigned on condition that ADA Batsidis remain. Later, a prosecutor from the Sex Crimes Bureau tried to investigate Sholem Weisner, prompting a call from Aidala to Vecchione, and a confrontation with the prosecutor.

49.     In May 2013, a recording surfaced of conversations with MT made by an acquaintance. On the tape, MT stated that he first disclosed his abuse by Baruch Lebovits to people within his community around the time he was 16 or 17, several years before he ever met Sam. He also revealed that Zalmen Ashkenazi "got him out" of testifying against Lebovits, hired Lonuzzi, and "made him" go against Sam. On June 26 and July 1, 2013, respectively, MT was re-interviewed by the Brooklyn District Attorney's office. In the interviews, MT, though he would not name those threatening him, disclosed that he fled to Israel for fear of possible child

molestation charges. He initially denied knowing Zalmen Ashkenazi, before claiming he barely

knew him, and then admitting that he has known him and his family, including Berel Ashkenazi,

since childhood. Moreover, he stated that "Zalmen Ashkenazi has supplied funds for [MT]'s

attorney, his airfare to and from Israel, his apartment in Israel, and his school fees," and that he

"needs Zalmen Ashkenazi's permission to return to the US when he's in Israel." He no longer

claimed that Sam had paid him $10,000, claiming now that he had either not paid him an agreed-

upon fee or not fulfilled a promise to finance his wedding. Bizarrely, he stated that he "had

never seen Baruch Lebovits in his life," that Lebovits "could have molested me. [I] can't really

say," and that he told others that Lebovits "really molested him."

### Vindication for Sam, and the end of Hynes

50.     None of these supposed newfound "revelations" in Sam's case mattered to

HYNES. On July 24, 2013, he appeared as a guest on the radio show of Zev Brenner, and said

the following to Sam's community: "I believe there was a substantial effort by Mr. Kellner to

gain money by making up stories. I think we have a substantial case." He further claimed that

Sam's case was wholly unconnected with Lebovits' case, and that both would soon go to trial.

Indeed, he maintained that a trial would begin in the Lebovits case in the second week of

September 2013.

51.     Behind the scenes, however, he was coordinating a pay-off by the

Lebovits family to YR through another lawyer, Michael S. Ross, Esq. Ross was a former

Brooklyn prosecutor with close ties to HYNES, and an area of expertise – unethical conduct by

lawyers – ideal for disguising, as a civil settlement, a pay-off from a pedophile trying to tamper

with his victim in an ongoing prosecution. By the time the agreement was finalized, HYNES

was in the midst of a difficult re-election campaign. Der Yid, published by his co-conspirator,

Moshe Friedman, ran a full-page notice extolling the fact that community leaders had an "open door with Charles Hynes for the past 20 years" and "know firsthand what happens … when they got themselves entangled with the law, how district attorney Hynes worked very sensitively and mercifully to avoid sending them to jail." On the other hand, Jews who supported his opponent, Ken Thompson, were "informers and accusers from the dregs of the Jewish community," who intended to "toss Jews in jail whenever it's possible!"

52.     In August 2013, after Sam made a motion to dismiss the charges against him related to MT, ADAs Batsidis and Alexis refused to defend them. HYNES lost the Democratic primary in September 2013 and the general election in November 2013. He tried desperately to secure his sweetheart deal with Lebovits, and told the Lebovits family that they should obtain a letter from YR stating that he was in poor health. Having been bought, HYNES was staying bought. However, Thompson wrote to the judge asking that no disposition in the case be agreed, and no further steps be taken, until after he assumed office. In May 2014, Baruch Lebovits pled guilty to abusing YR, in exchange for another year in prison. An error by the sentencing judge meant that he was freed 86 days later.

53.     On March 7, 2014, following a review of Sam's case, it was dismissed in its entirety. ADA Kevin O'Donnell described the Grand Jury testimony by Meyer Lebovits as a "complete fabrication" and noted the witness tampering and intimidation of MT.

54.     Justice, however, still awaits Sam and his son.

## FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983 – MALICIOUS PROSECUTION)

55.     Plaintiff repeats and re-alleges paragraphs 1 through 54 of this Complaint as if fully set forth herein.

56.     Defendant HYNES, acting under color of state law, initiated a criminal proceeding against Plaintiff, the proceeding terminated in Plaintiff's favor, probable cause did not exist for commencing the proceeding, and HYNES' actions were motivated by actual malice. As a result, HYNES violated Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments.

57.     HYNES directed, aided and abetted, and conspired with others in the deprivation of Plaintiff's constitutional rights.  The "investigation" by HYNES into Plaintiff deviated so egregiously from acceptable law enforcement activity as to demonstrate an intentional or reckless disregard for proper procedures.  HYNES agreed with others to act in concert in depriving Plaintiff of his constitutional rights, and committed overt acts in furtherance of that goal, causing damage to Plaintiff.  The indictment against Plaintiff was obtained through fraud, perjury, misrepresentation, falsification and suppression of evidence, and other conduct undertaken in bad faith, by HYNES and his co-conspirators.  HYNES's motivation in initiating and pursuing the investigation and prosecution of Plaintiff was wrong and improper; it was not a desire to see the ends of justice served.  Indeed, the current Brooklyn District Attorney, Eric Gonzalez, stated that "the decision had been made to prosecute [Sam], and they were going to go forward with that prosecution whether it was the right thing or the wrong thing to do."

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 – MUNICIPAL LIABILITY)

58.     Plaintiff repeats and re-alleges paragraphs 1 through 57 of this Complaint as if fully set forth herein.

59.     The violations of Plaintiff's constitutional rights resulted from policies, customs or practices of Defendant THE CITY OF NEW YORK.  They resulted from policies, customs or practices in the management and administration of the Brooklyn District Attorney's office under HYNES, including with respect to the investigative activity pursued and procedures followed in the case of Plaintiff, in its deliberate indifference to witness tampering and intimidation, and in the opportunity it afforded to a convicted pedophile to undermine his conviction, respectively.  In this regard, HYNES possessed final policy-making authority.

60.     Accordingly, Defendant THE CITY OF NEW YORK is also liable for the violation of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

(a)     Damages in an amount to be determined at trial;

(b)     Punitive damages in an amount to be determined at trial;

(c)     Interest, costs, disbursements, and attorneys' fees; and

(d)     Such other relief as to this Court may be just and proper.

Dated: New York, New York
      March 6, 2017

LAW OFFICE OF NIALL MACGIOLLABHUÍ

By:    NIALL MACGIOLLABHUÍ, ESQ.

    260 Madison Avenue, 21st Floor
    New York, NY 10016
    (347) 809-0092

Attorneys for Plaintiff