**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SAMUEL KELLNER,

Plaintiff,

-against-

THE CITY OF NEW YORK and CHARLES J. HYNES, in his individual capacity,

Defendants.

Civil Action No. 17 CV 1268 (MKB) (SJB)

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

NIALL MACGIOLLABHUÍ, ESQ.
LAW OFFICE OF
NIALL MACGIOLLABHUÍ
Attorneys for the Plaintiff
260 Madison Avenue, 21st Floor
New York, NY 10016
(212) 455-0328

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS

A. Baruch Lebovits' crimes ........ 3

B. The Hynes conspiracy ........ 4

C. The prosecution of Sam Kellner ........ 7

STANDARD OF REVIEW ........ 8

ARGUMENT

A. Plaintiff has stated a § 1983 conspiracy claim ........ 9

B. Plaintiff has stated a § 1983 claim of malicious prosecution ........ 12

C. Hynes is not entitled to either absolute or qualified immunity ........ 14

D. The City of New York is liable under *Monell* for Hynes' actions ........ 17

CONCLUSION ........ 19

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. Kress & Co.*,
398 U.S. 144 (1970) .......... 9

*Amnesty Am. v. Town of W. Hartford*,
361 F.3d 113 (2d Cir. 2004) .......... 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 8, 9

*Baez v. Hennessy*,
853 F.2d 73 (2d Cir. 1988) .......... 17, 18

*Barr v. Abrams*,
810 F.2d 358 (2d Cir. 1987) .......... 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 8

*Bernard v. Cty. of Suffolk*,
356 F.3d 495 (2d Cir. 2004) .......... 16

*Bonide Prod., Inc. v. Cahill*,
223 F.3d 141 (2d Cir. 2000) .......... 16

*Boyd v. City of New York*,
336 F.3d 72 (2d Cir. 2003) .......... 13, 14

*Buckley v. Fitzsimmons*,
509 U.S. 259 (1993) .......... 15

*Carbajal v. Cnty. of Nassau*,
271 F.Supp.2d 415 (E.D.N.Y. 2003) .......... 15

*Chimurenga v. City of New York*,
45 F.Supp.2d 337 (S.D.N.Y. 1999) .......... 13

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988) .......... 17

*Colon v. City of New York*,
60 N.Y.2d 78 (N.Y. 1983) .......... 13

*Conte v. Cty. of Nassau*,
No. 06-CV-4746 (JFB) (ETB), 2010 WL 3924677 (E.D.N.Y. Sept. 30, 2010) ................ 18

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991) ........................................................................................ 9

*Dwares v. City of New York*,
985 F.2d 94 (2d Cir. 1993) ........................................................................................ 9

*Fries v. Barnes*,
618 F.2d 988 (2d Cir. 1980) ...................................................................................... 9

*Hill v. City of New York*,
45 F.3d 653 (2d Cir. 1995) ...................................................................................... 15

*Imbler v. Pachtman*,
424 U.S. 409 (1976) ................................................................................................ 15

*In re AJ Contracting Co., Inc.*,
300 B.R. 182 (Bankr. S.D.N.Y. 2003) ..................................................................... 18

*Jenkins v. City of New York*,
No. 98-CV-7170 (JGK)(DFE), 1999 WL 782509 (S.D.N.Y. Sept. 30, 1999)
*aff'd*, 216 F.3d 1072 (2d Cir. 2000) ........................................................................ 13

*Lowth v. Town of Cheektowaga*,
82 F.3d 563 (2d Cir. 1996) ...................................................................................... 14

*Mandell v. County of Suffolk*
316 F.3d 368 (2d Cir. 2003) .................................................................................... 16

*Manganiello v. City of New York*,
612 F.3d 149 (2d Cir. 2010) .................................................................................... 12

*McIntyre v. United States*,
336 F. Supp. 2d 87 (D. Mass. 2004) ........................................................................ 10

*Moore v. Andreno*,
505 F.3d 203 (2d Cir. 2007) .................................................................................... 16

*Murphy v. Lynn*,
118 F.3d 938 (2d Cir. 1997) .................................................................................... 12

*Myers v. Cty. of Orange*,
157 F.3d 66 (2d Cir. 1998) ...................................................................................... 18

*Pangburn v. Culbertson*,
200 F.3d 65 (2d Cir. 1999) .......... 9

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986) .......... 17

*Pinsky v. Duncan*,
79 F.3d 306 (2d Cir. 1996) .......... 14

*Ricciuti v. N.Y. City Transit Auth.*,
124 F.3d 123 (2d Cir. 1997) .......... 16

*Rivers v. Towers, Perrin, Forster & Crosby Inc.*,
No. 07-CV-5441 (DGT) (RML), 2009 WL 817852 (E.D.N.Y. Mar. 27, 2009) .......... 12

*Roe v. City of Waterbury*,
542 F.3d 31 (2d Cir. 2008) .......... 17

*Singer v. Fulton Cty. Sheriff*,
63 F.3d 110 (2d Cir. 1995) .......... 9

*Torres v. Jones*,
26 N.Y.3d 742 (N.Y. 2016) .......... 12

*Zahrey v. Coffey*,
221 F.3d 342 (2d Cir. 2000) .......... 15, 16, 17

**Statutes**

42 U.S.C. § 1983 .......... *passim*

**Rules**

Federal Rule of Civil Procedure 12(b)(6) .......... *passim*

This Memorandum of Law is submitted in opposition to Defendants' motion to dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

As set forth in the introduction to Plaintiff's original complaint, this action arises from a conspiracy to pervert the course of justice for victims of a notorious, decades-long pedophile in Brooklyn's ultra-Orthodox community, the cornerstone of which was the malicious prosecution of Plaintiff. The events set forth in the complaint undoubtedly presented a tangled, complicated tale. Accordingly, Plaintiff amended the complaint – not to add to it,[1] but rather to distill the factual basis of his claim against former Brooklyn District Attorney Charles J. Hynes ("Hynes"), which is that he is liable as a key member of the conspiracy, and indeed, the *sine qua non* for its success.

As an alleged conspirator, Hynes shares responsibility for the acts of his co-conspirators; in particular, he is equally responsible for the false evidence that was manufactured and supplied to the Brooklyn District Attorney's office during the period from April to July 2010, which later resulted in Plaintiff's indictment in April 2011. The conspiracy itself has been sufficiently stated for purposes of the present motion, as has its goal, which was the malicious prosecution of Plaintiff. Furthermore, because the evidence at issue was fabricated during the "investigative" phase of the criminal process, Hynes is not entitled to absolute immunity. Nor is he entitled to qualified immunity, because the right to be free from malicious prosecution is a clearly established right, as is the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigative capacity.

[1] Defendants incorrectly maintain that Plaintiff amended his original complaint "to add the allegations of a purported conspiracy," and then express puzzlement at the absence of a distinct conspiracy claim. There is no distinct claim, because the sole claim remains one of a § 1983 conspiracy. *See* Defendants' Memorandum of Law, pp. 5, 13.

The claim against the City of New York ("City") is that it is responsible under *Monell* for Hynes' actions with regard to Plaintiff, as a decision maker possessing final authority to establish municipal policy in respect of these actions. For the same reason that Hynes is not entitled to absolute immunity – i.e., the offending conduct occurred during the investigative phase of the proceeding – he is considered a policymaker for the City, not the State, and thus the City is responsible for his actions.

Finally, it is readily acknowledged that the allegations made against Hynes are serious and shocking. They open up an appalling vista into his administration while Brooklyn District Attorney, the extent to which he was beholden to political interests, and his wholly scandalous undermining of his own office's prosecution of a serial rapist of children. Yet, the allegations in the Amended Complaint are highly detailed, and sourced almost entirely from documents produced during the prosecution of Plaintiff and from extensive investigative reporting by The New York Times, The Jewish Week, and The New Yorker into Plaintiff's case. Ultimately, the only defense available to Hynes (and, by extension, the City) will not be found in the underlying facts, but rather will rest upon claims of purpose and motivation. In other words, the close collaboration of Hynes and the Lebovits family over the course of the events described in the Amended Complaint is beyond contention; towards what end is the only issue that can be disputed (plausibly or otherwise). This is not an issue that can be resolved by a motion to dismiss. On the other hand, the immunity issues raised by Defendants – absolute and qualified in respect of Hynes, and sovereign in respect of the City (on the basis that Hynes was a State of New York actor) – can and should be resolved, in Plaintiff's favor.

## STATEMENT OF FACTS

### A. Baruch Lebovits' crimes

In 2008, Plaintiff's son was sexually molested by Baruch Lebovits. *See* Amended Complaint (Dkt. 14), at ¶ 8. For decades, Lebovits had serially preyed upon children in Plaintiff's community. *Id.* Two other victims of Lebovits – "MT" and "YR" – subsequently reported their abuse to the Brooklyn District Attorney's office, with Plaintiff's support and encouragement. *Id.* at ¶¶ 10-11. In September 2008, under the supervision of NYPD Detective Steve Litwin, YR recorded a conversation with Lebovits – which was then provided to the Brooklyn District Attorney's office – in which he told Lebovits that an eyewitness to the abuse may have spoken about it. *Id.* at ¶ 11. Lebovits instructed him as follows: "You'll say you were alone, you had nobody with you"; "You'll deny it"; "[The witness] didn't see anything." *Id.*

Lebovits was indicted following grand jury testimony from MT and YR (as well as Plaintiff's son) detailing the horrific acts perpetrated upon them. *Id.* at ¶ 12. Strenuous efforts were made to prevent the victims from testifying at trial. Plaintiff was contacted by Moshe Friedman, a first cousin through marriage of Lebovits. *Id.* at ¶ 14. For decades, Friedman was the right hand man of Rabbi Moshe Teitelbaum, leader of the powerful Satmar sect in New York's Hasdic community until his death in 2006. *Id.* Friedman was someone of huge power and influence, both inside and outside of his community. *Id.* In 2009, a profile of him described "many senators and politicians flocking to his door throughout the year, especially before elections." *Id.* He was also the editor of the main Satmar newspaper, Der Yid. *Id.* Friedman demanded that Plaintiff drop his son's case, and told him that the Lebovits family was willing to offer $250,000. *Id.* Plaintiff refused the offer, along with others made on behalf of the Lebovits family, and reported the pay-off attempts to Assistant

District Attorneys Rhonnie Jaus and Miss Gregory – Chief and First Deputy Chief, respectively, of the Brooklyn District Attorney's Sex Crimes Bureau, which was handling the Lebovits prosecution. *Id.* at ¶¶ 14-15.

Trial in MT's case was scheduled to begin on December 3, 2009. *Id.* at ¶ 20. In November 2009, ADA Gregory received a call from an attorney named John Lonuzzi, informing her that MT was no longer cooperating with the prosecution. *Id.* Detective Litwin was also contacted by Lonuzzi, and instructed to have no further contact with MT. *Id.* at ¶ 21. Subsequently, however, Litwin was contacted directly by MT. *Id.* MT told him that he had not retained Lonuzzi; that some unknown person had retained him (later revealed to be an associate of the Lebovits family); and that his family could not know he contacted Litwin, with whom his father did not want him to speak (MT's father received a substantial pay-off). *Id.* Litwin arranged to meet MT the following day, and, according to an affidavit Litwin subsequently prepared, MT reiterated that he had not retained Lonuzzi, "had been pressured and was afraid to say what had happened," and "had been told not to talk to [Litwin] or to go to the District Attorney's office." *Id.*

The Lebovits family and their associates were unable, though, to stop YR from testifying against Baruch Lebovits. In March 2010, because of that testimony, Lebovits was convicted; he was sentenced the following month to a term of 10 $^{2}/_{3}$ – 32 years in prison. *Id.* at ¶ 23.

**B. The Hynes conspiracy**

Following the conviction, Baruch Lebovits and his supporters turned to Hynes. He had long cultivated Plaintiff's community and harvested their votes. *Id.* at ¶ 25. In return, he granted undue access and influence to community leaders and other powerful and wealthy interests within the community, along with a special, preferential system of "justice" for pedophiles. *Id.* As

defendants, their names were sheltered from public disclosure, they routinely received sweetheart deals with little or no imprisonment, and their victims (and the families of their victims) were left unprotected from harassment and intimidation within the community. *Id.*

It should be noted that Plaintiff's allegations concerning harassment and intimidation faced by victims of sexual abuse and their families in Plaintiff's community, and Hynes' collusion with its power-brokers for political purposes, over the time period at issue in this action, mirror those made in a series of investigative reports in the New York Times.[2] Hynes' acquiescence in the practice whereby a rabbi must first determine that an accusation of child sexual abuse is valid before permission is given to notify the authorities drew particular opprobrium. Hynes was severely criticized by then Mayor Michael Bloomberg, and denounced by former Mayor Ed Koch, as follows: "At this point, unless District Attorney Hynes announces that he will release the names of all defendants, including those of ultra-orthodox Jews charged with child abuse, sexual or otherwise, and will pursue criminally anyone who engages in obstruction of justice, advising someone not to assist the police in their investigation of a child abuse incident, the governor should supersede him in these cases and appoint a special prosecutor to handle them."[3]

The New York Times exposé was published in May 2012. In April 2010, the severe sentence received by Baruch Lebovits threatened Hynes' squalid arrangement. *See* Amended Complaint, at ¶ 25. On April 14, 2010, two days after it was imposed, Moshe Friedman visited the Brooklyn District Attorney's office and demanded action of Hynes, as a result of which Hynes entered into an agreement with members of the Lebovits family, Moshe Friedman, ADA Michael

---

[2] https://www.nytimes.com/2012/05/10/nyregion/ultra-orthodox-jews-shun-their-own-for-reporting-child-sexual-abuse.html; https://www.nytimes.com/2012/05/11/nyregion/for-ultra-orthodox-in-child-sex-abuse-cases-prosecutor-has-different-rules.html.

Vecchione, and others, to work together to undermine the Lebovits conviction, by means of manufacturing a case that Plaintiff had solicited false testimony from MT and YR in order to extort the Lebovits family. *Id.* at ¶ 55.

At the same time, the Brooklyn District Attorney's office was preparing to defend the Lebovits conviction on appeal. The Sex Crimes Bureau was also still trying to bring the separate case involving MT to trial, despite his prior supposed unwillingness to cooperate (as represented by Lonuzzi). ADA Gregory attempted unsuccessfully to subpoena MT to testify in court on May 27, 2010, and brought her concerns of witness tampering and intimidation to Hynes' Chief Assistant, Amy Feinstein; she was told by Feinstein that Hynes was unwilling to pursue it. *Id.* at ¶ 22. By that stage, the conspiracy was well underway. The conspirators pursued an "investigation," directed by Hynes and Vecchione from the Brooklyn District Attorney's office, in which fabricated allegations of attempted extortion were initially generated from Meyer Lebovits and Moshe Friedman, respectively. *Id.* at ¶ 55. Subsequently, on July 22, 2010, an affidavit was manufactured from MT – faxed to the Brooklyn District Attorney's office by counsel for Lebovits – in which he claimed to have been "brainwashed" by Plaintiff and paid to fabricate his allegations of sexual abuse and rape by Lebovits. *Id.* at ¶ 32. The case against Lebovits involving MT was dismissed by Hynes in August 2010, followed by the case involving Plaintiff's son (in respect of which Plaintiff and his son were never notified). *Id.* at ¶¶ 33-34.

The conspirators were less successful with regard to YR. According to Meyer Lebovits (interviewed as part of a 2014 review by the Brooklyn District Attorney's office, after Hynes lost the 2013 election), Hynes personally counseled his family on what "evidence" to obtain to

[3] https://www.huffingtonpost.com/ed-koch/child-abuse-in-the-ultrao_b_1515683.html.

include him in the case against Plaintiff. *Id.* at ¶ 35. However, unlike MT, YR remained steadfast that he did not lie and was not paid for his testimony (it wasn't until 2013 that his resistance was finally overcome by means of a pay-off). *Id.* at ¶¶ 35, 51. Nonetheless, the conspirators resolved to proceed on the basis of MT alone. According to Avraham Lehrer a.k.a. Joe Levin – a private investigator working at the time for the Lebovits family – a substantial payment was made to ensure Plaintiff's formal prosecution. *Id.* at ¶ 39.

**C. The prosecution of Sam Kellner**

The case to indict Plaintiff had three witnesses before the Grand Jury: MT, Meyer Lebovits, and Moshe Friedman (ADA Gregory provided background information about the cases against Baruch Lebovits). *Id.* at ¶ 40. Each one of these three witnesses committed perjury. *Id.* According to the Indictment, Plaintiff made repeated monetary demands to the Lebovits family, in exchange for which he would, inter alia, cause the dismissal of the pending charges against Baruch Lebovits through his "ability to control the cooperation and content of the testimony of [MT, YR, and his son]," and also paid MT to secure his false testimony against Lebovits. *Id.* at ¶¶ 41-43. He was charged with multiple counts of conspiracy, extortion, and subornation of perjury. *Id.*

On April 12, 2011, Plaintiff was arrested and imprisoned. *Id.* at ¶ 44. Bail was set at $25,000 and his passport was confiscated. *Id.* A news conference convened personally by Hynes followed, and Plaintiff and his son were denounced in front of the media for making false complaints. *Id.* The next day, Lebovits was released on bail pending the appeal of his conviction and placed under house arrest. *Id.*

In 2012, however, the case against Plaintiff began to crumble. *Id.* at ¶¶ 46-48. By 2013, Hynes was in the midst of a difficult re-election campaign. *Id.* at ¶ 51. Der Yid, published by

his co-conspirator, Moshe Friedman, ran a full-page notice extolling the fact that community leaders had an "open door with Charles Hynes for the past 20 years" and "know firsthand what happens … when they got themselves entangled with the law, how district attorney Hynes worked very sensitively and mercifully to avoid sending them to jail." *Id.* On the other hand, members of Plaintiff's community who supported his opponent, Ken Thompson, were "informers and accusers from the dregs of the Jewish community," who intended to "toss Jews in jail whenever it's possible!" *Id.* Despite this support, Hynes lost the Democratic primary in September 2013 and the general election in November 2013. *Id.* at ¶ 52.

On March 7, 2014, following a review of Plaintiff's case by the Brooklyn District Attorney's office under District Attorney Thompson, it was dismissed in its entirety. *Id.* at ¶ 53. ADA Kevin O'Donnell described the Grand Jury testimony by Meyer Lebovits as a "complete fabrication" and noted the witness tampering and intimidation of MT. *Id.*

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a complaint will be dismissed if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff; conversely, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 555–56 (internal citation and quotation marks omitted). Thus, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"; whereas "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). For purposes of Rule 12(b)(6), "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (internal citations omitted).

## ARGUMENT

### A. Plaintiff has stated a § 1983 conspiracy claim

In order to state a § 1983 conspiracy claim, a plaintiff must allege facts showing: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (internal citations omitted). However, "[w]hile conclusory allegations of a § 1983 conspiracy are insufficient," it is well-recognized "that such conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Id.* (internal citations and quotation marks omitted). Nonetheless, a plaintiff is expected "to provide some details of time and place and the alleged effect of the conspiracy." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993) (internal citation and quotation marks omitted). Also, a necessary element of a conspiracy claim is the actual violation of a federal right. *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995).

In *Adickes v. Kress & Co.*, 398 U.S. 144 (1970), the Supreme Court held that that a person acting a person acting under color of state law who collaborates or conspires with a private person to deprive a plaintiff of a constitutional right is equally liable under § 1983. As stated by the Second Circuit in *Fries v. Barnes*, 618 F.2d 988 (2d Cir. 1980): "The police officer or government agent may not escape responsibility by claiming that the violation of the plaintiff's rights was

committed by the private person involved in such a collaborative undertaking." *Id.* at 990. In *McIntyre v. United States*, 336 F. Supp. 2d 87 (D. Mass. 2004), the court noted the following "common theme" of *Adickes*, *Fries*, and other Second Circuit cases: "[W]hen a government actor participates in the conduct of private actors that would violate the constitution if the conduct were solely that of the government actor, the conduct is government action for purposes of analyzing whether a constitutional violation has occurred." *Id.* at 119.

In the present matter, there can be no dispute (at least for purposes of a motion to dismiss) that Hynes and ADA Vecchione worked closely with the Lebovits family following the conviction of Baruch Lebovits. Plaintiff has specified April 14, 2010 as the date the alleged conspiracy began, when Moshe Friedman met with Hynes. There can also be no dispute that Hynes and the Lebovits family pursued a joint investigation into whether both MT and YR fabricated their allegations of abuse against Lebovits, resulting in an affidavit to that effect from MT on July 22, 2010 (that was faxed from counsel for Lebovits to the Brooklyn District Attorney's office). Furthermore, there can be no dispute that the Sex Crimes Bureau tried in vain to initiate an investigation into witness tampering by the Lebovits family and their associates with regard to MT's non-cooperation with the prosecution of Lebovits in May 2010 (the month following the beginning of the alleged conspiracy), and that Hynes refused to sanction it. Finally, there can be no dispute that Hynes personally counseled the Lebovits family as to what "evidence" they should obtain in respect of YR in order to include him in the case against Plaintiff.

The close collaboration between Hynes and the Lebovits family cannot be disputed. Nor can the fact that it resulted in fabricated allegations from Meyer Lebovits, Moshe Friedman, and MT, respectively, on the basis of which Plaintiff's malicious prosecution was initiated. The only

argument available to Defendants is that Hynes genuinely believed there was an issue as to the veracity of the allegations made by MT and YR against Baruch Lebovits that required investigation. However, an argument founded upon Hynes' true motivation is not one that can succeed on a motion to dismiss. Moreover, it defies credibility. With regard to YR, Hynes had a recording on which Lebovits, having been told that an eyewitness to his abuse of YR may have spoken about it, instructed YR as follows: "You'll say you were alone, you had nobody with you"; "You'll deny it"; "[The witness] didn't see anything." *See* Amended Complaint, at ¶ 11. Not only that, there is no remotely good explanation for why Hynes would counsel the Lebovits family in their attempt to get YR to recant – without any evidence to suggest that he had not told the truth at trial – while Hynes' own office was defending the conviction on appeal. With regard to MT, Hynes had been urged by the Sex Crimes Bureau to institute an investigation into witness tampering and intimidation after MT revealed to Detective Litwin that he had "had been pressured [into ending his cooperation with the Lebovits prosecution] and was afraid to say what had happened," and "told not to talk to [Litwin] or to go to the District Attorney's office." *Id.* at ¶ 21. Hynes personally thwarted the efforts of the Sex Crimes Bureau to take action for witness tampering against those responsible, some of whom were his co-conspirators. *Id.* at ¶ 22. It is also alleged by Avraham Lehrer a.k.a. Joe Levin (a private investigator who was working at the time for the Lebovits family), that a substantial payment by the Lebovits family was made to ensure Sam's formal prosecution. *Id.* at ¶ 39. Finally, there is the fact that, in 2013, Hynes coordinated a pay-off by the Lebovits family to YR leading his successor-elect as District Attorney, Ken Thompson, to write to the presiding judge asking that no disposition in the case be agreed, and no further steps be taken, until after he assumed office. *Id.* at ¶ 52.

The known, undisputed details of the collaboration between Hynes and the Lebovits

family following the conviction of Baruch in Lebovits in 2010 through the end of Hynes' term of office in 2013 are wholly damning (even apart from the malicious prosecution of Plaintiff). The manner in which he betrayed MT and YR is simply appalling. Equally appalling is the wider context of collusion revealed by the New York Times in 2012, and set forth in Plaintiff's Amended Complaint. In this context, given the extensive details of time, place, overt acts, and effect of the alleged conspiracy to maliciously prosecute Plaintiff also set forth in the Amended Complaint, the existence of this conspiracy is abundantly plausible on its face.

**B. Plaintiff has stated a § 1983 claim of malicious prosecution**

To sustain a § 1983 claim based on malicious prosecution, a plaintiff must show sufficient restraint on liberty to implicate his or his Fourth Amendment rights and establish the elements of a malicious prosecution claim under state law. *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010). The restriction on a criminal defendant's right to travel outside of the state, and the requirement of periodic court appearances, are "appropriately viewed as seizures within the meaning of the Fourth Amendment." *Murphy v. Lynn*, 118 F.3d 938, 946 (2d Cir. 1997). To succeed on a claim for malicious prosecution under New York law, the plaintiff must show (1) the initiation or continuation of a criminal proceeding, (2) termination of the proceeding in plaintiff's favor, (3) lack of probable cause for commencing the proceeding, and (4) actual malice as a motivation for the defendant's actions. *Manganiello*, F.3d at 161.

Supplying falsified evidence "in substantial furtherance of a criminal action" is sufficient to constitute the commencement or a criminal proceeding. *Torres v. Jones*, 26 N.Y.3d 742, 760 (N.Y. 2016); *see also Rivers v. Towers, Perrin, Forster & Crosby Inc.*, No. 07-CV-5441 (DGT) (RML), 2009 WL 817852, at *3 (E.D.N.Y. Mar. 27, 2009) (internal citation omitted) ("Giving

information to the police that is known to be false qualifies as the commencement of a prosecution."); *Chimurenga v. City of New York*, 45 F.Supp.2d 337, 343 (S.D.N.Y. 1999) (internal citations omitted) ("Where a party is responsible for providing false information or manufactured evidence that influences a decision whether to prosecute, he may be held liable for malicious prosecution.").

Probable cause (in the context of malicious prosecution) has "been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (internal citation omitted). A presumption of probable cause is created by a grand jury's indictment. *Colon v. City of New York*, 60 N.Y.2d 78, 82 (N.Y. 1983). The presumption is rebuttable, however, and "may be overcome by evidence establishing that the police witnesses "have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Id.* at 82–83 (internal citations omitted). Accordingly, if a "plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id.* at 83; *see also Jenkins v. City of New York*, No. 98-CV-7170 (JGK)(DFE), 1999 WL 782509, at *9 (S.D.N.Y. Sept. 30, 1999), *aff'd,* 216 F.3d 1072 (2d Cir. 2000) (internal citation omitted) ("The fact that Michael Murray perjured himself before the grand jury when inculpating Jenkins is not sufficient to rebut the presumption of probable cause. To overcome the presumption, Murray's perjury must be attributable to the police.").

Malice "may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff."

*Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996) (internal citation and quotations marks omitted); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (internal citation and quotation marks omitted) (malice means that "the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served."). A lack of probable cause generally creates an inference of malice. *Boyd*, 336 F.3d at 78.

While the above-described conspiracy involving Hynes continued for a considerable period of time, the focus of the malicious prosecution claim is the period from April 14, 2010, when the conspiracy began, until July 22, 2010. During this time, the evidence that initiated Plaintiff's prosecution – specifically, false allegations from Moshe Friedman, Meyer Lebovits, and MT, respectively – was manufactured in the course of the conspiracy and supplied to the Brooklyn District Attorney's office. Probable cause did not exist, in that there was no other actual evidence, and the presumption of probable cause that resulted from Plaintiff's indictment is rebutted because the indictment was produced exclusively by means of perjury from each of Friedman, Meyer Lebovits, and MT. That perjury is attributable to Hynes as a member of the conspiracy to maliciously prosecute Plaintiff. Malice is also clearly present, in that the prosecution was motivated by the desire to undermine the conviction of Baruch Lebovits. Plaintiff's Fourth Amendment rights were implicated because his bail was set at $25,000, his passport was confiscated, and he made multiple court appearances for almost three years, before the case was terminated in his favor. *See* Amended Complaint, at ¶¶ 44, 53.

Thus, Plaintiff's malicious prosecution claim has been more than adequately stated.

**C. Hynes is not entitled to either absolute or qualified immunity**

Courts apply a "functional approach" in determining whether absolute immunity is

available to a prosecutor, looking to "the nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (internal citation omitted). Prosecutors are entitled to absolute immunity for conduct "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). On the other hand, "[w]hen a district attorney functions outside his or her role as an advocate for the People, the shield of immunity is absent." *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995). In particular, "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Buckley*, 509 U.S. at 273 (internal citation and quotation marks omitted); *see also Carbajal v. Cnty. of Nassau*, 271 F.Supp.2d 415, 421 (E.D.N.Y. 2003) (internal citations and quotation marks omitted) ("[W]hen a prosecutor supervises, conducts, or assists in the investigation of a crime, or gives advice as to the existence of probable cause to make a warrantless arrest—that is, when he performs functions normally associated with a police investigation—he loses his absolute protection from liability."); *Hill*, 45 F.3d at 662 (2d Cir.1995) (absolute immunity "does not protect efforts to manufacture evidence that occur during the investigatory phase of a criminal case"). Furthermore, that a grand jury is subsequently called upon "to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial." *Buckley*, 509 U.S. at 276; *see also Zahrey v. Coffey*, 221 F.3d 342, 353 (2d Cir. 2000) ("[A] subsequent immunized act of a single official does not break the chain of causation traceable to his initial misconduct occurring in another capacity.").

A prosecutor may also lose absolute immunity even for acts performed in his role as an advocate if the prosecutor acts "in the clear absence of all jurisdiction" or "without any colorable

claim of authority." *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987). Thus, "[f]or example, where a prosecutor has linked his authorized discretion to initiate or drop criminal charges to an unauthorized demand for a bribe, sexual favors, or the defendant's performance of a religious act, absolute immunity has been denied." *Bernard v. Cty. of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004) (internal citations omitted).

The doctrine of qualified immunity provides that "a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003) (internal citation omitted). It is generally only the "plainly incompetent or those who knowingly violate the law—those who are not worthy of the mantle of office—who are precluded from claiming the protection of qualified immunity." *Moore v. Andreno*, 505 F.3d 203, 214 (2d Cir. 2007) (internal citation and quotation marks omitted).

The "right to be free from malicious prosecution is a clearly established right," and defendants are only entitled to "qualified immunity if it was objectively reasonable for them to believe that their actions did not violate th[at] right[ ]." *Bonide Prod., Inc. v. Cahill*, 223 F.3d 141, 145 (2d Cir. 2000). Also clearly established is the right is "not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." *Zahrey*, 221 F.3d at 349 (2d Cir. 2000); *see also Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123, 130 (2d Cir.1997) (violation of clearly established constitutional rights by police officers conspiring to fabricate and forward to prosecutors a known false confession).

Hynes is not entitled to absolute immunity because Plaintiff's malicious prosecution

claim refers to the period from April 14, 2010 until July 22, 2010, during which the false allegations from Moshe Friedman, Meyer Lebovits, and MT, respectively, were manufactured and supplied to the Brooklyn District Attorney's office. These allegations were generated during the investigative (rather than judicial) phase of the criminal process.

Hynes is also not entitled to qualified immunity. In *Zahrey*, qualified immunity was denied to a prosecutor who allegedly conspired with other defendants to manufacture false evidence for use against the plaintiff in criminal and police disciplinary proceedings. So too must Hynes be denied qualified immunity in the present circumstances.

**D. The City of New York is liable under *Monell* for Hynes' actions**

A municipal entity may be liable under 42 U.S.C. § 1983 for a single decision by a municipal policymaker if "the decision maker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Thus, a "single tortious decision or course of action … constitutes the act of the municipality and therefore provides a basis for municipal liability where it is taken by, or is attributable to, one of the city's authorized policymakers." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (internal citation omitted). The identification of policymaking officials is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988). Moreover, "the critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (internal citation omitted).

In *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988), the Second Circuit held that,

"[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Id.* at 77 (internal citations omitted). On the other hand, in *Myers v. Cty. of Orange*, 157 F.3d 66 (2d Cir. 1998), it held that the county defendants was properly found liable "for a DA policy that directed the Port Jervis police and county ADAs to engage in investigative procedures that violated Myers' equal protection rights." *Id.* at 77; *see also Conte v. Cty. of Nassau*, No. 06-CV-4746 (JFB) (ETB), 2010 WL 3924677, at *27 (E.D.N.Y. Sept. 30, 2010) ("[T]he evidence of the [Nassau County District Attorney's Office's] actions in the instant case relates to their investigation of Conte and I Media, and not prosecutorial functions. Under those circumstances, the rule that precludes *Monell* liability for municipalities with respect to prosecutorial actions does not apply."). Thus, the "boundaries of prosecutorial immunity in an action against a prosecutor in his individual capacity … are strikingly similar to those of a prosecutor attempting to assert Eleventh Amendment immunity in his official capacity." *In re AJ Contracting Co., Inc.*, 300 B.R. 182, 193 (Bankr. S.D.N.Y. 2003) (internal citations omitted).

In the present matter, the City does not argue that Hynes was not a final policymaker in respect of his investigative functions. Instead, having argued that Hynes is entitled to absolute immunity as a prosecutor in his individual capacity, it maintains that he represented the State of New York and not the City in this capacity (the former of which is immune from suit under the Eleventh Amendment). As set forth above, Hynes is not entitled to absolute immunity because the false allegations against Plaintiff underlying his malicious prosecution claim were generated during the investigative (rather than judicial) phase of the criminal process. During this phase of the process, Hynes represented the City, and thus, as he was a decision maker possessing final authority to establish municipal policy in respect of his actions with regard to Plaintiff, the City is liable for those

actions.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated: New York, New York
June 11, 2018

Respectfully submitted,

/s/ Niall MacGiollabhuí
NIALL MACGIOLLABHUÍ, ESQ.
LAW OFFICE OF
NIALL MACGIOLLABHUÍ
Attorneys for the Plaintiff
260 Madison Avenue, 21st Floor
New York, NY 10016
(212) 455-0328