UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

SAMUEL KELLNER,

                            Plaintiff,                        **MEMORANDUM & ORDER**
                                                    17-CV-1268 (MKB)

           v.

THE CITY OF NEW YORK and CHARLES J.
HYNES,[1]

                         Defendants.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

       Plaintiff Samuel Kellner commenced the above-captioned action on March 6, 2017,

against Defendants the City of New York (the "City") and Charles J. Hynes.  (Compl., Docket

Entry No. 1.)  Plaintiff filed an Amended Complaint on October 2, 2017, asserting claims of

malicious prosecution, conspiracy,[2] and municipal liability under 42 U.S.C. §§ 1983 and 1988.

(Am. Compl., Docket Entry No. 14.)  Plaintiff alleges that after he reported to the District

Attorney's office that his son and others were sexually abused by Baruch Lebovits, a man

---

    [1]  On March 4, 2019, Defendants notified the Court pursuant to Federal Rule of Civil
Procedure 25(a)(1) of the death of Charles J. Hynes on January 29, 2019.  (Suggestion of Death,
Docket Entry No. 25.)  On March 19, 2019, the Court stayed the case pending Plaintiff's motion
for substitution as to Hynes.  (Minute Entry dated March 19, 2019.)  On December 16, 2020,
Magistrate Judge Sanket J. Bulsara granted Plaintiff's unopposed motion to substitute Patricia L.
Hynes, administrator of the Estate of Charles J. Hynes, for Hynes.  (Order dated Dec. 16, 2020.)

    [2]  Although the Amended Complaint does not specifically state that Plaintiff asserts a
cause of action for conspiracy under 42 U.S.C. § 1983, Plaintiff claims that "Hynes entered into
an agreement . . . [to] manufactur[e] 'evidence' against [Plaintiff] (of soliciting false testimony
and attempted extortion) and thereby inducing his prosecution."  (Am. Compl. ¶ 55.)  Defendants
argue that Plaintiff inadequately pleads the conspiracy claim.  (Mem. in Supp. of Defs.' Mot. to
Dismiss ("Defs.' Mem.") 13, Docket Entry No. 20.)  The Court considers the viability of
Plaintiff's conspiracy claim below.

"connected to powerful and wealthy interests" in "Brooklyn's ultra-Orthodox community,"
Hynes conspired with others to prosecute Plaintiff for allegedly telling Lebovits and his
supporters that Plaintiff would convince the complaining witnesses to recant their testimony in
exchange for money.  (Am. Compl. ¶¶ 1, 42.)

Defendants move to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the
Federal Rules of Civil Procedure.  (Defs.' Mot. to Dismiss, Docket Entry No. 19; Defs.' Mem.)
For the reasons set forth below, the Court denies Defendants' motion to dismiss.

I.     **Background**

a.     **The case against Lebovits**

Sometime in 2008, Plaintiff's son told him that he was molested by a man named Baruch
Lebovits.[3]  (Am. Compl. ¶ 8.)  With the permission of a "highly respected rabbi who presides
over a rabbinical court," Plaintiff reported the incident to the police.  (*Id.*)  Shortly thereafter,
Plaintiff and his son met with a prosecutor at the Brooklyn District Attorney's Office (the "DA's
Office"), who informed Plaintiff that the DA's Office would not prosecute Lebovits "primarily
because the alleged offense was a misdemeanor and [because] there were no other known
victims."  (*Id.* ¶ 9.)  Plaintiff then spoke with an individual in his community who put him in
contact with Detective Steve Litwin, a sexual abuse investigator.  (*Id.*)  Detective Litwin told
Plaintiff that "a case against [Lebovits] would be viable if other victims could be found and
encouraged to report their abuse."  (*Id.*)  Soon thereafter, Plaintiff learned that two individuals,
MT and YR, had been repeatedly raped and/or sexually abused by Lebovits.  (*Id.* ¶¶ 10–12.)
Plaintiff encouraged MT and YR to report the abuse to Detective Litwin and both did so.  (*Id.*

---

[3]  The Court assumes the truth of the factual allegations in the Amended Complaint for
the purpose of deciding Defendants' motion.

¶ 10.)  In September of 2008, under Detective Litwin's supervision, YR "recorded a conversation with Lebovits, in which he told Lebovits he had been contacted by a member of Assemblyman Dov Hikind's office . . . who had found out he was a victim" and "told Lebovits that he believed a witness to the abuse may have spoken about it."  (*Id.* ¶ 11.)  Lebovits responded: "deny it"; tell them the witness "didn't see anything."  (*Id.*)

In March of 2008, after hearing testimony from Plaintiff's son and MT, a grand jury indicted Lebovits, (*id.* ¶ 10), and in November of 2008, after hearing testimony from MT and YR, a grand jury returned a superseding indictment against Lebovits, (*id.* ¶ 12).

Plaintiff contends that as a result of his communication with Lebovits' victims and Detective Litwin, he was the subject of "severe harassment and intimidation in his community." (*Id.* ¶ 13.)  For example, Plaintiff alleges that "it was demanded that [Plaintiff] submit to adjudication in a . . . rabbinical court."  (*Id.*)  Plaintiff agreed to adjudicate his son's case in rabbinical court on the condition that (1) both the rabbi who had given him permission to report his son's abuse and Michael Dowd, a lawyer, attend the adjudication; and (2) Plaintiff would not be responsible for any expenses or legal fees arising out of the adjudication.  (*Id.*)  Plaintiff alleges that "[a]n associate of Lebovits, Wolf Wertzberger, became involved and promised to pay [Plaintiff's] share of the expenses and fees," but when Plaintiff requested that Wertzberger honor that promise, Wertzberger responded that "he was merely a front for Baruch Lebovits'[] son, Meyer, whom [Plaintiff] would need to ask directly."  (*Id.*)  In addition, Plaintiff alleges that several individuals made "[s]ubstantial monetary offers" to Plaintiff to induce him "to drop his son's case," but Plaintiff rejected each offer.  (*Id.* ¶¶ 13, 14.)  For example, Moshe Friedman, a first cousin of Lebovits through marriage, made a "payoff offer" to Plaintiff.  (*Id.* ¶ 14.) Friedman also offered Plaintiff a job, which Plaintiff accepted.  (*Id.*)  However, after Plaintiff

rejected Friedman's "demand[] that [Plaintiff] drop his son's case against Baruch Lebovits" and ignored Friedman when he told Plaintiff that Lebovits was willing to pay Plaintiff $250,000 to drop his son's case, Friedman fired Plaintiff. (*Id.*) Plaintiff reported these events to Detective Litwin and two prosecutors in the Sex Crimes Bureau. (*Id.* ¶ 15.)

In May of 2009, Plaintiff met with Meyer Lebovits, one of Lebovits' sons, to discuss the bill from the rabbinical court adjudication. (*Id.* ¶ 16.) Meyer Lebovits secretly recorded the conversation, and later provided a copy of the recording to Hynes. (*Id.*) During their meeting, Meyer Lebovits insisted that Plaintiff was "wrong to report [Lebovits' abuse of Plaintiff's son] to the police" and that had Plaintiff approached the Lebovits family instead, "the problem would have been taken care of." (*Id.*) Also during that meeting, Plaintiff "expressed his objection[s] to the threats he was receiving to force him into dropping his son's case." (*Id.* ¶ 18.)

By November of 2009, the prosecution against Lebovits relating to his abuse of YR had been severed from the case related to Lebovits' abuse of MT. (*Id.* ¶ 20.) In December of 2009, an attorney named John Lonuzzi called the Assistant District Attorney ("ADA") prosecuting the case against Lebovits and told the ADA that MT "was no longer cooperating with the prosecution" because the case was causing MT "severe stress" and MT "was suffering from a variety of psychological issues." (*Id.*) Lonuzzi also told the ADA that if MT was called to testify, he would "plead the Fifth Amendment privilege against self-incrimination . . . because parts of his grand jury testimony might have been embellished." (*Id.* (quotation marks omitted).) The ADA then arranged several meetings with MT and Lonuzzi, but Lonuzzi canceled each meeting. (*Id.*) Lonuzzi also contacted Detective Litwin, instructing him to have no further contact with MT. (*Id.* ¶ 21.) However, MT himself subsequently contacted Detective Litwin and revealed that he had not retained Lonuzzi, that his family "could not know [that] [Lonuzzi]

contacted Detective Litwin," and that he "had been pressured and was afraid to say what had happened." (*Id.*) Plaintiff alleges that it was "later revealed" that an associate of the Lebovits family, Zalmen Ashkenazi, had retained Lonuzzi, and that MT's father received a substantial payoff in exchange for pressuring his son not to cooperate with the prosecution. (*Id.*) When the ADA prosecuting the case against Lebovits for his abuse of MT raised her concerns about witness tampering and intimidation with Hynes' Chief Assistant, she was told that Hynes "was unwilling to do anything about it." (*Id.* ¶ 22.)

Plaintiff alleges that, although Lebovits and his supporters were successful in intimidating MT, they were unable to stop YR from testifying against Lebovits. (*Id.* ¶ 23.) In March of 2010, Lebovits was convicted of abusing YR. (*Id.*) During the trial, Lebovits' counsel argued that YR had fabricated his allegations as "part of an extortion plot." (*Id.*) The jury heard testimony that the sole defense witness, Berel Ashkenazi (the brother of Zalmen Ashkenazi, who allegedly paid Lonuzzi to "represent" MT), attempted to "pay off YR" in order to "stop his testimony." (*Id.* ¶ 24.) Plaintiff alleges that Detective Litwin's contemporaneous records detail Berel Ashkenazi's efforts, along with Plaintiff's "counter-efforts" to assure YR "that he would receive support and compensation without having [to] . . . drop the case." (*Id.* (quotation marks omitted).) When Berel Ashkenazi took the stand, he was "confronted with a rabbinical court ruling . . . that forbade YR from reporting [Berel] Ashkenazi's attempts to bribe him and stop him from testifying," but the witness "had no answer." (*Id.*) The jury convened for "only a few hours" and found Lebovits guilty on the charges arising out of his abuse of YR. (*Id.* ¶ 23.) Lebovits was subsequently sentenced to a term of between ten and two-thirds years to thirty-two years in prison. (*Id.*)

### b.   The case against Plaintiff

Plaintiff alleges that after the jury convicted Lebovits for his abuse of YR, Lebovits and his supporters "began an intensive campaign to overturn [the conviction] by any means possible" and "found that Hynes was willing to take a leading role in their criminal conspiracy to pervert the course of justice." (*Id.* ¶ 25.)  Plaintiff alleges that "Hynes had long cultivated [Plaintiff's] community and harvested their votes," and that "[i]n return, he pursued a policy, custom and practice of granting undue access and influence to community leaders and other powerful and wealthy interests within the community" and "provided a special, preferential system of 'justice' for pedophiles within the community." (*Id.*)  Plaintiff alleges that Lebovits' sentence threatened that arrangement, and, on April 14, 2010, two days after Lebovits' sentence was imposed, Moshe Friedman (Lebovits' cousin) visited the DA's Office and "demanded action," and, in addition, a substantial payment by the Lebovits family was "made to ensure [Plaintiff's] prosecution." (*Id.* ¶ 39.)

On April 23, 2010, Simon Taub, a "prominent member" of Plaintiff's community, spoke with Meyer Lebovits (one of Baruch Lebovits' sons) on the telephone.  (*Id.* ¶ 26.)  Their conversation was recorded.  (*Id.*)  Taub's son was molested by Meyer Lebovits, and during the telephone call, Taub offered to treat Meyer Lebovits as "a person who 'made a mistake'" but was willing to "straighten it out."  (*Id.*)  Meyer Lebovits "pressed [Taub] to accept $400,000" and tried "desperately to concoct a claim that [Plaintiff had] demanded the same $400,000 for his son through Taub."  (*Id.*)  When Plaintiff learned that Meyer Lebovits and Taub had discussed exchanging money for Taub's silence, Plaintiff reported it to Detective Litwin and to a rabbi who subsequently "broadcast on his hotline that Taub was attempting to extort money from Meyer [Lebovits], and that both would be arrested."  (*Id.* ¶ 27.)

On April 27, 2010, Lebovits' attorney met with an ADA, a detective/investigator, and an investigator at the DA's Office, and also at the attorney's private office.  (*Id.* ¶ 28.)  Chaim Lebovits, one of Lebovits' sons, attended the second meeting, during which he requested that the DA's Office "assist him in trying to bring justice for his family."  (*Id.*)  On June 4, 2010, at the direction of the DA's Office, Chaim Lebovits participated in and recorded a "lengthy meeting" with Taub.  (*Id.* ¶ 29.)  During that recorded meeting, Chaim Lebovits "begged Taub to involve [Plaintiff] in their transaction" and said that "after the first payment" there would be "no second payment" unless Plaintiff was present.  (*Id.*)  The two spoke again on June 18, 2010.  (*Id.* ¶ 31.)  During that conversation, Taub told Chaim Lebovits that Plaintiff would not meet with him because Plaintiff "was afraid" and "shaking with fear."  (*Id.*)  Taub "proposed to receive an initial payment" without Plaintiff present, but promised that Plaintiff would attend a subsequent meeting if "the first time goes well."  (*Id.*)  Chaim Lebovits spoke with Taub again in July of 2010, and Taub was arrested shortly thereafter.  (*Id.*)  Plaintiff claims that Taub then met with "some of the most senior of Hynes' cronies," who told Taub that if he could implicate Plaintiff, "he would be home within an hour."  (*Id.*)  Taub subsequently pleaded guilty to attempted extortion.  (*Id.*)

Though Lebovits had been convicted on the charges related to his abuse of YR, (*id.* ¶ 23), on August 4, 2010, Hynes dismissed the case against Lebovits regarding his abuse of MT, (*id.* ¶ 33).  In October of 2010, without notifying Plaintiff or his son, Hynes also dismissed the charges against Lebovits arising out of the abuse of Plaintiff's son.  (*Id.* ¶ 34.)

Plaintiff alleges that in June of 2010, "the conspirators manufactured" three affidavits authored by Sholem Weisner, Moshe Friedman, and MT, explaining that YR and MT had manufactured their allegations against Lebovits.  (*Id.* ¶ 32.)  Weisner claimed to be a friend of

YR's, and stated in his affidavit that "YR told him that he had been paid off by [Plaintiff], that he was making it 'big time' financially, and that he had perjured himself at the Lebovits trial." (*Id.*) MT's affidavit "stated that he had been 'brainwashed' by [Plaintiff] and paid $10,000 by him to fabricate his allegations."[4] (*Id.*)

The DA's Office subsequently interviewed both MT and YR. (*Id.* ¶¶ 33, 35.) MT was interviewed in September of 2010, but was not asked several "obvious" questions because "Hynes had purposely excluded the Sex Crimes Bureau and Detective Litwin from the 'investigation' into [Plaintiff]." (*Id.* ¶ 33.) YR was interviewed in December of 2010, and "stated unequivocally that he did not lie and was not paid for his testimony." (*Id.* ¶ 35.) However, Weisner "was encouraged by Hynes to continue in his efforts to make [YR] crack." (*Id.*) Plaintiff also alleges that in a 2014 interview, Meyer Lebovits stated that "Hynes personally counseled his family on what 'evidence' to obtain [against Plaintiff]." (*Id.*) As part of that effort, "a trip was planned to Florida, on which YR would be lured with the pretense of making a movie about his life." (*Id.*) During the trip, YR was "plied with drugs" and "gave a number of video-recorded interviews." (*Id.* ¶ 36.) During one of those interviews, YR stated that the Lebovits family "terrorized" MT and told MT that if he testified against Lebovits, he would himself be prosecuted for child molestation. (*Id.* ¶ 37.) YR also stated that the Lebovits family paid for MT's lawyer, Lonuzzi, and that Plaintiff never "tried to shut [YR] up" or "offer him money to drop the case." (*Id.* ¶ 38.) After these conversations, the Lebovits family told the ADA handling the case against Lebovits that YR had implicated Plaintiff in Florida, though they refused to disclose the recordings of their conversations with YR. (*Id.* ¶ 39.)

---

[4] Plaintiff alleges that the second affidavit "appeared from Moshe Friedman," an individual who was present at the April 27, 2010 meeting at the DA's Office but does not set forth the content of that affidavit. (Am. Compl. ¶ 32.)

Plaintiff was eventually indicted for one count of conspiracy in the fourth degree, five counts of attempted grand larceny by extortion in the second degree, two counts of perjury in the first degree, and two companion counts of criminal solicitation in the fourth degree.  (*Id.* ¶ 41.)  The indictment alleged that between March of 2008 and March of 2010, Plaintiff made repeated demands for money, through five unindicted co-conspirators, "in exchange for which [Plaintiff] would (1) cause the dismissal of the pending charges against Baruch Lebovits, through his 'ability to control the cooperation and content of the testimony of [MT, YR, and his son]'; (2) direct an additional alleged victim of Baruch Lebovits not to make a complaint; and (3) cause the publication of Lebovits' alleged abuse of children within the community to cease."  (*Id.* ¶ 42 (second alteration in original).)  Plaintiff alleges that each of the three witnesses who testified against him before the grand jury, MT, Meyer Lebovits, and Moshe Friedman, committed perjury.  (*Id.* ¶ 40.)  On April 12, 2011, Plaintiff was arrested and imprisoned.  (*Id.* ¶ 44.)  Bail was set at $25,000 and Plaintiff's passport was confiscated.[5]  (*Id.*)  After Plaintiff's arrest, Hynes convened a news conference where he "denounced [Plaintiff and his son] in front of the media."  (*Id.*)  Hynes told the media: "child abuse has to be prosecuted vigorously, but we also have to be very, very careful about false complaints."  (*Id.*)  On April 25, 2012, Lebovits' conviction was overturned because of the prosecution's untimely disclosure of certain material.  (*Id.* ¶ 45.)

In March of 2012, several events transpired that led to Plaintiff's exoneration.  First, an attorney in the DA's Office interviewed MT's "best friend," who told the attorney that MT fled to Israel "out of fear" after he was told by Lebovits' eldest daughter that if he testified against Lebovits, MT "would [himself] immediately be arrested for molestation."  (*Id.* ¶ 46.)  Through

---

[5]  The Amended Complaint does not indicate whether Plaintiff posted bail or the period of time he spent in jail.  (*See generally* Am. Compl.)

travel and bank records, the ADA learned that MT did in fact go to Israel and that his flights were paid for by Zalmen Ashkenazi, the same individual who paid for MT's purported attorney, John Lonuzzi, and the brother of the sole defense witness at the Lebovits trial. (*Id.* ¶ 47.) Plaintiff alleges that the Lebovits family "reacted furiously." (*Id.* ¶ 48.)

In addition, in May of 2013, a recording of a conversation between MT and an acquaintance surfaced. (*Id.* ¶ 49.) During that conversation, MT stated that he first disclosed that he was abused by Lebovits several years before he met Plaintiff, that he fled to Israel out of fear of possible child molestation charges, and that he was forced to "go against" Plaintiff. (*Id.*) On June 26 and July 1, 2013, the DA's Office interviewed MT. (*Id.*) During those interviews, MT disclosed that (1) "he fled to Israel for fear of possible child molestation charges"; (2) Zalmen Ashkenazi "supplied funds" for MT's attorney, "his airfare to and from Israel, his apartment in Israel, and his school fees"; and (3) MT "needs [Zalmen] Ashkenazi's permission to return to the [United States] when [MT is] in Israel." (*Id.*) MT "no longer claimed that [Plaintiff] had paid him $10,000, claiming now that he had either not paid him an agreed-upon fee or not fulfilled a promise to finance his wedding." (*Id.*) Plaintiff also alleges that, "[b]izzarely," MT stated that he "had never seen Baruch Lebovits in his life," that Lebovits "could have molested [him]," but that he could not "really say," and that he told others that Lebovits had molested him. (*Id.*)

Plaintiff alleges that Hynes disregarded these revelations and, on July 24, 2013, appeared on a radio show, stating: "I believe there was a substantial effort by [Plaintiff] to gain money by making up stories. I think we have a substantial case." (*Id.* ¶ 50.) Plaintiff also states that "behind the scenes," Hynes was "coordinating a pay-off by the Lebovits family to YR" through a

lawyer named Michael S. Ross, a former prosecutor with "close ties to Hynes" who helped disguise a pay-off from the Lebovits family as a civil settlement.  (*Id.* ¶ 51.)

Hynes lost the primary election of September of 2013 and the general election of November of 2013 to Ken Thompson.  (*Id.* ¶ 52.)  Before the election, Moshe Friedman "ran a full-page notice extolling the fact that community leaders had an 'open door with Charles Hynes for the past [twenty] years'" and that when members of the community got "entangled with the law," Hynes "worked very sensitively and mercifully to avoid sending them to jail."  (*Id.* ¶ 51.)  Even after losing the election, Plaintiff alleges that Hynes "tried desperately to secure his sweetheart deal with Lebovits, and told the Lebovits family that they should obtain a letter from YR stating that he was in poor health."  (*Id.* ¶ 52.)  However, Thompson "wrote to the judge asking that no disposition in the case be agreed [to], and no further steps be taken, until after he assumed office."  (*Id.*)  On March 7, 2014, after Thompson took office, the case against Plaintiff was dismissed.  (*Id.* ¶ 53.)  An ADA later described Meyer Lebovits' grand jury testimony as a "complete fabrication" and "noted the witness tampering and intimidation of MT."  (*Id.*)

   **c.   Plaintiff's conspiracy allegations**

Plaintiff alleges that in April of 2010, "Hynes entered into an agreement with members of the Lebovits family, Moshe Friedman, [Assistant District Attorney] Michael Vecchione, and others, to work together to undermine [Lebovits'] conviction by means of manufacturing 'evidence' against [Plaintiff] (of soliciting false testimony and attempted extortion) and thereby inducing his prosecution."  (*Id.* ¶ 55.)  In furtherance of the conspiracy, on or about May 27, 2010, Hynes "personally thwarted the efforts of the Sex Crimes Bureau to take action for witness tampering against those responsible."  (*Id.*)  Plaintiff also contends that "Hynes and Vecchione met on numerous occasions with their co-conspirators in the [DA's Office], after the initial

meetings on April 14 and April 27, 2010, to plot the course of the conspiracy." (*Id.* ¶ 56.)  In

July of 2010, after the affidavits surfaced explaining that YR and MT had manufactured their

allegations against Lebovits, "Hynes was personally aware that MT was a genuine victim, and

that he had been forced by associates of Lebovits to end his cooperation with the prosecution."

(*Id.* ¶ 55.)

## II.   Discussion

### a.   Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a court must construe the "complaint liberally, accepting all factual allegations in the

complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Vaughn v.

Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020).  A complaint must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Chambers v. Time

Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).  A claim is plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986

F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).  Although all allegations

contained in the complaint are assumed to be true, this tenet is "inapplicable to legal

conclusions." *Iqbal*, 556 U.S. at 678; *Vaughn*, 957 F.3d at 145 (same).

### b.   Prosecutorial immunity

Defendants contend that Plaintiff's claims must be dismissed because Hynes is entitled to

absolute prosecutorial immunity for the actions he took as the District Attorney.  (Defs.' Mem.

9.)  In support, Defendants argue that "[b]ased on [P]laintiff's allegations, it is clear that Hynes

acted, if anything, as an advocate," and therefore is entitled to absolute immunity, (*id.* at 10), and

that Plaintiff offers "no more than labels and conclusions" in support of his argument that Hynes

undertook investigatory rather than prosecutorial actions with respect to Plaintiff's prosecution,

(*id.* at 11 (internal quotation marks omitted)).  Defendants also argue that even if some of Hynes'

actions could be categorized as investigatory, where such actions are reasonably related to

decisions about whether to begin or carry on a criminal prosecution, a prosecutor remains

immune.  (*Id.*)

Plaintiff contends that because the allegations against Hynes relate to the period of time

during which false allegations were "manufactured and supplied" to the DA's Office, "the

investigative (rather than judicial) phase of the criminal process," Hynes is not entitled to

absolute immunity.  (Pl.'s Opp'n 16–17, Docket Entry No. 21.)

Prosecutors are entitled to absolute immunity "for 'acts undertaken . . . in preparing for

the initiation of judicial proceedings or for trial, and which occur in the course of his role as an

advocate for the State,' but '[a] prosecutor's administrative duties and those investigatory

functions that do not relate to an advocate's preparation for the initiation of a prosecution or for

judicial proceedings are not entitled to absolute immunity."  *Malik v. City of New York*, 841 F.

App'x 281, 284 (2d Cir. 2021) (alteration in original) (quoting *Buckley v. Fitzsimmons*, 509 U.S.

259, 273 (1993)); *see also Van de Kamp v. Goldstein*, 555 U.S. 335, 341 (2009) ("[P]rosecutorial

actions that are 'intimately associated with the judicial phase of the criminal process' . . . are

absolutely immune from liability in § 1983 lawsuits." (quoting *Imbler v. Pachtman*, 424 U.S.

409, 430 (1976))); *Ogunkoya v. Monaghan*, 913 F.3d 64, 69 (2d Cir. 2019) ("Absolute immunity

bars § 1983 suits against prosecutors for their role 'in initiating a prosecution and in presenting

the State's case.'" (quoting *Imbler*, 424 U.S. at 431)); *Santulli v. Russello*, 519 F. App'x 706, 711

(2d Cir. 2013) ("It is well settled that a prosecutor is entitled to absolute immunity for acts

undertaken pursuant to her traditional function as an advocate in the prosecutorial process."

(citing *Shmueli v. City of New York*, 424 F.3d 231, 236–38 (2d Cir. 2005))).  Such immunity

attaches "regardless of any allegations that [the prosecutor's] actions were undertaken with an

improper state of mind or improper motive."  *Shmueli*, 424 F.3d 231, 237 (2d Cir. 2005) (citing

*Bernard v. County of Suffolk*, 356 F.3d 495, 503 (2d Cir. 2004)); *see also Giraldo v. Kessler*, 694

F.3d 161, 165 (2d Cir. 2012) (same).

  "To determine whether an official enjoys absolute immunity we take a 'functional

approach,' examining 'the nature of the function performed, not the identity of the actor who

performed it.'"  *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013) (quoting *Buckley*,

509 U.S. at 269); *Flagler v. Trainor*, 663 F.3d 543, 546 (2d Cir. 2011) ("[I]mmunity is not a

function of the prosecutor's *title*.  Rather, it attaches to prosecutorial functions that are intimately

associated with initiating or presenting the State's case." (citing *Kalina v. Fletcher*, 522 U.S.

118, 125 (1997))).  A prosecutor seeking absolute prosecutorial immunity bears the burden of

showing that it applies.  *Simon*, 727 F.3d at 171 ("[T]he official seeking absolute immunity bears

the burden of showing that such immunity is justified for the function in question." (alteration in

original) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991))); *Warney v. Monroe County*, 587

F.3d 113, 121 (2d Cir. 2009) ("[T]o establish immunity, the 'ultimate question' is 'whether

the prosecutors have carried their burden of establishing that they were functioning as

"advocates" when they engaged in the challenged conduct.'" (quoting *Doe v. Phillips*, 81 F.3d

1204, 1209 (2d Cir. 1996))).

The Supreme Court has explained that functions essential to the prosecutorial function include a prosecutor's decisions regarding "whether to present a case to the grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present." *Giraldo*, 694 F.3d at 165 (quoting *Imbler*, 424 U.S. at 431 n.33); *see also Simon*, 727 F.3d at 171 (stating that prosecutors are immune for their decisions to bring charges and present a case to a grand jury, "along with the tasks generally considered adjunct to those functions, such as witness preparation, witness selection, and issuing subpoenas"). By contrast, a prosecutor does not enjoy absolute immunity while performing "administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." *Warney*, 587 F.3d at 121 (quoting *Buckley*, 509 U.S. at 273); *see also Simon*, 727 F.3d at 171 (same). For example, the Supreme Court has held that "statements to the media are not entitled to absolute immunity" because "[t]he conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions." *Buckley*, 509 U.S. at 277. The Supreme Court has also held that prosecutors are not entitled to immunity for "fabricating evidence during the preliminary investigation of a crime," *Giraldo*, 694 F.3d at 165 (quoting *Buckley*, 509 U.S. at 273)), because a prosecutor "neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested," *id.* (quoting *Buckley*, 509 U.S. at 274).

Further, although "all investigative activity could be considered in some sense to be 'prepar[ation] for the initiation of judicial proceedings,'" a prosecutor is not immune when he takes "investigative steps . . . to gather evidence," as opposed to "those preparatory steps that a prosecutor takes to be an effective advocate of a case already assembled." *Id.* (alteration in

original) (quoting *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998)).  In other words, when a prosecutor "evaluat[es] evidence and interview[s] witnesses," he or she is immune.  *Id.*  But when the prosecutor "'search[es] for clues and corroboration' that might lead to a recommendation for an arrest," only qualified immunity applies.  *Id.* (quoting *Smith*, 147 F.3d at 94) ("Good prosecutors may — usually should — perform acts reasonably characterized as investigative at all phases of a criminal proceeding.  The investigative acts that are entitled to only qualified immunity are those undertaken in the phase of law enforcement that involves the gathering and piecing together of evidence for indications of criminal activities and determination of the perpetrators."); *see also Simon*, 727 F.3d at 171 (stating that prosecutors are not immune when they perform functions that have "historically and by precedent been regarded as the work of police, not prosecutors" such as "[i]nvestigation, arrest, and detention").

Plaintiff's allegations concerning Hynes' involvement in his prosecution relate to Hynes' (1) collection and fabrication of evidence against Plaintiff, and (2) media statements about Plaintiff, none of which are entitled to absolute immunity.

### i.   Collection and fabrication of evidence against Plaintiff

Defendants argue that even assuming that "[P]laintiff's case [was] assigned to the Rackets Bureau rather than the Sex Crimes Bureau, that witness testimony was evaluated or marshaled, . . . [and] that preparatory sessions took place between prosecutors and witnesses, . . . [these] are all activities that fall within the ambit of prosecutorial judgment and discretion." (Defs.' Mem. 12–13.)

Plaintiff alleges that Hynes participated in the collection and fabrication of evidence against Plaintiff.  (Am. Compl. ¶¶ 33–35.)  In support, Plaintiff asserts that (1) during an August 4, 2010 interview of MT at the DA's Office, Hynes "purposely excluded the Sex Crimes Bureau

and Detective Litwin from the 'investigation' into [Plaintiff]," (*id.* ¶ 33); (2) during a December 2010 interview, YR stated that he did not lie and was not paid for his testimony, but Hynes "encouraged [Sholem Weisner, a friend of YR's] . . . to continue in his efforts to make [YR] crack, (*id.* ¶ 35); and (3) "Hynes personally counseled [the Lebovits family] on what 'evidence' to obtain [against Plaintiff]," (*id.*).

The Court finds that Hynes is not protected by absolute immunity for (1) his decision to exclude the Sex Crimes Bureau and Detective Litwin from the investigation into Plaintiff; (2) encouraging Weisner to make YR "crack," or (3) counseling the Lebovits family on what evidence to obtain against Plaintiff.  Plaintiff was arrested on April 12, 2011, (Am. Compl. ¶ 44), after these events transpired, (*see id.* at ¶¶ 3, 33).  Hynes' actions therefore were part of the evidence-gathering process before Plaintiff's arrest; they were not investigative activities undertaken *after* the case was "already assembled," as part of Hynes' effort "to be an effective advocate."  *Giraldo*, 694 F.3d at 166 (stating that prosecutors are only entitled to qualified immunity for "investigative steps [taken] . . . to gather evidence," as opposed to "preparatory steps . . . take[n] to be an effective advocate of a case already assembled" for which a prosecutor is shielded by absolute immunity).  Further, Hynes' advice to the Lebovits family "on what 'evidence' to obtain [against Plaintiff]," (Am. Compl. ¶ 35), was part of the investigation into Plaintiff that involved gathering and piecing together evidence for indication of criminal activity, which has historically been regarded as the work of the police, not prosecutors.  *Van de Kamp*, 555 U.S. at 344 ("[A]bsolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation." (citing *Burns*, 500 U.S. at 496)); *Simon*, 727 F.3d at 172 ("Investigation, arrest, and detention have historically and by precedent been regarded as the work of police, not prosecutors . . . ."); *Giraldo*, 694 F.3d at 166 (stating that prosecutors are not

absolutely immune when acting in the "phase of law enforcement that involves the gathering and piecing together evidence for indications of criminal activities and determination of the perpetrators" (citing *Smith*, 147 F.3d at 94)).

## ii.   Media statements

Nor can Hynes rely on absolute immunity to shield him from liability arising from his statements to the media.  Plaintiff alleges that after his arrest, Hynes convened a news conference and "denounced [Plaintiff and his son]."  (*Id.* ¶ 44.)  Hynes told the media, "child abuse has to be prosecuted vigorously, but we also have to be very, very careful about false complaints."  (*Id.*)  In addition, on July 24, 2013, Hynes appeared on a radio show, stating, "I believe there was a substantial effort by [Plaintiff] to gain money by making up stories.  I think we have a substantial case."  (*Id.* ¶ 50.)

Prosecutors are not protected by absolute immunity for statements to the press but may be protected by qualified immunity in their communications with the media.  *Galliotti v. Green*, No. 07-CV-6601, 2011 WL 2938449, at *6 (W.D.N.Y. July 19, 2011) (collecting cases); *Jovanovic v. City of New York*, No. 04-CV-8437, 2006 WL 2411541, at *16 (S.D.N.Y. 2006) ("[T]he Second Circuit made clear that 'only qualified good faith immunity is available where a prosecutor distributes extraneous statements to the press designed to gain unfair advantage at trial.'" (quoting *Powers v. Coe*, 728 F.2d 97, 103 (2d Cir. 1984))); *Thomas v. County of Putnam*, 262 F. Supp. 2d 241, 248–49 (S.D.N.Y. 2003) ("[I]mmunity is not available when a prosecutor releases information or evidence to the media." (citing *Buckley*, 509 U.S. at 276–78)).  While statements made during judicial proceedings are shielded by absolute immunity because they are part of the prosecutor's function as an advocate, statements made outside of court at a press

conference do "not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions." *Buckley*, 509 U.S. at 278.

The Court, therefore, considers below whether Hynes is shielded by qualified immunity for his alleged actions relating to the collection and fabrication of evidence against Plaintiff and media statements about Plaintiff.

### c. Malicious prosecution claim

Defendants contend that Plaintiff's malicious prosecution claim must be dismissed because (1) probable cause existed for the prosecution against Plaintiff; and (2) Plaintiff has failed to demonstrate that Hynes was personally involved in any alleged constitutional deprivation. (*See* Defs.' Mem. 7–8.) In support, Defendants argue that a presumption of probable cause arises from Plaintiff's grand jury indictment, and that Plaintiff cannot rebut that presumption because "[t]here are no facts alleged from which it can plausibly be inferred that Hynes presented evidence in the grand jury, misled the grand jury, or otherwise acted in bad faith." (*Id.* at 7.) Defendants also argue that Plaintiff has made only three allegations that specifically implicate Hynes — that he (1) purposefully excluded attorneys from the Sex Crimes Bureau from the investigation into Plaintiff; (2) "encouraged a convicted felon to continue in his attempts to influence a witness to implicate [P]laintiff in a bribery scheme"; and (3) "denounced" Plaintiff and his son in the media — which are insufficient to demonstrate Hynes' personal involvement. (*Id.* at 8.)

Plaintiff argues that (1) "[s]upplying falsified evidence 'in substantial furtherance of a criminal action' is sufficient to constitute the commencement [of] a criminal proceeding," (Pl.'s Opp'n 12 (collecting cases)); (2) although a presumption of probable cause arises from his grand jury indictment, that presumption is rebutted because the indictment was "produced exclusively

by means of perjury," which "is attributable to Hynes as a member of the conspiracy to maliciously prosecute Plaintiff," (*id.* at 14); (3) "following a review of Plaintiff's case by the Brooklyn District Attorney's office under District Attorney Thompson, it was dismissed in its entirety," (*id.* at 8); and (4) "[a] lack of probable cause generally creates an inference of malice," (*id.* at 14 (citing *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003)), and that "[m]alice is also clearly present, in that the prosecution was motivated by the desire to undermine the conviction of Baruch Lebovitz," (*id.*).

The Second Circuit has clarified that "federal law defines the elements of a [section] 1983 malicious prosecution claim, and that a [s]tate's tort law serves only as a source of persuasive authority rather than binding precedent in defining these elements." *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018). To prevail on a section 1983 claim for malicious prosecution, a plaintiff is "required to show 'a seizure or other perversion of proper legal procedures implicating [his] personal liberty and privacy interests under the Fourth Amendment,'" *id.* at 24 (alteration in original) (quoting *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004)), and "that criminal proceedings were initiated or continued against him, with malice and without probable cause, and were terminated in his favor," *id.* (first citing *Mitchell v. City of New York*, 841 F.3d 72, 79 (2d Cir. 2016); and then citing *Swartz v. Insogna*, 704 F.3d 105, 111–12 (2d Cir. 2013)). The elements of malicious prosecution under New York law are substantially the same. *See Morris v. Silvestre*, 604 F. App'x 22, 24 (2d Cir. 2015) ("The elements of a claim for malicious prosecution in New York are '(1) the initiation or continuation of a criminal proceeding against [the] plaintiff; (2) termination of the proceeding in [the] plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for [the] defendant's actions.'" (quoting *Manganiello v. City of New York*,

612 F.3d 149, 161 (2d Cir. 2010))).  However, under section 1983, a plaintiff is required to show an "affirmative indication[] of innocence to establish 'favorable termination,'" *see Lanning*, 908 F.3d at 25, and under state law, the favorable termination element is satisfied "so long as the final termination of the criminal proceeding is not inconsistent with the [p]laintiff's innocence," *id.* (citing *Penree v. City of Utica*, No. 13-CV-1323, 2016 WL 915252, at *17 (N.D.N.Y. Mar. 4, 2016)).  Because the lack of probable cause is an element of a malicious prosecution claim, "the existence of probable cause is . . . a complete defense to a claim of malicious prosecution." *Keith v. City of New York*, 641 F. App'x 63, 67 (2d Cir. 2016) (first quoting *Stansbury v. Wertman*, 721 F.3d 84, 90 (2d Cir. 2013); and then citing *De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 761 (2016)).

### i.     Probable cause

"[A]bsence of probable cause for prosecution is an element of a malicious prosecution claim, and thus probable cause provides a complete defense to [a malicious prosecution] claim." *Tuccillo v. County of Nassau*, 723 F. App'x 81, 82 (2d Cir. 2018) (citing *Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017)); *see also Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021) ("[P]robable cause is a complete defense against a claim for malicious prosecution." (citing *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003))); *Frost v. New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (same) (quoting *Stansbury*, 721 F.3d at 94–95)); *Dufort*, 874 F.3d at 351 (same).  The existence of probable cause in a malicious prosecution suit is determined at the time the prosecution is commenced, *Rothstein v. Carriere*, 373 F.3d 275, 292 (2d Cir. 2004), and requires "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff [is] guilty," *Stansbury*, 721 F.3d at 95 (citation omitted).

While an "indictment by a grand jury creates a presumption of probable cause," *see McGrier v. City of New York*, 849 F. App'x 268, 270 (2d Cir. 2021) (quoting *Manganiello*, 612 F.3d at 161–62), a plaintiff can rebut that presumption by "showing that the indictment 'was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith,'" *Jones v. City of New York*, 846 F. App'x 22, 24 (2d Cir. 2021) (quoting *Rothstein*, 373 F.3d at 283); *see also Rios v. City of New York*, 687 F. App'x 88, 90 (2d Cir. 2017) ("If plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." (quoting *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006))); *Rothstein*, 373 F.3d at 283–84 ("The presumption [of probable cause] may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the [g]rand [j]ury or the [d]istrict [a]ttorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." (citation omitted)).  Bad faith may exist "[w]here there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have lied in order to secure an indictment" or where "a prosecutor knowing[ly] use[es] . . . false evidence to obtain a tainted conviction." *Manganiello*, 612 F.3d at 162 (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)); *see also Hincapie v. City of New York*, 434 F. Supp. 3d 61, 74 (S.D.N.Y. 2020) (finding plaintiff met his burden to rebut probable cause in alleging "the indictment was the product of suppressed evidence . . . , fabricated confessions, and conduct taken in bad faith").  Such actions are taken in bad faith as they "work[] an unacceptable 'corruption of the truth-seeking function of the trial process.'" *Manganiello*, 612 F.3d at 162 (quoting *Ricciuti*, 124 F.3d at 130).  Bad faith also exists where an officer "knowing

that no crime has been committed, presses the prosecution of criminal charges 'solely in order to further [the officer's] own personal goals.'" *McClellan*, 439 F.3d at 146 (alteration in original) (quoting *Marshall v. Sullivan*, 105 F.3d 47, 55 (2d Cir. 1996)).[6]

Plaintiff alleges that Hynes knew that Plaintiff was innocent, but nevertheless continued his efforts to procure an indictment against Plaintiff. In support, he alleges that when the ADA prosecuting the case against Lebovits raised her concerns of witness tampering and intimation to the attention of Hynes' Chief Assistant, she was told that Hynes was "unwilling to do anything about it." (Am. Compl. ¶ 22). Plaintiff also alleges that Meyer Lebovits provided a recording of a conversation between himself and Plaintiff to Hynes, during which Meyer Lebovits insisted that Plaintiff was "wrong to report [Lebovits] to the police," (*id.* ¶ 16), and Plaintiff "expressed his objection to the threats he was receiving to force him into dropping his son's case," (*id.* ¶ 18). In addition, Plaintiff alleges that Hynes "coordinat[ed] a pay-off by the Lebovits family to YR" and counseled the Lebovits family "that they should obtain a letter from YR stating that he was in poor health." (*Id.* ¶¶ 51–52.) Those allegations are sufficient to rebut the presumption of probable cause by showing that Hynes knew or had reason to know that Lebovits and his supporters — and not Plaintiff — were tampering with and intimidating witnesses. *See also*

---

[6] In *Rehberg v. Paulk*, 566 U.S. 356 (2012), the Supreme Court held that a "grand jury witness, including a law enforcement officer, 'has absolute immunity from any [section] 1983 claim based on the witness' testimony, even if that testimony is perjurious." *Coggins v. Buonora*, 776 F.3d 108, 112 (2d Cir. 2015). Therefore, following *Rehberg*, a plaintiff may not be able to rebut the presumption of probable cause by relying on a witness's perjurious testimony before the grand jury. *See Adamou v. Doyle*, No. 12-CV-7789, 2017 WL 1230541, at *3 (S.D.N.Y. Jan. 12, 2017) (collecting cases); *Carr v. City of New York*, No. 11–CV–6982, 2013 WL 1732343, at *5 (S.D.N.Y. Apr.19, 2013) ("[The] presumption [of probable cause arising from indictment] cannot be overcome by alleging that a police officer lied before the grand jury given the absolute immunity accorded grand jury witnesses."). However, where a plaintiff's malicious prosecution claim does not rest solely on allegedly perjured grand jury testimony, the claim "is not 'based on' that testimony" within the meaning of *Rehberg*, and accordingly, the defendant is not entitled to absolute immunity. *Coggins*, 776 F.3d at 113.

*Adamou v. Doyle*, No. 12-CV-7789, 2017 WL 1230541, at *3 (S.D.N.Y. Jan. 12, 2017) (finding

the plaintiff's allegation that the officer "knew that the indictment was based exclusively on false

testimony yet he continued to make false statements to the NYPD, the Bronx County District

Attorney's office, and others to facilitate [plaintiff's prosecution] . . . is a different proposition,

and . . . sufficient to rebut the presumption of probable cause").

      In addition, Plaintiff alleges Hynes: (1) "encouraged [Sholem Weisner, a friend of YR's]

. . . to continue in his efforts to make [YR] crack," that is, continue his efforts to make YR

implicate Plaintiff, and (2) "personally counseled [the Lebovits family] on what 'evidence' to

obtain [against Plaintiff]." (*Id.* ¶ 35). At this stage, these allegations are sufficient to rebut any

presumption of probable cause and support the inference that Hynes knowingly used false

evidence to obtain an indictment and that Plaintiff's indictment was therefore procured by bad

faith. *See Manganiello*, 612 F.3d at 162 (finding bad faith may exist where "a prosecutor

knowing[ly] use[es] . . . false evidence to obtain a tainted conviction"); *Li v. City of New York*,

246 F. Supp. 3d 578, 612 (E.D.N.Y. 2017) (holding that bad faith rebutted the presumption of

probable cause where the plaintiff alleged that the defendants made false reports and fabricated

witness statements even though they knew or had reason to know that plaintiff was innocent);

*Shabazz v. Kailer*, 201 F. Supp. 3d 386, 394 (S.D.N.Y. 2016) (holding that because the

"plaintiffs allege that substantial exculpatory facts were known to [the DA] before he drafted the

purportedly misleading affidavit, . . . [a]t the pleading stage . . . the [c]ourt cannot decide that

there was probable cause to prosecute as a matter of law"). Plaintiff has therefore alleged

sufficient facts to rebut the presumption of probable cause.

24

### ii.   Personal involvement

"[T]he 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.'" *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)), *as amended* (Feb. 24, 2016).  A plaintiff must allege the direct participation or personal involvement of each of the named defendants in the alleged constitutional deprivation.  *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010); *Farrell*, 449 F.3d at 484 ("It is well settled in this [c]ircuit that personal involvement of [the] defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994))).  As the Second Circuit recently made clear, "there is no special rule for supervisory liability," and to find a state official liable under section 1983, "a plaintiff must plead that 'each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).  Being in the chain of command is not sufficient to satisfy personal involvement as the "violation must be established against the supervisory official *directly*."  *Id.* (emphasis added); *see also Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *33 (S.D.N.Y. Mar. 26, 2021) ("[I]n light of *Tangreti*, [p]laintiff must establish that [defendant] committed a constitutional violation through his own conduct, rather than through his supervision of [others]."); *Hunter v. Telefore*, No. 21-CV-78, 2021 WL 878745, at *3 (E.D.N.Y. Mar. 8, 2021) ("[T]he [Second] Circuit recently held that, following the Supreme Court's decision in *Iqbal*, a plaintiff must sufficiently allege a supervisory official's *direct* involvement in an alleged constitutional violation to state an actionable claim against that official.").  Direct participation provides a basis of liability where the defendant personally

participates in the plaintiff's prosecution with "knowledge of the facts that rendered the conduct illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (quoting *Gaston v. Coughlin*, 249 F.3d 156, 165–66 (2d Cir. 2001)).

Accepting as true all of Plaintiff's factual allegations and drawing all reasonable inferences in his favor, Plaintiff has sufficiently alleged that Hynes was knowingly and personally involved in his malicious prosecution.

First, Plaintiff alleges that Hynes (1) "purposely excluded the Sex Crimes Bureau and Detective Litwin from the 'investigation'" into Plaintiff, (Am. Compl. ¶ 33); (2) "encouraged [Sholem Weisner, a friend of YR's] . . . to continue in his efforts to make [YR] crack," (*id.* ¶ 35); and (3) "personally counseled [the Lebovits family] on what 'evidence' to obtain [against Plaintiff], (*id.*).[7] These facts are sufficient to support the inference that Hynes' "own individual actions . . . violated the Constitution" in the malicious prosecution of Plaintiff, *Tangreti*, 983 F.3d at 615, as they indicate that Hynes personally participated in the investigation into Plaintiff, including by directing which attorneys would be excluded from the investigation and by

_____

[7] Plaintiff also argues that Hynes was personally involved because "[a]s an alleged conspirator, [he] shares responsibility for the acts of his co-conspirators." (Pl.'s Opp'n 1 (stating that Hynes "is equally responsible for the false evidence that was manufactured and supplied to the Brooklyn District Attorney's office . . . which later resulted in Plaintiff's indictment."); *see also id.* at 14 (stating that the allegedly perjured testimony "is attributable to Hynes as a member of the conspiracy to maliciously prosecute Plaintiff").) However, these conclusory allegations are insufficient to establish the personal involvement of a defendant. *See Forbes v. Doe*, No. 18-CV-6700, 2021 WL 810020, at *3 (W.D.N.Y. Mar. 3, 2021) ("[W]here the personal involvement of a defendant in a section 1983 violation is premised upon a claim of conspiracy, it is incumbent on a plaintiff to state more than conclusory allegations to avoid dismissal of a claim predicated on a conspiracy to deprive him of his constitutional rights." (citing *Vega v. Artus*, 610 F. Supp. 2d 185, 199 (N.D.N.Y. 2009))); *see also Leibovitz v. Barry*, No. 15-CV-1722, 2016 WL 5107064, at *11 (E.D.N.Y. Sept. 20, 2016) (finding conclusory allegation that defendant conspired to maliciously prosecute plaintiff insufficient to show personal involvement). Nevertheless, for the reasons detailed below, the Court finds that Plaintiff sufficiently alleges Hynes' personal involvement in the malicious prosecution on other grounds.

directing third parties to obtain certain evidence against Plaintiff, including YR's testimony, even in the face of evidence that Plaintiff had not committed a crime.  *See Alvarez v. County of Orange, New York*, 95 F. Supp. 3d 385, 399 n.1 (S.D.N.Y. 2015) (finding personal involvement sufficiently alleged where defendant "directly participated in the investigation, directed the investigation, and instructed [others] to arrest [the plaintiff]");  *Vazquez v. City of New York*, No. 10-CV-6277, 2014 WL 4388497, at *8 (S.D.N.Y. Sept. 5, 2014) (finding that a reasonable juror could infer defendant's personal involvement in malicious prosecution where defendant, *inter alia*, met with witnesses and was present when witnesses were coached to testify falsely);  *cf. Demosthene v. City of New York*, No. 18-CV-1358, 2019 WL 181305, at *7 (E.D.N.Y. Jan. 10, 2019) (dismissing section 1983 claim because plaintiff "fail[ed] to identify the role of each of the defendant officers in formulating and conveying the fabricated evidence").

Plaintiff also sufficiently alleges that Hynes had knowledge of the facts that rendered his conduct illegal in participating in Plaintiff's malicious prosecution.  First, Plaintiff alleges that Hynes had a recording of a May of 2009 conversation between Meyer Lebovits and Plaintiff. (Am. Compl. ¶ 16.)  In the recording, Meyer Lebovits insisted that it was wrong to report the sexual abuse of Plaintiff's son to the police and that Plaintiff should have approached the Lebovits family instead, who would have "taken care of" "the problem."  (*Id.*)  Plaintiff alleges that during that conversation, he "expressed his objections to the threats he was receiving to force him into dropping his son's case."  (*Id.* ¶ 18.)  Second, Plaintiff alleges that the ADA prosecuting the case against Lebovits brought her concerns of witness tampering and intimidation to the attention of Hynes' Chief Assistant, who told the ADA that Hynes was "unwilling to do anything about it."  (*Id.* ¶ 22.)  Third, Plaintiff alleges that Hynes counseled the Lebovits family "that they should obtain a letter from YR stating that he was in poor health" and

"coordinat[ed] a pay-off by the Lebovits family to YR." (*Id.* ¶¶ 51–52.) Based on these allegations, a jury could conclude that Hynes knew that Lebovits was engaged in witness tampering, and that Hynes ignored it or participated in it. Plaintiff has therefore sufficiently alleged that Hynes "knew of the facts rendering [his conduct] illegal." *Victory*, 814 F.3d at 67; *see also Williams v. County of Nassau*, No. 14-CV-5959, 2016 WL 6994312, at *8 (E.D.N.Y. Nov. 30, 2016) (finding personal involvement where the plaintiff "pointed to testimony . . . [that the defendant] was present at the show-up and aware of the fact that [a witness] exculpated plaintiff" and nonetheless ordered that the plaintiff be detained); *Vazquez*, 2014 WL 4388497, at *8 (finding personal involvement where the defendants knew that third parties were coached to testify falsely against the plaintiff but proceeded with the prosecution against him); *Murvin v. Jennings*, 259 F. Supp. 2d 180, 190 (D. Conn. 2003) (finding that plaintiff sufficiently alleged personal involvement and that defendant had knowledge of facts rendering his conduct illegal where plaintiff provided evidence showing that defendant received witness statements recanting their implication of the plaintiff and had access to exculpatory information regarding plaintiff).

Because Plaintiff has alleged sufficient facts to rebut the presumption of probable cause and to infer Hynes' personal involvement in the malicious prosecution of Plaintiff, the Court denies Defendants' motion to dismiss Plaintiff's malicious prosecution claim.

### d.   Section 1983 conspiracy claim

Defendants argue that Plaintiff's conspiracy allegations are "sparse" and "conclusory" and "attribute no specific conduct to Hynes to evince any agreement or participation in an effort to violate one or more of [P]laintiff's rights." (Defs.' Mem. 13.) In addition, Defendants argue that Plaintiff's conspiracy claim cannot survive because Plaintiff has failed to allege facts showing Hynes' personal involvement in the alleged conspiracy. (*Id.* at 13, 15.)

Plaintiff argues that "there can be no dispute" that Hynes "worked closely with the

Lebovits family following the conviction of Baruch Lebovits" or that he "pursued a joint

investigation into whether both MT and YR fabricated their allegations of abuse against

Lebovits." (Pl.'s Opp'n 10.)  Plaintiff also argues that "there can be no dispute that the Sex

Crimes Bureau tried in vain to initiate an investigation into witness tampering by the Lebovits

family . . .[,] that Hynes refused to sanction it," and that "Hynes personally counseled the

Lebovits family as to what 'evidence' they should obtain [with] respect [to] YR in order to

include him in the case against Plaintiff." (*Id.*)  Plaintiff claims that these efforts "resulted in

fabricated allegations from Meyer Lebovits, Moshe Friedman, and MT, respectively, on the basis

of which Plaintiff's malicious prosecution was initiated." (*Id.*)

To state a claim for conspiracy under section 1983, a "plaintiff must plausibly allege

(1) an agreement between a state actor and a private party (2) to act in concert to inflict

unconstitutional injury, and (3) an overt act furthering that goal and causing damages." *Corsini*

*v. Brodsky*, 731 F. App'x 15, 19 (2d Cir. 2018) (citing *Ciambriello v. County of Nassau*, 292

F.3d 307, 324–25 (2d Cir. 2002)); *see also McCray v. Patrolman N.A. Caparco*, 761 F. App'x

27, 31 (2d Cir. 2019) (same); *McGee v. Dunn*, 672 F. App'x 115, 116 (2d Cir. 2017) (same).

"[C]omplaints containing only conclusory, vague, or general allegations that the defendants have

engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly

dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific

instances of misconduct." *Ciambriello*, 292 F.3d at 325 (quoting *Dwares v. City of New York*,

985 F.2d 94, 100 (2d Cir. 1993)); *see also Morales v. City of New York*, 752 F.3d 234, 237 (2d

Cir. 2014) ("[E]ven specific allegations of conspiracy, if conclusory, [are] not . . . sufficient to

state a claim for conspiratorial violation of [a plaintiff's] rights."); *Buari v. City of New York*, ---

F. Supp. 3d ---, ---, 2021 WL 1198371, at *16 (S.D.N.Y. Mar. 30, 2021) ("'To survive a motion

to dismiss, a plaintiff must . . . provide some factual basis supporting a meeting of the minds,

such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end,'

as well as 'some details of time and place and the alleged effects of the conspiracy.'" (first

quoting *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993); and then quoting *Romer v.

Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000))); *White v. Abney*, No. 17-CV-4286,

2019 WL 1298452, at *6–7 (E.D.N.Y. Mar. 21, 2019) (dismissing complaint where the plaintiff

did not allege facts to support section 1983 conspiracy claim that the defendants sought to have

him arrested based on false information).  However, because "'conspiracies are by their very

nature secretive operations,' [they] may have to be proven by circumstantial, rather than direct,

evidence."  *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (quoting *Rounseville v. Zahl*,

13 F.3d 625, 632 (2d Cir. 1994)); *see also Anilao v. Spota*, 340 F. Supp. 3d 224, 255 (E.D.N.Y.

2018) (quoting same).

Plaintiff has alleged sufficient facts to state a conspiracy claim at this stage.  Plaintiff

alleges that: Hynes entered into an agreement with the Lebovits family and others to undermine

the Lebovits conviction by, *inter alia*, prosecuting Plaintiff for soliciting false testimony and

attempted extortion, (Am. Compl. ¶ 55); "Hynes had long cultivated" a relationship with

individuals in Plaintiff's community and "harvested their votes," (*id.* ¶ 25); and, in return, as the

District Attorney, Hynes "granted undue access and influence to community leaders and other

powerful and wealthy interests within the community," (*id.*).  These allegations show that Hynes

and certain powerful or wealthy individuals in the community — for example, members of the

Lebovits family — shared an interest in undermining or overturning the Lebovits conviction.

When combined with Plaintiff's allegations of coordination between Hynes and others, for

example, that Hynes counseled the Lebovits family on what evidence to obtain against Plaintiff and coordinated a pay-off by the Lebovits family to YR, (*id.* ¶¶ 31, 51), the allegations support the inference that Hynes and others agreed, expressly or tacitly, to undermine the Lebovits conviction through Plaintiff's prosecution. *See, e.g.*, *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 208–09 (S.D.N.Y. 2013) ("[T]o withstand a motion to dismiss a [section] 1983 . . . conspiracy claim, a plaintiff 'must provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end.'" (quoting *Romer*, 119 F. Supp. 2d at 363)).

Plaintiff has also alleged several overt acts that were committed in furtherance of the conspiracy.  He alleges that Hynes: (1) met his co-conspirators on numerous occasions after the initial meetings on April 14 and on April 27, 2010, (Am. Compl. ¶ 56); (2) "purposely excluded the Sex Crimes Bureau and Detective Litwin from the 'investigation'" into Plaintiff, (*id.* ¶ 33); (3) "encouraged [Sholem Weisner, a friend of YR's] . . . to continue in his efforts to make [YR] crack," that is, continue his efforts to make YR implicate Plaintiff, (*id.* ¶ 35); and (4) "personally counseled [the Lebovits family] on what 'evidence' to obtain [against Plaintiff]," (*id.*).  These allegations establish that, in order to accomplish the conspiracy's purported goal of undermining Lebovits' conviction, Hynes encouraged third parties or his co-conspirators to obtain certain evidence to support the prosecution of Plaintiff.  They also support the inference that Hynes had a role in directing the investigation into Plaintiff, since he allegedly made the decision to exclude the Sex Crimes Bureau and Detective Litwin from the investigation.  These overt acts provide sufficient "details of time and place" to support Plaintiff's conspiracy claim.  *See, e.g.*, *Martin v. County of Suffolk*, No. 13-CV-2104, 2014 WL 1232906, at *1, 6 (E.D.N.Y. March 26, 2014) (finding allegations that defendant caused police to arrest plaintiff "without any legal

justification" in order to prevent him from "lawfully standing on the sidewalk" and recording as a third party "barricaded herself within [her] premises to avoid being served by [the police] with [desk] appearance tickets" sufficient to support plaintiff's section 1983 conspiracy claim); *Biswas v. City of New York*, 973 F. Supp. 2d 504, 534 (S.D.N.Y. 2013) (finding plaintiff's allegations that defendants "communicated with each other and 'devis[ed] a plan to arrest, detain, restrain, prosecute and suspend [the plaintiff], all knowing that there was no evidence linking [the plaintiff] to any criminal conduct'" sufficient to state a section 1983 conspiracy claim (alterations in original)); *Young v. Suffolk County*, 705 F. Supp. 2d 183, 197 (E.D.N.Y. 2010) ("A plaintiff is not required to list the place and date of defendants['] meetings and the summary of their conversations when he pleads conspiracy," but he is required to "present facts tending to show agreement and concerted action." (alteration in original) (quoting *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005), *adopted in relevant part by Fisk v. Letterman*, 401 F. Supp. 2d 362 (S.D.N.Y. 2005))).  The Court therefore denies Defendants' motion to dismiss Plaintiff's conspiracy claim.

### e.   Qualified immunity

Defendants argue that Hynes is entitled to qualified immunity because "it was reasonable for him to investigate and prosecute [P]laintiff for making monetary demands to cause the dismissal of criminal charges and influence witnesses, on receiving reports of such activities." (Defs.' Mem. 18.)

Plaintiff argues that Hynes violated his clearly established constitutional rights and is therefore not entitled to qualified immunity.  (Pl.'s Opp'n 16–17.)

Qualified immunity protects government officials from civil damages liability "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'" *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020)

(quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).   "Thus, pursuant to the two-step

framework articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), when an

official raises qualified immunity as a defense, the court must consider whether: '(1) . . . the

official violated a statutory or constitutional right, and (2) . . . the right was "clearly established"

at the time of the challenged conduct.'"   *Id.* (quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d

Cir. 2016)); *see also Chamberlain ex rel. Chamberlain v. City of White Plains*, 960 F.3d 100,

110 (2d Cir. 2020) ("Qualified immunity is available to officials so long as their actions do not

violate 'clearly established statutory or constitutional rights of which a reasonable person would

have known.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))); *Garcia v. Does*, 779

F.3d 84, 92 (2d Cir. 2014) (same).

Given that "qualified immunity is not only a defense to liability, but also provides

immunity from suit," a court should resolve a "defendant's entitlement to qualified immunity . . .

'at the earliest possible stage in [the] litigation.'"   *Lynch v. Ackley*, 811 F.3d 569, 576 (2d Cir.

2016) (quoting *Pearson*, 555 U.S. at 231–32).   "[U]sually, the defense of qualified immunity

cannot support the grant of a Rule 12(b)(6) motion" to dismiss, but "a district court may grant a

Rule 12(b)(6) motion on the ground of qualified immunity if 'the facts supporting the defense

appear on the face of the complaint.'"   *Hyman v. Abrams*, 630 F. App'x 40, 42 (2d Cir. 2016)

(quoting *McKenna v. Wright*, 386 F.3d 432, 435–36 (2d Cir. 2004)).   As a result, "a defendant

presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary

judgment must accept [that] . . . the plaintiff is entitled to all reasonable inferences from the facts

alleged, not only those that support his claim, but also those that defeat the immunity defense."

*Id.* (alteration in original) (quoting *McKenna*, 386 F.3d at 436).

Plaintiff alleges that Hynes conspired with others to undermine the prosecution and conviction of Lebovits by, *inter alia*, prosecuting Plaintiff for allegedly promising Lebovits and his supporters that Plaintiff would convince the complaining witnesses to recant their testimony in exchange for money.  (Am. Compl. ¶¶ 1, 42.)  In addition, Plaintiff alleges that Hynes was aware that Lebovits and his supporters were engaged in witness tampering and witness intimidation but was "unwilling to do anything about it," (*id.* ¶ 22), and that Meyer Lebovits provided Hynes with a recording of a conversation during which Plaintiff "expressed his objections to the threats he was receiving to force him into dropping his son's case," (*id.* ¶ 18). Plaintiff also alleges that Hynes "coordinat[ed] a pay-off by the Lebovits family to YR."  (*Id.* ¶ 51.)  Finally, Plaintiff asserts that Hynes "purposely excluded the Sex Crimes Bureau and Detective Litwin from the 'investigation' into [Plaintiff]," (*id.* ¶ 33), counseled the Lebovits family and their supporters on what evidence to obtain against Plaintiff, (*id.* ¶ 35), "personally convened" a "news conference" following Plaintiff's arrest and imprisonment during which "[Plaintiff] and his son were denounced in front of the media," (*id.* ¶ 44), and appeared on a radio show, stating: "I believe there was a substantial effort by [Plaintiff] to gain money by making up stories.  I think we have a substantial case," (*id.* ¶ 50).  Accepting those allegations as true, they amount to the assertion that Hynes knowingly violated the law by participating and directing the prosecution of Plaintiff, knowing that Plaintiff was innocent, and thereby precluding qualified immunity.  *Vincent v. Yelich*, 718 F.3d 157, 173 (2d Cir. 2013) ("Qualified immunity is not available to 'those who knowingly violate the law.'" (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))).  Further, drawing all inferences in Plaintiff's favor and accepting Plaintiff's factual allegations as true, Hynes is not entitled to qualified immunity at this stage because it was not objectively reasonable for Hynes to believe that prosecuting Plaintiff did not

violate the law, given his alleged knowledge of Plaintiff's innocence. *See Cooper v. City of New York*, No. 12-CV-8008, 2013 WL 5493011, at *6 (S.D.N.Y. Oct. 2, 2013) (finding no qualified immunity where plaintiff alleged that defendants "knew he was innocent of the charges but chose to provide contrary information"); *Crews v. County of Nassau*, No. 06-CV-2610, 2007 WL 4591325, at *18 (E.D.N.Y. Dec. 27, 2007) (denying qualified immunity where plaintiff alleged that defendants prosecuted him knowing he was innocent and engaged in "several coercive interrogations to falsely implicate him"). The Court therefore denies Defendants' motion to dismiss Plaintiff's malicious prosecution and conspiracy claims based on qualified immunity.

### f. Municipal liability claim

Defendants argue that Plaintiff's claim against the municipality must be dismissed because "the pleading is threadbare and therefore does not satisfy the *Iqbal* plausibility standard." (Defs.' Mem. 18–19.) Defendants also argue that Plaintiff's claim must be dismissed because he has not adequately shown the existence of an official policy or custom that deprived him of his rights, and further argue that Hynes "acted in his prosecutorial role as an advocate for the People of New York," not the municipality, and therefore the City cannot be held liable for his actions. (*Id.* at 21.)

Plaintiff argues that the City is liable for Hynes' actions because the violation of Plaintiff's constitutional rights "resulted from policies, customs or practices in the management and administration of the Brooklyn [DA's] office under [Hynes], . . . including with respect to the investigative activity pursued and procedures followed in the case of Plaintiff, in its deliberate indifference to witness tampering and intimidation, and in the opportunity it afforded to a convicted pedophile to undermine his conviction . . . ." (Am. Comp. ¶ 62.)

To establish a municipal liability claim, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. County of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)); *see also Frost*, 980 F.3d at 258 ("To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." (quoting *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019))). A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) an action by a decision-maker who possesses final authority to establish municipal policy; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) ("Where plaintiffs allege that their rights were deprived . . . by a city employee's single tortious decision or course of action, the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself. Such an action constitutes the act of the municipality and therefore provides a basis for municipal liability where it is taken by, or is attributable to, one of the city's authorized policymakers." (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 481–82 (1986))); *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13–14 (2d Cir. 2015) (formal policy officially endorsed by the municipality); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice); *Carter v. Inc. Vill. of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014) (failure to train amounting to deliberate indifference); *O'Kane v.*

36

*Plainedge Union Free Sch. Dist.*, 827 F. App'x 141, 143 (2d Cir. 2020) (failing to "take appropriate action to prevent or sanction violations of constitutional rights" amounting to deliberate indifference (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012)); *Jones*, 691 F.3d at 81 (policymaking official's "express" or "tacit" ratification of low-level employee's actions).

"[U]nder *Monell* municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants." *Barrett v. Orange Cnty. Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999); *see also Coleman v. County of Suffolk*, 685 F. App'x 69, 72 (2d Cir. 2017) ("[M]unicipal liability may arise absent an officer's constitutional deprivation if a deprivation was nonetheless caused by a non-party for whom the municipality is also bound to answer . . . ." (citing *Barrett*, 194 F.3d at 350)); *Rutigliano v. City of New York*, 326 F. App'x 5, 9 (2d Cir. 2009) (affirming that a "'municipality may be found liable under [section] 1983 even in the absence of individual liability' . . . only in very special circumstances" (quoting *Barrett*, 194 F.3d at 350)).

In addition, "a single act" could form the "basis of municipal liability . . . [s]o long as the single challenged act was the decision of a municipal policymaker." *Walker v. City of New York*, 974 F.2d 293, 296 (2d Cir. 1992) (citing *Pembaur*, 475 U.S. at 480); *see also Pignone v. Village of Pelham Manor*, No. 10-CV-2589, 2014 WL 929805, at *3 (S.D.N.Y. Mar. 6, 2014) ("Even one act by a municipal policymaker may constitute a municipal policy, so long as that policymaker possessed final authority to establish municipal policy in the area at issue." (citing *Pembaur*, 475 U.S. at 481–83)); *see also Canzoneri v. Incorporated Vill. of Rockville Ctr.*, 986 F. Supp. 2d 194, 204 (E.D.N.Y. 2013) ("It is well settled that municipal liability may be

established based on the single acts of a municipal official with 'final policymaking authority.'"
(collecting cases)).

For *Monell* purposes, a district attorney acts as a policymaker for the municipality only
when he or she acts as "the manager of the district attorney's office," *Bellamy*, 914 F.3d at 758–
59, by, for example, "directing the police and ADAs to engage in unconstitutional investigative
procedures," *Myers v. County of Orange*, 157 F.3d 66, 77 (2d Cir. 1998); *see also Pinaud v.
County of Suffolk*, 52 F.3d 1139, 1153 n.14 (2d Cir. 1995) ("[A]s long as a plaintiff's 'claims
center[] not on decisions whether or not, and on what charges, to prosecute but rather on the
administration of the district attorney's office,' there can be liability against a New York county
for an alleged malicious prosecution." (alteration in original) (quoting *Ying Jing Gan v. City of
New York*, 996 F.2d 522, 536 (2d Cir. 1993))); *Fraser v. City of New York*, No. 20-CV-4926,
2021 WL 1338795, at *10–11 (S.D.N.Y. Apr. 9, 2021) (noting that "district courts in this Circuit
have consistently refused to dismiss *Monell* claims alleging that a county prosecutor's office has
sanctioned an unlawful practice" (collecting cases)); *Davis v. Lynbrook Police Dep't*, 224 F.
Supp. 2d 463, 478 (E.D.N.Y. 2002) ("A plaintiff can show a municipal custom, policy or
practice by establishing that an official who is a final policymaker directly committed or
commanded the constitutional violation . . . ." (first citing *Monell*, 436 U.S. at 690; and then
citing *Jeffes v. Barnes*, 208 F.3d 49, 56–57 (2d Cir. 2000))).

The Second Circuit, however, has consistently held that "inherently prosecutorial
functions (i.e., decisions whether to prosecute) are controlled by state policies for purposes of
*Monell*," *see Bellamy*, 914 F.3d at 758, and therefore a prosecutor's decision whether to
prosecute an individual may not form the basis for *Monell* liability, *Martin v. County of Suffolk*,
No. 13-CV-2104, 2014 WL 1232906, at *5 (E.D.N.Y. March 26, 2014) (finding claims based on

"acts of a district attorney related to the decision to prosecute or not prosecute an individual"

may not provide the basis for municipal liability (first citing *Myers*, 157 F.3d at 77; and then

citing *Pinaud*, 52 F.3d at 1154 n.15)).

Plaintiff cannot state a claim against the City based on Hynes' decision to prosecute

Plaintiff despite knowing or having reason to know that Plaintiff was innocent, (Am. Compl.

¶¶ 1, 33–39, 50–51), as Hynes was acting pursuant to state policies in deciding whether or not to

prosecute Plaintiff.  *See D'Alessandro v. City of New York*, 713 F. App'x 1, 8 (2d Cir. 2017)

(finding "the Eleventh Amendment shields [a district attorney and assistant district attorney]

from suit in their official capacities, to the extent that [the plaintiff] attacks their prosecutorial

decisions over the course of his case"); *Baez*, 853 F.2d at 77 (dismissing section 1983 suit

seeking to impose *Monell* liability based on an ADA's attempt to prosecute the plaintiff after a

grand jury declined to return an indictment).

However, Plaintiff sufficiently states a claim for municipal liability based on the violation

of his constitutional rights caused by Hynes as a policy maker in implementing an illegal

investigative policy within the Brooklyn DA's Office.  Plaintiff alleges that Hynes instituted "a

policy, custom and practice of deliberate indifference towards witness tampering and

intimidation of victims of pedophiles and their families within the Hasidic community."  (Am.

Compl. ¶ 22.)  He alleges that pursuant to this policy, when the ADA prosecuting the case

against Lebovits for his abuse of MT raised her concerns about witness tampering and

intimidation with Hynes' Chief Assistant, she was told that "Hynes was unwilling to do anything

about it."  (*Id.*)  In addition, Plaintiff alleges that Hynes "purposely excluded the Sex Crimes

Bureau and Detective Litwin from the 'investigation' into [Plaintiff]," including during ADA

Nicolas Batsidis' interview of MT in September of 2010, in order to avoid the potential

39

revelation of inconsistencies or otherwise exculpatory information during the course of MT's

interview.  (*Id.* ¶ 33.)  These allegations are sufficient to withstand a motion to dismiss as courts

in the Second Circuit have routinely declined to dismiss *Monell* claims alleging that the District

Attorney's Office, under the direction of the District Attorney, condoned or displayed deliberate

indifference to illegal and unconstitutional investigative practices.  *See Fraser*, 2021 WL

1338795, at *10–11) (refusing to dismiss plaintiff's municipal liability claim based on

allegations that "the Manhattan DA had an 'unlawful policy . . . [of directing] prosecutors to

refrain from asking police officer-witnesses about civil suits or allegations of misconduct against

them unrelated to the prosecution at hand'" to avoid obtaining information that would have to be

disclosed under *Brady* (collecting cases)); *O'Hara v. City of New York*, No. 17-CV-4766, 2019

WL 2326040, at *9 (E.D.N.Y. May 31, 2019) (denying defendant's motion to dismiss plaintiff's

*Monell* claim based on the plaintiff's allegations that "DA Hynes acted as a New York City

policymaker and that through him, the [District Attorney's Office] 'maintained an unlawful

policy and custom of conducting illegal and unethical acts, including fabricating evidence,

harassing, intimidating and bribing witnesses to provide false testimony, and filing false criminal

charges against political opponents of DA Hynes and his political allies'"); *see also DeCarlo v.*

*Fry*, 141 F.3d 56, 61–62 (2d Cir. 1998) (noting that plaintiff may establish municipal liability by

presenting "'evidence that the municipality had notice of but repeatedly failed to make any

meaningful investigation into charges' that its agents were violating citizens' constitutional

rights" (quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)));

*Gentile v. County of Suffolk*, 926 F.2d 142, 146 (2d Cir. 1991) (imposing municipal liability

based on plaintiffs' allegations that "the County Police Department and the District Attorney's

Office in refusing seriously to investigate [the police officer's false claim that plaintiffs stole his

badge] or to discipline the involved officers constituted a pattern of conduct that ratified and even encouraged the officers' violations by recklessly ignoring evidence that County employees had violated plaintiffs' constitutional rights in attempting to secure their malicious prosecution"); *Galgano v. County of Putnam*, No. 16-CV-3572, 2020 WL 3618512, at *8, 11 (S.D.N.Y. July 2, 2020) (refusing to dismiss plaintiff's municipal liability claim based on the District Attorney's malicious prosecution of plaintiff including "execut[ing] falsified eavesdropping applications against plaintiff" and incentivizing the fabrication and manipulation of evidence against plaintiff); *cf. Gallo v. Suffolk Cnty. Police Dep't*, 360 F. Supp. 2d 502, 509 (E.D.N.Y. 2005) (denying defendants' motion for summary judgment as to plaintiff's claim that the county "had a custom or policy that caused the violation of his constitutional rights because it was aware . . . [that a municipal employee] forge[d] [plaintiff's declination letter] yet failed to conduct a meaningful investigation into that matter").

The Court therefore denies Defendants' motion to dismiss Plaintiff's *Monell* claim.

### III.  Conclusion

For the foregoing reasons, the Court denies Defendants' motion to dismiss.

Dated: September 16, 2021
Brooklyn, New York

SO ORDERED:

___s/ MKB_____
MARGO K. BRODIE
United States District Judge