Index No. 17-CV-1268 (NRM) (MMH)

---

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SAMUEL KELLNER,

Plaintiff,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

***MURIEL GOODE-TRUFANT***
*Acting Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Brian Francolla/*
*Hannah V. Faddis*
*Tel: (212) 356-3527/2486*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ I

TABLE OF AUTHORITIES ........ II

INTRODUCTION ........ 1

PROCEDURAL HISTORY ........ 1

STATEMENT OF FACTS ........ 2

STANDARD OF REVIEW ........ 12

ARGUMENT ........ 13

POINT I ........ 14

PLAINTIFF'S MALICIOUS PROSECUTION CLAIM FAILS AS A MATTER OF LAW ........ 14

POINT II ........ 18

CHARLES HYNES IS ENTITLED TO ABSOLUTE IMMUNITY OR, AT A MINIMUM, QUALIFIED IMMUNITY ........ 18

POINT III ........ 21

ANY CLAIM FOR CONSPIRACY FAILS AS A MATTER OF LAW ........ 21

POINT IV ........ 22

PLAINTIFF HAS FAILED TO DEMONSTRATE THE REQUISITE PERSONAL INVOLVEMENT OF CHARLES HYNES FOR ANY OF HIS CLAIMS ........ 22

POINT V ........ 24

PLAINTIFF'S CLAIMS AGAINST THE CITY OF NEW YORK FAIL AS A MATTER OF LAW ........ 24

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)....12

Anthony v. City of N.Y.,
339 F.3d 129 (2d Cir. 2003)....20

Baez v. Hennessy,
853 F.2d 73 (2d Cir. 1988)....23

Bernard v. United States,
25 F.3d 98 (2d Cir. 1994)....15

Bordenkircher v. Hayes,
434 U.S. 357 (1978)....23

Brogdon v. City of New Rochelle,
200 F. Supp. 2d 411 (S.D.N.Y. 2002)....17

Buckley v. Fitzsimmons,
509 U.S. 259 (1993)....20

Byrne v. Vance,
736 Fed. Appx. 263....16

Ciambrello v. County of Nassau,
292 F.3d 307 (2d Cir. 2002)....21

Cornejo v. Bell,
592 F.3d 121 (2d Cir. 2010)....18

D'Alessandro v. City of N.Y.,
713 F. App'x 1 (2d Cir. 2017)....23

Da Mata v. City of N.Y.,
21-cv-155 (KPF), 2023 U.S. Dist. LEXIS 2133 (S.D.N.Y. Jan. 5, 2023)....21

Dorman v. Higgins,
821 F.2d 133 (2d Cir. 1987)....19

Farid v. Ellen,
593 F.3d 233 (2d Cir. 2010)....22

Gil v. County of Suffolk,
590 F. Supp. 2d 360 (E.D.N.Y. 2008) ....................16

Giraldo v. Kessler,
694 F.3d 161 (2d Cir. 2012)....................20

Harris v. County of Nassau,
No. 13-cv-4728 (NGG) (RML), 2013 U.S. Dist. LEXIS 132005 (E.D.N.Y. Sept. 16, 2013) ....................19

Hill v. City of New York,
45 F.3d 653 (2d Cir. 1995)....................18, 19

Jefferson v. Javits,
No. 06-CV-6616 (NGG) (LB), 2010 U.S. Dist. LEXIS 104987 (E.D.N.Y. Sept. 30, 2010) ....................15

Johnson v. City of N.Y.,
No. 06-CV-630 (KAM) (ALC), 2010 U.S. Dist. LEXIS 70207 (E.D.N.Y. July 13, 2010) ....................16

Kee v. City of New York,
12 F.4th 150 ....................14

Kellman v. Metro. Transp. Auth.,
8 F. Supp. 3d 351 (S.D.N.Y. 2014) ....................12, 13

Kellner v. City of New York,
17-CV-1268 (MKB), 2021 U.S. Dist. LEXIS 177698 (E.D.N.Y. Sep. 16, 2021) ....................1, 18

Kinzer v. Jackson,
316 F.3d 139 (2d Cir. 2003)....................14

Linda R.S. v. Richard D.,
410 U.S. 614 (1973)....................23

McClennan v. Smith,
439 F.3d 137 (2d Cir. 2006)....................15

Mejia v. City of New York,
119 F. Supp. 2d 232 (E.D.N.Y. 2000) ....................17

Mitchell v. City of N.Y.,
841 F.3d 72 (2d Cir. 2016)....................15

Morse v. Fusto,
804 F.3d 538 (2d Cir. 2015)....................16

People v. Crosby,
87 Misc.2d 1079 (S. Ct. Bx. Co. 1976)....13

Pinaud v. County of Suffolk,
52 F.3d 1139 (2d Cir. 1995)....19

Provost v. City of Newburgh,
262 F.3d 146 (2d Cir. 2001)....22

Rothstein v. Carriere,
373 F.3d 275 (2d Cir. N.Y. 2004)....17

Savino v. City of N.Y.,
331 F.3d 63 (2d Cir. 2003)....15

Scheiner v. Wallace,
955 F. Supp. 232 (S.D.N.Y. 1997)....15

Staley v. Grady,
371 F. Supp. 2d 411 (S.D.N.Y. 2005)....23

Stansbury v. Wertman,
721 F.3d 84 (2d Cir. 2013)....15

Tangreti v. Bachmann,
983 F.3d 609 (2d Cir. 2020)....22

Taylor v. Kavanagh,
640 F.2d 450 (2d Cir. 1981)....19

United States v. Williams,
504 U.S. 36 (1992)....16

Van de Kamp v. Goldstein,
555 U.S. 335 (2009)....23

Victory v. Pataki,
814 F.3d 47 (2d Cir. 2016)....22

Warney v. Monroe Cnty,
587 F.3d 113 (2d Cir. 2009)....19

Williams v. City of New York,
No. 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y. Oct. 9, 2006)....19

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Defendants City of New York and Patricia L. Hynes, as Administrator of the Estate of Charles J. Hynes ("defendants"), by their attorney, Muriel Goode-Trufant, Acting Corporation Counsel of the City of New York, respectfully submit this Memorandum of Law in support of their motion for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.

## INTRODUCTION

Plaintiff Samuel Kellner brings this action alleging, inter alia, the following: that he was maliciously prosecuted; subjected to a conspiracy under 42 U.S.C. 1985 and that the City of New York should be held liable under a theory of municipal liability. Defendants now move to for summary judgment on all of plaintiff's claims.

## PROCEDURAL HISTORY

By Memorandum and Order dated September 16, 2021, the Honorable Margo K. Brodie, denied defendants' motion to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Kellner v. City of New York, 17-CV-1268 (MKB), 2021 U.S. Dist. LEXIS 177698 (E.D.N.Y. Sep. 16, 2021). In denying defendants' motion to dismiss, the Court found that plaintiff had alleged sufficient facts in his complaint to survive dismissal pursuant to Rule 12(b)(6). At this stage, however, plaintiff must set forth admissible evidence sufficient to create an issue of fact in order to survive summary judgment. After extensive discovery, defendants submit that plaintiff cannot do so and for the reasons set forth herein, his claims all fail as a matter of law.

## STATEMENT OF FACTS

The following facts are material to the claims that are the subject of this motion and are derived from Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Defs.' 56.1 Stmt.").[1]

The Investigation of Plaintiff

In April of 2010, an attorney, Arthur Aidala, approached Assistant District Attorney Michael Vecchione about the possibility of opening an investigation into allegations that plaintiff had been extorting Aidala's client's (Baruch Lebovits's) family, bribing witnesses, and interfering with witnesses related to a trial that he had conducted. Id. at ¶ 5. Lebovits was being prosecuted by the Kings County District Attorney's Office in relation to allegations of sexual abuse. Id. at ¶ 44. Specifically, Lebovits was accused of molesting three individuals, "M.T.," "P.K. (plaintiff's son)," and "Y.R.,"[2] and was ultimately convicted by a jury of abusing Y.R. Id. at ¶¶ 44, 45 and 48. At the time, Vecchione was the Chief of the Rackets Division of the KCDA. Id. at ¶ 4. He ultimately supervised the investigation into plaintiff. Id. at ¶ 3. Assistant District Attorneys Nicholas Batsidis and Joseph Alexis were also assigned to the investigation. Id. at ¶¶ 1-2. As part of the investigation, the KCDA obtained statements from Rabbi Moshe Friedman, Meyer Lebovits,

[1] In an attempt at brevity, defendants have not set forth the entirety of facts set forth in their 56.1 statement.

[2] In light of New York Civil Rights Law § 50-b, the parties to this action and the KCDA have agreed to reference the alleged sexual assault victims by the pseudonyms "M.T." or "Victim 1," "P.K." or "Victim 2," and "Y.R." or "Victim 3." Defendants have also redacted certain exhibits to protect the victims' identities and to remove references to grand jury testimony, which has not been unsealed by court order for use in this case.

and M.T., and a May 2009 recorded conversation between plaintiff and Meyer Lebovits. Id. at ¶ 6.

- Rabbi Moshe Friedman

According to Friedman, plaintiff had asked him to arrange for Lebovits to pay plaintiff $250,000. Id. at ¶ 7. Friedman reported to the KCDA that plaintiff had told Friedman that Baruch Lebovits, or persons acting on his behalf, had reneged on an agreement to pay plaintiff $250,000. Id. at ¶ 8. Friedman reported to the KCDA that plaintiff had told Friedman that plaintiff controlled another victim or two. Id. at ¶ 9. Friedman reported to the KCDA that plaintiff had told Friedman that if plaintiff received money from Baruch Lebovits, the other victim or two would be quiet. Id. at ¶ 10. On July 15, 2010, Friedman signed an affirmation stating that plaintiff had approached Friedman and asked Friedman to negotiate with the Lebovits family so that the charges against Baruch Lebovits would go away. Id. at ¶ 11. In the July 15, 2010 affirmation, Friedman stated that plaintiff had stated that he controlled all of the cases against Lebovits; that he was not making a living and needed money; that Lebovits's son had money; and that the Lebovits family should pay. Id. at ¶ 12.

On August 13, 2010, Batsidis and two detective investigators for the KCDA interviewed Friedman. Id. at ¶ 13. During the August 13, 2010 interview, Friedman was shown a copy of his July 15, 2010 affirmation and he confirmed that the contents thereof were true and accurate. Id. at ¶ 14. During the August 13, 2012 interview, Friedman stated that he had been approached by plaintiff in or around March of April of 2009, who told Friedman that Baruch Lebovits had given plaintiff's son a ride and touched him in a sexual manner; that plaintiff wanted to settle for $250,000 and was negotiating a deal; that plaintiff's son's case was only a misdemeanor, but that he could bring in Y.R., another victim whom plaintiff controlled; that

Friedman knew the Lebovitses and could convince them to pay; that plaintiff knew that Lebovits's son Chaim had money; that plaintiff's son had problems in school and needed a tutor, but plaintiff did not have money; that plaintiff was receiving money from people in Monsey, New York, that was brought to him by his brother, Joseph, who lived in Monsey, based on whether Baruch Lebovits stayed in jail; that, when people in Monsey heard that plaintiff was trying to settle with the Lebovitses, they threatened to stop sending him money, and that plaintiff was adamant that he could get $250,000 from the Lebovitses. Id. at ¶ 15.

- Meyer Lebovits

Meyer Lebovits told the KCDA that plaintiff had demanded money from him in order to silence the witnesses. Id. at ¶ 16. A witness, Rabbi Mandel, reported to Batsidis that Meyer Lebovits was forced to give money to plaintiff and wanted to memorialize the fact that he was paying the money through a third party. Id. at ¶ 17.

- The May 2009 Recorded Conversation

In May of 2009, a conversation between plaintiff and Meyer Lebovits took place. Id. at ¶ 18. The conversation was conducted in Hungarian Yiddish, some Hebrew, and included references to the Talmud. Id. at ¶ 19. Meyer Lebovits recorded the conversation. Id. at ¶ 20. Batsidis was provided a copy of a certified translation of the conversation that had been prepared by Rina Neeman on or before September 16, 2010. Id. at ¶ 21. Batsidis also obtained his own translation of the recorded conversation between plaintiff and Meyer Lebovits by Ruth Kohn. Id. at ¶ 22. Vecchione told Batsidis to contact Kohn because she was known to the KCDA as someone who had previously done Yiddish-English translations in cases in state and federal courts. Id. at ¶ 23. Batsidis received the translation prepared by Kohn on or before November 24, 2010. Id. at ¶ 24. The translation prepared by Kohn was 161 pages in length. Id. at ¶ 25. Kohn had worked

hard on the translation and listened to the entire recording several times. Id. at ¶ 26. Batsidis initially found the meaning of the translation unclear. Id. at ¶ 27. Batsidis then reviewed the translation with Meyer Lebovits line by line. Id. at ¶ 28. The translation appeared to reflect that plaintiff had demanded money from Lebovits in exchange for not bringing allegations to the KCDA. Id. at ¶ 29. To Batsidis, the translation appeared to be "damning" to plaintiff until plaintiff's criminal defense counsel weighed in. Id. at ¶ 30. Batsidis learned that plaintiff's criminal defense counsel had a different interpretation of the recorded conversation between Meyer Lebovits and plaintiff. Id. at ¶ 31. Defense counsel's interpretation differed in that he believed that plaintiff was proposing a rabbinical settlement to resolve the criminal matter out of court. Id. at ¶ 32.

- M .T.

On July 22, 2010, M.T. signed an affirmation stating, among other things, that plaintiff had approached him, told M.T. that he had a job for him, gave him about $400 or $500, and told him to say "yes" if someone asked him if he had been molested; that plaintiff instructed him to say that Baruch Lebovits had raped him on a regular basis from the time he was 12 until he was 16 years old; that M.T. had testified twice that Baruch Lebovits had raped him; that Baruch Lebovits had never molested him; that plaintiff gave him approximately $10,000; and that plaintiff brainwashed him and he desperately needed money. Id. at ¶ 33. In a September 26, 2010 interview attended by Batsidis and KCDA Investigator Stephanie Green-Jones, M.T. was asked about the affirmation that M.T. had signed on July 22, 2010. Id. at ¶ 34. During the September 26, 2010 interview, M.T. stated, among other things, that, in or around March 11, 2008, plaintiff came to his home; he (M.T.) told plaintiff that Baruch Lebovits had not molested him; that plaintiff told him, if anyone asked, to say he had been molested by Baruch Lebovits; plaintiff told him (M.T.)

he had a job for him and gave him $500 in cash; plaintiff took him to see Detective Litwin, whom M.T. lied to by stating that Baruch Lebovits had molested him as plaintiff had told him to do; he (M.T.) received approximately $100 per week, for a total of approximately $10,000 from plaintiff; Y.R. had told him (M.T.) that, he, too, had received money and regretted starting the Lebovits prosecution; and he (M.T.) came forward because he was shocked when he learned of Baruch Lebovits's lengthy sentence. Id. at ¶ 35.

Plaintiff's Criminal Prosecution

On April 11, 2011, plaintiff was indicted on one count of conspiracy in the fourth degree; five counts of attempted grand larceny in the second degree by extortion; two counts of perjury in the first degree, and two counts of criminal solicitation in the fourth degree under Indictment No. 2538/2011. Id. at ¶ 36. The indictment alleged that, between March of 2008 and March of 2010, plaintiff made repeated demands for money to Meyer Lebovits, via five unindicted co-conspirators, in exchange for which plaintiff would cause the pending criminal sex abuse charges against Baruch Lebovits to be dismissed through his "ability to control the cooperation and content of the testimony of the complaining victims [M.T., Y.R., and his son (P.K.)]"; direct an additional alleged victim of Baruch Lebovits not to make a complaint; and cause the publication of Lebovits' alleged abuse of children within the community to cease. Id. at ¶ 37. The alleged overt acts in furtherance of the conspiracy consisted of five extortionate demands made to Meyer Lebovits, on plaintiff's behalf, solicitation by plaintiff of another individual to act as an emissary for his alleged extortion, payments by plaintiff to a witness to secure his false testimony in the two separate grand jury proceedings against Baruch Lebovits, and the re-iteration of the earlier extortionate demands made by his co-conspirators in a May 2009 recorded conversation between plaintiff and Meyer Lebovits. Id. at ¶ 38. Plaintiff was arrested pursuant to the indictment on

April 12, 2011. Id. at ¶ 39. A news conference attended by Hynes took place after plaintiff's arrest. Id. at ¶ 40. On July 24, 2013, Hynes appeared on a radio show and commented on the case against plaintiff. Id. at ¶ 41.

The Prosecution of Baruch Lebovits

Assistant District Attorney Miss Gregory was the supervisor of the KCDA's Sex Crimes Special Victims Bureau and had prosecuted Baruch Lebovits. Id. at ¶ 42, 43. Three alleged sex crimes victims, M.T., P.K., and Y.R, had accused Baruch Lebovits. Id. at ¶ 44. P.K. was plaintiff's son. Id. at ¶ 45. Plaintiff did not want his son to testify at a trial if he were the only witness. Id. at ¶ 46. Plaintiff was concerned that his son would have to reveal what had happened to him on cross-examination at trial. Id. at ¶ 47. Baruch Lebovits was convicted for a crime against Y.R. Id. at ¶ 48. Hynes sought a sentence for Baruch Lebovits of ten and two-thirds to 32 years. Id. at ¶ 49. During the course of his prosecution, Baruch Lebovits was represented by six lawyers – Arthur Aidala, Alan Dershowitz, Amy Adelson, Nathan Dershowitz, Lawrence Goldman, and Elizabeth Johnson. Id. at ¶ 50.

ADA Gregory's Attempts to Contact M.T.

Gregory took steps to secure the cooperation of M.T. for the prosecution of Baruch Lebovits. Id. at ¶ 51. M.T. was represented by attorney John Lonuzzi. Id. at ¶ 52. M.T.'s brother arranged a consultation with Lonuzzi to discuss Lonuzzi's representation of M.T. Id. at ¶ 53. M.T. retained Lonuzzi. Id. at ¶ 54. Lonuzzi had a meeting at which M.T., his brother, and his uncle were present. Id. at ¶ 55. M.T. did not want to be subjected to testifying at trial. Id. at ¶ 56. M.T. communicated through his attorney that he would not testify at a trial. Id. at ¶ 57. Without M.T.'s testimony, there was insufficient evidence to try the case arising out of M.T.'s allegations. Id. at ¶ 58. Gregory attempted to contact M.T. via his attorney. Id. at ¶ 59. Gregory arranged multiple

appointments with M.T.'s attorney for M.T. and his attorney to speak with her; however, all of those appointments were canceled. Id. at ¶ 60. Gregory served subpoenas to obtain the attendance of M.T. Id. at ¶ 61. Gregory could not do anything more to secure M.T.'s cooperation. Id. at ¶ 62. It was not unusual for sexual abuse victims to withdraw their cooperation because they became panicked at the last minute before they had to testify. Id. at ¶ 63. After M.T. had recanted his allegations against Baruch Lebovits, his credibility was questionable. Id. at ¶ 64. Gregory was never told that Hynes was unwilling to do anything concerning witness tampering with regard to M.T. Id. at ¶ 65.

The Communications Between Sex Crimes and Rackets

Vecchione initiated a meeting with members of Sex Crimes to inform Sex Crimes that Rackets was investigating plaintiff and that the investigation might have implications for the Sex Crimes prosecution of Baruch Lebovits. Id. at ¶ 75. Plaintiff was believed by Rackets to be extorting Baruch Lebovits's family relating to the three sex crimes victims from the Sex Crimes prosecution of Baruch Lebovits. Id. at ¶ 76. Early in his investigation, Batsidis met with Gregory and took her file because it was alleged in the reports that plaintiff had brought witnesses forward against Baruch Lebovits. Id. at ¶ 77. Gregory and Batsidis investigated plaintiff. Id. at ¶ 78. Gregory spoke to Alexis and Batsidis about plaintiff's prosecution. Id. at ¶ 79. An assistant district attorney in Rackets could request information from an assistant district attorney in Sex Crimes. Id. at ¶ 80. Batsidis was in contact with Gregory often. Id. at ¶ 81. Batsidis reviewed trial minutes and police reports from Gregory's file. Id. at ¶ 82. Batsidis spoke to Gregory about the circumstances in which M.T. had ended his cooperation with the Lebovits prosecution. Id. at ¶ 83. Batsidis was instructed by Vecchione to turn over the information that he had to Sex Crimes. Id. at ¶ 84. Gregory communicated by email with Batsidis on February 24, 2011, referencing the

existence of videotapes about Y.R., a complainant in one of Gregory's cases against Baruch Lebovits. Id. at ¶ 85. The purpose of the conversations between Gregory, Alexis, and Batsidis was to discuss background on the criminal prosecutions against plaintiff and Lebovits. Id. at ¶ 86. A meeting took place that was attended by Hynes, members of Rackets, and members of the Appeals Bureau who were involved in the prosecution of Baruch Lebovits. Id. at ¶ 87. At that meeting, Hynes was provided Sex Crimes' view of the case against Baruch Lebovits. Id. at ¶ 88. A meeting took place that was attended by Hynes, members of Sex Crimes, and members of Rackets, when it was learned that Y.R. might have recanted on tape. Id. at ¶ 89.

Hynes's Communications Concerning Plaintiff's Prosecution

At a meeting between Hynes and Vecchione, Hynes asked Vecchione if there was a triable case against plaintiff. Id. at ¶ 90. Vecchione told Hynes that there was a triable case against plaintiff. Id. at ¶ 91. Hynes asked Vecchione if there was a legally sufficient case against plaintiff. Id. at ¶ 92. Vecchione told Hynes that there was a legally sufficient case against plaintiff. Id. at ¶ 93. On June 19, 2013, Hynes requested that Batsidis and Alexis provide him with a brief summary of the evidence against plaintiff. Id. at ¶ 94. Batsidis's summary of the evidence against plaintiff consisted of the testimony of Meyer Lebovits, M.T., and Moshe Friedman, as well as the May 2009 recorded conversation between Meyer Lebovits and plaintiff. Id. at ¶ 95. Batsidis stated the witnesses had testified, among other things, that plaintiff had sought money from the Lebovits family in exchange for keeping the witnesses from testifying against Baruch Lebovits and the cases against him from going forward; that plaintiff would bring forward another witness if there was no settlement; and that plaintiff did not want his son to testify. Id. at ¶ 96. Batsidis stated that Rackets had been investigating allegations that the Lebovits family may have paid M.T. to testify in the grand jury and then made him leave the country so as to be unavailable for trial. Id. at ¶ 97.

Batsidis stated that he and Alexis intended to speak with M.T. concerning the allegations that he had been paid to testify in the grand jury and whether he had ever been molested by Baruch Lebovits. Id. at ¶ 98. Batsidis stated that there was a difference of opinion between Meyer Lebovits and plaintiff as to whether the conversation reflected attempts by plaintiff to extract money from the Lebovits family in exchange for the silence of Baruch Lebovits's accusers. Id. at ¶ 99.

Plaintiff's Communications With the KCDA

Plaintiff was advised that the KCDA would not proceed with charges arising out of his son's complaint because the alleged offense was a misdemeanor, Lebovits was 60 years old, and a prosecution was unlikely to result in jail time. Id. at ¶ 100. Plaintiff told Litwin and prosecutors at a meeting that attempts were being made to pay him off. Id. at ¶ 101. Plaintiff was very vague about who was trying to buy him off and made only general statements. Id. at ¶ 102. Plaintiff made buoyant remarks to Litwin indicating that he should be offered millions of dollars to be bought off and he would consider. Id. at ¶ 103.

The Orthodox Jewish Community in Brooklyn

It was at times difficult to understand the evidence against plaintiff because of language barriers and cultural mores specific to the Orthodox community. Id. at ¶ 104-105. Victims in the Orthodox Jewish community were often reluctant to cooperate with law enforcement. Id. at ¶ 106. Victims in the Orthodox Jewish community in Brooklyn were pressured by their community not to cooperate with the district attorney's office. Id. at ¶ 107. In response, Hynes instituted the Kol Tzedek program to assist sexual abuse victims by making them feel more comfortable about coming forward through the criminal justice system. Id. at ¶ 108.

The Involvement of Dov Hikind

On July 17, 2013, members of Rackets interviewed former Assemblyman Dov Hikind. Id. at ¶ 109. Plaintiff had met with Hikind related to sexual abuse in the Orthodox Jewish community. Id. at ¶ 110. Plaintiff had come to Hikind's office on many occasions. Id. at ¶ 111. Hikind stated that he had listened to the recording of the conversation between plaintiff and Meyer Lebovits twice. Id. at ¶ 112. Hikind stated that the conversation was in Hungarian Yiddish and some Hebrew and contained references to the Talmud. Id. at ¶ 113. Hikind stated that the recording contained phrases and expressions that could be interpreted incorrectly. Id. at ¶ 114. Plaintiff himself agreed that the recording contained phrases and expressions that could be interpreted incorrectly. Id. at ¶ 115. Hikind stated that plaintiff had asked Hikind for money. Id. at ¶ 116. Hikind stated that, after he had listened to the recorded conversation, he came out publicly and suggested that the charges be dropped. Id. at ¶ 117. Hikind stated that plaintiff's main concern about what had happened to his son was that it would get out in the community and the effect on how his son would be viewed in the Hasidic community. Id. at ¶ 118. Hikind stated that, although many people had spoken out about sexual abuse in the Hasidic community, there was still "a long way to go." Id. at ¶ 119.

The Later Inconsistent Statements Made by M.T.

On July 5, 2013, Batsidis and Alexis advised plaintiff's criminal defense counsel that they had spoken with M.T. on June 26, 2013, and July 1, 2013, and learned of information that had not been previously disclosed or known to them. Id. at ¶ 120. During the June 26, 2013 interview, M.T. stated that, on several occasions, he told several people that Baruch Lebovits had molested him, but further stated that Baruch Lebovits might have molested him, but he was not sure. Id. at ¶ 121-2.

During the July 1, 2013 interview, M.T. stated that: plaintiff failed to pay him a fee that the two had agreed upon to testify falsely in the grand jury that Baruch Lebovits had molested him (id. at ¶ 123); plaintiff had promised to finance a wedding for him in exchange for falsely testifying in the grand jury that Baruch Lebovits had molested him, and added that he could not clearly remember specific dates and times because of his heavy drug and alcohol use (id. at ¶ 124); he went to Israel because his family had arranged a possible marriage for him, but after further questioning, M.T. acknowledged that he traveled to Israel to avoid allegations of child molestation that were being made against him (id. at ¶ 125); and he had never seen Baruch Lebovits in his life (id. at ¶ 126). In sum, KCDA learned that M.T. had lied leading to plaintiff's arrest and prosecution and that he made contradictory statements under oath which affected his credibility. Id. at ¶ ¶ 127-8. As a result, Batsidis believed that the charges should be dismissed after confronting M.T. with information that had been learned by the KCDA. Id. at ¶ 129.

The Dismissal of the Charges Against Plaintiff

The evidence against plaintiff changed over time. Id. at ¶ 130. Assistant District Attorney Kevin O'Donnell was assigned to the criminal prosecution against plaintiff after Hynes lost the election in 2013, and was replaced by District Attorney Kenneth Thompson. Id. at ¶ 131. O'Donnell was assigned to the prosecution against plaintiff on January 17, 2014. Id. at ¶ 132. O'Donnell recommended that the case against plaintiff be dismissed because it could not be proven beyond a reasonable doubt. Id. at ¶ 133. Notwithstanding, O'Donnell believed that plaintiff was factually guilty of some or all of the crimes with which he had been charged. Id. at ¶ 134.

## STANDARD OF REVIEW

The Court should grant summary judgment when, as here, the movant can show that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a); see also Kellman v. Metro. Transp. Auth., 8 F. Supp. 3d 351, 369 (S.D.N.Y. 2014). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Neither "conclusory allegations" nor "speculation or conjecture" are sufficient to defeat a motion for summary judgment. Kellman, 8 F. Supp. 3d at 369 (citations omitted). Rather, plaintiff "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Id. (quoting FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010)).

## ARGUMENT

All of plaintiff's claims are largely, if not entirely, premised on his contention that he "could not be guilty of paying M.T. to fabricate allegations of being abused by Lebovits when Lebovits had already confessed to the abuse." See Plaintiff's Response to Defendants' Letter Requesting a Premotion Conference, Docket #88, p. 4. The purported confession plaintiff refers to was included in an application from Lebovits' defense attorney, during the prosecution of Lebovits, that was entitled "In Camera Confidential Memorandum In Support Of Defendant's Pre-Pleading Application Concerning Sentence ('PPI')." See Pl's 56.1, ¶¶ 150-151 and 154-159. Lebovits' defense counsel expressly submitted the PPI "with the further understanding that any statement or admission in it is excluded from use by the District Attorney in the event of trial." Pl. Ex. 8, p. 2. In support of that understanding, Lebovits' defense counsel cited People v. Crosby, 87 Misc.2d 1079 (S. Ct. Bx. Co. 1976). Id.; see also Crosby, 87 Misc.2d at 1083 ("Both these cases make it clear that in the instant situation the statements of the defendant obtained for the purpose of aiding the defendant in his consideration of the best plea he can take and aiding the

court to determine which plea it would be willing to accept, should not later be usable, if the plea negotiation proves fruitless, by the prosecutor at the trial."). The holding in Crosby largely mirrors the current Federal Rule of Evidence which similarly prohibits the use of any statements made by a defendant during the course of plea negotiations as evidence against him in a civil or criminal case. See F.R.E. 410.

Without any basis to deem the contents of the PPI as a legal "confession," plaintiff's entire theory of liability falls apart and his claims fail as a matter of law. Additionally, even if Lebovits had actually confessed to the alleged abuse – in the form of an allocution for example – that would not necessarily eliminate probable cause to prosecute plaintiff based on the statements and testimony of the witnesses detailed supra as well as the audio recording of the May 2009 conversation between plaintiff and Meyer Lebovits. As explained herein, plaintiff cannot maintain a claim for malicious prosecution as there was, inter alia, probable cause for plaintiff's prosecution. Further, any claim against Charles Hynes in his capacity as the District Attorney of Kings County fails as he is entitled to absolute immunity for liability for any prosecutorial decisions, including those at issue in this case. Finally, any purported conspiracy claim fails as a matter of law as does the largely derivative claim against defendant City of New York.

## POINT I

## PLAINTIFF'S MALICIOUS PROSECUTION CLAIM FAILS AS A MATTER OF LAW

In order to state a claim for malicious prosecution under Section § 1983, a plaintiff must show: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions. See, e.g., Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003) (citations omitted).

To prevail on a malicious prosecution claim under federal law, a plaintiff must show: (1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding, (4) actual malice, and (5) a sufficient post-arraignment liberty restraint. Kee v. City of New York, 12 F.4th 150, 161-162.

**A. Plaintiff Cannot Show That Charles Hynes Initiated Or Continued A Criminal Proceeding Against Plaintiff**

The only individual against whom plaintiff has brought his malicious prosecution claim is former KCDA District Attorney Charles Hynes. The evidentiary record is devoid, however, of any admissible evidence to establish that he personally either initiated or continued a criminal proceeding against plaintiff. For that reason alone, this claim should be dismissed.

**B. Plaintiff Cannot Show There Was A Lack Of Probable Cause**

Plaintiff also cannot demonstrate a lack of probable cause for commencing the criminal proceedings, an essential element of a claim for malicious prosecution. As a result, plaintiff's claim fails for this reason as well.

A § 1983 claim for malicious prosecution requires, inter alia, that plaintiff prove an absence of probable cause. Mitchell v. City of N.Y., 841 F.3d 72, 79 (2d Cir. 2016). Probable cause is a complete defense to such a claim. Stansbury v. Wertman, 721 F.3d 84, 88-89 (2d Cir. 2013). A grand jury indictment creates a presumption of probable cause that may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence, or other bad faith conduct. Savino v. City of N.Y., 331 F.3d 63, 72 (2d Cir. 2003). A plaintiff bears the burden of rebutting that presumption. McClennan v. Smith, 439 F.3d 137, 145 (2d Cir. 2006). However, plaintiff cannot overcome the presumption simply by his own self-serving testimony. See Bernard v. United States, 25 F.3d 98, 104 (2d Cir. 1994) (plaintiff's claims of innocence did not rebut the

presumption of probable cause created by an indictment); see also Scheiner v. Wallace, 955 F. Supp. 232, 240 (S.D.N.Y. 1997) (finding plaintiff's "unsupported conclusions that certain witnesses committed perjury" to be insufficient to overcome the presumption of probable cause created by a grand jury indictment); Jefferson v. Javits, No. 06-CV-6616 (NGG) (LB), 2010 U.S. Dist. LEXIS 104987 (E.D.N.Y. Sept. 30, 2010) (granting summary judgment for defendants despite plaintiff's unsupported allegation that his indictment was procured by defendants' false grand jury testimony); Johnson v. City of N.Y., No. 06-CV-630 (KAM) (ALC), 2010 U.S. Dist. LEXIS 70207, at *24-26 (E.D.N.Y. July 13, 2010); Gil v. County of Suffolk, 590 F. Supp. 2d 360, 370 (E.D.N.Y. 2008).

Here, plaintiff cannot rebut the presumption of probable cause based on bad faith conduct in the grand jury. In that regard, according to plaintiff the alleged bad faith conduct was the "deliberate concealment from the grand jury of the Lebovits's confession" – referring again to the PPI disclosed during plea negotiations. See Docket Sheet, Entry #88, p. 3. Ignored at least in that suggestion is any legal authority for how the contents of the PPI would constitute a "confession," as noted supra, and even if it did, the legal basis that would entitle KCDA to introduce it as evidence during the grand jury presentation regarding plaintiff. Nor did the KCDA have any obligation to present this evidence to the grand jury even assuming that it was exculpatory in nature. See Byrne v. Vance, 736 Fed. Appx. 263, 266 ("to the extent Byrne complains that the District Attorney's Office failed to train prosecutors to disclose exculpatory evidence to the grand jury, the argument is foreclosed by precedent instructing that '[t]he government ha[s] no obligation to present exculpatory material to a grand jury.'") (citing United States v. Regan, 103 F.3d 1072, 1081 (2d Cir. 1997); see United States v. Williams, 504 U.S. 36, 51-52 (1992); see also Morse v. Fusto, 804 F.3d 538, 547 (2d Cir. 2015).

In any event, there was ample evidence to support probable cause beginning with statements of Rabbi Moshe Friedman, M.T. and Meyer Lebovits. "An eyewitness's unequivocal identification of an individual as the perpetrator of the crime generally establishes probable cause, as long as it is reasonable to believe the eyewitness under the circumstances." Id. (quoting Candelario v. City of New York, No. 12-CV-1206 (LAP), 2013 U.S. Dist. LEXIS 48412, at *15 (S.D.N.Y. Mar. 29, 2013)). While various aspects of these statements were later called into question based on newly obtained evidence as the prosecution proceeded, the existence or lack of probable cause is measured at the time of the commencement of the judicial proceeding, i.e., at the time of plaintiff's arraignment or indictment. Mejia v. City of New York, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000). There is no admissible evidence in the record to establish or even suggest that it was unreasonable for the KCDA to rely on each of these statements – let along all three – at the time of plaintiff's indictment. Additionally, the audio recording of the May 2009 conversation between plaintiff and Meyer Lebovits further supported the accuracy of these statements insofar as plaintiff was heard seeking to extort money from the Lebovits family in exchange for silencing Baruch Lebovits's victims. Defs.' 56.1, at ¶¶ 28-29. For all these reasons there was probable cause to prosecute to plaintiff.

**C. Plaintiff Cannot Establish Actual Malice**

"Malice means that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." Brogdon v. City of New Rochelle, 200 F. Supp. 2d 411, 423 (S.D.N.Y. 2002) (internal quotation and citation omitted). The Second Circuit, following the New York standard, allows accusers "room for benign misjudgments" and requires § 1983 plaintiffs to provide strong factual support to sustain a claim of malice. See Rothstein v. Carriere, 373 F.3d 275, 282 (2d Cir. N.Y. 2004). Accordingly, "there must be a showing of some deliberate act punctuated with

awareness of conscious falsity to establish malice." Brogdon, 200 F. Supp. 2d at 423 (internal quotations and citation omitted). As explained in Subparagraph B, supra, plaintiff's prosecution was not malicious because it was supported by probable cause. Husbands, 2007 U.S. Dist. LEXIS 61042, at *31 ("[T]he existence of probable cause on these facts precludes a finding of malice, as there is no 'improper motive' in following through on the prosecution of a defendant lawfully arrested"). Accordingly, because plaintiff cannot establish that his prosecution was initiated or continued with malice, his malicious prosecution claim should be dismissed on these grounds as well.

## POINT II

## CHARLES HYNES IS ENTITLED TO ABSOLUTE IMMUNITY OR, AT A MINIMUM, QUALIFIED IMMUNITY

In denying defendants' motion to dismiss, Judge Brodie found that plaintiff sufficiently alleged in his pleadings that Charles Hynes was involved in the (1) collection and fabrication of evidence against plaintiff, and (2) media statements about plaintiff. Kellner, 2021 U.S. Dist. LEXIS 177698, *24. The Court held that those allegations, if supported by evidence, consisted of actions that would not be entitled to absolute immunity. Id. Now that the parties are at the summary judgment stage, plaintiff must point to admissible evidence in support of his claims that would create a triable issue of fact for a jury. Regarding plaintiff's allegation that Hynes was involved in the collection and fabrication of evidence against him, after extensive discovery, the record is devoid of any evidence let alone admissible evidence, to support this allegation and certainly nothing sufficient to create an issue of fact to survive summary judgment.

It is well established in this Circuit that "[p]rosecutors are entitled to absolute immunity […] because their prosecutorial activities are 'intimately associated with the judicial phase of the criminal process.'" Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010) (quoting Imbler

v. Pachtman, 424 U.S. 409, 430 (1976)). "Prosecutorial immunity from § 1983 liability is broadly defined, covering 'virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate.'" Hill v. City of New York, 45 F.3d 653, 661 (2d Cir. 1995) (quoting Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994)). Indeed, "since absolute immunity spares the official any scrutiny of his motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done with bad faith or with malice, neither of which defeats a claim of absolute immunity." Dorman v. Higgins, 821 F.2d 133, 139 (2d Cir. 1987). Thus, even acts such as "the falsification of evidence and the coercion of witnesses, or the failure to drop charges until immediately before trial, have been held to be prosecutorial activities for which absolute immunity applies." Taylor v. Kavanagh, 640 F.2d 450, 452 (2d Cir. 1981).

Determining whether a prosecutor is functioning as an advocate "depends chiefly on whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate." Warney v. Monroe Cnty, 587 F.3d 113, 123 (2d Cir. 2009). For instance, "a district attorney is absolutely immune from civil liability for initiating a prosecution and presenting the case at trial […] or determining which offenses to be charged." Hill, 45 F.3d at 661. "Similarly, because a prosecutor is acting as an advocate in a judicial proceeding, the solicitation and subornation of perjured testimony, the withholding of evidence, or the introduction of illegally-seized evidence at trial does not create liability in damages." Taylor, 640 F.2d at 452.

Accordingly, courts in this Circuit have routinely dismissed malicious prosecution claims against prosecutors. See Pinaud v. County of Suffolk, 52 F.3d 1139, 1149 (2d Cir. 1995) ("Case law from this circuit clearly establishes that the district attorney's activities with respect to [a] malicious prosecution claim […] are covered by absolute immunity"); Harris v. County of Nassau, No. 13-CV-4728 (NGG) (RML), 2013 U.S. Dist. LEXIS 132005, at * 7-8 (E.D.N.Y. Sept.

16, 2013) (dismissing claims against Assistant District Attorneys on the grounds that "Defendants' challenged conduct—initiating and pursuing a criminal case—are classic prosecutorial functions," such that "absolute immunity bars all § 1983 claims against them"); Williams v. City of New York, No. 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418, at * 29 (E.D.N.Y. Oct. 9, 2006) (dismissing malicious prosecution claims against prosecutors on the grounds that "evaluating evidence and deciding whether to initiate a prosecution are exactly the sort of actions for which absolute immunity shields prosecutors from liability"). "[A] prosecutor's motivation, and whether preferable alternatives to the actions taken were available, is irrelevant." Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993) (citing Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994)). As long as the acts were reasonably within the functions of a prosecutor, "absolute immunity applies to protect the prosecutor even in the face of a complaint's allegations of malicious or corrupt intent behind the acts." Giraldo v. Kessler, 694 F.3d 161, 166 (2d Cir. 2012).

Plaintiff lacks admissible evidence to show that Hynes knowingly participating in creating false evidence. Nor is there any evidence that Hynes' involvement in the underlying prosecution of plaintiff was anything other than him performing his prosecutorial function, i.e., decisions related solely to the prosecution of the case, meetings with other ADAs about the underlying prosecution, whether to proceed with the prosecution, etc. To the extent that prosecutorial immunity may not apply, Hynes is entitled to qualified immunity where he may have reasonably relied on information provided by members of the KCDA. See, e.g., Anthony v. City of N.Y., 339 F.3d 129, 138 (2d Cir. 2003).

## POINT III

## ANY CLAIM FOR CONSPIRACY FAILS AS A MATTER OF LAW

Plaintiff's conspiracy theory fails because he has not developed evidentiary proof that Hynes acted with others to undermine the Lebovits' conviction by prosecuting plaintiff for soliciting false testimony and attempted extortion without probable cause. Plaintiff can offer no evidence to support that Hynes "directed" an "investigation" or played a "direct role" in any efforts to do so, such as by "manufacturing" evidence against plaintiff or seeking to undermine the conviction of Lebovits, a conviction which his office had, in fact, actively pursued and defended on appeal. Nor is there evidence that Hynes coordinated with the Lebovits family to influence victims to recant or witnesses to change their stories (one of whom, Y.R., did not change his story or recant), counseled the family of Lebovits (who was represented by no fewer than six accomplished lawyers) on what evidence to obtain, or coordinated a pay-off by the family to Y.R. (who agreed to continue his cooperation by testifying at a second trial). Plaintiff thus cannot meet his burden to prove an agreement to act in concert to inflict an unconstitutional injury and an overt act in furtherance of that goal that caused damages to plaintiff. See, e.g., Ciambrello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002). In any event, plaintiff cannot pursue a conspiracy claim where, as here, he cannot establish a violation of an underlying constitutional right. See, e.g., Da Mata v. City of N.Y., 21-cv-155 (KPF), 2023 U.S. Dist. LEXIS 2133, at *46 (S.D.N.Y. Jan. 5, 2023) (absent an underlying constitutional violation on which to base a § 1983 conspiracy claim, the conspiracy claim fails as a matter of law).

In reality, as set forth in the statement of facts, supra, as well as Defs.' 56.1 statement, pressures on the Lebovits victims from their families and community loomed large. Plaintiff has conceded that, he too, felt pressures separate and apart from anything emanating from

Hynes. He has acknowledged in testimony in this action that he did not wish for his son to testify against Lebovits at trial, as his son would have been required publicly to reveal the details of his abuse. He attributes his children's compromised marriage prospects to the Orthodox community's awareness that his son was a sexual abuse victim and his own stance against powerful interests in the community that sought to conceal such abuse. Significantly, Hynes had instituted the Kol Tzedek (Voice of Justice) program to combat just such pressures by affording Orthodox abuse victims support to equip them for the challenges of accusing predators in their community in the secular courts.

For all these reasons, any claim for conspiracy fails as a matter of law.

## POINT IV

## PLAINTIFF HAS FAILED TO DEMONSTRATE THE REQUISITE PERSONAL INVOLVEMENT OF CHARLES HYNES FOR ANY OF HIS CLAIMS

Plaintiff can offer no evidence to establish that Hynes was personally and directly involved in a violation of a constitutional right. The personal involvement of a defendant in a constitutional deprivation is a prerequisite to an award of damages under § 1983. Victory v. Pataki, 814 F.3d 47, 67 (2d Cir. 2016). Personal involvement consists of direct participation in the deprivation of a right. Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010). There is no special rule for supervisory liability. Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020). Rather, a plaintiff must show that the defendant has violated the constitution directly through his own individual actions, rather than merely being in the chain of command. Tangreti, 983 F.3d at 618 (citing Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)). To satisfy this standard, plaintiff must come forward with evidence of Hynes's personal participation while knowing that his conduct was illegal in light of the underlying facts. See Provost v. City of Newburgh, 262 F.3d 146, 155 (2d

Cir. 2001). There is, however, no evidence to show that Hynes directly and knowingly participated in any activity that could give rise to liability pursuant to § 1983. In fact, much of the evidence directly counters plaintiff's assertions of fact as set forth in the Amended Complaint.

There is, for example, no evidence that Hynes purposely excluded Sex Crimes or Litwin from the Rackets investigation of plaintiff (in fact, ADAs from Sex Crimes and Rackets met with Hynes on March 16, 2011, prior to plaintiff's April 11, 2011 indictment, to discuss the Lebovits case, at which time Sex Crimes presented their view that Lebovits was guilty of the crimes with which he had been charged, and the respective bureaus exchanged information among themselves on multiple other occasions); tolerated witness tampering (ADA Gregory attempted to interview M.T., who was represented by his own counsel, and served subpoenas to obtain his attendance); surreptitiously dismissed criminal charges against Lebovits (among other things, the dismissals were discussed in court);[3] or knowingly took any steps to wrongfully prosecute plaintiff. While plaintiff alleges that Hynes made damaging statements about him in the media, the alleged statements were made at a press conference after plaintiff's arrest and on a radio show more than two years later on July 24, 2013. Not only is there no evidence that Hynes knowingly made false statements in the media, but any such statements are not remediable by way of a malicious prosecution claim.

---

[3] The decision as to whether and what charges to bring rests in the prosecutor's discretion. See, e.g., Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978). A private party is not entitled to a criminal prosecution of another person. Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973); Staley v. Grady, 371 F. Supp. 2d 411, 415 (S.D.N.Y. 2005). Accordingly, no liability may arise for the prosecutor's discretionary decision to withdraw any charges against Lebovits.

## POINT V

## PLAINTIFF'S CLAIMS AGAINST THE CITY OF NEW YORK FAIL AS A MATTER OF LAW

Plaintiff's policy claim against defendant City is equally unavailing. The City cannot be held liable for the decisions of a district attorney's office regarding the handling of a prosecution. Van de Kamp v. Goldstein, 555 U.S. 335, 345-48 (2009)). In his role as prosecutor, the district attorney acts for the state. Baez v. Hennessy, 853 F.2d 73, 77 (2d Cir. 1988); see also D'Alessandro v. City of N.Y., 713 F. App'x 1, 8 (2d Cir. 2017) (Eleventh Amendment shields district attorney from suit attacking prosecutorial decisions). A district attorney acts as municipal policymaker only when he or she acts in an administrative or managerial role. See, e.g., Van de Kamp, 555 U.S. at 345-348 (acts taken related to a prosecutor's basic trial advocacy role are treated as prosecutorial decisions). Accordingly, plaintiff may rely on Hynes' role as policymaker only as to investigative (not prosecutorial) policies within the KCDA. Notwithstanding plaintiff's allegations, he can offer no evidence that Hynes maintained policies of deliberate indifference to witness tampering and intimidation of victims of pedophiles and their families in the Hasidic community or of affording an opportunity to a convicted pedophile to undermine his conviction by purposely excluding Sex Crimes or Litwin from the Rackets investigation into plaintiff to prevent exculpatory information from coming to light. For these reasons, and all those set forth, supra, this claim fails as well.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant their motion, together with such costs, fees and other further relief as the Court deems just and proper.

Dated: New York, New York
August 23, 2024

**MURIEL GOODE-TRUFANT**
Acting CORPORATION COUNSEL OF THE CITY OF NEW YORK
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 356-3527/2486

/s/
By: ______________________________
Brian Francolla
Hannah V. Faddis
*Senior Counsels*
Special Federal Litigation Division

cc: *All Counsel of Record*