UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------x

SAMUEL KELLNER,

Plaintiff(s),

17-cv-1268(MKB)(MMH)

-against-

THE CITY OF NEW YORK and PATRICIA L. HYNES, administrator of the Estate of CHARLES J. HYNES,

Defendant(s).

---------------------------------------------x

March 23, 2022
10:11 a.m.

VIDEO CONFERENCED EXAMINATION BEFORE TRIAL of Non-Party Witness ADA NICHOLAS BATSIDIS, pursuant to Subpoena, before Laura B. Lowenthal, a Notary Public within and for the State of New York.

A P P E A R A N C E S:

LAW OFFICE OF NIALL MACGIOLLABHUI
Attorneys for Plaintiff(s)
171 Madison Avenue, Suite 305
New York, New York 10016
BY: NIALL MacGIOLLABHUI, ESQ.
E-mail: niallmacg@macglaw.com

GEORGIA M. PESTANA, Corporation Counsel of the City of New York
Attorneys for Defendant(s) City of New York and Patricia L. Hynes, as administrator of the estate of Charles J. Hynes
100 Church Street
New York, New York 10007
BY: SUSAN P. SCHARFSTEIN, ESQ.
E-mail: sscharfs@law.nyc.gov

KINGS COUNTY DISTRICT ATTORNEY'S OFFICE
Attorneys for Non-Party Witness
ADA Nicholas Batsidis
350 Jay Street
Brooklyn, New York 11201
BY: JOHN CARROLL, ESQ.
E-mail: carrollj@brooklynda.org
BY: ZACHARY SIDER, ESQ.

ALSO PRESENT:
Anthony Minervini
Lexitas

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

oOo

VIDEOCONFERENCE STIPULATION

IT IS HEREBY STIPULATED AND AGREED by and between counsel for all parties present that pursuant to the CPLR section 3113(d) this deposition is to be conducted by video conference, that the court reporter, all counsel, and the witness are all in separate remote locations and participating via videoconference (LegalView/Zoom) meeting under the control of Lexitas Court Reporting Service, that the officer administering the oath to the witness need not be in the place of the deposition and the witness shall be sworn in remotely by the court reporter after confirming the witnesses identity, that this videoconference will not be recorded in any manner and that any recording without the express written consent of all parties shall be considered unauthorized, in violation of law, and shall not be used for any purpose in this litigation or otherwise.

IT IS FURTHER STIPULATED that exhibits may be marked by the attorney presenting the exhibit to the witness, and that a copy of any

exhibit presented to a witness shall be e-mailed to or otherwise in possession of all counsel prior to any questioning of a witness regarding the exhibit in question. All parties shall bear their own costs in the conduct of this deposition by videoconference, notwithstanding the obligation by CPLR to supply a copy of the transcript to the deposed party by the taking party in civil litigation matters.

ADA N I C H O L A S B A T S I D I S,
called as a witness, having been first duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. MacGIOLLABHUI:

Q Can you please state your full name for the record?
A ADA Nicholas Batsidis.
Q Can you please state your current work address for the record?
A I work at 350 Jay Street, Brooklyn, New York 11201.

(Whereupon, Plaintiff's Exhibit 45, Timeline, 22 pages,
Plaintiff's Exhibit 46, DD5 dated 5/24/10, 2 pages,
Plaintiff's Exhibit 47, Meyer Kellner Translation, 29 pages,
Plaintiff's Exhibit 48, Neeman Translation, 54 pages,
Plaintiff's Exhibit 49, e-mail, 1 page,

ADA N. Batsidis

A No, I don't know.

Q Is this a document that is familiar to you at all?

A Yes.

Q In what way is it familiar?

A I think it is excerpts of a transcript between your client and Meyer Lebovits taken out of a bigger transcript.

Q I see, well, in terms of that particular conversation between Meyer Lebovits and Sam Kellner I am going to bring you back to Exhibit 46 which is the DD5, did either Meyer Lebovits or attorneys acting on his behalf provide your office in and around this time, so this is May, the end of May of 2010, with either a transcript or more than one transcript of this particular conversation?

MS. SCHARFSTEIN: Objection.

MR. CARROLL: Objection.

A I was provided two transcripts but I can't really tell you when specific unless it's in my notes.

Q Is it fair to say that at a subsequent point you or your office obtained your own

transcript of the conversation?

MS. SCHARFSTEIN: Objection.

A Yes.

Q And that prior to obtaining your own transcript you have been provided with two transcripts of the conversation either by Meyer Lebovits or by somebody acting on his behalf?

MS. SCHARFSTEIN: Objection.

MR. CARROLL: Objection.

A No, I was provided with -- we were provided with the recording and a transcript from one individual and then we had it transcribed by another individual from what I recall.

Q The other individual is that a lady by the name of Ruth Kohn?

A Yes.

Q The other individual that is a lady by the name of Rina Neeman?

A Yes.

Q Other than those two transcripts do you recall a third transcript and in particular what I have shown you already as Exhibit 47?

MS. SCHARFSTEIN: Objection.

MR. CARROLL: Objection.

ADA N. Batsidis

what you could see at the moment, this is e-mail correspondence between you and Miss Gregory on June 17, 2010; correct?

MS. SCHARFSTEIN: What is the exhibit number?

MR. MacGIOLLABHUI: 30.

A Yes, it is.

Q At that time do you recall why you and Miss Gregory were in contact with one another?

A I was in contact with Miss Gregory often.

Q In terms of the matter?

A In terms of this e-mail?

Q Well no, let me ask a different question.

In terms of the matter the two of you were handling so am I correct in understanding you were handling an investigation or you were part of an investigation into Simon Taub and also Sam Kellner?

A That is correct.

Q Was there anybody else you were investigating at that time meaning were there any other targets of your investigation at that time?

ADA N. Batsidis

A Not that I recall, no.

Q In terms of the investigation that you were carrying out do you recall when you first made contact with Miss Gregory?

A I don't recall.

Q In terms of that initial contact, I know you don't remember exactly when it took place, but can you recall why you and Miss Gregory were in contact with one another?

MS. SCHARFSTEIN: Objection.

MR. CARROLL: Objection.

A Yes, Samuel Kellner it was alleged from the reports that Samuel Kellner brought forward witnesses against her defendant and at some point early in the investigation I met with Miss Gregory and basically took her file, I read it.

Q When you say you took her file did you take the entire file?

A I don't know if it is going to be the entire file but mostly the grand jury minutes and any documents pertaining to police reports.

Q In general terms would the documents that you examined be contained in what are called

ADA N. Batsidis

within your office complainants folders?

A Complainants folders?

MR. CARROLL: Objection.

Q Right.

A I don't know what that is.

Q So at that time you recall you looked at the grand jury minutes from her case and also the police reports?

A You know what, I don't think it is the grand jury minutes. I think it is the trial minutes. I am mistaken on that I believe. Almost positive it was the trial minutes.

Q This was the trial in relation to victim number three; right?

A Victim number three, correct.

Q In terms of the connection between what you were investigating and that particular and Miss Gregory case can you explain what the connection was as you perceived it at that time?

A At that time the connection was that Mr. Taub and Mr. Kellner were basically extorting the Lebovits family with victims of sex crimes in our office.

Q Those were the allegations that have

been made?

A Yes, pretty straight forward.

Q In terms of Mr. Taub the allegation with regard to him is that he had claimed that Meyer Lebovits had abused his son; right?

A I don't recall. I'd have to look at more documents.

Q In terms of Mr. Kellner the allegation was that he was engaged in extortion relating to the three victims in Miss Gregory's case; right?

A Correct, but Simon Taub was the mastermind, that was the initial allegation. I think he was on that DD5 we looked at.

Q Let me see if I can bring you back to the DD5 in terms of refreshing your recollection as to Simon Taub and I think let me bring you up to page one which I think is the material to do with Simon Taub.

Again, I will direct your attention in particular to what you can see there which begins "Meyer stated the following regarding Haim Eluzer" and then you have five bullet points if you want to read through those quickly.

A Okay.

ADA N. Batsidis

Q That I'll do. We will get to it. I think it is one of the exhibits coming up.

A Okay.

Q Going back to Meyer Lebovits' position with regard to Simon Taub's son his position was that the allegations were false; right?

A Correct.

Q He maintained that he had not abused Simon Taub's son?

A Correct.

Q In terms of Miss Gregory's case that involved the father of Meyer Lebovits Baruch Lebovits?

A Yes.

Q Let me point you to Plaintiff's Exhibit 50. I will let you scroll through that particular document. There are several pages. And I will suggest to you that these are news reports concerning Baruch Lebovits and that you printed off and placed into the Simon Taub file.

MR. CARROLL: Objection.

MS. SCHARFSTEIN: Objection.

A I don't recall that.

Q Do you recall reading about the Baruch

ADA N. Batsidis

A I don't understand the question.
Q Isn't it fair to say that in the course of there were a number of recorded phone calls between Chaim Lebovits and Simon Taub prior to this sting operation?
A Correct.
Q In the course of those phone calls didn't Chaim Lebovits repeatedly ask Simon Taub to arrange for Sam Kellner to come to their meeting?
MR. CARROLL: Objection.
MS. SCHARFSTEIN: Objection.
A I don't know. I don't recall.
Q Isn't it the case that, and again I will refer you back to some of the earlier e-mails, that Chaim Lebovits was urging Simon Taub to deliver Sam Kellner?
A The whole point of the sting operation was to get Kellner and Taub in the same vicinity, not vicinity, in the same meeting for the payoff which would have been recorded.
Q Right, isn't it the case that the only evidence that Sam Kellner had any connection to what Simon Taub was doing was Simon Taub's

ADA N. Batsidis

representations to that effect?

A And Detective Deboer's observations of Kellner in the vicinity.

Q Prior to the sting operation itself isn't it the case the only evidence connecting Sam Kellner to what Simon Taub was doing was Sam Kellner's representations that Kellner was involved?

MS. SCHARFSTEIN: Objection.

MR. CARROLL: Objection.

A No, it was Meyer Lebovits. That is the first opening DD5 that I read when I was assigned the case.

Q Isn't it the case that Meyer Lebovits said that Sam Kellner had a connection to it, Simon Taub said that Sam Kellner had a connection to it but beyond that there was no evidence?

MS. SCHARFSTEIN: Objection.

MR. CARROLL: Objection.

A There was evidence. Victim number three.

Q At this point in time were you aware of -- had you already reviewed Miss Gregory's file concerning victim number three?

ADA N. Batsidis

Sam Kellner?

A Yes.

Q Did you have contact with him on one occasion or more than one occasion?

A I don't recall.

Q How in what form did that contact take place meaning was it by phone, in person, by e-mail or some other way?

A I don't recall.

Q Do you recall at any time meeting Detective Litwin in person?

A Yes.

Q Do you recall whether or not that was prior or after to the indictment of Sam Kellner?

A I don't recall.

Q In terms of why victim number one ended his cooperation you were aware, were you not, at that time that within the particular community you were dealing with meaning the ultra orthodox Hassidic community in Brooklyn that victims had in the past ended their cooperation with prosecution because of pressure from the community?

MR. CARROLL: Objection.

ADA N. Batsidis

MS. SCHARFSTEIN: Objection.

A That was the rumor.

Q When you say that was the rumor the rumor from where?

A Like I said prior the community is not forthcoming. And the understanding of the officers is once a case is brought especially in the sex crimes area witnesses tend not to go forward for what ever reason whether the allegations are true or not or whether it is a money settlement it is what it is.

Q So fair to say that one of the reasons that victims don't come forward is because they're pressured, they're put under pressure by elements within their community not to cooperate with your office; right?

A That is true.

MS. SCHARFSTEIN: Objection.

Q And another reason is that they are at times paid off meaning that settlements are made with them to end meaning they receive money and in return for which they end their cooperation with your office; right?

A That is true. I heard that.

ADA N. Batsidis

family was and he said he was like a long distant friend and I don't recall if he did say he was related by marriage it was something like they grew up together.

Q In terms of the -- let me find his affidavit.

In terms of his affidavit did you have an understanding either at the time you received the affidavit or after you met with Mr. Friedman why it was that Simon Kellner supposedly went to him looking to reach some kind of settlement with Baruch Lebovits?

A If I recall I think he is a Rabbi in the community and he kind of like an intermediary like he is friends with Mr. Kellner and Baruch Lebovits. I think that is what he told me when I interviewed him. I can't really recall the interview. Something to that effect that he knows both parties.

Q I will bring you back to your timeline again. You see entry 27, August 12, 2010 entry?

A Yes.

Q That is a reference to or there is a reference in to the translator Rina Neeman?

ADA N. Batsidis

A Yes.
Q We previously discussed; right?
A Yes.
Q You had at this time you had that particular transcript of the phone call between Meyer Lebovits and Sam Kellner that had been prepared by her; right?
A I don't recall having it yet. I have to look at my notes.
Q Let me bring you further down. Entry number 35 for September 16, 2010?
A Yes.
Q Does that refresh your recollection as to when you were contacting Miss Neeman at this time you had the translation of the call?
A I believe I had the translation of the call at that point.
Q I will show you Plaintiff's Exhibit 57. I will turn over the control to you so you can scroll through it and I will ask you to confirm that this is a memo that was prepared in relation to an interview you conducted of Moshe Friedman.
A Yes, go ahead.

ADA N. Batsidis

Lebovits trial; right?
A Right.
Q Victim number one was the victim who was originally meant to go first but then he ended his cooperation which meant that victim three went ahead instead; right?
MS. SCHARFSTEIN: Objection.
A Yes.
Q At the time victim number one ended his cooperation he made no claim with regard to Sam Kellner; right?
A To me?
MR. CARROLL: Objection.
Q To anybody?
A Yes, he did to me.
Q But when he ended his cooperation so this is in late 2009 you were not involved at that time; right?
A No.
Q At that time who was involved within your office in terms of interacting with victim number one?
A Miss Gregory.
Q Did you speak to Miss Gregory about

ADA N. Batsidis

the circumstances in which victim number one had ended his cooperation in late 2009?
A Yes.
Q What did she tell you?
A She said he hired a lawyer and he is refusing to testify.
Q At that time he had made no claim with regard to Sam Kellner; right?
A To who?
Q In terms of when he originally ended his cooperation?
A Well certainly not to me. I don't know if he made that claim to anyone else that I don't recall.
Q Did Miss Gregory tell you that he had made the claim or the claim had been made to her?
A I don't believe so.
Q The claim with regard to Sam Kellner only came about eight months later; right?
A Eight months later, when I interviewed him?
MR. CARROLL: Objection.
Q Meaning that the affidavit that contains his accounts by Sam Kellner that came

ADA N. Batsidis

knowledge whatsoever that they would attempt to use what you were doing or what Rackets were doing as a way to challenge the Baruch Lebovits conviction?

MR. CARROLL: Objection.

A No.

(Short break: 1:09 to 1:38)

Q I want you to have a look at back to Exhibit 54 again and entry number 36, see that September 20, 2010?

A Yes.

Q Have a quick read through it.

A Should I read it out loud?

Q No, just to yourself.

A Yes.

Q That is a reference to, well, what is that a reference to in terms of where it says affidavits, interviews and translated recorded conversations between Meyer Lebovits and Kellner from 2009?

MS. SCHARFSTEIN: Objection.

MR. CARROLL: Objection.

A That is a reference to the affidavits that were supplied by the Lebovits family. The

ADA N. Batsidis

translation provided to us I don't recall which one, I know there were several as you know I don't know which one at that point. And ADA Vecchione instructed me to give everything over to sex crimes.

Q And the interviews is a reference to at this point you had interviewed victim number one; right?

A I believe so if you can refresh my recollection. It is very difficult. I believe so.

Q I think we had established earlier that the interview of victim number one was September 15 and I think you also interviewed Moshe Friedman on August 13, that you had interviewed victim number four on September 1?

A Okay.

Q What was your understanding of why you were instructed by ADA Vecchione to provide this material to sex crimes?

MR. CARROLL: Objection.

A I really didn't have an understanding.

MS. SCHARFSTEIN: Objection.

A I was just told to provide it to them

ADA N. Batsidis

Now again, in terms of your recollection do you recall during the course of your investigation that any representation was made to Weisner that his name would not be disclosed publicly by your office?

A I don't recall.

Q Let me point you then to Exhibit 62. And I will ask you to, I think that is the full extent of it, and I will ask you just to review it and confirm that it is an e-mail that was sent initially by a lady named Ruth to Stephanie Green-Jones and then forwarded to you on November 24, 2010?

A Yes.

Q It is a reference to the translation that Mrs. or Miss Ruth Kohn did of the conversation between Meyer Lebovits and Sam Kellner; right?

A Yes.

Q It is 161 pages in length; right?

A Yes.

Q I will ask you to look at the next exhibit which is Plaintiff's 62A and confirm that you don't need to read through the whole thing or

ADA N. Batsidis

A Great. Okay.

Q You see there is a reference there to I believe it is two individuals, and in fact three individuals. There is at the top there is a Rabbi Wolf and then below that there is somebody by the name of Wolf Wurtzberger and then below that there is the name Mandel.

Rabbi Wolf and Wolf Wurtzberger were two of the alleged coconspirators with Sam Kellner according to his indictment; right?

A I believe so. I have to look over the indictment. I don't remember the names.

Q There were five, do you recall there being five alleged coconspirators?

A Yes.

Q In terms of these notes do you know whose handwriting that is?

A No.

Q I am showing you now what was marked at a previous deposition as Plaintiff's Exhibit 39; do you see that particular e-mail?

A Yes.

Q That is an e-mail that was sent from Miss Gregory to you on February 24, 2011?

ADA N. Batsidis

A Okay.

Q It makes reference to videotapes that were made one in Florida and the other in Brooklyn; do you see that?

A Yes.

Q They were tapes that he discussed earlier that were made of victim number three; right?

MS. SCHARFSTEIN: Objection.

A Yes.

Q Was this the first time that you became aware that videotapes had been made of victim number three down in Florida?

A I believe so.

Q Do you recall why Miss Gregory e-mailed you about it?

A I do not recall. I believe she might have done it because victim number three was on the tapes for me to review.

Q Victim number three was her complainant in the case in which she had secured a conviction of Baruch Lebovits; right?

A Correct.

Q Fair to say that at this time she

ADA N. Batsidis

expressed concern to you about what was going on with victim number three?

MR. CARROLL: Objection.

MS. SCHARFSTEIN: Objection.

A I don't recall any of that.

Q At that time did you have beyond the fact that videotapes had been made did you have any understanding of what the purpose was behind the making of the videotapes?

A Not that I recall.

Q I will show you now what is Plaintiff's Exhibit 67 and ask you to review that. It is a single page.

A Okay.

Q Do you recall meeting with Rabbi Mandel?

A Somewhat.

Q Isn't it the case that he was asked by according to him at least by Meyer Lebovits to prepare a particular document in connection with your investigation into Sam Kellner?

MR. CARROLL: Objection.

A No.

Q I will rephrase that.

ADA N. Batsidis

A Rephrase that. I understand we both were on the case.

Q Isn't it the case that he discussed with you a document that he had prepared at the behest of Meyer Lebovits in and around January of 2009?

A Yes.

Q Isn't it the case that according to him Meyer Lebovits had come to him and said he was, this is Meyer Lebovits, forced to give Sam Kellner money?

A Yes, that is what is stated in the document.

Q He wanted the document to memorialize the fact that he was according to him paying the money through a third party?

A Yes.

Q Didn't Meyer Lebovits at a particular point in time tell you that he had provided $30,000 to a third party in relation to his back and forth with according to him Sam Kellner?

A I believe so.

Q Do you recall the name of the person to whom Meyer Lebovits claimed he gave the money?

ADA N. Batsidis

forward unless he was paid $250,000.

Q Isn't it the case?

A It is in the notes.

Q I will see if I can pull up the notes for you. Beer with me a moment. I will see if I can find it.

A Okay.

Q I am showing you what was Plaintiff's Exhibit 27 in a earlier deposition and it is an affidavit from Detective Litwin with his notes attached to it and, let me see if I have it, they're not the notes, I know the notes to which you're referring, there not the particular notes. I will see if I can find those. I know the notes your referring to so I will pull them up later.

Let me show you for now Exhibit 75 I may not have it open.

Before we get there I will show you Exhibit 74 and ask you to confirm that this is the indictment that was filed in relation to Sam Kellner and I will give you the, you should have control of the mouse so you can scroll down. This is Plaintiff's Exhibit 74.

A That is the indictment.

ADA N. Batsidis

so the evidence that cxisted prior to that what evidence was there as against Sam Kellner that didn't exist as against the alleged coconspirators other than what victim number one had said in relation to Sam Kellner?

A Other witnesses.

Q Who in particular?

A Am I suppose to talk about them?

Q I am not interested in any witnesses that if there may be a witness that gave grand jury testimony and also provided information to your office prior to the presentation. It is fine to speak in terms of the information that was given, I don't want you to speak in terms of the presentation.

A It is going to be pretty tough.

Q Let me --

A Can you rephrase it.

Q Let me see if I can rephrase it exactly.

A Okay.

Q So fair to say the evidence against Sam Kellner that was brought to your office consisted of what Meyer Lebovits alleged but

ADA N. Batsidis

Moshe Friedman alleged and what victim number one alleged?

A Amongst others, yes.

Q Other than those three witnesses, Moshe Friedman, victim number one and Meyer Lebovits what other evidence was there there?

A There were other individuals interviewed that talked about Samuel Kellner.

Q Who in particular?

A I don't recall. It is in the DD5.

Q Let me show you Plaintiff's 73. Let me get back to your timeline. You see the entry number 56 and I am not concerned with the first line.

The second line that begins on October 6, 2011; do you see that?

A Yes.

Q What is that a reference to?

A That one of the unindicted coconspirators.

Q Mr. Wurtzberger?

A Correct.

Q Now I will point you to number 73 and ask you to review them and my question is are

ADA N. Batsidis

Q Did you inquire further into that organization?

A I don't recall.

Q Is it fair to say that this is something that ADA Alexis was pursuing rather than you?

A I really don't recall. We were both assigned the case.

Q Was it any concern to you that Lonuzzi was being paid for by an unknown beyond the name of the organization third party to represent victim number one?

A Yes, I think he needs to investigate or get checks. Something to that effect.

Q Did you personally do you recall beyond what is indicated in this e-mail do you recall doing anything further by way of that investigation?

A I don't recall.

Q I will bring you back again to your timeline and the same entry we looked at before and so this is number 89 and you see there is reference to a report of the existence of a recording between Kellner and another individual;

ADA N. Batsidis

A I don't recall. I don't even know if I was the lead on that.

Q In terms of -- let me ask you.

In terms of what constitute or not Brady material with regard to the Keller case in particular who would have made those decisions within your office at that time?

A The assigned ADAs and supervisor.

Q The assigned ADA was yourself and ADA Alexis; right?

A Correct.

Q Who were the supervisor?

A Vecchione.

Q Wasn't it the case that DA Hynes got involved in what should be disclosed or not pursuant to your Brady obligations with regard to victim number one?

MS. SCHARFSTEIN: Objection.

MR. CARROLL: Objection.

A I don't recall. If you can refresh my recollection.

Q Let me move you on then to Exhibit 83, it's at DD5 dated March 25, 2013 and I will ask you to review it. That is between a gentleman by

ADA N. Batsidis

Q This time you know that victim number one has been paid off, victim number three is about to get a pay off and get the only person you're prosecuting is Sam Kellner; correct?

A Correct.

Q Who never received a payment?

A No, but asked for one.

Q According to the prosecution case; right?

A Exactly.

Q Which was based on what Meyer Lebovits had reported to you; right?

A Not only Meyer Lebovits, victim number three.

Q You mean victim number one?

A Victim number three.

Q This is Litwin's notes?

A Yes.

Q Victim number three had no connection --

Withdrawn.

What role, going back to what we discussed before about moving ahead with an indictment and waiting if victim number three

ADA N. Batsidis

Q That is fine.

I will show you Plaintiff's Exhibit 85 and so this would have been the following day it was a story in The Jewish Week about a purported audio tape that somebody else had made and victim number one saying that he was in fact a genuine victim of Baruch Lebovits do you see that or does that ring a bell to you?

A Not really but I don't recall that article.

Q Let me point you to your timeline in particular. See entry 111?

A Yes.

Q Do you recall that where you were?

A I recall that.

Q That is a reference to an individual having come forward with a recording of victim number one and where he stated that he was a genuine victim?

A I believe that is what Michael Doud told me and I still have not received it till this date.

Q That makes two of us.

Let me show you Plaintiff's Exhibit 86

ADA N. Batsidis

and I will ask you to look at that and identify it.

A Okay.

Q And let me give you -- you should have the control.

A Okay, this is from myself to DA Hynes.

Q Right, you have been asked to provide a summary of the evidence in the case against Sam Kellner; right?

A Correct.

Q Let me ask you, you see item number four, is that a typo, should that be three rather than four?

A That is probably a typo due to my diabetes, yes.

Q The evidence at that point consisted of three things, the as you say testimony of Meyer Lebovits, the testimony of victim number one and then the recorded phone call between Sam Keller and Meyer Lebovits; right?

A And I think it was another witness I believe I forget his name.

Q I think if you scroll down there is item number five which I think is meant to be

ADA N. Batsidis

item number four it is the testimony of Moshe Friedman?

A Yes.

Q There are four elements of the case?

A Correct.

Q If you look at element number two in terms of the recorded conversation you see where you state in the second line "at first blush, the meaning of the 161 page transcript is unclear"?

A Yes.

Q And then you continue by saying that the meaning that you were relying upon was supplied to you by Meyer Lebovits; do you see that?

A Yes, I sat down with him and went line by line, correct.

Q Let me point you to Exhibit 87 and I will ask you to review, you don't need to review the entire thing. I think if you review I am only going to ask you to identify it, I am not going to go through it with you, so if you go through the first two pages you should be allow to you identify it.

A Okay. Looks like the Brady letter that

ADA N. Batsidis

Q You had no evidence that Sam Kellner received a penny in this case; right?

A You don't have to receive.

MS. SCHARFSTEIN: Objection.

MR. CARROLL: Objection.

A You don't have to receive the payment. All you have to do is report someone to the District Attorney office and/or ridicule them in public for monetary settlement is extortion.

Q The only evidence that you have such as it was of extortion by Sam Kellner depends entirely on Meyer Lebovits; right?

A Meyer Lebovits, the translation of the phone call, the statement by victim number three, the interview of witness Mr. Friedman. It is a lot.

Q But you didn't rely on victim three's statements when it came to the indictment; right?

A No, I did not. We went over that.

Q In terms of the recorded conversation as you said in your e-mail to the DA at first blush it is unclear what it means so you had to rely on Meyer Lebovits to explain it to you; right?

ADA N. Batsidis

Q Would you agree that you need evidence to support the prosecution and the charges?

A Yes.

Q Do you need anything else?

A No.

Q Would you agree that in some cases the nature of the evidence or the extent of the evidence might change over time?

A Yes.

Q Was the prosecution of Samuel Kellner such a case?

A Yes.

Q Is the possibility that you would have probable cause something that would be subject to change as the evidence develops?

A Yes.

Q Would you agree that --

Strike.

Have you ever come across a situation where you had a subjective belief that someone was a crime victim but you didn't have evidence to pursue a successful prosecution?

A Yes.

Q That happens from time to time?

ADA N. Batsidis

A Yes.

Q Would you agree that --

A I just want to clarify a statement.

I think you asked me something with regard to probable cause.

The probable cause to arrest someone won't change over time. The actual case will. Initially if you have probable cause to arrest someone sometimes it will change. Sometimes the evidence in the case later will change but you still have probable cause to arrest the individual or prosecute the individual.

Q I think my question was specifically about probable cause for prosecution and whether that could change over time?

A Okay.

Q So would you agree that it could change over time as the evidence developed or doesn't develop?

A Yes.

Q Would you agree that in a case involving members of the orthodox community in Brooklyn that your job may be made more difficult by language barriers?

ADA N. Batsidis

A Yes.

Q Would you agree that your job may be made more difficult because it requires an understanding of the customs of the community?

A Yes.

Q Did you ever obtain a translation of any document including any recording with regard to the prosecution of Mr. Kellner?

A Yes.

Q What I meant by that was did you personally arrange for the translation of any document or recording?

A Me personally? I did make a telephone call to the individual who translated the second document I believe to take a look at it and translate it or I e-mailed I don't recall but I did contact somebody.

Q So the translation was made at your request?

A Yes, Ruth Kohn.

Q How did you choose Miss Kohn to do the translation?

A Mr. Vecchione told me to give her a call because she has done it before in various

ADA N. Batsidis

cases in State and Federal Court.

Q She is known to your office?

A Yes.

Q Were there ever times when it was difficult for you to parse or understanding the evidence because of language barriers?

A Yes.

Q Were there ever times when it was difficult for you to understand the evidence because it depended to some extent on the cultural mores of the orthodox community?

A Yes.

Q What does it mean to go to TAP?

A That was a part created in Supreme Court where cases were over the requisite number of days and they want to push those cases to trial.

Q If an ADA in Rackets wanted information from anyone in sex crimes could they ask for it?

A Sure.

Q That would include you?

A Yes.

Q Can you explain what a target of an

ADA N. Batsidis

leaving of the country of victim number one, potential I guess tampering of victim number one, things of that nature.

Q Did that or anything else that Mr. Doud provided you in the way of information or leads lead you to your conclusion later on that the charges should be dismissed?

A No, we believed the charges should be dismissed after we confronted the witness victim number one with what we learned.

Q I am just going to turn to -- I will call him Mr. Niall now because I am not as good as pronounce his last name as you are.

But the same question, how often did you have contact with him how many times?

A More than Mr. Doud.

Q Would you say it was more than a handful of times?

A Yes.

Q Would you say that when he wanted to speak with you about the case you were within reason available to him?

A Yes.

Q Did he ever provide you with evidence

ADA N. Batsidis

deemed appropriate?

A Yes.

Q Did you do any further investigation as a result of information given to you by Mr. Niall?

A I would look into what he was claiming.

Q Do you remember anything specific?

A Mainly about victim number one.

Q Without having the benefit of looking at your action sheet which I am not going to take the time to do right now can you remember anything else except with regard to victim number one?

A The reading of the transcript he had a different translation of it, a different interpretation.

Q That was the transcript of the lengthy telephone conversation between Meyer Lebovits and Mr. Kellner?

A Correct.

Q That is what we are referring to?

A Yes.

Q Anything else that you can think of?

ADA N. Batsidis

A Not that I can recall.

Q Do you have any explanation as to why the translation provided by Mr. Niall was different if you in fact believe that it was different from the one that you worked with previously?

MR. MacGIOLLABHUI: That was not his testimony. He said interpretation. Different interpretation.

A Different interpretation. Different interpretation of the actual transcript.

Q So just to be clear, the translation reflected a different interpretation and not a different formulation of a literal language?

MR. MacGIOLLABHUI: Can we go off the record. I don't want to intrude.

MS. SCHARFSTEIN: This is what you would tell me. Save it until I am done and then you can ask your questions to clean it up.

MR. MacGIOLLABHUI: No, can I do this. I don't want to intrude on your question. Can I e-mail you my point because I think you misunderstood and

ADA N. Batsidis

it may.

MS. SCHARFSTEIN: I am about to clarify it so why don't you just let me do that.

MR. MacGIOLLABHUI: Okay.

Q So can you clarify for me, ADA Batsidis, what was the difference between the translation that was done by Miss Kohn and the translation that you later received from Mr. Niall?

MR. MacGIOLLABHUI: Objection. There was no translation he subsequently received from me. He has not said that.

MS. SCHARFSTEIN: Why don't you let him answer the question then.

A Mr. Kellner's attorneys had a different interpretation of Miss Kohn's translation of the recording.

Q Oh, so there was no second translation of the call?

A Of the call, there was two translations. One by Mrs. Neeman's company and one by Miss Ruth Kohn.

ADA N. Batsidis

Q Who provided the translation done by Miss Neeman?

A I don't recall but the individual couldn't testify due to being out of the country and didn't want to testify according to Miss Neeman.

Q The individual --

A Yes, I believe there was an individual -- Miss Neeman owned a company a translation company and I believe the individual interpreter did not want to testify. That is what I recall.

Q So just to clarify, the translation was not done by Miss Neeman, it was done by someone who was working for her?

A Yes, exactly. I don't believe it was her.

Q How did the interpretation given to you by Mr. Niall differ from the interpretation that you had before he brought that new interpretation to you?

A Counsel's interpretation was more this is a rabbinical settlement, he is not looking for any kind of money, something to that effect where

ADA N. Batsidis

they're just trying to settle it out of court.
Q The rabbinical settlement meaning what?
A Meaning they would go to the rabbinical court and settle the difference between them to that effect as opposed to give me money or I am going to the DA.
Q So it was a different interpretation of what Mr. Kellner was proposing in the conversation with Meyer Lebovits?
A That was his interpretation. Mine was with Meyer Lebovits told me and just reading the transcript. It look pretty damming for Mr. Keller until I spoke with defense counsel.
Q Was there a time to your knowledge when your office was prosecuting both Baruch Lebovits and Samuel Kellner?
A There was a time.
Q At the same time that both of those individuals were being prosecuted?
A Baruch Lebovits was convicted.
Q But then there was an appeal?
A Yes.
Q And your office continued to pursue