UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------X

SAMUEL KELLNER,

Plaintiff,

Docket No. 17-cv-1268

- against -

THE CITY OF NEW YORK and PATRICIA L. HYNES, Administrator of the ESTATE OF CHARLES J. HYNES,

Defendants.

--------------------------------------------X

Held via Zoom videoconference

May 20, 2022
9:38 a.m.

DEPOSITION of MICHAEL F. VECCHIONE, Non-party Witness, taken by Plaintiff, pursuant to Federal Rules of Civil Procedure, and Subpoena, held at the above-noted time and place, before Kyra Kustin, a Stenotype Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

LAW OFFICE OF NIALL MACGIOLLABHUI
Attorneys for Plaintiff
171 Madison Avenue, Suite 305
New York, New York 10016

BY: NIALL MACGIOLLABHUI, ESQ.

CORPORATION COUNSEL OF THE CITY OF NEW YORK
Attorneys for Defendants
CITY OF NEW YORK and PATRICIA L. HYNES,
AS ADMINISTRATOR OF THE ESTATE OF
CHARLES J. HYNES
100 Church Street
New York, New York 10007

BY: SUSAN P. SCHARFSTEIN, ESQ.

MICHAEL F. VECCHIONE

MR. MACGIOLLABHUI: Let me just say for the record -- so I just pressed record there, and I understand, Susan, you're going to make a record.

MS. SCHARFSTEIN: Okay. Do you want to go ahead and swear the witness.

M I C H A E L F. V E C C H I O N E,

Non-Party Witness, having first been duly sworn by the Notary Public, was examined and testified as follows:

THE REPORTER: Can I have your name with the spelling, please.

THE WITNESS: Michael, middle initial F., last name Vecchione. V, as in Victor, e-c-c-h-i-o-n-e.

THE REPORTER: And your address, please.

THE WITNESS: 31-01 --

MS. SCHARFSTEIN: Wait. Wait. You're using my address.

THE WITNESS: That's right. Sorry. Thank you, Susan.

Corporation counsel's address. So that's 100 Church, New York, New York.

MICHAEL F. VECCHIONE

practice.

Q You were a solo practitioner?

A Yes.

Q Now what position did you hold when you returned to the office -- or the Brooklyn DA's office in early '92?

A I started out as the -- I started out -- when I got the position, I was hired as a -- as a trial attorney for one of the -- for the trial zones, but I never served in that position. Before I got the to the office, I had been promoted to the deputy chief of the Homicide Bureau.

Q And then you were subsequently promoted, or soon afterwards, to chief, right? Chief of the Homicide Bureau, that is.

A Yes. It was called the trial cadre at the time, but it was the chief of the Homicide Bureau. Yes.

Q Approximately how long did you hold that position for?

A Until 1995 when I became chief of trials.

Q And how long did you hold that

MICHAEL F. VECCHIONE

particular position for?

A Until 2001 when I became chief of the Rackets Division.

Q Now when you became chief of the Rackets Division, was it a division at that point? Or was it still a bureau?

A Rackets Division.

Q No. I know that, but had it been, at some earlier point in time, a bureau, meaning Rackets Bureau, rather than Rackets Division?

A Before I got to it?

Q Yeah.

A I -- I guess. I don't remember.

Q I guess what I'm asking is this. When you got to it, it was a division at that point.

A Rackets Division. Yes.

Q Now you wrote a book, it was in 2015, called Crooked Brooklyn.

A What was the year? What did you say?

Q Around 2015.

A I don't remember the year, but yes. I wrote a book, Crooked Brooklyn. Correct.

Q In case you're wondering how I know all of this, I read your book.

it would be better if you could give him the mouse and let him scroll through --

MR. MACGIOLLABHUI: That's fine.

MS. SCHARFSTEIN: -- on the screen share.

MR. MACGIOLLABHUI: Okay. Let me do that.

Q So you should have control there, Mr. Vecchione, over the mouse which will allow you to scroll down through the document. There you are.

A Okay. What's the question?

Q So the question is that document describes a meeting that occurred, amongst other things, on April 27, 2010, right?

A That's what it says.

Q Well, do you recall on April 27, 2010, meeting in your office with Arthur Aidala?

A I don't recall a date, but I recall a meeting with Arthur Aidala in my office. Yes.

Q Okay. And what do you recall that meeting was about?

A Came to me to discuss an investigation

that potentially we could open regarding his -- individuals who he believed were either or were extorting -- potentially extorting his client's family, had bribed witnesses, and had interfered with witnesses in a trial that he had conducted.

Q And the trial involved a defendant by the name of Baruch Lebovits, right?

A I know that now. Yes.

Q Well, did you not know it at that time?

A No. I didn't know -- I didn't know Baruch Lebovits from a hole in the wall. He came to me and told me about the case, and we looked into the investigation.

Q So fair to say that that meeting was the first time you heard the name Baruch Lebovits?

MS. SCHARFSTEIN: Objection.

A Okay. I can't tell you that because I may have read about a -- a very large sentence that was given by Judge DiMango, and I think it was him. So I'm not sure, but that's what he came in to ask me about.

Q Let me ask the question a different way. Was that the first time you and Mr. Aidala

MICHAEL F. VECCHIONE

A Well, you'll have to break it up. That's two questions. So --

Q Well, start with Baruch Lebovits. Do you recall any meeting that occurred --

A No.

Q -- with either Ms. Bruffee or Ms. Jaus concerning the Baruch Lebovits case?

A No. I don't believe that I ever met with anyone regarding Baruch Lebovits's case, but the answer to your question is no.

Q Okay. So then in relation to Sam Kellner, do you recall any meeting that occurred concerning the Sam Kellner case that involved Rhonnie Jaus?

A No.

Q Do you recall any meeting that occurred concerning the Sam Kellner case that involved Anthea Bruffee?

A No.

Q Do you recall any meeting that occurred involving the Sam Kellner case that involved Amy Feinstein?

A No.

Q Do you recall any meeting that occurred

concerning the Sam Kellner case that involved DA Hynes?

A Me and Hynes?

Q Yeah.

A Ever?

Q Correct.

A Of course. Yes.

Q Okay. Well, tell me what you recall.

A I recall a meeting in which Hynes called me to his office to tell me that two of my -- that Batsidis and Alexis wanted the Kellner case dismissed. And he asked them to write a memo, and he showed me the memo and asked me, first of all, did I know that they wanted it to be dismissed, and I said no.

Second of all, he showed me the memo and said this memo is not to my liking. It's just -- it's poor, shoddy work. And he said that he didn't like the -- not that he didn't like. He was disappointed that two people who work for him would write a memo of that quality.

And he asked me if I thought there was a triable case, and I said yes, I do. He asked me if it was legally sufficient. I said yes, it

MICHAEL F. VECCHIONE

was. And that was the meeting.

Q And his complaint about the quality of the memo he received from --

A Correct.

Q -- Batsidis and Alexis, was that to do with the way it was written? Or its content?

A He didn't --

MS. SCHARFSTEIN: Objection.

A He did not tell me -- he didn't give me any specifics. He was just disappointed at the quality of their work.

Q And do you recall telling him why, in your view, there was a legally sufficient case at that time against Sam Kellner?

A No. He just asked me those questions, and I gave him two yeses.

Q Was it your understanding that prior to that meeting with you, that he had decided to dismiss the case against Sam Kellner?

A Absolutely not.

Q Now around that time, somebody made a decision to refer Detective Steve Litwin to IAB, right?

A You know, I did not remember that. I

MICHAEL F. VECCHIONE

communicating with regard to ADA Batsidis?

A No.

Q Now you see the first line of the second e-mail there from you to him -- and I'm going to read it. He's been working under my direct supervision, and he's done a very good job.

Is that, as you sit here today, an accurate statement?

A I don't have a recollection of saying that, but I do -- I was the chief of the Rackets Division, so he worked under me.

Q And did there come a point in time either in the investigation or prosecution of Sam Kellner where your belief changed with regard to the job that ADA Batsidis was doing?

A I can't answer the question. Clarify it.

Q Well, fair to say that in November of 2010, you felt that ADA Batsidis was doing a good job with regard to the prosecution of Simon Taub?

A That's what it says.

Q Well, ADA Batsidis subsequently was the assigned prosecutor with regard to Sam Kellner's

MICHAEL F. VECCHIONE

case, right?

A He was assigned to do the investigation. Correct.

Q And he also presented the case to the grand jury, right?

A My recollection is that that is correct.

Q And at a subsequent point in time, you assigned ADA Alexis to the case, as well.

A Correct.

Q And why was that?

A Well, ADA Alexis had more trial experience. He had been in the office probably around 20 years at that point. And Batsidis, I don't think, had the same -- I know he didn't have the same amount of trial experience. So if this was going to trial, I needed someone with more trial experience to be a part of the trial team.

Q And had you personally tried cases in the past with ADA Alexis?

A Yes.

Q One case? Or more than one case?

A I don't remember.