UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
SAMUEL KELLNER,

PLAINTIFF,

-against- Case No.: 17-cv-1268

THE CITY OF NEW YORK and
PATRICIA L. HYNES, Administrator of
the ESTATE OF CHARLES J. HYNES,

DEFENDANTS.
----------------------------------------X

DATE: January 30, 2023
TIME: 10:38 a.m.

CONTINUED VIRTUAL

DEPOSITION of the Plaintiff, SAMUEL KELLNER, taken by the Defendant, pursuant to an Order and to the Federal Rules of Civil Procedure, held at the above date and time, before Julie Parisi, a Notary Public of the State of New York.

A P P E A R A N C E S:

LAW OFFICES OF NIALL MACGIOLLABHUI, ESQ.
Attorneys for the Plaintiff
171 Madison Avenue
New York, New York 10016
BY: NIALL MACGIOLLABHUI, ESQ.

HON. SYLVIA O. HINDS-RADIX
CORPORATION COUNSEL
NEW YORK CITY LAW DEPARTMENT
Attorneys for the Defendants
100 Church Street
New York, New York 10007
BY: SUSAN SCHARFSTEIN, ESQ.
File #: 2017-018324
Control #: 23-0298

* * *

F E D E R A L  S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

*    *    *    *

out then it's going to be no case, it's a waste of time.

Q. So you understood that if your son decided to go forward that he would basically be committing to go ahead and testify at trial, correct?

A. Correct.

Q. And you hadn't wanted him to testify at trial or did you?

A. When he was together with the other witness I didn't mind, but when he would be the star witness, yes, I minded.

Q. Star witness?

A. Right, the only witness, I had no problem when there was present another witness.

Q. Was there ever a time when you wanted Baruch Lebovits to plead guilty because you thought it was unfair for your son to be put in the position of testifying at trial?

A. One hundred percent.

Q. So what changed?

A. They now, again it could be I misunderstood the law, the way I understood they separate the cases, my son and Victim 1. So my son comes first, so I insisted since he took away Victim 1 -- I'm sorry, it's a name of a victim.

MS. SCHARFSTEIN: I'm just going to ask that

make us all fools, all fools. Vaad Hatznius knew about it.

Q. Victim Number 1 made you a fool?

A. A criminal, but who he made a fool is Steve Litwin. He worked with him two years, Gregory she worked with him, two Grand Juries he's testified. Vaad Hatznius, Vaad Hatznius had a picture that he sent them from Lebovits molesting him. How do you believe a person like this in 60 seconds.

Q. So you believe that it was the fault of Victim Number 1 that you were arrested and prosecuted?

MR. MACGIOLLABHUI: Objection.

A. It wasn't my charges. I was charged with that.

Q. So you attribute it to him, right, just answer out loud so the Reporter --

A. Yes, yes, I attribute it to the people that did it.

Q. Meaning Victim Number 1, right?

MR. MACGIOLLABHUI: Objection.

A. Victim Number 1 was coached or told what to say and because we all knew, you know, everyone, not me.

Q. I'm just trying to get a clear answer to the question. I'm not asking for elaboration. So Victim Number 1 did what to you?

A. To me he said that the story is not true, the story with Lebovits is not true and I paid him $10,000.00.

I don't have 10,000 pennies.

Q. So he lied and which resulted in your arrest and prosecution?

A. Correct.

Q. Okay, thank you. So to your knowledge did anyone at the DA's office prepare Victim 1 for trial?

A. Yes.

Q. Who did that?

A. Ms. Gregory.

Q. When did she do that?

A. Steve Litwin told me.

Q. What did Steve tell you?

A. That he's refusing to come, they want to prepare him for trial he was operating all the way, all along we don't have it.

Q. Okay, I'm just asking a very specific question, to your knowledge did ADA Gregory or anyone else at the DA's office actually sit down with Victim Number 1 and prepare for trial?

A. No.

Q. To your knowledge did Ms. Gregory or anyone else at the DA's office ever sit down with Victim Number 1 and tell him what to expect at trial on cross examination?

A. Probably Laline for sure and probably Ms. Gregory also, that's what I was told by Detective Litwin.

Flohr?

A. Victim Number 3 came to Dov Hikin's office, the assemblyman.

Q. So were you in contact with Dov Hikin's office?

A. Yes.

Q. What was the nature of your relationship with Dov Hikin's office?

A. The nature that --

Q. Yes, go ahead.

A. -- I was thinking someone has to get involved what's going on here, you've been stopped ten times on the street and people telling you their victims --

Q. So did you go to Dov Hikin's office with regard to concerns about sexual assault in the Hassidic community?

A. Yes.

Q. And who did you speak to there?

A. I had opportunity to speak to Dov Cohen chief of staff and I had an opportunity --

Q. Do you know how to spell that?

A. D-O-V C-O-H-E-N.

Q. And he was the chief of staff?

A. Right.

Q. You spoke with him directly?

A. Correct.

Q. What was the nature of the conversation?

A. I told him why I want to see Dov Hikin.
Q. And who else did you speak with in Dov Hikin's office?
A. With Mr. Hikin himself.
Q. So you spoke with Mr. Cohen first?
A. Correct.
Q. Was that a walk in or did you call and make an appointment?
A. I called in, I said I got something important and the lady says come up, you could always speak to Dov. I thought it's Dov Hikin but when I came up it was Dov Cohen that wanted to know beforehand what if he could help and I told him the story.
Q. What exactly did you tell him?
A. That my son is being molested, was being molested so I was brought into here -- you go to the street everyone is a victim, what's going on.
Q. So at that point you had come in contact with Victim Number 1?
A. Yeah, Victim Number 1 had to come in order, they should pick up Lebovits.
Q. So when you went to Dov Hikin's office you had already been in contact with Victim Number 1; is that right?
A. Yes, yes.

Q. When you went to speak -- when you went to Dov Hikin's office what did you want to ask them for?
A. What particular -- what could be done, what can be done as, you know, some kind of assistance, therapy, if there's any -- he knows the state, is there anything that these people can go. And he told me St. Luke's Hospital which, you know, which these kids didn't buy.
Q. Did you ask Dov Hikin's chief of staff to put you in contact with other victims?
A. No.
Q. So you were inquiring about services for victims?
A. Mostly, yeah.
Q. What were you told?
A. I was told that whoever is going to come up to his office and seek help if there is available help they'll make sure that he getting it.
Q. Did they tell you what the procedure was they should come --
A. Come up to Dov Hikin's office.
Q. So that was what you had come to find out, correct?
A. That's all, right.
Q. So was that the end of the conversation with Mr. Cohen?
A. No, they wanted to know the full story. So he

called in -- so we had a meeting Dov Hikin, Dov Cohen and Ellie Schindler.
Q. Ellie is a man or a woman?
A. All of them are men.
Q. And what was Ellie's last name, could you spell it, please?
A. S-C-H-I-N-D-L-E-R.
Q. What was Ellie Schindler's position?
A. By me what I saw he was writing what I'm saying. I don't know what his position in the office was.
Q. You don't know what his title was?
A. No, what his title in the office, no.
Q. What you knew about him was that he worked for Dov Hikin?
A. I saw him there, Dov called him in.
Q. So the answer is yes?
A. The answer to what? At that time Dov called him in.
Q. So what you knew about Mr. Schindler was that he worked for Dov Hikin?
A. At that time I found out, yes.
Q. Did you subsequently learn anything more about what he did in Dov Hikin's office or anything else?
A. I assumed because --
Q. No, what did you learn, forget about what you

assumed?
A. Learned is that he's writing down what I'm telling him.
Q. Do you know if he had any special expertise or experience in dealing with sexual assault victims?
A. No, he doesn't, he said he doesn't.
Q. He doesn't, that's what he said?
A. I don't -- yeah.
Q. And you don't know specifically what his job was?
A. No.
Q. So in the meeting there was you, there was Mr. Cohen, there was Mr. Hikin, then there was Mr. Schindler, correct?
A. And the press guy.
Q. The press guy?
A. Yeah, I think so the one that gives out the press release. I asked him later I found him by doctor, same doctor and I asked him what his job is we were wasting time waiting for the doctor.
Q. You ran into him in a doctor's office?
A. Right.
Q. And you were speaking to him and you asked him what he did?
A. What he does for a living there in Hikin's office and he says he prepares the press release and all of these

things.

Q. You don't know his name, correct?

A. No, I couldn't remember.

Q. So there were five of you at the meeting, correct?

A. Dov, those two, and Dov Cohen, yes.

Q. So what was the discussion at the meeting?

A. He wanted to know my son's story and he wanted to check with his staff if they had --

Q. He being Mr. Hikin?

A. Mr. Hikin.

Q. Did he lead the meeting?

A. Yes. And then like I said do we have people coming and complaining about it and Dov --

Q. You directed that question to?

A. To Dov Cohen.

Q. To his staff, okay?

A. And Dov Cohen took out a list and I saw his name.

Q. You saw whose name?

A. Victim Number 3.

Q. We're not referring to that you mean Victim Number 3?

A. Victim Number 3.

Q. So you saw Victim Number 3's name on the list?

A. Correct.

Q. Was there a time when you were no longer in speaking terms with Detective Litwin?
A. Yes.
Q. When was that?
A. When I got upset that they did two things first they severed the case, which I blamed on Lebovits, but then that the DA put Victim Number 3 together with Victim 1, not a protection for my son. I screamed, I called, I screamed, you know, I'm risking my life for you and this is what happened. So we both screamed at each other and we had --
Q. I'm sorry, I didn't follow you so when was the screaming fight with Detective Litwin?
A. When they added Victim 1 and Victim 3 together, that means Victim 2 is going to go again alone.
Q. There was a time when they were going to try Victim 1 and Victim 3 together?
A. Yes, the judge puts it together, he called them both to a grand jury so he went back Victim 1 and then they brought in Victim 3. So it became Victim 1 and Victim 3 and my Victim 2 stayed exposed as a star witness again.
Q. So you were angry when you believed that Victim 1 and Victim 3 cases would be tried together and your son's case --
A. Right, and mine.
Q. -- your son's case would be tried separately?

A. Right.
Q. And you didn't want your son's case tried separately?
A. Being a star witness, being a star witness all by himself.
Q. What does that mean being a star witness, being the only witness?
A. Right, being the only witness.
Q. So you thought that that situation was the fault of Detective Litwin?
A. He didn't put up -- he didn't put no input, he knew about it.
Q. He was aware that your son's case would be tried separately?
A. No, he was aware why I brought Victim Number 3.
Q. You wanted Victim Number 3 because --
A. To be added to Victim Number 2. In the meantime the DA went and added to Victim Number 1.
Q. So that was the reason why you brought in Victim Number 3?
A. He should be together with my son Victim Number 2.
Q. So your son wouldn't be out there alone?
A. Right.
Q. What about getting justice for Victim Number 3

the money?
A. I had to go borrow money from friends, I took my silver pieces and I pawned them, and the rest came in through lawsuits which I won and I was able to pay him the rest.
Q. Did that include a lawsuit against the Forward?
A. Right.
Q. Was there any other lawsuit?
A. You might ask Niall because I think so --
Q. No, I'm asking you just tell me what you know?
A. There is agreement Niall told me --
MR. MACGIOLLABHUI: Objection, this is privileged information.
MS. SCHARFSTEIN: You can't object to your client's answer.
MR. MACGIOLLABHUI: I can object to the extent he's going to reveal privileged information. I absolutely can, Susan.
MS. SCHARFSTEIN: The fact that he has a lawsuit is not privileged.
MR. MACGIOLLABHUI: No, but he is going to divulge -- he's about to divulge communications.
MS. SCHARFSTEIN: Then tell him what --
MR. MACGIOLLABHUI: He can't describe any conversations between me and him. Once more, the

A. Correct.
Q. And then sometime after that one of the victims changed his story, right?
A. Correct.
Q. And you believe that it was because he was influenced by people, right?
A. Correct.
Q. But nevertheless he changed his story, right?
A. Correct.
Q. And he's now on record as having said inconsistent things, right?
A. Who?
Q. Victim Number 1.
A. Yes.
Q. He was under oath saying contradictory things?
A. Right.
Q. And so that might affect his credibility, right?
A. Correct.
Q. So ADA Gregory might not be able to present him as a credible witness after he's changed his story under oath, correct?
MR. MACGIOLLABHUI: Objection.
A. But records (sic) believed him, all of these people can say what they want.
Q. We're talking about presenting him to a jury at

would you say to that?
A. What would I say, again what would I say --
MR. MACGIOLLABHUI: Objection.
A. -- put in five minutes more effort and you're going to figure it out or three minutes more effort. But basically they're the same the names were discussed there, everything was discussed, Simon Taub, everything was discussed there. So, you know, anyone could have interpreted what we talking.
Q. Was the entire conversation in Hungarian/Yiddish or were any other languages spoken?
A. Maybe about four phrases of Talmud but that wouldn't make a difference but, yeah, there's about four phrases in English -- in Lushen Kodsh, L-U-S-H-E-N K-O-D-S-H.
Q. So if it's Talmud is that in Hebrew?
A. Talmud is in Hebrew, right.
Q. So if Mr. Hikin said that he listened to the tape recording and he believed that there were phrases and expressions that could be interpreted incorrectly what would you say to that, that he's wrong?
A. No, I would say the content cannot be changed. Let's say when we argued and I used Hebrew word so maybe they would have like what is this, but it wouldn't go smoothly. But the content is there. We spoke about

everyone and the contents is there. So I made let's say a reference which doesn't make sense -- which even if you don't understand you would continue reading it and you see it.

MS. SCHARFSTEIN: Can you read back my question, please.

(Whereupon, the referred to question was read back by the Reporter.)

Q. So is he wrong or is he correct, Mr. Kellner?

A. If he's talking about that word, yes, if he's talking about the contents he's wrong.

Q. What's the difference?

A. What's the difference because same thing as the stenographer today I tell you Jewish name even she spells it bad everyone is going to know whom we're talking about. But then again everyone knows what the question was, what the answer, so it's maybe that particular word that I used in Lushen Kodsh that we were arguing in Hebrew maybe that would have made it like, okay, I got to skip this word.

Q. I just asked a very simple question.

A. I said not for the contents just that word.

Q. So Mr. Hikin said that there were phrases and expressions that could be interpreted incorrectly, do you agree or not?

A. Only on phrases probably.

Q. So there are phrases that could be interpreted incorrectly, is that what you're saying?

A. I don't know if the person knew Hebrew, if the person doesn't know Hebrew it could make it incorrectly but it was translated.

Q. So the references to the Talmud could they be understood incorrectly by someone?

A. Yeah, and it made no difference with the Talmud or without the Talmud.

Q. I'm just asking if you agree?

A. Yes, I'm sorry.

Q. You agree with him?

A. Right.

(Inaudible discussion between Mr. Macgiollabhui and the witness.)

A. Context not content. I meant context is the right word in English. I said contents and my lawyer just made me aware it's called in English context.

Q. So your lawyer is helping you out with your testimony?

A. No, he's not helping he said I do something wrong and I said context I said okay.

Q. But he supplied a word for you, right?

A. No, he said I say it wrong.

MR. MACGIOLLABHUI: He's mispronouncing the