UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------X
SAMUEL KELLNER,

PLAINTIFF,

-against- Case No.: 17-CV-1268(MKB)(SJB)

THE CITY OF NEW YORK and PATRICIA L. HYNES, administrator of the Estate of CHARLES J. HYNES,

DEFENDANTS.
------------------------------------------X

DATE: February 23, 2022
TIME: 10:00 A.M.

VIDEOCONFERENCE DEPOSITION of the Non-Party Witness,ADA MISS HYNES, taken by the respective parties, pursuant to a Subpoena and to the Federal Rules of Civil Procedure, held before Desreen Sinclair, a Notary Public of the State of New York.

**A P P E A R A N C E S:**

NIALL MACGIOLLABHUI
Attorneys for the Plaintiff
SAMUEL KELLNER
171 Madison Avenue, Suite 305
New York, New York 10016
BY: NIALL MACGIOLLABHUI, ESQ.
niallmacg@macglaw.com

NEW YORK CITY LAW DEPARTMENT
Attorneys for Defendants
THE CITY OF NEW YORK and PATRICIA L. HYNES, administrator of the Estate of CHARLES J. HYNES
100 Church Street
New York, New York 10007
BY: SUSAN SCHARFSTEIN, ESQ.
sscharfs@law.nyc.gov

KINGS COUNTY DISTRICT ATTORNEY'S OFFICE
Attorneys for Non-Party Witness
ADA MISS GREGORY
350 Jay Street
Brooklyn, New York 11201
BY: JOHN CARROLL, ESQ.
ZACHARY SIDER, ESQ.

ALSO PRESENT
Anthony Minervini
Lexitas Legal.

* * *

VIDEO STIPS

IT IS HEREBY STIPULATED AND AGREED by and between counsel for all parties present that Pursuant to CPLR section 3113 (d) this deposition is being conducted by Videoconference, that the Court Reporter, all counsel, and the witness are all in separate remote locations and participating via Videoconference (LegalView/Zoom/WebEx) meeting under the control of Lexitas Court Reporting Service, that the officer administering the oath to the witness need witness shall be sworn in remotely by the Court Reporter after confirming the witness's identity, that this Videoconference will not be recorded in any manner, and that any recording without the express written consent of all parties shall be considered unauthorized, in violation of law, and shall not be used for any purpose in this litigation or otherwise.

IT IS FURTHER STIPULATED that exhibits may be marked by the attorney presenting the

exhibit to the witness, and that a copy of any exhibit presented to a witness shall be emailed to or otherwise in possession of all counsel prior to any questioning of a witness regarding the exhibit in question. All parties shall bear their own costs in the conduct of this deposition by Videoconference, not withstanding the obligation by the CPLR to supply a copy of the transcript to the deposed party by the taking party in Civil Litigation matters.

F E D E R A L S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

* * * *

M. GREGORY

A D A M I S S G R E G O R Y, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

**MR. MACGIOLLABHUI:**

Q. Please state your name for the record.

**A. ADA Miss Gregory.**

Q. What is your address?

**A. Kings County DA, 350 Jay Street, Brooklyn, New York 11201.**

**MS. SCHARFSTEIN: I understand the deposition is being recorded stenographically and there is also a audio recording; is that be correct?**

**MR. MACGIOLLABHUI: Correct.**

**MS. SCHARFSTEIN: Who is officially taking the audio recording and who will have custody of it?**

**MR. MACGIOLLABHUI: My understanding is that it is being recorded and I'm subject to correction here, it's being recorded on both ends.**

M. GREGORY

Supreme Court.

Q. Have you ever testified at a deposition before?

A. I have not.

Q. Could you give us just a general summary of your educational background?

A. Yes, I went to college at Florida A&M University in Tallahassee, Florida. I graduated there in 1990 and then I went to Georgetown University Law Center in Washington D.C. and I graduated there in 1994.

Q. Am I correct in understanding that you were admitted to practice law in New York in the following year, 1995?

A. Yes, I believe that's right.

Q. What is your current position in the Brooklyn District Attorney's Office?

A. I am chief of The Special Victims Bureau.

Q. How long have you held that particular position?

A. Since 2015.

Q. Prior to that, what position did

M. GREGORY

you hold?

**A. I was the chief of The Crimes Against Children Bureau.**

Q. How long did you hold that particular position?

**A. I began -- that was from 2010 to 2015.**

Q. What is the relationship between the Crimes Against Children Bureau and Special Victims Bureau, if any?

**A. Prior to -- well, at the time that I'm referring to, The Crimes Against Children Bureau was in 2010 and even before that, was a distinct separate bureau and as of 2015, there technically is no Crimes Against Children Bureau, it is part of The Special Victims Bureau.**

Q. Prior to being chief of the Crimes Against Children Bureau, what was your position at that time in the Brooklyn DA's office?

**A. Prior to that, I was supervisor of The Sex Crimes Special Victims Bureau.**

Q. For how long did you hold that

M. GREGORY

position, approximately?

**A. I would say seven to ten years.**

Q. Prior to that were you, as it were, a regular ADA?

**A. Yes, I mean --**

**MS. SCHARFSTEIN: Objection.**

**A. Yes, I mean I was an ADA various places in the District Attorney's office.**

**You want me to list them?**

Q. Yes, maybe it's better to do it the other way around.

When did you join the Brooklyn DA's Office?

**A. In January of 1996.**

Q. If you could briefly go through from that time up until when you became a supervisor in the Sex Crimes Special Victims Bureau?

**A. In January of 1996 I was in the Criminal Court Bureau. After that same year I went to the ECAB Bureau, Early Case Assessment Bureau, also called the Complaint Room. After that I went to The Sex Crimes where I was what we call a writer. I was**

M. GREGORY

**had three separate entities. It had The Sex Crimes Special Victims Bureau, The Crimes Against Children Bureau and The Human Trafficking Unit.**

Q. In terms of your position and from 1999 until 2010, the position you had was outside of the work of The Crimes Against Children Unit?

**MR. CARROLL: Objection.**

**MS. SCHARFSTEIN: Objection.**

**A. Yes.**

Q. So you moved at that time in 2010 into that particular unit and then in 2015 that unit, as it were, was subsumed within The Special Victims Bureau?

**A. Yes.**

Q. Now, I want to direct your attention to the prosecution by your office of Baruch Lebovits; you remember that case?

**A. I do.**

Q. When was your first involvement in that particular case?

**A. I don't know the date. But I believe it was in 2008 the case was assigned**

M. GREGORY

**to me after he had been indicted and prior to the Supreme Court felony arraignment.**

Q. Did you handle the arraignment?

**A. I don't recall if I handled the arraignment.**

Q. At that particular time when you first became involved in the case, who else within your office, in terms of ADAs were involved in the case?

**A. Prior to the case being assigned to me, it was assigned to a former ADA, Christopher Laline; L-A-L-I-N-E.**

Q. Did his involvement with the case overlap with your involvement?

**A. No.**

Q. So you essentially took the case over from him; is that it?

**MR. CARROLL: Objection to form.**

**MS. SCHARFSTEIN: Objection.**

**A. The way that the bureau was rendered, there were misdemeanor assistants, there were ADAs, there were grand jury ADAs and then there were felony trial ADAs. So Mr. Laline was grand jury assistant at that**

**M. GREGORY**

**MR. CARROLL: Okay, so we will come back at 2:50.**

**(Whereupon a break was taken at this time.)**

Q. Exhibit 26. So Ms. Gregory, you were reviewing this particular document; you finished your review?

**A. Yes, I have.**

Q. I'm going to point you to the second page at the fourth paragraph from the top, you see it begins with, it is my belief?

**A. Yes.**

Q. Now that paragraph, two sentences in that paragraph refer to Victim Number 1; correct?

**A. Yes.**

Q. And they refer to his decision to no longer cooperate with the case against Baruch Lebovits; right?

**A. Correct.**

Q. You believe that decision and I am quoting from the memo to no longer cooperate with the case was caused by pressure from

M. GREGORY

his Hasidic community; right?

**A. Right.**

Q. What was the basis of your belief in that regard?

**A. Conversations that I had with his attorney, Mr. Lonuzzi. The fact that Mr. Lonuzzi had told me he would bring Victim 1 to speak to me on more than one occasion, that did not happen, he stopped answering all multiple subpoenas that were delivered to his home and that was my belief just based on the interactions that I had with him prior to his withdrawal of his cooperation and conversations and the things that were going on with the case after the conviction; after the trial conviction.**

Q. What do you mean about the things that were going on after the conviction?

**A. After the conviction there was the Rackets investigation, the case was reversed; just those -- just the history of the case and what I knew of Victim Number 1.**

Q. Well, let me ask you.

On June 3, 2010 obviously the case

M. GREGORY

Bekioni?

**A. No.**

Q. What about ADA Alexis, did you participate in or are you aware of any direct communications with ADA Alexis about the prosecution of Mr. Kellner?

**A. Yes, I don't recall the specifics but I know that I spoke to ADA Alexis and ADA Batsidis and my recollection is that I spoke either in person or on the phone more times with ADA Batsidis than I did with any other person that was involved in that event in the Kellner investigation.**

Q. What was the purpose of your communications with ADA Batsidis?

**A. Some of it was background in my cases and then there was -- as his investigation proceeded, there were things that the defense attorney on my case had information about those, the Rackets investigation, and then would inquire of the judge or judges that were handling the Lebovits matter. Like might be there was some material from that Rackets**

M. GREGORY

**investigation that needed to be dealt with or observed by the judge handling the Lebovits case.**

Q. Was there a time that your office was proceeding with the prosecution of both Mr. Lebovits and Mr. Kellner?

**A. Yes, there was an overlap.**

Q. Do you know what time period was that?

**A. My recollection is that the Lebovits -- after it was reversed on appeal that in 2014, the year might be wrong, but it was when Mr. Thompson won the election and became the DA that the case was, in the way that I am recalling it now, was disposed of not like in the first days of his administration but in the first year of his administration.**

Q. So we're talking now about the prosecution of Mr. Kellner?

**A. I'm talking about of Mr. Lebovits. I believe that the Kellner prosecution continued after the Lebovits prosecution was included.**

**M. GREGORY**

Q. And the Lebovits prosecution came to an end during DA Thompson's tenure, is that what you said?

**A. That is correct.**

Q. And after that the Kellner prosecution continued?

**A. That is my understanding, yes.**

Q. Just to ask an obvious question.

During the pendency of the Lebovits prosecution you believe that there was probable cause to go forward?

**A. Yes.**

Q. Did you have enough knowledge to form an opinion as whether there was probable cause with regard to the Kellner prosecution?

**A. No, I did not.**

Q. Have you ever been assigned to the Rackets Bureau?

**A. I have not.**

Q. Is it fair to say that your office has different bureaus because there are different areas of expertise and experience that are called upon to prosecute different

M. GREGORY

types of cases?

**A. Yes.**

Q. So ADA Gregory, were you at any time involved in actually obtaining translations of any documents, non-English documents, that were used in connection with the Baruch Lebovits prosecution?

**A. I was.**

Q. How did you obtain a translator?

**A. I believe I had used the particular translator on other translations.**

Q. Who did you use?

**A. I believe her name was Ruth Korn.**

Q. I'm sorry, Ruth what was that?

**A. I believe her last name is K-O-R-N. I could be wrong about that.**

Q. And you used her because you believe her to be up to the job and reliable?

**A. Yes.**

Q. Did you ever encounter any criticism of her translation?

**A. Not that I recall.**

Q. Other than the information sharing

M. GREGORY

that you described earlier, did you have any role in the prosecution of Mr. Kellner?

**A. I did not.**

Q. Do you have an understanding of what expertise is needed for Rackets prosecution?

**A. Not particularly.**

Q. Have you ever prosecuted a case involving allegations of conspiracy?

**A. No.**

Q. What about allegations of grand larceny?

**A. Yes, I was involved in grand larceny cases I would say and defend them in the grand jury stages.**

Q. Was that a matter of years before your involvement with the Lebovits prosecution?

**A. Yes.**

Q. Do you have any idea or can you give me any reasonable estimate of how many grand larceny prosecutions you have been involved in in your career?

**A. No, I know definitely less than my**

M. GREGORY

**sex crimes cases.**

Q. What about bribery extortion cases, have you ever prosecuted any of those?

**A. I have not.**

Q. What about perjury cases, have you ever prosecuted any of those?

**A. I have not.**

Q. And criminal solicitation?

**A. I don't believe so, no.**

Q. Is there an expertise in your opinion in prosecuting sex crime cases?

**A. I believe so, yes.**

Q. Can you give me an example of something that you as an experienced sex crimes prosecutor would have an expertise in that some other type of prosecutor perhaps would not?

**A. What you mentioned before about outcry evidence, additionally, Sex Crimes ADAs are mandated to have forensic interviewing training.**

Q. Do you know what the charges were against Mr. Kellner?

**M. GREGORY**

Q. And that included Victim Number 1?

**A. Yes.**

Q. I apologize if I asked you this but just to be clear; have you ever worked in Rackets?

**A. I have not worked in Rackets.**

Q. Do you have any experience in prosecution of the type of charges that were brought against Mr. Kellner?

**A. No, I don't.**

Q. Do you have any awareness of whether ADA Batsidis had ever handled any sex crime prosecutions?

**A. I wouldn't say that he handled any sex crimes. Like, he was never in the Sex Crimes Bureau as far as I know but he could have been in part of the office where you know, obviously, he was in the Early Case Assessment Bureau where all the cases come through. Additionally, I think when he was coming through the office, there was an investigations unit where ADAs went out to the precinct and you know, and, we called it writing cases, and I would imagine based on**

**M. GREGORY**

**his years in the office that he would have done that and he more than likely would have handled some Sex Crimes investigations and just like in the earlier stages but not anything -- not handling a prosecution of the Sex Crimes case.**

Q. As far as you know he's never handled felony sex crime prosecution?

**A. As far as I know, no.**

Q. Has he ever been assigned to the, if I got the name right, Crimes Against Children Unit?

**A. Again, as far as I know, he has not.**

Q. Did you ever learn whether Mr. Lonuzzi was compensated for his services?

**A. I don't believe that we ever learned that.**

Q. Did you ever learn who had hired him?

**A. I don't recall.**

Q. Have you ever been told by anyone that Mr. Hynes was unwilling to do anything

M. GREGORY

concerning witness tampering with regard to Victim Number 1?

**A. No.**

Q. Why was Victim Number 1's case dismissed with regard to Baruch Lebovits prosecution?

**A. He, through Mr. Lonuzzi who represented himself as his attorney said that he would not testify at the trial.**

Q. Did that means there was insufficient evidence to go forward?

**A. Right and we couldn't -- there was no -- there were times -- we didn't -- yes, we could not go forward with an evidence-based prosecution without the complainant Victim 1.**

Q. And you took steps to secure his cooperation; is that correct?

**A. That is correct.**

Q. Was there anything more that you think you could have done to secure his cooperation?

**A. I don't believe so.**

Q. Why was Victim Number 2's case

M. GREGORY

anything additional could have been done to resecure the prosecution of Baruch Lebovits and again, you were asked your opinion so I'll ask your opinion too.

In your opinion, would a witness tampering investigation potentially help to resecure Victim Number 1's cooperation?

**MS. SCHARFSTEIN: Objection.**

**A. I think the main thing dealing with Victim Number 1 whether he had recanted his recantation or then said no the recantation was correct then these people paid me off, the only thing I think that his credibility was questionable at that point. So to rely on him for a prosecution, him alone, I don't think that would have happened. But obviously, the more evidence that you could have in a case perhaps, you know, there could have been something.**

Q. Aside from whether or not he resumed cooperation, aside from whether that would have meant that a continued prosecution of Mr. Lebovits was viable in regard to Victim Number 1, would it