UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------X
SAMUEL KELLNER,

Plaintiff,

Docket No.

- against - 17-cv-1268

THE CITY OF NEW YORK and PATRICIA L. HYNES, Administrator of the ESTATE OF CHARLES J. HYNES,

Defendants.

---------------------------------------------X

Video Conference

April 8, 2022
10:00 a.m.

DEPOSITION of RHONNIE JAUS, Nonparty Witness, taken by Adverse Parties, pursuant to Federal Rules of Civil Procedure, and Order, held at the above-noted time and place, before Joanne Maggiore, a Stenotype Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

LAW OFFICE OF NIALL MACGIOLLABHUI
Attorney for Plaintiff
171 Madison Avenue, Suite 305
New York, New York 10016

BY: NIALL MACGIOLLABHUI, ESQ.

HON. SYLVIA O. HINDS-RADIX
Corporation Counsel of The City of New York
Attorneys for Defendants
100 Church Street
New York, New York 10007

BY: SUSAN P. SCHARFSTEIN, ESQ.

F E D E R A L  S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the sealing, filing and certification of the within deposition be waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form, are reserved to the time of trial;

IT IS FURTHER STIPULATED AND AGREED that the transcript of this deposition may be signed before any Notary Public, with the same force and effect as if signed before a clerk or Judge of the Court;

IT IS FURTHER STIPULATED AND AGREED that all rights provided to all parties by the F.R.C.P. cannot be deemed waived, and the appropriate sections of the F.R.C.P. shall be controlling with respect thereto.

oo0oo

RHONNIE JAUS

R H O N N I E J A U S,

Nonparty Witness, having first been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. MACGIOLLABHUI:

Q. Please state your name for the record.

A. Rhonnie Jaus.

Q. Where do you reside?

A. 100 Church Street, New York, New York 10007.

MS. SCHARFSTEIN: I don't stipulate to the usual federal stips without knowing what it is.

MR. MACGIOLLABHUI: Obviously you and me will speak about this subsequently in terms of what the proper stips are. I think for today there are no usual stips to begin with. We have stipulated that this deposition is being conducted remotely and I believe we have stipulated that I'll be as it were in charge of presenting the witness with exhibits and

RHONNIE JAUS

as a Kol Tzedek case wasn't exclusively one that originated through Kol Tzedek, it could also include cases that may have originated beforehand, but in which victims nonetheless availed of some of the services that Kol Tzedek provided?

MS. SCHARFSTEIN: Objection.

A. We didn't have many cases before Kol Tzedek. So whatever -- maybe Lebovits started in 2008. We didn't have that many cases. I don't know when the superseding indictment occurred and when victim 3 came forward. I just don't know. But I do know we had a lot of services. I would say the vast majority of the cases came through Kol Tzedek. We had so few cases before.

Q. I can represent to you that the superseding indictment came through at the beginning of December 2008. So I'm going to show you a specific status sheet later in relation to the Lebovits case, but at this time April 2009, the superseding indictment was in place and you had by this stage three victims, victims 1, 2, and 3. We will get to that a little later. In terms of Kol Tzedek itself though, can you explain, can you

RHONNIE JAUS

describe I should say how it came into being? What prompted Kol Tzedek to be initiated by your office as a program?

MS. SCHARFSTEIN: Objection.

A. So Assemblyman Hikind, I don't know if he was assemblyman. I don't know what his position was. I think he was an assemblyman. He went on radio and was talking about the hundreds of victims of sex assault. I don't want to say hundreds. Like a lot. I thought it was hundreds. And how people are -- there are rampant sexual assaults in the Orthodox community. So when we read that we were concerned. We were, oh, my goodness, what can we do. That is why we came up with this way -- we discussed it, Henna White, Mr. Hynes, a whole bunch of people were discussing what could be done. We thought about -- I do believe I met with Dov Hikind as well, it's very vague, talking about what could be done. We came up with this idea of the Kol Tzedek program. People expressed feeling afraid to go to a precinct. I just always remember one of the Satmars, for example, are in Williamsburg. So

RHONNIE JAUS

people expressed feeling, which is the 9-0, people expressed feeling that they couldn't go into the precinct for fear of being seen. That's why they couldn't report. They were afraid they would be seen going into the precinct, they were to be seen going into the 6-6 in Borough Park. So we came up with this idea of a hotline, that was one aspect, a culturally sensitive social worker allowing people to come into our office directly and we would speak with them and put them in the grand jury and designate police officers that would make the arrest on the indictment or if it was a misdemeanor. It was a procedure that worked because we got a lot of people who were very frightened, very reluctant to come in and testify and were very -- we explained how the grand jury was a secret proceeding, et cetera. It helped, encouraged so many people to come forward. Then we also had a culturally sensitive social worker who connect the victims with resources and all kinds of things in the community to help them and it was extremely effective. We had a lot of cases. I don't

remember the number, but a lot.

Q. In terms of what you describe there, is it nonetheless fair to say that, I'll point to the Lebovits case in particular, that even before Kol Tzedek there were some cases that were brought directly to your office as opposed to a police precinct?

A. Always. I mean throughout my years and years in the DA's office there might be a case that would come directly to us. Usually it was the police that -- maybe it was a high profile case involving a dentist who was accused of various sexual assaults or something of that nature where the police maybe wanted to work with the assistant to brainstorm the cases if it was considered a high profile case. There were teacher cases that came in another way that came in through Stansic's office. I can't think of who came after him. But, you know, all these different cases. Cases would come in different ways. For the most part obviously through the police.

Q. In terms of the Lebovits case, that was a case that came to your office through Henna

RHONNIE JAUS

have been -- I'm just imagining. I don't want to do that. So I'm withdrawing it. No, I'm not aware. I am not aware. I don't know anything about it.

Q. Going back to Kol Tzedek. You had indicated a name of two other people that were involved as it were in the conception of the program as Henna White and Mr. Hynes; right?

MS. SCHARFSTEIN: Objection.

A. Yes. Mr. Hynes, Henna White, Chana Widowski was the social worker, the culturally sensitive social worker, myself, Louise Cohen. We were involved.

Q. Was someone by the name of Sarah Ellis involved?

A. Sarah Ellis was the head of all the social workers. So I imagine she had to give her permission for Chana to be involved. She was Chana's boss.

Q. In terms of Mr. Hynes, at that particular time this is when the program was being conceived, what was his level of engagement with that process?

MS. SCHARFSTEIN: Objection.

RHONNIE JAUS

think he assisted us in maybe a few cases.

Q. At this particular time regarding Kol Tzedek in particular and more generally the prosecution of sex crimes originating from the ultra-Orthodox community in Brooklyn, did you have any engagement with Mr. Hynes at this time?

A. Well, I will say this --

MS. SCHARFSTEIN: Objection.

A. I would never meet with Dov Hikind without permission from Mr. Hynes. I would never meet -- this was an office. I would have to get a green light from my superiors if I can meet with a politician.

Q. Beyond the specific context of Mr. Hikind as the number of cases were increasing, meaning the numbers of sex crime cases involving members of the ultra-Orthodox community in Brooklyn, as they were increasing, were you engaged with Mr. Hynes or did you have any engagement with Mr. Hynes at that time?

MS. SCHARFSTEIN: Objection.

A. Yes, because we -- I saw him quite a bit. He was my boss and we -- there were other cases that were going on. There may have

been something else I had to talk to him about, maybe there was a big case, maybe bureau chief meetings, whatever it was. I met with him quite bit. I might have said in passing the program is working out well, a lot of people are coming forward. He might have asked me how is everything going and I would said great, Henna is doing a great job, Chana is really helpful. This type of thing. He checked in. He checked in about a lot of things. He checked in about this as well. I saw him. We worked in the same office.

Q. You used the word pleased before and I think you had used the word satisfaction before. Although I may be wrong with that one. You certainly used the word pleased before. Did he express to you around this time he was either pleased or satisfied that Kol Tzedek seemed to be displaying as it were a measure of success?

A. Yes, absolutely. If you are going to ask me how he did or what he did I don't know. He was interested. He was enthusiastic. He green lighted the program. He gave us resources in the sense that he okayed that Henna

would run it and Chana and other -- I imagine there were other social workers on the hotline. I can't remember that. This was an effort that we made to -- we had to staff the hotline. It was at night. So, it was considered a positive -- he was very positive about it and would check in or I would tell him.

Q. Right. I think would it be fair to say, again, I'm referring back to what he said during the New York 1 interview, where for a long period of time there were very few cases coming from this community that this marked a significant development in your office's relationship with the community and in particular when it came to prosecuting sex crime cases?

MS. SCHARFSTEIN: Objection.

A. I would say that it was a change. That it was a -- just the objective data. We were able to encourage so many people to come forward, make them feel safe. Now, I understand why you are asking me this question, how would he know this because I told him many, many times we didn't have many cases with the community. People didn't want to come forward. He had been

RHONNIE JAUS

legal offer. That's all I can remember. I don't know what Amy knew. I do not recall. I don't believe I would -- that's something from the front office.

Q. I understand the point you're making that this is not strictly speaking a coming down because it's a different complainant. I understand that point. You had mentioned or you testified earlier that in terms of Amy Feinstein that you at this time met with her around once a week and aside from coming down on a plea one of the other kinds of issues you would discuss with her was suspected witness tampering in cases. Is that a conversation you had with her at this time or around this time about this particular case?

MS. SCHARFSTEIN: Objection.

A. I don't have any recollection.

Q. Well, around this time you indicated earlier that Mr. Lonuzzi was in your words the purported attorney for victim 1. Were you in any way suspicious as to the circumstances in which victim 1 had suddenly withdrawn cooperation on the eve of trial?

MS. SCHARFSTEIN: Objection.

RHONNIE JAUS

A. First of all, I want to say this. It's not unusual in sexual assault cases, even in domestic violence cases, for people to withdraw their cooperation victims at the last minute. That's what happens when people get panicked about having to testify. We had that happen to us in all forms of cases since I was a prosecutor. Sex Crimes, domestic violence cases people panic at the end. They get cold feet and they don't want to go forward. So we heard out of the blue that Lonuzzi was representing number 1. It raised concerns and we kept trying to bring in number 1, but Miss couldn't get him to come in. I think Lonuzzi kept saying he would bring him in, but didn't. We were concerned and we had -- we were very surprised, but suspicions -- I don't know, maybe. We had concerns. I'm going to say that.

Q. I'll point you now to Exhibit 28 in the Exhibits 4 e-mail that you got. I'll ask you to confirm this is an e-mail that was sent by Chana Widowski on January 27, 2010 to you and Louise Cohen with Henna White CC'd?

A. Okay.

RHONNIE JAUS

A. Not really, no. I have no independent recollection of speaking to her. I don't doubt that I did. I just don't have any recollection. There is no reason that stands out in my mind.

Q. What about Mr. Hynes, do you have any recollection of speaking to him about the case?

A. No, not really. Except when we were -- I have recollection of only one time way after the trial when there was information that number 3 may have recanted on tape. We did have a meeting just to discuss who was going to look into it and Mike was there and it was decided that Rackets was going to look into it.

Q. This alleged recantation on tape, this was information that was brought to your office by the Lebovits attorneys; right?

A. Not to me. Mike called me on the phone and told me that. This is after the trial, after the sentencing that the victim in our case from the trial there may be -- he may have recanted and there was a tape.

Q. I see. The Mike you are referring to is Mike Vecchione; right?

RHONNIE JAUS

A. Yes.

Q. At that time you recall speaking to Mr. Hynes; right?

A. I met with Mike, Miss, Anthea Bruffee. There's probably other people. I don't remember who. There were other people. I never heard the tape. We were very concerned. Once you hear about a recantation it is very concerning because you have to act on it quickly. We can't have someone recanting and the defendant went to jail. Anthea and Miss worked on it. Ultimately I think the victim said he did not recant, and then after that later that day or maybe the next day, we met with Mr. Hynes and -- maybe that day. We discussed what was going on and that Mike's department was going to look into it. We were going to speak to our witness. Supposedly there was a tape. I never heard the tape.

Q. This is prior to my client meaning Samuel Kellner being indicted?

A. I didn't hear you.

Q. This is prior to my client meaning Samuel Kellner being indicted?