UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X
SAMUEL KELLNER,

Plaintiff,

Docket No.
17-cv-1268

- against -

THE CITY OF NEW YORK and PATRICIA L. HYNES, Administrator of the ESTATE OF CHARLES J. HYNES,

Defendants.

-------------------------------------------X

Held via Zoom videoconference

April 22, 2022
10:44 a.m.

DEPOSITION of KEVIN O'DONNELL, Non-party Witness, taken by Plaintiff, pursuant to Federal Rules of Civil Procedure, and Subpoena, held at the above-noted time and place, before Kyra Kustin, a Stenotype Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

LAW OFFICE OF NIALL MACGIOLLABHUI
Attorneys for Plaintiff
171 Madison Avenue, Suite 305
New York, New York 10016

BY: NIALL MACGIOLLABHUI, ESQ.

CORPORATION COUNSEL OF THE CITY OF NEW YORK
Attorneys for Defendants
CITY OF NEW YORK and PATRICIA L. HYNES,
AS ADMINISTRATOR OF THE ESTATE OF
CHARLES J. HYNES
100 Church Street
New York, New York 10007

BY: SUSAN P. SCHARFSTEIN, ESQ.

KINGS COUNTY DISTRICT ATTORNEY'S OFFICE
Attorneys for Non-Party Witness
KEVIN O'DONNELL
350 Jay Street
Brooklyn, New York 11201

BY: JOHN CARROLL, ESQ.

KEVIN O'DONNELL

K E V I N O ' D O N N E L L,

Non-Party Witness, having first been duly sworn by the Notary Public, was examined and testified as follows:

THE REPORTER: Can I have your name with the spelling, please.

THE WITNESS: Kevin, K-e-v-i-n, O'Donnell, O -- apostrophe -- D-o-n-n-e-l-l.

THE REPORTER: And your address, please.

MR. CARROLL: Just give your office address. The business address.

THE WITNESS: 350 Jay Street, Brooklyn, New York, 11201.

THE REPORTER: This is pursuant to subpoena?

MR. CARROLL: Yes.

THE REPORTER: Federal stips?

MS. SCHARFSTEIN: No. I'm not going to stipulate to anything unless I know what it is.

MR. MACGIOLLABHUI: I'm fine with no stips. We had used three stips on

transferred to the Frauds or Rackets Bureau. And the following year, I was transferred back to Special Victims.

Q And in terms of your transfer to Frauds or to Rackets, did that transfer coincide with an investigation that you carried out related to your office's prosecution of Sam Kellner?

A Say the beginning of the question. I didn't catch that.

Q The transfer that you described to -- I think you said it was either Frauds or Rackets, did that transfer coincide with an investigation that you were involved in related to your office's production of Mr. Kellner?

A No. The Kellner matter that I had, I was assigned it on January 17 of 2014. I believe it was a Friday. And then Mr. Kellner's case was dismissed, I believe, March 17. Sometime in March of 2014.

I wasn't transferred to Frauds until -- I think I was notified of the transfer in July, and I wasn't transferred, actually, in August. And didn't really start working there because I had two weeks' vacation, and I was on grand jury

little bit differently, and we'll get back to that. So I'm going to show you what are Plaintiff's Exhibit 168, 169, and 170, and I'm going to share my screen with you. And I'm going to start with -- so this is Plaintiff's Exhibit 168. I'm going to ask you to scroll through the document and identify it for us.

A I can see without scrolling through, it's six pages. It's a memorandum. I know in your -- I was provided with some documents earlier in the week that were exhibits, and I think there were two or three versions of this memo. So I don't know which version it is, but it's a memo that I drafted in -- at the end of the Kellner prosecution.

Q And am I correct in saying that after Hynes -- former DA Hynes lost the election that took place in 2013 and was replaced by DA Thompson, that you were asked to conduct a review of the Sam Kellner prosecution?

A I was asked to -- well, I was -- I was assigned the Sam Kellner case.

Q And who assigned it to you?

A I do not recall. My best guess is Mark

Feldman, but I'm not sure of that.

Q Okay. And in connection with being assigned the case, you also carried out a review of the prosecution to that point, right?

MS. SCHARFSTEIN: Objection.

MR. CARROLL: Objection.

A A review as in I reviewed the file. I wasn't reviewing anybody's conduct, if that's what your question was.

Q No, it wasn't. But nonetheless, you answered the question. But this memorandum, what was the purpose of this memorandum?

A This was my recommendation that the case be dismissed because we could not prove it beyond a reasonable doubt.

Q Did somebody ask you to prepare it?

A I don't know whether someone did or didn't. Just our practice in our office is that we don't dismiss cases without some documentation of why we're doing so.

Q And the particular document that is Plaintiff's Exhibit 168, it's not a final version of the memorandum, right?

A I wouldn't know the --

KEVIN O'DONNELL

A Your client had been indicted, and the case had been dismissed by that point.

Q Right. So what were you investigating at this subsequent point in time different or separate from that for which my client had already been indicted?

MR. CARROLL: Objection.

MS. SCHARFSTEIN: Objection.

A All the cases were -- in my opinion, all the cases are intertwined. The end of the Lebovits case, the Simon Taub case, and your client's case. And part of looking into all of that were -- there were allegations made against your client. And, you know, I -- I believe it's in some of this -- I think it's somewhere else in this document that's before us about your client having a history of being an extortionist and things of that nature.

So my belief was your client was guilty of the crime, and we just couldn't prove it, which is why it was dismissed. I didn't believe he was innocent for a second. So part of what I was looking into would be were there any other things out there. Not that we could prosecute

KEVIN O'DONNELL

him again, but if there was evidence that proved our case that was since dismissed. I wasn't going to close my eyes to it, so to speak. So it was -- I wasn't going into this with a narrow view of I'm looking only at the Lebovits family and not at anybody else.

It was a broad view of -- because in my opinion, pretty much anybody, with the exception of the attorney I'm speaking to, pretty much everybody else who had a hand in this case had some kind of misconduct, including a fair amount of the other attorneys involved in this case. That was my personal opinion. So I didn't want to close off to any limited view of what I was doing.

Q In terms of your opinion that Sam Kellner was guilty of something, did you have any evidence to support that opinion at any time?

A We did not have evidence that would have proved his guilt beyond a reasonable doubt, which is why the case was dismissed.

Q Right, but in terms of your opinion that he was guilty, was that opinion informed by any evidence?