UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

SAMUEL KELLNER,

Plaintiff,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

---------------------------------------------------------------------- x

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**

17-cv-01268 (NRM) (MMH)

Defendants City of New York and Patricia L. Hynes, as Administrator of the Estate of Charles J. Hynes (defendants) submit this statement pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Eastern District of New York, to set forth material facts as to which defendants contend there are no genuine issues to be tried.[1]

The Investigation of Plaintiff

1. Assistant District Attorney Nicholas Batsidis was assigned to investigate certain claims made against plaintiff. (Def. Ex. A (Transcript of the deposition of Nicholas Batisidis conducted on March 23, 2022 (Batsidis trans.), at 204:5-9; Def. Ex. B (Transcript of the deposition of Michael Vecchione conducted on May 20, 2022 (Vecchione trans.), at 77:24-78:4)).[2]

---

[1] The facts stated herein and in defendants' accompanying letter request for a pre-motion conference are not conceded by defendants and are assumed to be true only for purposes of their motion. See Local Civil Rule 56.1(c) (facts are admitted only "for the purposes of the motion"). Defendants reserve the right to assert different and/or conflicting facts at trial. See Vasconcellos v. City of N.Y., 12-cv-8445 (CM) (HBP), 2015 U.S. Dist. LEXIS 121572, at *4 (S.D.N.Y. Sept. 9, 2015).

[2] The exhibits referenced herein are to be filed with defendants' moving papers and are cited as "Def. Ex. __". Unless otherwise indicated, the references to transcripts are by the witnesses' surnames and are to the transcripts of depositions conducted in this matter.

2. Assistant District Attorney Joseph Alexis was also assigned to the investigation. (Def. Ex. A (Batisidis trans. at 204:5-9; 211:10-12)).

3. Assistant District Attorney Michael Vecchione supervised the investigation. (Def. Ex. A (Batsidis trans. at 211:13-14)).

4. At the time of the investigation, Vecchione was the Chief of the Rackets Division of the Kings County District Attorney's Office (KCDA). (Def. Ex. B (Vecchione trans. at 11:25-12:8)).

5. An attorney, Arthur Aidala, approached Vecchione about the possibility of opening an investigation regarding individuals whom he believed were extorting Aidala's client's (Baruch Lebovits's) family, bribing witnesses, and interfering with witnesses related to a trial that he had conducted. (Def. Ex. B (Vecchione trans. at 18:19-19:9)).

6. As part of the investigation, the KCDA obtained statements of Rabbi Moshe Friedman, Meyer Lebovits, and M.T.,[3] and a May 2009 recorded conversation between plaintiff and Meyer Lebovits. (Def. Ex. A (Batsidis trans. at 54:15-55:22; 182:23-183:9; 218:17-219:6; 234:11-17)).

<u>Rabbi Moshe Friedman</u>

7. Plaintiff had asked Friedman to arrange for Lebovits to pay plaintiff $250,000. (Def. Ex. C (Transcript of the deposition of Moshe Friedman conducted on December 1, 2022 (Friedman trans.), at 31:17-32:10)).

---

[3] In light of New York Civil Rights Law § 50-b, the parties to this action and the KCDA have agreed to reference the alleged sexual assault victims by the pseudonyms "M.T." or "Victim 1," "P.K." or "Victim 2," and "Y.R." or "Victim 3." Defendants have also redacted certain exhibits to protect the victims' identities and to remove references to grand jury testimony, which has not been unsealed by court order for use in this case.

8. Friedman reported to the KCDA that plaintiff had told Friedman that Baruch Lebovits, or persons acting on his behalf, had reneged on an agreement to pay plaintiff $250,000. (Def. Ex. C (Friedman trans. at 87:4-24)).

9. Friedman reported to the KCDA that plaintiff had told Friedman that plaintiff controlled another victim or two. (Def. Ex. C (Friedman trans. at 83:6-86:16)).

10. Friedman reported to the KCDA that plaintiff had told Friedman that if plaintiff received money from Baruch Lebovits, the other victim or two would be quiet. (Def. Ex. C (Friedman trans. at 83:6-86:16)).

11. On July 15, 2010, Friedman signed an affirmation stating that plaintiff had approached Friedman and asked Friedman to negotiate with the Lebovits family so that the charges against Baruch Lebovits would go away. (Def. Ex. D (July 15, 2010 Affirmation of Moshe Friedman)).

12. In the July 15, 2010 affirmation, Friedman stated that plaintiff had stated that he controlled all of the cases against Lebovits; that he was not making a living and needed money; that Lebovits's son had money; and that the Lebovits family should pay. (Def. Ex. D (July 15, 2010 Affirmation of Moshe Friedman)).

13. On August 13, 2010, Batsidis and two detective investigators for the KCDA interviewed Friedman. (Def. Ex. E (August 13, 2010 memorandum prepared by Detective Investigator Stephanie Green-Jones)).

14. During the August 13, 2010 interview, Friedman was shown a copy of his July 15, 2010 affirmation and he confirmed that the contents thereof were true and accurate. (Def. Ex. E (August 13, 2010 memorandum prepared by Detective Investigator Stephanie Green-Jones)).

15. During the August 13, 2012 interview, Friedman stated that he had been approached by plaintiff in or around March of April of 2009, who told Friedman that Baruch Lebovits had given plaintiff's son a ride and touched him in a sexual manner; that plaintiff wanted to settle for $250,000 and was negotiating a deal; that plaintiff's son's case was only a misdemeanor, but that he could bring in Y.R., another victim whom plaintiff controlled; that Friedman knew the Lebovitses and could convince them to pay; that plaintiff knew that Lebovits's son Chaim had money; that plaintiff's son had problems in school and needed a tutor, but plaintiff did not have money; that plaintiff was receiving money from people in Monroe, New York, that was brought to him by his brother, Joseph, who lived in Monroe, based on whether Baruch Lebovits stayed in jail; that, when people in Monroe heard that plaintiff was trying to settle with the Lebovitses, they threatened to stop sending him money, and that plaintiff was adamant that he could get $250,000 from the Lebovitses. (Def. Ex. E (August 13, 2010 memorandum prepared by Detective Investigator Stephanie Green-Jones)).

<u>Meyer Lebovits</u>

16. Meyer Lebovits told the KCDA that plaintiff had demanded money of him to get rid of all three cases against his father, Baruch Lebovits. (Def. Ex. A (Batsidis trans. at 213:2-15); Def. Ex. CC (May 25, 2010 memorandum prepared by Detective Investigator Stephanie Green-Jones)).

17. A witness, Rabbi Mandel, reported to Batsidis that Meyer Lebovits had stated that he was forced to give money to plaintiff and wanted to memorialize the fact that he was paying the money through a third party. (Def. Ex. A (Batsidis trans. at 154:16-155:18)).

<u>The May 2009 Recorded Conversation</u>

18. In May of 2009, a conversation between plaintiff and Meyer Lebovits took place. (Amended Complaint filed on October 2, 2017 (docket entry # 14) (AC)), at ¶ 16).

19. The conversation was conducted in Hungarian Yiddish, some Hebrew, and included references to the Talmud. (Def. Ex. F (August 1, 2013 Green-Jones report); Def. Ex. G (Transcript of the deposition of plaintiff Samuel Kellner conducted on January 30, 2023 (Kellner Jan. 30, 2023 trans.), at 428:10-430:13)).

20. Meyer Lebovits recorded the conversation. (AC, at ¶ 16).

21. Batsidis received a copy of a certified translation of the conversation that had been prepared by Rina Neeman on or before September 16, 2010. (Def. Ex. A (Batsidis trans. at 102:21-103:18); Def. Ex. H (Certified translation by Trustforte Language Services)).

22. Batsidis obtained a translation of the recorded conversation between plaintiff and Meyer Lebovits by Ruth Kohn. (Def. Ex. A (Batsidis trans. at 24:24-25:4; 248:11-21); Def. Ex. I (Translation by Ruth Kohn)).

23. Vecchione told Batsidis to contact Kohn because she was known to the KCDA as someone who had previously done Yiddish-English translations in cases in state and federal courts. (Def. Ex. A (Batsidis trans. at 248:19-249:4)).

24. Batsidis received the translation prepared by Kohn on or before November 24, 2010. (Def. Ex. A (Batsidis trans. at 145:8-20; Def. Ex. J (November 24, 2010 emails among Kohn, Batsidis, and Green-Jones)).

25. The translation prepared by Kohn was 161 pages in length. (Def. Ex. A (Batsidis trans. at 145:8-22; Def. Ex. J (November 24, 2010 emails among Kohn, Batsidis, and Green-Jones)).

26. Kohn had worked hard on the translation and listened to the entire recording several times. (Def. Ex. J (November 24, 2010 emails among Kohn, Batsidis, and Green-Jones)).

27. Batsidis initially found the meaning of the translation unclear. (Def. Ex. A (Batsidis trans. at 219:7-11)).

28. Batsidis then reviewed the translation with Meyer Lebovits line by line. (Def. Ex. A (Batsidis trans. at 219:12-17)).

29. The translation appeared to reflect that plaintiff had demanded money from Lebovits in exchange for not bringing allegations to the KCDA. (Def. Ex. A (Batsidis trans. at 257:11-261:15)).

30. The translation appeared to be "damning" to plaintiff until plaintiff's criminal defense counsel weighed in. (Def. Ex. A (Batsidis trans. at 261:9-15)).

31. Batisidis learned that plaintiff's criminal defense counsel had a different interpretation of the recorded conversation between Meyer Lebovits and plaintiff. (Def. Ex. A (Batsidis trans. at 257:4-259:20)).

32. Defense counsel's interpretation differed in that he believed that plaintiff was proposing a rabbinical settlement to resolve the criminal matter out of court. (Def. Ex. A (Batsidis trans. at 260:19-261:15)).

<u>M .T.</u>

33. On July 22, 2010, M.T. signed an affirmation stating, among other things, that plaintiff had approached him, told M.T. that he had a job for him, gave him about $400 or $500, and told him to say yes if someone asked him if he had been molested; that plaintiff instructed him to say that Baruch Lebovits had raped him on a regular basis from the time he was 12 until he was 16 years old; that M.T. had testified twice that Baruch Lebovits had raped him; that Baruch Lebovits had never molested him; that plaintiff gave him approximately $10,000; and that plaintiff brainwashed him and he desperately needed money. (Def. Ex. K (July 22, 2010 Affirmation of M.T.)).

34. In a September 15, 2010 interview attended by Batsidis and KCDA Investigator Stephanie Green-Jones, M.T. was asked about the affirmation that M.T. had signed on July 22, 2010. (Def. Ex. L (September 16, 2010 report by Detective Stephanie Green-Jones)).

35. During the September 15, 2010 interview, M.T. stated, among other things, that, in or around March 11, 2008, plaintiff came to his home; he (M.T.) told plaintiff that Baruch Lebovits had not molested him; that plaintiff told him, if anyone asked, to say he had been molested by Baruch Lebovits; plaintiff told him (M.T.) he had a job for him and gave him $500 in cash; plaintiff took him to see Detective Litwin, whom M.T. lied to by stating that Baruch Lebovits had molested him as plaintiff had told him to do; he (M.T.) received approximately $100 per week, for a total of approximately $10,000 from plaintiff; Y.R. had told him (M.T.) that, he, too, had received money and regretted starting the Lebovits prosecution; and he (M.T.) came forward because he was shocked when he learned of Baruch Lebovits's lengthy sentence. (Def. Ex. L (September 16, 2010 report by Detective Stephanie Green-Jones)).

<u>Plaintiff's Criminal Prosecution</u>

36. On April 11, 2011, plaintiff was indicted on one count of conspiracy in the fourth degree; five counts of attempted grand larceny in the second degree by extortion; two counts of perjury in the first degree, and two counts of criminal solicitation in the fourth degree under Indictment No. 2538/2011. (AC, at ¶ 41; Def. Ex. M (Indictment No. 2538/2011); Def. Ex. A (Batsidis trans. at 179:19-179:25)).

37. The indictment alleged that, between March of 2008 and March of 2010, plaintiff made repeated demands for money to Meyer Lebovits, via five unindicted co-conspirators, in exchange for which plaintiff would cause the pending criminal sex abuse charges against Baruch Lebovits to be dismissed through his "ability to control the cooperation and content of the testimony of the complaining victims [M.T., Y.R., and his son (P.K.)]"; direct an

additional alleged victim of Baruch Lebovits not to make a complaint; and cause the publication of Lebovits' alleged abuse of children within the community to cease. (AC, at ¶ 42; Def. Ex. M (Indictment No. 2538/2011)).

38. The alleged overt acts in furtherance of the conspiracy consisted of five extortionate demands made to Meyer Lebovits, on plaintiff's behalf, solicitation by plaintiff of another individual to act as an emissary for his alleged extortion, payments by plaintiff to a witness to secure his false testimony in the two separate grand jury proceedings against Baruch Lebovits, and the re-iteration of the earlier extortionate demands made by his co-conspirators in a May 2009 recorded conversation between plaintiff and Meyer Lebovits. (AC, at ¶ 43; Def. Ex. M (Indictment No. 2538/2011)).

39. Plaintiff was arrested on April 12, 2011. (AC, at ¶ 44).

40. A news conference attended by Hynes took place after plaintiff's arrest. (AC, at ¶ 44; Def. Ex. DD (Affirmation of Niall MacGiollabhui in Support of Motion To Dismiss dated July 26, 2013, at ¶ 46)).

41. On July 24, 2013, Hynes appeared on a radio show and commented on the case against plaintiff. (AC, at ¶ 50).

<u>The Prosecution of Baruch Lebovits</u>

42. Assistant District Attorney Miss Gregory was the supervisor of the KCDA's Sex Crimes Special Victims Bureau. (Def. Ex. N (Transcript of the deposition of Miss Gregory conducted on February 23, 2022 (Gregory trans.), at 13:18-15:3)).

43. Gregory was an assistant district attorney who had prosecuted Baruch Lebovits. (Def. Ex. N (Gregory trans. at 19:18-20:3)).

44. Three alleged sex crimes victims, M.T., P.K., and Y.R, had accused Baruch Lebovits. (AC, at ¶¶ 8, 10, 11).

45. P.K. was plaintiff's son. (AC, at ¶ 8).

46. Plaintiff did not want his son to testify at a trial if he were the only witness. (Def. Ex. G (Kellner Jan. 30, 2023 trans. at 256:2-13; 326:21-327:24)).

47. Plaintiff was concerned that his son would have to reveal what had happened to him on cross-examination at trial. (Def. Ex. G ((Kellner Jan. 30, 2023 trans. at 291:6-22)).

48. Baruch Lebovits was convicted for a crime against Y.R. (AC, at ¶ 23; Def. Ex. A (Batsidis trans. at 40:12-41:7)).

49. Hynes sought a sentence for Baruch Lebovits of ten and two-thirds to 32 years. (Def. Ex. O Mar. 25, 2010 letter from Charles J. Hynes to the Honorable Patricia DiMango)).

50. During the course of his prosecution, Baruch Lebovits was represented by six lawyers – Arthur Aidala, Alan Dershowitz, Amy Adelson, Nathan Dershowitz, Lawrence Goldman, and Elizabeth Johnson. (Def. Ex. P (signature page of Lebovits Pre-Pleading Memorandum; Def. Ex. Q cover page of Reply Memorandum of Law in Further Support of Defendant Baruch Lebovits's Omnibus Motion)).

<u>ADA Gregory's Attempts to Contact M.T.</u>

51. Gregory took steps to secure the cooperation of M.T. for the prosecution of Baruch Lebovits. (Def. Ex. N (Gregory trans. at 240:5-20)).

52. M.T. was represented by attorney John Lonuzzi. (Def. Ex. R (Transcript of the deposition of John Lonuzzi conducted on October 17, 2022 (Lonuzzi trans.), at 34:10-35:7)).

53. M.T.'s brother arranged a consultation with Lonuzzi to discuss Lonuzzi's representation of M.T. (Def. Ex. R (Lonuzzi trans. at 35:21-36:8)).

54. M.T. retained Lonuzzi. (Def. Ex. R (Lonuzzi trans. at 35:21-36:8)).

55. Lonuzzi had a meeting at which M.T., his brother, and his uncle were present. (Def. Ex. R (Lonuzzi trans. at 36:18-24)).

56. M.T. did not want to be subjected to testifying at trial. (Def. Ex. R (Lonuzzi trans. at 27:14-28:20)).

57. M.T. communicated through his attorney that he would not testify at a trial. (Def. Ex. N (Gregory trans. at 240:5-10)).

58. Without M.T.'s testimony, there was insufficient evidence to try the case arising out of M.T.'s allegations. (Def. Ex. N (Gregory trans. at 240:11-17)).

59. Gregory attempted to contact M.T. via his attorney. (Def. Ex. N (Gregory trans. at 148:15-149:17)).

60. Gregory arranged multiple appointments with M.T.'s attorney for M.T. and his attorney to speak with her; however, all of those appointments were canceled. (Def. Ex. S (Gregory July 8, 2011 Affirmation at ¶ 12)).

61. Gregory's office served subpoenas to obtain the attendance of M.T. (Def. Ex. N (Gregory trans. at 148:15-149:17; Def. Ex. S (Gregory July 8, 2011 Affirmation at ¶ 13)).

62. Gregory could not do anything more to secure M.T.'s cooperation. (Def. Ex. N (Gregory trans. at 240:21-24)).

63. It was not unusual for sexual abuse victims to withdraw their cooperation because they became panicked at the last minute before they had to testify. (Def. Ex. T (Transcript of the deposition of Rhonnie Jaus conducted on April 8, 2022 (Jaus trans.), at 152:19-153:19)).

64. After M.T. had recanted his allegations against Baruch Lebovits, his credibility was questionable. (Def. Ex. N (Gregory trans. at 253:6-20)).

65. Gregory was never told that Hynes was unwilling to do anything concerning witness tampering with regard to M.T. (Def. Ex. N (Gregory trans. at 239:24-240:4)).

The Sex Crimes and Rackets Bureaus

66. The KCDA had different bureaus because different types of cases called for different experience and expertise. (Def. Ex. N (Gregory trans. at 233:22-234:3)).

67. Gregory had never been assigned to the Rackets Bureau. (Def. Ex. N (Gregory trans. at 233:19-21; 238:4-7)).

68. Gregory did not have any particular understanding of the expertise needed for a Rackets prosecution. (Def. Ex. N (Gregory trans. at 235:5-8)).

69. Gregory had never prosecuted a case involving allegations of conspiracy, bribery, extortion, perjury, or criminal solicitation. (Def. Ex. N (Gregory trans. at 235:9-11; 236:3-11)).

70. Gregory had not been involved in the prosecution of a grand larceny case for years before the Baruch Lebovits prosecution. (Def. Ex. N (Gregory trans. at 235:12-20)).

71. Gregory had no experience in prosecuting the types of charges that were brought against plaintiff. (Def. Ex. N (Gregory trans. at 238:8-11)).

72. Gregory used Kohn for translations in the course of handling the Baruch Lebovits prosecution. (Def. Ex. N (Gregory trans. at 234:4-17)).

73. Gregory had used Kohn on other translations. (Def. Ex. N (Gregory trans. at 234:10-12)).

74. Gregory had found Kohn's translations to be reliable. (Def. Ex. N (Gregory trans. at 234:18-24)).

Case 1:17-cv-01268-NRM-MWH Document 81 Filed 11/03/22 Page 12 of 19 PageID #: 6501

The Communications Between Sex Crimes and Rackets

75. Vecchione initiated a meeting with members of Sex Crimes to inform Sex Crimes that Rackets was investigating plaintiff and that the investigation might have implications for the Sex Crimes prosecution of Baruch Lebovits. (Def. Ex. U (Transcript of the deposition of Anthea Bruffee conducted on April 14, 2022 (Bruffee trans.), at 80:18-81:9)).

76. Plaintiff was believed by Rackets to be extorting Baruch Lebovits's family relating to the three sex crimes victims from the Sex Crimes prosecution of Baruch Lebovits. (Def. Ex. A (Batsidis trans. at 32:17-33:14)).

77. Early in his investigation, Batsidis met with Gregory and took her file because it was alleged in the reports that plaintiff had brought witnesses forward against Baruch Lebovits. (Def. Ex. A (Batsidis trans. at 31:3-31:18)).

78. Gregory and Batsidis investigated plaintiff. (Def. Ex. A (Batsidis trans. at 30:9-31:2)).

79. Gregory spoke to Alexis and Batsidis about plaintiff's prosecution. (Def. Ex. N (Gregory trans. at 231:4-14)).

80. An assistant district attorney in Rackets could request information from an assistant district attorney in Sex Crimes. (Def. Ex. A (Batsidis trans. at 249:19-24)).

81. Batsidis was in contact with Gregory often. (Def. Ex. A (Batsidis trans. at 30:9-12)).

82. Batsidis reviewed trial minutes and police reports from Gregory's file. (Def. Ex. A (Batsidis trans. at 31:19-32:16)).

83. Batsidis spoke to Gregory about the circumstances in which M.T. had ended his cooperation with the Lebovits prosecution. (Def. Ex. A (Batsidis trans. at 121:25-122:4)).

84. Batsidis was instructed by Vecchione to turn over the information that he had to Sex Crimes. (Def. Ex. A (Batsidis trans. at 128:17-129:6)).

85. Gregory communicated by email with Batsidis on February 24, 2011, referencing the existence of videotapes about Y.R., a complainant in one of Gregory's cases against Baruch Lebovits. (Def. Ex. A (Batsidis trans. at 152:20-153:24)).

86. The purpose of the conversations between Gregory, Alexis, and Batsidis was to discuss background on the criminal prosecutions against plaintiff and Lebovits. (Def. Ex. N (Gregory trans. at 231:15-232:4)).

87. A meeting took place that was attended by Hynes, members of Rackets, and trial and appeals lawyers who were involved in the prosecution of Baruch Lebovits. (Def. Ex. U (Bruffee trans. at 43:11-44:25)).

88. At that meeting, Hynes was provided Sex Crimes' view of the case against Baruch Lebovits. (Def. Ex. U (Bruffee trans. at 43:11-45:4)).

89. A meeting took place that was attended by Hynes, members of Sex Crimes, and members of Rackets, when it was learned that Y.R. might have recanted on tape. (Def. Ex. T (Jaus trans.), at 157:7-158:20)).

Hynes's Communications Concerning Plaintiff's Prosecution

90. At a meeting between Hynes and Vecchione, Hynes asked Vecchione if there was a triable case against plaintiff. (Def. Ex. B (Vecchione trans. at 43:25-45:2)).

91. Vecchione told Hynes that there was a triable case against plaintiff. (Def. Ex. B (Vecchione trans. at 43:25-45:2)).

92. Hynes asked Vecchione if there was a legally sufficient case against plaintiff. (Def. Ex. B (Vecchione trans. at 43:25-45:2)).

93. Vecchione told Hynes that there was a legally sufficient case against plaintiff. (Def. Ex. B (Vecchione trans. at 43:25-45:2)).

94. On June 19, 2013, Hynes requested that Batsidis and Alexis provide him with a brief summary of the evidence against plaintiff. (Def. Ex. V (June 19, 2013 emails exchanged among Hynes, Vecchione, and Batsidis)).

95. Batsidis's summary of the evidence against plaintiff consisted of the testimony of Meyer Lebovits, M.T., and Moshe Friedman, as well as the May 2009 recorded conversation between Meyer Lebovits and plaintiff. (Def. Ex. A (Batsidis trans. at 217:25-219:4)); (Def. Ex. V (June 19, 2013 emails exchanged among Hynes, Vecchione, and Batsidis)).

96. Batsidis stated the witnesses had testified, among other things, that plaintiff had sought money from the Lebovits family in exchange for keeping the witnesses from testifying against Baruch Lebovits and the cases against him from going forward; that plaintiff would bring forward another witness if there was no settlement; and that plaintiff did not want his son to testify. (Def. Ex. V (June 19, 2013 emails exchanged among Hynes, Vecchione, and Batsidis)).

97. Batsidis stated that Rackets had been investigating allegations that the Lebovits family may have paid M.T. to testify in the grand jury and then made him leave the country so as to be unavailable for trial. (Def. Ex. V (June 19, 2013 emails exchanged among Hynes, Vecchione, and Batsidis)).

98. Batsidis stated that he and Alexis intended to speak with M.T. concerning the allegations that he had been paid to testify in the grand jury and whether he had ever been molested by Baruch Lebovits. (Def. Ex. V (June 19, 2013 emails exchanged among Hynes, Vecchione, and Batsidis)).

99. Batsidis stated that there was a difference of opinion between Meyer Lebovits and plaintiff as to whether their May 2009 conversation reflected attempts by plaintiff to extract money from the Lebovits family in exchange for the silence of Baruch Lebovits's accusers. (Def. Ex. V (June 19, 2013 emails exchanged among Hynes, Vecchione, and Batsidis)).

<u>Plaintiff's Communications With the KCDA</u>

100. Plaintiff was advised that the KCDA would not proceed with charges arising out of his son's complaint because the alleged offense was a misdemeanor, Lebovits was 60 years old, and a prosecution was unlikely to result in jail time. (AC, at ¶ 9; Def. Ex. W ((Kellner Jan. 25, 2023 trans. at 175:21-177:19)).

101. Plaintiff told Litwin and prosecutors at a meeting that attempts were being made to pay him off. (Def. Ex. X (Transcript of the deposition of Steven Litwin conducted on January 13, 2023 (Litwin trans.), at 49:17-23)).

102. Plaintiff was very vague about who was trying to buy him off and made only general statements. (Def. Ex. X (Litwin trans. at 49:17-23)).

103. Plaintiff made buoyant remarks to Litwin indicating that he should be offered millions of dollars to be bought off and he would consider. (Def. Ex. X (Litwin trans. at 50:22-51:3)).

<u>The Orthodox Jewish Community in Brooklyn</u>

104. It was at times difficult to understand the evidence because of language barriers with the Orthodox community. (Def. Ex. A (Batsidis trans. at 247:22-248:2; 249:5-13)).

105. It was at times difficult to understand the evidence because it depended on the cultural mores of the Orthodox Jewish community. (Def. Ex. A (Batsidis trans. at 249:9-13)).

106. Victims in the Orthodox Jewish community were often reluctant to cooperate with law enforcement. (Def. Ex. X (Litwin trans. at 32:5-8)).

107. Victims in the Orthodox Jewish community in Brooklyn were pressured by their community not to cooperate with the district attorney's office. (Def. Ex. A (Batsidis trans. at 94:17-95:18)).

108. Hynes instituted the Kol Tzedek program to assist sexual abuse victims by making them feel more comfortable about coming forward through the criminal justice system. (Def. Ex. Y (Transcript of the deposition of Henna White conducted on July 8, 2022 (White trans.), at 36:17-24); Def. Ex. T (Jaus trans.), at 50:17-53:2; 62:6-14; 79:15-81:8)).

The Involvement of Dov Hikind

109. On July 17, 2013, members of Rackets interviewed former Assemblyman Dov Hikind. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

110. Plaintiff had met with Hikind related to sexual abuse in the Orthodox Jewish community. (Def. Ex. G (Kellner Jan. 30, 2023 trans. at 313:13-318:14; 335:9-18)).

111. Plaintiff had come to Hikind's office on many occasions. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

112. Hikind stated that he had listened to the recording of the conversation between plaintiff and Meyer Lebovits twice. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

113. Hikind stated that the conversation was in Hungarian Yiddish and some Hebrew and contained references to the Talmud. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

114. Hikind stated that the recording contained phrases and expressions that could be interpreted incorrectly. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

115. Plaintiff agreed that the recording contained phrases and expressions that could be interpreted incorrectly. (Def. Ex. G (Kellner Jan. 30, 2023 trans. at 428:10-430:13)).

116. Hikind stated that plaintiff had asked Hikind for money. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

117. Hikind stated that, after he had listened to the recorded conversation, he came out publicly and suggested that the charges be dropped. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

118. Hikind stated that plaintiff's main concern about what had happened to his son was that it would get out in the community and the effect on how his son would be viewed in the Hasidic community. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

119. Hikind stated that, although many people had spoken out about sexual abuse in the Hasidic community, there was still "a long way to go." (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

<u>The Later Inconsistent Statements Made by M.T.</u>

120. On July 5, 2013, Batsidis and Alexis advised plaintiff's criminal defense counsel that they had spoken with M.T. on June 26, 2013, and July 1, 2013, and learned of information that had not been previously disclosed or known to them. (Def. Ex. Z (July 5, 2013 letter from Alexis and Batsidis to Michael Dowd, with attachment)).

121. During a June 26, 2013 interview by members of the KCDA, M.T. stated that, on several occasions, he told several people that Baruch Lebovits had molested him. (Def. Ex. Z (July 5, 2013 letter from Alexis and Batsidis to Michael Dowd, and attachment)).

122. During a June 26, 2013 interview by members of the KCDA, M.T. stated that Baruch Lebovits might have molested him, but he was not sure. (Def. Ex. Z (July 5, 2013 letter from Alexis and Batisidis to Michael Dowd, and attachment)).

123. During a July 1, 2013 interview by members of the KCDA, M.T. stated that plaintiff failed to pay him a fee that the two had agreed upon to testify falsely in the grand jury that Baruch Lebovits had molested him. (Def. Ex. Z (July 5, 2013 letter from Alexis and Batsidis to Michael Dowd, and attachment)).

124. During a July 1, 2013 interview by members of the KCDA, M.T. stated that plaintiff had promised to finance a wedding for him in exchange for falsely testifying in the grand jury that Baruch Lebovits had molested him, and added that he could not clearly remember specific dates and times because of his heavy drug and alcohol use. (Def. Ex. Z (July 5, 2013 letter from Alexis and Batsidis to Michael Dowd, and attachment)).

125. During a July 1, 2013 interview by members of the KCDA, M.T. initially stated that he went to Israel because his family had arranged a possible marriage for him; after further questioning, M.T. acknowledged that he traveled to Israel to avoid allegations of child molestation that were being made against him. (Def. Ex. Z (July 5, 2013 letter from Alexis and Batsidis to Michael Dowd, and attachment)).

126. During a July 1, 2013 interview by members of the KCDA, M.T. stated that he had never seen Baruch Lebovits in his life. (Def. Ex. Z (July 5, 2013 letter from Alexis and Batsidis to Michael Dowd, and attachment)).

127. M.T. had lied leading to plaintiff's arrest and prosecution. (Def. Ex. G ((Kellner Jan. 30, 2023 trans. at 298:21-299:4)).

128. M.T. had made contradictory statements under oath which affected his credibility. (Def. Ex. G (Kellner Jan. 30, 2023 trans. at 381:8-18; 388:5-10)).

129. Batisidis believed that the charges should be dismissed after confronting M.T. with information that had been learned by the KCDA. (Def. Ex. A (Batsidis trans. at 255:5-11)).

The Dismissal of the Charges Against Plaintiff

130. The evidence against plaintiff changed over time. (Def. Ex. A (Batsidis trans. at 246:7-13; 247:14-21)).

131. Assistant District Attorney Kevin O'Donnell was assigned to the criminal prosecution against plaintiff after Hynes lost the election in 2013, and was replaced by District Attorney Kenneth Thompson. (Def. Ex. AA (Transcript of the deposition of Kevin O'Donnell conducted on April 22, 2022 (O'Donnell Apr. 22, 2022 trans.), at 20:17-23)).

132. O'Donnell was assigned to the prosecution against plaintiff on January 17, 2014. (Def. Ex. AA (O'Donnell Apr. 22, 2022 trans. at 18:11-24)).

133. O'Donnell recommended that the case against plaintiff be dismissed because it could not be proven beyond a reasonable doubt. (Def. Ex. AA (O'Donnell Apr. 22, 2022 trans. at 21:11-16)).

134. O'Donnell believed that plaintiff was factually guilty of some or all of the crimes with which he had been charged. (Def. Ex. AA (O'Donnell Apr. 22, 2022 trans. at 87:4-88:16; Ex. BB (Transcript of the deposition of Kevin O'Donnell conducted on November 2, 2022 (O'Donnell Nov. 2, 2022 trans.), at 131:5-132:3)).

Dated: New York, New York
November 3, 2023

HON. SYLVIA O. HINDS-RADIX
Corporation Counsel of the City of New York
*Attorney for Defendants*
100 Church Street
New York, NY 10007
(212) 356-2355
sscharfs@law.nyc.gov

By: /s/Susan P. Scharfstein
SUSAN P. SCHARFSTEIN