UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
SAMUEL KELLNER, Case No. 17-cv-1268 (NRM) (MHH)

Plaintiff,

-against-

THE CITY OF NEW YORK and
PATRICIA L. HYNES, administrator
of the Estate of CHARLES J. HYNES,

Defendants.
------------------------------------------------------------------------X Date of Service: October 8, 2024

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NIALL MACGIOLLABHUÍ, ESQ.
LAW OFFICE OF
NIALL MACGIOLLABHUÍ
Attorneys for the Plaintiff
171 Madison Avenue, Suite 305
New York, NY 10016
(646) 850-7516

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 5

A. Baruch Lebovits' Crimes ..... 5

B. Baruch Lebovits' Plea Negotiations ..... 6

C. M.T. is Forced to End his Cooperation with the Lebovits Prosecution ..... 8

D. Hynes Authorizes an Investigation into Plaintiff ..... 8

E. The Investigation into Plaintiff is "Resurrected" ..... 10

F. Sex Crimes Confronts Hynes about the Effort to Overturn the Lebovits Conviction ..... 10

G. Plaintiff is Indicted ..... 11

H. Hynes is Voted Out of Office, and the Case against Plaintiff is Dismissed ..... 13

STANDARD OF REVIEW ..... 15

ARGUMENT ..... 15

I. Plaintiff was the Victim of a Malicious Prosecution ..... 15

II. Hynes was Personally Involved in the Violation of Plaintiff's Constitutional Rights ..... 22

III. Hynes is Not Entitled to Absolute or Qualified Immunity ..... 27

IV. The City of New York is Liable for Hynes' Conduct ..... 29

CONCLUSION ..... 30

## TABLE OF AUTHORITIES

**Cases**

*Adickes v. Kress & Co.*,
398 U.S. 144 (1970) ........ 22

*Amnesty Am. v. Town of W. Hartford*,
361 F.3d 113 (2d Cir. 2004) ........ 29

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 22

*Baez v. Hennessy*,
853 F.2d 73 (2d Cir. 1988) ........ 30

*Bailey v. City of New York*,
79 F. Supp. 3d 424 (E.D.N.Y. 2015) ........ 18

*Bellamy v. City of New York*,
914 F.3d 727 (2d Cir. 2019) ........ 30

*Bonide Prod., Inc. v. Cahill*,
223 F.3d 141 (2d Cir. 2000) ........ 28

*Boyd v. City of New York*,
336 F.3d 72 (2d Cir. 2003) ........ 17, 18

*Buari v. City of New York*,
530 F. Supp. 3d 356 (S.D.N.Y. 2021) ........ 28-29

*Buckley v. Fitzsimmons*,
509 U.S. 259 (1993) ........ 27, 28

*Carbajal v. Cnty. of Nassau*,
271 F.Supp.2d 415 (E.D.N.Y. 2003) ........ 27-28

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 15

*Chimurenga v. City of New York*,
45 F.Supp.2d 337 (S.D.N.Y. 1999) ........ 16

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988) ........................................................................................................ 29

*Colon v. City of New York*,
60 N.Y.2d 78 (N.Y. 1983) ............................................................................................... 17

*D'Amico v. City of New York*,
132 F.3d 145 (2d Cir. 1998) ............................................................................................ 15

*De Lourdes Torres v. Jones*,
26 N.Y.3d 742 (N.Y. 2016) ....................................................................................... 16-17, 17

*Fappiano v. City of New York*,
No. 01 Civ. 2476 (SLT) (SMG), 2015 WL 94190 (E.D.N.Y. Jan. 7, 2015),
*aff'd*, 640 F. App'x 115 (2d Cir. 2016)................................................................................ 19

*Farid v. Ellen*,
593 F.3d 233 (2d Cir. 2010) ............................................................................................ 22

*Fries v. Barnes*,
618 F.2d 988 (2d Cir. 1980) ............................................................................................ 22

*Fujitsu Ltd. v. Fed. Exp. Corp.*,
247 F.3d 423 (2d Cir. 2001) ............................................................................................ 15

*Gordon v. Emmanuel*,
No. 15 Civ. 2439 (CBA)(SJB), 2018 WL 4688935 (E.D.N.Y. Sept. 28, 2018)....................... 27

*Hampton v. Hanrahan*,
600 F.2d 600 (7th Cir.1979), *rev'd in part on other grounds*, 446 U.S. 754 (1980) ............... 23

*Hill v. City of New York*,
45 F.3d 653 (2d Cir. 1995) .............................................................................................. 27

*Hoffman-La Roche, Inc. v. Greenberg*,
447 F.2d 872 (7th Cir. 1971) ........................................................................................... 23

*Imbler v. Pachtman*,
424 U.S. 409 (1976) ........................................................................................................ 27

*Jackson v. Nassau Cnty.*,
552 F. Supp. 3d 350 (E.D.N.Y. 2021) ................................................................................ 29

*Jocks v. Tavernier*,
316 F.3d 128 (2d Cir. 2003) ............................................................................................ 16

*Lowth v. Town of Cheektowaga*,
82 F.3d 563 (2d Cir. 1996) .................... 18

*Mandell v. County of Suffolk*,
316 F.3d 368 (2d Cir. 2003) .................... 28

*Manganiello v. City of New York*,
612 F.3d 149 (2d Cir. 2010) .................... 16, 17, 18

*Moore v. Andreno*,
505 F.3d 203 (2d Cir. 2007) .................... 28

*Myers v. Cty. of Orange*,
157 F.3d 66 (2d Cir. 1998) .................... 30

*Pangburn v. Culbertson*,
200 F.3d 65 (2d Cir. 1999) .................... 22-23

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986) .................... 29

*Provost v. City of Newburgh*,
262 F.3d 146 (2d Cir. 2001) .................... 22, 26

*Rentas v. Ruffin*,
816 F.3d 214 (2d Cir. 2016) .................... 18

*Ricciuti v. N.Y.C. Transit Auth.*,
124 F.3d 123 (2d Cir. 1997) .................... 16, 28

*Rich-Taubman Assocs. v. Stamford Rest. Operating Co.*,
587 F. Supp. 875 (S.D.N.Y. 1984) .................... 23

*Richards v. City of New York*,
No. 97 Civ. 7990 (MBM), 2003 WL 21036365 (S.D.N.Y. May 7, 2003) .................... 19

*Roe v. City of Waterbury*,
542 F.3d 31 (2d Cir. 2008) .................... 29-30

*Rothstein v. Carriere*,
373 F.3d 275 (2d Cir. 2004) .................... 17

*Stampf v. Long Island R. Co.*,
761 F.3d 192 (2d Cir. 2014) .................... 16

*TADCO Constr. Corp. v. Dormitory Auth. of New York*,
700 F.Supp.2d 253 (E.D.N.Y. 2010) .................................................. 16

*Tangreti v. Bachmann*,
983 F.3d 609 (2d Cir. 2020) .................................................. 22

*Taylor v. City of New York*,
No. 19 Civ. 6754 (KPF), 2022 WL 744037 (S.D.N.Y. Mar. 11, 2022) .................................. 26

*Terebesi v. Torreso*,
764 F.3d 217 (2d Cir. 2014) .................................................. 22

*United States v. Henry*,
325 F.3d 93 (2d Cir. 2003) .................................................. 23

*United States v. Sobell*,
204 F. Supp. 225 (S.D.N.Y. 1962), *aff'd*, 314 F.2d 314 (2d Cir. 1963) .................................. 23

*Weyant v. Okst*,
101 F.3d 845 (2d Cir. 1996) .................................................. 15

*Ying Li v. City of New York*,
246 F. Supp. 3d 578 (E.D.N.Y. 2017) .................................................. 16

*Zahrey v. Coffey*,
221 F.3d 342 (2d Cir. 2000) .................................................. 28

**Statutes & Rules**

42 U.S.C. § 1983 .................................................. 22, 29

Fed. R. Civ. P. 56(a) .................................................. 15

This Memorandum of Law is submitted in opposition to Defendants' motion for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiff's entanglement with the criminal justice system began in 2008, when one of his sons was molested by Baruch Lebovits, whom he later learned was a known serial abuser of children in his community. After Plaintiff brought his son to the Kings County District Attorney's Office ("KCDA"), he was asked if he could locate another victim of Lebovits. Plaintiff located two such victims, herein identified as M.T. and Y.R. Lebovits was indicted in April 2008 in relation to Plaintiff's son and M.T., and a superseding indictment followed in November 2008, charging Lebovits with multiple felony counts in relation to both M.T. and Y.R. Counsel for Lebovits attempted to secure a non-jail disposition from the KCDA, in support of which he submitted various documents in mitigation of Lebovits's crimes, including a report by a forensic psychiatrist who examined Lebovits and gave the following account: "The victims were underage boys. The sexual acts were all consensual without force or coercion. Mr. Lebovits's deviate sexual behavior was compulsive in nature. He had difficulty resisting temptation and controlling his sexual impulses at the time." However, the effort was unsuccessful. District Attorney Charles J. Hynes had personally approved the pre-existing plea offer, which involved a custodial sentence, and he was unwilling to reduce the offer to a non-jail disposition.

Lebovits and his associates then tried a different gambit, forcing M.T. to end his cooperation with the prosecution shortly before Lebovits's trial was due to begin. Hynes was made personally aware of the circumstances of M.T.'s non-cooperation. Lebovits was unable though to prevent Y.R. from testifying against him, and, in March 2010, he was convicted. In late April

2010, Arthur Aidala, lead counsel for Lebovits, approached Michael Vecchione, Chief of the KCDA Rackets Division ("Rackets"), and in early May 2010, Aidala met with Hynes. Aidala regarded both Hynes and Vecchione as close friends and mentors. Hynes authorized an investigation into Plaintiff in connection with another father, Simon Taub, one of whose sons was allegedly abused by Meyer Lebovits, a son of Baruch Lebovits, from whom Taub had been attempting to extort a financial settlement. Taub was arrested in July 2010 but there was "not a scintilla of evidence" (according to a later KCDA review) linking Plaintiff to Taub's plot. Still, the scheming continued. Lebovits manufactured an affidavit from M.T., in which M.T. claimed to have been paid by Plaintiff to fabricate his abuse allegations (the same allegations to which Lebovits had confessed). This false affidavit was first used to secure dismissal of the still-pending charges against Lebovits relating to M.T. Two days later, on August 6, 2010, the affidavit was brought to Rackets and (in the contemporaneous account of the Rackets prosecutor assigned to the case) the investigation into Plaintiff was "resurrected." A joint investigation between Rackets and Lebovits continued until March 2011 but failed in its ultimate aim, a false recantation from Y.R. to go with the false recantation from M.T. Hynes and Vecchione decided nonetheless, according to the same the contemporaneous account, to "indict [Plaintiff] & see if Y.R. comes round." Plaintiff was arrested on April 12, 2011. Days later, Lebovits was released on bail pending appeal of his conviction. The case against Plaintiff continued for another two years, until M.T.'s supposed "recantation" began to implode. Despite a direct request for Brady material relating to Lebovits's effort to secure a non-jail disposition, Hynes personally contributed to a response which described the effort by counsel for Lebovits as merely "informal" and concealed the documents he submitted, including the psychiatrist's report and a memorandum from counsel which included the following

statement: [redacted] It was only after Hynes was voted out of office in 2013 that Plaintiff's criminal case was finally dismissed. It was only in the course of discovery in the present case that the report and memorandum were finally revealed.

Plaintiff's malicious prosecution claim is based on the fact that the cornerstone with which his prosecution was initiated—namely, M.T.'s affidavit claiming that he was paid by Plaintiff to falsely accuse Lebovits—was known all along by Hynes to be a fabrication. There was not a single shred of independent, untainted evidence against Plaintiff; the so-called "evidence" consisted exclusively of M.T.'s false claim, the false claim of Meyer Lebovits that Plaintiff tried to extort the Lebovits family, and the false claim of Moshe Friedman (a proposed character witness at Lebovits's trial) that Plaintiff tried to enlist him as an intermediary in the supposed extortion scheme. All of this "evidence" came from the same corrupt, polluted source: the Lebovits family. Indeed, almost eight months of investigation from early August 2010 (when the prosecution was initiated) to late March 2011 (when the decision was made to seek Plaintiff's indictment) uncovered no actual evidence, such that the only "evidence" presented to the grand jury that indicted Plaintiff was the false testimonies of M.T., Meyer Lebovits, and Moshe Friedman. While the indictment that followed created a presumption of probable cause under New York law, that presumption is rebutted by the fabricated evidence used to initiate the prosecution. Beyond the presumption, in the absence of any independent, untainted evidence, there was no probable cause for Plaintiff's prosecution. Thus, since malice can be inferred from the lack of probable cause and the prosecution terminated in Plaintiff's favor, the elements of a § 1983 claim based on malicious

prosecution have been established.

Defendants argue that, because the documentary submission in support of Lebovits's effort to obtain a non-jail disposition was made with the "understanding that any statement or admission in it is excluded from use by the District Attorney in the event of trial," somehow Lebovits's confession was not "legal" and therefore "plaintiff's entire theory of liability falls apart and his claims fail as a matter of law." *See* Defendants Memo of Law ("Def. Memo") at 13-14. This argument is quite bizarre. Lebovits confessed to abusing M.T., to his own counsel and to a psychiatrist. There is no dispute that this confession could not have been used against Lebovits at any subsequent trial. However, this restriction did not prevent the KCDA from otherwise using the confession against Lebovits, and the KCDA *did* use the confession to oppose the expansion of his bail conditions. More importantly, simply because the confession could not be used against Lebovits at trial, it does not follow that Hynes could somehow pretend that it didn't exist and that he didn't know that M.T. was a genuine victim of Lebovits. Defendants also argue that a conversation with Plaintiff that Meyer Lebovits secretly recorded in May 2009 supported the accusations in the indictment. In fact, as the aforementioned KCDA internal review found, it did the opposite, and actually supported Plaintiff's innocence. Defendants further claim, despite Hynes's knowledge that the allegations M.T. was forced to level against Plaintiff were false, that Hynes cannot be held liable because he was not "personally involved" in the deprivation of Plaintiff's constitutional rights. That claim too is belied by the evidence, which shows that Hynes personally authorized the investigation into Plaintiff in May 2010; that he personally approved the dismissal of Lebovits's case relating to M.T. in August 2010 after the false affidavit was manufactured; and that he was deeply involved in the resumed investigation into Plaintiff that

resulted from M.T.'s affidavit, including when his office's Sex Crimes prosecutors demanded a meeting with him in March 2011 after they became aware of the effort to also secure a "recantation" from Y.R. and thus capsize the Lebovits conviction. The conclusion is inescapable that Hynes sanctioned the resumed investigation by which Plaintiff's malicious prosecution was initiated, and indeed that he had a tacit understanding with counsel for Lebovits that the affidavit from M.T. would be used for this unlawful purpose, making him liable to Plaintiff. Finally, Defendants claim that Hynes is entitled to absolute immunity in his role as a prosecutor, or to qualified immunity, and that the City of New York is immune from *Monell* liability. However, since the conduct at issue occurred during investigative phase of the criminal process, Hynes is not entitled to absolute immunity, and the City (as opposed to the State of New York) is liable for his conduct in this regard. Hynes is also not entitled to qualified immunity since it was not objectively reasonable for him to believe that initiating a prosecution of Plaintiff based on an affidavit from M.T. that Hynes knew to be false did not violate Plaintiff's constitutional rights.

Thus, Plaintiff submits that there is no basis here for summary judgment.

## STATEMENT OF FACTS

### A. Baruch Lebovits' Crimes

Plaintiff is a Hasidic resident of Borough Park. Pl. Rule 56.1 Statement, ¶ 135. In 2008, one of his sons (herein identified as "P.K.") was molested by Baruch Lebovits. *Id.* ¶ 136. Plaintiff was told by the Williamsburg Va'ad HaTznius (a "modesty committee" which receives community reports of sexual abuse) that Baruch Lebovits was a known serial abuser of children. *Id.* ¶ 137. Plaintiff brought P.K. to the KCDA, where he reported his abuse. *Id.* ¶ 138. Plaintiff was subsequently put in contact with NYPD Detective Steven Litwin, who interviewed P.K. and

asked Plaintiff if he could locate another victim of Lebovits. *Id.* ¶ 139. The Williamsburg Va'ad HaTznius disclosed the name of another victim (herein identified as "M.T.") to Plaintiff. *Id.* ¶ 140. Plaintiff arranged for M.T. to meet with Litwin. *Id.* ¶ 141. In April 2008, Baruch Lebovits was indicted on thirty-two felony charges in relation to his abuse of M.T., including twenty-seven charges of sodomy in the second degree, and two misdemeanor charges in relation to P.K. *Id.* ¶ 142. Plaintiff subsequently obtained the name of another victim of Lebovits (herein identified as "Y.R.") from the office of then New York State Assemblyman Dov Hikind. *Id.* ¶ 143. Plaintiff arranged for Y.R. to also meet with Litwin. *Id.* ¶ 144. In November 2008, a superseding indictment was filed against Baruch Lebovits, charging the same thirty-two felony counts in relation to M.T. and an additional ten felony counts in relation to Y.R. *Id.* ¶ 145.

By this time, substantial monetary offers were being made to Plaintiff to drop his son's case, including an offer from Moshe Friedman, all of which he rejected. *Id.* ¶ 146. At Plaintiff's request, he met with KCDA Sex Crimes Bureau Chief Rhonnie Jaus, Assistant District Attorneys Miss Gregory and Chris Laline, and Detective Litwin, and informed them that attempts were being made to pay him off. *Id.* ¶ 147.

**B. Baruch Lebovits' Plea Negotiations**

The KCDA plea offer prior to the superseding indictment was for Lebovits to plead guilty to sodomy in the second degree in relation to M.T. in exchange for a recommended sentence of 2⅓ to 7 years. *Id.* ¶ 148. The offer remained the same after the superseding indictment, except that Lebovits was also required to enter a plea to one of the counts relating to Y.R. *Id.* ¶ 151. The plea offer was personally approved by Hynes. *Id.* ¶ 152. In February 2009, Arthur Aidala, counsel for Lebovits, advised the trial court that he wished to submit a Pre-Pleading Information ("PPI");

which is submitted to the court in circumstances where a defendant intends to plead guilty and receive a sentence from the court and/or to a prosecutor's office when seeking an improved plea offer. *Id.* ¶¶ 149-150. Counsel for Lebovits prepared a PPI memorandum, dated May 3, 2009—together with a letter from Lebovits's treating psychiatrist and a report from Robert Lloyd Goldstein, a forensic psychiatrist—[redacted] *Id.* ¶ 153. The memorandum stated the following: [redacted] *Id.* ¶ 154. The memorandum further stated: [redacted] *Id.* ¶ 155. According to Dr. Goldstein: "Mr. Lebovits is currently accused of multiple counts of charges of Sodomy, Criminal Sexual Act., Sexual Misconduct, Sexual Abuse, and Endangering the Welfare of a Child. The victims were underage boys. The sexual acts were all consensual without force or coercion. Mr. Lebovits's deviate sexual behavior was compulsive in nature. He had difficulty resisting temptation and controlling his sexual impulses at the time. The relief and gratification his behavior afforded him were short-lived and quickly followed by extreme guilt, contrition, and depression at his loss of control." *Id.* ¶ 156. Counsel for Lebovits provided the PPI to ADA Gregory, who discussed it with Sex Crimes Bureau Chief Jaus. *Id.* ¶¶ 157-158. The offer did not change after the PPI was submitted. *Id.* ¶ 159. Hynes was personally unwilling to reduce the offer to a non-jail disposition. *Id.* ¶ 160.

**C. M.T. is Forced to End his Cooperation with the Lebovits Prosecution**

In November 2009, M.T. told ADA Gregory that he was ready to testify at Lebovits's trial, which was due to begin the following month. *Id.* ¶ 161. Later that month, Gregory and Detective Litwin each received a call from an attorney named John Lonuzzi, informing them that M.T. was no longer cooperating with the Lebovits prosecution. *Id.* ¶ 162. Lonuzzi was the president of the Brooklyn Bar Association and Moshe Friedman's personal attorney. *Id.* ¶ 163. Gregory spoke to Hynes and KCDA Chief Assistant Amy Feinstein about Lonuzzi's call and M.T.'s non-cooperation. *Id.* ¶ 164. Some months later, M.T. called Litwin and asked to meet him; at a meeting the next day, he told Litwin that "someone else had retained Mr. Lonuzzi but that he did not know who"; that "he had been pressured and that he was afraid to say what had happened"; and "had been told not to talk to [Litwin] or to go to the District Attorney's Office." *Id.* ¶ 165. Litwin wanted M.T.'s "non-cooperation to be investigated by him or by an ADA but [Sex Crimes Bureau Chief] Rhonnie [Jaus] said no." *Id.* ¶ 166.

In March 2010, after Lebovits was found guilty by a jury of sexually abusing Y.R., Hynes met with Gregory, Jaus, and Chief Assistant Feinstein; they discussed the trial and the remaining cases against Lebovits, and Hynes was told that M.T. was no longer cooperating. *Id.* ¶ 167. Gregory later prepared a memorandum, dated June 3, 2010, addressed to Jaus, in which she stated her belief that M.T.'s "decision to no longer cooperate with the case was caused by pressure from [the] Hasidic Community" and noted that her office had been informed by various individuals that M.T. had been paid to drop out of the case. *Id.* ¶ 178.

**D. Hynes Authorizes an Investigation into Plaintiff**

On April 27, 2010, shortly after the Lebovits conviction, his attorney, Arthur

Aidala, met with ADA Vecchione, Chief of Rackets, and later that day with two detective investigators, who interviewed Chaim Lebovits, another one of Baruch Lebovits's sons. *Id.* ¶ 168. Chaim Lebovits claimed that his family had been approached by Plaintiff and an individual named Simon Taub prior to the Lebovits trial with an offer to "make the case go away" for a fee, and further claimed that a separate effort was being made to extort Meyer Lebovits in respect of abuse that Meyer had perpetrated against one of Taub's sons. *Id.* ¶ 169. Taub had abandoned the effort as to Meyer Lebovits after it was brought to public attention and reported by Plaintiff to Detective Litwin. *Id.* ¶ 170. On May 5 and 6, 2010, Aidala met with Hynes. *Id.* ¶ 171. On May 10, 2010, an investigation was formally opened by Rackets. *Id.* ¶ 173. Hynes specified for the Lebovits family and their representatives exactly which kinds of evidence his office would need to arrest Plaintiff. *Id.* ¶ 174. On May 24, 2010, Meyer Lebovits met with a Rackets detective investigator and told her about a conversation with Plaintiff he recorded in May 2009, in which he claimed that Plaintiff sent "numerous people to negotiate a deal with him, but nothing happened"; that Plaintiff "could get rid of all three (3) cases against his father"; and "get his father off of [a community] Hot-Line." *Id.* ¶ 175; Pl. Ex. 20. ADA Nicholas Batsidis was assigned to the investigation. Def. Rule 56.1 Statement, ¶ 1. In June 2010, Rackets obtained a translation of the recorded conversation prepared by Rina Neeman. Pl. Rule 56.1 Statement, ¶ 176. According to the translation, Plaintiff stated that he did not want to drop his son's case; was asked, "So you want to settle?"; responded "No! Not settle"; and stated that he wanted Baruch Lebovits to plead guilty in respect of his son. *Id.* ¶ 177.

On July 7, 2010, Taub was arrested. *Id.* ¶ 179. According to the KCDA review of Plaintiff's case in 2014, there was "not a scintilla of evidence which indicates that Kellner engaged

in any conversation, meeting, or any other activity that would link him to Taub's plot." *Id.* ¶ 180.

**E. The Investigation into Plaintiff is "Resurrected"**

Robert Mladinich, a private investigator, was hired by counsel for Lebovits. *Id.* ¶ 181. In an affidavit he executed for Mladinich on July 22, 2010, M.T. claimed that Plaintiff paid him $10,000 to falsely allege he had been abused by Baruch Lebovits. *Id.* ¶ 182. On August 4, 2010, the case against Lebovits relating to M.T. was dismissed, after Sex Crimes Bureau Chief Jaus sought and received approval from Chief Assistant Feinstein and Hynes. *Id.* ¶ 183; Pl. Ex. 61. According to the Sex Crimes prosecutors, they were constrained to dismiss the charges against Lebovits relating to M.T. after "he became uncooperative under highly suspect circumstances" and "later recanted his claims of [Lebovits's] sexual abuse." *Id.* ¶ 184.

On August 6, 2010, at a meeting with Vecchione and counsel for Lebovits (Aidala was now joined by Alan Dershowitz, Esq.), ADA Batsidis was given various affidavits, including the M.T. affidavit; an affidavit from Moshe Friedman, in which he claimed that Plaintiff asked him to negotiate on his behalf with the Lebovits family; and an affidavit from Sholem Weisner, at the time a known con man, who claimed that Y.R. told him that he and Plaintiff were engaged in an effort to extort money from Lebovits, and that Y.R. had falsified the extent of his abuse. *Id.* ¶¶ 182, 185. Batsidis noted that the case against Kellner had been "resurrected by the Lebovits lawyers with the affidavits they gave us and their investigator was escorting witnesses and potential witnesses to Kings County District Attorney's Office." *Id.* ¶ 187.

**F. Sex Crimes Confronts Hynes about the Effort to Overturn the Lebovits Conviction**

On November 29, 2010, Vecchione instructed ADA Batsidis to "have [KCDA Detective Green-Jones] coordinate with Bob [Mladinich]" to "come up with" Y.R. *Id.* ¶ 189. On

December 1, 2010, Y.R. was interviewed by Rackets "regarding allegations that he lied at the Baruch Lebovits trial," to which he responded by stating that he was abused by Lebovits; was not paid for his testimony; and that his testimony was truthful. *Id.* ¶ 190. Weisner was told by Rackets to continue his interactions with Y.R. *Id.* ¶ 191. A trip to Florida was arranged, on which Y.R. was lured with the pretense of making a movie about his life, and where he was subjected to videotaped efforts to implicate Plaintiff and undermine the Lebovits conviction. *Id.* ¶ 192. Photographs were provided to Rackets of the Florida trip. *Id.* ¶ 193. In January 2011, Aidala sent Vecchione a draft copy of papers in support of a motion to vacate the Lebovits conviction. *Id.* ¶ 194. The Sex Crimes prosecutors were not made aware of the planned motion. *Id.* ¶ 195. On March 15, 2011, counsel for Lebovits met with Vecchione and ADA Batsidis and provided them with purported excerpts from the Florida tapes. *Id.* ¶ 196.

On March 16, 2011, counsel for Lebovits sent the Sex Crimes prosecutors a copy of a proposed application for Lebovits's release on bail pending appeal of his conviction. *Id.* ¶ 197. Shortly afterwards, and after Sex Crimes became aware of the existence of the Florida tapes, a meeting was sought with Hynes to challenge the false narrative about the Lebovits conviction being advanced through Rackets. *Id.* ¶ 198. Hynes asked Vecchione to attend the meeting. *Id.* ¶ 199. Despite the effort to overturn the Lebovits conviction, Hynes directed Vecchione to continue Rackets' investigation into Y.R. *Id.* ¶ 200. According to Chief Assistant Feinstein, at no time did she believe that M.T. and Y.R. were not genuine victims of Lebovits. *Id.* ¶ 201.

**G. Plaintiff is Indicted**

On March 24, 2011, after ADA Batsidis interviewed Y.R. again, and Y.R. continued to hold firm to the truth, Vecchione told Batsidis that a decision had been made to "indict

[Plaintiff] [and] see if Y.R. comes round." *Id.* ¶ 202. The case against Plaintiff before the grand jury had four witnesses: M.T., Meyer Lebovits, and Moshe Friedman (and ADA Gregory, who provided background information about the Sex Crimes cases against Baruch Lebovits). *Id.* ¶ 203; Pl. Ex. 41. M.T. repeated his false claim that Plaintiff paid him $10,000 to falsely allege he had been abused by Lebovits; Friedman repeated his false claim that Plaintiff asked him to negotiate on his behalf with the Lebovits family; and Meyer Lebovits repeated his false claim that Plaintiff tried to extort his family. Pl. Ex. 41.

Plaintiff was indicted on one count of conspiracy in the fourth degree (Count 1); five counts of attempted grand larceny in the second degree by extortion (Counts 2 to 6); two counts of perjury in the first degree (Counts 7-8), and two counts of criminal solicitation in the fourth degree (Counts 9-10) under Indictment No. 2538/2011 (the "Indictment"). Def. Rule 56.1 Statement, ¶ 36. Count 1 of the Indictment alleged that, between March of 2008 and March of 2010, Plaintiff made repeated demands for money to Meyer Lebovits, via five unindicted co-conspirators, in exchange for which Plaintiff would cause the pending criminal sex abuse charges against Baruch Lebovits to be dismissed through his "ability to control the cooperation and content of the testimony of the complaining victims [M.T., Y.R., and his son (P.K.)]"; would direct an additional alleged victim of Lebovits not to make a complaint; and would cause the publication of Lebovits' alleged abuse of children within the community to cease. *Id.* ¶ 37; Def. Ex. M (Indictment). The nine overt acts alleged to have occurred in furtherance of the charged conspiracy consisted of five extortionate demands made to Meyer Lebovits, on Plaintiff's behalf, by each of the five unindicted co-conspirators (Overt Acts 1-5); solicitation by Plaintiff of Moshe Friedman to act as a further emissary for his alleged extortion (Overt Act 6); payments by Plaintiff to M.T.

to secure his false testimony in the two separate grand jury proceedings against Baruch Lebovits (Overt Acts 7-8); and the re-iteration of the earlier extortionate demands made by his co-conspirators in the May 2009 recorded conversation between Plaintiff and Meyer Lebovits (Overt Act 9). Def. Ex. M. Counts 2 to 6 of the Indictment arose from Overt Acts 1 to 5 and Counts 7 to 10 arose from Overt Acts 7 and 8. *Id.*

Plaintiff was arrested on April 12, 2011. Pl. Rule 56.1 Statement, ¶ 207. Within days, Lebovits had been released on bail pending appeal. Pl. Ex. 62. In September 2011, ADA Bruffee sent a proposed opposition to an application by Lebovits to expand the conditions of his bail to Chief Assistant Feinstein; expressed the hope that she could convince Hynes to oppose the application; and asked for permission to refer to Dr. Goldstein's report since "[Lebovits's] admissions in the report are highly relevant to the threat he poses to the community, should the court give him unrestricted access." Pl. Rule 56.1 Statement, ¶ 209.

**H. Hynes is Voted Out of Office, and the Case against Plaintiff is Dismissed**

In May 2013, the M.T. "recantation" began to implode after a witness came forward and reported that M.T. told the witness "that Baruch Lebovits had indeed molested him and that the Lebovits family forced him to recant his initial Lebovits accusation"; after which ADA Batsidis and ADA Alexis (who was assigned to the case in 2012) interviewed M.T. and recommended to Hynes on June 26, 2013, that the case against Plaintiff should be dismissed. Pl. Ex. 55 (Alexis-Batsidis Memo) at 7-8. Hynes asked them "to prepare a closing memo by Monday [July 1, 2013]." *Id.* at 8. However, on June 28, 2013, after Vecchione found out about their recommendation and met with Hynes, he informed Batsidis and Alexis that "there was a change in course," "[t]he Kellner case was not going to be dismissed," and "Batsidis and Alexis were to have no further

contact with [Hynes] regarding the Kellner case." *Id.*

By letter dated July 2, 2013, counsel for Plaintiff sought disclosure of information from Rackets about Lebovits's willingness, prior to M.T.'s non-cooperation, to plead guilty in respect of offenses committed against M.T. in exchange for an agreeable disposition, noting that "the withholding of information to this effect would constitute a grave violation of your Brady obligations" and "would show knowledge on the part of your office that [M.T.] was a genuine victim of Baruch Lebovits and that, when he testified to the contrary in front of the Grand Jury that indicted my client as a result, he committed perjury." Pl. Rule 56.1 Statement, ¶ 210. Hynes was personally involved in drafting a response to the letter, which included personally making revisions. *Id.* ¶ 211. The responsive letter, dated July 5, 2013, stated merely that counsel for Lebovits "informally" proposed a non-jail disposition. *Id.* ¶ 212. The existence of the PPI memorandum, the Dr. Goldstein report, and letter from Lebovits's treating psychiatrist were not disclosed. *Id.* ¶ 213. In fact, their existence was only revealed in 2022, during the course of discovery in the present matter. The KCDA also failed to disclose that Rackets prosecutors, in the fall of 2012, "were made aware of allegations that the Lebovits family paid [M.T.] to testify in the [Kellner] grand jury," and that they obtained, in October 2021, proof of monthly payments to M.T.'s father made by Zalman Ashkenazi, a brother of Beryl Ashkenazi, who was the sole defense witness at Lebovits's trial. *Id.* ¶ 214. By July 29, 2013, Batsidis and Alexis had "asked to be taken off the case." Pl. Ex. 55 (Alexis-Batsidis Memo) at 10. On March 7, 2014, following a review of Plaintiff's case shortly after Hynes was voted out of office, it was dismissed. Pl. Rule 56.1 Statement, ¶ 215. Hynes died in January 2019. Pl. Ex. 63 (New York Post obituary).

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment shall be granted where no genuine dispute as to any material fact exists, and the movant is entitled to judgment as a matter of law. A fact is material if it "might affect the outcome of the suit under the governing law," and an issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "district court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854-855 (2d Cir. 1996) (citations omitted). On the other hand, "[w]hile all factual ambiguities must be resolved in favor of the nonmoving party, the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up), and "instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (citations omitted). In summary, "[a] court may grant summary judgment only when no rational jury could find in favor of the non-moving party." *Id.* (citations omitted).

## ARGUMENT

### I. Plaintiff was the Victim of a Malicious Prosecution

To sustain a § 1983 claim based on malicious prosecution, a plaintiff must show sufficient restraint on liberty to implicate his or his Fourth Amendment rights and establish the

elements of the common-law tort of malicious prosecution, specifically: "(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, (4) the matter terminated in plaintiff's favor." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (citation omitted). The elements are "substantially the same" as the elements of a claim for malicious prosecution under New York law. *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (cleaned up).

To initiate a prosecution, a defendant must do more than report the crime or give testimony; he must "play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010) (cleaned up). Accordingly, "a jury may permissibly find that a defendant initiated a prosecution where he filed the charges or prepared an alleged false confession and forwarded it to prosecutors." *Id.*; *see also Ying Li v. City of New York*, 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017) (a defendant may initiate a prosecution "by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor." (cleaned up)). Likewise, "[g]iving information to the police that is known to be false qualifies as the commencement of a prosecution." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 199 (2d Cir. 2014) (quoting *TADCO Constr. Corp. v. Dormitory Auth. of New York*, 700 F.Supp.2d 253, 270 (E.D.N.Y. 2010)); *see also Chimurenga v. City of New York*, 45 F.Supp.2d 337, 343 (S.D.N.Y. 1999) (citations omitted) ("Where a party is responsible for providing false information or manufactured evidence that influences a decision whether to prosecute, he may be held liable for malicious prosecution."). Thus, supplying falsified evidence "in substantial furtherance of a criminal action" is sufficient to constitute the initiation of a criminal proceeding. *De Lourdes*

*Torres v. Jones*, 26 N.Y.3d 742, 760 (N.Y. 2016).

Probable cause, in the context of malicious prosecution, means "probable cause to believe that [the prosecution] could succeed," or, alternatively, "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (citations omitted). Under New York law, indictment by a grand jury creates a presumption of probable cause, which "may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Rothstein v. Carriere*, 373 F.3d 275, 283 (2d Cir. 2004) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82-83 (N.Y. 1983).[1] Accordingly, for a plaintiff to succeed in a malicious prosecution action after he has been indicted, "he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id.* A prosecution initiated by means of falsified evidence will rebut the presumption of probable cause. *Manganiello*, 612 F. 3d at 162 ("Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process." (cleaned up)); *see also De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 767-768 (2016) (evidence that police officer lacked probable cause to believe that the plaintiff committed a crime and provided a falsified confession to

[1] The *Colon* court explained that "[t]he rule is founded upon the premise that the Grand Jury acts judicially and it may be presumed that it has acted regularly," and that, in New York, it "differs in this respect from that in some jurisdictions which permit the presumption to be overcome by any evidence tending to show the absence of probable cause." 60 N.Y.2d 78 at 82-83 (citations omitted). Plaintiff assumes for present purposes that the more exacting New York rule applies to a § 1983 claim.

prosecutors can rebut the presumption of probable cause arising from an indictment). On the other hand, "if the prosecution relied on independent, untainted information to establish probable cause, a complaining official will not be responsible for the prosecution that follows." *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016) (citation omitted) ("[T]he [district] court relied on evidence that the Bronx District Attorney made a subsequent, independent decision to prosecute Rentas that was supported by probable cause and untainted by the officers' allegedly false reports." (*Id.* at 220)).

Finally, malice "may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff." *Manganiello*, 612 F. 3d at 163 (cleaned up); *Lowth v. Town of Cheektowa*ga, 82 F.3d 563, 573 (2d Cir. 1996) (malice means that "the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." (cleaned up)). "A lack of probable cause generally creates an inference of malice." *Boyd*, 336 F.3d at 78. Also, "[f]alsifying evidence is sufficient to show malice." *Bailey v. City of New York*, 79 F. Supp. 3d 424, 451 (E.D.N.Y. 2015) (collecting cases).

Plaintiff's malicious prosecution was initiated in August 2010, when M.T.'s false affidavit was provided to Rackets and, in the words of ADA Batsidis, it "resurrected" the investigation into Plaintiff. As set forth in detail above, the affidavit was not only false but known to be false since, in May 2009, while M.T. was still cooperating with the Lebovits prosecution, counsel for Lebovits attempted to secure a non-jail disposition from the KCDA and submitted a memorandum from counsel, along with a report by a forensic psychiatrist named Dr. Goldstein, in which he confessed to abusing M.T. According to the memorandum: [redacted]

[redacted] Pl. Ex. 8 (PPI Memo) at 6. Dr. Goldstein, after examining Lebovits, stated the following in respect of the crimes charged by the superseding indictment: "The victims were underage boys. The sexual acts were all consensual without force or coercion. Mr. Lebovits's deviate sexual behavior was compulsive in nature. He had difficulty resisting temptation and controlling his sexual impulses at the time." Pl. Ex. 9 (Dr. Goldstein Report) at 4-5. Since supplying falsified evidence in substantial furtherance of a criminal action is sufficient to constitute the initiation of a criminal proceeding, the malicious prosecution was commenced in August 2010.

Probable cause was also wholly lacking. While Plaintiff's indictment creates a presumption of probable cause, the initiation of the prosecution by means of known false evidence suffices to rebut the presumption. With regard to the Lebovits confession, Defendants argue that the KCDA did not "have any obligation to present this evidence to the grand jury even assuming that it was exculpatory in nature." *See* Def. Br. at 16 (citations omitted). That is beside the point, since the significance of Lebovits' confession to counsel and to Dr. Goldstein is to conclusively establish that M.T.'s affidavit was known to have been fabricated. Thus, "[a]lthough the government has no constitutional obligation to present exculpatory material to a grand jury, New York law … strips an indictment of its presumptive force in a malicious prosecution action when the indictment was obtained through improper means." *Fappiano v. City of New York*, No. 01 Civ. 2476 (SLT) (SMG), 2015 WL 94190, at *11 (E.D.N.Y. Jan. 7, 2015), *aff'd*, 640 F. App'x 115 (2d Cir. 2016) (cleaned up); *see also Richards v. City of New York*, No. 97 Civ. 7990 (MBM), 2003 WL 21036365, at *14 (S.D.N.Y. May 7, 2003) ("[T]he police may not purposely withhold or ignore exculpatory evidence that, if taken into account, would void probable cause." (citation

omitted)).

Absent the presumption, there is no "independent, untainted" information to establish probable cause since the only so-called "evidence" presented to the grand jury came from the same corrupt, polluted source: the Lebovits family. The internal review of Plaintiff's prosecution described the various affidavits given to the KCDA in August 2010 as containing "a variety of uncorroborated and self-serving accusations," including "wholly incredible accusations against Det. Litwin." *See* Pl. Ex. 24 at 2.[2] By the time M.T.'s false affidavit "resurrected" the investigation into Plaintiff, the Lebovits family had spent more than a year peddling the false claims that Plaintiff tried to extort the Lebovits family and tried to enlist Moshe Friedman as an intermediary in this supposed scheme. *See* Pl. Ex. 10 (ADA Gregory Affirm.) at ¶¶ 3-7. From when these claims were first made to Sex Crimes in May 2009, they defied all credibility; originating as they did with the Lebovits family and the person Baruch Lebovits proposed as a character witness at his trial to attest to his reputation in the community as someone who "is with children or young adults on a somewhat regular basis and his reputation of being an upstanding family man, heterosexual man." *See* Pl. Ex. 64 (3/3/10 trial transcript) at 5. In other words, even aside from the fact that the other "evidence" in the case was nether independent nor untainted, it was obviously spurious. According to Defendants, the transcript of the recorded conversation between Plaintiff and Meyer Lebovits first received by Rackets in June 2010 (a second translation was obtained in November 2010 because the first translator was unavailable to testify as a witness) supported the accusations in the Indictment. *See* Def. Memo at 17. In fact, it did the opposite. In

[2] A draft version of the review used even stronger language, referring to "uncorroborated, seemingly baseless accusations," and "wildly unbelievable accusations" against Litwin. *See* Pl. Ex. 54 at 2.

the words of the internal KCDA review: "Although clearly stated in the Alexis-Batsidis memo, it is worth repeating, [Plaintiff] never demanded money in the recorded conversation." *See* Pl. Ex. 57 at 5.[3] To the contrary, Plaintiff stated that he did not want to drop his son's case; was asked, "So you want to settle?" by Meyer Lebovits; responded "No! Not settle"; and stated that he wanted Baruch Lebovits to plead guilty in respect of his son. *See* Pl. Rule 56.1 Statement, ¶ 177. The review continues: "[During Meyer's grand jury testimony] (and during KCDA interviews), he stated that [Plaintiff] claimed that he "controls" all three cases and that he "controls" [M.T.] and [Y.R.]. There is absolutely no such language or any similar language used in any portion of the recorded conversation." *See* Pl. Ex. 57 at 5. As to the next accusation: "Meyer's [testimony] regarding a fourth victim being brought as a federal case is also misleading … It is abundantly clear from reading the transcript that Kellner never stated that he was going to refer any claim of sexual abuse to the federal authorities." *Id.* Finally: "There is no monetary reference in the transcript surrounding this one comment about [the person publicizing Lebovits abuse' of children]." *Id.* Thus, not only did the recorded conversation not support the accusations against Plaintiff; it wholly contradicted them.

Finally, as above noted, for purposes of a motion for summary judgment, a lack of probable cause generally creates an inference of malice, as does the falsification of evidence. The blatant fabrication of evidence and the utter lack of probable cause in the present matter more than suffice to show malice.

[3] Two versions of the final memorandum dated March 4, 2014 (Pl. Ex. 24 & 57) were produced by the KCDA, with inconsistent redactions; it is helpful to read them in conjunction with one another and the earlier version (Pl. Ex. 54).

## II. Hynes was Personally Involved in the Violation of Plaintiff's Constitutional Rights

It is long established in the Second Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (cleaned up). Moreover, a plaintiff must prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). The "personal involvement" requirement is satisfied by showing "personal participation by one who has knowledge of the facts that rendered the conduct illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (citations omitted). This participation can be direct or indirect, "such as ordering or helping others to do the unlawful acts." *Id.*; *see also Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014) (participation "includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally." (citations omitted)).

Furthermore, while under 42 U.S.C. § 1983, constitutional torts are only actionable against persons acting under color of law, in *Adickes v. Kress & Co.*, 398 U.S. 144 (1970), the Supreme Court held that that a person acting under color of state law who collaborates or conspires with a private person to deprive a plaintiff of a constitutional right is equally liable under § 1983. As stated by the Second Circuit in *Fries v. Barnes*, 618 F.2d 988 (2d Cir. 1980): "The police officer or government agent may not escape responsibility by claiming that the violation of the plaintiff's rights was committed by the private person involved in such a collaborative undertaking." *Id.* at 990. "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an

unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citations omitted). It is well-recognized "that such conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Id.* (cleaned up). Thus, a "conspiratorial agreement itself may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement." *United States v. Henry*, 325 F.3d 93, 105 (2d Cir. 2003) (cleaned up). Also, "a plaintiff seeking redress need not prove that each participant in a conspiracy knew the exact limits of the illegal plan or the identity of all participants therein." *Rich-Taubman Assocs. v. Stamford Rest. Operating Co.*, 587 F. Supp. 875, 879 n.5 (S.D.N.Y. 1984) (quoting *Hoffman-La Roche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir. 1971)); *see also Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir.1979), *rev'd in part on other grounds*, 446 U.S. 754 (1980) ("The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result."). Finally, "[t]he rule is clear that one who joins an existing conspiracy takes it as it is, and is therefore held accountable for the prior conduct of the co-conspirators." *United States v. Sobell*, 204 F. Supp. 225, 227 (S.D.N.Y. 1962), *aff'd*, 314 F.2d 314 (2d Cir. 1963) (cleaned up).

There is clear evidence of Hynes's involvement in the violation of Plaintiff's constitutional rights. As described in detail above, on April 27, 2010, counsel for Lebovits, Athur Aidala, met with Michael Vecchione, Chief of Rackets, in an effort to open an investigation into Plaintiff. On May 5, 2010, and again the following day, the KCDA visitor log (Pl. Ex. 16) shows that Aidala met with Hynes. On May 10, 2010, the Rackets investigation was formally opened.

Aidala, a former KCDA prosecutor, had an especially close relationship with both Vecchione and Hynes. At his deposition, Vecchione described Aidala as a "dear friend" with whom he went on multiple vacations to Italy. *See* Pl. Ex. 52 at 27-29. As for Hynes, shortly after Aidala joined the KCDA, his first job out of law school, he "worked very strongly on [Hynes's] 1994 campaign when he ran for attorney general," to the extent of taking a "a leave of absence from the office." *See* Pl. Ex. 17 at 9-10. When Hynes died in 2019, Aidala led the tributes to him, calling him "a mentor and a dear friend," and posting a photograph online that "was taken at one of our 'loyalty' lunches." *See* Pl. Ex. 63 (New York Post obituary). Aidala recalled the lesson being imparted: "As [Hynes] taught me loyalty can only be repaid with loyalty." *Id.* Vecchione also held particular sway over Hynes, a point emphasized by the 2014 KCDA review of Plaintiff's prosecution. In 2013, as M.T.'s "recantation" of the horrific abuse inflicted upon him by Lebovits unraveled, the assigned Rackets prosecutors reported that they went directly to Hynes and asked for the case against Plaintiff to be dismissed. Hynes reportedly agreed, until Vecchione intervened. According to the review: "It is shameful that former DA Hynes allowed ADA Vecchione to talk him out of dismissing this case." *See* Pl. Ex. 54 at 1. The inference is inescapable that Hynes's authorization to open an investigation into Plaintiff was sought and obtained by Aidala in May 2010.

In July 2010, after the investigation had turned up not a "scintilla" of evidence against Plaintiff, the affidavit from M.T. falsely accusing Plaintiff of paying him to fabricate his abuse was manufactured. Before it was used to initiate Plaintiff's prosecution, it was used to secure dismissal on August 4, 2010, of the still-pending Lebovits case relating to M.T. The evidence is undisputed that Hynes's approval was sought by Sex Crimes and obtained before the case was dismissed. Two days later, on August 6, 2010, the M.T. affidavit was brought to Rackets,

where it "resurrected" the investigation and served to initiate Plaintiff's malicious prosecution. The broader context in which that happened is particularly important. M.T.'s affidavit was one of a number of affidavits. One of the other affidavits was from Sholem Weisner, who claimed that Y.R. had provided false testimony at the Lebovits trial. *See* Pl. Rule 56.1 Statement, ¶ 185. Another one claimed that Detective Litwin had falsified accusations of abuse against Beryl Ashkenazi, the sole defense witness at the Lebovits trial. *See* Pl. Ex. 24 at 4. Thus, not only was Plaintiff targeted but the Lebovits conviction was now under direct assault. In these circumstances, it is inconceivable that Hynes, whose authorization was required to open the investigation into Plaintiff in May 2010, was also not required to authorize the resumption of that investigation into Plaintiff considering that it took direct aim at the Lebovits conviction. At his deposition, Aidala claimed to have no recollection of his meetings with Hynes in May 2010 and, in relation to the need for Hynes's approval, stated: "I don't remember that. I'm not saying it's not true." *See* Pl. Ex. 17 at 71-72. However, during a court appearance on October 3, 2011, after filing a motion to vacate the Lebovits conviction (the draft of which he had secretly sent Vecchione in January 2011, *see* Pl. Rule 56.1 Statement, ¶ 194), Aidala recalled exactly who was responsible for opening the door to Plaintiff's malicious prosecution: "I compliment Joe Hynes and his office tremendously because they easily could have closed the door on our faces and they didn't." Pl. Ex. 65 at 44. Vecchione, at his deposition, likewise claimed that he couldn't recall whether he spoke to Hynes in April and May 2010 about the investigation into Plaintiff. Pl. Ex. 52 at 22. Asked to recall the first time he spoke with Hynes about Plaintiff, he responded: "I have no recollection of when I first spoke to him." *Id.* at 22-23. Indeed, he claimed not to recall any meeting with Hynes prior to June 2013—including the confrontation in March 2011 when Sex Crimes became aware of the

effort to capsize the Lebovits conviction, and Hynes decided that the Rackets investigation should continue. *Id.* at 43-44, 46, 106-108. ADA Bruffee described that confrontation with Hynes at her deposition; in response, Vecchione claimed not recall anything about it, including whether he had previously told Hynes that Lebovits was innocent of the charges that resulted in Y.R.'s conviction. *Id.* at 106-108. Nonetheless, asked whether, "during the course of the investigation [into Plaintiff]," he and Hynes discussed the investigation, he answered: "I don't have specific recollections of that, but I wouldn't say that it -- it's out of the ordinary." *Id.* at 75-76.

For purposes of showing personal involvement by Hynes in the deprivation of Plaintiff's constitutional rights, it is sufficient to show that he authorized the initial investigation into Plaintiff in May 2010, and the resumption of that investigation in August 2010, based on M.T.'s fabricated affidavit. *See e.g. Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *11 (S.D.N.Y. Mar. 11, 2022) ("[T]he record contains evidence suggesting that Fabrizi affirmatively approved Plaintiff's arrest, thereby personally sanctioning the conduct that allegedly violated Plaintiff's constitutional rights."). During this period, Hynes was fully aware that M.T.'s supposed recantation was false, since he had been personally unwilling to offer Lebovits a non-jail disposition in 2009 when counsel submitted the PPI containing Lebovits's confession. Hynes also knew that M.T. had been forced to end his cooperation with the Lebovits prosecution. Thus, there is clear evidence of "personal participation by one who has knowledge of the facts that rendered the conduct illegal." *Provost*, 262 F.3d at 155. For purposes of finding Hynes liable under a conspiracy theory, the evidence shows that he knew of M.T.'s false recantation when he approved dismissal of the Lebovits case relating to M.T. on August 4, 2010. Plaintiff submits that he is entitled on summary judgment to the inference that there was, at the

least, a tacit understanding with counsel for Lebovits that the affidavit would next be brought to Rackets, thereby initiating Plaintiff's malicious prosecution. That being so, there is compelling, albeit circumstantial, evidence of the meeting of minds underlying Plaintiff's conspiracy claim. *See Gordon v. Emmanuel*, No. 15 Civ. 2439 (CBA)(SJB), 2018 WL 4688935, at *9 (E.D.N.Y. Sept. 28, 2018) (to prevail on summary judgment, evidence must "reasonably lead to the inference that the defendants positively or tacitly came to mutual understanding to try to accomplish a common and unlawful plan." (cleaned up)). Thus, Hynes is liable for the violation of Plaintiff's constitutional rights.

## III. Hynes is Not Entitled to Absolute or Qualified Immunity

Courts apply a "functional approach" in determining whether absolute immunity is available to a prosecutor, looking to "the nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (cleaned up). Prosecutors are entitled to absolute immunity for conduct "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). On the other hand, "[w]hen a district attorney functions outside his or her role as an advocate for the People, the shield of immunity is absent." *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995). In particular, "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Buckley*, 509 U.S. at 273-274 (cleaned up); *see also Carbajal v. Cnty. of Nassau*, 271 F.Supp.2d 415, 421 (E.D.N.Y. 2003) ("[W]hen a prosecutor supervises, conducts, or assists in the investigation of a crime, or gives advice as to the existence of probable cause to make a warrantless arrest—that is, when he performs functions normally associated with a police

investigation—he loses his absolute protection from liability." (cleaned up)). Furthermore, that a grand jury is subsequently called upon "to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial." *Buckley*, 509 U.S. at 276; *see also Zahrey v. Coffey*, 221 F.3d 342, 353 (2d Cir. 2000) ("[A] subsequent immunized act of a single official does not break the chain of causation traceable to his initial misconduct occurring in another capacity.").

The doctrine of qualified immunity provides that "a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003) (citation omitted). It is generally only the "plainly incompetent or those who knowingly violate the law—those who are not worthy of the mantle of office—who are precluded from claiming the protection of qualified immunity." *Moore v. Andreno*, 505 F.3d 203, 214 (2d Cir. 2007) (cleaned up). The "right to be free from malicious prosecution is a clearly established right," and defendants are only entitled to "qualified immunity if it was objectively reasonable for them to believe that their actions did not violate that right." *Bonide Prod., Inc. v. Cahill*, 223 F.3d 141, 145 (2d Cir. 2000) (cleaned up). Also clearly established is "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." *Zahrey*, 221 F.3d at 349; s*ee also Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123, 130 (2d Cir.1997) (police officers who fabricated and forwarded to prosecutors a false confession not entitled to qualified immunity); *Buari v. City of New York*, 530 F. Supp. 3d 356, 396 (S.D.N.Y. 2021) ("In 1993, when the alleged misconduct began, Buari's right not to be

prosecuted based on fabricated evidence was clearly established such that every reasonable officer would understand that any actions to falsify evidence violated that right." (citations omitted)); *Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350, 372 (E.D.N.Y. 2021) ("qualified immunity does not apply when alleged fabrication of evidence is key to the case, as it is here." (cleaned up)).

Hynes is not entitled to absolute immunity because Plaintiff's malicious prosecution claim is based on conduct that occurred during the investigatory (rather than judicial) phase of the criminal process. At that time, Hynes was performing investigative functions normally performed by the police. Hynes is also not entitled to qualified immunity. The right to be free from malicious prosecution based on fabricated evidence was clearly established in 2010 and it was not objectively reasonable for Hynes to believe that initiating a prosecution of Plaintiff based on an affidavit from M.T. that Hynes knew to be false did not violate that right.

**IV. The City of New York is Liable for Hynes' Conduct**

A municipal entity may be liable under 42 U.S.C. § 1983 for a single decision by a municipal policymaker if "the decision maker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Thus, a "single tortious decision or course of action … constitutes the act of the municipality and therefore provides a basis for municipal liability where it is taken by, or is attributable to, one of the city's authorized policymakers." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (citation omitted). The identification of policymaking officials is a question of state law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988), and "the critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the

particular conduct challenged in the lawsuit." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (citation omitted).

In *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988), the Second Circuit held that, "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Id.* at 77 (citations omitted). On the other hand, in *Myers v. Cty. of Orange*, 157 F.3d 66 (2d Cir. 1998), it held that the county defendant was properly found liable "for a DA policy that directed the Port Jervis police and county ADAs to engage in investigative procedures that violated Myers' equal protection rights." *Id.* at 77. In *Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019), the court summarized its caselaw as follows: "[W]e have been consistent in holding that the actions of county prosecutors in New York are generally controlled by municipal policymakers for purposes of *Monell*, with a narrow exception emanating from *Baez* being the decision of whether, and on what charges, to prosecute." *Id.* at 759.

The conduct at issue of Hynes occurred during the investigative phase of the criminal process, when he represented the City of New York. Since he was a decision maker possessing final authority to establish municipal policy, the City is therefore liable for that conduct.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

Dated: New York, New York
October 8, 2024

Niall MacGiollabhui

NIALL MACGIOLLABHUÍ, ESQ.
LAW OFFICE OF NIALL MACGIOLLABHUÍ
171 Madison Avenue, Suite 305
New York, NY 10016
(646) 850-7516