UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X
SAMUEL KELLNER,

Plaintiff,

-against-

THE CITY OF NEW YORK and
PATRICIA L. HYNES, administrator
of the Estate of CHARLES J. HYNES,

Defendants.
--------------------------------------------------------------------------X

Case No.
17-cv-1268 (NRM) (MHH)

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL CIVIL RULE 56.1 AND STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Local Civil Rule 56.1, Plaintiff responds to Defendants' statement of undisputed material facts as to which they contend there is no genuine issue to be tried and submits his own statement of additional material facts as follows:

**Defendants' Local Rule 56.1 Statement and Plaintiff's Response**

1. Assistant District Attorney Nicholas Batsidis was assigned to investigate certain claims made against plaintiff. (Def. Ex. A (Transcript of the deposition of Nicholas Batisidis conducted on March 23, 2022 (Batsidis trans.), at 204:5-9; Def. Ex. B (Transcript of the deposition of Michael Vecchione conducted on May 20, 2022 (Vecchione trans.), at 77:23-78:4)).

**Response**: Undisputed.

2. Assistant District Attorney Joseph Alexis was also assigned to the investigation. (Def. Ex. A (Batisidis trans. at 204:5-9; 211:10-12)).

**Response**: It is undisputed that ADA Alexis was assigned to the case in May 2012.

3. Assistant District Attorney Michael Vecchione supervised the investigation. (Def.

Ex. A (Batsidis trans. at 211:13-14)).

**Response**: Undisputed.

4. At the time of the investigation, Vecchione was the Chief of the Rackets Division of the Kings County District Attorney's Office (KCDA). (Def. Ex. B (Vecchione trans. at 11:25-12:8)).

**Response**: Undisputed.

5. An attorney, Arthur Aidala, approached Vecchione about the possibility of opening an investigation regarding individuals whom he believed were extorting Aidala's client's (Baruch Lebovits's) family, bribing witnesses, and interfering with witnesses related to a trial that he had conducted. (Def. Ex. B (Vecchione trans. at 18:19-19:9)).

**Response**: It is undisputed that, on April 27, 2010, Aidala approached Vecchione about the possibility of opening an investigation based on allegations of extortion. It is disputed that any allegation of bribing or interfering with witnesses was made at the time Aidala approached Vecchione. *See* Rackets Memo 4/30/10 (Pl. Ex. 14).

6. As part of the investigation, the KCDA obtained statements of Rabbi Moshe Friedman, Meyer Lebovits, and M.T., and a May 2009 recorded conversation between plaintiff and Meyer Lebovits. (Def. Ex. A (Batsidis trans. at 54:15-55:22; 182:23-183:9; 218:17-219:6; 234:11-17)).

**Response**: Undisputed.

7. Plaintiff had asked Friedman to arrange for Lebovits to pay plaintiff $250,000. (Def. Ex. C (Transcript of the deposition of Moshe Friedman conducted on December 1, 2022 (Friedman trans.), at 31:17-32:10)).

**Response**: Disputed. Friedman is a first cousin of Baruch Lebovits, and publisher of *Der Yid*, the oldest, most widely circulated Yiddish newspaper in the world. *See* O'Donnell Memo (Pl. Ex. 24) at 4. For decades, Friedman was the right-hand man of Rabbi Moshe Teitelbaum, leader of the powerful Satmar sect in New York's Hasidic community until his death in 2006, and significant "political power broker in New York." *Id.* Friedman contacted Plaintiff to offer him a job selling advertising for *Der Yid*. *See* Kellner Tr. (Pl. Ex. 1) at 265:24-267:5. Plaintiff accepted the job but soon afterwards, Friedman offered him $250,000 to drop his son's case against Lebovits, which Plaintiff refused. *Id.* Friedman concedes that Plaintiff met with him for purposes of working for *Der Yid* but claims, preposterously, that "at the same meeting," *see* Friedman Tr. (Pl. Ex. 58) at 82:1-82:14, Plaintiff tried to enlist Friedman, his prospective employer and one of the most powerful people in his community, to serve as his messenger in an extortion scheme.

8. Friedman reported to the KCDA that plaintiff had told Friedman that Baruch Lebovits, or persons acting on his behalf, had reneged on an agreement to pay plaintiff $250,000. (Def. Ex. C (Friedman trans. at 87:4-24)).

**Response**: Disputed. According to the memorandum of his interview by the KCDA on August 13, 2010, Friedman made no mention of an agreement that had been reached or reneged upon. *See* Rackets Memo 8/13/10 (Def. Ex. E).

9. Friedman reported to the KCDA that plaintiff had told Friedman that plaintiff controlled another victim or two. (Def. Ex. C (Friedman trans. at 83:6-86:16)).

**Response**: Disputed. According to the memorandum of his interview by the KCDA on August 13, 2010, Friedman referred solely to one other victim of Lebovits, namely Y.R. *Id.*

10. Friedman reported to the KCDA that plaintiff had told Friedman that if plaintiff

received money from Baruch Lebovits, the other victim or two would be quiet. (Def. Ex. C (Friedman trans. at 83:6-86:16)).

**Response**: Disputed. According to the memorandum of his interview by the KCDA on August 13, 2010, Friedman referred solely to one other victim of Lebovits, namely Y.R., and claimed that Plaintiff told him that "he could bring in another boy"—not that Y.R. would be quiet—even though, at the time of Friedman's meeting with Plaintiff, Lebovits had already been indicted in respect of Y.R.

11. On July 15, 2010, Friedman signed an affirmation stating that plaintiff had approached Friedman and asked Friedman to negotiate with the Lebovits family so that the charges against Baruch Lebovits would go away. (Def. Ex. D (July 15, 2010 Affirmation of Moshe Friedman)).

**Response**: It is undisputed that Friedman signed an affidavit (entitled an "affirmation") in which he stated: "I was approached at my office by a man named Mr. Kellner, who wanted me to negotiate with the Lebovits family to ensure that the charges against Baruch Lebovits never went to court and "all went away.""

12. In the July 15, 2010 affirmation, Friedman stated that plaintiff had stated that he controlled all of the cases against Lebovits; that he was not making a living and needed money; that Lebovits's son had money; and that the Lebovits family should pay. (Def. Ex. D (July 15, 2010 Affirmation of Moshe Friedman)).

**Response**: It is undisputed that Friedman signed an affidavit (entitled an "affirmation") with these statements.

13. On August 13, 2010, Batsidis and two detective investigators for the KCDA

interviewed Friedman. (Def. Ex. E (August 13, 2010 memorandum prepared by Detective Investigator Stephanie Green-Jones)).

**Response**: Undisputed.

14. During the August 13, 2010 interview, Friedman was shown a copy of his July 15, 2010 affirmation and he confirmed that the contents thereof were true and accurate. (Def. Ex. E (August 13, 2010 memorandum prepared by Detective Investigator Stephanie Green-Jones)).

**Response**: It is undisputed that Friedman was shown the document during the interview and stated that it was true and accurate. It is disputed that the contents were in fact true and accurate. *See* Plaintiff's response to no. 7.

15. During the August 13, 2010 interview, Friedman stated that he had been approached by plaintiff in or around March of April of 2009, who told Friedman that Baruch Lebovits had given plaintiff's son a ride and touched him in a sexual manner; that plaintiff wanted to settle for $250,000 and was negotiating a deal; that plaintiff's son's case was only a misdemeanor, but that he could bring in Y.R., another victim whom plaintiff controlled; that Friedman knew the Lebovitses and could convince them to pay; that plaintiff knew that Lebovits's son Chaim had money; that plaintiff's son had problems in school and needed a tutor, but plaintiff did not have money; that plaintiff was receiving money from people in Monroe, New York, that was brought to him by his brother, Joseph, who lived in Monroe, based on whether Baruch Lebovits stayed in jail; that, when people in Monroe heard that plaintiff was trying to settle with the Lebovitses, they threatened to stop sending him money, and that plaintiff was adamant that he could get $250,000 from the Lebovitses. (Def. Ex. E (August 13, 2010 memorandum prepared by Detective Investigator Stephanie Green-Jones)).

**Response**: It is undisputed that Friedman made these statements during the August 13, 2010 interview.

16. Meyer Lebovits told the KCDA that plaintiff had demanded money of him to get rid of all three cases against his father, Baruch Lebovits. (Def. Ex. A (Batsidis trans. at 213:2-15); Def. Ex. CC (May 25, 2010 memorandum prepared by Detective Investigator Stephanie Green-Jones)).

**Response**: It is undisputed that Meyer Lebovits made this statement.

17. A witness, Rabbi Mandel, reported to Batsidis that Meyer Lebovits had stated that he was forced to give money to plaintiff and wanted to memorialize the fact that he was paying the money through a third party. (Def. Ex. A (Batsidis trans. at 154:16-155:18)).

**Response**: It is undisputed that Mandel stated to Batsidis that Meyer Lebovits claimed to Mandel that he was forced to give money to Plaintiff and wanted to memorialize his claim that he was paying the money through a third party.

18. In May of 2009, a conversation between plaintiff and Meyer Lebovits took place. (Amended Complaint filed on October 2, 2017 (docket entry # 14) (AC)), at ¶ 16).

**Response**: Undisputed.

19. The conversation was conducted in Hungarian Yiddish, some Hebrew, and included references to the Talmud. (Def. Ex. F (August 1, 2013 Green-Jones report); Def. Ex. G (Transcript of the deposition of plaintiff Samuel Kellner conducted on January 30, 2023 (Kellner Jan. 30, 2023 trans.), at 428:10-430:13)).

**Response**: Undisputed.

20. Meyer Lebovits recorded the conversation. (AC, at ¶ 16).

**Response**: Undisputed.

21. Batsidis received a copy of a certified translation of the conversation that had been prepared by Rina Neeman on or before September 16, 2010. (Def. Ex. A (Batsidis trans. at 102:21-103:18); Def. Ex. H (Certified translation by Trustforte Language Services)).

**Response**: It is undisputed that Batsidis, as shown by the material cited in support of this statement, received a copy of the translation before September 16, 2010.

22. Batsidis obtained a translation of the recorded conversation between plaintiff and Meyer Lebovits by Ruth Kohn. (Def. Ex. A (Batsidis trans. at 24:24-25:4; 248:11-21); Def. Ex. I (Translation by Ruth Kohn)).

**Response**: Undisputed.

23. Vecchione told Batsidis to contact Kohn because she was known to the KCDA as someone who had previously done Yiddish-English translations in cases in state and federal courts. (Def. Ex. A (Batsidis trans. at 248:19-249:4)).

**Response**: Undisputed.

24. Batsidis received the translation prepared by Kohn on or before November 24, 2010. (Def. Ex. A (Batsidis trans. at 145:8-20; Def. Ex. J (November 24, 2010 emails among Kohn, Batsidis, and Green-Jones)).

**Response**: It is undisputed that Batsidis received the translation on November 24, 2010.

25. The translation prepared by Kohn was 161 pages in length. (Def. Ex. A (Batsidis trans. at 145:8-22; Def. Ex. J (November 24, 2010 emails among Kohn, Batsidis, and Green-Jones)).

**Response**: Undisputed.

26. Kohn had worked hard on the translation and listened to the entire recording several times. (Def. Ex. J (November 24, 2010 emails among Kohn, Batsidis, and Green-Jones)).

**Response**: Undisputed.

27. Batsidis initially found the meaning of the translation unclear. (Def. Ex. A (Batsidis trans. at 219:7-11)).

**Response**: It is undisputed that Batsidis claimed to have initially found the meaning of the translation unclear.

28. Batsidis then reviewed the translation with Meyer Lebovits line by line. (Def. Ex. A (Batsidis trans. at 219:12-17)).

**Response**: It is undisputed that Batsidis reviewed the translation with Meyer Lebovits.

29. The translation appeared to reflect that plaintiff had demanded money from Lebovits in exchange for not bringing allegations to the KCDA. (Def. Ex. A (Batsidis trans. at 257:11-261:15)).

**Response**: Disputed. At the outset of the translation, Meyer Lebovits states that, had Plaintiff approached him instead of reporting the matter to the police, "[t]he problem would have been taken care of," "[w]e would have handled the [problem], we would have done everything." *See* Kohn Translation (Pl. Ex. 31) at 12. Meyer states that Plaintiff was wrong to report the matter to the police: "Why didn't you call me, "Meyer, I heard your father is going to be in trouble. We should have seen what could have been done."" *Id.* at 26. The translation makes unmistakably clear that it is the Lebovits family who were attempting to extract a financial settlement when Meyer states: "I thought that we'll settle it, we'll settle the matter," to which Plaintiff responds unequivocally: "No, not settle," and tells Meyer that what he wanted was for Lebovits "to plead guilty for

[Plaintiff's] son." *Id.* at 69-72.

30. The translation appeared to be "damning" to plaintiff until plaintiff's criminal defense counsel weighed in. (Def. Ex. A (Batsidis trans. at 261:9-15)).

**Response**: Disputed. *See* Plaintiff's response to no. 29.

31. Batisidis learned that plaintiff's criminal defense counsel had a different interpretation of the recorded conversation between Meyer Lebovits and plaintiff. (Def. Ex. A (Batsidis trans. at 257:4-259:20)).

**Response**: Disputed to the extent that the statement is referring to the conversation itself as opposed to the Kohn translation. In the cited portion of his testimony, Batsidis stated that criminal defense counsel had a different interpretation of the translation.

32. Defense counsel's interpretation differed in that he believed that plaintiff was proposing a rabbinical settlement to resolve the criminal matter out of court. (Def. Ex. A (Batsidis trans. at 260:19-261:15)).

**Response**: Disputed. Batsidis testified as follows: "Counsel's interpretation was more this is a rabbinical settlement, he is not looking for any kind of money, something to that effect where they're just trying to settle it out of court." Batsidis Tr. 260:19-261:2. Defense counsel, in an affirmation dated July 26, 2013, stated that the translation "not only confirms [Plaintiff's] innocence but squarely contradicts Meyer Lebovits' perjured testimony to the Grand Jury," and that Plaintiff, instead of proposing a rabbinical settlement, "speaks about being pressured and threatened to attend the rabbinical court proceedings presided over by Rabbi Yisroel Makavetzky." *See* MacGiollabhuí Affirm. 7/26/13 (Pl. Ex. 51), ¶¶ 18, 24. Even though Plaintiff managed to avoid the rabbinical court proceedings, he received a bill from Makevetzky in the amount of $1,800

for the court's work "in the matter between Shlomo Aaron Kellner and the Lebovits family related to damages to his son," and was told to speak with Meyer Lebovits about payment. *Id.* ¶ 15. When Plaintiff then met with Meyer Lebovits in May 2009, by the latter's design (since he was ready to secretly record the meeting), Plaintiff immediately refers to Makavetsky and the bill. *See* Kohn Translation (Pl. Ex. 31) at 2-3.

33. On July 22, 2010, M.T. signed an affirmation stating, among other things, that plaintiff had approached him, told M.T. that he had a job for him, gave him about $400 or $500, and told him to say yes if someone asked him if he had been molested; that plaintiff instructed him to say that Baruch Lebovits had raped him on a regular basis from the time he was 12 until he was 16 years old; that M.T. had testified twice that Baruch Lebovits had raped him; that Baruch Lebovits had never molested him; that plaintiff gave him approximately $10,000; and that plaintiff brainwashed him and he desperately needed money. (Def. Ex. K (July 22, 2010 Affirmation of M.T.)).

**Response**: It is undisputed that M.T. signed an affidavit (entitled an "affirmation") with these statements.

34. In a September 15, 2010 interview attended by Batsidis and KCDA Investigator Stephanie Green-Jones, M.T. was asked about the affirmation that M.T. had signed on July 22, 2010. (Def. Ex. L (September 16, 2010 report by Detective Stephanie Green-Jones)).

**Response**: Undisputed.

35. During the September 15, 2010 interview, M.T. stated, among other things, that, in or around March 11, 2008, plaintiff came to his home; he (M.T.) told plaintiff that Baruch Lebovits had not molested him; that plaintiff told him, if anyone asked, to say he had been molested by

Baruch Lebovits; plaintiff told him (M.T.) he had a job for him and gave him $500 in cash; plaintiff took him to see Detective Litwin, whom M.T. lied to by stating that Baruch Lebovits had molested him as plaintiff had told him to do; he (M.T.) received approximately $100 per week, for a total of approximately $10,000 from plaintiff; Y.R. had told him (M.T.) that, he, too, had received money and regretted starting the Lebovits prosecution; and he (M.T.) came forward because he was shocked when he learned of Baruch Lebovits's lengthy sentence. (Def. Ex. L (September 16, 2010 report by Detective Stephanie Green-Jones)).

**Response**: It is undisputed that M.T. made these statements.

36. On April 11, 2011, plaintiff was indicted on one count of conspiracy in the fourth degree; five counts of attempted grand larceny in the second degree by extortion; two counts of perjury in the first degree, and two counts of criminal solicitation in the fourth degree under Indictment No. 2538/2011. (AC, at ¶ 41; Def. Ex. M (Indictment No. 2538/2011); Def. Ex. A (Batsidis trans. at 179:19-179:25)).

**Response**: Undisputed.

37. The indictment alleged that, between March of 2008 and March of 2010, plaintiff made repeated demands for money to Meyer Lebovits, via five unindicted co-conspirators, in exchange for which plaintiff would cause the pending criminal sex abuse charges against Baruch Lebovits to be dismissed through his "ability to control the cooperation and content of the testimony of the complaining victims [M.T., Y.R., and his son (P.K.)]"; direct an additional alleged victim of Baruch Lebovits not to make a complaint; and cause the publication of Lebovits' alleged abuse of children within the community to cease. (AC, at ¶ 42; Def. Ex. M (Indictment No. 2538/2011)).

**Response**: It is undisputed that the Indictment contained these allegations.

38. The alleged overt acts in furtherance of the conspiracy consisted of five extortionate demands made to Meyer Lebovits, on plaintiff's behalf, solicitation by plaintiff of another individual to act as an emissary for his alleged extortion, payments by plaintiff to a witness to secure his false testimony in the two separate grand jury proceedings against Baruch Lebovits, and the re-iteration of the earlier extortionate demands made by his co-conspirators in a May 2009 recorded conversation between plaintiff and Meyer Lebovits. (AC, at ¶ 43; Def. Ex. M (Indictment No. 2538/2011)).

**Response**: It is undisputed that the Indictment contained these allegations.

39. Plaintiff was arrested on April 12, 2011. (AC, at ¶ 44).

**Response**: Undisputed.

40. A news conference attended by Hynes took place after plaintiff's arrest. (AC, at ¶ 44; Def. Ex. DD (Affirmation of Niall MacGiollabhui in Support of Motion To Dismiss dated July 26, 2013, at ¶ 46)).

**Response**: Undisputed, except that Hynes did not simply attend the conference; he decided to hold it. *See* ADA Batsidis Timeline (Pl. Ex. 30) at 11 ("I was made aware by ADA Vecchione that there will be a press conference as per DA.").

41. On July 24, 2013, Hynes appeared on a radio show and commented on the case against plaintiff. (AC, at ¶ 50).

**Response**: Undisputed

42. Assistant District Attorney Miss Gregory was the supervisor of the KCDA's Sex Crimes Special Victims Bureau. (Def. Ex. N (Transcript of the deposition of Miss Gregory

conducted on February 23, 2022 (Gregory trans.), at 13:18-15:3)).

**Response**: It is undisputed that ADA was "a supervisor" of the KCDA's Sex Crimes Special Victims Bureau. *See* Gregory Tr. (Pl. Ex. 7) 15:16-16:15.

43. Gregory was an assistant district attorney who had prosecuted Baruch Lebovits. (Def. Ex. N (Gregory trans. at 19:18-20:3)).

**Response**: Undisputed.

44. Three alleged sex crimes victims, M.T., P.K., and Y.R, had accused Baruch Lebovits. (AC, at ¶¶ 8, 10, 11).

**Response**: Undisputed.

45. P.K. was plaintiff's son. (AC, at ¶ 8).

**Response**: It is undisputed that P.K. was (and remains) Plaintiff's son.

46. Plaintiff did not want his son to testify at a trial if he were the only witness. (Def. Ex. G (Kellner Jan. 30, 2023 trans. at 256:2-13; 326:21-327:24)).

**Response**: Undisputed.

47. Plaintiff was concerned that his son would have to reveal what had happened to him on cross-examination at trial. (Def. Ex. G ((Kellner Jan. 30, 2023 trans. at 291:6-22)).

**Response**: Undisputed.

48. Baruch Lebovits was convicted for a crime against Y.R. (AC, at ¶ 23; Def. Ex. A (Batsidis trans. at 40:12-41:7)).

**Response**: It is disputed that Lebovits was convicted of a single crime. In fact, he was convicted of eight felony counts of Criminal Sexual Act in the Third Degree. *See* Gregory letter dated March 25, 2010 (Def. Ex. O).

49. Hynes sought a sentence for Baruch Lebovits of ten and two-thirds to 32 years. (Def. Ex. O Mar. 25, 2010 letter from Charles J. Hynes to the Honorable Patricia DiMango)).

**Response**: Undisputed.

50. During the course of his prosecution, Baruch Lebovits was represented by six lawyers – Arthur Aidala, Alan Dershowitz, Amy Adelson, Nathan Dershowitz, Lawrence Goldman, and Elizabeth Johnson. (Def. Ex. P (signature page of Lebovits Pre-Pleading Memorandum; Def. Ex. Q cover page of Reply Memorandum of Law in Further Support of Defendant Baruch Lebovits's Omnibus Motion)).

**Response**: Undisputed.

51. Gregory took steps to secure the cooperation of M.T. for the prosecution of Baruch Lebovits. (Def. Ex. N (Gregory trans. at 240:5-20)).

**Response**: Undisputed.

52. M.T. was represented by attorney John Lonuzzi. (Def. Ex. R (Transcript of the deposition of John Lonuzzi conducted on October 17, 2022 (Lonuzzi trans.), at 34:10-35:7)).

**Response**: Undisputed.

53. M.T.'s brother arranged a consultation with Lonuzzi to discuss Lonuzzi's representation of M.T. (Def. Ex. R (Lonuzzi trans. at 35:21-36:8)).

**Response**: Disputed. After Lonuzzi informed Gregory and NYPD Detective Steven Litwin that he was representing M.T., M.T. called Litwin and told him that "he had not retained this lawyer but that someone else had." *See* Litwin Affidavit (Pl. Ex. 11), ¶ 9. At a meeting the following day, M.T. "told [Litwin] again that he had not retained the lawyer, Mr. Lonuzzi," and "that someone else had retained Mr. Lonuzzi but that he did not know who had done so." *Id.* ¶ 10.

54. M.T. retained Lonuzzi. (Def. Ex. R (Lonuzzi trans. at 35:21-36:8)).

**Response**: Disputed. *See* Plaintiff's response to no. 53.

55. Lonuzzi had a meeting at which M.T., his brother, and his uncle were present. (Def. Ex. R (Lonuzzi trans. at 36:18-24)).

**Response**: It is undisputed that Lonuzzi testified at his deposition that he had a meeting at which M.T., his brother, and his uncle were present.

56. M.T. did not want to be subjected to testifying at trial. (Def. Ex. R (Lonuzzi trans. at 27:14-28:20)).

**Response**: Disputed. In early November 2009, Gregory met with M.T. in her office, informed him that the Lebovits case had been set down for trial the following month, and noted that "M.T. was cooperative and told [her] that he would be ready to testify at the trial." *See* Gregory Affirmation (Pl. Ex. 10), ¶ 11. A few months later, M.T. told Litwin that "he had been pressured and that he was afraid to say what had happened," and that "he had been told not to talk to [Litwin] or to go to the District Attorney's Office." *See* Litwin Affidavit (Pl. Ex. 11), ¶ 10.

57. M.T. communicated through his attorney that he would not testify at a trial. (Def. Ex. N (Gregory trans. at 240:5-10)).

**Response**: It is undisputed that Lonuzzi communicated that M.T. would not testify.

58. Without M.T.'s testimony, there was insufficient evidence to try the case arising out of M.T.'s allegations. (Def. Ex. N (Gregory trans. at 240:11-17)).

**Response**: Undisputed.

59. Gregory attempted to contact M.T. via his attorney. (Def. Ex. N (Gregory trans. at 148:15-149:17)).

**Response**: Undisputed.

60. Gregory arranged multiple appointments with M.T.'s attorney for M.T. and his attorney to speak with her; however, all of those appointments were canceled. (Def. Ex. S (Gregory July 8, 2011 Affirmation at ¶ 12)).

**Response**: Undisputed.

61. Gregory's office served subpoenas to obtain the attendance of M.T. (Def. Ex. N (Gregory trans. at 148:15-149:17; Def. Ex. S (Gregory July 8, 2011 Affirmation at ¶ 13)).

**Response**: Undisputed.

62. Gregory could not do anything more to secure M.T.'s cooperation. (Def. Ex. N (Gregory trans. at 240:21-24)).

**Response**: Disputed. Litwin wanted M.T.'s "non-cooperation to be investigated by him or by an ADA but [Sex Crimes Bureau Chief] Rhonnie [Jaus] said no." *See* ADA O'Donnell notes (Pl. Ex. 13) at 14. Gregory testified in relation to M.T.'s supposed recantation in July 2010 that, while she doubted that a prosecution could have relied on M.T. alone at that point, a witness tampering investigation could have potentially helped to resecure his cooperation: "[O]bviously, the more evidence that you could have in a case perhaps, you know, there could have been something." *See* Gregory Tr. (Pl. Ex. 7) at 253:6-20.

63. It was not unusual for sexual abuse victims to withdraw their cooperation because they became panicked at the last minute before they had to testify. (Def. Ex. T (Transcript of the deposition of Rhonnie Jaus conducted on April 8, 2022 (Jaus trans.), at 152:19-153:19)).

**Response**: Undisputed.

64. After M.T. had recanted his allegations against Baruch Lebovits, his credibility was

questionable. (Def. Ex. N (Gregory trans. at 253:6-20)).

**Response**: It is undisputed that Gregory testified that M.T.'s credibility at a potential future trial was questionable.

65. Gregory was never told that Hynes was unwilling to do anything concerning witness tampering with regard to M.T. (Def. Ex. N (Gregory trans. at 239:24-240:4)).

**Response**: Disputed. Gregory clarified at a subsequent point in her deposition that she could not recall "whether [she was] told or not told" that Hynes was unwilling to do anything concerning witness tampering with regard to M.T. *See* Gregory Tr. (Pl. Ex. 7) at 251:5-252:22.

66. The KCDA had different bureaus because different types of cases called for different experience and expertise. (Def. Ex. N (Gregory trans. at 233:22-234:3)).

**Response**: Undisputed.

67. Gregory had never been assigned to the Rackets Bureau. (Def. Ex. N (Gregory trans. at 233:19-21; 238:4-7)).

**Response**: Undisputed.

68. Gregory did not have any particular understanding of the expertise needed for a Rackets prosecution. (Def. Ex. N (Gregory trans. at 235:5-8)).

**Response**: Undisputed.

69. Gregory had never prosecuted a case involving allegations of conspiracy, bribery, extortion, perjury, or criminal solicitation. (Def. Ex. N (Gregory trans. at 235:9-11; 236:3-11)).

**Response**: Undisputed.

70. Gregory had not been involved in the prosecution of a grand larceny case for years before the Baruch Lebovits prosecution. (Def. Ex. N (Gregory trans. at 235:12-20)).

**Response**: Undisputed.

71. Gregory had no experience in prosecuting the types of charges that were brought against plaintiff. (Def. Ex. N (Gregory trans. at 238:8-11)).

**Response**: Undisputed.

72. Gregory used Kohn for translations in the course of handling the Baruch Lebovits prosecution. (Def. Ex. N (Gregory trans. at 234:4-17)).

**Response**: Undisputed.

73. Gregory had used Kohn on other translations. (Def. Ex. N (Gregory trans. at 234:10-12)).

**Response**: Undisputed.

74. Gregory had found Kohn's translations to be reliable. (Def. Ex. N (Gregory trans. at 234:18-24)).

**Response**: Undisputed.

75. Vecchione initiated a meeting with members of Sex Crimes to inform Sex Crimes that Rackets was investigating plaintiff and that the investigation might have implications for the Sex Crimes prosecution of Baruch Lebovits. (Def. Ex. U (Transcript of the deposition of Anthea Bruffee conducted on April 14, 2022 (Bruffee trans.), at 80:18-81:9)).

**Response**: Undisputed.

76. Plaintiff was believed by Rackets to be extorting Baruch Lebovits's family relating to the three sex crimes victims from the Sex Crimes prosecution of Baruch Lebovits. (Def. Ex. A (Batsidis trans. at 32:17-33:14)).

**Response**: Disputed. In the cited portion of his testimony, Batsidis stated that "allegations" of this

nature had been made. He did not testify that he or Rackets believed them.

77. Early in his investigation, Batsidis met with Gregory and took her file because it was alleged in the reports that plaintiff had brought witnesses forward against Baruch Lebovits. (Def. Ex. A (Batsidis trans. at 31:3-31:18)).

**Response**: Undisputed.

78. Gregory and Batsidis investigated plaintiff. (Def. Ex. A (Batsidis trans. at 30:9-31:2)).

**Response**: Disputed. In the cited portion of his testimony, Batsidis did not state that Gregory investigated Plaintiff. He testified that he was in contact with her as part of the investigation he was carrying out. He was subsequently asked why Gregory was not asked to be present at an interview of M.T. in March 2011, shortly before the decision was made to seek an indictment against Plaintiff, to which he responded: "It was a Rackets investigation." *See* Batsidis Tr. (Pl. Ex. 40) at 169:5-17. Vecchione testified that the investigation of Plaintiff "was not a joint investigation," and that "there was no reason to include Sex Crimes." *See* Vecchione Tr. (Pl. Ex. 52) at 97:17-98:8. Gregory testified: "I was not part of that investigation." See Gregory Tr. (Pl. Ex. 7) at 167:2-20. On April 12, 2011, the day Plaintiff was arrested, Gregory informed ADAs Jaus and Bruffee by email of the ten counts on which Plaintiff was indicted, including two counts of perjury; to which Jaus responded: "What is the perjury for?"; and Gregory replied: "I'm not sure. Maybe a [detective investigator] and/or ADA took a statement from him." *See* Gregory Emails (Pl. Ex. 53). In fact, the two counts arose from M.T.'s Grand Jury testimony in the Lebovits prosecution, which, unbeknownst at that time to sex Crimes, the KCDA was claiming in the Kellner indictment to be false.

79. Gregory spoke to Alexis and Batsidis about plaintiff's prosecution. (Def. Ex. N (Gregory trans. at 231:4-14)).

**Response**: Undisputed.

80. An assistant district attorney in Rackets could request information from an assistant district attorney in Sex Crimes. (Def. Ex. A (Batsidis trans. at 249:19-24)).

**Response**: Undisputed.

81. Batsidis was in contact with Gregory often. (Def. Ex. A (Batsidis trans. at 30:9-12)).

**Response**: It is undisputed that Batsidis and Gregory were in contact with one another on multiple occasions.

82. Batsidis reviewed trial minutes and police reports from Gregory's file. (Def. Ex. A (Batsidis trans. at 31:19-32:16)).

**Response**: Undisputed.

83. Batsidis spoke to Gregory about the circumstances in which M.T. had ended his cooperation with the Lebovits prosecution. (Def. Ex. A (Batsidis trans. at 121:25-122:4)).

**Response**: Undisputed.

84. Batsidis was instructed by Vecchione to turn over the information that he had to Sex Crimes. (Def. Ex. A (Batsidis trans. at 128:17-129:6)).

**Response**: It is undisputed that, on September 20, 2010, Batsidis was instructed to provide certain affidavits, interviews and a translation of the 2009 recorded conversation between Plaintiff and Meyer Lebovits to Sex Crimes. *See* Batsidis Tr. (Def. Ex. A) at 128:9-129:18.

85. Gregory communicated by email with Batsidis on February 24, 2011, referencing

the existence of videotapes about Y.R., a complainant in one of Gregory's cases against Baruch Lebovits. (Def. Ex. A (Batsidis trans. at 152:20-153:24)).

**Response**: Undisputed.

86. The purpose of the conversations between Gregory, Alexis, and Batsidis was to discuss background on the criminal prosecutions against plaintiff and Lebovits. (Def. Ex. N (Gregory trans. at 231:15-232:4)).

**Response**: It is undisputed that Gregory testified that "some" of the purpose of her conversations with Batsidis "was background in [the Lebovits] cases." *See* Gregory Tr. (Def. Ex. N) 231:4-232:4. She did not recall the specifics of her conversations with Alexis. *Id.*

87. A meeting took place that was attended by Hynes, members of Rackets, and trial and appeals lawyers who were involved in the prosecution of Baruch Lebovits. (Def. Ex. U (Bruffee trans. at 43:11-44:25)).

**Response**: Undisputed, except that ADA Bruffee testified that Vecchione was in attendance and not "members of Rackets."

88. At that meeting, Hynes was provided Sex Crimes' view of the case against Baruch Lebovits. (Def. Ex. U (Bruffee trans. at 43:11-45:4)).

**Response**: Undisputed.

89. A meeting took place that was attended by Hynes, members of Sex Crimes, and members of Rackets, when it was learned that Y.R. might have recanted on tape. (Def. Ex. T (Jaus trans.), at 157:7-158:20)).

**Response**: Undisputed.

90. At a meeting between Hynes and Vecchione, Hynes asked Vecchione if there was

a triable case against plaintiff. (Def. Ex. B (Vecchione trans. at 43:25-45:2)).

**Response**: Disputed. In the deposition testimony cited in support of this statement, Vecchione is referring to a meeting that occurred in June 2013, after ADAs Batsidis and Alexis recommended to Hynes that the case against Plaintiff be dismissed. A review of Plaintiff's prosecution conducted by the KCDA in 2014, after Hynes was voted out of office, referred to this meeting as follows: "It is shameful that former DA Hynes allowed ADA Vecchione to talk him out of dismissing this case." *See* ADA O'Donnell Memo 3/3/14 (Pl. Ex. 54) at 1. According to Vecchione's deposition testimony, before Hynes supposedly asked him if he "thought there was a triable case," and "if it was legally sufficient," Hynes showed him a supposed memo written by Batsidis and Alexis in support of their recommendation, and stated that it was "not to [Hynes's] liking," that "it's poor, shoddy work," and "[h]e was disappointed that two people who work for him would write a memo of that quality." *See* Vecchione Tr. (Def. Ex. B) at 44:10-22. Vecchione's account of the meeting is not credible. In fact, on June 26, 2013, after Batsidis and Alexis recommended to Hynes that the case against Plaintiff should be dismissed, Hynes asked them "to prepare a closing memo by Monday [July 1, 2013]." *See* Batsidis Timeline (Pl. Ex. 30) at 20. However, on June 27-28, 2013, after Vecchione found out about their recommendation and met with Hynes, Batsidis and Alexis were informed that Hynes "no longer wants closing memo," "there was a change in course," that "[t]he Kellner case was not going to be dismissed," and that "Batsidis and Alexis were to have no further contact with the former District Attorney regarding the Kellner case." *Id.*; Alexis-Batsidis Memo (Pl. Ex. 55) at 8.

91. Vecchione told Hynes that there was a triable case against plaintiff. (Def. Ex. B (Vecchione trans. at 43:25-45:2)).

**Response**: Disputed. *See* Plaintiff's response to no. 90.

92. Hynes asked Vecchione if there was a legally sufficient case against plaintiff. (Def. Ex. B (Vecchione trans. at 43:25-45:2)).

**Response**: Disputed. *See* Plaintiff's response to no. 90.

93. Vecchione told Hynes that there was a legally sufficient case against plaintiff. (Def. Ex. B (Vecchione trans. at 43:25-45:2)).

**Response**: Disputed. *See* Plaintiff's response to no. 90.

94. On June 19, 2013, Hynes requested that Batsidis and Alexis provide him with a brief summary of the evidence against plaintiff. (Def. Ex. V (June 19, 2013 emails exchanged among Hynes, Vecchione, and Batsidis)).

**Response**: Undisputed.

95. Batsidis's summary of the evidence against plaintiff consisted of the testimony of Meyer Lebovits, M.T., and Moshe Friedman, as well as the May 2009 recorded conversation between Meyer Lebovits and plaintiff. (Def. Ex. A (Batsidis trans. at 217:25-219:4)); (Def. Ex. V (June 19, 2013 emails exchanged among Hynes, Vecchione, and Batsidis)).

**Response**: It is undisputed that Batsidis's summary of the evidence included descriptions by him of the testimony of Meyer Lebovits, M.T., and Moshe Friedman, as well as of the May 2009 recorded conversation.

96. Batsidis stated the witnesses had testified, among other things, that plaintiff had sought money from the Lebovits family in exchange for keeping the witnesses from testifying against Baruch Lebovits and the cases against him from going forward; that plaintiff would bring forward another witness if there was no settlement; and that plaintiff did not want his son to testify.

(Def. Ex. V (June 19, 2013 emails exchanged among Hynes, Vecchione, and Batsidis)).

**Response**: It is undisputed that Batsidis made these statements.

97. Batsidis stated that Rackets had been investigating allegations that the Lebovits family may have paid M.T. to testify in the grand jury and then made him leave the country so as to be unavailable for trial. (Def. Ex. V (June 19, 2013 emails exchanged among Hynes, Vecchione, and Batsidis)).

**Response**: It is undisputed that Batsidis made these statements.

98. Batsidis stated that he and Alexis intended to speak with M.T. concerning the allegations that he had been paid to testify in the grand jury and whether he had ever been molested by Baruch Lebovits. (Def. Ex. V (June 19, 2013 emails exchanged among Hynes, Vecchione, and Batsidis)).

**Response**: It is undisputed that Batsidis made these statements.

99. Batsidis stated that there was a difference of opinion between Meyer Lebovits and plaintiff as to whether their May 2009 conversation reflected attempts by plaintiff to extract money from the Lebovits family in exchange for the silence of Baruch Lebovits's accusers. (Def. Ex. V (June 19, 2013 emails exchanged among Hynes, Vecchione, and Batsidis)).

**Response**: It is undisputed that Batsidis stated that Meyer Lebovits and counsel for Plaintiff provided different accounts of the May 2009 conversation, albeit he misstated that counsel for Plaintiff claimed that Plaintiff's was "seeking a rabbinical settlement." *See* Plaintiff's response to no. 32. Batsidis did not describe the difference as one of "opinion."

100. Plaintiff was advised that the KCDA would not proceed with charges arising out of his son's complaint because the alleged offense was a misdemeanor, Lebovits was 60 years old,

and a prosecution was unlikely to result in jail time. (AC, at ¶ 9; Def. Ex. W ((Kellner Jan. 25, 2023 trans. at 175:21-177:19)).

**Response**: Undisputed, except, as indicated in the material cited in support of this statement, Plaintiff was also told it was because “there were no other known victims.”

101. Plaintiff told Litwin and prosecutors at a meeting that attempts were being made to pay him off. (Def. Ex. X (Transcript of the deposition of Steven Litwin conducted on January 13, 2023 (Litwin trans.), at 49:17-23)).

**Response**: Undisputed.

102. Plaintiff was very vague about who was trying to buy him off and made only general statements. (Def. Ex. X (Litwin trans. at 49:17-23)).

**Response**: It is undisputed that Litwin testified that he was “not positive” but that the above statement was his “recollection” of the meeting. *See* Litwin Tr. (Def. Ex. X) at 49:11-23.

103. Plaintiff made buoyant remarks to Litwin indicating that he should be offered millions of dollars to be bought off and he would consider. (Def. Ex. X (Litwin trans. at 50:22-51:3)).

**Response**: Undisputed. Litwin testified that Plaintiff in this regard had “a particular sense of humor.” *See* Litwin Tr. (Def. Ex. X) at 50:22-51:8.

104. It was at times difficult to understand the evidence because of language barriers with the Orthodox community. (Def. Ex. A (Batsidis trans. at 247:22-248:2; 249:5-13)).

**Response**: It is undisputed that Batsidis agreed with counsel for Defendants at his deposition, without specific examples, that there were times when it was “difficult for [Batsidis] to parse or understanding the evidence because of language barriers.”

105. It was at times difficult to understand the evidence because it depended on the cultural mores of the Orthodox Jewish community. (Def. Ex. A (Batsidis trans. at 249:9-13)).

**Response**: It is undisputed that Batsidis agreed with counsel for Defendants at his deposition, without specific examples, that there were times when it was "difficult for [Batsidis] to understand the evidence because it depended to some extent on the cultural mores of the orthodox community."

106. Victims in the Orthodox Jewish community were often reluctant to cooperate with law enforcement. (Def. Ex. X (Litwin trans. at 32:5-8)).

**Response**: Undisputed.

107. Victims in the Orthodox Jewish community in Brooklyn were pressured by their community not to cooperate with the district attorney's office. (Def. Ex. A (Batsidis trans. at 94:17-95:18)).

**Response**: It is undisputed that Batsidis testified that he heard a "rumor" that some victims had in the past ended their cooperation because of pressure from the community and that some victims don't come forward because "they're put under pressure by elements within their community not to cooperate with [the Kings County District Attorney's] office."

108. Hynes instituted the Kol Tzedek program to assist sexual abuse victims by making them feel more comfortable about coming forward through the criminal justice system. (Def. Ex. Y (Transcript of the deposition of Henna White conducted on July 8, 2022 (White trans.), at 36:17-24); Def. Ex. T (Jaus trans.), at 50:17-53:2; 62:6-14; 79:15-81:8)).

**Response**: It is undisputed that Hynes instituted the Kol Tzedek program. It is also undisputed that White testified that the program was instituted in order "to try and make victims of sexual

abuse feel more comfortable to come to the criminal justice system." Jaus, in the cited portion of her testimony, stated that the program was instituted in response to reports of "rampant sexual assaults in the Orthodox community" that were not being prosecuted by the KCDA. Hynes was being heavily criticized for the absence of prosecutions in terms such as the following from a newspaper editorial entitled "The Reluctant DA": "Sadly, it seems an institution whose role in part is to stand up for crime victims also continues to abdicate its responsibility. For several years Brooklyn District Attorney Charles Hynes has been treating the issue of child sexual abuse in certain Jewish communities with a stance ranging from passive to weak-willed. Victims brave enough to contemplate going to the authorities - with its attendant social costs - are left wondering if their information will be acted on seriously if they come forward. Hynes' curious passivity has been on display most recently as Hikind has amassed what he describes as "hundreds" of files with testimony from individuals who say yeshiva teachers molested them when they were children." *See* Jewish Week editorial 11/19/08 (Pl. Ex. 56). The Kol Tzedek program, whether otherwise commendable or not, was instituted in response to prolonged, stinging criticism of Hynes' curious passivity and abdication of responsibility in standing up for victims of childhood sexual abuse in certain Jewish communities, including in Plaintiff's community.

109. On July 17, 2013, members of Rackets interviewed former Assemblyman Dov Hikind. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

**Response**: Undisputed.

110. Plaintiff had met with Hikind related to sexual abuse in the Orthodox Jewish community. (Def. Ex. G (Kellner Jan. 30, 2023 trans. at 313:13-318:14; 335:9-18)).

**Response**: Undisputed.

111. Plaintiff had come to Hikind's office on many occasions. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

**Response**: It is undisputed that Plaintiff went to Hikind's office on multiple occasions.

112. Hikind stated that he had listened to the recording of the conversation between plaintiff and Meyer Lebovits twice. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

**Response**: It is undisputed that Hikind made this statement.

113. Hikind stated that the conversation was in Hungarian Yiddish and some Hebrew and contained references to the Talmud. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

**Response**: Undisputed.

114. Hikind stated that the recording contained phrases and expressions that could be interpreted incorrectly. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

**Response**: It is undisputed that Hikind made this statement.

115. Plaintiff agreed that the recording contained phrases and expressions that could be interpreted incorrectly. (Def. Ex. G (Kellner Jan. 30, 2023 trans. at 428:10-430:13)).

**Response**: It is undisputed that Plaintiff stated that individual words or phrases could be interpreted incorrectly but not such that it would affect the overall understanding of what was said on the recording.

116. Hikind stated that plaintiff had asked Hikind for money. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

**Response**: It is undisputed that Hikind stated, as indicated in the report, that Plaintiff had asked him for money to help Lebovits's victims (other than his son).

117. Hikind stated that, after he had listened to the recorded conversation, he came out

publicly and suggested that the charges be dropped. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

**Response**: Undisputed.

118. Hikind stated that plaintiff's main concern about what had happened to his son was that it would get out in the community and the effect on how his son would be viewed in the Hasidic community. (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

**Response**: It is undisputed that Hikind made this statement.

119. Hikind stated that, although many people had spoken out about sexual abuse in the Hasidic community, there was still "a long way to go." (Def. Ex. F (Aug. 1, 2013 Green-Jones report)).

**Response**: It is undisputed that Hikind made this statement.

120. On July 5, 2013, Batsidis and Alexis advised plaintiff's criminal defense counsel that they had spoken with M.T. on June 26, 2013, and July 1, 2013, and learned of information that had not been previously disclosed or known to them. (Def. Ex. Z (July 5, 2013 letter from Alexis and Batsidis to Michael Dowd, with attachment)).

**Response**: It is undisputed that the July 5, 2013 letter contains these statements.

121. During a June 26, 2013 interview by members of the KCDA, M.T. stated that, on several occasions, he told several people that Baruch Lebovits had molested him. (Def. Ex. Z (July 5, 2013 letter from Alexis and Batsidis to Michael Dowd, and attachment)).

**Response**: It is undisputed that M.T. made this statement.

122. During a June 26, 2013 interview by members of the KCDA, M.T. stated that Baruch Lebovits might have molested him, but he was not sure. (Def. Ex. Z (July 5, 2013 letter

from Alexis and Batisidis to Michael Dowd, and attachment)).

**Response**: It is undisputed that M.T. made this statement.

123. During a July 1, 2013 interview by members of the KCDA, M.T. stated that plaintiff failed to pay him a fee that the two had agreed upon to testify falsely in the grand jury that Baruch Lebovits had molested him. (Def. Ex. Z (July 5, 2013 letter from Alexis and Batsidis to Michael Dowd, and attachment)).

**Response**: It is undisputed that M.T. made this statement.

124. During a July 1, 2013 interview by members of the KCDA, M.T. stated that plaintiff had promised to finance a wedding for him in exchange for falsely testifying in the grand jury that Baruch Lebovits had molested him, and added that he could not clearly remember specific dates and times because of his heavy drug and alcohol use. (Def. Ex. Z (July 5, 2013 letter from Alexis and Batsidis to Michael Dowd, and attachment)).

**Response**: It is undisputed that M.T. made these statements.

125. During a July 1, 2013 interview by members of the KCDA, M.T. initially stated that he went to Israel because his family had arranged a possible marriage for him; after further questioning, M.T. acknowledged that he traveled to Israel to avoid allegations of child molestation that were being made against him. (Def. Ex. Z (July 5, 2013 letter from Alexis and Batsidis to Michael Dowd, and attachment)).

**Response**: It is undisputed that M.T. made these statements.

126. During a July 1, 2013 interview by members of the KCDA, M.T. stated that he had never seen Baruch Lebovits in his life. (Def. Ex. Z (July 5, 2013 letter from Alexis and Batsidis to Michael Dowd, and attachment)).

**Response**: It is undisputed that M.T. made this statement.

127. M.T. had lied leading to plaintiff's arrest and prosecution. (Def. Ex. G ((Kellner Jan. 30, 2023 trans. at 298:21-299:4)).

**Response**: Undisputed.

128. M.T. had made contradictory statements under oath which affected his credibility. (Def. Ex. G (Kellner Jan. 30, 2023 trans. at 381:8-18; 388:5-10)).

**Response**: Undisputed.

129. Batisidis believed that the charges should be dismissed after confronting M.T. with information that had been learned by the KCDA. (Def. Ex. A (Batsidis trans. at 255:5-11)).

**Response**: Undisputed.

130. The evidence against plaintiff changed over time. (Def. Ex. A (Batsidis trans. at 246:7-13; 247:14-21)).

**Response**: Disputed. There was never any credible evidence against Plaintiff. *See* Plaintiff's Statement of Additional Facts.

131. Assistant District Attorney Kevin O'Donnell was assigned to the criminal prosecution against plaintiff after Hynes lost the election in 2013, and was replaced by District Attorney Kenneth Thompson. (Def. Ex. AA (Transcript of the deposition of Kevin O'Donnell conducted on April 22, 2022 (O'Donnell Apr. 22, 2022 trans.), at 20:17-23)).

**Response**: Undisputed.

132. O'Donnell was assigned to the prosecution against plaintiff on January 17, 2014. (Def. Ex. AA (O'Donnell Apr. 22, 2022 trans. at 18:11-24)).

**Response**: Undisputed.

133. O'Donnell recommended that the case against plaintiff be dismissed because it could not be proven beyond a reasonable doubt. (Def. Ex. AA (O'Donnell Apr. 22, 2022 trans. at 21:11-16)).

**Response**: Disputed, in that while O'Donnell expressed the "opinion" that there was "no way to prove any of the counts in the indictment beyond a reasonable doubt," he "recommend that the case against Samuel Kellner be dismissed in the interests of justice." *See* O'Donnell Memo 3/4/14 (Pl. Ex. 57) at 1.

134. O'Donnell believed that plaintiff was factually guilty of some or all of the crimes with which he had been charged. (Def. Ex. AA (O'Donnell Apr. 22, 2022 trans. at 87:4-88:16; Ex. BB (Transcript of the deposition of Kevin O'Donnell conducted on November 2, 2022 (O'Donnell Nov. 2, 2022 trans.), at 131:5-132:3)).

**Response**: Disputed. At the time of his recommendation that the case against Samuel Kellner be dismissed in the interests of justice, O'Donnell stated that his "opinion on the actual guilt or innocence of Mr. Kellner is not as clear." *See* O'Donnell Memo 3/4/14 (Pl. Ex. 57) at 7. More than eight years later, he testified that he had actually believed that Plaintiff was guilty of a crime. Asked whether he could identify a "single piece of credible evidence" to support this opinion, he responded: "I don't have any specific recollection of any specific piece of evidence. I can just tell you my impression now is that he was guilty. I can't articulate what the basis of that is. It's not based on any specific fact or circumstance." *See* O'Donnell Tr. (Pl. Ex. 59) at 138:14-139:22.

**Plaintiff's Statement of Additional Material Facts**

135. Plaintiff is a Hasidic resident of Borough Park. Kellner Tr. (Pl. Ex. 1) at 24:7-27:7.

136. In 2008, one of Plaintiff's sons (herein identified as "P.K." or "Victim 2") was

molested by Baruch Lebovits. *Id.* at 152:4-153:9.

137. Plaintiff was told by the Williamsburg Va'ad HaTznius (a "modesty committee" which receives reports of sexual abuse in Plaintiff's community) that Baruch Lebovits was a known serial abuser of children. *Id.* at 162:8-165:19.

138. Plaintiff brought P.K. to the Kings County District Attorney's Office ("KCDA"), where he reported his abuse. *Id.* at 174:13-175:10.

139. Plaintiff was subsequently put in contact with NYPD Detective Steven Litwin, who interviewed P.K. and asked Plaintiff if he could locate another victim of Lebovits in his community. *Id.* at 184:12-186:18.

140. The Williamsburg Va'ad HaTznius disclosed the name of another victim (herein identified as "M.T." or "Victim 1") to Plaintiff. *Id.* at 186:19-187:25.

141. Plaintiff arranged for M.T. to meet with Litwin. *Id.* at 196:18-197:11.

142. By Indictment filed on April 1, 2008, Baruch Lebovits was charged with thirty-two felony counts in relation to his abuse of M.T., including twenty-seven top counts of sodomy in the second degree, and two misdemeanor counts in relation to P.K. Lebovits Indictment No. 2600/2008 (Pl. Ex. 2).

143. Plaintiff subsequently obtained the name of another victim of Lebovits (herein identified as "Y.R." or "Victim 3") from the office of then New York State Assemblyman Dov Hikind. Kellner Tr. (Pl. Ex. 1) at 188:10-15.

144. Plaintiff arranged for Y.R. to meet with Litwin. *Id.* at 310:5-20.

145. In November 2008, a superseding indictment was filed against Baruch Lebovits, charging the same thirty-two felony counts in relation to M.T. and an additional ten felony counts

in relation to Y.R. Lebovits Indictment No. 11393/2008 (Pl. Ex. 3).

146. By this time, substantial monetary offers were being made to Plaintiff to drop his son's case, including an offer from Moshe Friedman, all of which he rejected. Kellner Tr. (Pl. Ex. 1) at 259:15-263:5.

147. At Plaintiff's request, he met with KCDA Sex Crimes Bureau Chief Rhonnie Jaus, Assistant District Attorneys Miss Gregory and Chris Laline, and Detective Litwin, and informed them that attempts were being made to pay him off. *Id.* at 251:19-24; 258:16-259:14.

148. The KCDA plea offer prior to the superseding indictment was for Lebovits to plead guilty to sodomy in the second degree in relation to M.T. in exchange for a recommended sentence of 2 ⅓ to 7 years. KCDA Status Sheet 11/18/2008 (Pl. Ex. 4).

149. In February 2009, Arthur Aidala, counsel for Lebovits, advised the court that he wished to submit a Pre-Pleading Information ("PPI"). Court Transcript 2/24/09 (Pl. Ex. 5) at 4.

150. A PPI is submitted to the court in circumstances where a defendant intends to plead guilty to an indictment and receive a sentence from the court and/or to a prosecutor's office in an effort to obtain an improved plea offer. KCDA Chief Assistant Amy Feinstein Tr. (Pl. Ex. 6) at 79:22-81:3.

151. The plea offer remained the same after the superseding indictment, except that Lebovits was also required to enter a plea to one of the counts relating to Y.R. Gregory Tr. (Pl. Ex. 7) at 90:2-91:18.

152. The offer was personally approved by Hynes. Feinstein Tr. (Pl. Ex. 6) at 84:4-17.

153. Counsel for Lebovits prepared a PPI memorandum, dated May 3, 2009, together with a letter from Lebovits's treating psychiatrist and a report from Robert Lloyd Goldstein, a

forensic psychiatrist, [redacted] PPI Memo (Pl. Ex. 8).

154. The memorandum stated the following: [redacted] *Id.* at 4.

155. The memorandum further stated: [redacted] *Id.* at 6.

156. According to Dr. Goldstein: "Mr. Lebovits is currently accused of multiple counts of charges of Sodomy, Criminal Sexual Act., Sexual Misconduct, Sexual Abuse, and Endangering the Welfare of a Child. The victims were underage boys. The sexual acts were all consensual without force or coercion. Mr. Lebovits's deviate sexual behavior was compulsive in nature. He had difficulty resisting temptation and controlling his sexual impulses at the time. The relief and gratification his behavior afforded him were short-lived and quickly followed by extreme guilt, contrition, and depression at his loss of control." Dr. Goldstein Report (Pl. Ex. 9) at 4-5.

157. Counsel for Lebovits provided the PPI to Gregory. Gregory Tr. at 97:2-98:22.

158. Gregory discussed the PPI with Jaus. *Id.* at 102:25-103:13; 105:22-106:5.

159. The offer did not change after the PPI was submitted. Feinstein Tr. at 84:19-85:14.

160. Hynes was personally unwilling to reduce the offer to a non-jail disposition. *Id.*

161. In November 2009, M.T. told Gregory that he was ready to testify at Lebovits's

trial, which was due to begin the following month. Gregory Affirmation (Pl. Ex. 10), ¶ 11.

162. Later that month, Gregory and Litwin each received a call from an attorney named John Lonuzzi, informing them that M.T. was no longer cooperating with the Lebovits prosecution. Gregory Affirmation, ¶ 12; Litwin Affidavit (Pl. Ex. 11), ¶ 8.

163. Lonuzzi was the president of the Brooklyn Bar Association and Moshe Friedman's personal attorney. Lonuzzi Tr. (Pl. Ex. 12) at 26:14-27:5; 46:13-23.

164. Gregory spoke to Hynes and Feinstein about Lonuzzi's call and M.T.'s non-cooperation. Gregory Tr. at 259:10-260:3.

165. Some months later, M.T. called Litwin and asked to meet him; he told Litwin at a meeting the next day that "someone else had retained Mr. Lonuzzi but that he did not know who," "he had been pressured and that he was afraid to say what had happened," and "had been told not to talk to [Litwin] or to go to the District Attorney's Office." Litwin Affidavit, ¶¶ 9-10.

166. Litwin wanted M.T.'s "non-cooperation to be investigated by him or by an ADA but [Sex Crimes Bureau Chief] Rhonnie [Jaus] said no." ADA O'Donnell Notes (Pl. Ex. 13) at 14.

167. After Lebovits was tried and found guilty of abusing Y.R. in March 2010, Hynes met with Gregory, Jaus, Feinstein, and possibly others; they discussed the trial and the remaining cases against Lebovits and Hynes was told that M.T. was no longer cooperating. Gregory Tr. at 221:3-222:4; 258:18-259:8.

168. On April 27, 2010, Aidala met with Michael Vecchione, Chief of the KCDA Rackets Division ("Rackets"), and later that day met with two detective investigators, who interviewed Chaim Lebovits, another one of Baruch Lebovits's sons. Rackets Memo (Pl. Ex. 14).

169. Chaim Lebovits claimed that his family had been approached by Plaintiff and an

individual named Simon Taub with an offer to "make the case [against Lebovits] go away" for a fee, and further claimed that a separate effort was being made to extort Meyer Lebovits in respect of abuse that Meyer had perpetrated against one of Taub's sons. *Id.*

170. Taub had abandoned the effort as to Meyer Lebovits after it was brought to public attention, *id.*, and reported by Plaintiff to Litwin. Kellner Tr. 3/16/23 (Pl. Ex. 15) at 38:12-39:14.

171. On May 5 and 6, 2010, Aidala met with Hynes. KCDA Visitor Log (Pl. Ex. 16).

172. Aidala regarded Hynes and Vecchione as friends and mentors. Aidala Tr. (Pl. Ex. 17) at 62:5-19.

173. On May 10, 2010, an investigation was formally opened by Rackets. Case Tracking Report (Pl. Ex. 18).

174. Hynes specified for the Lebovits family and their representatives exactly which kinds of evidence his office would need to arrest Plaintiff. New Yorker article (Pl. Ex. 19) at 22.

175. On May 24, 2010, Meyer Lebovits met with a Rackets detective investigator and told her about his recorded conversation with Plaintiff. Rackets Memo 5/25/10 (Pl. Ex. 20).

176. In June 2010, Rackets obtained a translation of the recorded conversation prepared by Rina Neeman. Neeman Translation (Pl. Ex. 21).

177. According to the translation, Plaintiff stated that he did not want to drop his son's case; was asked, "So you want to settle?" by Meyer Lebovits; responded "No! Not settle"; and stated that he wanted Baruch Lebovits to plead guilty in respect of his son. *Id.* at 24-25.

178. Gregory prepared a memorandum dated June 3, 2010, addressed to Jaus, in which Gregory stated her belief that M.T.'s "decision to no longer cooperate with the case was caused by pressure from Hasidic Community," and noted that her office had been informed by various

individuals that M.T. had been paid to drop out of the case. Gregory Memo (Pl. Ex. 22) at 2.

179. On July 7, 2010, Taub was arrested. Rackets Memo 7/20/10 (Pl. Ex. 23).

180. According to the KCDA review of Plaintiff's case in 2014, "there is not a scintilla of evidence which indicates that Kellner engaged in any conversation, meeting, or any other activity that would link him to Taub's plot." ADA O'Donnell 3/4/14 Memo (Pl. Ex. 24) at 3.

181. Robert Mladinich, a private investigator, was hired by counsel for Lebovits. Aidala Tr. (Pl. Ex. 17) at 73:11-14.

182. In affidavits affirmed before Mladinich, M.T. claimed that Plaintiff paid him $10,000 to falsely allege he had been abused by Baruch Lebovits (Pl. Ex. 25), and Moshe Friedman claimed that Plaintiff asked him to negotiate on his behalf with the Lebovits family (Pl. Ex. 26).

183. Jaus sought and received approval from Feinstein and Hynes to dismiss the cases against Lebovits relating to M.T. and P.K. Feinstein Tr. (Pl. Ex. 6) at 49:8-50:11; 53:19-54:13.

184. The Sex Crimes Bureau ("Sex Crimes") prosecutors were constrained to dismiss the charges against Lebovits relating to M.T. after "he became uncooperative under highly suspect circumstances" and "later recanted his claims of [Lebovits's] sexual abuse." ADA Anthea Bruffee Tr. (Pl. Ex. 27) at 82:5-83:11.

185. On August 6, 2010, at a meeting with Vecchione and counsel for Lebovits, Batsidis was given various affidavits, including the M.T. and Friedman affidavits, and an affidavit from Sholem Weisner (Pl. Ex. 28), at the time a known con man (New York Post article, Pl. Ex. 29), who claimed Y.R. told him that Y.R. and Plaintiff were engaged in an effort to extort money from Lebovits, and that Y.R. had falsified the extent of his abuse. Batsidis Timeline (Pl. Ex. 30) at 7.

186. Batsidis was instructed by Vecchione to contact Mladinich and schedule interviews

for Friedman, which occurred on August 13, 2010, and M.T., which occurred on September 15, 2010. *Id.*

187. Batsidis subsequently noted that Plaintiff's case had been "resurrected by the Lebovits lawyers with the affidavits they gave us and their investigator was escorting witnesses and potential witnesses to Kings County District Attorney's Office." *Id.* at 21-22.

188. On November 24, 2010, Rackets received a translation by Ruth Kohn of the recorded conversation between Plaintiff and Meyer Lebovits. *Id.* at 9; Kohn Translation (Pl. Ex. 31).

189. On November 29, 2010, Vecchione instructed Batsidis to "have [Detective Green-Jones] coordinate with Bob [Mladinich]" to "come up with [Y.R]." Vecchione Email (Pl. Ex. 32).

190. On December 1, 2010, Y.R. was interviewed by Rackets "regarding allegations that he lied at the Baruch Lebovits trial," and stated that he was abused by Lebovits; was not paid for his testimony; and that his testimony was truthful. Rackets Memo 12/2/10 (Pl. Ex. 33).

191. Weisner was told by Rackets to continue his interactions with Y.R. Meyer Lebovits Interview Notes 2/25/14 (Pl. Ex. 34) at 11.

192. A trip to Florida was arranged, on which Y.R. was lured with the pretense of making a movie about his life, where he was subjected to videotaped efforts to implicate Plaintiff and undermine the Lebovits conviction. O'Donnell Memo 3/4/14 (Pl. Ex. 24) at 2.

193. Photographs were provided to Rackets of the Florida trip. Det. Green-Jones Tr. at 79:10-80:20 (Pl. Ex. 35).

194. On January 20, 2011, Aidala sent Vecchione a draft copy of papers in support of a motion to vacate the Lebovits conviction. Aidala Email (Pl. Ex. 36).

195. Sex Crimes was not made aware of the planned motion. Bruffee Tr. (Pl. Ex. 27) at 228:12-22.

196. On March 15, 2011, counsel for Lebovits met with Vecchione and Batsidis and provided them with purported excerpts from the Florida tapes. Batsidis Timeline (Pl. Ex. 30) at 10; Florida Tape Excerpts (Pl. Ex. 37).

197. On March 16, 2011, counsel for Lebovits sent Sex Crimes a copy of an application for his release on bail pending appeal of his conviction. Bruffee Email (Pl. Ex. 38).

198. Shortly after Sex Crimes received a copy of the bail application and became aware of the existence of the Florida tapes, meetings were arranged with Feinstein and Hynes to challenge the false narrative about the Lebovits conviction being advanced through Rackets. Bruffee Tr. (Pl. Ex. 27) at 41:17-44:11; Jaus Tr. (Pl. Ex. 39) at 157:7-159:2.

199. Hynes asked Vecchione to attend the meeting. Bruffee Tr. at 44:12-16.

200. Hynes directed Vecchione to continue Rackets' investigation into Y.R. Jaus Tr. at 157:7-15.

201. There was never a time that Feinstein believed that M.T. and Y.R. were not genuine victims of Lebovits. Feinstein Tr. (Pl. Ex. 6) at 56:7-57:15.

202. On March 24, 2011, after Batsidis interviewed Y.R. again, Vecchione told Batsidis that a decision had been made to "indict [Plaintiff] & see if Y.R. comes round." Batsidis Tr. (Pl. Ex. 40) at 172:2-173:5.

203. The Grand Jury evidence in Plaintiff's case consisted of testimony from four witnesses: M.T., Friedman, Meyer Lebovits, and Gregory. Grand Jury Evidence (Pl. Ex. 41).

204. The 2009 recorded conversation between Plaintiff and Meyer Lebovits was not

provided to the Grand Jury. *Id.*

205. The PPI memorandum (Pl. Ex. 8) and the Goldstein report (Pl. Ex. 9) were not disclosed to the Grand Jury. *Id.*

206. Meyer Lebovits testified that Plaintiff sent him various "messengers" to demand that the Lebovits family pay him off in return for which Plaintiff would ensure that P.K., Y.R., and M.T. would not testify against him at trial, and that, during the recorded conversation in May 2009, Plaintiff re-iterated this demand and stated that Y.R. and M.T. "will not come to testify if I give him the money that he is asking for." Lebovits Testimony (Pl. Ex. 42) at 19:4-21:6.

207. On April 12, 2011, after the Grand Jury voted to indict Plaintiff, he was arrested and taken into custody. Vecchione Email (Pl. Ex. 43); Batsidis Timeline (Pl. Ex. 30) at 11.

208. On April 14, 2011, Justice Barry Kamins, administrative judge for the criminal courts of New York City, emailed Hynes to let him know that he had spoken with Justice Leventhal, before whom Lebovits had made a successful application for release on bail pending his appeal, and Justice DiMango, the trial judge. Hynes Email (Pl. Ex. 44).

209. In September 2011, ADA Bruffee sent a proposed opposition to an application by Lebovits to expand the conditions of his bail to Feinstein; expressed the hope that she could convince Hynes to oppose the application; and asked for permission to refer to Dr. Goldstein's report since "[Lebovits's] admissions in the report are highly relevant to the threat he poses to the community, should the court give him unrestricted access." Bruffee Tr. (Pl. Ex. 27) at 103:9-104:15; Bruffee Emails (Pl. Ex. 45).

210. By letter dated July 2, 2013, counsel for Plaintiff sought disclosure of information from the KCDA about Lebovits's willingness, prior to M.T.'s non-cooperation, to plead guilty in

respect of offenses committed against M.T. in exchange for an agreeable disposition, noting that "the withholding of information to this effect would constitute a grave violation of your Brady obligations" and "would show knowledge on the part of your office that [M.T.] was a genuine victim of Baruch Lebovits and that, when he testified to the contrary in front of the Grand Jury that indicted my client as a result, he committed perjury." Kellner Letter (Pl. Ex. 46).

211. Hynes was personally involved in drafting a response to the letter, which included personally making revisions. ADA Joe Alexis Email (Pl. Ex. 47).

212. The responsive letter dated July 5, 2013 (Pl. Ex. 48) stated only that counsel for Lebovits "informally" proposed a non-jail disposition.

213. The existence of the PPI memorandum, the Dr. Goldstein report, and letter from Lebovits's treating psychiatrist were not disclosed in the July 5, 2013 letter. *Id.*

214. The KCDA also failed to disclose that Rackets, in the fall of 2012, "were made aware of allegations that the Leibovits family paid [M.T.] to testify in the [Kellner] grand jury," and that they obtained, in October 2012, proof of monthly payments to M.T.'s father made by Zalman Ashkenazi, a brother of Beryl Ashkenazi, who was the sole defense witness at Lebovits's trial. Batsidis Email 6/19/13 (Pl. Ex. 49); Checks (Pl. Ex. 50); Batsidis Tr. 207:16-208:25.

215. On March 7, 2014, following a review of Plaintiff's case after Hynes was voted out of office in 2013, the case was dismissed. Court Transcript (Pl. Ex. 60).

Dated: New York, New York
October 8, 2024

Niall MacGiollabhuí

NIALL MACGIOLLABHUÍ, ESQ.
171 Madison Avenue, Suite 305
New York, NY 10016
Tel: (646) 850-7516
Email: niallmacg@macglaw.com