# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------X

SAMUEL KELLNER,

PLAINTIFF,

-against-            Case No.:
17-cv-1268

THE CITY OF NEW YORK and
PATRICIA L. HYNES, Administrator of
the ESTATE OF CHARLES J. HYNES,

DEFENDANTS.

-------------------------------------------X

DATE:  January 25, 2023
TIME:  11:16 a.m.

VIRTUAL DEPOSITION of the Plaintiff, SAMUEL KELLNER, taken by the Defendant, pursuant to an Order and to the Federal Rules of Civil Procedure, held at the above date and time, before Julie Parisi, a Notary Public of the State of New York.

A P P E A R A N C E S:


LAW OFFICES OF NIALL MACGIOLLABHUI, ESQ.
          Attorneys for the Plaintiff
          171 Madison Avenue
          New York, New York 10016
          BY:  NIALL MACGIOLLABHUI, ESQ.
HON. SYLVIA O. HINDS-RADIX
NEW YORK CITY LAW DEPARTMENT
CORPORATION COUNSEL
          Attorneys for the Defendants
          100 Church Street
          New York, New York 10007
          BY:  SUSAN SCHARFSTEIN, ESQ.
          File #:  2017-018324
       Control #: 23-0246
                    *          *          *

communications generally, it's just a yes or no question.  I'm not asking about the substance of communications.

MR. MACGIOLLABHUI:  Okay.

Q. Do you want to change your answers, Mr. Kellner?

A. Same answer.

Q. Have you ever been known by any name other than Samuel Kellner?

A. Shloma Aron, my Jewish name.

Q. Can you spell that for the Court Reporter, please?

A. S-H-L O-M-A and the second name is A-R-O-N.

Q. Any other name?

A. No.  Mr. Kellner.

Q. What is your highest level of education?

A. I went through all of the Jewish classes, I don't know when I was in high school or college, I have no idea. I went through, I finished everything and I start when I was a kid so I went through everything.

Q. Is it fair to say your entire education was at religious institutions?

A. Yes.

Q. Yeshivas?

A. Schools and Yeshivas.

Q. Do you have the equivalent of a college degree?

A. Probably.

Q. But you don't have a formal degree from an institution?

A. Right.

Q. So did you go to school continuously when you were a young man?

A. Yes.

Q. What age were you when you stopped your schooling?

A. Twenty five.

Q. Did you study full-time until you were about 25?

A. Full-time, full-time that the Yeshiva required.

Q. What was the last yeshiva that you attended?

A. Satmei.

Q. I didn't hear it, could you spell it?

A. S-A-T-M-E-I.

Q. Was all of your schooling here in the United States?

A. Yes.

Q. Was it here in New York?

A. In New York and Westchester.

Q. Any particular town in Westchester?

A. Mount Kisco.

Q. After you were 25 did you continue to study?

A. Let's say an hour a day. Just like it shouldn't

go by a day that I don't study so when I had time it was two hours.  I'm still doing it till today.

Q.    Has all of your education been of a religious nature?

A.    No, we learned how you're owner of a place, what happens someone disagrees about ownership, we learned about if someone sins what's the punishment, we learned which are the things that is permitted on Shabbos or not permitted on Shabbos.  A full range of all of the Jewish laws.

Q.    So you studied Jewish laws?

A.    Right.

Q.    And you continue to study the Jewish laws to this day?

A.    Correct.

Q.    Have you ever -- you want to finish your answer?

A.    Right, because, you know, Jewish law is usually at the end, so there is a start and end.  Let's say saying this is, then it gets discussed I'm now at a time that I'm studying just the basics, just the basics, not what goes next.  How do you punish them and who is allowed to punish, those things.

Q.    Have you ever taken classes that are the equivalent of a secular education in the United States such as English, math, social studies?

A.    Yes, English, math.

Q.	When did you last study those secular subjects?

A.	Probably when I was ten, twelve, that year of age.

Q.	How long have you lived in Brooklyn?

A.	Constantly all my life.  I may have gone two weeks here, a month here, a month there but constantly I lived all my life in Brooklyn.

Q.	So that's your primary residence?

A.	Correct.

Q.	Have you ever had a secondary residence?

A.	What, when I had -- what is a secondary?

Q.	Have you ever had a second home?

A.	Not when I had one home I moved, but not in the same time have another home, right.

Q.	Have you ever lived anywhere else in the New York area other than Brooklyn?

A.	Except for vacation, no.

Q.	Do you have any specialized non-religious training?

A.	English, math and probably history a little bit.

Q.	Those were classes that you took in the yeshiva?

A.	As I told you till ten, twelve.

Q.	What languages do you speak?

A.	My primary language is Yiddish, my secondary is English, my father and mother talked Hungarian so I

what's going on. Sitting in people's succah, S-U-C-C-A-H, what is he a religious guy, what is he doing. But that's between me and God, I just found it funny.

Q. So at some point you learned that one of your children had become a victim of sexual abuse, correct? You have to answer out loud for the Reporter.

A. Correct.

Q. When was that?

A. Two days after the incident or maybe one day.

Q. Can you place it in time at all, month, year?

A. Which it was in back -- 15 years ago, it was '08.

Q. 2008?

A. Right.

Q. How did you learn of what had happened to your son?

A. My wife told me the next morning that Victim 2 confided to him that he was -- I have no idea what he did, I wouldn't care because I would have been out of control. The next thing I know it's either the next night as he comes home from yeshiva and he tells me that, you know, he tells me the whole story and he went to the --

Q. You learned it first from your wife?

A. From my wife.

Q. And I'm just going to ask you to please not refer to your son by name in relation to any sexual abuse.

MS. SCHARFSTEIN:  And I'm going to ask that, Niall, will you stipulate that the Reporter can substitute Victim 2 for the name?

MR. MACGIOLLABHUI:  Yes, so stipulated.

Q. So you first learned about it from your wife, what did she tell you?

A. That it happened a very bad thing to my son, he came home and told her that Lebovits had done a terrible thing.  She didn't tell me what and to this day promise I don't know what.  And I said why didn't he jump out of the car.  He said --

Q. We're talking about the conversation you had with your wife so --

A. I asked my wife, I asked my wife, I said why didn't he jump out of the car.  My wife said something that had kids lock on, I really don't recall, you could ask her.  So Victim 2 thought this was a closed door and I said so he couldn't defend himself.

Q. Did your wife tell you what Victim 2 told her had been done to him?

A. No, I said please don't tell me, please.

Q. What was your thinking, why didn't you want to know?

A. I would go crazy.

Q. But you knew of the general nature, right?

Q. Joseph Kellner?

A. Right.

Q. Does he work in law enforcement?

A. No.

Q. So he was just someone you called because you trusted and wanted --

A. He knows everything, somehow he knows everything. So I told him something bad happened with my son, where do I go. He said -- that was the first time that I heard about the Vaad Hatznius, that I was supposed to go there.

Q. This is the Modesty Council?

A. There is where you must go.

Q. You were familiar with the Modesty Council before he told you?

A. I knew it, I knew that these are the people that just recycle these people, you know. Everyone had a good laugh, if there would be a mixed wedding they would show up, if a lady would have the man -- what is it called, the lady figure on the store to put on the dress, he would be there. Any kind of -- if anyone opened -- the lady would open a manicure pedicure they would close it down, it's sick.

Q. So just to be clear, this is a council that deals with allegations of sexual impropriety?

A. This is the most proper word, the taliban police.

Q. What is their mission?

A. Their mission is everything in tzinius, in modesty is their field, whatever, someone raped a woman, someone raped a kid, someone opened a store, someone had a mixed wedding, all of these things have to do with sexual they were the ones. And if you give me a minute I'll explain to you just because I explained to you before. We come from Hungaria so they had that thing that the rabbi had an enforcer, you know, probably the butcher man someone, and when the rabbi knew that something going on suspicious he send that guy, telling him if he doesn't stop it we'll make him stop it. So this was always in the Hungarian tradition. But what happened is here in the United States it wasn't one story a month, it was everyday. So these people didn't have another job, like it happened. So, now these were people that were paid, and again if you want to deduct my time deduct it otherwise I have no problem. George Pataki, just so you understand, George Pataki wanted to send up the girls from the girls' school, they should make calls, he's running for governor. And George Pataki called his friends Mr. Frine (phonetic), Mr. Menzer (phonetic) that he wants to get a phone bank and he doesn't have money, so he wants to take the girls from Satmar. So he was told he could do it, but only with permission from Vaad Hatznius. It was written in an

article and he went there and he got their permission, so this is how it looks. The governor needing something he had to go to Vaad Hatznius.

Q. But going to our situation your brother Joseph recommended that you contact them because they deal with matters involving sexual improprieties?

A. Yes.

Q. And so did you approach Vaad Hatznius?

A. I got his number, he gave me a name, I looked it up in the phonebook and I found the guy, I called him up, I said I want to talk to you.

Q. Do you recall his name?

A. It's Yisrul, Mr. Krauzs, Yisrul Duvid Krauzs or something like that, Y-I-S-R-U-L  D-U-V-I-D  K-R-A-U-Z-S.

Q. So you called him?

A. I called him, he says tell me what happened, I said not over the phone. So he tells me that he has an office on Keap Street and he wants me with my son to go there Friday. But this thing probably happened middle of the week Tuesday, Wednesday, I don't recall, but it wasn't Friday. So he said but I need to talk to your son in person, I said fine, you can talk to him. So he probably asked, probably, asked for what happened, I don't know. They were inside for quite a while then all of a sudden I see my son Victim 2 walking out, he was so disturbed. I

said what, don't tell me that he told you -- don't tell me that he did anything bad, no, he said this guy has a stupid idea that they're going to call Mr. Lebovits and they're going to tell Mr. Lebovits, because he's ignoring their calls for the last 20 years, whenever they had a problem I'm not calling you, what would you do, so he was not even listening. So now we have a case this guy is about to go to the police so if you want to save your ass, I'm sorry, come here. And he's going to do that. The plan is when he comes Victim 2 should be there and slap him and cut down his beard.

Q. Comb out his beard?

A. Cut off his beard. And my son says I'm not going to touch this guy, I don't want to see him anymore, I'm not going to slap him no person that is 67 years. But after -- so I said going to the car, I was about to go into Mr. Krauzs' office ask him what this is all about Mr. Krauzs came out, and I said, listen, do you know the guy that did it he said yes, do you know he's a molester, yes. So you really think that he was molesting because he has a beard and we're going to cut it off and the molesting is going to go away, just explain to me what, you know, what is the -- my son is going to slap him and that will make his urge go away.

Q. Okay, just to sum up, Mr. Kellner, you were not

Q. And did Mr. White prevent you from going to the DA's office?

A. Prevent me, right now he said he needs to get a heter himself.

Q. But do you have to listen to him or can you go directly to the DA's office?

A. I was trying getting in directly it doesn't work, so what am I supposed to do now, how do I get into that office. So now Vaad Hatznius told me how to get into that office, and now I have a problem with Usher White needs a heter. But I was lucky he went into a different office all the way on the --

Q. But at some point you did get to the DA's office, right?

A. Right, Hanna White -- he took me to Hanna White and Hanna White was the one who handled the case and she wanted to know, you know, details some details not what happened, you know, some details. And she said let me tell you something, all you people back out and now I'm going to do a thing that I really, I don't think I should have done, because the DA is limited with funds. We can't waste our funds people backing out. I said, Hanna, I'm going tomorrow, you just tell me I'll never back out, they hurt my son. Good. You have a heter, yes, she took me down to the 14th floor and Usher came along, the lawyer that I had,

he came along and we all sat there. A person comes out, we were sitting in the waiting room, and he says my name is Chris Laline I'm ADA I want to talk to Victim 2. Usher White stood up he wanted to go in and the lawyer told him take a seat, you're not coming in, I'm the lawyer, you're not coming in. So he was there with my son for quite a while and then he says --

Q. Mr. Kellner, the point is you did get to speak to an ADA?

A. Yes.

Q. And the Modesty Group and Mr. Usher facilitated that, they put you in touch with ADA Laline, correct?

A. Correct, to Hanna and Hanna put me in touch to Chris Laline.

Q. And Hanna White explained to you that the DA's office had limited resources and they were interested in letting the victim and their families know what was involved so that they would only go forward forewarned and if they were serious about it?

A. If they're serious about it.

Q. So now you're in touch with the ADA, which was your goal the entire time, and the ADA spoke with your son, correct?

A. Correct. Then he calls me in.

Q. And then you spoke with the ADA?

that the DA's office did not want to proceed because the charges were misdemeanor what steps did you take next?

A. I called Vaad Hatznius, the Modesty Group, and I told them well, you know, you told me this is the way he's going to get arrested, but he's not, what do I do now. Is he going to walk just like that by molesting my son. They all said they'll work it out with Hanna. So a few days later I got a call from Hanna and she tells me it's a very bad guy, we'll get all the support it's a very, very bad guy. And she has a friend by the name of Steve Litwin, which bon appetite.

Q. So she put you in touch with Detective Litwin?

A. With Steve Litwin, right.

Q. So the next thing that happened was you had a conversation with Detective Litwin?

A. And then he spoke to Victim 2 and they were in for a long time and he comes out and he said sadly I must conclude, I'm not going to be able to pick up this man. Because the DA -- I spoke to Chris Laline the DA is not going to take the case no matter if he come through me or no matter this. And I would explain, I think he is the one that explained, you know, they're not going to say that a man is so bad when there was no complaints against him till 60. And I said the way I heard it this is a very bad guy.

Q. Meaning there had been other complaints?

A. Right. So he said I'm a detective and I can tell you the way I spoke to my -- to Victim 2 this guy has no fear. There was other kid in the car and so this guy is a serial rapist. All you have to do is go out on the street you'll find a witness, you could do it. I said, Steve, I've never done this in my life, I have no idea how to do it.

Q. Okay, but the point was Detective Litwin was telling you that --

A. He gave me some hints go look at the kids off the derech, go look at the cuckoos those are usually the victims from everything, I should go there. I said I got no name, I got no nothing but he said that's the only way.

Q. The substance of what he was telling you what, that he needed victims of more serious offenses?

A. Serious, he needed more victims because this is the first complaint against this person. We didn't discuss misdemeanor, felonies, your son comes in the man is 60 years of age, I mean come on. He never said -- the way I understood it was going to be two, three other people complaining, it's going to be a guaranteed thing even if he's 60 years of age, that's the way I understood it.

Q. But the point is there needed to be additional victims and then the DA's office will consider prosecuting?

A. Not consider, he gave me a promise that he's

going arrest him, no matter what Chris Laline thinks he's going to arrest him.

Q. Did he tell you how many more victims were needed?

A. He said let's start with one, I'll talk to that one and we'll see.

Q. Did Detective Litwin give you any explanation as to why he wasn't going out looking for victims himself?

A. In our community who's going to talk to him.

Q. Did he say that or are you saying that now?

A. He told me I don't think so on this and all different cases my lawyer told me not to get involved now, he told me, I'm sorry, I can't do that, I go into your community I can't do that.

Q. So you understood that you were a member of the community and it would be easier for you to get information?

A. Not easier only possible, the only possible way.

Q. So what steps did you take to get more information?

A. I called my brother who informed the rabbis no matter how much I tried, you know, obviously whatever reason I'm still zero, I came up with a big zero. I went to the police, I went to this. So the Vaad Hatznius told me to call Hanna again.

Q.    You spoke to the Modesty Group again about the additional victims?

A.    Right.

Q.    And were they helpful or unhelpful?

A.    They provided the name to Rabbi Flohr.

Q.    I didn't hear you, a name to who?

A.    Rabbi Flohr, the one that gave me the heter.

Q.    F-L-O-H-R?

A.    F-L-O-H-R.

Q.    Did Ms. White give you the names of any victims?

A.    No, but she told me she's aware.

Q.    Did she tell you that she would communicate the names of the victims to Detective Litwin?

A.    Yes.

Q.    Do you know if she came up with anyone other than Victims 1 and 3?

A.    Other than these two victims, no.  These two -- Victim 1, what she said she knows, obviously Vaad Hatznius gave us for both of us.

Q.    They gave you what?

A.    Victim 1.

Q.    So you learned of Victim 1 and Victim 3 from Vaad Hatznius?

A.    Victim 1 completely from Rabbi Flohr.  They gave it to Rabbi Flohr and Rabbi Flohr gave it to my brother.

My brother calls me up and he says, listen, I have a kid the name is Victim 1, I don't know his first name, I don't know anything. I know they live on 60th Street by 15th Avenue.

MS. SCHARFSTEIN: Can we stipulate to have the Reporter replace the name with Victim 1?

MR. MACGIOLLABHUI: Yes.

Q. So you learned of Victim 1 from Rabbi Flohr?

A. Right.

Q. And where did you learn the name of Victim 3?

A. Victim 3 is I was up at Assemblyman Dov Hikin's office, D-O-V H-I-K-I-N, assemblyman in our district.

Q. And you learned of Victim 3's name from Dov Hikin's office?

A. Yeah, I saw it.

Q. Did anyone in particular there give you the name?

A. No, but they had the file. We were talking to Dov at that time and he said that he's very busy now we should go talk to Dov Cohen. And he was taking out a file and I think so there was a list of names and I saw it and I double checked it with Vaad Hatznius and, yes, this is the name.

Q. Did you have any relationship with Dov Hikin?

A. Before this case, no.

Q. So how did you get access to him, did you walk

question read back.

(Whereupon, the referred to question was read back by the Reporter.)

I think the question has been answered so let me go onto the next one.

Q. And the brother you're referring to his first name is Simcha?

A. Simcha, S-I-M-C-H-A.

Q. And so you eventually met with Victim 1, right?

A. He told me that it's his brother and the only thing that he could tell me is they live -- and he gave me the address. And he says he's pretty standard with times he comes home 6:00 to eat, he goes out 7:00. But one thing make sure don't bother him when my father see because my father is going to be afraid of those things. So make sure -- so it was actually him sending me to talk to his younger brother.

Q. So you spoke to Victim 1 at some point?

A. Right I found Victim 1, right.

Q. And he indicated to you that he had been a victim of Mr. Lebovits?

A. No. I told him that we need him for an event otherwise I'm not -- how do I come to a person speak about a victim. And as he sat in my car this kid was shaking, shaking. I said what's going on and he said I have a

terrible past, a terrible past and I said in what nature, he says in not having a school, not having friends and being molested. I said if it bothers you did you do anything, did you go to the rabbis, did you go to that. He says he's afraid, you know, they're going to blame him and, no, he did not go to no one. I said if I refer you to a police officer would you talk to him. He said what kind, a Jew, I said, yeah, Jewish. He said, okay, and to this day I don't know what Mr. Lebovits did to him.

Q. So you referred him to Detective Litwin?

A. Right.

Q. And you got to have a conversation with him by inviting him to an event?

A. Not inviting him to make him -- he was a handyman that's what he told me, and I said they need a handyman to build a stage, to build things, you know, big rabbis wedding that's what I started up with.

Q. So you got to know him and then you had this conversation?

A. Right.

Q. And he agreed to go see Detective Litwin?

A. One hundred percent.

Q. And you went with him to Detective Litwin?

A. Might be, sounds right.

Q. You're not sure?

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------X

SAMUEL KELLNER,

PLAINTIFF,

-against-          Case No.:
17-cv-1268

THE CITY OF NEW YORK and
PATRICIA L. HYNES, Administrator of
the ESTATE OF CHARLES J. HYNES,

DEFENDANTS.

-----------------------------------------X

DATE:  January 30, 2023

TIME:  10:38 a.m.

CONTINUED VIRTUAL
DEPOSITION of the Plaintiff, SAMUEL KELLNER,
taken by the Defendant, pursuant to an Order
and to the Federal Rules of Civil Procedure,
held at the above date and time, before
Julie Parisi, a Notary Public of the State
of New York.

A P P E A R A N C E S:


LAW OFFICES OF NIALL MACGIOLLABHUI, ESQ.
        Attorneys for the Plaintiff
        171 Madison Avenue
        New York, New York 10016
        BY:  NIALL MACGIOLLABHUI, ESQ.
HON. SYLVIA O. HINDS-RADIX
CORPORATION COUNSEL
NEW YORK CITY LAW DEPARTMENT
        Attorneys for the Defendants
        100 Church Street
        New York, New York 10007
        BY:  SUSAN SCHARFSTEIN, ESQ.
        File #:  2017-018324
        Control #:  23-0298


                *         *         *

your son?

A. Before my arrest?

Q. We're talking about your son now, we're not talking about your arrest or prosecution.

A. I'm saying before my arrest I did not.

Q. When you spoke with Hanna White did Mr. Hynes participate in that conversation?

A. No.

Q. When you spoke with Usher White did Mr. Hynes participate in that conversation?

A. No.

Q. When you spoke with Chris Laline, Assistant District Attorney Laline, did Mr. Hynes participate in that conversation?

A. No.

Q. When you spoke with Detective Litwin did Mr. Hynes participate in that conversation?

A. No.

Q. At some point you spoke with Ms. Gregory, correct?

A. I definitely spoke to her once in the presence of Rhonnie Jaus, Steve Litwin, Chris Laline and I requested a meeting and they came, but to separate maybe once but for a very short time.

Q. So there was a meeting and possibly a separate

detective and he worked with DNA unsolved cases and he had to be in Florida that's why he couldn't take me before because he had to collect DNA. But whatever the DA tells him to do he will do, he's doing it and was actually the DA referred me to him.

Q. When you say the DA who specifically are you speaking of, who referred you to Detective Litwin?

A. Hanna White.

Q. Do you have any reason to believe that DA Hynes was involved in that decision?

A. Guessing, for a fact I know nothing.

Q. I'm sorry, I didn't hear you, can you repeat that please?

A. Without guessing just what I know exactly, no, I don't know.

Q. How many times did you communicate with Rhonnie Jaus about your son's case?

A. Once.

Q. That was in the meeting you described a little earlier?

A. Right.

Q. And when did that meeting take place?

A. Can I give a two-minute answer?

Q. Well --

A. They were all --

Q. I'm just asking you when, do you know when it took place?

A. No, that's what I'm trying to say. After it was money thrown around on the streets for every case I begged them I want to come in. And I said, listen, thank God these peoples are coming forward, please stop the obstruction and she said she will.

Q. Can you tell me when the meeting took place, do you remember what year it was?

A. Before my arrest.

Q. Years before your arrest, months before, something else?

A. Yeah, it was definitely more than one year but it was before Lebovits' arrest too and before his conviction.

Q. So what do you mean by money thrown around on the streets, were people attempting to bribe you, is that what you're referring to?

A. Me and another cases.

Q. So who offered you money?

A. For me?

Q. Yes, just give me a list of names, that's all I'm asking.

A. I know, but it might turn out, it might turn out for known for a fact Yidel Wolf, Moshe Friedman, and then I was called to a few Beth Din which I never, never attended.

Q. You were called to what?

A. I was called to those Beth Din.

Q. To those --

A. Beth Din, three rabbis.

Q. Did the rabbis offer you money?

A. I wasn't there, I didn't go. I said, listen --

Q. I'm just asking who were the individual who offered you money, you said Yidel Wolf and Moshe Friedman and I'm asking you if there was anyone else?

A. Not on this moment I could specifically under oath tell you.

Q. Did any --

A. Mr. Leifer, Mordechi Leifer, M-O-R-D-E-C-H-I L-E-I-F-E-R.

Q. How much money did Yidel Wolf offer you?

A. Whatever it's going to take.

Q. So he told you he would give you whatever amount of money?

A. Whatever it takes.

Q. To do what?

A. Get out of the case.

Q. Get out of -- get Baruch Lebovits out of the prosecution?

A. Out of the prosecution, right.

Q. Was that the prosecution related to your Victims

1, 2 or 3 or more than one?

A.    To me and to Victim 3.

Q.    So what information do you have, if any, that DA Hynes was involved in that offer?

A.    None.

Q.    So what did Moshe Friedman offer you, how much money?

A.    Whatever I needed, first 30,000 then he says whatever you need you could get it just get out.

Q.    And his goal was to stop the prosecution against Baruch Lebovits?

A.    Correct.

Q.    Related to any victim or victims in particular?

A.    To my son, I should get out with my son.

Q.    So Moshe Friedman was going to give you any amount of money that you wanted to stop the prosecution of Baruch Lebovits based on allegations made by your son, correct?

A.    Yes, but he said you're not going to get millions, fair enough.

Q.    Do you have any reason to believe that DA Hynes was involved in that decision for Moshe Friedman to make you an offer?

A.    No.

Q.    And then you mentioned Mordechi Leifer?

A.    Leifer.

Q.    How much money did Mordechi Leifer offer you?

A.    Four hundred thousand.

Q.    Four hundred thousand and when was that?

A.    That was before Baruch Lebovits conviction.

Q.    Can you place it anymore specifically in time?

A.    Under oath it would be very hard for me, it's after all three witnesses were in Victim 1, Victim 2, Victim 3 and I think so Victim 1 was already bought off. So it was me and Victim 3, so it was only Victim 2 and Victim 3 at that time.

Q.    So was that an in person conversation, a telephone conversation or something else in which Mr. Leifer offered you $400,000.00 to cease the allegations that led to the prosecution of Baruch Lebovits?

A.    Phone conversation.

Q.    It was a phone conversation, okay, so who called who?

A.    I don't even know.  His phone, he called me.

Q.    Did you know him from the community or somewhere else?

A.    No.

Q.    So he called you up on your landline or cell phone or something else?

A.    I don't recall.

Q.    What exactly did he say to you?

A.    He tell me that I need to get out of court but if I need damages they could give up to $400,000.00.

Q.    What did you say to him?

A.    Get lost.

Q.    Did you hear from him again?

A.    Yes.

Q.    How did that next communication come about, did he call you, did you call him or something else?

A.    No, now I put him in my contacts do not pick it up so I remember, but I wouldn't remember.  He send me an emissary, how do you say it, don't ask me on the minute I wouldn't --

Q.    Who was the emissary?

A.    On the memo there was so many people I would not under oath be truthful if I tell you name.

Q.    So you used a phrase on the minute?

A.    At the minute.

        MR. MACGIOLLABHUI:  At the minute, at the moment.

Q.    At the moment, oh, okay.

A.    At the moment, right.

Q.    When Yidel Wolf approached you and offered you money who, if anyone, did you report that to?

A.    I think I even referred to Steve Litwin

99 percent.

Q. But you're not certain of that?

A. I would have said 100 percent but I'm under oath I got to be much more, but 99 I did report everything to Litwin, so everything fits in, everything.

Q. So I'm asking you specifically about that conversation with Yidel Wolf and whether you reported it to anyone?

A. I reported it to Steve Litwin 99 percent, if not on the day the next day I reported everything to Steve Litwin.

Q. What did Detective Litwin say to you about that?

A. Thank you.

Q. Did you ask him to take any action?

A. Yes.

Q. What did you ask him to do?

A. Stop these people buying off witnesses.

Q. Did you know that Yidel Wolf had made any other offers to anyone besides you?

A. Yes.

Q. So who else did Yidel Wolf offer money to?

A. Victim 3.

Q. When did he do that?

A. I know I brought Victim Number 3 to Vaad Hatznius, they wanted to confirm his story, that's what

they told me.  And when he came out he told me he was offered money.

Q.     By Yidel Wolf or someone else?

A.     There was only Yidel Wolf and Victim 3.

Q.     How much did Victim 3 tell you that Yidel Wolf had offered him?

A.     I don't think he told me an amount.  The only time that I knew about amount is when he testified, I wasn't there, but when he testified at court that the person came up to his house with a bag $100,000.00 cash.

Q.     So you heard Victim 3's testimony in the trial of Baruch Lebovits?

A.     I heard it from people that attended.  I never attended Lebovits' trials.

Q.     So you had heard from other people that Yidel Wolf -- I'm sorry, Victim 3 had testified that Yidel Wolf offered him --

A.     A hundred thousand dollars.

Q.     Who told you that?

A.     From people who attended court and they just told me what happened in the court.

Q.     Can you say anyone in particular?

A.     No, not really maybe Rabbi Rosenberg.

Q.     How did you come in contact with Moshe Friedman when he offered you money in exchange for ceasing

cooperation with the prosecution?

A. He called me -- how he called me, he found me, he offered me a job.

Q. Did you accept it?

A. Yes.

Q. How much were you paid for that job, what was the compensation?

MR. MACGIOLLABHUI: Objection, asked and answered.

A. I was supposed to sell ads. He had a plan he has a paper he wanted to come up everyday of the week, right now he told me it's only once a week. So he needed a lot more advertisement from the not Jewish world, outside planes, credit cards, banks.

Q. Was this a job or was this the commission based work that we talked about last week?

A. Commission based work that I -- yeah.

Q. But it wasn't a job like with set hours and a salary?

A. No salary.

MR. MACGIOLLABHUI: Objection.

Q. So you were saying Moshe Friedman called you about the work and at what point did he offer you money in exchange for ceasing cooperation with the prosecution?

A. While I was there the second time or the third

time he called me into his office and that's how he offered me to drop the case for money.

Q. Speaking of your son's case or other victims?

A. I didn't ask him, I told him I'm not taking money.

Q. Was there a discussion about a specific amount?

A. I thought but I'm not sure, he spoke about 250.

Q. Mordechi Leifer, if I'm pronouncing it correctly, was he someone that you knew in the community?

MR. MACGIOLLABHUI: Objection.

A. No.

Q. So did you have control over Victim Number 1?

A. He backed out. Do I have control, I couldn't do nothing.

Q. Was there any time when you had control over him?

A. I hardly spoke to Victim Number One after I brought him to Steve Litwin by order from Steve Litwin.

Q. What did Detective Litwin tell you in that regard?

A. Sam, this is a serial rapist, trust me I want to have as many victims as possible. Go -- you could find, but, listen, I don't want you should have anything to do with the witnesses because you're going to be the common denominator who, in order to bring down the case, they're going to bring down you.

Victim 1 to Detective Litwin?

A. Yes.

Q. Which rabbi gave you permission?

A. Rabbi Flohr.

Q. Did you need permission to bring Victim 3 to Detective Litwin?

A. Yes.

Q. Was it always Rabbi Flohr who gave you permission?

A. It was a combination Vaad Hatznius told me they have a heter, and Rabbi Flohr knew that I didn't but he didn't stop me.

Q. Was Rabbi Flohr your personal rabbi?

A. After that, right.

Q. But at the time that you went to him for permission was he your rabbi?

A. No.

Q. So Vaad Hatznius gave you permission to bring Victim 3 to Detective Litwin, yes?

A. Yes.

Q. Why did you go to Vaad Hatznius to request permission for Victim Number 3?

A. Because why did I do because they severed the case and in my mind by adding Victim 3 to my son's case he wouldn't be the star witness.