# EXHIBIT 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------x
SAMUEL KELLNER,
Plaintiff,
Docket No.
- against - 17-cv-1268
THE CITY OF NEW YORK and PATRICIA L. HYNES, administrator of the ESTATE OF CHARLES J. HYNES,
Defendants.
---------------------------------------------x

Video Conference
April 26, 2022
9:45 a.m.

EXAMINATION BEFORE TRIAL of THE CITY OF NEW YORK, Defendant, by, AMY FEINSTEIN, taken by Plaintiff, pursuant to Federal Rules of Civil Procedure, and Order, held at the above-noted time and place, before Kristen McAlevey, a Stenotype Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

THE LAW OFFICE OF NIALL MACGIOLLABHUI
Attorneys for Plaintiff
171 Madison Avenue, Suite 305
New York, New York 10016

BY: NIALL MACGIOLLABHUI, ESQ.

NEW YORK CITY CORP COUNSEL
Attorneys for Defendants
100 Church Street
New York, New York 10007
BY: SUSAN SCHARFSTEIN, ESQ.

also conducting around this time an investigation into Samuel Kellner?

A. Yes.

Q. To go back to Plaintiff's Exhibit 181 --

A. Yes.

Q. -- at that time, Miss and Rhonnie had asked for your approval to dismiss the case against victim number two, right?

A. The case against Mr. Lebovits involving victim number two, yes.

Q. Excuse me, my apologies for being imprecise earlier.

And the approval that you gave them was that on your own behalf or on behalf of Mr. Hynes?

MS. SCHARFSTEIN: Objection.

A. On both of our behalves.

Q. In her deposition, Ms. Jaus used a particular phrase, which was and I'll quote front office approval, is that a phrase with which --

A. Sorry.

Q. -- which you're familiar?

A. FEINSTEIN

A. I've heard of it, yes.

Q. In this case, she and Ms. Gregory needed front office approval to dismiss the case against Baruch Lebovits involving victim number two?

A. I don't know if the word is needed, but yes.

Q. They had asked for it and received it, right?

A. Correct.

Q. Now, in terms of that form of approval and I'm using her phrase front office approval, in what circumstances is such approval or was such approval in 2010 sought?

MS. SCHARFSTEIN: Objection.

A. People a -- approval was sought on cases that the DA had an interest in, cases that had garnered a great deal of press coverage, in almost all homicide cases. There were lots and lots of cases that the district attorney signed off on dismissals.

Q. What was the procedure at that time for obtaining, again I'll use Ms. Jaus' phrase, front office approval?

A. FEINSTEIN

A. Didn't say that.

Q. Well, what does that mean as far as you can recall in terms of there being no impact on the Rackets investigation as a result of dismissing that particular case against Baruch Lebovits?

MS. SCHARFSTEIN: Objection.

A. It speaks for itself, in my opinion, that they spoke to Rackets and whether or not the case against Baruch Lebovits that involved victim number two, whether or not that was pending or not pending, would not have an impact on their investigation. There is nothing in this email, nor is there any recollection about the father's knowledge.

Q. I see.

Going back to Plaintiff's 178, so this is the email in relation to the case against Mr. Lebovits involving victim number one, right?

A. Yes.

MS. SCHARFSTEIN: Objection.

Q. And dismissal of that particular

A. FEINSTEIN

case also required, and again I'm using Ms. Jaus' phrase front office approval, right?

MS. SCHARFSTEIN: Objection.

A. Yes.

Q. It followed a similar procedure in terms of Mr. Hynes being made aware of the circumstances of that particular case at the time approval was being sought, right?

MS. SCHARFSTEIN: Objection.

A. It would have been -- I don't have a specific recollection, but yes, he would have been brought up to date.

Q. Now, at the time this case was dismissed, victim number one was no longer cooperating with your office, right?

A. Correct.

Q. And in terms of dismissing the case, withdrawn.

In terms of dismissing a case, a sex crimes case, in circumstances where the alleged victim was no longer cooperating, was it unusual for your office to dismiss such a case before the full 30.30 time had elapsed?

MS. SCHARFSTEIN: Objection.

A. I have no idea.

Q. Let me ask the question in a different way.

In sex crimes cases where the victim was or the alleged victim was not cooperating, did your office typically wait for the 30.30 time to elapse before the case was dismissed?

MS. SCHARFSTEIN: Objection.

A. I have no idea.

Q. Well, do you recall ever, other than this particular case, receiving a request from either Ms. Juas or Ms. Gregory to dismiss a pending sex crimes case for reasons of victim noncooperation before the full 30.30 time had elapsed?

MS. SCHARFSTEIN: Objection.

A. I have absolutely no recollection.

Q. In terms of victim number one specifically, what do you recall knowing at this particular time -- this is August 4, 2010 -- about the circumstances in which he ended his cooperation with your office?

A. FEINSTEIN

MS. SCHARFSTEIN: Objection.

A. I have no recollection of what I knew in 2010.

Q. Well, isn't it the case that with regard to, withdrawn.

In terms of victim number three, so this is the victim whose case went to trial, was there ever a time that you personally did not believe victim number three to be a genuine victim?

MS. SCHARFSTEIN: Objection.

A. I -- I don't understand the question, what the context of the question is. But, no, there is no reason -- there was never a time that I can recollect that I believed victim number three was not a genuine victim.

Q. When I refer to a genuine victim, I mean a genuine victim of Baruch Lebovits.

MS. SCHARFSTEIN: Objection.

A. My answer is the same, there was never a time -- I think we did two double negatives -- there was never a time that I believed that victim number three was not a genuine victim of Baruch Lebovits.

A. FEINSTEIN

Q. What about in relation to victim number two; was there ever a time in relation to him that you believed that he was not a genuine victim of Baruch Lebovits?

MS. SCHARFSTEIN: Objection.

A. I don't think I ever gave any thought to that particular question.

Q. Same question in relation to victim number one; was there ever a time in relation to victim number one that you did not believe that he was a genuine victim of Baruch Lebovits?

MS. SCHARFSTEIN: Objection.

A. No.

Q. Now, in terms of the investigation that was being carried out by Rackets into Sam Kellner, did you, while that investigation was ongoing, ever have occasion to discuss it with Mr. Vecchione?

A. Ever?

Q. Yes. So, the time period I'm referring to is prior to the indictment of Mr. Kellner in April 2011, prior to the indictment.

A. FEINSTEIN

Q. So the portion of page 6 that's headed the defendant's recognition of his problem, and then read it through the conclusion, which is on page 7 and 8.

A. Okay.

MS. SCHARFSTEIN: Objection, just going to note my objection to partially reading the document and then answering questions based on the document.

Q. What you're looking at now should be the same report I showed you previously. I want to ask you not about the report, but about the memo.

A. Sorry, I don't -- what's the memo?

Q. The memo, if you scroll up.

A. Oh, the memo the PPI, the submission?

Q. Yes, exactly.

A. Okay.

Q. So my first question is this, can you explain what a PPI is?

A. A PPI is a pre-pleading investigation. It's a -- well, it's a -- PPI

A. FEINSTEIN

is a phrase that we use to mean a report submitted on behalf of a defendant prior to a plea, to aid a judge in formulating an offer to the defendant. It's a very general statement, not necessarily relating to Mr. Lebovits, but generally that's what a PPI is.

Q. Fair to say in general terms it's submitted in circumstances in which a defendant intends to plead guilty to the top count in an indictment and receive a sentence from the Court as opposed to trying to work out a disposition with, in this case, your office?

MS. SCHARFSTEIN: Objection.

A. Not always. Defense attorneys will submit PPIs to prosecutors in an effort for them to get a lower plea offer, they're not exclusively submitted to judges.

Q. Fair to say it can serve both purposes; a PPI? Meaning that it can be submitted to the Court in anticipation of the Court imposing a particular sentence, but it can also be submitted to your office with a

A. FEINSTEIN

view to getting an improved plea offer?

A. Yes.

MS. SCHARFSTEIN: Objection.

Q. With regard to Mr. Lebovits, isn't it the case that that was the purpose that this PPI served?

MS. SCHARFSTEIN: Objection.

A. What was the purpose?

Q. Meaning that, isn't it the case that this PPI was submitted to your office with a view to getting an improved plea offer?

MS. SCHARFSTEIN: Objection.

A. I thought it was submitted to the Court in an effort to get a better plea offer.

Q. In that regard, there was a copy, though, also submitted to your office, right?

MS. SCHARFSTEIN: Objection.

A. Correct, but that's because they filed a document with the Court and the People -- we would be served as well.

Q. Right. In terms of the arguments that are set forth in the memorandum, and in particular the portion of the memorandum that you just read, were those arguments that

A. FEINSTEIN

A. I don't remember what I believed at that time.

Q. Well, in terms of Mr. Hynes, isn't it the case that -- this is before the Lebovits trial -- that he did not accept that a non-jail disposition for Mr. Lebovits would be appropriate?

MS. SCHARFSTEIN: Objection.

A. I -- the offer was a jail -- a prison, upstate prison offer. So, I can't speak to what he thought or what he believed. I can say that the offer was an upstate prison sentence, though.

Q. That was an offer that he approved, right?

A. Correct.

MS. SCHARFSTEIN: Objection.

Q. And he was unwilling to see that offer reduced to a non-jail disposition, right?

MS. SCHARFSTEIN: Objection.

A. Unwilling, it didn't change.

Q. Right, by which I mean that he, and again this is before the trial, did not

A. FEINSTEIN

agree to extend an improved offer to Mr. Lebovits that did not involve jail time.

MS. SCHARFSTEIN: Objection.

A. Yes, the offer always included Upstate prison time, yes.

Q. Isn't it the case the Mr. Hynes was not persuaded by the arguments set forth in this memorandum as to why Mr. Lebovits should receive a non-jail offer?

MS. SCHARFSTEIN: Objection.

A. The offer didn't change, I don't know whether he was -- what his state of mind was at the time.

Q. I'm going to point you now to Plaintiff's 185 and ask you to review that document. I have something I have to print off, I'll be back in one moment and hopefully you'll be done. No rush though, take your time.

A. (Persuing document.)

Q. Have you had an opportunity to review it?

A. I have.

Q. I'm going to point you to,