# EXHIBIT 7

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X
SAMUEL KELLNER,

PLAINTIFF,

-against- Case No.:
17-CV-1268(MKB)(SJB)

THE CITY OF NEW YORK and PATRICIA L. HYNES, administrator of the Estate of CHARLES J. HYNES,

DEFENDANTS.
-------------------------------------------X

DATE: February 23, 2022
TIME: 10:00 A.M.

VIDEOCONFERENCE DEPOSITION of the Non-Party Witness,ADA MISS HYNES, taken by the respective parties, pursuant to a Subpoena and to the Federal Rules of Civil Procedure, held before Desreen Sinclair, a Notary Public of the State of New York.

**A P P E A R A N C E S:**

NIALL MACGIOLLABHUI
Attorneys for the Plaintiff
SAMUEL KELLNER
171 Madison Avenue, Suite 305
New York, New York 10016
BY: NIALL MACGIOLLABHUI, ESQ.
niallmacg@macglaw.com

NEW YORK CITY LAW DEPARTMENT
Attorneys for Defendants
THE CITY OF NEW YORK and PATRICIA L. HYNES, administrator of the Estate of CHARLES J. HYNES
100 Church Street
New York, New York 10007
BY: SUSAN SCHARFSTEIN, ESQ.
sscharfs@law.nyc.gov

KINGS COUNTY DISTRICT ATTORNEY'S OFFICE
Attorneys for Non-Party Witness
ADA MISS GREGORY
350 Jay Street
Brooklyn, New York 11201
BY: JOHN CARROLL, ESQ.
ZACHARY SIDER, ESQ.

ALSO PRESENT
Anthony Minervini
Lexitas Legal.

* * *

M. GREGORY

position, approximately?

**A. I would say seven to ten years.**

Q. Prior to that were you, as it were, a regular ADA?

**A. Yes, I mean --**

**MS. SCHARFSTEIN: Objection.**

**A. Yes, I mean I was an ADA various places in the District Attorney's office.**

**You want me to list them?**

Q. Yes, maybe it's better to do it the other way around.

When did you join the Brooklyn DA's Office?

**A. In January of 1996.**

Q. If you could briefly go through from that time up until when you became a supervisor in the Sex Crimes Special Victims Bureau?

**A. In January of 1996 I was in the Criminal Court Bureau. After that same year I went to the ECAB Bureau, Early Case Assessment Bureau, also called the Complaint Room. After that I went to The Sex Crimes where I was what we call a writer. I was**

M. GREGORY

Investigations as well as Grand Jury Assistant District Attorney. After that I was a misdemeanor trial assistant in the Criminal Court Bureau. There were a lot of stops in between I don't know the exact order but I was supervisor in the Complaint Room. I was in Generalized Grand Jury on two occasions. I was in something called Narcotics Grand Jury and I was the Grace Room, the Generalized Trials Room, and then either I believe in 1999 I was a felony assistant in The Sex Crimes Special Victims Bureau. I do not recall the year that I became a supervisor there.

Q. In terms of the sex crimes that are handled by your office, is there a distinction between sex crimes in the general sense and sex crimes with regards to Special Victims and if so, what is that?

MR. CARROLL: Objection to form.

MS. SCHARFSTEIN: Objection.

Q. You can answer.

A. So sex crimes that occur in Brooklyn are handled by various bureaus in

M. GREGORY

Ms. Gregory, directing your attention to Plaintiff's Exhibit 14, that is, is it not, the status sheet for the appearance of Baruch Lebovits case on April 21, 2009; right.

**A. Yes.**

Q. You were the Part ADA for that too; right?

**A. Yes.**

Q. If you see the notes where it says defense counsel needs additional time to prepare PPI for court; you see that?

**A. I do.**

Q. What is a PPI?

**A. It stands for pre-pleading information.**

Q. What exactly is that?

**A. Is could be anything that a defense attorney would prepare. Sometimes it is submitted to the Court for the Court to consider making an offer to the defendant and sometimes it is sent to the People and the Court for, you know, in an eye towards some sort of disposition.**

**M. GREGORY**

Q. If you scroll to the top.

At that time your offer as it is indicated in the notes remains jail and the specific plea offer was the same as before meaning a plea to sodomy in the second degree and a sentence of two and a third to seven years in relation to Victim Number 1; right?

**A. That was the offer for the superseding indictment 11393/2008.**

Q. Was that solely in relation to Victim Number 1 or at that time as part of the plea offer, was an additional plea required in relationship to Victim Number 3?

**A. Yes, it would have required the defendant to plea guilty to one of the counts that was for Victim 3 as well.**

Q. In terms of the overall jail time, would that have remained two and a third to seven or was additional time required, jail time that is, in relation to Victim Number 3?

**A. It was two and a third to seven.**

Q. That would cover both victims;

**M. GREGORY**

Q. Let me direct your attention to an exhibit, it's in two parts, 15A and 15B and ask you just to review that document and confirm that is a report from Dr. Goldstein in relation to Baruch Lebovits that was given to you by Arthur Aidala, defense counsel for Baruch Lebovits?

**A. Okay.**

**MS. SCHARFSTEIN: Niall, could we get the question; I don't know if you asked it before she reviewed the document?**

**MR. MACGIOLLABHUI: Desreen, could you read that back?**

**(Whereupon, the referred to question was read back by the Reporter.)**

**A. I know that I received this from defense counsel. I don't which one or I don't recall.**

Q. I am going to direct your attention as well to 15B and the question is similar in that, isn't it the case that at the time you received the report that is Plaintiff's 15A, you also received this

M. GREGORY

letter which is Plaintiff's 15B?

**A. Yes.**

Q. I am going to direct your attention to Plaintiff's Exhibit 16.

My question to you Ms. Gregory is, as you are reviewing this particular document, isn't it the case that you also received around that same time these letters from the defense counsel for Mr. Lebovits?

**A. Yes, that's correct.**

Q. Isn't it the case that Plaintiff's 15A and B and Plaintiff's 16 were in the nature of a PPI?

**MS. SCHARFSTEIN: Objection.**

**MR. CARROLL: Objection.**

**A. I don't recall if those three exhibits; 15A and 15B and 16, were given to me simultaneously but yes, they were given in and around that same time when the case was pending in Part 20 in front of Judge McKay.**

Q. I'm going to point you now to Plaintiff's Exhibit 17.

I'm asking you first of all just

**M. GREGORY**

**in the file is what was given to me.**

Q. In terms of looking at Exhibit 15, the memorandum and again, quote unquote, in-camera confidential memorandum for the defendant's pre-pleading application concerning sentencing, is that a document that you place within the case files?

**MR. CARROLL: Objection.**

**A. When I'm reading this, until you pointed it out specifically that it says confidential memorandum, my belief was he was referring to letters, the two letters, letters that are Exhibit 16 and the letters that are Exhibit 15A and 15B; nothing more than that.**

Q. This, what is described as the cover memorandum dated May 4, 2019, do you recall that specific document?

**A. I do not.**

Q. Is it your testimony that you didn't receive or that you don't recall receiving it?

**A. I don't recall receiving it.**

Q. Once you received or after you

M. GREGORY

received the documents that are Plaintiff's 15A and 15B and also Exhibit 16, did you discuss those documents with anyone within your office?

**A. At what point; when I received them?**

Q. Yes, around the time you received them.

**A. I believe that I spoke with my supervisor about these. Again, these were not attempts to get us to make a different offer, it was to get the Court to do so.**

Q. Do you know if the Court received these particular documents?

**A. My understanding is that they did. They were looking for a court offer and this was the documents that they had prepared for that.**

Q. If you scroll down to the second email on the first page of Exhibit 17 and I will ask you just to read the first two sentences of Ms. Bruffee's email and in particular the second sentence where it indicates that it was submitted to The

M. GREGORY

People during plea negotiations; you see this?

**A. I do.**

Q. And there is no indication here that it was submitted to the Court; correct?

**A. Not in that document but my understanding -- my memory is that the letters from the medical doctor as well as -- were submitted to The Court as well as myself and the letters from the family members and other individuals known to the defendant are all addressed to Judge McKay.**

Q. Can you scroll down to Page 2 again the last sentence of Mr. Dershowitz' email which states, ADA Gregory acknowledged at that time that she had received the documents, that is Exhibit 15, solely as part or plea negotiations; is that an inaccurate statement?

**A. I wouldn't say so. I think that we had made it clear that we were not offering a non-jail disposition. The defense attorney put together a PPI. They did not, I'm using a double negative, they gave us**

**M. GREGORY**

**the materials as well. Have there been times when we were not making an offer that the defense attorney wanted and defense PPI to us and the Judge has changed her mind, yes. But it was not exclusively given to me, it was given to both myself and The Court, you know, with the rule of a different offer either from the Court or potentially the DA's office.**

Q. Is it fair to say that at that time your understanding was that the defense were, as it were, exploring both options meaning, trying to get a better offer from your office and also exploring the option of pleading to the top count from the superseding indictment and receiving a sentence from The Court?

**MR. CARROLL: Objection.**

**MS. SCHARFSTEIN: Objection.**

**A. Yes.**

Q. In terms of the aspects of what you describe that involved your office as opposed to the court, I think you indicated that you spoke to your supervisor about the

M. GREGORY

documents that you had received; was that Ms. Jaus?

**A. Yes, it would have been Ms. Jaus, yes.**

Q. Did you give her or do you recall giving her a copy or even the originals of the documents you had received?

**A. I don't recall that I did or didn't give her the originals or a copy.**

Q. Is it possible that you gave her the originals and made copies for your file but omitted or neglected or overlooked making a copy of the cover memo and simply copied what are Exhibit 15 and Exhibit 16?

**MS. SCHARFSTEIN: Objection.**

**MR. CARROLL: Objection.**

**A. My recollection is that I received the two letters from the two doctors and the letters from the family and other community members.**

Q. You also recall discussing them with Ms. Jaus; right?

**MS. SCHARFSTEIN: Objection.**

**MR. CARROLL: Objection.**

**M. GREGORY**

Q. And that's a reference to the same investigation we are been discussing in terms of Rackets and ADA Batsidis; right?

**A. Yes.**

Q. By that stage, this is August 4, 2010, had you learnt anything more about the investigation from what you knew before which was that it involved Mr. Kellner but was broader than the allegations that had been brought to your attention in 2009?

**MR. CARROLL: Objection.**

**MS. SCHARFSTEIN: Objection.**

**A. I can't say that on this -- by this particular date what I knew or didn't know but as that investigation proceeded and things came out of that investigation indictment, I was aware of more of what was going on but I was not part of that investigation.**

Q. So on this date the case against Baruch Lebovits relating to Victim Number 1 was dismissed; right?

**A. That's correct.**

Q. At that point, had you been

M. GREGORY

**A. Yes.**

Q. I belive you testified earlier that you recall one conversation that you had with Mr. Hynes with regard to the prosecution of Baruch Lebovits; is that correct?

**A. Yes.**

Q. What was said during that conversation?

**MR. CARROLL: Objection.**

**A. I recall the conversation, it wasn't a one-on-one conversation with me and Mr. Hynes. My recollection is that ADA Jaus was present, ADA Feinstein, there very well could have been other people but that's what I recall and it was after the conviction and before the sentencing. So we discussed the trial of Victim Number 3, we discussed the evidence and it wasn't in that meeting that we were making a recommendation for what sentence we were going to request of the trial judge, Judge Dimanjo, but I think we began those conversations at that meeting. We also discussed that there were other**

M. GREGORY

**cases for this defendant and at that point at that meeting we didn't make any decisions about those at that time.**

Q. What was your understanding of the purpose of the meeting?

**A. It was for myself and Sex Crimes to update him on this trial. That prior to the trial it hadn't garnered a lot of attention, I would say, and then when as the trial happened, there were Rosario issues, there were mistrials being sought by the defense so that sort of elevated it, I guess -- not I guess, and we were speaking to him so that he could get from us what had transpired and where we were.**

Q. You said, I believe, something to the effect that it hadn't garnered a lot of attention before the conviction; was that correct?

**A. Yes, that is correct.**

Q. I just want to know what you mean by that?

**A. I mean, there are some cases that are heavy, you know, have a lot of paper**

M. GREGORY

inform either him or Victim 2 that the case was dismissed?

**A. I don't recall that.**

Q. I had shown you a portion of a New Yorker Article with regard to what was indicated in the article that you had brought concerns of witness tampering with regard to Victim Number 1 to Ms. Feinstein and I believe your testimony was that you didn't recall doing that. You testified in response to one of Ms Scharfstein's questions not that you didn't recall but you were not told at any time that Mr. Hynes was not going to pursue a witness tampering investigation with regard to the circumstances of Victim Number 1's withdrawal of his cooperation and I apologize for the long-winded prelude, but my question is this; is it that you don't remember being told that no witness tampering investigation would be conducted or is that you were told affirmatively or not told that such an investigation would not be conducted?

M. GREGORY

**MS. SCHARFSTEIN: Objection.**

**MR. CARROLL: Objection.**

**MR. MACGIOLLABHUI: Let me rephrase. It's particularly long-winded and I apologize for that.**

Q. What I'm trying to find out is this, is it that you don't recall being told one way or another that a witness tampering investigation would be carried out in relation to Victim Number 1 or is your testimony that you were not told that a witness tampering investigation would not be carried out?

**MR. CARROLL: Objection.**

**MS. SCHARFSTEIN: Objection.**

**A. I would say the first thing that you said not the latter.**

Q. Meaning, you don't recall either way; meaning, you don't recall whether you were told or not told?

**A. Exactly.**

**MS. SCHARFSTEIN: Objection.**

**MR. CARROLL: Objection.**

Q. You were asked in that regard if

M. GREGORY

anything additional could have been done to resecure the prosecution of Baruch Lebovits and again, you were asked your opinion so I'll ask your opinion too.

In your opinion, would a witness tampering investigation potentially help to resecure Victim Number 1's cooperation?

**MS. SCHARFSTEIN: Objection.**

**A. I think the main thing dealing with Victim Number 1 whether he had recanted his recantation or then said no the recantation was correct then these people paid me off, the only thing I think that his credibility was questionable at that point. So to rely on him for a prosecution, him alone, I don't think that would have happened. But obviously, the more evidence that you could have in a case perhaps, you know, there could have been something.**

Q. Aside from whether or not he resumed cooperation, aside from whether that would have meant that a continued prosecution of Mr. Lebovits was viable in regard to Victim Number 1, would it

M. GREGORY

issue to your supervisor who was Ms. Jaus?

**A. Yes, but I mean, you are using the word witness tampering. We definitely have prosecuted violation of Orders of Protection where somebody has told somebody where either a defendant or an associate of a defendant has tried to stop someone from proceeding with the prosecution, sometimes we include that violation of the order of protection charges within the indictment depending on the timing of all things. So it wouldn't have specifically been oh, another group is going to investigate this. I guess it would be varied depending on what the allegation was.**

Q. Going back to a little before that meeting you had following the conviction of Baruch Lebovits with Mr. Hynes and a number of others.

You had indicated in your answers to Ms. Scharfstein that you had, as it were, discussed at that meeting the remaining two cases against Mr. Lebovits and specifically

M. GREGORY

the case involving Victim Number 1 and the case involving Victim Number 2, am I correct in understanding that at that time you reported or it was reported within this meeting that Victim Number 1 was no longer cooperating with your office?

**A. Yes.**

**MS. SCHARFSTEIN: Objection.**

Q. Do you recall Mr. Hynes or anyone else during that meeting inquiring into the circumstances as to how his cooperation had ended?

**MS. SCHARFSTEIN: Objection.**

**MR. CARROLL: Objection.**

**A. So not in that meeting but in 2009 when all of that was happening, I did not -- I can't recall the specific conversation that I had with Mr. Hynes but my understanding -- I believe that and I'm fairly certain that I spoke with Ms. Feinstein about Lonuzzi and Victim 1 not wanting to testify.**

Q. This would have been following your conversation with Mr. Lonuzzi but

M. GREGORY

before the trial in March of 2010?

**A. Right.**

Q. In terms of the conversations with Ms. Feinstein, do you recall any specifics of either that particular one or any follow-up conversations that you and she had?

**A. No.**

Q. In terms of conversation of that nature with Ms. Feinstein, did you, as best you can recall, have any such conversations with her following the trial in March of 2010?

**MS. SCHARFSTEIN: Objection.**

**MR. CARROLL: Objection.**

**A. I don't recall any specific conversation but I know that I had communications about the cases and what was going on with them after that big meeting after the conviction.**

**MR. MACGIOLLABHUI: Ms. Gregory, they all my questions and again I just thank you very much for all time you have given me.**