# EXHIBIT 19

EXHIBIT
PLTF 37 2/23/22 (DS)
exhibitsticker.com



Save paper and follow @newyorker on Twitter

A REPORTER AT LARGE | **NOVEMBER 10, 2014 ISSUE**

# THE OUTCAST

*After a Hasidic man exposed child abuse in his tight-knit Brooklyn community, he found himself the target of a criminal investigation.*

**BY RACHEL AVIV**

g+1



*In exchange for political support, Brooklyn politicians give Hasidim latitude to police themselves. They have their own emergency medical corps, a security patrol, and a rabbinic court system, which often handles criminal allegations.*

PHOTOGRAPH BY CHRISTOPHER ANDERSON / MAGNUM

NEWS
CULTURE
BOOKS & FICTION
SCIENCE & TECH
BUSINESS
HUMOR
MAGAZINE
ARCHIVE
SUBSCRIBE
SIGN IN
LINK YOUR SUBSCRIPTION

Sam Kellner's reputation in the Hasidic community of Borough Park, Brooklyn, began to suffer in 2008, when his teen-age son told him that he had been molested by a man who had prayed at their synagogue. Kellner's first instinct was to run the man over with his van, but he didn't know if his anger was justified. Molestation was rarely discussed in the community, and it didn't seem to Kellner that any of the prohibitions in the Ten Commandments explicitly related to it. The most relevant sins—adultery and coveting a neighbor's belongings—didn't capture the depth of the violation. Kellner couldn't pinpoint what was lost when a child was sexually abused, since the person looked the same afterward. But he sensed that molestation was damaging, because he knew a few victims, and they had gone off the *derech*, or religious way. "They became dead-enders, lost souls, outcasts," he told me.

Kellner, a heavyset man with hazel eyes and a long, graying beard, never spoke about sexual matters with his six children. They would take classes about the human body (with a focus on how to get pregnant) only after their marriages were arranged. Kellner took his son to a modesty committee, called *vaad hatznius*, which enforces standards of sexual propriety among Borough Park's hundred thousand ultra-Orthodox Jews, the majority of them Hasidic. *Vaad hatznius* disciplines residents who freely express their sexuality or behave lewdly. In a community where non-procreative sex is considered shameful, molestation tends to be regarded in roughly the same light as having an affair. When

children complain about being molested, the council almost never notifies the police. Instead, it devises its own punishments for offenders: sometimes they are compelled to apologize, pay restitution, or move to Israel.

Kellner had once been a top administrator at the Munkacz synagogue and yeshiva, in Borough Park, but he had fought with other leaders about financial and educational policies. He had left the job and started a toner business, collecting discarded cartridges and reselling them. His son's alleged abuser, Baruch Lebovits, was the descendant of a rabbinic dynasty, a prominent cantor with twenty-four grandchildren. Kellner told *vaad hatznius* that he wanted to report his son's abuse to the police, because he didn't trust that the issue could be dealt with internally.

The committee granted him permission, as long he had the approval of a rabbi. The rabbi would have to make an exception to the Talmudic prohibition against *mesirah*, the act of turning over another Jew to civil authorities. According to some interpretations of Talmudic law, a Jew who informs on another Jew has committed a capital crime. He is a "wicked man," who has "blasphemed and rebelled against the law of Moses," the twelfth-century Torah scholar Maimonides wrote. The law was meant to protect the community from anti-Semitic governments. Kellner said, "The way history tells it is that if a Jew was arrested he was thrown in jail and never heard of again."

Hasidim, whose movement emerged in the eighteenth century as a mystical, populist alternative to traditional Judaism, are defined in part by their concern for self-preservation. Kellner is the son of Hungarian Holocaust survivors who re-created in Brooklyn a community that had been destroyed by the war. Men dress in black frock coats; married women wear long skirts and hide their hair, which is considered alluring, under shawls or wigs. They speak Yiddish, and resist television, the Internet, and other secular forms of entertainment. Hasidic parents take literally the Lord's order to "be fruitful and multiply"—they intend to replenish a culture devastated by the Holocaust—and Hasidim are now the fastest-growing segment of the Jewish population in New York City. Sixty per cent of the city's Jewish children, many of them Hasidic, live in Orthodox homes.

Kellner, who was a member of a synagogue that is closely affiliated with the Satmar sect, the largest Hasidic community in New York, wasn't sure that the prohibition against *mesirah* made sense in a country where, he said, "the justice system is credible enough." Although the Satmar community distrusts secular government, it participates fully in the democratic process. Hasidim typically vote as a bloc, delivering tens of thousands of votes to the politicians their leaders endorse. In exchange for the community's loyalty, politicians have given Brooklyn's Hasidim wide latitude to police themselves. They have their own emergency medical corps, a security patrol, and a rabbinic court system, which often handles criminal allegations.

Kellner sought counsel from Rabbi Chaim Flohr, the leader of an institute where rabbinic scholars study how the teachings of the Torah translate to contemporary dilemmas. After listening to Kellner's story, Flohr called the modesty councils in Borough Park and Williamsburg (where there are sixty thousand Hasidim) to see if other children had reported being molested by Lebovits. Flohr wrote in an affidavit that "numerous complaints and allegations of a similar nature had been made against Baruch Lebovits dating back over a long period of time." Flohr told Kellner that he was justified in going to the police, because Lebovits could be considered a *rodef*, or pursuer, someone who is endangering the lives of other Jews. In a letter, Flohr wrote, "Behold I make known in the public arena: to praise an honest man, namely Mr. Shloma Aron Kellner, may his light shine, that how he acted in regards to the government was based on a query before a rabbinic court and was done according to our Holy Torah. . . . It is forbidden to trouble him or humiliate him."

With the rabbi's approval, Kellner took his son, whom I'll call Yossel, to the offices of the Brooklyn Special Victims Unit, in Crown Heights, to speak with Steven Litwin, the senior detective. A studious and introspective boy, Yossel explained that Lebovits had offered him a ride home from a school outing late at night, then reached over to the passenger seat and molested him. He said that Lebovits was soon moaning and grunting. He told his teacher what had happened, but the teacher said that Lebovits was a "respected person" and instructed him not to think about the incident again.

Litwin found the boy's "claims to be extremely credible," he wrote in an affidavit. But he told Kellner that the crime was a misdemeanor, and that it was unlikely that Lebovits, a first-time offender, would receive jail time. Disappointed, Kellner said that Lebovits had molested other boys, too. "O.K., so help me find them," Litwin told him.

Kellner went back to the modesty council and was given the name of another boy, Joshua, who had complained about Lebovits. (All victims' names have been changed.) Joshua said that, starting in 2000, when he was twelve, Lebovits sometimes drove alongside him while he was walking to school, honking his horn and encouraging him to get into the car, where Lebovits performed oral sex on him. Joshua said that, on other occasions, Lebovits molested him in the mikvah, a ritual bath that was in the basement of his synagogue.




*"I feel like my best passwords are already behind me."*

BUY OR LICENSE »

Joshua had gone to a yeshiva for students with developmental disabilities. His family was poor, and he begged for charity outside synagogues and weddings, a common practice in Borough Park, where the poorest members of the Hasidic community live and pray next to the wealthiest. They patronize the same businesses on Thirteenth Avenue, a commercial strip of kosher restaurants and shops. Although Kellner had never met Joshua, he drove

to his house and offered him work helping to plan the wedding of a mutual acquaintance. Kellner gradually steered the conversation toward Baruch Lebovits, and urged Joshua to report his abuse. Joshua became jittery and hyper. "Listen, unless you go to the authorities, you'll never feel relaxed," Kellner told him. "You'll never feel unviolated."

On March 6, 2008, Joshua told Detective Litwin that he had been molested by Lebovits on more than thirty occasions over four years. Once, he said, Lebovits had picked him up on his way to school and anally raped him in a building near his yeshiva. After each encounter, Lebovits apologized and promised he would never do it again.

Five days later, Baruch Lebovits was arrested in front of his house. Although Joshua's name wasn't publicly released, everyone in his neighborhood seemed to know that he had gone to the police. Natalie Hadad, his best friend, said, "People would call him and say, 'If you testify, bad things are going to happen to your parents. If you testify, you're going to get thrown out of Borough Park.' "

A few months later, Kellner spoke with Dov Hikind, the assemblyman who represents Borough Park. Hikind hosts a weekly radio program, and he had recently dedicated three shows to the problem of sex abuse among the ultra-Orthodox. Hikind said that, after the show, more than a hundred victims had called or visited his office to complain about multiple offenders. One of the victims was a twenty-year-old named Aron, who said that

NEWS
CULTURE
BOOKS & FICTION
SCIENCE & TECH
BUSINESS
HUMOR
MAGAZINE
ARCHIVE
SUBSCRIBE
SIGN IN
LINK YOUR SUBSCRIPTION

Lebovits had repeatedly molested him in his car, beginning when he was sixteen. A year later, he fell in with a clique of teen-agers who were known to be O.T.D., or off the *derech*, and he began using heroin or cocaine almost every day.

Aron had tried to leave the Hasidic community, but he struggled to assimilate into the secular world. Many of the yeshivas in Brooklyn teach in Yiddish and provide less than two hours of secular education a day. Aron had a heavy Yiddish accent, a rudimentary grasp of written English, and no diploma. In a video filmed by a friend, Aron complained about his limited education and social skills. He said that he didn't know how to interact with women—he had been forbidden to mingle with them or look them in the eye—and no one had taught him "what your body is about." He had struggled to process what was happening when Lebovits, a pious man, put his mouth on Aron's penis. "My head, like, exploded," he said. "Call it an epiphany, I guess."

Aron's schoolmate Boorey Deutsch said that he and his friends had known that Aron was molested by Lebovits. "We saw them together," Deutsch told me. "And every day we saw Aron breaking down. He stopped playing with us. He hung out in the corners. Then we started bullying him. I even recall slapping him once in the face."

Aron felt that he had little to lose when Kellner urged him to report his abuse. Ian Christner, a mental-health advocate who worked with Aron, said that Kellner adopted a paternal attitude toward Aron, who was often so high that he nodded off in the middle of

conversations. "Sam Kellner saw the way that victims in the community were suffering," Christner told me. "He is a real tough guy, and he has got a sense of fairness. It's not a high-placed sense of social justice that comes from being a scholar. It's simple and straightforward. If he feels like people have wronged him or his family, he'll make sure that they hear about it."

In October, 2008, a second indictment was brought against Lebovits, naming Aron as a victim. A few weeks later, Aron was invited to the home of Berel Ashkenazi, the spiritual adviser of his former yeshiva, who was a colleague of Baruch Lebovits's son. It was a Friday afternoon, a few hours before businesses closed for Shabbat. Ashkenazi served Aron food, made polite conversation, and then, Aron said, offered him between five and ten thousand dollars to drop out of the case. (Ashkenazi denied this, and said that Aron came to him seeking compensation.)

Although Aron disliked Ashkenazi, he was tempted by the offer. He told Kellner that he needed the money. "Don't be crazy!" Kellner shouted. "I could get you two hundred thousand dollars!" Kellner, who barely had enough money to support his family, told me that he was willing to say anything to keep the case intact. He asked a rabbi, Yisroel Makevetzky, if he had permission to report Ashkenazi to the police for tampering with a witness. Makevetzky held a hearing on the matter in a yeshiva classroom on the edge of Borough Park and concluded that Aron was a *moser*, an informer. He ruled that Ashkenazi was right to dissuade Aron from testifying in criminal court, "as this is a serious transgression." In his ruling, he wrote that Ashkenazi

should "help the young man in following the just path, and will begin in this after the young man removes himself from the jurisdiction of the secular courts."

Aron eventually described the situation to Detective Litwin, who documented the incident in his notes, and forbade Aron to accept money from anyone. Aron's father, Abe, who owned a kosher Italian frozen-food company, lost several customers because of the case, but he supported his son's decision to go to trial. Abe told me that the Mishnah, the first major work of rabbinic literature, says that it is the obligation of the community to stop a *rodef* from making his next attack. "It's in the books," he told critics. "Look it up!"

Soon, Aron became the object of intimidation and threats. A Hasidic medical volunteer, who helped Aron with his addiction, told me that "at some point people started reaching out to me. The messages were never specific, but it was pretty obvious that I need to read between the lines: you need to let him relapse. You need to let him crack." The medical volunteer (who, like many people I interviewed, requested anonymity, because he didn't want to be ostracized by his community) met with Litwin. "I tried to explain to him that there is no way he's going to get the type of coöperation he wants," he said. "Unless you really understand how this community works—what tactics are used to intimidate these victims, to prevent them from coming forward, to manipulate them into feeding the authorities wrong information—you will never deliver."

Case 1:17-cv-01268-NRM-MMH Document 104-19 Filed 10/31/24 Page 12 of 38 PageID #: 1745



On holidays, it used to take Kellner an hour to make his way into the synagogue, because he had so many people to greet. Now only a few people in his prayer group responded when he made conversation. Some yelled that he was a *moser*. He began saying his daily prayers elsewhere. He also let his interest in his toner business lapse. He was too inflamed. "When it comes to your kid, you overdo it—you lose your mind," he said.

He didn't dwell on the insults—in response to criticism, he usually shouted that Rabbi Flohr had approved everything—but he worried about the effect on his children. Yossel found the case so embarrassing that he denied his participation to his brothers and sisters. "There was never talk in my house about this whole Lebovits thing," Kellner told me. "My other kids heard people talking on the street, and they used to have to ask my wife, 'Which one of us was molested?' "



*"Does this lens flare make me look fat?"*

BUY OR LICENSE »

Kellner worried that the psychological dysfunction he saw in Joshua and Aron could eventually afflict his son. He wondered if it was possible that Lebovits had nothing do with their fragile mental states; maybe it was just a coincidence that, on top of all their problems, they had been molested. "I was hoping to wake up one day and they tell me there's a new study and we've all made a

mistake," he said. "Molestation doesn't make any permanent damage. It's no worse than yelling at your kid."

But Yossel already seemed more cautious and isolated. He was no longer welcome at his yeshiva in Borough Park. "They ignored me and my son, and, when summer was over and the new school year started, they gave me a hard time," Kellner said. "They said, 'Oh, maybe you need special ed for your child.' " In the fall, he sent Yossel and his younger brother to yeshivas outside the city. Kellner never contemplated moving, because all the major Hasidic communities—in upstate New York, Jerusalem, London, Montreal, and Antwerp—were connected, and he assumed that everyone already knew his story. The idea of moving to a non-Hasidic neighborhood was too far-fetched to consider. "What are we going to do—give up our beliefs, our religion, our everything?" he said.

In the fall of 2009, Kellner was notified of a summons issued by Rabbi Makevetzky to participate in what was described as the "case of Mr. Shloma Aron Kellner, may his light shine, and the Lebovits family in the matter of injury of the son." Kellner assumed that the hearing was a trap, designed to force his son out of criminal court. He told the rabbi that he would coöperate only if someone else paid for the hearing—the rabbi charged a hundred and fifty dollars an hour—and for the cost of being represented by a secular lawyer. An acquaintance of one of Lebovits's sons paid Kellner's expenses. Then, Kellner said, the man came back with an offer: Kellner should accept two hundred and fifty

thousand dollars to drop the criminal case. (Lebovits's oldest son, Chaim, denied that this happened. He added that Kellner was always looking for money.)

Kellner was insulted by the offer. "What would I say to my son?" he said. "That I took money so he could be used as a prostitute?" At a meeting at the district attorney's office, he told Detective Litwin and three prosecutors in the sex-crimes division that people were trying to bribe him. According to one official at the meeting, Kellner complained that the only victims who were willing to come forward were already outcasts. He warned, "Stay on top of them, or the other side will buy them off."

Not long after, Kellner drove to the home of one of Lebovits's sons, Meyer, whom he had known since he was a child, to complain about an invoice that he had received from Rabbi Makevetzky. He had been charged eighteen hundred dollars, even though the negotiations for the rabbinic court had collapsed. Meyer, who surreptitiously recorded the conversation, didn't directly address Kellner's concern about who would pay for his expenses. Standing on the sidewalk in front of his house in Borough Park, he began speaking of the shame that his family was enduring, and he accused Kellner of violating a law in the Torah. "You cannot punish a person unless you warn him," he told him.

Kellner insisted that the modesty council had tried to warn his father and had given him opportunities to coöperate. "I am not going to justify myself now," he said. "Perhaps it was half right. Perhaps it was three-quarters right. Perhaps it was only a quarter right."

"Didn't you put together an entire case?" Meyer said. "Didn't you become God's police?" He said that, if Kellner had warned him directly, "I would have taken care of the problem. We would have done everything."

"I don't believe that you will ever understand," Kellner said. "But I cannot go to a person and tell the person that his father did it."

The men began arguing about whose reputation had been hurt more by the case. They were both upset that the allegations would prevent their children from marrying well. Kellner begged Meyer to persuade his father to plead guilty, so that his son wouldn't have to testify at a trial. But Meyer said that the prosecution wasn't offering his father the plea deal he wanted: no jail time, just probation. He suggested that, if Kellner didn't want his son to be exposed, he should pull him out of the case.

"I cannot drop it," Kellner said.

"But you don't want to go to trial!"

"But after all my child was treated unjustly!"

"True."

"I don't want to drop it," Kellner repeated.

"So you want to settle?" Meyer asked.

"No!"

NEWS
CULTURE
BOOKS & FICTION
SCIENCE & TECH
BUSINESS
HUMOR
MAGAZINE
ARCHIVE
SUBSCRIBE
SIGN IN
LINK YOUR SUBSCRIPTION

Kellner had hoped that all three victims would testify at the same trial, but a judge ruled that trying the cases together would prejudice the jury. Joshua's case was scheduled to go first. In November, 2009, the prosecutor, Miss Gregory, met with Joshua at her office, and he seemed ready for trial. Three weeks later, she received a message from John Lonuzzi, then the president of the Brooklyn Bar Association. Lonuzzi, a civil attorney, said that Joshua would no longer be coöperating with the prosecution, because it was causing him "severe stress" and he was "suffering from a variety of psychological issues." In an affidavit, Gregory wrote that she made multiple appointments to meet Lonuzzi and Joshua, but all the meetings were cancelled. When Joshua didn't comply with four subpoenas, she mentioned to the chief assistant to Charles Hynes, the district attorney, that she was concerned about the possibility of witness tampering, but no one followed up. After Joshua dropped out of the case, he confided to Detective Litwin that he had never retained Lonuzzi and didn't know who had. Litwin wrote in an affidavit that Joshua said that he was under pressure and was afraid, but he wouldn't elaborate. (Lonuzzi denied this account, and said that he had no involvement in witness tampering.)

Aron's trial began in March, 2010. With no material evidence or eyewitnesses, it hinged on Aron's credibility. Lebovits's lawyer, Arthur Aidala, the current president-elect of the Brooklyn Bar Association, dwelled on Aron's history of sneaking into synagogues late at night and stealing cash from charity boxes. Aidala told the jury that Aron had fabricated a story about being abused so that he could extort money from the Lebovits family.

"He disrespects the court and our system," Aidala said. "The whole thing—he made it up to get money. He didn't get the money, and now he is stuck."

The only witness for the defense was Berel Ashkenazi, the spiritual adviser at Aron's yeshiva. Ashkenazi testified that Aron was a "nervous child" who "didn't have patience." He told the jury that Aron was pursuing the charges against Lebovits in order to pay for his drugs. "It bothers me that he wants to lie about an innocent person," he said.

Gregory, the prosecutor, asked Ashkenazi, "Do you consider Aron to be a traitor for what he is saying against the defendant?"

"What means the word 'traitor'?" Ashkenazi asked.

"Let me ask you this," Gregory continued. "Do you understand the concept of a *mesirah*?"

"*Mesirah*?"

"Maybe I am not pronouncing it, but isn't that a Jewish person is not supposed to perform—"

"A Jewish man is not allowed to go to court without the permission from his rabbi," Ashkenazi said.

"And if that Jewish person doesn't go to his rabbi are there any consequences?"

"I never heard," he responded. "I don't know."

"Sir, wouldn't such a person be stigmatized in your community?"

"The rabbi will talk to him," he said.

"Isn't it possible that a consequence of that could be that this person would be stigmatized within the community?"

"It depends."

"It depends on what?"

"Depends on how he did it," he said.



*"This is it, Slim. I'm putting you on the next off-peak train outta here."*

BUY OR LICENSE »

The jury found Lebovits guilty on eight counts of sexual abuse. In the month between the conviction and the sentencing, nearly eighty people sent letters to the judge, requesting mercy for Lebovits. They described him as charitable, kind, blessed with a beautiful singing voice, and compassionate toward helpless people. Zalman Teitelbaum, one of the two Grand Rebbes of Satmar, the highest authorities among the Satmar Hasidim, wrote, "In the name of Almighty God and for the sake of compassionate justice, I appeal to your God-given wisdom to treat Mr. Lebovits with the utmost understanding."

The judge, Patricia DiMango, sentenced Lebovits to the maximum penalty on eight counts, to run consecutively, for a total of up to thirty-two years—a harsher sentence than anyone had expected. The average sentence given

to defendants convicted of similar crimes is two years. She said, "It is imperative for courts to send a clear and unequivocal message that abusing and harming children will not be tolerated."

One of Kellner's relatives told me that after the trial "no one talked about the real issue, the victims. Instead, they talked about the problem of Sam Kellner going on a crusade." He believed that the lengthy sentence "triggered everything. Now the Lebovits family would not let this go down. They were going to spend millions of dollars and fight, fight, fight."

Aidala, Lebovits's defense attorney, told me that the trial was one of the worst and most surprising losses of his career. Immediately, he began second-guessing his strategy. A year before, he had given the district attorney's office a tape of a recorded conversation that he thought indicated that his client's family was the target of extortion by Kellner. After discussing it with sex-crimes prosecutors, Aidala had dropped the subject.

Now Aidala wanted to broach the topic of extortion again. He was comfortable in the district attorney's office, where he had begun his career. He was close to the D.A., Charles Hynes, who had been in office for twenty years, and to his family, and to several top officials. He had volunteered on all of Hynes's reëlection campaigns and frequently attended his fund-raisers.

On April 27, 2010, six weeks after the trial ended, Aidala went to the district attorney's office and met with the chief of the rackets bureau, Michael Vecchione, who was also a friend. Initially, Aidala didn't focus on

Kellner. He spoke about a case that was easier to substantiate: he said that, days before, a friend of Kellner's named Simon Taub had extorted the Lebovits family. Taub had said that his son had been molested and threatened to go to the police unless he was compensated by the family. A few weeks later, in a sting operation, detectives from the rackets bureau wired Chaim Lebovits, a businessman who had made a fortune in oil and diamonds. Chaim went to Taub's home and caught him on tape accepting money.

After he was arrested, Taub said that prosecutors told him, "If you coöperate with us, you will be home in an hour." They pushed him to implicate Kellner in an extortion plot. Taub said that he didn't have the information that the prosecutors wanted. "To coöperate, I had to lie," he told me. Instead, he pleaded guilty to attempted grand larceny and was sentenced to probation. The alleged abuse of his son was never investigated.

Chaim told me that the crime was a "miracle," because it lent legitimacy to his family's complaints. Soon, they insisted that Kellner had been after them, too. They said that Kellner had offered to "make the case go away," but they had refused. As evidence, they gave the rackets bureau the audio recording that the sex-crimes division had already heard. The recording captured a conversation in Yiddish between Meyer Lebovits and Kellner about who would pay the costs of the rabbinic court. The English translation provided to the district attorney's office was so laden with emotional outbursts and Talmudic references that it is possible to miss the context and understand only that Kellner is asking for money. An assistant district attorney requested that

Meyer Lebovits be given a polygraph test, to see if he was lying about his family being extorted by Kellner, but Vecchione said no. According to a prosecutor with knowledge of the case, "There was a strong sense that the investigation was a favor that Mike Vecchione did for Arty Aidala, a very close friend." (Vecchione and Aidala deny that their friendship affected the case. Vecchione disputes many details of this account.)

The rackets bureau encouraged the Lebovits family to get information out of Aron. Under the guidance of Vecchione, who is now retired, the family paid for one of Aron's friends, also a drug addict, to take Aron to a rented house in Florida and question him about the case. (Vecchione denies knowing about the video before it was made.) The friend pretended to be making a movie of Aron's life, and enlisted two young filmmakers (also from Hasidic families) to direct the video. They urged Aron to open up about his relationship with Kellner. "In order for me to build the script of your life, I have to know the whole twist," one of the filmmakers says, in the footage.

Aron, who was smoking marijuana for much of the filming, was less interested in talking about the case than about his sense of estrangement. Sitting on a cream-colored sofa, in a T-shirt and black jeans, he looks like a patient in his first therapy session, relieved that someone is finally listening to him. "I feel like an atheist, but I feel bad feeling like an atheist," he told the filmmakers. "I want to live up to the place where I come from, to be Jewish." He spoke, too, about his bond with Joshua, who had disappointed him by dropping out of the case. He said that when Joshua described his abuse to the grand

NEWS
CULTURE
BOOKS & FICTION
SCIENCE & TECH
BUSINESS
HUMOR
MAGAZINE
ARCHIVE
SUBSCRIBE
SIGN IN
LINK YOUR SUBSCRIPTION

jury, before the indictment, the court reporter wept while typing. "If you saw [Joshua] speaking, you'd have cried," he said.

The filmmakers tried to direct the conversation away from Aron's emotions. They seemed confused by the fact that Aron had risked his reputation by testifying in court, asking what he had gained. "Kellner told you he was going to give you money?" one of them said.

"This wasn't the thing—no," Aron said.

"You never got money?"

"No, that's not true, that's bullshit."

"What could Kellner sell you?"

"Nothing. That is the joke, that's what I want to say."

The filmmakers seemed unhappy with his response. One told Aron, "You would never have gone to court if not for that jackass Kellner [who] wanted money."

"No, no, no, no," Aron said.

"That's how I want to make the movie," the filmmaker persisted. "He's a crazy man, this Kellner."

"Do you want to hear the truth?" Aron continued. "He let me go the truthful way. I proceeded truthfully and honestly."

"But why did Kellner have the power to schlep you?" the filmmakers asked.

"Who didn't have the power to schlep me?" he said. "I

had such a soft heart."

Aron was proud that he had gone through with the trial, unlike Joshua, who he said had been pressured and offered money. "They terrorized him," he said. "They took real victims, and they shot down their lives." He said that he had expected Lebovits to call him, beg for forgiveness, and say, "I'm an elderly man, please don't do this to me." He figured that, if Lebovits had apologized, he would have dropped the case. "I'd say, O.K., I'm sorry. Whatever. And we forgive each other."

The video did not produce information useful to the district attorney's office, but the Lebovits family was still confident that they could prove that Kellner was an extortionist. Chaim told me that Hynes specified for his lawyers exactly which kinds of evidence they would need to arrest Kellner. "They said that, if you can provide A, B, C, D, E, and F, then we will move in with the indictment," Chaim said. (Hynes, through his lawyer, declined to comment for this story.)




BUY OR LICENSE »

The Lebovits family hired a Hasidic private investigator named Joe Levin, who runs a company called T.O.T. Consulting—the letters standing for the Yiddish phrase *tuchis afn tish*, or "put your ass on the table." Levin said that at his first meeting with Chaim, at

the Plaza Hotel, he was instructed to find anything that might cast Kellner in a negative light. (He said that he was so troubled by what he observed that he felt justified in telling me about his work for the family.)

Beginning in the fall of 2010, Levin bugged Kellner's van, and he and his employees followed him. He listened to hours of Kellner's conversations each week. But he came up with little related to the case. "It was devastating," Levin told me. "I really went nowhere."

After he had been working on the case for a few months, he said, he was asked to drive to the home of a friend of Hynes, where a birthday party was being held. Levin said, "It was a very fancy house, and people just came in and out." Meyer Lebovits attended the party briefly, he said, and was joined by two *machers*, or "big shots," who mediate between secular political figures and the community. Levin stayed within three hundred feet of the house, because he had been asked to record the *machers'* conversations. It is not uncommon for Hasidic power brokers to record conversations to use as leverage. (Meyer denied going to the party.)

After the party, Levin said, the relationship between the Lebovits sons and the district attorney's office immediately became much warmer. He was surprised by how frequently the Lebovits family received updates about the investigations. When he overheard phone conversations, "It did not sound like law enforcement talking to a criminal's family. It sounded like two good friends." Levin said that he can remember few cases where the pressure on him was higher. The message he

got from the Lebovits sons was "Now we have the O.K., so anything you bring to us, we are going to be able to do something with it. "

In late 2010 and early 2011, Aron was summoned to the district attorney's office a number of times and interrogated about his relationship with Kellner. His father, Abe, told me that Aron, after being the key witness for the prosecution, now felt as if he were being treated as a criminal. Aron had little information to offer. He repeatedly insisted, as he had at trial, that he had never accepted money.

Joshua proved a more forthcoming witness. After failing to communicate with the sex-crimes division for nearly a year, he reappeared with his lawyer, John Lonuzzi, to say that Kellner had "brainwashed" him. "Lebovits never molested me," he said. "Everything I said was false." He said that he made up the story because Kellner gave him a hundred dollars a week and Detective Litwin took him to meals.

Lebovits's cousin Moshe Friedman, the publisher of an influential Yiddish newspaper, *Der Yid*, and the adviser to Zalman Teitelbaum, the Grand Rebbe, also accused Kellner of criminal behavior. Testifying before a grand jury in March, 2011, he said that Kellner came to his office and begged him to persuade the Lebovits family to hand over two hundred and fifty thousand dollars. Yosef Blau, the senior spiritual adviser at Yeshiva University, said that he was amazed that Friedman would testify before a grand jury, given the community's rules against informing on other Jews. "It's extraordinary that this major figure in the community is willing to be a *moser* to

get Kellner," he said. He believed that Friedman got involved because "Kellner's behavior was seriously threatening to the community's power structure."

Two weeks after Friedman's testimony, Kellner came home after shopping in Williamsburg and found a tall man in casual clothing standing outside. The man had a companion, who flashed a police badge and instructed Kellner to get inside his Jeep. The driver took a circuitous route through Borough Park, and Kellner began to worry that he was being kidnapped. Yossel, who had watched his father being taken away, called the police. "An unmarked car just picked up my father," he told a sergeant. "There were no lights, no nothing."

Twenty minutes later, Kellner arrived at a familiar building, the office of the district attorney, in downtown Brooklyn. He was placed in a holding cell in a hallway. His wife brought him his diabetes pills and his prayer book. He fell asleep to the sound of officers talking about a ring of criminals with stolen credit cards. He wondered if he was being apprehended for some sort of violation with his toner business or if he had accidentally got involved in a drug bust.

In the morning, he was handcuffed and escorted to Kings County Supreme Court, two blocks away. He was greeted by a crowd of local reporters, who took pictures as he walked down the hallway to court. Kellner's lawyer, Israel Fried, said that when he handed Kellner the indictment he appeared "bewildered and shell-shocked." The indictment said that he had made "repeated demands to Meyer Lebovits, the son of Baruch Lebovits, for payments in excess of $50,000, in return for which

the defendant Kellner would, through the defendant Kellner's ability to control the coöperation and the content of the testimony of the complaining victims, cause the dismissal of criminal charges." He faced up to twenty-one years in prison.

At a press conference that morning, Charles Hynes announced the charges while standing beside an easel with a large photograph of Kellner's face on it. He told a room full of reporters that "child abuse has to be prosecuted vigorously, but we also have to be very, very careful about false complaints." Later, on a Jewish radio show, Hynes said, "We're confident we have the case. . . . I believe there was a substantial effort by Mr. Kellner to gain money, for his own benefit, by making up stories."

A day after Kellner's arrest, Lebovits's appeals lawyers, Alan Dershowitz (the former Harvard law professor, who worked on the O. J. Simpson case) and his brother, Nathan, persuaded an appellate judge to free Lebovits on bail, pending the determination of his appeal. Alan Dershowitz, who grew up in Borough Park, told me that "the Kellner information put the government in a difficult position: on the one hand, they are proclaiming that my client was extorted, and, on the other hand, they are claiming that he is guilty of eight felonies." Within a week, Lebovits was released, after thirteen months in prison. He arrived in Borough Park in time for the first night of Passover and led a Seder at his home.

Kellner was in jail for about thirty-two hours, which he saw as punishment for putting Lebovits in prison for thirty-two years.

Although he had acted for what he thought were good reasons, there was also a part of him that had wanted revenge, and it was this impulse, he believed, that God was punishing. "When you hurt someone, you better make sure your motivations are pure," he told his son. "Because if your intentions aren't pure, you are going to pay the price."

Yossel's case against Lebovits had been dismissed six months earlier, without explanation. No one from the sex-crimes bureau had notified him or his father. Yossel told me that if he had a friend who was molested he would advise him to avoid the secular courts. "Why would you report to the police if you're just going to shame yourself and open your wounds and be more destroyed?" he said.



JULY 17, 2000
*"But I'm not here to talk about bowling."*

BUY OR LICENSE »

Yossel was a "Cadillac of a boy," one rabbi told me, but he had reached his twenties and had yet to marry. Hasidic families typically marry off their children in descending order: the younger siblings wait for the older ones to be matched, ideally around the age of eighteen.

Kellner's four youngest children had been stalled since 2008, when their father first went to the police. Kellner said that his brothers thought he was crazy for allying himself with loners like Joshua and Aron. "They tell me, 'You've ruined the family,' " he said. "And the truth is

I'm starting to think maybe they are right. If your job is to protect your child, maybe the best thing to do is keep your mouth shut."

At night, unable to sleep, Kellner paced his house, going over all the details of his indictment. At times, he almost admired the Lebovits sons for spending so much money to save their father. "They honored their father so much," he said. "You can't take that away from anyone." He described their activities as if recounting the chess moves of an opponent. "They masterfully put this thing together," he said. "Amazing stuff." His anger was directed largely toward the district attorney's office. "A thug can only go so far on his own," he told me.

A Hasidic businessman, who spoke on the condition of anonymity, told me that in parts of the Hasidic community there was widespread speculation that Kellner had been framed. He said that Kellner had become the prime example of "how devastated you will be if you go against the rabbis." He said that Flohr, the rabbi who had granted Kellner permission to go to the police, was an outlier in his approach toward molestation. "He's not a major power broker," he told me. "He's a nobody when it comes to internal, high-level politics." The businessman believed that Kellner had made himself vulnerable as a target, because he had been sloppy and uninformed in his interactions with law enforcement. "He didn't understand the legal system, so he was meddling too much," he said.

In the spring of 2012, the guilty verdict against Lebovits was vacated because of a prosecutorial violation: two pages of Detective Litwin's notes

(about Berel Ashkenazi, the defense witness) hadn't been disclosed until halfway through the trial. The district attorney's office promised to retry Aron's case, but Aron, who was now twenty-four, didn't want to go through a second trial. "He can't take the pressure anymore," his father, Abe, told me. Aron felt betrayed by the friend who had taken him to Florida, and now saw conspiracies in daily life. When his car broke down, he wondered if Lebovits's sons had hired someone to fill the tank with the wrong kind of fuel. When he got in a motorcycle accident, he suspected that the Lebovits family had arranged the collision.

Several weeks after the conviction was overturned, one of Baruch Lebovits's in-laws approached Abe outside his synagogue and said, "Maybe we can make a closing to this case." Abe was exhausted by the case, which had hurt his business and restricted the synagogues where he could pray, so he told the Lebovits family that he would agree to negotiate a civil settlement. He asked for several hundred thousand dollars, but they said that was too much. They changed their minds after the trial of Nechemya Weberman, a Hasidic sex offender who, in early 2013, was sentenced to more than a hundred years in prison. "When Weberman got a guilty verdict, all of a sudden it was hot, hot," Abe said. "They were willing to agree to my number."

Abe could not disclose how much money he received except to say that it was enough for his son to "build a house, to build a life." In exchange, Aron sent a letter to the district attorney's office stating that he was satisfied with the punishment that Lebovits had already served. Abe and his son were represented by an attorney named

Michael Ross, who Abe said had been recommended to him by the Lebovits family and who worked for free. Ross met with Hynes and explained that Aron did not wish to testify at a second trial. Aron wrote to me on Facebook (the only medium through which he felt comfortable communicating) that the Lebovits family, their lawyers, his father, and Ross handled the details of the civil settlement. "I had no qluo of anything what wuz going on beind closd doors," he wrote. (Ross declined to comment, except to say, "Any matter that I'm involved in, the client will always be fully informed.")

By the time the civil settlement was finalized, Hynes was deep into a campaign for reëlection and was confident that he had the support of the Hasidic community. In early 2013, in an e-mail to a colleague, he asserted that an opponent's "threat about my not getting the Satmar vote is pathetic." Hynes had been supported by the Hasidic bloc for two decades and worked diligently to maintain an amicable relationship with leading rabbis in the community. He had a history of offering unusually light plea deals to Hasidic offenders, whose names his office kept confidential—a practice unique to the Hasidic community. *Der Yid*, published by Lebovits's cousin, ran a full-page notice explaining that community leaders had benefitted from an "open door with Charles Hynes for the past 20 years" and "know firsthand what happens . . . when they got themselves entangled with the law, how district attorney Hynes worked very sensitively and mercifully to avoid sending them to jail." Jews who supported Hynes's opponent, Ken Thompson, were "informers and accusers from the dregs of the Jewish community," who intended to "toss Jews in jail whenever it's possible!"

In less religious circles, the policies of the Hynes administration came under scrutiny. The links between the Kellner and Lebovits cases were analyzed by two blogs, Failed Messiah and Frum Follies, which are written by ultra-Orthodox Jews who became disillusioned, and by Hella Winston, a contributing editor at *Jewish Week*, who for the past several years has investigated the community's approach to sex abuse. In the months leading up to the election, other news outlets exposed the Hynes administration's record of using unreliable or coerced witnesses to secure prosecutions: three guilty convictions had been overturned, and a panel was reviewing dozens of cases handled by a discredited detective. There were also leaks from within the office, which revealed that Hynes made little distinction between the work of the office and the goals of his campaign: he used asset-forfeiture funds to pay for a political consultant and sought political advice from a judge.

Hynes lost the election, in November, 2013, by fifty percentage points. Minutes after he gave a concession speech, Aidala put his arm around him, walked him to his car, and held the door open for him, according to a privately recorded video.

During Hynes's last weeks in office, Abe said, he got calls from the Lebovits sons, who were concerned that their civil agreement was no longer strong enough. They now requested a letter stating that Aron was not in good health. "They said they had some information from the higher guys in the D.A. that they need that letter to make the case go away," Abe told me. In exchange for the letter, Abe said, Baruch Lebovits agreed to apologize

NEWS
CULTURE
BOOKS & FICTION
SCIENCE & TECH
BUSINESS
HUMOR
MAGAZINE
ARCHIVE
SUBSCR
SIGN IN
LINK YOUR

to Aron in person—something that Aron had been asking for since the negotiations began. But on the morning of the meeting Aron refused to leave his house. "He was never convinced that they were not scheming," Abe told me. "He didn't want to fool around with these people anymore."

For almost three years, as Kellner's extortion case dragged on, the rabbis in his community urged him to take a plea deal. They warned him that, as a Hasid, he would never get a fair trial. "They say you are guilty just by having the big beard," he said. His rabbi told him, "If you know you didn't do it, what do you care? It's between you and God."



JANUARY 31, 2011
*"Someone's misfiled Harrington."*

BUY OR LICENSE »

Kellner had a new attorney, Niall MacGiollabhuí, who began working on the case in the spring of 2013. An Irish immigrant, MacGiollabhuí was dismayed that the rackets bureau had relied on evidence with little regard for the culture from which it emerged. "They are lifting things out of that community, dropping it into the wider world, and stripping the things of context," he said. MacGiollabhuí initially assumed that Kellner was exaggerating when he told stories about being followed and secretly recorded, but then audio recordings of Kellner's private conversations surfaced on

a new Web site called Sam Kellner—Alleged Jewish Mob Ringleader Revealed. MacGiollabhuí discovered that his own calls, too, were being recorded. He complained to the district attorney's office that Kellner's van was bugged, but no one investigated.

When the new district attorney, Ken Thompson, took office, last January, MacGiollabhuí warned two prosecutors in an e-mail, "At the moment, your office is being openly mocked in his community."

Eric Gonzalez, the counsel to Thompson, told me that the new administration was skeptical of the Kellner indictment. Four prosecutors had asked to be removed from the case, because they didn't believe in it. He said that it seemed as if "the decision had been made to prosecute Kellner, and they were going to go forward with that prosecution whether it was the right thing or the wrong thing to do. And here you had multiple senior people saying it was the wrong thing to do."

A new prosecutor, Kevin O'Donnell, conducted a review of the case in early 2014 and determined that Meyer Lebovits was not credible and the recording of him talking to Kellner was "ambiguous at best." "There are motives of certain witnesses that go beyond this case," he said at a hearing in March. He told the judge that Joshua's statements were "wildly inconsistent" and supported by "no credible evidence." In one interview, Joshua said that Lebovits might have molested him, but he wasn't sure. "Could be a different Lebovits," he offered. A week later, he said that he'd never even seen Lebovits. Joshua had recently moved to Israel, and he acknowledged that whenever he wanted to return to the

United States he requested permission from a man named Zalman Ashkenazi, who paid his airfare. Records obtained by the prosecution show that Ashkenazi, who is the brother of the defense witness at Aron's trial, made monthly payments to Joshua's father. (Ashkenazi denied that Joshua needed his permission to travel.)

When O'Donnell signalled that he would submit a motion to dismiss the case against Kellner, MacGiollabhuí said that he wanted to go to trial. He didn't understand how a case had been brought against Kellner, and he wanted to put people on the witness stand. "The people in my client's community are entitled to it," he told the judge. "They are entitled to know why it is that victims of pedophiles in my client's community don't get the justice that victims in other communities get."

MacGiollabhuí consented to have the case dismissed only after O'Donnell told him, last March, that the district attorney's office would undertake an investigation into the circumstances surrounding Kellner's indictment. But an investigation was never announced. Months later, MacGiollabhuí wrote to the prosecutor, "I now believe that I was lied to." (A spokeswoman from the D.A.'s office said that an investigation was never promised.) Gonzalez would not acknowledge whether or not there was an ongoing investigation, but he did say that "this district attorney is very concerned about the amount of money and effort used to prevent the Baruch Lebovits case from seeing the courtroom." He said that Aron's civil settlement seemed to be a "very calculated way of buying the victim off."

Two months after Kellner's case was dismissed, Lebovits pleaded guilty to molesting Aron and avoided a second trial. The prosecution was severely compromised by the settlement. In May, Lebovits was sentenced to two years in prison. "You wanted to have it your way," Aron said to Lebovits at the sentencing hearing. "He still won't apologize to me in person," he went on. "He never apologized to me. That's it." Lebovits was released after eighty-three days.

Supporters of both Lebovits and Kellner continue their efforts at intimidation. Two people told me they were afraid that I had been hired by the Lebovits family. Others alerted Kellner that I was a secret agent of the district attorney's office. When I met Chaim Lebovits, in a suite at the Plaza, he told me that if I continued to work on this article I would make a fool out of myself and ruin my career. Chaim vacillated between lightheartedness—he played the shofar, a musical instrument made out of a ram's horn, and encouraged me to have children immediately, before I was too old—and loud rants about Kellner's evil strategic intelligence. He told me that I could not rely on the documents that the district attorney's office had compiled, because Kellner "talked a smart language," and when it was translated into English his criminal intentions weren't as evident as they were in Yiddish.

Not long ago, Kellner and I met near the office in Crown Heights where Detective Litwin worked before moving to a new unit. Kellner wanted to talk to me only in public spaces, so that he did not violate the prohibition in his community against meeting with a woman alone. As officers walked in and

Case 1:17-cv-01268-NRM-MMH Document 104-19 Filed 10/31/24 Page 37 of 38 PageID #: 1770



out of the building, they stared at us, apparently confused that a Hasidic man was chatting with a secular woman.

Kellner was still consumed by the case. It was as though he believed that if he recited the details enough times he might figure out exactly what had happened. Since his case, he said, the rabbis had become even less willing to permit victims to go to the police. Recently, when a father whose daughter had been molested asked for advice, Kellner told him, "If you go to the police, you're probably going to end up with zero."

Three officers walked past us for the third time, and Kellner, who almost never turns down an opportunity for conversation, asked them if they knew Steve Litwin. "Steve and I worked together on a case," he said. "Then the D.A. turned against me. And no one stood up for me."

"Really," one of the officers said, casually. He suddenly seemed less interested in us.

"Basically, the D.A. destroyed me."

"Well, Steve doesn't work here anymore," the officer said.

"Yeah, but the question is, Who's going to come here anymore?" Kellner asked.

"None of these guys work here anymore," the officer said. "They're all gone."

"They ruined me," Kellner went on. "This is what is left of me."

"Well, keep fighting the fight," the officer said, as he and his partners walked away. ♦

NEWS
CULTURE
g+1
BOOKS & FICTION



Rachel Aviv is a staff writer.

TECH
BIO
ALL WORK
HUMOR
MAGAZINE
ARCHIVE
SIGN UP TO GET THE BEST OF THE NEW YORKER DELIVERED TO YOUR INBOX EVERY DAY
SUBSCRIBE
SIGN UP
SIGN IN
LINK YOUR SUBSCRIPTION
Cl