# EXHIBIT 36

## SIDER, ZACHARY

**From:** aidalaesq@aidalalaw.com
**Sent:** Thursday, January 20, 2011 7:30 PM
**To:** vecchiom@brooklynda.org
**Subject:** Fw: Fwd: 440 Motion
**Attachments:** ATT176180.txt; LEBOVITS  MOL.pdf; LEBOVITS  NZD AFF.pdf; Lebovits Exhibits.pdf; Lebovits Notice.pdf

EXHIBIT
Plaintiff's 185 5/20/2022 KK
exhibitsticker.com

Arthur L. Aidala
Aidala & Bertuna, Attorneys at Law
546 - Fifth Ave
New York, N.Y. 10036
(212) 486-0011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS, CRIMINAL TERM – PART 15

---------------------------------------------------------------------X

PEOPLE OF THE STATE OF NEW YORK

- Against -

BARUCH LEBOVITS,

Defendant-Appellant

Index No..: 11393/08
(Kings County)

AFFIDAVIT

---------------------------------------------------------------------X

STATE OF NEW YORK )
: ss:
COUNTY OF NEW YORK )

NATHAN Z. DERSHOWITZ, being duly sworn, deposes and says:

1. I am one of the attorneys for the above-named defendant, Baruch Lebovits, and make this Affidavit in support of a motion to vacate the judgment of conviction under the provisions of CPL §440.10 1(b); 1(c); 1(d); 1(f); 1(g); and 1(h).

2. On March 8, 2010, Mr. Lebovits was convicted of eight counts of criminal sexual acts in the third degree. (P.L. §130.40.2). On April 12, 2010, he was sentenced to a term of imprisonment of 1-1/3 to 4 years on each count, to be served consecutively, for a total term of imprisonment of 10-2/3 to 32 years.

3. Subsequent to the trial, information was provided to the defendant's family and counsel which is outlined below. This information was provided to the District Attorney's office, which indicated an interest in pursuing an investigation. So as not to undermine that investigation, this §440.10 motion was not filed at the outset of the District Attorney's investigation. However, although, apparently, the investigation is still ongoing and has resulted in at least one arrest, counsel believes that, because the defendant is incarcerated, it is now appropriate to file the motion.

4. Baruch Lebovits was originally charged with engaging in illegal sexual acts by three different individuals. One a misdemeanor charge was leveled by Pinchus Kellner; - a second by Michael Torenheim; and a third by Yaakov Rubenstein ("Sruli") - - the complainant in the case now before this Court. Only Rubenstein's charges went to trial. The other charges were dismissed.

5. Subsequent to the trial, evidence emerged that, during the trial, which occurred from March 3, 2010 through March 8, 2010, Detective Litwin, the detective involved in all of the Lebovits related cases, at 2:00A.M. on March 4, 2010, visited with the Eisenbach family seeking to confirm that Mr. Yaakov Eisenbach had alleged that a Rabbi Beryl Ashkenazi, whom the People knew was a prospective defense witness, had sexually molested him. Mr. Eisenbach denied that he had been molested. Nonetheless, the prosecutor represented to the Court that Mr. Eisenbach made such allegations. (Tr. ____)

6. When Detective Litwin visited the Eisenbach home he was accompanied by Mr. Samuel Kellner and Rabbi Nauchem Rosenberg. Mr. Kellner is the father of Pinchus Kellner, one of the complainants whose case has been dismissed. It appears, as detailed more fully below, that Mr. Kellner offered Mr. Rubenstein a bribe to make false charges against Mr. Lebovits. Mr. Kellner also bribed Michael Torenheim into falsely accusing Mr. Lebovits. Mr. Kellner further sought to have Mr. Eisenbach make false charges against Rabbi Ashkenazi and offered to make payments to Mr. Eisenbach's family if they cooperated with him.

7. Rabbi Nauchem Rosenberg, who also accompanied Det. Litwin to the Eisenbach home, is a "blogger" who has made numerous allegations of sexual abuse against many different people, including Lebovits and his family, and recently vowed to run District Attorney Hynes out

DRAFT

of office, claiming the District Attorney is *inter alia* corrupt and took bribes. (See: http://www.youtube.com/profile?user=rabbinrosenberg&view=videos)

8. After the trial, friends of Rubenstein have come forward confirming that Rubenstein (who admitted that he had been a drug addict), was also a male prostitute and was used by Kellner to falsely testify against Mr. Lebovits. Kellner apparently wanted to extort money from the Lebovits family.

A. **The Prosecutor Misled the Trial Court**

9. Attached hereto (Ex. 1) is an Affidavit of Yaakov Eisenbach dated June 30, 2010. In his affidavit, Mr. Eisenbach states:

> "On Thursday, March 4, 2010 at 2:00 AM, Det. Litwin, along with Mr. Kellner and Mr. Rosenberg, came to my home."
>
> "Det. Litwin sought to have me file a police report wherein I would allege that I was molested by Beryl Ashkanazi. I advised Det. Litwin that Mr. Ashkanazi had not molested me."

10. Upon information and belief, on or about October 25, 2010, Mr. Eisenbach provided statements to ADA Nick Batsidis and Det. Stephanie Greens at the Brooklyn District Attorney's office and elaborated on the above written statement, including stating that Mr. Kellner approached him sometime in 2007 and told him to make false criminal molestation allegations against Rabbi Berel Ashkenazi.

11. Upon information and belief, Yaacov Eisenbach's parents, Rochel and Samuel Eisenbach, also met with ADA Nick Batsidis and Det. Stephanie Greens and confirmed that Mr. Kellner came to the Eisenbach home with Det. Litwin at 2:00 AM on March 4, 2010 and insisted on speaking to Yaakov alone. Kellner told them they would get $12,000 in the morning to pay

DRAFT

off a debt for stolen property if they "helped out." Besides the cash, Kellner also said he would get Yaakov into drug rehabilitation program and get him a job for his cooperation.

12. On March 8, 2010, four days after Mr. Eisenbach denied having been molested by Rabbi Ashkenazi, Rabbi Ashkanazi took the stand, primarily to testify that Rubenstein had asked Rabbi Ashkenazi to arrange for him to receive money to drop the case. (Tr.535-36, 443-44) During cross-examination, without prior warning, the prosecutor asked Rabbi Ashkenazi whether he had molested a fifteen year old boy. The defense immediately objected. The prosecutor represented she had a good basis for her question. At a side bar, the prosecutor, holding what she identified as notes of Det. Litwin, claimed that two men, both friends of Rubenstein, including Yaakov Eisesnbach, had told Litwin they were sexually abused by Rabbi Ashkenazi many years earlier, but that no charges had been brought because of the statute of limitations (Tr[1], pp 451-52, Ex. 2) Based on this representation, the Court allowed the inquiry. The prosecutor never advised the Court that Det. Litwin had reached out to Mr. Eisenbach a few days earlier and that Mr. Eisenbach had denied the claim.

13. The prosecutor inquired of Rabbi Ashkenazi about the allegations (Tr. 453-55). In summation, the prosecutor argued that Rabbi Ashkenazi "is an accused child molester" and "uses his relationship as a teacher to abuse boys." (Tr. 515)

B. <u>Kellner's Suborning Perjury and Extortion Attempts</u>

14. Upon information and belief, on or about July 15, 2010, Mr. Moshe Friedman executed an affidavit where he stated the following:

> "I was approached at my office by a man named Mr. Kellner, who wanted me to negotiate with the Lebovits family to ensure that the charges against Baruch Lebovits never went to court and 'all went away'

---

[1] All references to "Tr." refer to Trial Transcript

> Mr. Kellner stated that he 'controlled all of these cases'.
>
> Mr. Kellner stated that 'only a misdemeanor happened' regarding sexual activity.
>
> When asked by me why he was pursuing this case, Mr. Kellner stated, 'Let them pay. Baruch doesn't have money but his son has money. I need to get money. I am not making a living, I have to get this money."

(Ex. 3)

15. Upon information and belief, on or about August, 2010 Mr. Friedman was interviewed by the Brooklyn District Attorney's office and confirmed and expanded upon his affidavit.

16. Upon information and belief, on or about July 22, 2010, Mr. Michael Torenheim, one of the complainants whose case has been dismissed, executed an affidavit which stated the following:

> "Sam Kellner approached me at the synagogue and said "I have a job for you." Mr. Kellner gave me about $400 or $500 and said "I should say yes if someone ask me if I was molested.
>
> Mr. Kellner instructed me to say 'Baruch Lebovits raped me' on a regular basis from the time I was 12 until I was 16 years old.
>
> I testified two times that Baruch Lebovits raped me by putting his penis in my anus, but Baruch Lebovits never molested me.
>
> Mr. Kellner gave me a total of approximately $10,000. I don't know why I did what I did but Sam Kellner 'brainwashed me' and I 'desperately needed the money.'
>
> I saw Israel (Sruli) Rubinstein last night, July 21, 2010, and he said 'Kellner gave money to everyone and he (Kellner) is going to get in trouble.'"

(Ex. 4)

DRAFT

17. Upon information and belief, on or about September 15, 2010, Mr. Torenheim met with people from the Brooklyn District Attorney's office and confirmed and elaborated upon what was reflected in his affidavit.

18. Upon information and belief, on or about June 22, 2010, Mr. Sholem Weisner, a friend of Sruli Rubenstein, executed an affidavit which included, *inter alia,* the following:

> I met Israel (Sruli) Rubinstein in the summer of 2009, right before Sruli was expected to testify in a court proceeding. Sruli did not want to testify. He was very stressed out about the Lebovits court proceedings. The trial did not take place at that time.
>
> Sruli was "desperate" and "suicidal" when I met him. He told me he was robbing charity boxes and working as a male prostitute to get drug money. He said he was going to die if he did not get money for his drug habit.
>
> Sruli said he had "numerous relationships" where he had sex for money which went back many years well before he met Baruch Lebovits.
>
> Sruli said he had a "guilty conscience" about making a case against Baruch Lebovits. Community pressure from "powerful people" was forcing Sruli to go forward with the complaint. He wanted me to get involved. He said he had picked up bigger money from Shloime Aaron Kellner and Mark Appel. He said Appel bought him a computer and in the past Appel gave him bigger money. He told me that he proceeded with the case because he received these payments. Sruli asked me to contact the Lebovits family to ask them to pay him not to proceed. He asked me to get involved because he did not trust Kellner and was afraid Kellner would keep all the money. I did not do so because I did not want to get involved.
>
> He said he was going after Baruch Lebovits because his son has money. He said he will not proceed with the case because the Lebovits will pay him. When he did not get money from Lebovits, he said he was angry and was going to proceed.
>
> I asked him why he did not push Lebovits' hand away. He said not everyone was strong enough. I understood him to be saying the only contact was a hand contact.

DRAFT

(Ex. 5)

19. Upon information and belief, on or about November 8, 2010, Mr. Weisner was interviewed by the District Attorney's office and confirmed what is contained in his affidavit.

20. Attached is an affidavit executed by Robert E. Mladinich, a private investigator hired by Attorney Arthur L. Aidala, of interviews he conducted with additional people who claimed to have relevant information, but who were either unwilling to sign affidavits and/or unwilling to be interviewed by personnel of the Brooklyn's District Attorney's office. In that affidavit, Mr. Mladinich states he spoke, *inter alia,* to: a) Benzion Cohen, who reported on conversations with Mr. Rubenstein and Mr. Kellner; b) Aaron Joseph Fux, who reported on conversations with Mr. Kellner; c) Aaron Benzion Mandel, who reported on conversations he had with a Mr. Taub about extorting money from the Lebovits family to make the case against Lebovits go away and who was threatening to have false allegations of sexual impropriety made against Baruch's son; d) Abraham Shemtov, who was friendly with Mr. Rubenstein and who confirmed that Rubenstein was a "male prostitute and had been paid by Kellner to proceed with his case against Baruch Lebovits. (Ex. 6)

21. The newly disclosed information, as set forth above, establishes that the prosecutor, or Det. Litwin, acting on her behalf, defrauded the Court either by an act of commission or omission in misrepresenting the facts relating to Mr. Eisenbach. As set forth more fully in the accompanying Memorandum of Law, this requires vacatur of the judgment pursuant to CPL §440.10(1)(b). This information further establishes that the prosecutor "adduced" "material evidence" at trial suggests that Rabbi Ashkenazi had sexually abused Mr. Eisenbach that the prosecutor or Detective Litwin, acting on her behalf, knew, or should have known, was false, in violation of CPL §440.10(1)(c). Had this information been conveyed to the

DRAFT

Court, and had it appeared on the record, the evidence relating to Rabbi Ashkenazi and Rubenstein would have been viewed differently by the jury. The newly discovered information requires a reversal pursuant to CPL §440.10(1)(f), and vacatur of the conviction under CPL §440.10(1)(d)(g) and (h).

22. In addition, the newly discovered evidence about repeated efforts by Kellner and others to extort money from the Lebovits' family, reveals that Rubenstein perjured himself at trial when he testified that he never sought money or was interested in obtaining money from the Lebovits' family. Given the relationship between Kellner and Det. Litwin, as reflected in Det. Litwin having Kellner accompany him in the middle of the night to visit Yaakov Eisenbach, there is ample reason to believe that Det. Litwin knew or had reason to know of Kellner's improprieties. An evidentiary hearing, at a minimum, is required. CPL § 440.30 Moreover, Mr. Kellner suborned perjury and manipulated complainants in an effort to use the judicial justice system to extort money from Mr. Lebovits and his family. This too requires vacateur of the judgment pursuant to CPL §410(d)(f)(g) and (h).

DRAFT

Dated: New York, New York
January ___, 2011

________________________
Nathan Z. Dershowitz

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS, CRIMINAL TERM - PART 15

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK,<br><br>-against-<br><br>BARUCH LEBOVITS,<br>Defendant-Appellant. | No.: 11393/08<br><br>(Kings County)<br><br>**AFFIDAVIT** |

STATE OF NEW YORK :
: ss:
COUNTY OF KINGS :

YAACOV EISENBACH, being duly sworn deposes and says:

1. On Thursday, March 4, 2010 at 2:00AM, Det. Litwin, along with Mr. Kellner and Mr. Rosenberg, came to my home.

2. Det. Litwin sought to have me file a police report wherein I would allege that I was molested by Berel Ashkanazi. I advised Det. Litwin that Mr. Ashkanazi had not molested me.

YAACOV EISENBACH

Sworn to before me this 30 day
of June, 2010

Notary Public

ROBERT E. MLADINICH
Notary Public, State of New York
No. 01ML6197480
Qualified In New York County
Term Expires December 1, 2012

Ex 2



THE COURT: Step up.

(Whereupon, a side-bar conference was held on the record outside of the presence of the jury as follows:)

THE COURT: It's prior bad acts.

Do you have a good faith basis?

MS. GREGORY: Yes, your Honor.

THE COURT: What's the objection?

It's your witness.

MR. AIDALA: May I inquire.

MS. GREGORY: There were two witnesses who were interviewed by Detective Steve Litwin. One is this Hershey Deutsch. It's a student of this witness. He told Detective Litwin that he was sexually abused by him on multiple instances inside the Munkasc Yeshiva. Because it was beyond the statute of limitations, Detective Litwin was unable to bring a case. There is a second individual by the name of Yakov Eisenbach who made similar allegations when he was a student of this witness.

MS. JOHNSON: Can we please at leave have a limiting instruction. Just because he says it, doesn't mean it's true.

MR. AIDALA: Where is Detective Litwin's notes regarding all this.

MS. GREGORY: Okay, I have his notes right here.

MR. AIDALA: So this is something that should have been turned over.

THE COURT: It's your witness.

MR. AIDALA: It's says right on the top.

MS. GREGORY: He is a friend of Srully Rubenstein and this right --

THE COURT: This is a prior bad act. I don't have to charge the jury that it's not, you know, it's not true or it is true.

MS. JOHNSON: Just to say that questions are not evidence.

THE COURT: I say that in my charge.

MS. JOHNSON: I would ask for a limiting instruction at this point.

THE COURT: Tell me what you want me to say.

MS. JOHNSON: That questions are not evidence and that the evidence is what the witness testifies to. The facts that are alleged in the question are not evidence.

THE COURT: So therefore, because she is asking the question, he denies it. It's the same thing. I say it all the time. I say it in the opening and I will say it in my summation. This is no different than

Ex 3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS, CRIMINAL TERM - PART 15

PEOPLE OF THE STATE OF NEW YORK,

-against-
(Kings County)

BARUCH LEBOVITS,
Defendant-Appellant.

No.: 11393/08

**AFFIRMATION**

STATE OF NEW YORK : ss:
COUNTY OF KINGS

MOSHE FRIEDMAN, affirms under penalty of perjury and says:

1. I was approached at my office by a man named Mr. Kellner, who wanted me to negotiate with the Lebovits family to ensure that the charges against Baruch Lebovits never went to court and "all went away."

2. Mr. Kellner stated that he "controlled all of these cases."

3. Mr. Kellner stated that "only a misdemeanor happened" regarding sexual activity.

When asked by me why he was pursuing this case, Mr. Kellner stated, "Let them pay. Baruch doesn't have money but his son has money. I need to get money. I am not making a living. I have to get this money."

[signature]
MOSHE FRIEDMAN

Sworn to before me this 15 day
of July, 2010

[signature]
Notary Public

ROBERT E. MLADINICH
Notary Public, State of New York
No. 01ML6197480
Qualified in New York County
Term Expires December 1, 2012

Ex 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS, CRIMINAL TERM - PART 15

PEOPLE OF THE STATE OF NEW YORK,

-against-

BARUCH LEBOVITS,

Defendant-Appellant.

No.: 11393/08

(Kings County)

**AFFIRMATION**

STATE OF NEW YORK : ss:
COUNTY OF KINGS :

MICHAEL TORENHEIM, affirms under penalty of perjury and says:

1. Sam Kellner approached me at the synagogue and said "I have a job for you." Mr. Kellner gave me about $400 or $500 and said "I should say yes if someone ask me if I was molested."

2. Mr. Kellner instructed me to say "Baruch Lebovits raped me" on a regular basis from the time I was 12 until I was 16 years old.

3. I testified two times that Baruch Lebovits raped me by putting his penis in my anus, but Baruch Lebovits never molested me.

4. Mr. Kellner gave me a total of approximately $10,000. I don't know why I did what I did but Sam Kellner "brainwashed me" and I "desperately needed the money."

5. I saw Israel (Sruli) Rubinstein last night, July 21, 2010, and he said "Kellner gave money to everyone and he (Kellner) is going to get in trouble."

[signature]
MICHAEL TORENHEIM

Sworn to before me this 22 day
of July, 2010
[signature]
Notary Public

ROBERT E. MLADINICH
Notary Public, State of New York
No. 01ML6197480
Qualified in New York County
Term Expires December 1, 2012

Ex 5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS, CRIMINAL TERM - PART 15

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK,<br><br>-against-<br><br>BARUCH LEBOVITS,<br><br>Defendant-Appellant. | No.: 11393/08<br><br>(Kings County)<br><br>**AFFIDAVIT** |

STATE OF NEW YORK :
: ss:
COUNTY OF NEW YORK :

SHOLEM WEISNER, affirms under penalty of perjury:

1. I reside at 227 Hewes Street, Brooklyn, New York 11211.

2. I met Israel (Sruli) Rubinstein in the summer of 2009, right before Sruli was expected to testify in a court proceeding. Sruli did not want to testify. He was very stressed out about the Lebovits court proceedings. The trial did not take place at that time.

3. Sruli was "desperate" and "suicidal" when I met him. He told me he was robbing charity boxes and working as a male prostitute to get drug money. He said he was going to die if he did not get money for his drug habit.

4. Sruli said he had "numerous relationships" where he had sex for money which went back many years well before he met Baruch Lebovits.

5. Sruli said he had a "guilty conscience" about making a case against Baruch Lebovits. Community pressure from "powerful people" was forcing Sruli to go forward with the



SW

complaint. He wanted me to get involved. He said he had picked up bigger money from Shloime Aaron Kellner and Mark Appel. He said Appel bought him a computer and in the past Appel gave him bigger money.

6. Sruli said his feelings were hurt when authorities asked Baruch Lebovits if he knew Sruli and Baruch said no. Another time Sruli asked Baruch for a favor (probably money) and Baruch said "I don't know you." This made Sruli very angry and hurt.

7. Sruli and I were arrested together in Brooklyn near the end of 2009 for marijuana possession. We were smoking in a car when stopped by the police.

8. Sruli frequently told me he was proceeding with the case only to get money. He said when he makes money he will remember the friends.

9. He told me that he proceeded with the case because he received these payments. Sruli asked me to contact the Lebovits family to ask them to pay him not to proceed. He asked me to get involved because he did not trust Kellner and was afraid Kellner would keep all the money. I did not do so because I did not want to get involved.

10. He said he was going after Baruch Lebovits because his son has money. He said he will not proceed with the case because the Lebovits will pay him. When he did not get money from Lebovits, he said he was angry and was going to proceed.

11. I asked him why he did not push Lebovits' hand away. He said not everyone was strong enough. I understood him to be saying the only contact was a hand contact.

12. I told him I did not want to see him. He said he was not happy to proceed but that's the way it goes.

S.W.

13. I met him right before the trial and he told me he is making it big time. He told me not to go to the Lebovits' because he was being taken care of financially.

ROBERT E MLADINICH
Notary Public, State of New York
No 01ML6197480
Qualified in New York County
Term Expires December 1, 2012

SHOLEM WEISNER

Sworn to before me this 22 day
of June, 2010

Notary Public

# REM PRIVATE INVESTIGATIONS & SECURITY, LLC

LICENSED & BONDED
PO Box 1271 – Peter Stuyvesant Station
New York, NY 10009

(917) 679-5159 FAX (212) 529-3073
remprivateinvestigators.com


E46

January 3, 2011

I, Robert Mladinich, am the President of REM Private Investigations & Security, LLC. I served with the NYPD for 20 years, retiring as a second grade detective in January 2003. I have operated REM Private Investigations & Security, LLC since 2007.

On June 2, 2010, I was retained by attorney Arthur Aidala to investigate an appeals case involving a subject named Baruch Lebovits. Relative to that case, I have performed the following duties:

Since the onset of this investigation, I have been in regular contact with Detective Stephanie Greens of the Brooklyn District Attorney's office. I provided information to her relative to this case and also personally delivered Rochel Eisenbach, Samuel Eisenbach, Yaacov Eisenbach and Sholem Weisner to her office to be interviewed.

I personally notarized statements of witnesses Yaacov Eisenbach, Moshe Friedman, Michael Torenheim and Sholem Weisner.

I have provided information and photos of a residence where Yacov Rubenstein, aka Sruli, was believed to be living to Detective Greens.

I have made several appointments with Detective Greens to bring Abraham Shemtov to her office to be interviewed. All were cancelled by Shemtov.

I have interviewed Benzion Cohen, Aron Friedman (regarding possible testimony by son Abraham Friedman), Aaron Joseph Fux, Aron Benzion Mandel, Abraham Shemtov, Elimelech Stern and Wolf Wercberger. Below is pertinent information related to these witnesses.

Benzion Cohen: Subject is willing to sign affidavit and be interviewed by the DA's office. Subject has personal knowledge that Yacov Rubenstein was a male prostitute and proceeded with the case because of pressure from Kelner. Subject has knowledge that Kelner was seeking to extort money from the Lebovits family.

Abraham Friedman: Subject is unwilling to be formally interviewed by private investigator or the DA's office. He has yet to be interviewed (phone contact was made with subject's father, Aron Friedman), so it is unknown if subject has any personal knowledge related to Yacov Rubenstein or Kelner.

Aaron Joseph Fux: Subject is willing to sign affidavit and be interviewed by the DA's office. Fux does not have personal knowledge of Yacov Rubenstein working as a male prostitute or any information related to Kelner in the Lebovits matter.

Aron Benzion Mandel: Subject told investigator in July 2010 that he would sign affidavit, but was not sure of speaking to the DA's office. Subject has since been unresponsive to all attempts to contact him. Subject has knowledge of Kelner seeking to extort money from the Lebovits family.

Abraham Shemtov: Subject has already signed an affidavit, and stated in an e-mail to investigator on January 2, 2011, that he is now willing to be interviewed by DA's office. Shemtov has personal knowledge of Yacov Rubenstein working as a male prostitute, as well as information that Rubenstein proceeded with the case because of pressure from Kelner and that Kelner was seeking to extort money from the Lebovits family.

Elimelech Stern: Subject is not willing to sign an affidavit or be interviewed by DA's office. He has no knowledge of Yacov Rubenstein working as a male prostitute or of Kelner seeking to extort money from the Lebovits family, of which he is an in-law.

Wolf Wercberger: Subject is willing to sign affidavit and be interviewed by DA"s office under four conditions (immunity, promise he can't be forced to testify in court, would have to be subpoenaed, prior conferral with rabbi). Subject has no knowledge of Yacov Rubenstein working as a male prostitute, but does have information related to Kelner seeking to extort money from the Lebovits family.

Signed,

[signature]

Robert Mladinich
President
REM Private Investigations & Security, LLC

MARY ELLEN DONOHOE
Notary Public - State of New York
NO. 01DO6119242
Qualified in Kings County
My Commission Expires 11/29/12

Mary Ellen Donohoe

SWORN TO BEFORE ME
THIS 3rd DAY OF Jan. 20 11

F:\WPFILES\Lebovits\Legal\440 Motion\Draft MOL 1-10-11.wpd

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS, CRIMINAL TERM - PART 15

---

PEOPLE OF THE STATE OF NEW YORK,

No.: 11393/08

-against-

(Kings County)

BARUCH LEBOVITS,

Defendant-Appellant.

---

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION PURSUANT TO CPL §440.10

DRAFT

NATHAN Z. DERSHOWITZ, ESQ.
AMY ADELSON, ESQ.
DERSHOWITZ, EIGER & ADELSON, P.C.
220 FIFTH AVENUE, SUITE 300
NEW YORK, NEW YORK 10001
Attorneys for Defendant-Appellant

ARTHUR L. AIDALA, ESQ.
LAW OFFICES OF AIDALA & BERTUNA, P.C.
8118 13TH AVENUE
BROOKLYN, NEW YORK 11228
718-238-9898

OF COUNSEL:

ALAN DERSHOWITZ, ESQ.

## NATURE OF THE PROCEEDINGS

On March 8, 2010, following a jury trial in Kings County Supreme Court before the Hon. Patricia Di Mango, defendant Baruch Lebovits was convicted of eight counts of criminal sexual act in the third degree (P.L. §130.40.2) On April 12, 2010, he was sentenced to a term of imprisonment of 1 1/3 to 4 years on each count, to be served consecutively, for a total term of imprisonment of 10 2/3 to 32 years. On April 22, 2010, he filed a notice of appeal.

## STATEMENT OF THE FACTS

Introduction

Baruch Lebovits was convicted of engaging in non-forcible sexual acts with Yaakov Rubenstein. Rubinstein was the only witness to testify to the alleged acts. Newly disclosed evidence requires that pursuant to CPL440.10 the judgment of conviction be vacated. The reasons for the required vacatur can be divided into two general categories:

First, during the trial, the prosecutor alleged she had a good faith basis for asking the sole defense witness, Rabbi Beryl Ashkenazi, whether he had molested two boys. The prosecutor's purportedly good faith basis was "notes" of Detective Litwin - - notes that she did not turn over to the Court or to the defense. As the

DRAFT

defense has now learned, the prosecutor had no "good faith" basis for injecting this highly inflammatory inquiry into the case. To the contrary, the prosecutor failed to advise the Court that, a few days earlier, Detective Litwin was advised by at least one of the alleged complainants, Yaakov Eisenbach, that the charges were not true. Worse still, Samuel Kellner (the father of Pinchus Kellner, another complainant with a pending misdemeanor charge) who was instrumental in efforts to extort money from the Lebovits' family, accompanied Detective Litwin to Eisenbach's home, at 2:00 A.M. on March 4, 2010, and sought to have him make a false claim.

Second, and related, the defense has uncovered evidence of serious improprieties, including evidence showing that Rubenstein testified falsely and showing efforts by Kellner to compel Rubenstein to testify falsely against Lebovits in exchange for money. Given Det. Litwin's relationship with Kellner, it is evident that he knew or must have known of Kellner's misconduct and of the falsity of Rubenstein's testimony. When Det. Litwin went in the middle of the night to interview Eisenbach, he brought along Kellner and a Rabbi Neuchem Rosenberg. There is no possible legitimate justification for Kellner's presence in the Eisenbach home at 2:00 A.M. Rabbi Rosenberg, who also accompanied Litwin, is a "blogger" who has made numerous false claims against people, including District Attorney Hynes. It now appears that Mr. Kellner's effort to suborn perjury that night was part

DRAFT

of a pattern of criminal activity, which included paying Rubenstein to provide false testimony, as well as paying others to bring false claims against Baruch Lebovits.

A. The Trial

By his own admission, Rubinstein was a thief and a drug abuser. He did not tell anyone about the alleged abuse for many years. In response to scripted questions, he gave scripted answers, testifying that, once a month between May 2, 2004 and February 22, 2005, on an unspecified day, he entered Lebovits' car and Lebovits put Rubenstein's penis in his mouth. Rubenstein did not testify that he ever protested and he described no force or coercion.

Rubenstein testified that from kindergarten he attended Yeshiva -- a Jewish religious school. (Tr. 39-42, 159) Rubenstein started using drugs at 14, and got into "heavy drugs" by the age of 17, becoming addicted to crack/cocaine and heroin. (Tr. 45-46, 90-94, 101-107, 112-16, 129-30) Within a year, he was using drugs on a daily basis, spending about $1,000 per week. (Tr. 57, 98, 116-117) To support his drug habit, he stole from the charity boxes at synagogues.[1]

Rubenstein admitted he was arrested four or five times, but was fuzzy on the details. He first was arrested for possession of cocaine. He next was arrested for

1 Rubenstein had never held a job, at most, working intermittently for his father. (Tr. 39-41, 101-03, 107-08, 117)



DRAFT

stealing DVDs from Best Buy. He was arrested another time for possession of marijuana and Oxycontin.

Rubenstein testified that he went to school with Baruch Lebovits' son, Mende, and knew Lebovits from the Hasidic community as a "respectful guy." (Tr. 54) Rubenstein claimed he would see Lebovits driving in his car, a silver Toyota Avalon that did not have tinted windows. Once, he and a friend had accepted a lift from Lebovits. At Rubenstein's request, Lebovits allowed him to drive, though Rubenstein did not yet have a license. (Tr. 56, 59-61, 357)

As to the ten counts in the indictment, Rubenstein was asked virtually the same question ten times: whether he had seen Lebovits in a given month, and, if so, what had happened. In response, Rubenstein recited, ten times, as to each month from May 2, 2004 through February 22, 2005, in virtually identical language each time, that Lebovits opened Rubenstein's zipper, took out his penis, and put his mouth on it. (Tr. 58-59, 64-67).[2] Mr. Rubenstein clearly conveyed the impression to the jury that he never received, sought or wanted money for his testimony (Tr. 143-46, 169-170, 376)

Newly discovered evidence establishes that Kellner claimed that he

---

2 The prosecutor was reading from a typed piece of paper and Rubenstein admitted he had reviewed the questions and answers several times, including right before he took the stand. (Tr. 83-84)

DRAFT

controlled Rubinstein and that Kellner, through Rubenstein and others, was seeking to extort money from the Lebovits' family. (NZD aff. Ex--). Kellner had induced Michael Torenheim, another "complainant" to falsely accuse Mr Lebovits of similar crimes (NZD Aff. Ex -); Contrary to his trial testimony, Rubinstein told his friends that he was creating false claims against Lebovits and that he was doing so because he was receiving funds from Kellner. (NZD Aft Ex --,--). Rubenstein apparently was a male prostitute and, as a drug addict, was vulnerable to being manipulated by Kellner. (NZD affidavit) Kellner apparently orchestrated other charges and induced Rubenstein to commit perjury. Kellner was making payments to Mr. Rubenstein -- contrary to Mr. Rubenstein's sworn testimony -- and promised him additional payments if he perjured himself at Mr. Lebovits' trial.

The District Attorney of Kings County has been given an opportunity to investigate these charges.

B. <u>The Rosario/Brady Violations Required the Defense to Call Rabbi Ashkenazi</u>

On March 3, 2010, before opening statements, the People sought an offer of proof as to a witness placed on the defense witness list, Rabbi Beryl Ashkenazi. Defense counsel, noting he would not mention any of these witnesses in its opening statement, advised that, *if* called, Rabbi Ashkenazi would testify that,

DRAFT

within the last twelve to fourteen months, Rubenstein had spoken with him and "in sum and substance admitted to him that he was going to try to make money by accusing Lebovits of these crimes." (Tr. 4-5) On cross-examination, defense counsel asked Rubenstein: "Do you know Beryl Ashkenazi?" Rubenstein responded that he had been his high school teacher. (Tr. 157-58)

On redirect, Rubenstein testified that he met Rabbi Ashkenazi "randomly" on the street and went to his house. Rabbi Ashkenazi said he could get him money to drop the case. A day or two later, Rabbi Ashkenazi called him and said he should "forget about what happened." (Tr. 164-69) When asked whether *he* had asked Rabbi Ashkenazi for money, rather than the other way around, Rubenstein denied it, though he admitted he was desperate for money. (Tr. 169-70) Rubenstein testified that he met with Det. Litwin and *"told him the whole story. He should have everything down."* (Tr. 167)

The next day, March 4th, after Rubenstein had testified, the prosecutor advised the court and the defense that Det. Litwin had just turned over four withheld documents. Two documents constituted handwritten notes of two separate conversations the detective had had with Rubenstein on January 14, 2009 and January 20, 2009.

The defense sought a mistrial. That was denied. (Tr. 255-306)

The court, though agreeing there was a *per se* discovery violation, refused any of defense counsel's proposed remedies. Instead, the court allowed the defendant to recall Rubenstein for further cross-examination and then gave, in the court's words, a "bare bones" charge (Tr. 345):

> We are going to recall [Rubenstein] as a witness to the stand, and I am going to explain why. On January 14, 2009 and on January 20, 2009, the detective in this case, Detective Litwin, took some handwritten notes concerning conversation that he had with the complainant witness in this case...on those dates. The law requires that those notes be given to the defense. In other words, the detective had an obligation to turn those notes over to the prosecution who then was obligated to turn them over to the defense. They were not given to the defense prior to the start of this trial. Instead they were turned over to [the defense] on March 4th of 2010. That was the day after the victim completed his testimony. Therefore, the [complainant] is being ordered to be recalled to the witness stand by me to allow [defense counsel] to further or continue his cross examination of him in light of the information in these notes, okay.

(Tr. 353-54)

Once the jury was told that Rubenstein was being brought back because of the prosecution's failure to turn over notes, the defense had no choice but to re-explore Rubenstein's alleged conversations with Rabbi Ashkenazi.

On re-cross, Rubenstein testified that he told Det. Litwin about his

conversations with Rabbi Ashkenazi. (Tr. 378-79) He also told Det. Litwin that he had been at the house of a very wealthy man who offered him money regarding the case, though the man never said or implied it was on behalf of Lebovits. (Tr. 379, 386) Litwin's notes reflected that Rubenstein said he was supposed to pick up $10,000 the next day. Rubenstein testified he did not recall this. (Tr. 382-83)

Detective Litwin took the stand, primarily to explain why he had failed to turn over the notes of his interviews with the complainant. A 29-year veteran with the Brooklyn Police Department, Litwin was with the Special Victim's Squad for 12 ½ years. (Tr. 389) He first met Rubenstein on September 16, 2008. Rubenstein's allegations led him to open an investigation of Lebovits. His entire file was maybe 25 to 30 pieces of paper. (Tr. 390-93, 398) Litwin testified he provided his notes of his initial interviews with Rubenstein to the DA, but, though aware of his Rosario obligations, forgot to turn over the notes of his January 14, 2009 and January 20, 2009 interviews. (Tr. 395, 397-99) Also, though aware that Rubenstein had a serious drug habit, he never pursued whether Rubenstein had engaged in any criminal activity to obtain money to purchase drugs. He testified that Rubenstein never disclosed that he stole from synagogues to buy drugs. (Tr. 404-05)

**Rabbi Ashkenazi's Testimony**

The defense had no choice but to put on Rabbi Ashkenazi to rebut Rubenstein's

testimony. The prosecutor knew this, but kept silent about alleged accusations that Rabbi Ashkenazi had molested two young boys. This information, would destroy him as a witness if explored during cross-examination. (Tr. 425)

Rabbi Ashkenazi testified that Rubenstein had been his student from October until June, 2004. (Tr. 427-28) He also knew Lebovits, and had taught his son, Mende. (Tr. 429-30) In 2008, he bumped into Rubenstein in Borough Park and, in June, 2008, Rubenstein called him and asked to meet with him. Nothing came of this. (Tr. 430-31) In March 20, 2009, Rubenstein showed up at his home, crying and asking for money. (Tr. 437-38)

Rabbi Ashkenazi also encountered Rubenstein in early December, 2008, shortly after Mende's wedding. Rubenstein said he had not gone to the wedding because of his claim that Lebovits had molested him. He told Ashkenazi that he needed money to deal with his drug problem and that people had told him that he could make money from the case. (Tr. 435) About two weeks later, on December 17, 2008, Rubenstein called him and again asked him to try to convince the Lebovits family to pay him money to drop the case. (Tr. 435-36, 443-44) About a week later, Rubenstein called again to ask about the money; Ashkenazi told him he did not want to be involved. Rabbi Ashkenazi denied every offering Rubenstein money, not to testify in this case. (Tr. 437-39).

On cross-examination, without first disclosing to either the court or to the defense that it intended to ask Rabbi Ashkenazi whether he had ever molested young boys, and, thus, without first obtaining a ruling on whether she had a good faith basis to expose the jury to these highly inflammatory allegations, the prosecutor asked Rabbi Ashkenazi about whether, in 2000, he had touched a 15-year old boy. (Tr. 450) The defense objected. At side bar, the prosecutor, holding what she identified as Det. Litwin's "notes," claimed that two men, both friends of Rubenstein's, had told Litwin they were sexually abused by Rabbi Ashkenazi many years earlier, but that no charges had been brought because of the statute of limitations. (Tr. 451-52) Litwin's notes were not examined by the court and were not shown to the defense. The court, over objection, decided that the prosecutor's statement alone constituted a good faith basis for asking the questions, and the prosecutor was permitted to continue. (Tr. 451-53)

DRAFT

The prosecutor again asked about the first alleged encounter and then followed up by asking whether the Rabbi had molested another 13 year-old boy in 1998. Rabbi Ashkenazi firmly and unequivocally denied both allegations. (Tr. 453-55) Thus, there was *no evidence* that Rabbi Ashkenazi had ever engaged in any improper activity. The sole source of the accusations was the prosecutor's questions. Nonetheless, during her closing, the prosecutor argued that Rabbi Ashkenazi "is an accused child molester." The defense objected but the court refused to strike the comment. The prosecutor, emboldened, followed up with, "I submit that he uses his relationship as a teacher to abuse boys." (Tr. 515) This time the court sustained the objection, but provided no other relief. (Tr. 515)

As it turns out, not only was there no good faith basis to inquire about molestation of Eisenbach, the very opposite was true. On March 4, 2010, at 2:00A.M., Det. Litwin, along with Kellner and Rabbi Rosenberg, visited the home of Yaakov Eisenbach and his parents, Rochel and Samuel Eisenbach. According to Yaakov Eisenbach, "Det. Litwin sought to have me file a police report wherein I would allege that I was molested by Beryl Ashkenazi. *I advised Det. Litwin that Mr. Ashkenazi had not molested me."* (Ex. 1 to Nathan Z. Dershowitz Affidavit)

While Det. Litwin was talking to Yaakov Eisenbach, Kellner told Eisenbach's parents that if they "helped out" they would get $12,000 in the morning. Kellner also

DRAFT

offered to get Yaakov into drug rehab and to get him a job if he cooperated. Disclosed evidence also reflects that Kellner had paid Torenheim money to false accuse Lebovits of engaging in illegal activities with him. The charges filed as a result of Torenheim's false charges have recently been dismissed by the DA's office (NZD aft ex.). It has also recently been confirmed that Kellner was responsible for efforts to extort money from the Lebovits family, claiming he controlled all of the complainants and cases involving people who filed charges against Lebovits. (NZD aff. Ex).

______________________

DRAFT

DRAFT

## POINT I

## THE PROSECUTOR PROVIDED THE TRIAL COURT WITH FALSE MATERIAL INFORMATION AND MADE FALSE STATEMENTS TO THE JURY RESULTING IN A JUDGMENT PROCURED IN VIOLATION OF CPL §440.10(1)(b)(c)(d)(f)(g) AND (h)

CPLR §440(1) provides for a number of alternative methods to collaterally attach a judgment of conviction.[3] Here the newly discovered evidence shows that the judgment of conviction was secured by fraud or misrepresentations. This judgment must be vacated pursuant to CPL 440.10(1)(b),(c),(d),(f) (g) and (h).

There can be no doubt as to the significance of the prosecutor's questioning the sole defense witness about accusations of sexual molestation. Rabbi Ashkenazi was offered by the defense to support Lebovits' claim that Rubenstein had manufactured the charges against Lebovits in an effort to obtain money. Rabbi Ashkenazi's credibility was essential. The prosecutor's questioning of Rabbi Ashkenazi about

3 Pursuant to §440 a judgment can be set aside if:
(b) The judgment was procured by duress, misrepresentation or fraud on the part of the court or a prosecutor or a person acting for or on behalf of a court or a prosecutor; or
(c) Material evidence adduced at a trial resulting in the judgment was false and was, prior to the entry of the judgment, known by the prosecutor or by the court to be false; or
(d) Material evidence adduced by the people at a trial resulting in the judgment was procured in violation of the defendant's rights under the constitution of this state or of the United States; or
(f) Improper and prejudicial conduct not appearing in the record occurred during a trial resulting in the judgment which conduct, if it had appeared in the record, would have required a reversal of the judgment upon an appeal therefrom; or
(g) New evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence; or
(h) The judgment was obtained in violation of a right of the defendant under the constitution of this state or of the United States.

allegations of sexual molestation, and her "testimony" during summation that, despite Rabbi Ashkenazi's denials, the witness himself was an accused child molester, effectively destroyed Rabbi Ashkenazi as a witness.

Any allegation of child molestation is highly prejudicial, but this is especially so when the defense witness is testifying on behalf of a person accused of molesting a teenage boy. In such situations, the jury is liable to believe that the defense witness and the defendant are in cahoots. Here, Rabbi Ashkenazi's testimony was rendered worthless. The propriety of what occurred on the record (including the *Brady* and *Rosario* violation) will be an issue on the appeal. But the actions of Det. Litwin, which are *not* reflected in the record, require the granting of this §440.10 Motion.

According to Yaakov Eisenbach, one of the young men who is alleged to have been molested by Rabbi Ashkenazi, the allegation was not true. It was Kellner, who had been trying for years to bolster his manufactured claims of molestation in order to extort money from the Lebovits' family, who proposed that Yaakov Eisenbach also make false charges against Rabbi Ashkenazi. Worse still, Det. Litwin – who had withheld *Rosario* material already -- knew that the allegation was untrue. Eisenbach told him the allegations were fake on March 4th, 2010 – a few nights before the issue came up in open Court. Nevertheless, a few days later, the prosecutor represented to the Court that Det. Litwin had interviewed "Yaakov Eisenbach" who made similar

DRAFT

allegations when he was a student of the witness. (Tr. 451) The prosecutor never advised the Court that Mr. Eisenbach denied, just days before, ever having been molested by Rabbi Ashkenazi.

Regardless of whether the prosecutor knew or should have known that Eisenbach had denied the allegations, deceiving the court and the defendant cannot be tolerated. A prosecutor "may only ask questions in good faith and upon a reasonable basis in fact." Prince, Richardson, On Evidence §6-406(11th Ed. 1995 at 389). *See also People v. Simpson*, 109 A.D.2d 461,464 1st Dept. 1988). Here, either the prosecutor or Det. Litwin, acting for or on behalf of the prosecutor, misled the Court and proceeded to ask a question designed to prejudice the jury without a reasonable basis in fact. As the Court of Appeals has recently reiterated in *People v. Colon,* 13 N.Y.3d 343, 349 (2009):

> In their role as public officers, prosecutors 'must deal fairly with the accused and be candid with the courts' (*People v. Steadman*, 82 N.Y.2d 1, 7, 603 N.Y.S.2d 382, 623 N.E.2d 509 [1993]. This duty requires prosecutors not only to disclose exculpatory or impeaching evidence but also to correct the knowingly false or mistaken material testimony of a prosecution witness. Where a prosecutor elicits or fails to correct such inaccurate testimony, reversal and a new trial are necessary unless there is no 'reasonable possibility' that the error contributed to the conviction (*People v. Pressley,* 91 N.Y.2d 825, 827, 666 N.Y.S.2d 555, 689 N.E.2d 525 [1997]; *see also Steadman*, 82 N.Y.2d at 8-9, 603 N.Y.S.2d 382, 623 N.E.2d 509).

Here, there is no reasonable possibility that this extraordinary scenario did not

contribute to the conviction. Rabbi Ashkenazi was the sole defense witness and his testimony that Rubenstein wanted money in connection with the charges was essential to undermine Rubenstein's already shaky credibility.

The prosecutor, whether knowing of Det. Litwin's lies or not, misled the court and defense counsel. Pursuant to CPL §440.10(1)(b) and (c) a new trial should be granted because there were misrepresentations and/or fraud made by the prosecutor, or by Det. Litwin acting in her behalf relating to a material representation made to the trial court. The convictions should also be ousted pursuant to of CPL §440.10(1)(d) and (h) since misleading the court on a material fact and presenting false information to a jury is a clear violation of the Constitution of the State of New York and the United States. Eisenbach's denial of the allegations was material and should have been turned over to the defense and the failure to do so violated *Brady v. Maryland*, 373 U.S. 83 (1963) and Giglio ________. Even if the prosecutor in "good faith" did not believe Eisenbach's denial (assuming Det. Litwin told her), that would not be a valid excuse for not disclosing the information to the Court and defense counsel. *See People v. Baxley,* 84 N.Y.2d 208, 213-214 (1994); *Giglio v. United States*, 405 U.S. 150 (______). Finally, this newly discovered evidence, not reflected on the record, requires a vacateur of the judgment under CPL 440.10(1) (f) and (g).

Prosecutors cannot strike foul blows to secure a conviction. Berger. v. United States, 295 U.S. 78, 88 (1920). Where a prosecutor elects or fails to correct inaccuracies, and the conviction must be vacated unless there is no "reasonable possibility" that the error contributed to the conviction, *People v. Colon*, 13 N.Y.3d at ___. This case, resting on the slim thread of Rubenstein's testimony, demanded that the prosecutor scrupulously avoid attempts to prejudice the jury to obtain a conviction that might otherwise be beyond reach. Instead, the prosecutor sought to taint the sole defense witness in a manner prohibited by law. The convictions must be vacated.

DRAFT

**POINT II**

**THE NEWLY DISCOVERED EVIDENCE ESTABLISHES THAT MR. RUBINSTEIN LIED WHEN HE TESTIFIED AND DID SO AT MR. KELLNER'S BEHEST AS PART OF KELLNER'S EXTORTION EFFORT RESULTING IN A JUDGMENT PROCURED IN VIOLATION OF CPL §440.10(1)(b)(c)(d)(f)(g) AND (H) AND IN VIOLATION OF THE CONSTITUTION OF THE STATE OF NEW YORK**

There is something particularly disreputable about the entire Litwin-Kellner scenario. It appears Det. Litwin may have aided Kellner's efforts to suborn perjury and commit extortion. Whether Det. Litwin knew, or should have known, what Kellner was doing, it is now clear is that Kellner was manipulating and perverting the system by suborning perjury and that, at Kellner's behest and perhaps awaiting a

Kellner payoff, Rubinstein committed perjury. Additionally, of course, Det. Litwin, by allowing Rabbi Ashkenazi credibility to be undermined by false accusations, undermined Rabbi Ashkenazi's substantive testimony that Rubinstein was making the allegations as part of a plan to secure money. The newly discovered evidence shows that Rubinstein, during the whole process, was being manipulated by Kellner.

Why a detective would have Kellner and Rabbi Rosenberg go with him at 2:00 A.M. to speak to Mr. Eisenbach, and then provide Kellner with an opportunity to undermine and manipulate the process, is beyond understanding. Mr. Kellner was the father of an alleged victim and he had no place in this investigation. His presence in the Eisenbach home, along with the "blogger" Rosenberg, by itself, was a gross impropriety.

Moreover, as the affidavits in support of this CPLR §440 Motion disclose, Kellner apparently had manipulated the whole case from the beginning, bought testimony, and induced people to commit perjury. Whether Det. Litwin participated in Kellner's efforts to subvert the system is crucial. At a minimum, an evidentiary hearing is necessary to determine what Det. Litwin knew and when, and what the prosecutor knew and when. If Det. Litwin was privy to the extortion scheme, the conviction must be vacated pursuant to CPL440.10(b)(c)(d)(f) (g) and (h).

But even if Det. Litwin was unaware of Kellner's extortion efforts, newly

disclosed discovered evidence establishes that the whole case was manipulated by Mr. Kellner who paid Rubenstein to commit perjury. Rubenstein lied and, it appears, the authorities had reason to know he was lying. When a conviction would not have occurred but for perjurious testimony, even if the prosecution is unaware of the perjurious nature of the testimony, such a conviction is violative of petitioner's Federal Constitutional rights (*Ortega v. Duncan*, 333 F.3d 102). The judgment must be vacated under CPL440.10(1)(d)(g) and (h). When a conviction is secured through the presentation of perjurious testimony manipulated by a third party who is seeking to use the court proceedings to secure funds for himself and the complaining witness, such a conviction is violative of the New York State and Federal Constitution.

As the Second Department observed in *People v. Tankleff*, 49 A.D. 3d 160, (2d Dept. 2007):

> It is abhorrent to our sense of justice and fair play to countenance the possibility that someone innocent of a crime may be incarcerated or otherwise punished for a crime which he or she did not commit. A motion pursuant to CPL 440.10 is a vehicle which "enables convicted defendants to fully vindicate their rights" (34 N.Y. Jur. 2d, Criminal Law §3047, at 838).

49 A.D.3d at 177

The Court went on to observe, citing the leading case of *People v.*



DRAFT

*Salemi*, 309 N.Y. 208 (1956), that:

> "'Newly-discovered evidence in order to be sufficient must fulfill all the following requirements: 1. It must be such as will probably change the result if a new trial is granted; 2. It must have been discovered since the trial; 3. It must be such as could have not been discovered before the trial by the exercise of due diligence; 4. It must be material to the issue; 5. It must not be cumulative to the former issue; and, 6. It must not be merely impeaching or contradicting the former evidence'"

*Id.* at 179;

If the People contest the allegations contained in this submission, an evidentiary hearing must be held. CPL §440.30 If the People concede the accuracy of the new trial information, petitioner has satisfied the requirements of *People v. Salemi*.[4]

Here in the absence of Rubinowitz' perjurious testimony, there would have been no conviction and no evidence that a crime occurred.

> "it is beyond question; of course, that a conviction based on a record lacking any evidence as to a crucial element of the offense charged . . . violate(s) due process." *Harris v. United States,* 404 U.S. 1232, 1233

---

4 See also *People v. Johnson*, 18 Misc. 3d 1131(A) (2008 N.Y. Slip Op. 50262. "this court is ever mindful of Voltaire's assertion in *Zalig*, that 'it is better to risk saving a guilty person than to condemn an innocent one,' and finds that it is no doubt that very sentiment which gave voice to the justiciable pronouncement that 'it is better to let then guilty persons escape than one suffer' (*See Sir. William Blackstone, Commentaires, bk. IV, 27).* In the face of that time worn precept, it seems inimical, if not outright contradictory, to contemplate whether murder, however foul, could ever justify the possibility, however remote, of wrongful conviction (*See Peo. v. Shuler, Ind. # 2770/91, NYLJ 03/04/02; p. 28; col.2).*"



DRAFT

(1971) (Douglas J. In Chambers); *Estelle v. Williams*, *Vachon v. New Hampshire,* 414 U.S. 478, 480 (1976)."

CPL §440.10(1)(h) addresses basic due process claims and provides a remedy for a free-standing claim of actual innocence. *See Ortega v. Duncan*, 333 F.3d 103 (2d Cir. 2003); *Sanders v. Sullivan*, 863 F.2d 218 (2d Cir. 1988). When false testimony is provided by a prosecution witness, even if the prosecution had no knowledge of the falsity, there is a constitutional violation if the false testimony was so material, absent it, the defendant would not have been convicted.

As stated by the Second Circuit in *Ortega v. Duncan,* 333 F.3d at 108

> We have held that a showing of perjury at trial does not in itself establish a violation of due process warranting habeas relief. *Sanders 1,* 863 F.2d at 222. Instead, when false testimony is provided by a government witness without the prosecution's knowledge, due process is violated only if the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted. *United States v. Wallach,* 935 F.2d 445, 456, (2d Cir.1991) (quoting *Sanders v. Sullivan,* 863 F.2d 218, 226(1988))

> Few rules are more central to an accurate determination of innocence or guilt than the requirement … that one should not be convicted on false testimony. *Sanders v. Sullivan,* 900 F.2d 601, 607 (2d Cir. 1990) ("Sanders II") (internal quotation marks and citations omitted).

A defendant's right to present post-conviction claims of actual innocence is protected by Article I, §§ 5 and 6 of the New York State Constitution. "The New York Constitution has at times provided greater guarantees for individuals than those

provided by the Federal Constitution" (*People v. Cahill*, 2 N.Y.3d 14, 97-98 [2003] [G.B. Smith, concurring], citing *People v. Scott,* 79 N.Y.2d 474, 491 [1992].

In *People v. Cole,* 1 Misc.3d 531 [Sup. Ct. Kings Co. 2003], defendant brought a CPL §440.10 motion alleging actual innocence based on newly discovered evidence. The court held that such a claim exists under the State Constitution, which provides greater rights to criminal defendants than the Federal Constitution, in order to protect an innocent person from wrongful conviction (*People v. Cole, supra,* 1 Misc.3d at 537-39, 541).

DRAFT

CONCLUSION

For the above stated reasons the CPL440.10 motion should be granted or in the alternative a hearing should be granted so the defendant can establish the facts necessary to support the granting of this motion.

Respectfully submitted,

Alan M. Dershowitz
Of Counsel

________________________________
Nathan Z. Dershowitz, Esq.
Amy Adelson, Esq.
DERSHOWITZ, EIGER & ADELSON, P.C.
220 Fifth Avenue, Suite 300
New York, New York 10001
(212) 889-4009

ARTHUR L. AIDALA, ESQ.
LAW OFFICES OF AIDALA & BERTUNA, P.C.
8118 13TH AVENUE
BROOKLYN, NEW YORK 11228
718-238-9898

Dated: January , 2011

DRAFT

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS, CRIMINAL TERM – PART 15

-----------------------------------------------------------------X
PEOPLE OF THE STATE OF NEW YORK

- Against -

BARUCH LEBOVITS,

Defendant-Appellant

:
-----------------------------------------------------------------X

Index No..: 11393/08
(Kings County)

NOTICE OF MOTION TO VACATE JUDGMENT

STATE OF NEW YORK )
: ss:
COUNTY OF NEW YORK )

DRAFT

PLEASE TAKE NOTICE that upon the annexed Affidavit of Nathan Z. Dershowitz executed on January ____, 2011 and the documents attached thereto, and all the proceedings hereinbefore had herein, a motion will be made in the Supreme Court, County of Kings, Part 15 thereof, at the Courthouse located at 320 Jay Street, Brooklyn, New York 11201 on the ____ day of ________________ at ___________ o'clock or as soon thereafter as counsel can be heard, for an Order vacating the judgment entered against the above-named defendant on or about April 12, 2010, or, in the alternative for an order for a hearing to determine whether such judgment should be vacated, on the following grounds:

(1) Pursuant to CPL §440.10(1)(b), the judgment was procured by fraud on the part of a prosecutor or a person acting for or in behalf of the prosecutor.

(2) Pursuant to CPL §440.10 (1)(c), material evidence adduced at a trial resulted in a judgment that was false and was, prior to the entry of the judgment, known by the prosecutor or a person acting for or in behalf of the prosecution to be false;

(3) Pursuant to CPL §440.10(1)(d) material evidence adduced by the People at trial resulting in a judgment that was procured in violation of the defendant's rights under the Constitution of the State and/or of the United States;

(4) Pursuant to CPL §440.10(1)(f), improper and prejudicial conduct not appearing in the record occurred during a trial resulting in a judgment which conduct, if it had appeared in the record, would have required a reversal of the judgment upon an appeal therefrom;

(5) Pursuant to CPL §440.10 (1)(g), new evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; or

(6) Pursuant to CPL §440.10(1)(h), the judgment was obtained in violation of a right of the defendant under the Constitution of the State or of the United States.

And for such other and further relief as to the Court may seem just and proper.

Dated: New York, New York
January _____, 2011

DERSHOWITZ, EIGER & ADELSON, P.C.

OF COUNSEL:

Alan M. Dershowitz, Esq.
1575 Massachusetts Avenue
Cambridge, MA 02163

By:_______________________________

Nathan Z. Dershowitz, Esq.
Amy Adelson, Esq.
Counsel for Defendant Baruch Lebovits
220 Fifth Avenue, Suite 300
New York, New York 10001
(212) 889-4009

DRAFT

LAW OFFICES OF AIDALA & BERTUNA, P.C.

By: ______________________________

Arthur L. Aidala, Esq.
8118 13th Avenue
Brooklyn, New York 11228
718-238-9898

TO: Charles J. Hynes, Esq.
Miss Gregory, Esq.
District Attorney- Kings County

DRAFT