# EXHIBIT 41

-------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK :

PLAINTIFF, :

against : 2538/2011

SAMUEL KELLNER, :

DEFENDANT, :
-------------------------------------x

MARCH 29, 2011

CHARLES J. HYNES, ESQ., DISTRICT ATTORNEY, KINGS COUNTY
NICHOLAS BATSIDIS, ESQ., Assistant District Attorney

ESTHER SCHWARTZ
Reporter/Stenographer (D. A.)

E.S.

# INDEX


| WITNESS | PAGES |
|---|---|
| MISS GREGORY | 5 |


# EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|

NONE

# JURY CHARGE

NONE

*****

Q. Can you please state your name for the Members of the Grand Jury?
A. My name is Miss Gregory.
Q. Miss Gregory, are you employed?
A. Yes.
Q. By whom?
A. The Brooklyn D.A.'s office.
Q. In what capacity?
A. I am the Bureau Chief of the Crimes Against Children Bureau.
Q. Is that where you are currently assigned?
A. Yes.
Q. When were you assigned to that division?
A. In August of 2010.
Q. Prior to being assigned to The Crimes Against Children division, where were you previously assigned?
A. I was assigned to Sex Crime Special Victims Bureau.
Q. What was your title?
A. I was the First Deputy Bureau Chief.
Q. What were your duties and responsibilities when aassigned to the Sex Crimes Division?
A. I supervised the Grand Jury assistants to decide which cases to present to the Grand Jury, I supervised the felony trial assistants in preparing their

cases for trial, and I also handled felony trials of my own.

Q. Are you aware and familiar with the case of The People of the State of New York versus Baruch Lebovits indictment numbers 2600 of 2008 and 11393 of 2008?

A. Yes.

Q. How are you familiar with those cases and indictment numbers?

A. After the cases were indicted, I was the trial assistant that handled the cases.

Q. Did you have time to review those indictments or files and records with those files prior to coming in today?

A. Yes.

Q. Were the records contained in those cases made in the regular course of business by the Kings County District Attorney's Office and yourself?

A. Yes.

Q. Was it regular course of business of the Kings County District Attorney's office to make such records?

A. Yes, it is.

Q. Were the records contained in those cases made at the time of the occurrence, events or transactions or reasonable time after?

A. Yes, they were.

Q. Were you and the other assistants under the business duty of accuracy to make such records?

A. Yes.

Q. You are the custodian of those files and records?

A. Yes.

Q. Are you familiar with the procedural history of those indictment numbers from the arrests to disposition?

A. Yes, I am.

Q. Who is the defendant in those cases?

A. The defendant was Baruch Lebovits, B-A-R-U-C-H L-E-B-O-V-I-T-S.

Q. When was Baruch Lebovits arrested?

A. On March 11 of 2008.

Q. What was the nature of those charges?

A. There were two complainants that corresponded to those arrests. One complainant was a [redacted] [redacted], P[redacted] K[redacted] and the nature of those charges were misdemeanor sex abuse charges.

Q. Who was the other complainant?

A. M[redacted] T[redacted], T[redacted] those were allegations of felony sexual abuse.

Q. Was there a time when those two complainants testified in the Grand Jury?

A. Yes, there was. They testified in March of 2008.

Q. That was under indictment number 2600 of 2008?
A. That's right.
Q. Was there an indictment secured in that case?
A. Yes, the Grand Jury returned an indictment.
Q. After an indictment was secured, talking procedurally, what happened with regards to that case?
A. The case proceeded in Supreme Court in a felony court part. At a certain point the defense attorneys in that case made a motion to the judge to ask that the two complainants on that case that their cases be separated from each other, that they be severed.
Q. What does severed mean?
A. If there were to be a trial as the cases proceeded the jury or the trial judge would only hear one case at a time as opposed to both of the witnesses together.
Q. Did there come a time that another complainant came forward after the severance of indictment number 2600 of 2008?
A. After the judge granted that motion to have those cases severed, a third complaining witness came forward in either I believe it was definitely September of 2008.
Q. What was that complainant's name?
A. His name was Y[redacted] R[redacted], Y[redacted]

R[redacted].

Q. Did he have a nick name?

A. Yes, [redacted], [redacted].

Q. Procedurally, what happened with regards once Y[redacted] R[redacted] came forward?

A. He testified in the Grand Jury and his case was combined with the case of M[redacted] T[redacted].

Q. Was that under indictment number 11393 of 2008?

A. That is correct.

Q. Was there an indictment secured with regard to that indictment number?

A. Yes, the Grand Jury returned an indictment in that case.

Q. Both complainants were Y[redacted] R[redacted] and M[redacted] T[redacted]?

A. That's right.

Q. Procedurally, what happened with that indictment?

A. Again, the defense attorneys made a motion to separate those cases, to have them severed and the judge in that case granted their motion. Now all three cases were separate trials and cases on to their selves.

Q. During the pendency of both of those indictments, were there ongoing plea negotiations?

A. Yes, with the majority of cases there are plea negotiations that go on between the Assistant District

Attorney and the defense attorneys and that happened in this case.

Q. Did there come a time that negotiations were not successful?

A. Yes.

Q. What happened after the negotiations were not successful?

A. The cases were then set down for a trial.

Q. Which case was to proceed to trial first?

A. The case that I was going to prosecute first as a trial was the M[redacted] T[redacted] case which was under indictment 11393 of 2008.

Q. Did that matter proceed to trial?

A. No.

Q. Why not?

A. In the beginning of November of two thousand -- let me just check my notes. In the beginning of 2009 I met with Mr. T[redacted] and explained to him that his case was going to be the first of the three trials to begin. We spoke and he indicated that he understood that. In the middle of November of 2009 I was contacted by a lawyer for Mr. T[redacted] who told me that Mr. T[redacted] would no longer be cooperating with the prosecution in the case and that he wouldn't in fact testify at a trial against the defendant.

MR. BATSIDIS: Ladies and gentlemen, that statement from the lawyer to the witness is not being offered for the truth, just to show why the witness proceeded the way she did.

Q. What happened after you received that information from the lawyer?

A. Multiple attempts were made to speak with Mr. T[redacted] and I was unable to do that. Then we proceeded with the next trial and that was also under indictment number 11393 of 2008 and the complaining witness in that case was Y[redacted] R[redacted].

Q. Did the trial take place?

A. Yes, it did.

Q. Did Mr. Y[redacted] R[redacted] testify at that trial?

A. Yes, he did. He testified on March 3 of 2010.

Q. Was there an outcome in that trial?

A. Yes, the defendant, Baruch Lebovits, was convicted of eight counts of Criminal Sexual Act in the Third Degree.

Q. What happened with regards to the third matter involving P[redacted] K[redacted] under indictment 2600 of 2008?

A. That matter was a misdemeanor count of Sexual Abuse in the Third Degree as well as a misdemeanor count of Endangering the Welfare of a Child was eventually dismissed on October 14, 2010.

Q. What happened with regard to complainant M[redacted] T[redacted] under indictment 11393 of 2008?

A. Due to Mr. T[redacted]s continued unwillingness to cooperate with the case, that case was also dismissed.

Q. Did you have occasion to meet with P[redacted] K[redacted] father?

A. Yes, I did.

Q. Do you know his name?

A. Yes, Samuel Kellner.

Q. Did you have conversations with Samuel Kellner?

A. Yes, I had multiple telephone conversations with him and I met with him on one occasion in my office.

Q. Pursuant to those conversations, did Mr. Kellner mention anything with regards to the complainants M[redacted] T[redacted] and Y[redacted] R[redacted]?

A. Yes, Mr. Kellner had contacted the police after his son had contacted him. I am sorry, after Mr. Kellner's son, P[redacted] spoke to him about the allegations he had made against the defendant and Samuel Kellner took his son to the police and then the other two complainants in the case were brought to the attention of the police by Mr. Kellner.

Q. Based on review of your records, was Michael T[redacted] brought in close proximity to the police with regards -- with P[redacted] K[redacted]?

A. Yes, both of those young men were interviewed by the police in March of 2008.

Q. When was Y[redacted] R[redacted] interviewed?

A. September of 2008.

Q. Thank you, I have no further questions. You may step down.

A. Thank you.

(Whereupon, the witness exited the Grand Jury room.)

[redacted]

(IN PART)

-----------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK :

PLAINTIFF, :

against : 2538-11

:

SAMUEL KELLNER

DEFENDANT. :

-----------------------------------------x

March 30, 2011

CHARLES J. HYNES, ESQ., DISTRICT ATTORNEY, KINGS COUNTY

NICHOLAS BATSIDIS, ESQ., Assistant District Attorney

VICKY VAVAS

ASSOCIATE REPORTER/STENOGRAPHER

VV.

I N D E X


| WITNESS | PAGE |
|---|---|
| Meyer Lebovits | |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| | None | |


JURY CHARGE

None

MEYER LEBOVITS

Q. Could you please state your name for the Grand Jury.

A. Meyer Lebovits.

Q. Are you employed?

A. Self-employed.

Q. What do you do for a living?

A. Real estate.

Q. Do you know an individual by the name of Baruch Lebovits?

A. Yes.

Q. Who is that individual?

A. My father.

Q. Do you an know an individual by the name of Chaim Lebovits?

A. Yes.

Q. How do you know that individual?

A. My brother.

Q. Is there something that you want to talk to me about?

A. Yes.

MR. BATSIDIS: The witness and I are going to step outside for a moment.

[redacted]

MEYER LEBOVITS, RECALLED

Q. Do you know an individual by the name of Chaim Lebovits?

A. Yes, my older brother.

Q. Do you know an individual by the name of Samuel Kellner?

A. Yes.

Q. How long have you known Samuel Kellner?

A. Since I am a child.

Q. I want to direct your attention to March 11, 2008.

A. They arrested my father.

Q. Do you know what your father was arrested for?

A. Yes. Two charges against him from one individual Samuel Kellner's son complaining and another by the name of M[redacted] T[redacted] that he molested them as well.

Q. I want to direct your attention to after your father's arrest, were you approached by individuals in your community?

A. Yes.

Q. By whom were you approached?

A. A few people. The first person was Leizer Wolf Hager. He found me on the street. He wanted to

talk to me.

Q. Does he go by another name?

A. Leizer Vevel.

Q. You said he stopped you on the street. When was that?

A. Like a few days after my father was arrested, March of 2008.

Q. Where were you?

A. Fourteenth Avenue. I think in Brooklyn.

Q. Did you have a conversation with Leizer Wolf Hager?

A. He said that I should call him later. I called him and he said I should come meet him. I met him on 45th Street.

Q. The same day?

A. Either the same day or the next day, March 2008. He said to me that this guy Sam Kellner prayed at his in-law's synagogue. He told him that he should come to me and tell me that he brought charges. He controls them and I should settle with him.

MR. BATSIDIS: Ladies and gentlemen of the Grand Jury, the statement by Kellner to Leizer Wolf Hager is not being offered for the truth of the statement. It is being offered for the fact that -- it is only for

the fact that it was said in the context of which it was said to this witness.

Q. When he said settle, what did you take that to mean?

A. He wanted money.

Q. Did he say how much money?

A. He did not say.

Q. Did you understand what he wanted money for, what did he want in exchange?

A. He will make sure that the victim won't come testify, so the case will be dismissed.

Q. Did anyone else approach you?

A. Yes. A few days later individual from the community a gentleman, Yakov Leizer Horowitz.

Q. Does he go by another name?

A. Yakov Leizer.

Q. What timeframe was that?

A. End of March, beginning of April.

Q. Is that 2008?

A. Yes.

Q. Where did he approach you?

A. I met him at the grocery on 45th Street and 13th. We went to his car. He said that he prays in the same synagogue with Sam Kellner Friday night and Sam Kellner came to him and said that he knows that

he knows me. He should come to me. He controls both of them and that I should sit down and settle with him for money. He will make sure both complainants are not coming to trial.

Q. With regards to your conversation with Leizer Wolf Hager and Yakov Leizer Horowitz, what did you say to them once they spoke to you about what Kellner told them to tell you?

A. I don't believe the stories. We have lawyers hired for the case. That is not the right way to go about it. We should do it through lawyers.

Q. Leizer Wolf Hager, did you know him?

A. A few years I know.

Q. What about Yakov Leizer Horowitz, do you know him?

A. I used to pray at the same synagogue.

Q. How long did you know him for?

A. Twenty-five years ago.

Q. Did you have any other conversations with Yakov Leizer Horowitz?

A. Yes. At a later time in the middle of the summer, July and August he came to me with the same message that Kellner said that we should not be smart alecks because we were in the process of going to court procedures. If we settle for money he will

make sure that the victims will not come forward against my father.

Q. What did you say to Yakov Leizer Horowitz, what did you say?

A. First time I don't believe that is the way to do it. We have lawyers and that is their view.

Q. Where were you when you had the second conversation with Yakov Leizer Horowitz?

A. In Borough Park.

Q. In Kings County?

A. Yes.

Q. Did you speak to Yakov Leizer Horowitz?

A. Later date. It was after summer. I think October of 2009, 2008 or beginning of November, end of October.

Q. Where did you speak with him?

A. Borough Park, Brooklyn, Kings County. He said that because we severed the cases our lawyers put motions to separate calendar cases so it should be two separate trials. Kellner's son has to -- must come testify. Kellner said that is not going to happen. To do it his way, come pay him or he will bring a third victim. It should legally be able to put it together again to one trial.

Q. Now, did Yakov Leizer Horowitz mention who the

third victim would be?

A. No.

Q. Did he mention any type of monetary amount that you should give?

A. No, he did not say.

Q. Did anyone else approach you from your community?

A. Yes.

Q. Who is that?

A. Simon Taub.

Q. Do you know Simon Taub?

A. Yes, from the community since I was a child.

Q. When did you have contact with Simon Taub?

A. Also a few times also in April of 2008. He called me. I spoke to him and Kellner told him we should sit down and maybe pay him money to -- he will make sure that the complainants will not show up to testify.

Q. That was during the phone call?

A. Yes.

Q. Where were you when you had that phone call?

A. In Brooklyn.

Q. Did you speak to Simon Taub again?

A. Yes.

Q. When was that?
A. That was later like after the summer. It was October of 2008.
Q. Did you speak to him in person?
A. He called me and we met in person. I went to his car and he said that Kellner told him that you are smart alecks. We are not coming through. We sent a few people and we must pay money that it should go away. That we were separating the cases. He is going to the bring another case, a third victim and he did not want to tell me the name. He told me he knows the name and he told me that amount is $400,000.
Q. What did you say to Mr. Taub after he told you the amount?
A. That we discussed it already, why is he doing this. We have the lawyers and this is not the way to do it.
Q. Did Simon Taub tell you who the third victim was going to be?
A. Yes, in November.
Q. What year?
A. 2008.
Q. Who did he say the victim was?
A. R[redacted].

Q. Did anyone else approach you from the community?
A. There was a Yidal Wolf?
Q. Do you know Yidal Wolf?
A. Yes.
Q. How do you know him?
A. Rabbi in the community.
Q. How long do you know him for?
A. A few years.
Q. When did you have contact with Yidal Wolf?
A. He called me in November that Kellner was by. He told him to tell me -- it was time before my younger brother's wedding.
Q. November of 2008?
A. Yes. Right before the wedding of my younger brother. He is bringing a third case. The name is [redacted] and he is going to make sure that the wedding will not be as we think it would be. We should call right now and settle with him. He did not want to go into the settling issue. Kellner went into it in detail. He did not want to convey that part of the message. He did convey the part of the message that the victim will be [redacted].
Q. Did you speak to anyone else in the community?
A. Yes, individual named Wolf Wertzberger.

They call him Volvi.
Q. Do you know him?
A. Yes. We went to the country together.
Q. Did you have contact with Wolf Wertzberger?
A. Yes.
Q. When was that?
A. From the end of December of 2008, going into 2009, January, February up until March, probably. He came to me with the same thing but more forcefully. He is praying with Kellner on Friday night and that he told him that he is in control of all three cases. We were trying to sever the cases. We are smart alecks. He will bring a fourth victim and he will take it to the federal institutions, not only state. He will not stop until we stop and, according to his plan, that we should give him the money to him. He said that he wants $300,000.
Q. What did you say in response to what Wolf Wertzberger said?
A. My response was that I want to meet personally with Kellner, why does he send middle people. I want to meet him in person. The reason was because at that time --
Q. Let me stop you. During the time that these witnesses from after your father's arrest in March

of 2008 through March of 2009, did you ever speak with the defendant, Samuel Kellner at that point?

A. No.

Q. Continue with what you said with regards to Mr. Wolf Wertzberger.

A. We were trying to get him to bring Kellner to us so we will be able to tape the conversation and show that it is not legal. We wanted to have it on tape but Kellner never agreed to come. We made some dialog 300,000 so much money. Kellner will take $225,000.

Q. Were those separate dates?

A. Separate dates.

Q. Do you remember what date he requested the $225,000?

A. I don't remember exactly. It was between January, February.

Q. Of 2009?

A. Yes.

Q. Did you agree to anything with Mr. Wertzberger at that point?

A. We agreed that he has to bring Kellner, which he did not bring him never. I said to him I will give you some of the money. The deal was Wertzberger was the third person, that he is going to

hold the money. He is going to give the money when it comes time, when the witnesses do not come that is what he was offering. I said I will give you a few money and then he will come meet him. I gave him $30,000.

Q. Prior to -- when did you give him the $30,000?

A. I don't remember. I don't remember the exact date January, February, 2009.

Q. Prior to the end of January 2009, February 2009, did you meet with anyone with regards to that conversation you had with Wertzberger?

A. When we started negotiating there is a Jewish concept when you make any agreement you are forced to make this agreement. You go to rabis that witness and tell them that you are forced to do this. You have to put money for somebody then you can put a lien. That we should not be able to give it to the person that they agreed with. This is done because you are forced to do it. That is what I did, I went to the rabbi.

Q. Who is that?

A. Aaron Mandel.

Q. Did he draft a document?

A. Yes.

Q. Did you see that document?

A. I see it, yes..

Q. Did you explain to him what was going on?

A. Yes, I did to Aaron Benzion Mandel.

Q. I want to direct your attention to May of 2009. Did there come a time you had contact with Samuel Kellner?

A. Yes.

Q. Where was that?

A. In the street where I live. I came home.

Q. What county is that?

A. Fifty-eighth Street between 11th and 12th in Brooklyn.

Q. What language was that conversation with?

A. Yiddish.

Q. How long was that conversation?

A. Over an hour.

Q. Did you record it?

A. Yes.

Q. Explain how you had contact with Mr. Kellner?

A. I came home and I parked my car a few houses away. I walk to my house and suddenly a white van makes a short stop in front of me and somebody jumps out and just stands in front of me. That was Sam Kellner. As soon as I saw that he starts to talk I put my hand in my pocket, which I knew how to put

it on. I put on the recorder and that is how the conversation is on the recorder.
Q. In sum and substance, what was the conversation about, what did he say to you, what did you say to him?
A. He said to me that all these people, all the messengers his plan was after the two complainants he brought with his son the DA would not prosecute my father. He went and brought T[redacted] so he can -- his plan I should come to him and pay him off. Nothing is going to come to him, why I go to the court, why I go to the lawyers. His son is never going to go on trial. He controls all three cases. Why didn't I come through with all these messages that he sent to me.
Q. When he said to you that he was sending you individuals to deliver messages from him, did you confirm that you received those messages?
A. No.
Q. Why not?
A. Because he was trying in the conversation not to get into explicit -- he was referring to the messages without saying what he wants. I wanted him to say because I have the recorder, to spell out what he wants.

Q. During the conversation did he have any mention of [redacted] [redacted] and [redacted]?
A. Yes. That he brought both of them to make a complaint. That he controls both of them. He can make sure that both will not come to testify, if I give him the money that he is asking for.
Q. Did he say a specific amount of money that he was requesting?
A. For that he referred to the messengers.
Q. He never stated a specific amount that he was requesting from you?
A. No.
Q. Did he talk about federal courts or state courts?
A. He presented that he brought all three cases. He reminded me that -- he warned me before the third case come through with all the messengers. He started telling me that he has a fourth case coming because we are not coming through. He will take them all -- he gave me reason because federal is 90 percent conviction and state is 70 percent conviction and he will take it to federal. It is going to be more worse against my father because I am not coming through to settle.
Q. To settle for?

A. For the money.
Q. Did he mention a name of Moishe Friedman?
A. Yes. After he finish with Wertzberger he went to Moishe. He wanted to send him that.
Q. Did he mention anything with regards to an individual by the name of Nacum?
A. Known guy in the community who has a hot line. A few years already he says that he claims he watches the community of sexual arrests, sexual crimes. When he wants he puts up names and talks against them. He started to talk with my father's name.
Q. After he got arrested?
A. Yes.
Q. What did Kellner say with regards to that?
A. I control this. It is part -- a part of the deal is you go off the hot line or in the internet site.
Q. During your conversation with Kellner did he ever in words state a demand for a specific amount of money?
A. No.
Q. Were you or any other member going to pay the demand of $225,000 in order for the witness not to appear and testify?

A. No.
Q. Were you afraid during the course of your dealings with the members of the community and your conversation with Kellner and the pendency of your father's case?
A. Yes.
Q. What were you afraid of?
A. He will bring more victims, federal business and the hot line slander ever week.
Q. I have no further questions. You may step down.

(WITNESS EXCUSED)

[redacted]

(IN PART)

5



-------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK :

PLAINTIFF, :

against : 2538/11

SAMUEL KELLNER, :

DEFENDANT, :
-------------------------------------x

MARCH 31, 2011

CHARLES J. HYNES, ESQ., DISTRICT ATTORNEY, KINGS COUNTY
NICHOLAS BATSIDIS, ESQ., Assistant District Attorney

RIVKA KAPLAN
Reporter/Stenographer (D. A.)

R.K.

# I N D E X


| WITNESS | PAGES |
|---|---|
| Moshe Friedman | 5 |


## E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|

NONE

## JURY CHARGE

NONE

*****

MOSHE FRIEDMAN

Q. Speak into the microphone. Can you please state your name for the members of the Grand Jury?

A. Moshe Friedman.

Q. Mr. Friedman, are you employed?

A. Yes.

Q. What type of business?

A. I run a newspaper.

Q. Where is that business located?

A. 84 Broadway Brooklyn, New York.

Q. Do you know an individual by the name of Baruch Leibowitz?

A. Yes.

Q. How do you know Baruch Lebovitz?

A. I know him we went to school together and I know him for a long time.

Q. Do you know his sons, Meyer Lebovitz and Chaim Lebovitz?

A. Yes.

Q. How do you know them?

A. Same reason. We grew up in the community.

Q. Do you know an individual by the name of Samuel Kellner?

A. Yes.

Q. How do you know that individual?

A. Same reason, we grew up in the community.

Q. I want to direct your attention to around March or April of 2009. Did there come a time that you were contacted by Samuel Kellner?

A. Yes.

Q. How did that come about?

A. He called me on my cell that he wants to see me urgent and he came to my office at 84 Broadway.

Q. That's in Kings County?

A. Yes, Brooklyn, New York.

Q. When he came to your office did you have a conversation with Samuel Kellner?

A. Yes.

Q. In sum and substance what was the conversation about? What did he say, what did you say to him?

A. Okay. Kellner told me that they have a case with Baruch Lebovitz. Baruch Lebovitz picked up his son for a ride. I think, he mentioned his son was the age of fifteen, I can't be so specific and he got involved with -- he touched him in a sexual, you know, something that he shouldn't have done. He told me, but he told me I must tell you by now I know the legal terms of it that it was a misdemeanor, that's what he told me, and he was negotiating to get two hundred and

fifty thousand dollars from Lebovitz's friend to try to make the case shouldn't get nowhere this was after Lebovitz was arrested, and he was negotiating for two hundred and fifty thousand dollars and it collapsed that negotiation. So he comes to me that I should convince Lebovitz's family that they should give him the two-hundred and fifty thousand dollars.

Q. What did you say to Kellner after he asked you?

A. I told him -- his name is Shlomo Aaron, you know, I told him I will tell you three reasons that I think you should get off this thing. Number one I think it's illegal to do it, I think it's not right and from what I hear from you I ask him and number three, I don't think they have the money. I think you're just dreaming, I don't know.

So he told me it's true that Lebovitz probably doesn't have the money but he has a son, Chaim, who has the money. I told him I think you make a mistake I don't know that Chaim Lebovitz is that close but I don't think he has the money either.

Q. Did he mention any individual by the name of R[redacted] during your conversation?

A. Yes.

Q. What did he say about R[redacted]?

A. He told me that his other people involved who

was a guy R[redacted], a boy R[redacted] he told me who is a drug addict from what I heard. I never met this guy by the way and I don't think I even know him and he's like they call he's a dropout, he's a drug addict, but I control him, so if he's going to pay me the two hundred and fifty thousand dollars I can make sure that nothing is going to go forward.

Q. After he requested you to try to convince the Lebovitz family what did you tell him?

A. I didn't get the question.

Q. After he tried to convince you to tell the Lebovitz family to pay him money what did you say? Did you in fact agree that you were going to do it?

A. No, I told him absolutely not. As a matter of fact I told him let me tell you I'm in the community I don't if I'm the community leader, but I'm involved in the community affairs. In general I told him I want to tell you one thing if they going to ask me I would advise them not to do it, that's all I can tell.

Q. Let me stop you right there. After your conversation with Kellner did you mention your conversation with Kellner to anybody?

A. Yes.

Q. Who?

A. I mentioned that to Lebovitz's son, not to

Lebovitz.

Q. Which one?

A. Meyer.

MR. BATSIDIS: I have no further questions. You may step down. Thank you.

[redacted]

(IN PART)

-------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK :

PLAINTIFF, :

against : 2538/11

SAMUEL KELLNER, :

DEFENDANT, :

-------------------------------------x

APRIL 7, 2011

CHARLES J. HYNES, ESQ., DISTRICT ATTORNEY, KINGS COUNTY
NICHOLAS BATSIDIS, ESQ., Assistant District Attorney

CHRISTOPHER LA ROCCA
Associate Reporter/
Stenographer (D. A.) II

clr

I N D E X


| WITNESS | PAGES |
| --- | --- |
| M[redacted] T[redacted] | 5 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | TRANSCRIPT | 11 |
| 2 | TRANSCRIPT | 12 |


JURY CHARGE

NONE

*****

M[redacted] T[redacted],

Q. Can can you please state your name.

A. M[redacted] T[redacted].

Q. Mr. T[redacted], do you know an individual by the name of Baruch Lebovits?

A. Yes.

Q. How do you know him?

A. From the synagogue in the Jewish community.

Q. I ask you to speak slowly, keep your voice up.

I want to direct your attention to March of 2008, did there come a time when you were approached by an man named Samuel Kellner?

A. Yes.

Q. Did you know Samuel Kellner prior to him approaching you in March of 2008, did you know him before that?

A. No.

Q. Now in March of 2008, did you have a conversation with Samuel Kellner?

A. Yes.

Q. That's when he approached you, correct?

A. Yes.

Q. Were you in Brooklyn?

A. Yes.

Q. What did he say to you?
A. That --
Q. During the conversation, what did he say to you?
A. He asked if I got molested.
Q. What did you say?
A. Yes.
Q. Did you tell him who molested you?
A. No.
Q. Did he mention anything about Baruch Lebovits molesting you?
A. Yes.
Q. What did he say?
A. That I should say in court that he molested me.
Q. When you say "he," are you talking about Baruch Lebovits?
A. Yes.
Q. Did you tell Samuel Kellner you were never molested by Baruch Lebovits?
A. Yes.
Q. What did he say?
A. I give you money to testify against Baruch Lebovits.
Q. Did he give you money on that day?
A. Yes.

Q. How much money?
A. $500.
Q. During that conversation, did he say what would happen to Baruch Lebovits once you testified?
A. Yes.
Q. What did he say?
A. 6 to 12 months jail, 10 years probation.
Q. Okay. Now, after you had that conversation, did you go to the police?
A. Yes.
Q. Who did you go to the police with?
A. Samuel Kellner.
Q. After you went to the police, did you testify in the Grand Jury?
A. Yes.
Q. That was here in Brooklyn, correct?
A. Yes.
Q. How many times?
A. Twice.
Q. Do you remember testifying in March and November of 2008?
A. Yes.
Q. What did you testify in the Grand Jury in March and November of 2008?
A. That Baruch Lebovits molested me.

Q. On both occasions in the Grand Jury when you were going to give testimony, you raised your right hand, correct?
A. Yes.
Q. On both occasions in the Grand Jury you testified you were affirming that you were going to tell the truth; is that correct?
A. Yes.
Q. When you testified before the Grand Jury on both occasions that Baruch Lebovits molested you, that was a lie?
A. Yes.
Q. Why did you lie that Baruch Lebovits molested you before the Grand Jury on both occasions?
A. Because that Samuel Kellner offered me money, gave me money.
Q. I want to ask you, before you testified in the Grand Jury, did you receive money from Samuel Kellner?
A. Yes.
Q. Between the first time you testified in the Grand Jury and the second time you testified in the Grand Jury, did you receive money from Samuel Kellner?
A. Yes.
Q. After the second time you testified in the Grand Jury, did you receive money from Samuel Kellner?

A. Yes.
Q. Throughout that whole period, approximately how much money did you receive from Samuel Kellner?
A. $10,000.
Q. Now with regard to your testimony here today, did anyone threaten or force you to testify today?
A. No.
Q. Did anyone offer you money to testify today?
A. No.
Q. Are you telling the truth today?
A. Yes.
Q. Why did you come forward to testify today?
A. Because I felt guilty and bad what I did to an innocent person.
Q. That person you mean is Baruch Lebovits?
A. Baruch Lebovits.
Q. I have no further questions. You may step down.

(WITNESS EXCUSED)

[redacted]

MR. BATSIDIS: Ladies and gentlemen of the Grand Jury, I am holding in my hand a stenographic transcript that contains 26 pages that I am deeming marked People's Exhibit 1 for identification.

(SO DEEMED)

MR. BATSIDIS: Reading from the top of the page.

People of the State of New York, Plaintiff, against Baruch Lebovits.

Top right: Indictment number 2600 of 2008.

The date, March 14, 2008.

At the bottom right, there is the name, Theresa Grieco, Associate Reporter/Stenographer.

Reading from page 26, Certification: I hereby certify that the foregoing transcript is a true copy of the original stenographic minutes, with the purported signature of Theresa Grieco, dated March 18, 2011.

Ladies and gentlemen of the Grand Jury, I'm now moving what previously has been deemed People's Exhibit 1 for identification into evidence as People's Exhibit 1, and ask it be so marked by the court reporter.

(SO MARKED)

MR. BATSIDIS: Ladies and gentlemen of the Grand Jury, I am holding in my hand a stenographic transcript containing 23 pages that I am deeming marked People's Exhibit 2 for identification purposes.

(SO DEEMED)

MR. BATSIDIS: Reading from the top page of People's Exhibit 2 for identification.

The People of the State of New York, Plaintiff, against Baruch Lebovits.

Indictment number 11393 of 2008.

The date is November 12, 2008.

From the bottom, Mirian Kaplan, Reporter/Stenographer.

Reading from page 23: I hereby certify that the foregoing transcript is a true copy of the original stenographic minutes, with the purported signature of Miriam Kaplan.

At this time I am moving what has previously been deemed People's Exhibit 2 for identification into evidence as People's Exhibit 2 and ask it be so marked by the court reporter.

(SO MARKED)