# EXHIBIT 51

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

-against-

SAMUEL KELLNER,

Defendant.
-----------------------------------------------------------------X

Ind. No. 2538/2011

**AFFIRMATION IN SUPPORT OF <u>MOTION TO DISMISS</u>**

NIALL MACGIOLLABHUÍ, an attorney duly admitted to practice law before the courts of the State of New York, hereby affirms the following under penalties of perjury:

1. I am an associate attorney in the Law Office of Michael G. Dowd, attorneys of record for Defendant Sam Kellner. As such, I am fully familiar with the facts of this case and make this affirmation in support of Defendant Kellner's motion to dismiss annexed hereto.

2. Unless otherwise specified, all allegations of fact are based upon inspection of the record of this case, conversations with the Assistant District Attorneys assigned thereto, independent investigation and research.

3. Defendant Kellner is charged herein with one count of Conspiracy in the Fourth Degree (Count 1); five counts of Attempted Grand Larceny in the Second Degree by Extortion (Counts 2 to 6); two counts of Perjury in the First Degree (Counts 7-8), and two companion counts of Criminal Solicitation in the Fourth Degree (Counts 9-10).

4. According to Count 1 of the Indictment, between March 2008 and March 2010, Defendant Kellner is alleged to have made repeated demands to Meyer Lebovits, the son of



EXHIBIT
92
Batsidis 3/23/22 (LL)
LEXITAS

Baruch Lebovits (who, during the period alleged, was a criminal defendant accused of molesting Defendant Kellner's son and raping two other children), for payments in excess of $50,000, in exchange for which defendant Kellner would (1) cause the dismissal of the pending charges against Baruch Lebovits, through his control of the three complaining witnesses, (2) direct an additional alleged victim of Baruch Lebovits not to make a complaint, and (3) cause the publication of Lebovits' alleged abuse of children within the community to cease. In this regard, Defendant Kellner is alleged to have been aided by five unindicted co-conspirators – namely, Leizer Wolf Hager, Yakov Leizer Horowitz, Simon Taub, Yidel Wolf, and Wolf Wertzberger.

5. The overt acts alleged to have occurred in furtherance of the charged conspiracy consist of five extortionate demands made to Meyer Lebovits, on Defendant Kellner's behalf, one by each of the five co-conspirators (Overt Acts 1-5), solicitation by Defendant Kellner of Moshe Friedman to act as a further emissary for his extortion (Overt Act 6), payments by Defendant Kellner to one of the complaining witnesses, [redacted], to secure false testimony in separate Grand Jury proceedings against Baruch Lebovits (Overt Acts 7-8), and a conversation in May 2009 between Defendant Kellner and Meyer Lebovits in which the former re-iterated the earlier extortionate demands made by his co-conspirators (Overt Act 9). Counts 2 to 6 of the Indictment arise from Overt Acts 1-5. Counts 7 to 10 arise from Overt Acts 7 and 8.

6. The Indictment is based entirely on testimony given to the Grand Jury by three people: Meyer Lebovits, [redacted], and Moshe Friedman (the first two are considered by the prosecution to be the "core" witnesses). Counts 7 to 10, which are the subject of the present motion to dismiss, are based entirely on [redacted] testimony.

7. Each one of the three above witnesses lied and perjured themselves before

the Grand Jury. [redacted], however, can be excused by reason of extenuating circumstances. He is a victim of childhood rape perpetrated by Baruch Lebovits who, after finding the courage to report his abuser, was intimidated into ending his cooperation with the prosecution. Later, when Lebovits and his associates were unable to prevent another victim, [redacted] from testifying, [redacted] was coerced and manipulated into claiming that Lebovits (by this time a convicted pedophile) was innocent and that Defendant Kellner had paid him to lie. Inexplicably, the District Attorney – whose sex crimes prosecutors received multiple offers to plead guilty from Baruch Lebovits with respect to [redacted] and remained convinced of [redacted] original complaint to the extent of trying to compel his testimony after he stopped cooperating – suddenly decided to accept without question (and behind the backs of his sex crimes prosecutors) the manufacture and delivery to him by counsel for Baruch Lebovits of [redacted] incredible about-turn.

8. On July 8, 2013, when trial in this matter was supposed to begin, the ugly and appalling truth of [redacted] debasement was publicly exposed. Obviously, his part in the case against Defendant Kellner is at an end. The damage inflicted upon him is incalculable, the injury of the abuse he suffered compounded by the insult of his abandonment by the District Attorney to the machinations of his abuser and supporters. He has suffered enough. He deserves, in the interests of justice, to be released from the agony of this case without further delay.

9. Meyer Lebovits and Moshe Friedman, on the other hand, deserve no such release. Their lies, and the connivance of others, in service of a convicted pedophile, deserve to be comprehensively exposed.

## FACTUAL BACKGROUND

**Sam Kellner's [redacted] is molested**

10. Sam Kellner's ordeal began in early 2008, when his son was molested by Baruch Lebovits. His son reported the incident to his yeshiva teacher, Rabbi Chaim Hager, who instructed him that Lebovits was a respected person and that he was forbidden from speaking further of the incident. Rabbi Hager also threatened to expel him from the yeshiva. He confided in his father, who decided to report the incident to the police. However, within Sam's community – the Satmar Hasidic community – he was obliged to first obtain the permission of a rabbi. He sought permission from Rabbi Chaim Flohr, a highly respected rabbi who presides over a rabbinical court in Monsey. Rabbi Flohr contacted the Williamsburg Va'ad HaTznius (modesty committee) as well as the Borough Park Va'ad HaTznius, entities that receive reports of sexually inappropriate conduct within the community, and learned that Baruch Lebovits was known for decades as a notorious pedophile. Sam was given permission to make the report.

11. Shortly afterwards, Sam met with ADA Christopher Laline, who interviewed Mr. Kellner's son, but informed him that the District Attorney would not proceed with a prosecution, primarily because the alleged offense was a misdemeanor and there were no other known victims. Unhappy with this outcome, Sam spoke to Henna White, the District Attorney's liaison to his community, who put him in contact with Detective Steve Litwin, a longtime investigator of sexual abuse of children. Detective Litwin interviewed Sam's son and concluded that Baruch Lebovits was a serial offender. He told Sam that a case against him would be viable if other victims could be found and encouraged to report their abuse. Thus began a working relationship that would last several years.

12. Sam was soon given the name of [redacted] a victim of Baruch Lebovits who had reported being raped by him as a child, by the Williamsburg Va'ad HaTznius. Sam met [redacted] and encouraged him to report his abuse to Detective Litwin, which he did. In March 2008, [redacted] and Sam's son testified before a Grand Jury, and Baruch Lebovits was indicted. [redacted] described how Lebovits started following him when he was 12 years old, and then, for the next four years, perpetrated countless horrific acts of oral and anal rape upon him. (Sam is now charged under Counts 7 and 9 of the present Indictment with Perjury and Criminal Solicitation, respectively, on account of [redacted] testimony.)

13. Subsequently, Sam was given the name of another victim of Lebovits, [redacted] whom he also helped to report his abuse to Detective Litwin. In September 2008, under Detective Litwin's supervision, [redacted] recorded a conversation he had with Lebovits, in which he tells Lebovits that he was contacted by a member of Dov Hikind's office who found out he was a victim of abuse. He further tells him that he believes a witness to the abuse may have spoken about it. Lebovits instructs him as follows: "You'll say you were alone, you had nobody with you"; "You'll deny it"; [The witness] "didn't see anything."

14. In November 2008, [redacted] testified a second time before a Grand Jury, along with [redacted] which resulted in a superseding indictment being filed against Baruch Lebovits. ([redacted] testimony on this occasion is the basis for the second set of charges of Perjury and Criminal Solicitation, in Counts 8 and 10 of the Indictment, respectively, against Sam.)

15. By this time, Sam was experiencing severe harassment and intimidation in his community for "informing" on Baruch Lebovits. Substantial monetary offers were also being

made to him by various people to drop his son's case. He rejected all of them. The pressure then took a different form whereby it was demanded that he submit to adjudication in a Beit Din, or rabbinical court. One rabbi in particular, Rabbi Yisroel Makavetzky, who presides over a Beit Din in Monroe, was relentless in his pursuit of Sam, demanding that his son's case against Baruch Lebovits be adjudicated before him. Sam, knowing that to live in his community means to live according to its rules, agreed in principle to go the Beit Din but set two pre-conditions: Rabbi Flohr (who had given him permission to report his son's abuse) and Michael Dowd, Esq., would be allowed to attend, and he would not be responsible for any expenses or legal fees charged by the court and Mr. Dowd. One of the alleged co-conspirators in this matter, Wolf Wertzberger, became involved and promised to pay Sam's share of the expenses and fees. However, Sam's other pre-conditions were rejected. Sam then received a bill from Makavetzky in the amount of $1,800 for the Beit Din's work "in the matter between Shlomo Aaron Kellner and the Lebovits family related to damages to his son" (attached hereto as Exhibit "A"). When Sam asked Wertzberger to honor his promise to pay the bill, Wertzberger told him that he was merely a front for Baruch Lebovits's son, Meyer, whom he would need to ask directly.

16. Before Sam met Meyer Lebovits, he received another payoff offer from Moshe Friedman, a first cousin through marriage of Baruch Lebovits. For decades, Friedman was the right hand man of Rabbi Moshe Teitelbaum, the leader of the Satmar Hasidic community until his death in 2006. Friedman is someone of huge power and influence, both inside and outside of his community. In 2009, a profile of him described "many senators and politicians flocking to his door throughout the year, especially before elections." He is also the editor of the main Satmar newspaper, Der Yid. Friedman contacted Sam offering him a job selling

advertising for Der Yid, which Sam accepted, and began making calls on the paper's behalf. (At least one recipient of these calls is prepared to testify on Sam's behalf.) Friedman demanded that Sam drop his son's case against Baruch Lebovits, and told him that the family was willing to offer $250,000. Sam refused the offer, and the job ended.

17. Throughout this time, Sam kept Detective Litwin apprised of the various attempts to buy him off. He also met with ADA Rhonnie Jaus and ADA Miss Gregory – Chief and First Deputy Chief of the Sex Crimes Bureau, respectively – and ADA Laline, and informed them about what was taking place. (The District Attorney accepts this meeting occurred, but claims that no notes were taken.)

**Tape recorded meeting**

18. In May 2009, Sam met with Meyer Lebovits concerning the Beit Din bill from Makavetzky. Lebovits secretly recorded the meeting. The recording was initially proclaimed by the District Attorney to be a "smoking gun" until it became apparent that it was not played in front of the Grand Jury, was translated by someone unfamiliar with the religious references used by the speakers (which provide much of its context), and, when read in its entirety (even without the un-translated religious references), not only confirms Sam's innocence but squarely contradicts Meyer Lebovits' perjured testimony to the Grand Jury.

19. Hella Winston, who has reported at length on this case, described the tape in an article published in The Jewish Week in January 2013 (attached hereto as Exhibit "B"), as follows:

> The DA's transcript of the tape (in Yiddish with an English translation) was reviewed for The Jewish Week by a native Yiddish speaker. Without context,

> the meaning of many of the exchanges is ambiguous at best; to someone with knowledge of the back story, it becomes clear that the discussion is not about attempts by Kellner to extort Meyer Lebovits using emissaries, but rather is about the beit din and those involved in it, Kellner's desire to see Baruch Lebovits plead guilty in his son's case, and attempts by others to get Kellner to drop the charges. (The reviewer also determined that many of the exchanges critical to the overall meaning of the conversation were distorted in the translation.)

20. The recording was also recently addressed in an article by Michael Powell of the New York Times (attached hereto as Exhibit "C"), in response to a description by ADA Batsidis of it as "the key evidence" in the case, and the following claim: ""When you have an audiotape where Kellner is warning him that he's going to bring other victims, it speaks for itself," Mr. Batsidis said." According to Powell:

> That explanation sounds better than the tape itself. The transcript reveals a conversation soaked in ambiguity, and rendered in overwrought language. It depicts Mr. Kellner as a tortured father trying to find justice. The younger Mr. Lebovits at times seems to accept that his father committed some acts of abuse.

21. The explanation of ADA Batsidis is based on a fundamental misunderstanding of the conversation's context. Part of the reason for this misunderstanding is that the translation the prosecution is relying upon was prepared by a translator without knowledge of the religious references and phraseology employed during the conversation, with the result that a key phrase uttered by Meyer Lebovits is missing. At the same time, however, the translation indicates unmistakably that, far from Sam warning Meyer Lebovits that he was going to bring victims forward, it is Meyer Lebovits who complains bitterly to Sam that he didn't warn

him before he reported his father to the police. The basis for his complaint is his missing phrase, taken from the Torah: "You cannot punish a person unless you warn him."

22. Meyer Lebovits assures Sam that had he approached him instead of reporting the matter to the police, "[t]he problem would have been taken care of," and "[w]e would have handled the [problem], we would have done everything." (Translation, p. 12). Lebovits continues: "If somebody did what was done to your child, I would have wanted to kill him." (Translation, pp. 25-26). Nonetheless, he stresses, Sam was wrong to report the matter to the police: "Why didn't you call me, "Meyer, I heard your father is going to be in trouble. We should have seen what could have been done."" (Translation, p. 26). According to Lebovits, Sam violated the command of the Torah by not warning him about his father in advance of the police report, and states indignantly: "There is no justification for that. In this crime I don't forgive anything. Nothing. Am I some bum? Should such things be done?" (Translation, p. 27).

23. Sam then tells Lebovits that he asked Yidel Wolf, one of his alleged co-conspirators, to "[t]ell Baruch Mordechai [Lebovits] to leave my child alone," meaning that Baruch Lebovits should not force him to testify. Sam believes his son should not be forced to testify because he "went through enough." (Translation, pp. 28-29). Sam's true motivation couldn't be farther from the alleged extortionate one: "How am I going to prevent my son taking the stand." (Translation, p. 43). Sam knew that his son would bear a stigma for the rest of his life in his community, and suffer accordingly, if he was forced to testify.

24. Later, Sam speaks about being pressured and threatened to attend the rabbinical court proceedings presided over by Rabbi Yisroel Makavetzky. Lebovits is initially evasive about these proceedings: "I wasn't told anything. It's not coming from me." (Translation,

p. 49). However, when Sam reminds him that he was directly involved – "[j]ust a minute. I spoke with you on the phone. You called me on the phone … [Makavetzky] told me, "I'm transferring you to Meyer" – Lebovits admits he was there: "I remember I was talking from Makavetsky's." (Translation, p. 49). Sam describes Makavetzky as follows: "Here is Rabbi Makavetsky who's been chasing me so long, telling me I should drop the case…" (Translation, p. 50). Meyer Lebovits takes a very different view of him: "He is a good man, Makavetsky" (p. 145).

25. Later in the conversation, Sam states the origin of the issue between them: "After all, my child was hurt"; "True," Lebovits responds. (Translation, p. 69). Lebovits says that he "thought we'll settle it, we'll settle the matter…." (Translation, pp. 69-70). Sam expresses his objection to the threats he was receiving to force him into dropping his son's case, by analogy with a person who breaks into the home of another, and then, after being arrested, threatens the person whose home he broke into that "if you don't back off, I'll fix you." (Translation, p. 70). Meyer Lebovits pleads ignorance of the threats – "Who wants to fix you?" – but then justifies his actions: "I must defend myself." (Id.)

26. Sam points out that had Baruch Lebovits pleaded guilty in the case of his son, he would not face time in jail. Meyer Lebovits responds: "He wanted to plead guilty." (Translation, p. 71). However, it is then clarified that Baruch Lebovits wanted to plead guilty in both Sam's son case and in the case of [redacted], but only if he was given an overall non-jail disposition; Meyer Lebovits concludes: "They didn't give him what he wanted." (Translation, p. 72). At the end of the conversation Lebovits reiterates that he can't forgive Sam, "not because

you put [Baruch Lebovits] in jail," asking instead: "Why didn't you come to us?" (Translation, p. 148).

27. The tape recording was disclosed by counsel for Baruch Lebovits to the sex crimes prosecutors prior to his trial but dismissed as worthless. The District Attorney's office was still not giving Baruch Lebovits what he wanted. That would soon change.

**Trial and conviction of Baruch Lebovits**

28. By November 2009, [redacted] case had been severed from that of [redacted] ADA Gregory spoke to [redacted], and noted that he was ready to proceed to trial. Later that month, she received a call from attorney John Lonuzzi, informing her that [redacted] was suddenly no longer cooperating with the prosecution of Baruch Lebovits. No reason was given. ADA Gregory's notes at the time reflect attempts to subpoena the testimony of [redacted] (Ultimately, however, that course of action was not pursued and the case was dismissed.)

29. The Lebovits family and their supporters were unable, though, to stop [redacted] from testifying against Baruch Lebovits. Because of that testimony, in March 2010, Lebovits was convicted; he was sentenced the following month to a term of 10 2/3 – 32 years in prison. Counsel for Lebovits argued that [redacted] had fabricated the allegations as part of an extortion plot. The truth was obvious to the jury, which needed only a few hours to reach its verdict.

30. During the trial, the jury heard of efforts by the sole defense witness, Berel Ashkenazi, to pay off [redacted] – a former pupil of his – and stop his testimony. Contemporaneous notes from Detective Litwin detail these efforts, as well as Sam's counter-

efforts to assure [redacted] – who suffered from a serious drug addiction and was in dire financial straits – that he would receive support and compensation without having "to sign anything" – i.e. without agreeing to drop the case. [redacted] later reported being similarly advised by ADA Gregory that he was entitled to pursue a civil case separate from the criminal one. When Berel Ashkenazi took the stand, he was confronted with a rabbinical court ruling that forbade [redacted] from reporting Ashkenazi's attempts to bribe him and stop him from testifying, while allowing Ashkenazi to "help" [redacted] if he removed "himself altogether from the courts of the goyim." Ashkenazi had no answer to what was blatant evidence of witness tampering and attempted bribery. Regardless, he faced no further consequence or sanction (careful note of which appears to have been taken by his brother, Zalmen, as will be seen below).

**"Justice" for Baruch Lebovits**

31. Following the conviction, Baruch Lebovits and his supporters began an intensive campaign to overturn it by any means possible. In their quest, they found an ally in the last place imaginable: the office of the same prosecutor that sent Lebovits to jail.

32. Help was also forthcoming from Simon Taub, a prominent member of Sam's community whom he had asked for assistance in the past with regard to the harassment and intimidation he and his family were facing. Later, Sam told him that Taub's son had reported being molested by Meyer Lebovits. Instead of going to the police, however, as Sam had done, Taub used the information to demand money from Meyer Lebovits. Horrified, Sam reported Taub's plan to Detective Litwin and to Rabbi Nuchem Rosenberg, a prominent community activist against the sexual abuse of children who maintains a "hotline" providing information on topics of concern to the community. In an effort to deter Taub, Rabbi Rosenberg

broadcast on his hotline that someone was attempting to extort money from an alleged molester, and that both would be arrested. The effort was successful. On April 27, 2010, Taub contacted Meyer Lebovits and told him that he was no longer pursuing him for money.

33. The Lebovitses still saw an opportunity for profit. Later that day, counsel for Baruch Lebovits met with Rackets Bureau Chief Michael Vecchione. A meeting was arranged in counsel's office that night at 9pm with Assistant Chief Investigator George Terra and Detective Investigator Stephanie Green-Jones of the District Attorney's office, and Chaim Lebovits, another son of Baruch Lebovits. According to the notes of DI Green-Jones, Chaim Lebovits "requested that we assist him in trying to bring justice for his family." It was a remarkably brazen request, considering that little more than a month has passed since Baruch Lebovits had been convicted of raping a child.

34. Even more remarkable (to the point where it can scarcely be believed), within 45 minutes of the meeting having begun, the effort by the District Attorney to assist the Lebovits family and the convicted child rapist was underway, with a direction that Chaim Lebovits re-instigate contact with Simon Taub. As a result, Taub resumed his plan to obtain money from the Lebovits family, which led ultimately to his arrest. The Lebovitses made the preposterous claim that Sam and Rabbi Rosenberg were acting in concert with Taub (even though the latter broadcast Taub's plan on his hotline), and that Taub was originally threatening to make a report to the police that Meyer had abused Sam's son, as opposed to his own.

35. In quick succession, an affidavit materialized, signed by a person named Sholem Weisner, claiming to be a friend of [redacted] According to Weisner, [redacted] told him that he ([redacted] had been paid off by Sam, that he was making it "big time" financially,

and that he had perjured himself at the Lebovits trial. Next, an affidavit signed by Moshe Friedman originated from the same source and, a week later, yet another one, signed by [redacted] and faxed to the District Attorney by counsel for Baruch Lebovits, in which [redacted] stated that he had been "brainwashed" and paid $10,000 by Sam to make his complaint. [redacted] was interviewed in September 2010. Nobody asked why he had not made these claims when he stopped cooperating less than a year earlier. Nor did anyone question why Baruch Lebovits had offered repeatedly to plead guilty with respect to heinous sexual offenses against a child of which he was now supposedly innocent. The investigating prosecutor had been conveniently banned from speaking to his colleagues in the Sex Crimes Bureau while, behind their backs, their conviction of a child rapist was being hollowed out.

36. In December 2010, [redacted] was interviewed by the District Attorney's office, and he stated unequivocally that he did not lie and was not paid for his testimony. On March 24, 2011, on the eve of the Grand Jury presentation, [redacted] was interviewed again. He stated that he had recently been invited to Florida by Sholem Weisner had given a number of video-recorded interviews. The District Attorney chose to ignore this information and proceed with Sam's indictment. Had he bothered to follow-up, he would have learned – as his sex crimes prosecutors learned afterwards – that [redacted] was lured to Florida by Weisner on the pretense of making a movie about his life. After [redacted] was plied with drugs, Weisner tried repeatedly, but in vain, to make him implicate Sam. It is very obvious from the recordings that Weisner is speaking to him for the first time about Sam; in particular, there is no reference to the statements Weisner claimed in his affidavit that [redacted] made to him about being paid off by Sam, making it "big time" financially, or lying at trial. After [redacted] meeting with the

District Attorney in December 2010, Weisner was obviously given the instruction that the attempt so far to discredit [redacted] hadn't worked and more was required. [redacted] on the other hand, entirely oblivious of the malign forces plotting against him, simply tells the truth throughout the recordings.

37. When [redacted] is asked why did [redacted] "get out" of the Lebovits case, he replies that "[t]hey scared him, they scared him," that the "Lebovitses" did this." He continues: "They, they terrorized him. You have no idea what they did to him." More specifically, "they came to tell him that, "If you're coming to court to testify against my father you're going to be arrested for the cases in which you molested two children." [redacted] also states that "they" paid for [redacted] lawyer and promised him money, which he never got.

38. When asked whether Sam ever tried to "shut him up," or offer him money to drop the case, [redacted] responds, "No … [Sam] always told me, [redacted] go to court, you're going to tell the truth, tell the truth." Sam, he says, "let me go the truthful way. I proceeded truthfully and honestly." He also recounts Baruch Lebovits attempting "to manipulate [his] father" along with numerous attempts to pay him off, including a payment of $50,000 in "forgiveness" money, and his initial reaction: "Wow, I don't know, $50,000, and I don't have a penny to my name." He didn't accept it, nor would he accept any amount: "My blood is not for sale … my blood has no price." A lonely island of integrity, about to be flooded by a heaving sea of corruption.

**Grand Jury presentation**

39. The attempt to turn [redacted] inside out having failed, the case against Sam before the Grand Jury had just three witnesses: [redacted] Meyer Lebovits, and Moshe

Friedman (ADA Gregory also provided background information about the cases against Baruch Lebovits).

40. [redacted] testified that Sam paid him $10,000 to falsely testify twice in Grand Jury proceedings that Baruch Lebobits, whom he knew "[f]rom the synagogue," molested him.

41. Meyer Lebovits testified that he was approached on Sam's behalf by each of the five alleged co-conspirators. He testified that he spoke to Yakov Leizer Horowitz at the "beginning of November, end of October" 2008, with Simon Taub in October and November 2008, and with Yidel Wolf in November 2008, and that each of them conveyed a threat by Sam to bring a third victim by the name of [redacted] forward unless Sam's monetary demands were met. The testimony was obviously staged to correspond with the time [redacted] testified against Baruch Lebovits before the Grand Jury in November 2008. However, [redacted] reported his abuse to Detective Litwin two months earlier, meaning he had already come forward long before Sam was supposedly threatening, according to Meyer Lebovits, to bring him forward. An obvious lie, with many more to follow.

42. Meyer Lebovits testified that, by early 2009, an amount of $225,000 had been agreed, yet in the recorded conversation in May 2009 it is obvious that there was never any agreement. Lebovits is questioned as to whether Sam specified any amount of money during their recorded conversation, and responds: "For that he referred to the messengers." A seemingly clever answer, except that the recording reveals it's entirely false. Sam never makes a reference to money being sought by anyone. Lebovits also testified that Sam told him that his plan was that "I should come to him and pay him off." Another lie, again nowhere to be found in the

recording. Lebovits testified that Sam said "he controls both of [redacted] and [redacted] Yet another lie, once again nowhere to be found in the recording. Lebovits testified that Sam "started telling me that he has a fourth case." In fact, Sam states clearly to Lebovits in the recording: "They have the two, two witnesses and there aren't anymore." (Translation, p. 82).

43. Possibly the biggest lie is one of omission: Makavetsky, the central figure in the interactions between Sam and the Lebovits family, whose unpaid bill was the cause of the recorded conversation in May 2009, is nowhere to be found in Lebovits's account to the Grand Jury. How, it must be asked – assuming the translation of the recording was actually read prior to the Grand Jury presentation – could the District Attorney have allowed Makavetsky and all the other lies to slip away unnoticed?

44. Finally, Moshe Friedman testified. He was asked how he knew Baruch Lebovits, and answered only that they "went to school together," neglecting to mention that he is Lebovits' first cousin by marriage. He also testified that he was the "community leader" and that Sam asked him in March or April 2009 to act as an emissary. The scenario advanced by Friedman was commented upon recently in The Jewish Week by Rabbi Yosef Blau, the spiritual adviser at the rabbinical seminary of Yeshiva University: "The whole situation doesn't make sense ... The idea that major players like [Moshe Friedman] would be doing Sam Kellner's bidding is mind-bogglingly absurd to [anyone familiar with how that community works]."

45. Friedman's testimony was largely superfluous. Nonetheless, it served a very important purpose. When the chief "fixer" and political liaison within Sam's community came to give testimony against him, it meant the fix was in.

46. On April 12, 2011, Sam Kellner was arrested. A news conference held personally by the District Attorney followed, and Sam was paraded in front of the media. The next day, Lebovits was released on $250,000 bail pending the appeal of his conviction and placed under house arrest. (On April 25, 2012, Lebovits' conviction was overturned by the Second Department and a new trial required because of the prosecution's untimely disclosure of certain Rosario material.)

**The case against Kellner begins to fall apart – [redacted] manipulation is revealed**

47. In May 2012, the District Attorney was told by a woman named Natalie, described as [redacted] best friend, that he fled to Israel "out of fear". She also "recalled the conversation she and [redacted] had prior to the [Lebovits] trial when he told her that [Lebovits's] oldest daughter called [redacted] and told him that if he testifies against her father, he ([redacted] would immediately be arrested for molestation." According to Natalie, Lebovits's "daughter said they would bring in the two little boys [redacted] molested as witnesses against him."

48. In September 2012, the District Attorney obtained travel and bank records that showed that [redacted] did in fact go to Israel and that his flights were being paid for by a felon, convicted a number of years ago of bank fraud, named Zalmen Ashkenazi, who just happened to be the brother of Berel Ashkenazi, the sole defense witness at the Lebovits trial who tried to pay [redacted] off (and faced no sanction for doing so). Again, no further action was taken by the District Attorney, and the information was not supplied to defense counsel in breach of the prosecution's Brady obligation.

49. In May 2013, defense counsel became aware of a recording of conversations with [redacted] made by an acquaintance of his who, being aware of Sam's case, began recording their conversations upon the realization that a grave injustice was being perpetrated (see article attached hereto as Exhibit "D"). On the tape, [redacted] states that he first disclosed his abuse by Baruch Lebovits to people within his community around the time he was 16 or 17, several years before he ever met Kellner. He also reveals that Zalmen Ashkenazi "got him out" of testifying against Lebovits, hired an attorney for him, and "made him" go against Sam.

50. Defense counsel met with [redacted] acquaintance, who described a number of conversations he had with [redacted] about his abuse by Baruch Lebovits – including one immediately after Lebovits was sentenced to prison, when [redacted] called to express his relief and elation. Discussions followed with the prosecutors, who wished to meet the acquaintance and listen to the tape. Neither could be arranged because the acquaintance felt unable to trust the District Attorney and feared his identity would be revealed to the Lebovitses and their supporters. At that point, I suggested to the prosecutors that they simply put the allegations directly to [redacted] on the assumption that [redacted] who sounded relatively unsophisticated on the tape, would not be able to maintain the deception. The prosecutors never mentioned that they had already looked into the Zalmen Ashkenazi connection.

51. On July 2, 2013, I wrote to ADA Batsidis, stating my belief that significant Brady material related to [redacted] was being withheld from the defense. On July 5, 2013, the defense was provided with redacted notes of interviews by prosecutors of [redacted] on June 26 and July 1, 2013, respectively, along with the aforementioned Ashkenazi travel and bank records

from September 2012. It was also indicated that other Brady material existed but was being withheld due to a protective order, which it later emerged was obtained on July 3, 2013, the day after my letter was sent.

52. In the interviews, [redacted] though he would not name the person(s) threatening him, conceded that he fled to Israel for fear of possible child molestation charges. He initially denied knowing Zalmen Ashkenazi, before claiming he barely knew him, and then admitting that he has known him and his family, including Berel, since childhood. Moreover, he stated that "Zalmen Ashkenazi has supplied funds for Mr. [redacted] attorney, his airfare to and from Israel, his apartment in Israel, and his school fees," and that he "needs Zalmen Ashkenazi's permission to return to the US when he's in Israel." He no longer claimed that Sam had paid him $10,000, claiming now that he had either not paid him an agreed-upon fee or not fulfilled a promise to finance his wedding. Bizarrely, he stated that he "had never seen Baruch Lebovits in his life," that Lebovits "could have molested me. [I] can't really say," and that he told others that Lebovits "really molested him."

53. In court on July 8, 2013, the prosecutors claimed that they were investigating Ashkenazi and the Lebovitses, and that they would report on the progress of this investigation on July 29, 2013, as well as on the investigation covered by the protective order (which, on information and belief, concerns more unfounded allegations manufactured on behalf of Baruch Lebovits – this time attacking Detective Litwin – that the District Attorney helpfully forwarded to the Internal Affairs Bureau of the NYPD).

## ARGUMENT

54. CPL § 210.40 provides that an indictment or any count thereof may be dismissed in furtherance of justice, when such dismissal is required as a matter of judicial discretion by the existence of some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon such indictment or count would constitute or result in injustice. Furthermore, in determining whether such compelling factor, consideration, or circumstance exists, the court must, to the extent applicable, examine and consider, individually and collectively, the following:

> (a) the seriousness and circumstances of the offense;
>
> (b) the extent of harm caused by the offense;
>
> (c) the evidence of guilt, whether admissible or inadmissible at trial;
>
> (d) the history, character and condition of the defendant;
>
> (e) any exceptionally serious misconduct of law enforcement personnel in the investigation, arrest and prosecution of the defendant;
>
> (f) the purpose and effect of imposing upon the defendant a sentence authorized for the offense;
>
> (g) the impact of a dismissal upon the confidence of the public in the criminal justice system;
>
> (h) the impact of a dismissal on the safety or welfare of the community;
>
> (i) where the court deems it appropriate, the attitude of the complainant or victim with respect to the motion;

> (j) any other relevant fact indicating that a judgment of conviction would serve no useful purpose.

55. The discretionary power to dismiss an indictment or any count thereof in the interest of justice is to be "exercised sparingly" (People v. Martinez, 304 A.D.2d 675, 676 (2nd Dept. 2003), "in those rare cases where there is a 'compelling factor' which clearly demonstrates that prosecution of the indictment would be an injustice" (People v. Anthony C., 269 A.D.2d 402 (2nd Dept. 2000). It is properly directed at "the unusual case that cries out for fundamental justice beyond the confines of conventional considerations of legal or factual merits of the charge or even on the guilt or innocence of the defendant." People v. Belge, 41 N.Y.2d 60, 62-63 (1976) (Fuchsberg, J., concurring) (internal citations and quotation marks omitted).

56. The present case, and in particular, the counts of the Indictment that relate to [redacted] – which are the subject of the present motion – is exactly the kind of rare or unusual case contemplated by CPL § 210.40 that cries out for fundamental justice. Indeed, the utter collapse of [redacted] credibility as a witness against Sam, in and of itself, presents a compelling reason to dismiss those counts of the Indictment based solely upon his testimony before the Grand Jury, as was made clear by the court in People v. Santoro, 63 N.Y.S.2d 615 (Co. Ct., Kings County, 1946):

> Where the evidence is legal, competent and sufficient, the Court will not, ordinarily, upon motion, inquire as to the credibility of the witnesses and the truth of their testimony, especially where conflicting views concerning its credence are expressed by the parties to the action. It is not the function of the court, nor has it the authority, to assume the role of a trier of the facts and thereby invade a province which is peculiarly that of the petit jury upon a trial. However, where the evidence is patently false, or where its falsity is

> conceded by the prosecutor, the court is bound, upon motion, to dismiss the indictment to prevent a perversion of justice.

Id., at 619.

57. For this, however, [redacted] is not to blame. It is sickeningly clear he was the victim of horrific sexual abuse and that, after he reported the abuse, he was terrorized and intimidated by his abuser and his abuser's supporters to the point of dropping the case. Worse again, he was then manipulated into denying the abuse ever happened, and into falsely implicating Sam, a manipulation that the District Attorney accepted without question for over three years, until the prospect of the utter shamefulness of it all being exposed at trial was unavoidable. Every day that [redacted] remains in this case is another day that his abuse and this shamefulness continues.

58. Regarding the other factors to be considered by the Court under CPL § 210.40, most have already been covered. There is not a single credible piece of evidence against Sam. Indeed, at this point, the case hangs by the slenderest of threads: the testimony of Meyer Lebovits, son of the pedophile trying to secure his father's release from prison -- testimony that is wholly contradicted by the tape he made of his conversation with Sam in May 2009.

59. Regarding law enforcement misconduct, there are many questions that arise from a situation in which a District Attorney is enlisted by a convicted pedophile and his supporters to oversee a blatant campaign of lies, manipulation and witness tampering in order to overturn his conviction and secure his release back into the community. Amongst these questions are the following:

> 1. Why did the District Attorney cooperate with a scheme to secure the release from jail of a

notorious, decades-long, convicted pedophile?

2. Why were the sex crimes prosecutors sidelined?

3. Why was [redacted] recantation accepted without question?

4. Why was the recantation accepted when Baruch Lebovits had offered repeatedly to plead guilty with respect to abusing [redacted]

5. Why was Baruch Lebovits not charged with witness tampering despite being recorded in the act in September 2008?

6. Why was Berel Ashkenazi never pursued for his attempts to bribe [redacted] and stop his testimony?

7. Why was Sholem Weisner not prosecuted for swearing falsely in an affidavit that [redacted] had admitted fabricating his trial testimony and being paid for it?

8. Why was no investigation carried out into the Lebovits family after multiple reports were received that they threatened [redacted] and forced him to flee to Israel?

9. Why were records evidencing Zalmen Ashkenazi's control of [redacted] not turned over to the defense in September 2012 when they were obtained by the District Attorney (a clear Brady violation)?

10. Why was Brady material covered by the protective order belatedly obtained on July 3, 2013, not previously turned over?

11. Why was Meyer Lebovits not challenged about the content of the recording of his

conversation with Sam in May 2009?

12. Why were Yisroel Makavetzky and his Beit Din not investigated?

13. Why was Detective Steve Litwin, known as a tireless champion of victims of childhood sexual abuse, referred to Internal Affairs based on more spurious allegations concocted by Lebovits and his supporters?

60. Each of these questions is prompted by pervasive evidence of serious investigative and prosecutorial misconduct. It is a searing portrait of shame. [redacted] was abused over and over again, and then failed utterly by those that were charged with his protection. Justice demands that he be set free from his continued abuse and that the counts in the Indictment that rely upon his continued debasement be dismissed. The confidence of the public in the criminal justice system requires no less.

WHEREFORE, it is respectfully requested that the Court grant the relief sought.

Dated: New York, New York
July 26, 2013

NIALL MACGIOLLABHUÍ

RABBINICAL COURT
**SHEVET MISHOR**
UPSTATE NY

בית דין צדק
שבט מישור
אפסטעיט נ.י. יע"א

Monroe Tel. 845-782-6708 / ~~845-667-9026~~ Monsey Tel. 845-260-0343 Fax 845-783-7026

בעזהשי"ת אדון הכל

# INVOICE

Name / שם הכעי"ד: Mr. S. A. Kellner
Address / כתובת:
City: State: ZIP:
Phone / טלפון:

| | Hours | Price per hour | TOTAL |
|---|---|---|---|
| בענין דוד בן מו"ה שלמה אהרן קעלנער נ"י<br>ומו"ה משפחת [illegible] הנ"ל בענין הצדקות בנוגע הגט [illegible]<br>ויעוץ והדרכה עפ"י דיני תוה"ק. במשך כמה שבועות,<br><br>Eighteen Hundred Dollars. | 12 | $150.00 | $1800.00 |

**Payment Details**
- ○ Cash
- ✓ Check made payable to: Rabbinical Court of Shevet Mishor
- ◉ Credit Card

Signature ______
CC # ______
Expires

Return Address: Makevet
3 Premishlan Way #
Monroe NY. 1095

New York • The Jewish Week
Connecting the World to Jewish News, Culture, and Opinion
Published on *The Jewish Week* (http://www.thejewishweek.com)

Home > Abuse Whistleblower Battling Both Haredi Community, DA

# Abuse Whistleblower Battling Both Haredi Community, DA

New York News Alan Dershowitz Borough Park Brooklyn DA Charles Hynes chasidic Der Yid Nechemya Weberman Sam Kellner

Sam Kellner, who says his son was abused, helped the Brooklyn DA in his fight against child sexual abuse. Now, Kellner himself is himself facing accusations of extortion. Is he being set up?

Mon, 01/14/2013
Hella Winston
Special To The Jewish Week

For Jews, Chanukah is a season of light and miracles. It wasn't like that last month for Sam Kellner, a chasidic resident of Brooklyn's Borough Park.




Unemployed and facing mounting debt from his lonely fight against both the powers that be in his community and the Brooklyn district attorney, Kellner, 50, was contemplating a Chanukah in darkness: he had pawned the family silver, and the menorah along with it, to free up some cash to pay his attorney.

When his wife found out, she was upset, so Kellner trudged back to the silver shop on 13th Avenue to retrieve the menorah.

If anyone could use a miracle, it's Sam Kellner.

"They took everything from me," Kellner says. "They've killed me on the street, kicked me out of my shul. I have no job, no money, no friends. And the DA is going after me. All because I committed the sin of fighting for my son."

In 2008, when Kellner reported his teenage son's alleged molester to the authorities, he knew he would make enemies in his chasidic community, despite having secured permission to do so from rabbis. What he never expected was that one of the people turning against him would be the Brooklyn district attorney.

To hear him tell it, Kellner — whose son reported he had been touched inappropriately by a man named Baruch Lebovits — went from being a valued law enforcement resource to the subject of wrongful perjury, extortion and conspiracy charges, all because he sought redress in the criminal justice system. If convicted, he faces up to 21 years in prison.

Kellner's case, for which a trial date has not been set, is dizzyingly complex and brings together a number of threads in the ongoing story of child sexual abuse in Orthodox Brooklyn: the conduct of Brooklyn DA Charles Hynes' office, which has come under great scrutiny of late for its perceived failure to aggressively pursue prosecution of sex abuse cases in the haredi community for fear of losing a key voting bloc; the religious courts that seek to address child molestation within the community; and the workings of the Vaad HaTznius, the communal modesty patrols to whom alleged molesters are often reported.

The case reaches into the highest echelons of chasidic Brooklyn, including the powerful editor of the newspaper Der Yid, and of the legal community; Alan Dershowitz worked on the appeal of Baruch Lebovits, who, in part because of the doggedness of Sam Kellner, was convicted in 2010 on eight counts of sexual abuse (his conviction was overturned on a technicality and a new trial reordered). And now, the Lebovits and Kellner cases have become linked in a legal and moral drama.

Some observers maintain that the climate in the Orthodox community is changing when it comes to reporting sexual abuse to law enforcement, and that Hynes' office has shed its seeming reluctance to prosecute ultra-Orthodox sex abuse cases rather than settle them with plea deals involving little or no jail time. (The recent conviction of an unlicensed counselor and well-connected member of the Satmar community, Nechemya Weberman, for sexually abusing a teenage girl has been hailed as evidence of Hynes' new resolve, as has his arrest not just of four men for witness tampering in the case, but of others who took photographs of the victim at trial).

But Kellner's case complicates the picture. It and the Lebovits case unfolded before pressure on Hynes' office intensified to take these cases to trial rather than dispose of them with plea deals. In a strange irony, those who support Kellner believe that it is precisely because the Lebovits case actually went to trial and resulted in a conviction and long prison sentence that Kellner is now under indictment.

As he awaits trial, Kellner, a man who did the right thing — at least by the standards of secular society — by reporting the crime of child molestation to the police, now stands accused of being an alleged criminal, while those who tried to stop him remain unpunished.

"There's a lot to be investigated here," Kellner's attorney, Michael Dowd, told The Jewish Week. "But it's not Sam Kellner."

A spokesman for Hynes' office denied the charge that the Kellner prosecution was politically motivated. The spokesman, Jerry Schmetterer, also said no one in the DA's

office would be made available to speak about the case since it is an ongoing investigation.

**A Father's Fight For Justice Begins**

His black velvet yarmulke slightly askew, Sam Kellner is leaning back in a chair in the lounge at the Brooklyn Marriott, twisting his wiry grey beard. Nearby, young Orthodox couples on "shidduch dates" sip soda from plastic cups.

The significance of the location — the hotel abuts the Brooklyn district attorney's office — is not lost on Kellner. "That's where they had me locked up for 14 hours after I was arrested," he says, pointing out the window.

Kellner's saga began in early 2008, the day his teenage son disclosed that Baruch Lebovits, 61, a travel agent and cantor from a rich and well-connected family, had given him a ride home the night before and touched him inappropriately in his car.

Furious, Kellner wanted to file a police report, but would not do so without first securing the permission of a rabbi. So he sought — and received — approval from Rabbi Chaim Flohr, a highly regarded rabbi who presides over a religious court in Monsey. In consultation with the Vaad HaTznius in Borough Park, Rabbi Flohr established that there were credible accusations against Lebovits going back years.

Nervous to report on his own, Kellner contacted the Williamsburg Vaad HaTznius, which he was told had a good relationship with the Brooklyn DA's office. (Attempts to reach members of the Vaad by phone were unsuccessful.) Kellner says they put him in touch with an attorney, Asher White. (An e-mail to White was not returned.) White's wife Henna is the DA's liaison to the Jewish community. She also heads his office's Kol Tzedek hotline, established in April of 2009 to encourage haredi victims of sexual abuse to report these crimes to the authorities.

After speaking with Kellner, Asher White took him to Henna's office.

Kellner recalls the meeting. "Henna told me, 'Sam, are you going to go all the way with this? I will take you to an ADA [assistant district attorney], but don't screw me. We've had problems with [haredi] witnesses dropping out.' And I told her, 'Henna, I am going all the way.'"

An ADA interviewed the boy and determined the alleged abuse was a misdemeanor. Because of that, along with Lebovits' age, clean record, and the lack of additional victims, the DA's office wouldn't pursue the case.

Kellner was crushed. But on the advice of Henna White, he reached out to then-sex crimes detective Steve Litwin.

Litwin interviewed the boy and concurred with the ADA. But he offered a way forward: based on his experience, Litwin believed that Lebovits was a serial offender. If Kellner could find and encourage other victims to report, they would have a better chance of bringing a case. It was the beginning of a working relationship that would last several years.

**'People Were Coming After Me On The Street'**

"At first I tell him, 'Steve, you're the detective, how is it I should find victims?'" Kellner recalled.

But Kellner mulled the idea and hit the streets. His first stop was the Williamsburg Vaad to obtain the name of another boy who had made credible allegations against Lebovits. The Vaad directed Kellner to a young man, Yoel (not his real name), who told Kellner he had been molested by Lebovits. Kellner asked Yoel if he wanted to go to the police, and when the young man said yes, Kellner secured rabbinic approval from Rabbi Shraga Hager, a chasidic leader.

Police records indicate that Yoel was interviewed by Litwin, the sex-crimes detective, on March 6, 2008 and disclosed multiple incidents of being sodomized by Lebovits, starting when he was 12. The acts alleged included felonies.

On March 11, 2008 Lebovits was arrested. He was indicted on the grand jury testimony of Kellner's son and Yoel. The two cases were severed and Kellner worried his son's misdemeanor case might be prosecuted first, forcing the teenager to take the stand, something Kellner hoped to avoid. If Lebovits were tried and convicted on a felony first, Kellner reasoned, the DA was unlikely to subsequently pursue a misdemeanor charge. Kellner also worried that the DA might not go forward with Yoel's case, given the young man's tenuous emotional state. (Yoel was so damaged emotionally he was often unable to meet his basic needs and Kellner says he occasionally bought the young man food; Litwin also took him out for meals, according to law enforcement materials.)

So, Kellner obtained permission from the Borough Park Vaad to track down yet another victim, Zev (not his real name), whose information Kellner obtained from Assemblyman Dov Hikind's office. Hikind received calls from hundreds of sex abuse survivors after he did a series of radio shows on the issue in 2008.

Kellner approached Zev, who disclosed that he, too, was a Lebovits victim, and struggling with drug addiction. Kellner got rabbinic approval for Zev, who then made a report to Litwin on Sept.16, 2008; his allegations were also felonies.

Zev and Yoel went to the grand jury in November 2008.

By then, Kellner was experiencing severe harassment in his community for "informing" on Lebovits. Many people accused him of fabricating the allegations for money.

"People were screaming at me, coming after me on the street, blowing out my tires," Kellner says. "I was kicked out from my shul, my kids kicked out of school, nobody would hire me."

Kellner says a variety of people in the community, including rabbis, began transmitting monetary offers to him to drop the case. He rejected all of them. He then got pressured to withdraw the charges and go to the beit din, or religious court.

Kellner was summoned to, but did not attend, a beit din in Monsey. Then, Kellner says, Yisroel Makavetzky, who has a beit din in upstate Monroe, demanded Kellner adjudicate his son's case against Lebovits there. (Makavetzky had already issued rulings forbidding

Kellner and Zev from pursuing justice in criminal court.) Kellner agreed to go to beit din, but made it clear he would not drop the criminal charges. He also insisted that Rabbi Flohr and attorney Michael Dowd be present (the latter to ensure everything would be done in accordance with secular law), and that his beit din legal expenses and fees be paid.

According to Kellner, a chasidic businessman got involved, promising to pay Kellner's beit din fees. He also told Kellner that if he dropped the criminal case and the beit din found in his favor, he could receive up to $400,000 in damages. Kellner told the businessman he wasn't interested: Rabbi Flohr had given him permission to go to the police, and he wasn't dropping the criminal charges. And if he did go to the beit din and won, Kellner said he would accept only funds to cover treatment for his son — estimated at $30,000 by a rabbi who does medical referrals for the community.

Ultimately, Kellner's conditions were rejected and the beit din never convened, though Kellner was billed $1,800 for its consultation work "in the matter between Shlomo Aaron Kellner and the Lebovits family related to damages to his son." When Kellner approached the businessman to honor his agreement to pay the bill, the man sent him to Lebovits' son, Meyer; the businessman told Kellner he had been fronting for Meyer all along.

Kellner approached Meyer and began the conversation by telling him that his only complaint against him was the unpaid beit din-related fees. Meyer then castigated Kellner for going to the police instead of coming to him, accusing Kellner of ruining his reputation. A wide-ranging conversation ensued that touched on the abortive beit din, the criminal cases against Baruch Lebovits (and specifically Kellner's wish to see Lebovits take a plea in Kellner's son's case) and other attempts to get Kellner to drop the charges.

Unbeknownst to Kellner, Meyer was recording the conversation.

**More Payoff Offers**

Kellner says he also got a payoff offer from Moshe Friedman, a cousin of Baruch Lebovits. Friedman, also known as Moshe Gabbai, is a longtime power broker in the Satmar community, going back to when he was the personal secretary (or gabbai, hence the nickname) of the previous Satmar rebbe, Moshe Teitelbaum. He is also the editor of the main Satmar newspaper, Der Yid. An article in an Israeli paper noted that Friedman has "many senators and politicians flocking to his door throughout the year, especially before elections."

Kellner says Friedman contacted him in 2009 with a job offer selling advertising for Der Yid. Kellner, who had worked selling toner cartridges and paper goods, began making calls on the paper's behalf. During that time, Friedman ordered Kellner to drop his criminal case. Kellner refused. Friedman came back with an offer: "the family" had had a meeting and was prepared to fine Baruch Lebovits $250,000 as an "apology" to Kellner if he dropped the charges. Kellner rejected the offer and quit.

"My son is not a prostitute," Kellner says. "There is not a price in this world that is going to justify [what Lebovits did]."

Kellner informed Detective Litwin — with whom he was working closely — about attempts to buy him off. He says he also met with sex crimes Bureau Chief Rhonnie Jaus and

assistant district attorneys Miss Gregory and Chris LaLine about the witness tampering and intimidation.

Reached by phone Litwin declined to speak with The Jewish Week.

"I tell them, 'You don't know what's going on on the street. Rhonnie, they're offering money," Kellner recalls. "We're going to lose every witness. I'll wear a wire.'" But Kellner says the office never took him up on it. "From that meeting on," Kellner continues, "she '[wouldn't take] my [calls]."

A spokesman for the DA's office told The Jewish Week that Jaus was not at liberty to comment on a pending case.

There were also attempts to pay Zev to drop his charges, some documented in Litwin's notes (one came from a man named Beryl Ashkenazi). Kellner feared that, needing money for drugs, Zev would succumb to temptation and take a payoff. With Kellner's encouragement, Zev held firm.

In February 2010, Lebovits went to trial in Zev's case. Yoel's case had been scheduled to go first but he abruptly stopped communicating with prosecutors and transmitted his refusal to cooperate through an apparently newly retained attorney.

Lebovits' defense argued that Zev had fabricated the allegations in order to extort money from the Lebovits family. The jury didn't buy it, and Lebovits was convicted on March 8, 2010.

Before sentencing, Lebovits' lawyer brought in a new witness who claimed Zev had told him he had fabricated his allegations in order to get money. The judge, Patricia DiMango, expressed skepticism about this 11th hour revelation and ultimately found the allegation without merit. She sentenced Lebovits to 10 2/3 to 32 years in jail on the eight sex abuse charges.

The sentence sent shockwaves through the chasidic community, where no one convicted of this kind of crime had ever faced such a stiff sentence (Jerry Brauner, convicted on sex-abuse charges in 2002, was sentenced to 11 years probation). Lebovits' lawyers vowed to appeal.

**Kellner Arrested: 'It's Mind-Boggling'**

About a year later, on April 12, 2011, Sam Kellner was arrested. The arrest came as a shock, as did the charges, whose substance he learned only after he had been bussed to and from Rikers and done a perp walk in front of assembled media the next day, when Hynes held a press conference. By that time, Kellner had already been indicted, charged with extortion, perjury and conspiracy.

The following day, an appellate judge ordered Lebovits released from prison on house arrest on $250,000 bail pending the appeal of his conviction.

Kellner was charged — along with five unindicted co-conspirators — with attempting to extort money with a promise that, if paid, Kellner would get the complaining witnesses not

to testify and prevent a third victim from coming forward (the indictment also charges Kellner with threatening to bring a fourth victim).

The case is being handled by the Rackets Bureau, headed by Michael Vecchione.

While not named in the indictment, it is clear from the grand jury minutes that the co-conspirators are: Leizer Wolf Hager; Yidel Wolf of the Borough Park Vaad; Wolf Wertzberger; Yakov Leizer Horowitz, an anti-informing activist who had harassed Kellner; and Simon Taub — all of whom Kellner allegedly sent as messengers to get money from Meyer Lebovits. All of these men's names were mentioned in the tape-recorded conversation between Meyer Lebovits and Kellner and in Meyer Lebovits' grand jury testimony. (Taub was arrested in July 2010 — and later pleaded guilty —for attempting to extort money from Meyer, who had allegedly molested Taub's son.)

Kellner was also charged with using Moshe Friedman, the editor of Der Yid, to convey his demand to Meyer Lebovits for a monetary payment in return for a guarantee that Kellner would stop the complaining witnesses — whom he allegedly controlled — from testifying.

Additionally, Kellner was charged with paying Yoel to lie before a grand jury and falsely accuse Lebovits of molesting him.

The only people to testify at Kellner's grand jury were Meyer Lebovits, Moshe Friedman and Yoel. In his testimony, Friedman alleges that Kellner came to him, "That I should convince Lebovits' family that they should give him [the] $250,000."

"It's mind-boggling," Kellner says of the charges. "All these people offering payoffs, and I'm telling this all along to Detective Litwin, and now I'm the extortionist?"

**The DA's Case Against Kellner**

Indeed, the timing, quality and sources of the DA's evidence against Kellner all raise questions about the legitimacy of the charges, say observers, as does evidence in the DA's possession that is favorable to Kellner.

The conspiracy charges were brought to the DA by Meyer Lebovits in May 2010 — after the guilty verdict in his father's case. They are based on Meyer's statements and the 2009 tape-recorded conversation between Meyer and Kellner, which occurred almost a year before Lebovits' trial. It is unclear why, given its purported importance as evidence of an extortion plot, the tape was not brought to the attention of law enforcement before the trial.

The DA's transcript of the tape (in Yiddish with an English translation) was reviewed for The Jewish Week by a native Yiddish speaker. Without context, the meaning of many of the exchanges is ambiguous at best; to someone with knowledge of the back story, it becomes clear that the discussion is not about attempts by Kellner to extort Meyer Lebovits using emissaries, but rather is about the beit din and those involved in it, Kellner's desire to see Baruch Lebovits plead guilty in his son's case, and attempts by others to get Kellner to drop the charges. (The reviewer also determined that many of the exchanges critical to the overall meaning of the conversation were distorted in the translation.)

Then there is the matter of the unindicted co-conspirators. Typically, co-conspirators are unindicted because they are cooperating with the government. It is unclear whether the DA interviewed any of these men in connection with the Kellner case (none testified at the grand jury, and two recently claimed they were unaware of their involvement in the case).

The charges that Kellner paid Yoel to lie also seem suspect in light of investigators' reports and videos in the DA's possession, as well as information independently obtained by The Jewish Week.

Yoel alleged to a DA investigator six months after Lebovits' conviction, on Sept. 15, 2010, that Kellner paid him $10,000 in $100 weekly increments to fabricate the charges against Lebovits. Yoel made these allegations about Kellner in the presence of his lawyer, John Lonuzzi, a partner in Lonuzzi and Woodland and a past president of the Brooklyn Bar Association. (The DA apparently declined to charge Yoel for allegedly giving false grand jury testimony). It is not known how Yoel, who had been barely able to take care of himself, was able to secure or afford Lonuzzi's services.

"If I'm a prosecutor trying to scrutinize the reliability of the information I am now getting, after the trial is over, I would ask, 'Why didn't you give this over sooner?,'" Bennett Gershman, a professor at Pace Law School and an expert in prosecutorial misconduct, told The Jewish Week. "It doesn't add up. All of this evidence must be tempered by [each] source's stake in the case, his motives, his biases."

The DA also has evidence that suggests Yoel's allegations against Kellner were made under duress. This includes several video interviews of Zev shot after Lebovits' conviction by people who claim to be making a movie about Zev's life. (The Jewish Week has information that this was a ruse.) The interviewers are not seen on camera, though two are referred to throughout as Sholem and Shimon Yosef. They ask Zev questions about his history of abuse and the Lebovits case.

When Zev is asked why Yoel "got out" of the Lebovits case, he replies, "They scared him, they scared him," clarifying that "they" are the Lebovitses. "They, they terrorized him. You have no idea what they did to him."

Zev also claims "they" got Yoel a lawyer and promised him money, which he never got.

Zev's statements are supported by an interview that a DA investigator conducted with a woman named Natalie B., identified as Yoel's "best friend," in May 2012. Natalie told the investigator that Lebovits' eldest daughter had threatened to produce two witnesses to testify that Yoel had molested them as children if he did not drop his case against her father. She also told the investigator that Yoel fled to Israel "out of fear" seven months prior.

It is not known whether the DA has ever questioned members of the Lebovits family about this alleged intimidation of Yoel, but given all this — and the fact that Litwin, the DA and two grand juries clearly found Yoel's allegations against Baruch Lebovits credible — it is difficult to understand why the DA so uncritically accepted Yoel's claims of being paid to lie by Kellner.

In addition, The Jewish Week has independent confirmation that Kellner obtained Yoel's name from the Vaad, to whom Yoel had reported being abused by Lebovits prior to ever meeting Kellner. This negates the charge that Kellner paid Yoel to fabricate his abuse claim.

As for the video interviews of Zev, it appears they too were part of an effort to generate evidence of an extortion plot against the Lebovits family after Lebovits' conviction. Chaim Levin, an abuse survivor and victims' advocate, told The Jewish Week he learned that one of the people behind the video was a man named Sholem Weisner (presumably the Sholem referred to on the tape). Levin says he met Weisner at a gathering on the Upper West Side in March of 2011, where Weisner bragged he had recently taken Zev to Florida, bugged the house with expensive recording equipment and "made sure Zev was good and high" before interviewing him in order to get evidence that "they could take to the DA" to clear Lebovits. Levin — who knows another alleged Lebovits victim — says he was horrified.

An attempt to contact Weisner was unsuccessful.

In June 2010, apparently the same Sholem Weisner gave the DA his sworn affidavit stating that Zev told him he had lied for money about being molested by Lebovits and that he had been pressured by "powerful people" to make the false allegations. Weisner also told a DA investigator that Lebovits was well known in the community as "a man who liked young men," but "was not a threat." (In 2007, Weisner was arrested on felony charges of cheating and first-degree larceny as well as criminal trespass in connection with marking cards at a Connecticut casino.)

The Zev videos, possibly made to support Weisner's affidavit, in fact contradict it. They are also favorable to Kellner. When asked whether Kellner ever tried to "shut him up," or offer him money to drop the case, Zev responds, "No ... Kellner always told me, Zev, go to court, you're going to tell the truth, tell the truth." (Zev also says many people offered his family money to drop the charges.)

**'I'll Keep Fighting For My Son'**

On April 25, 2012, Lebovits' conviction was overturned by a New York appeals court on an issue unrelated to Kellner. A new trial was ordered.

The DA vowed to retry the case but no trial date has been set.

Meanwhile, Sam Kellner is still waiting to clear his name. In that effort he has found supporters outside his community.

"The whole situation doesn't make sense," Rabbi Yosef Blau, the spiritual adviser at the rabbinical seminary of Yeshiva University, told The Jewish Week. "The idea that major players like Moshe Gabbai would be doing Sam Kellner's bidding is mind-bogglingly absurd to [anyone familiar with how that community works]."

Some observers fear the charges against Kellner are enough to threaten the possibility of a retrial, not to mention a conviction, of Baruch Lebovits.

"I was devastated by Kellner's arrest because it cast doubt on Lebovits' conviction," the blogger and advocate known as Yerachmiel Lopin told The Jewish Week. "I strongly suspected the evidence against him was fabricated and misrepresented to get Lebovits off the hook."

Lebovits' lawyer, Arthur Aidala, declined to comment on the two cases.

Even if Lebovits is retried and convicted, Kellner's attorney nonetheless believes that the prosecution of his client is politically motivated.

"I believe the DA came under such pressure from [powerful elements] in the community after Lebovits was sentenced that he didn't want to further alienate them," Dowd told The Jewish Week. "In order to placate them, the DA agreed to prosecute Sam [based on these incredible stories], even though he knew it could sabotage the case against Lebovits."

That Hynes' office has apparently not acted on allegations made to its own investigator that Yoel was intimidated by the Lebovits family, and on information reported to police that other witnesses — including Zev and Kellner himself — were harassed and subjected to multiple instances of witness tampering, lends support to Dowd's position.

According to Pace Law School's Gershman, all of this "seems to accord with the perception of how Hynes goes about his prosecution responsibilities, particularly as they relate to certain constituencies he's worried about losing support from."

Indeed, a source familiar with the Kellner case told The Jewish Week that "there were serious misgivings about it [within the DA's office], but they were overruled," the implication being overruled from on high. This could account for why it took almost a year after Meyer Lebovits came to the DA with information about his tape for the police to arrest Kellner.

According to Dowd, this is "one of the most stunning examples of intimidation by the government I have ever seen."

But Sam Kellner is clearly not someone to be intimidated. "I'm a fighter," he said. "And I will keep fighting for my son."

This piece was made possible by The Jewish Week Investigative Journalism Fund.
Investigate@jewishweek.org



Copyright 2010 The Jewish Week

**Source URL (retrieved on *07/26/2013 - 15:13*):** http://www.thejewishweek.com/news/new-york-news/abuse-whistleblower-battling-both-haredi-community-da

The New York Times

June 17, 2013

# After Sexual Abuse Case, a Hasidic Accuser Is Shunned, Then Indicted

By MICHAEL POWELL

Sam Kellner is a man twice shunned and living in a deepening shadow.

Five years ago, this gray-bearded and excitable man with a black velvet yarmulke spoke out about the sexual abuse of his 16-year-old son by a prominent Hasidic cantor. As Mr. Kellner helped investigators with the Brooklyn district attorney's office search for other young Orthodox victims of this man, the Orthodox establishment grew ever angrier at him. The rabbi at his Hasidic synagogue in Borough Park, Brooklyn, denounced Mr. Kellner as a traitor and forbade parishioners to talk with him on the street. Yeshivas barred his sons. His businesses dried up — he pawned his silverware to meet his bills. And he still fears that he will never find a marriage match for his son.

"I felt murdered and abandoned," Mr. Kellner said. "I'm ruined."

This, however, was a prologue to a worse situation. In April 2011, after the district attorney's office gained a conviction against that cantor, Baruch Lebovits, the prosecutors turned around and obtained an indictment of Mr. Kellner. They said, based on a secret tape and the grand jury testimony of a prominent Satmar supporter of Mr. Lebovits, that he had tried to extort hundreds of thousands of dollars from Mr. Lebovits.

District Attorney Charles J. Hynes has shown great deference to the politically powerful Hasidic community over the years, and it has rewarded him with large margins on election days. Even his heralded crackdown on Hasidic sexual abuse was a velvet glove wrapped around a velvet fist, as he took the unusual step of refusing to publicize the names of defendants — even the convicted.

Mr. Hynes extended no such courtesy to Mr. Kellner. "We allege that Kellner sent emissaries to Lebovits's family telling them that he controlled the witnesses against Baruch Lebovits," the district attorney said at a 2011 news conference, "and that in return for $400,000, he would ensure that the witnesses would not testify."

Case 1:17-cv-01268-NRM-MMH Document 104-51 Filed 10/31/24 Page 40 of 46
PageID #: 2284

This indictment stunned the small, embattled community of Hasidic whistle-blowers. Mr. Kellner, to their view, took enormous risks in a righteous fight. That he could sit in the dock next month is a message not lost on anyone.

"If he's convicted, no one will ever come forward again," said Rabbi Cheskel Gold, a member of a rabbinical court in Monsey, N.Y., that gave Mr. Kellner religious permission to investigate Mr. Lebovits. "No one."

Mr. Kellner posted $25,000 bail. And to pile legal insult atop injury, Mr. Lebovits's lawyers used his indictment and other technicalities to persuade a state appeals court to overturn his conviction. Even today, Alan M. Dershowitz, one of Mr. Lebovits's lawyers, portrays Mr. Kellner and other prominent whistle-blowers as extortionists. "We see Kellner as a leader of a major extortion ring," he said in an interview. "He is not a do-gooder."

I talked with Brooklyn prosecutors about the case against Mr. Kellner. By way of throat-clearing, the prosecutor Nicholas J. Batsidis demanded to know if I'd read the indictment. As it was five pages long and contained little detail, I allowed that I had managed to stumble through.

He pointed to the key evidence, a secretly taped, rambling and excited conversation between Mr. Kellner and Meyer Lebovits, the cantor's son. Mr. Kellner is also accused of paying witnesses to testify against Mr. Lebovits. "When you have an audiotape where Kellner is warning him that he's going to bring other victims, it speaks for itself," Mr. Batsidis said.

That explanation sounds better than the tape itself. The transcript reveals a conversation soaked in ambiguity, and rendered in overwrought language. It depicts Mr. Kellner as a tortured father trying to find justice. The younger Mr. Lebovits at times seems to accept that his father committed some acts of abuse.

Hella Winston of The Jewish Week has profitably plowed the fields of this case, exposing its many weaknesses. Ms. Winston notes that, far from persuading fake witnesses to testify, Mr. Kellner worked closely with a rabbinical court in Monsey, and with a Brooklyn assemblyman, each of whom helped him find alleged victims of Mr. Lebovits.

Two weeks ago, I talked with the three-member rabbinical court — known as a Beit Din — in Monsey. These rabbis rarely grant interviews, but spoke now of their moral obligation. Their community for too long has resisted coming to grips with sexual abuse.

They view Mr. Kellner as a brave pioneer. He did not seek out witnesses at random; rather their court, with the help of local leaders in Williamsburg, gave him the name of a victim.

“Lebovits is known to have a long history” of sexual abuse, Rabbi Chaim Flohr said. But Mr. Lebovits has powerful supporters, and people are fearful, he added.

Mr. Lebovits’s lawyers maintain that he is innocent of all charges.

The rabbis frowned at talk of extortion. Mr. Kellner spoke to them of being offered bribes, and of his determination not to let abusers buy him off. “We are not aware of Mr. Kellner ever asking for money,” Rabbi Flohr said.

Mr. Kellner takes pain to insist that he is no saint. He wanted only justice for his son. Now, though, he hears from more and more Hasidic families, with their own stories of more abuse, and asking for his help.

If I win my case, he asked, what should I do?

“I’m not clear how this happened,” he said, his voice keening. “I got into this to avenge my son. Do I have the strength to go on?”

*E-mail: powellm@nytimes.com*

*Twitter: @powellnyt*

New York • The Jewish Week
Connecting the World to Jewish News, Culture, and Opinion
Published on *The Jewish Week* (http://www.thejewishweek.com)

Home > New Evidence Hurts DA's Case

# New Evidence Hurts DA's Case

New York News Brooklyn DA Charles Hynes Charles Hynes Sam Kellner

Emergence of tape suggests a witness was pressured to fabricate claims about Sam Kellner.

Thu, 05/23/2013
Hella Winston
Special Correspondent

New evidence has emerged that could deal a serious blow to Brooklyn District Attorney Charles Hynes' case against Sam Kellner, a chasidic Borough Park resident who was charged with extortion and perjury after he helped to convict a fellow chasid, Baruch Lebovits, on sex abuse charges.

The evidence, obtained by The Jewish Week, is an audiotape on which a young man makes statements that undermine his previous claims that Kellner paid him to fabricate allegations of sex abuse. The young man also makes statements indicating that powerful members of his own community pressured him to accuse Kellner of perjury.




"This tape should make clear what should be clear to any reasonable person — that Sam Kellner is not guilty of these charges," Kellner's attorney, Michael Dowd, told The Jewish Week.

Kellner, whose ordeal was the subject of a Jewish Week story in January, played an indirect but key role in the 2010 sex abuse conviction of Lebovits, a cantor and prominent member of the Munkacs chasidic community.

After learning in 2008 that his son had been inappropriately touched by Lebovits, Kellner obtained rabbinic permission to report the incident to the police. When a detective told him that his son's case was a misdemeanor and thus unlikely to be prosecuted unless

additional victims came forward, Kellner obtained the names of two men — "Yoel" and "Zev" (not their real names) —who had previously disclosed their abuse at the hands of Lebovits to the Vaad HaTznius, or modesty committee. (The Vaad is an unofficial community watchdog group that deals with abuse allegations and alleged molesters, typically without involving law enforcement.)

After meeting each of these men, Kellner secured rabbinic permission for both to make police reports. Along with Kellner's son, both also testified before grand juries, resulting in indictments against Lebovits.

While Yoel, the young man on the newly uncovered audio tape, ultimately backed out of testifying against Lebovits at trial, Zev went forward, and in March of 2010, Lebovits was convicted and sentenced to 10 to 32 years in jail. (The verdict was overturned on a technicality and a new trial ordered; that trial has yet to occur).

Then, in a stunning turn of events, a year after Lebovits' conviction, Kellner was arrested. He was charged with trying to extort money from Lebovits' son Meyer prior to Lebovits' trial, in exchange for persuading the witnesses against Lebovits to drop their charges. Kellner was also charged with perjury for paying Yoel to falsely testify before a grand jury that Lebovits had molested him. At the time, Lebovits' lawyers expressed confidence to reporters that Kellner's alleged acts would fatally undermine the integrity of their client's conviction.

Kellner's case, which is set to go to trial on July 8, is being handled by the Rackets Bureau, headed by Senior Assistant District Attorney Michael Vecchione.

In its January story, The Jewish Week challenged the validity of the charges against Kellner on a number of grounds, including the timing, sources and quality of the DA's evidence — all of which, experts were quoted as saying, should have raised serious red flags in the Rackets Bureau.

The new audiotape, made by an acquaintance of Yoel after Kellner's arrest, not only further supports Kellner's claims of innocence, but raises additional questions about the DA's handling of the allegations against him. The acquaintance, who requested anonymity for fear of retribution, had been told repeatedly by Yoel about his abuse at the hands of Lebovits, and made the tape after trying unsuccessfully to alert the DA that Yoel was falsely accusing Kellner.

"I called the DA's office — I didn't give my name but said I had information that Kellner was innocent of these charges," the friend told The Jewish Week.

"I was transferred from one place to another, and finally I got someone who told me, 'We're not interested. We are the prosecution; we are prosecuting Kellner. Go talk to his lawyer."

Asked about this person's account, a spokesman for the district attorney told The Jewish Week, "We know nothing about this."

Yoel's acquaintance turned over the recording to Rabbi Chaim Flohr and his beit din, the same religious court that had given Kellner permission to report his son's abuse to the police. The tape was then shared with The Jewish Week.

During the conversation, which is in Yiddish and was translated by a native Yiddish speaker for the paper, Yoel makes statements that indicate he first disclosed his abuse by Lebovits to people within his community around the time he was 16 or 17 — several years before he ever met Kellner. This is consistent with information obtained by The Jewish Week that Yoel first sought help around this same time from Rabbi Shraga Hager, also known as the Kosover Rebbe, for depression related to his abuse by Lebovits. (Rabbi Hager is the rabbi who ultimately gave Yoel permission to make a police report about Lebovits several years later). It also comports with an account by the Vaad that Yoel first approached them around this same time with these allegations, and even e-mailed them a photo of Lebovits to positively identify him as his abuser. These statements seem to undermine Yoel's claims that Kellner paid him to lie about being abused by Lebovits.

At another point on the tape, Yoel says that a powerful community activist named Zalmen Ashkenazi "got him out" of testifying against Lebovits. He also states that Ashkenazi hired an attorney for him and "made him" go against Kellner. (Zalmen's brother, Berel, was a character witness for Lebovits at trial, where it emerged that Berel was also an alleged child molester). Yoel's story comports with DA records that note that when Yoel made allegations against Kellner, he did so in the presence of an attorney. At another point on the tape, Yoel says that if Zalmen ever "turns on him," he would accuse Zalmen of molesting him.

The Jewish Week tried, unsuccessfully, to reach Zalmen Ashkenazi several times by phone and was unable to independently confirm Yoel's claims.

The Jewish Week contacted Yoel, but he declined to comment.

According to defense attorney and former prosecutor Mark Bederow, the tape is likely to hurt the prosecution's case against Kellner.

"If it is true that the witness testified emphatically under oath that he was not abused by Lebovits, and then told an acquaintance that he was in fact molested by Lebovits, and also was recorded admitting that he disclosed such abuse years before, then the witness has severely damaged his own credibility," he said.

"Even worse," Bederow continued, "not only has the witness harmed the prosecution, he may have exposed himself to perjury charges. If the recording and other statements that he has made contradict his sworn testimony as alleged, it is hard to fathom how the prosecution could possibly call him as a witness. If they do call him as a witness under these circumstances, by testifying, the witness likely will incriminate himself."

Dowd, Kellner's attorney, is not in possession of the tape, but is familiar with its contents and has alerted prosecutors to its existence. He and his associate, Niall MacGiollabhui, are concerned, however, about turning it over to prosecutors out of concern that they will not be able to protect the identity of the person who recorded it, possibly exposing the individual to intimidation and threats.

"The person who made the tape did so in good faith, to help prevent an injustice," MacGiollabhui told The Jewish Week. "Prosecutors want to meet with this individual and hear the tape. However, this individual is concerned about what might happen as a result. Unfortunately, this concern is not unfounded. After all, Sam Kellner cooperated with the Brooklyn District Attorney to expose the truth about child abuse within his community. And look what happened to him."

That said, both Dowd and MacGiollabhui believe that it should have been obvious to prosecutors in the Rackets Bureau, given information in the office's possession, that Yoel could have been pressured to make false allegations against Kellner.

"What troubles me the most," Dowd said, "is that Sam Kellner could have been spared the agony of this indictment, as this information was available from inside the DA's office for a long time."

For one, an experienced sex crimes detective, Steve Litwin, and the district attorney's own sex crimes prosecutors had found Yoel to be a credible witness against Lebovits. Further, a close friend of Yoel's gave a statement, obtained by The Jewish Week, to a DA investigator indicating that Lebovits' eldest daughter had intimidated Yoel into backing out of the Lebovits prosecution by threatening to have him arrested for molesting boys.

Rackets Bureau prosecutors are also in possession of a videotape on which Zev claims that Yoel was "terrorized" by members of the Lebovits family after he decided to press charges against Lebovits. And then there are notes, written by Litwin, detailing attempts by Berel Ashkenazi and another man to persuade Zev to drop his charges in exchange for money. Sex crimes prosecutors also have a psak, or rabbinical ruling, made at the behest of Berel Ashkenazi and signed by a rabbi, prohibiting Zev from adjudicating his case against Lebovits in secular court. (This document was used to impeach Berel's credibility as a witness for Lebovits at trial, but was not used by the DA's office to charge Berel with witness tampering).

All of this, says Dowd, should certainly have raised serious questions about whether these same people who tried (and in Yoel's case, succeeded) to intimidate both Yoel and Zev into withdrawing their charges against Lebovits may have manipulated Yoel into making false allegations against Kellner to help Lebovits' cause after he was convicted.

That prosecutors have not acted on this evidence of witness tampering in the Lebovits case has soured many victims' advocates on cooperating with the DA. Hynes' public statements about having no tolerance for those who would intimidate witnesses to the contrary, these advocates believe that while the he may be willing to prosecute individual molesters, Hynes has no stomach for cracking down on powerful members of the religious community who intimidate victims.

In the Lebovits and Kellner cases they see a disturbing irony wherein the DA appears to have shielded from prosecution those who intimidated victims while pursuing questionable charges against one of the few people who has cooperated with his office in bringing molesters to justice: Sam Kellner.

"As an advocate for justice, the DA's [conduct in this case] is extremely disconcerting to me," sex abuse survivor, advocate and writer Chaim Levin told The Jewish Week.

Case 1:17-cv-01268-NRM-MMH Document 104-51 Filed 10/31/24 Page 46 of 46 PageID #: 2290

Recalling a recent meeting he had with sex crimes prosecutors who were hoping he might help them find additional Lebovits victims, Levin recounted that "I did my best to make sure they understood why, aside from the existing pressures religious communities [place] on victims [not] to come forward, the DA's behavior in charging Sam Kellner as Lebovits roamed free because of [their mistake], is another really good reason for victims not to want to come forward.

"The fact that the DA's office is telling people like me to bring them more victims, and yet Sam Kellner did just that and he's now facing 21 years in jail because of forces more powerful than him," Levin said, "is just another reason not to want to trust the DA's office."

editor@jewishweek.org



Copyright 2010 The Jewish Week

**Source URL (retrieved on *07/26/2013 - 15:19*):** http://www.thejewishweek.com/news/new-york-news/new-evidence-hurts-das-case