# EXHIBIT 55

Kenneth P. Thompson
District Attorney

DISTRICT ATTORNEY
KINGS COUNTY
350 JAY STREET
BROOKLYN, NY 11201-2908
(718) 250-2000
WWW.BROOKLYNDA.ORG

# MEMORANDUM

To: District Attorney Kenneth P. Thompson
First Assistant District Attorney Mark Feldman

From: Assistant District Attorney Joseph Alexis
Assistant District Attorney Nicholas Batsidis

Date: January 16, 2014

Re: **<u>PSNY v. Samuel Kellner,</u>**
Indictment Number 2538/2011

EXHIBIT
93
Batsidis 3/23/22 (LL)
LEXITAS

---

Please accept this memorandum as our closing recommendation for the above referenced case.

This matter emanates from the trial of Baruch Lebovits [Baruch], 11393/08. In that case, Baruch was convicted after trial of several counts of Sodomy and sentenced to a term of 11-33 years of imprisonment. The victim who testified at trial in that case was [redacted] [[redacted]

## <u>The Simon Taub Prelude</u>

On April 27, 2010, after Baruch's conviction, Arthur Aidala, Baruch's attorney, met with former Rackets Chief Michael Vecchione, [Vecchione] Assistant Chief Investigator George Terra [ACI Terra] and Detective Investigator Stephanie Green-Jones [DI Green-Jones] in Vecchione's office. During this meeting Mr. Aidala provided KCDA with two transcripts that were purported to be of conversations between Simon Taub [Taub] and Meyer Lebovits, [Meyer], one of Baruch sons.

Later that evening, ACI Terra and DI Green-Jones met Mr. Aidala at his law office where they interviewed Chaim Lebovits [Chaim], another of Baruch's sons.

During this interview, Chaim stated that before his father's trial Taub and Samuel Kellner [Kellner] approached the Lebovits family and offered to scuttle the case against Baruch in exchange for $400,000. Also, in exchange for this fee, Taub and Kellner volunteered that they would persuade Rabbi Nuchem Rosenberg [Rabbi Rosenberg] to stop broadcasting that Baruch Lebovits is a pedophile over a Yiddish language community hotline.

Chaim further claimed that the Lebovits family rebuffed this offer, and added that after Baruch's conviction, Kellner and Taub began falsely accusing Meyer of molesting Kellner's son, and that Rabbi Rosenberg broadcasted that Meyer was also a child molester.

Chaim finished by stating that Taub and Kellner demanded an unspecified amount of money in exchange for their silence regarding the allegations against Meyer. Chaim, who lives in Israel, came to America to assist his family sort through this matter and stated that Meyer initially agreed to give Taub a $25,000 down payment.

Shortly after this interview, Chaim returned to Israel.

Shortly afterwards, on May 13, 2010, Chaim returned to the US, and accompanied by Meyer, came to KCDA to further discuss the case. Chaim stated that he was scheduled to meet Taub at Taub's home. He also handed KCDA representatives two recorded conversations between Meyer and Taub. The KCDA provided Chaim with recording equipment.

Chaim used this equipment to capture a conversation with Taub. In this captured conversation, Taub did not mention dollar amounts, but purportedly wrote 250,000 and 50 five times to signal the amount that the Lebovits' would have to pay in exchange for Taub's silence.

In this recording, Taub clarified that the money to be exchanged related to his son's molestation, not Kellner's. He continued by demanding that Chaim bring a $50,000 installment to the next meeting and added that Kellner and Rabbi Mandel, a Rabbinic Court Arbitrator, would be in attendance.

Between May 13 and July 7, 2010 KCDA continued to investigate this extortion plot. Between these dates Kellner surfaced in this meaningful way:

On May 24, 2010, Meyer informed DI Green-Jones that sometime in 2009, well before his father's trial, Kellner sent various emissaries, including Yidal Wolf Wercberger, Taub and others to negotiate a deal in which Kellner would quash the case against Lebovits.

Initially, according to Meyer, no money was mentioned. Then, Taub demanded $400,000 in exchange for making the false allegations go away.

Ultimately, Meyer claimed that Kellner also offered to insure that Baruch's name would not be mentioned on Rabbi Rosenberg's Hotline.

Meyer further stated that he taped an April 2009 conversation between himself and Kellner. The conversation was in Yiddish. During this taped conversation, Meyer claimed that Kellner stated:

- **That he sent several emissaries to negotiate a deal with Meyer.**
- **That he could silence the 3 accusers whom Baruch faced in exchange for money.**
- **That he could persuade Rabbi Rosenberg to stop mentioning Baruch on the hotline in exchange for money.**

Meyer further informed DI Green-Jones that Larry Goldman, one of Baruch's attorneys, possessed this tape.

In June 2010, KCDA authorized a $75,000 controlled meeting between the Lebovits brothers and Taub.

On July 7, 2010 Meyer handed Taub $75,000 which our office provided. Moments later KCDA detectives arrested Taub with the $75,000. Neither Kellner nor Rabbi Mandel was present at this exchange. However Deputy Chief Investigator Greg DeBoer reported that he saw Kellner in the vicinity at the time of the handoff.

Taub was indicted shortly afterwards, 4502/2010, and later pled guilty to the entire indictment. The top count was Attempted Grand Larceny 3° by Extortion. He received a sentence of 5 years probation over KCDA's objection.

## The Case Against Samuel Kellner

On August 11, 2010 Lebovits family attorneys provided KCDA with several affirmations. The affirmations that are relevant to this matter were those of [redacted] and Rabbi Moishe Friedman. [Friedman]

In Friedman's affirmation, dated July 15, 2010, Friedman stated that Kellner went to Friedman's office and urged Friedman to negotiate on behalf of the Lebovits family to ensure that Baruch's case went away. According to Friedman's affirmation, Kellner stated that he controlled all of the cases and that Baruch's son should pay Kellner money since Kellner did not have any.

Rabbi Moishe Friedman is also known as Moishe Gabbai.

In [redacted] affirmation, dated July 22, 2010, he stated that Kellner paid him approximately $10,000 to falsely accuse Baruch of raping him between the time [redacted] was 12 and 16 years of age. In this affirmation [redacted] also swore that on July 21, 2010 [redacted] stated to him that "Kellner gave money to everyone and is going to get into trouble."

On August 13, 2010, Assistant District Attorney Nick Batsidis [Batsidis] and DI Sbordone interviewed Friedman. During this interview, Rabbi Friedman confirmed the content of his affirmation.

On September 16, 2010, Batsidis and DI Green-Jones spoke to [redacted] during a proffer session. [redacted] attorney, John Lonuzzi was present during this meeting.

During this proffer session, [redacted] confirmed the content of his affirmation.

On September 20, 2010, upon Vecchione's instructions, Batsidis provided the Sex Crimes Bureau with the affirmations, interviews and Lebovits supplied translation of the 2009 conversation between Meyer and Kellner.

The Rackets Bureau obtained a copy of the 2009 taped Yiddish conversation between Meyer and Kellner after serving a subpoena upon the Law Offices of Lawrence S. Goldman on September 24, 2010.

On November 24, 2010 KCDA received the official translation of the 2009 conversation between Meyer and Kellner.

**During this 156 page transcript, Kellner never demands any money.**

**Neither Kellner nor Meyer mention that Kellner has brought witnesses forward to falsely accuse Baruch of any crime.**

**Kellner's attorneys assert that the conversation this transcript captures relates to Kellner lamenting to Meyer that his father never appeared before a Rabbinical Court to settle that matter of Kellner's son's molestation.**

**On December 1, 2010, [redacted] met with KCDA representatives and [redacted].**

On March 21, 2011, Batsidis and former Executive Assistant District Attorney Monique Ferrell [Ferrell] interviewed [redacted] During this interview, [redacted] again stated that Kellner paid him to testify falsely against Baruch.

[redacted] The four witnesses who testified during this presentation were [redacted] Meyer, Freidman and Assistant District Attorney Miss Gregory.

[redacted]

[redacted] [redacted]

[redacted]

Friedman testified consistently with his affirmation.

Miss Gregory testified to the preceedural aspect of the Baruch Lebovits case.

[redacted]

[redacted]

On April 13, 2011 Kellner was arraigned on the instant indictment.

Between the arraignment and March 2012 this matter was adjourned several times so that the Court could approve the [redacted] and so that Kellner could retain an attorney of his choosing. Ultimately, Kellner retained Michael Dowd who filed various motions.

On March 23, 2012 Batsidis, Assistant District Attorney Anthea Bruffee and Detective Steve Litwin interviewed [redacted] This interview related to hand written notes that Detective Litwin made regarding conversations that [redacted] had in late 2008 and early 2009.

On March 23, [redacted] confirmed that in late 2008, Beryl Askenazi offered to pay [redacted] not to testify against Baruch. [redacted] added that Beryl Ashkenazi later stated that paying [redacted] not to testify was illegal and withdrew this offer. However, Beryl Ashkenazi did offer to help [redacted] obtain money for therapy.

During this interview, [redacted] also restated that Kellner urged him not to take any of Beryl Ashkenazi's money, and promised [redacted] that he would help [redacted] get a bigger payment in the future. ($200,000) Kellner urged [redacted] to continue participating in the Lebovits prosecution.

Further, [redacted] added that Natalie Bagimov, a mutual friend of his and [redacted] informed him that one of Baruch Lebovits' daughters warned [redacted] that if he testified against her father, the Lebovits family would insure that [redacted] would be charged with molesting two boys.

Finally, [redacted] reported a rumor in his community that [redacted] backed out of testifying at the Lebovits trial due to Lebovits family pressure and because his lawyer was paid $5,000.

On April 23, 2012, Batsidis informed Dowd of [redacted] March 23, 2012 interview.

On May 4, 2012 DIs Green-Jones and Sbordone interviewed Natalie Baigimov. During this interview, Bagimov stated that she and [redacted] were very close friends who are both child molestation survivors. She felt that the system failed them and therefore was very distrustful of law enforcement.

Ms. Bagimov then stated that [redacted] informed her that one of Baruch Lebovits' daughters warned [redacted] that if he testified against her father, the Lebovits family would insure that [redacted] would be charged with molesting two boys.

Ms. Bagimov added that [redacted] supposedly molested the boys when [redacted] was 10 years old and therefore could not be prosecuted for these acts. These Lebovits family threats caused [redacted] to stop cooperating with the Lebovits prosecution.

Additionally, Ms. Bagimov stated that [redacted] fled to Israel approximately 7 months prior to her interview.

Ms. Bagimov also added that she is also close to [redacted] and that his involvement in the Lebovits matter impacted him greatly.

Ms. Bagimov concluded by stating that she was uncomfortable coming to KCDA to further speak with the DIs and a prosecutor, but promised to consider doing so.

Ultimately however, despite several KCDA attempts to interview Ms. Bagimov at 350 Jay Street, Ms. Bagimaov refused further contact with our office.

In late May 2012, at Vecchione's behest, ADA Joe Alexis [Alexis] joined this case.

On June 1, 2012 Batsidis and Alexis appeared in court regarding this matter. During this appearance, Batsidis provided Kellner's attorney's with the DD5s that relate to the aforementioned [redacted] and Bagimov interviews.

Between June 1, 2012 and May 10, 2013 this matter was routinely adjourned for defense motions and for the defense to obtain its own translation of the taped 2009 conversation between Meyer and Kellner.

In August and September 2012, KCDA subpoenaed El AL flight records and bank records relating to [redacted] travel between Israel and the United States.

On May 10, 2013 Niall MacGiollabhui, one of Kellner's attorneys, informed Batsidis and Alexis that in a taped conversation between [redacted] and a witness whom he had spoken to, [redacted] stated that Baruch Lebovits had indeed molested him and that the Lebovits family forced him to recant his initial Lebovits accusation.

Batsidis and Alexis assured Kellner's attorney that they would look into this matter and asked for this new witness's name and contact information. MacGiollabhui replied that the witness was hesitant to come forward due to fear of law enforcement retribution.

Batsidis and Alexis decided that they needed to personally confront [redacted] with this information, and the information that Natalie Bagimov provided. After being asked to do so, John Lonuzzi, [redacted] attorney, arranged to have [redacted] return to Brooklyn and come to KCDA to be interviewed.

Batsidis and Alexis informed Vecchione and Former District Attorney Hynes of these developments.

On Wednesday, June 26, 2013, Batsidis and Alexis interviewed [redacted] at KCDA in order to assess [redacted] as a witness, and to discuss whether or not [redacted] ever stated that his initial sexual molestation accusations against Baruch were in fact true. [redacted] was accompanied by his attorney, Mr. John, Lonuzzi.

During the June 26 interview [redacted] restated that Kellner paid him to falsely accuse Baruch of sexual molestation. He added that Kellner took him to see Detective Steven Litwin in order to formally lodge this complaint against Lebovits.

[redacted] explained that as he and Kellner went to see Steve Litwin he anticipated that Steve Litwin would give [redacted] a badge and a gun and allow [redacted] to aid Litwin in his police work.

[redacted] further said that he told Litwin that a man named Kraus was his true molester. Upon hearing this, Litwin told [redacted] that he wasn't going to arrest Kraus, but would instead arrest Baruch and falsely accuse him of this crime.

Litwin allegedly also showed [redacted] Baruch's passport photo, informed [redacted] of the address of the temple where the molestation took place, advised [redacted] as to the dates when the molestation took place and coached [redacted] as to [redacted]

[redacted] disclosed that he had recent significant psychiatric history and that he used drugs and alcohol very heavily during the relevant time period.

[redacted] acknowledged telling other people on several occasions that Baruch molested him.

[redacted] initially denied knowing Zalman Ashkenazi. After continued questioning, he admitted knowing Zalman Ashkenazi, stated that Zalman Ashkenazi is his brother's Rabbi, and added that Zalman Ashkenazi is paying for his airfare to and from Israel, his apartment and school fees in Israel, and his attorney's fees.

At the end of the June 26 interview, [redacted] stated that he wasn't sure who molested him and stated that Baruch could have molested him, but that he wasn't sure.

Shortly after this interview, Batsidis and Alexis met with and briefed Former District Attorney Hynes. During this briefing, the assistants informed Hynes of the interview's content and stated that they did not believe [redacted] was a reliable witness and that the case against Kellner should be dismissed.

Former District Attorney Hynes agreed with this assessment and informed the assistants to prepare a closing memo by Monday July 1, 2013.

On June 27, 2013 the assistants discussed this matter with Vecchione. During this discussion, the assistants informed Vecchione that, in their belief, [redacted] was not credible and that the Kellner case should be dismissed.

The parties also discussed Detective Steve Litwin.

During this discussion Batsidis and Alexis stated that since [redacted] was so unreliable they did not believe that KCDA should refer Detective Litwin to IAB. Vecchione disagreed.

Ultimately (the writers are unsure of the precise date) Vecchione ordered Executive Assistant District Attorney Charles Guria to refer Detective Litwin to IAB regarding [redacted] allegations.

On Friday June 28, 2013 Vecchione informed Batsidis and Alexis that there was a change in course. The Kellner case was not going to be dismissed. Batsidis and Alexis were to have no further contact with the former District Attorney regarding the Kellner case, and the assistants were to have [redacted] return to KCDA on Monday July 1, 2013 so that Vecchione could personally question [redacted]

On Monday July 1, 2013, [redacted] and Mr. Lonuzzi returned to the KCDA for further questioning.

Vecchione, Batsidis and Alexis conducted the questioning.

During the July 1 interview, [redacted] repeated that Kellner paid him to falsely testify against Baruch Lebovits.

[redacted] initially stated that he flew to Israel because his family had arranged a possible marriage for him. He stated that his uncle paid for this flight, and added that upon arriving in Israel, Rabbi Menachem Landsman and Rabbi Fischer gave him money, paid his rent and paid his school fees.

After further questioning, [redacted] stated that he really went to Israel because he was accused of child molestation. His family arranged for him to flee to Israel until the accusations in America were resolved. [redacted] stated that the charges against him were false and, upon the advice of counsel, did not discuss them any further.

After initially stating that he barely knew Zalman Ashkenazi, [redacted] stated that he has known Zalman Askenazi since he was a child, and that he knows the entire Askenazi family, including Zalman's father who is a Rabbi, and Zalman's brother, Beryl.

(Beryl Askenazi testified as a defense witness for Baruch Lebovits and is mentioned earlier in this memorandum regarding [redacted]

[redacted] acknowledged that Zalman Ashkenazi paid for several of his flights between the United States and Israel, and that he needed Zalman Ashkenazi's permission to return to the U.S. when he was in Israel.

[redacted] brother, Simcha [redacted] made the travel arrangements, but Zalman Ashkenazi paid.

[redacted] added that Kellner promised to make [redacted] wedding in exchange for falsely accusing Baruch. When pressed for specific dates and times [redacted] stated that he could not clearly remember because of his heavy drug and alcohol use.

[redacted] stated that his relationship with Kellner cooled because Kellner didn't pay [redacted] as he promised to.

[redacted] stated that he has never at any time seen Baruch.

After this interview, Batsidis and Alexis were further convinced that [redacted] was an unreliable witness. Vecchione disagreed.

Batsidis and Alexis restated their belief that the Kellner case should be dismissed. Vecchione disagreed.

Batsidis and Alexis then stated that the [redacted] interviews were replete with Brady material that must be turned over immediately to Kellner's attorneys. Vecchione initially stated that there was no Brady to be turned over since [redacted] never recanted the accusation that Kellner paid him to falsely testify against Baruch Lebovits.

Batsidis and Alexis replied that [redacted] recent statements were a great departure from his [redacted]

Ultimately, it was resolved that [redacted] statements were Brady material.

Vecchione informed Batsidis and Alexis that the former District Attorney ordered that in addition to disclosing the Brady material, we were to inform the court that our office was seeking an adjournment so that we could investigate the issues raised by [redacted] statements on June 26 and July 1.

On Wednesday July 3, 2013 Batsidis and Alexis telephoned Kellner's attorneys and advised them that they were in the process of preparing a Brady disclosure letter which they would deliver to Kellner's attorneys on Friday July 5.

On Friday July 5, 2013 Batsidis and Alexis provided Kellner's attorneys with a Brady letter that laid out all of [redacted] statements with the exception of his allegations levelled against Detecetive Litwin which were under seal due to the IAB investigation that Vecchione ordered.

On July 8, 2013, Batsidis and Alexis made the aforementioned Brady disclosures in court, and requested an adjournment so that our office could further investigate [redacted] most recent statement.

The case was adjourned until July 29, 2013.

On July 17, 2013 Batsidis, Alexis and DI Jones-Green met with NY State Assemblyman Dov Hikind at his Borough Park offices.

During this meeting, Assemblyman Hikind stated that he was very fluent in the Hungarian Yiddish dialect that Kellner and Meyer spoke during the taped 2009 conversation.

He continued that after listening to the conversation, he is convinced that Kellner was not extorting the Lebovits family, but rather that he was expressing disappointment that he was not successful in getting Baruch Lebovits to sit down with the Rabbinical Council.

On July 29, 2013, the defense served Batsidis and Alexis with a Motion to Dismiss the Indictment in the interest of justice.

Shortly after receiving this motion, Batsidis and Alexis informed Vecchione that neither of them could answer the motion to dismiss because each assistant believed that the case should be dismissed.

Batsidis and Alexis also asked to be taken off the case at this time.

In early August of 2013 former Executive Assistant District Attorney Monique Ferrell was assigned the task of answering Kellner's motion to dismiss.

On September 11, 2013 Kellner withdrew his motion to dismiss.

On September 11, 2013 Ferrell informed Batsidis and Alexis that she would no longer work on the Kellner matter.

Because of various religious holidays and the travel plans of Kellner's attorneys the case was adjourned until Monday November 11, 2013.

[redacted].

[redacted].

[redacted]

[redacted]