UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------X

SAMUEL KELLNER,

Plaintiff,

-against-

THE CITY OF NEW YORK and PATRICIA L. HYNES, administrator of the Estate of CHARLES J. HYNES,

Defendants.

--------------------------------------------------------------------------X

Case No. 17-cv-1268 (NRM) (MHH)

**Defendants' Response to Plaintiff's Statement of Additional Material Facts**[1]

135. Plaintiff is a Hasidic resident of Borough Park. Kellner Tr. (Pl. Ex. 1) at 24:7-27:7.

**Response**: Disputed only insofar as the cited record does not establish that plaintiff is Hasidic nor that he specifically resides in Borough Park. Admitted that plaintiff is a resident of Brooklyn.

136. In 2008, one of Plaintiff's sons (herein identified as "P.K." or "Victim 2") was molested by Baruch Lebovits. *Id.* at 152:4-153:9.

**Response**: Admitted that in 2008, plaintiff was told by his wife that one of his sons had been molested by Baruch Lebovits. Disputed, however, to the extent that the cited record does not conclusively establish that the molestation in fact occurred.

137. Plaintiff was told by the Williamsburg Va'ad HaTznius (a "modesty committee"

[1] The facts stated herein are not conceded by defendants and are assumed to be true only for purposes of their motion. See Local Civil Rule 56.1(c) (facts are admitted only "for the purposes of the motion"). Defendants reserve the right to assert different and/or conflicting facts at trial. See Vasconcellos v. City of N.Y., 12-cv-8445 (CM) (HBP), 2015 U.S. Dist. LEXIS 121572, at *4 (S.D.N.Y. Sept. 9, 2015).

which receives reports of sexual abuse in Plaintiff's community) that Baruch Lebovits was a known serial abuser of children. *Id.* at 162:8-165:19.

**Response**: Disputed insofar as the cited record does not support this assertion.

138. Plaintiff brought P.K. to the Kings County District Attorney's Office ("KCDA"), where he reported his abuse. *Id.* at 174:13-175:10.

**Response**: Admitted.

139. Plaintiff was subsequently put in contact with NYPD Detective Steven Litwin, who interviewed P.K. and asked Plaintiff if he could locate another victim of Lebovits in his community. *Id.* at 184:12-186:18.

**Response**: Admitted.

140. The Williamsburg Va'ad HaTznius disclosed the name of another victim (herein identified as "M.T." or "Victim 1") to Plaintiff. *Id.* at 186:19-187:25.

**Response**: Admitted.

141. Plaintiff arranged for M.T. to meet with Litwin. *Id.* at 196:18-197:11.

**Response**: Admitted insofar as plaintiff referred M.T. to Det. Litwin. Disputed insofar as the cited record does not establish that plaintiff arranged any such meeting.

142. By Indictment filed on April 1, 2008, Baruch Lebovits was charged with thirty-two felony counts in relation to his abuse of M.T., including twenty-seven top counts of sodomy in the second degree, and two misdemeanor counts in relation to P.K. Lebovits Indictment No. 2600/2008 (Pl. Ex. 2).

**Response**: Admitted.

143. Plaintiff subsequently obtained the name of another victim of Lebovits (herein

identified as "Y.R." or "Victim 3") from the office of then New York State Assemblyman Dov Hikind. Kellner Tr. (Pl. Ex. 1) at 188:10-15.

**Response**: Disputed that plaintiff learned the name from anyone in the office of then New York State Assemblyman Dov Hikind. Admitted that plaintiff saw the name on a list while visiting said office. See (Pl. Ex. 1) at 188:10-22.

144. Plaintiff arranged for Y.R. to meet with Litwin. *Id.* at 310:5-20.

**Response**: Disputed insofar as the cited record does not support this assertion. Admitted that Vaad Hatznius gave plaintiff permission to bring Victim 3 to Detective Litwin, but the cited record does not establish whether any such meeting took place and if it did, whether it was arranged by plaintiff.

145. In November 2008, a superseding indictment was filed against Baruch Lebovits, charging the same thirty-two felony counts in relation to M.T. and an additional ten felony counts in relation to Y.R. Lebovits Indictment No. 11393/2008 (Pl. Ex. 3).

**Response**: Admitted.

146. By this time, substantial monetary offers were being made to Plaintiff to drop his son's case, including an offer from Moshe Friedman, all of which he rejected. Kellner Tr. (Pl. Ex. 1) at 259:15-263:5.

**Response**: Admitted that plaintiff testified to having received monetary offers to drop his son's case and refused same, but disputed to the extent that the reported offer from Moshe Friedman would necessarily qualify as "substantial."

147. At Plaintiff's request, he met with KCDA Sex Crimes Bureau Chief Rhonnie Jaus, Assistant District Attorneys Miss Gregory and Chris Laline, and Detective Litwin, and informed

them that attempts were being made to pay him off. *Id.* at 251:19-24; 258:16-259:14.

**Response**: Disputed that the cited record supports this assertion generally – other than the fact that a meeting of the type referenced took place at some point – and in particular that plaintiff informed anyone during any meeting about attempts that were being made to pay him off.

148. The KCDA plea offer prior to the superseding indictment was for Lebovits to plead guilty to sodomy in the second degree in relation to M.T. in exchange for a recommended sentence of 2 ⅓ to 7 years. KCDA Status Sheet 11/18/2008 (Pl. Ex. 4).

**Response**: Admitted that there was a plea offer listed in the document relied up of "Sodomy 2 + 2 ½ - 7," but disputed that the cited record establishes if it was actually offered and when (both generally and in relation to the superseding indictment).

149. In February 2009, Arthur Aidala, counsel for Lebovits, advised the court that he wished to submit a Pre-Pleading Information ("PPI"). Court Transcript 2/24/09 (Pl. Ex. 5) at 4.

**Response**: Admitted.

150. A PPI is submitted to the court in circumstances where a defendant intends to plead guilty to an indictment and receive a sentence from the court and/or to a prosecutor's office in an effort to obtain an improved plea offer. KCDA Chief Assistant Amy Feinstein Tr. (Pl. Ex. 6) at 79:22-81:3.

**Response**: Admitted.

151. The plea offer remained the same after the superseding indictment, except that Lebovits was also required to enter a plea to one of the counts relating to Y.R. Gregory Tr. (Pl. Ex. 7) at 90:2-91:18.

**Response**: Admitted.

152. The offer was personally approved by Hynes. Feinstein Tr. (Pl. Ex. 6) at 84:4-17.

**Response**: Admitted that the cited record establishes that Hynes approved an offer of an unspecified upstate prison sentence for Lebovits, but disputed that the cited record establishes what specifically was "the offer" as well as when specifically it was made and/or approved by him.

153. Counsel for Lebovits prepared a PPI memorandum, dated May 3, 2009, together with a letter from Lebovits's treating psychiatrist and a report from Robert Lloyd Goldstein, a forensic psychiatrist, [redacted] PPI Memo (Pl. Ex. 8).

**Response**: Admitted, but noted that the date of the PPI Memo appears to be May 4, 2009.

154. The memorandum stated the following: [redacted]" *Id.* at 4.

**Response**: Admitted, but note that the cited record does not specifically identify what specifically Lebovits admitted to having been involved in with whom.

155. The memorandum further stated: [redacted] *Id.* at 6.

**Response**: Admitted, but note that the cited record does not specifically identify what specifically Lebovits admitted to having been involved in with whom.

156. According to Dr. Goldstein: "Mr. Lebovits is currently accused of multiple counts of charges of Sodomy, Criminal Sexual Act., Sexual Misconduct, Sexual Abuse, and Endangering the Welfare of a Child. The victims were underage boys. The sexual acts were all consensual without force or coercion. Mr. Lebovits's deviate sexual behavior was compulsive in nature. He had difficulty resisting temptation and controlling his sexual impulses at the time. The relief and gratification his behavior afforded him were short-lived and quickly followed by extreme guilt, contrition, and depression at his loss of control." Dr. Goldstein Report (Pl. Ex. 9) at 4-5.

**Response**: Admitted, but note that the cited record does not specifically identify what specifically Lebovits admitted to having been involved in with whom.

157. Counsel for Lebovits provided the PPI to Gregory. Gregory Tr. at 97:2-98:22.

**Response**: Admitted.

158. Gregory discussed the PPI with Jaus. *Id.* at 102:25-103:13; 105:22-106:5.

**Response**: Admitted.

159. The offer did not change after the PPI was submitted. Feinstein Tr. at 84:19-85:14.

**Response**: Admitted.

160. Hynes was personally unwilling to reduce the offer to a non-jail disposition. *Id.*

**Response**: Admitted.

161. In November 2009, M.T. told Gregory that he was ready to testify at Lebovits's trial, which was due to begin the following month. Gregory Affirmation (Pl. Ex. 10), ¶ 11.

**Response**: Admitted.

162. Later that month, Gregory and Litwin each received a call from an attorney named John Lonuzzi, informing them that M.T. was no longer cooperating with the Lebovits prosecution.

Gregory Affirmation, ¶ 12; Litwin Affidavit (Pl. Ex. 11), ¶ 8.

**Response**: Admitted.

163. Lonuzzi was the president of the Brooklyn Bar Association and Moshe Friedman's personal attorney. Lonuzzi Tr. (Pl. Ex. 12) at 26:14-27:5; 46:13-23.

**Response**: Admitted that Lonuzzi was the president of the Brooklyn Bar Association from early June 2009 through the end of May 2010. Disputed that the cited record establishes that Lonuzzi was Moshe's Friedman's "personal attorney." To the contrary, the cited record indicates simply that Lonuzzi represented Friedman "in various matters and his family members."

164. Gregory spoke to Hynes and Feinstein about Lonuzzi's call and M.T.'s non-cooperation. Gregory Tr. at 259:10-260:3.

**Response**: Disputed. The cited record establishes simply that Gregory spoke to Feinstein "about Lonuzzi and Victim 1 not wanting to testify." There is no affirmative indication, however, that Gregory ever spoke to Hynes about either.

165. Some months later, M.T. called Litwin and asked to meet him; he told Litwin at a meeting the next day that "someone else had retained Mr. Lonuzzi but that he did not know who," "he had been pressured and that he was afraid to say what had happened," and "had been told not to talk to [Litwin] or to go to the District Attorney's Office." Litwin Affidavit, ¶¶ 9-10.

**Response**: Admitted.

166. Litwin wanted M.T.'s "non-cooperation to be investigated by him or by an ADA but [Sex Crimes Bureau Chief] Rhonnie [Jaus] said no." ADA O'Donnell Notes (Pl. Ex. 13) at 14.

**Response**: Disputed insofar as the cited record does not appear to support this assertion.

167. After Lebovits was tried and found guilty of abusing Y.R. in March 2010, Hynes

met with Gregory, Jaus, Feinstein, and possibly others; they discussed the trial and the remaining cases against Lebovits and Hynes was told that M.T. was no longer cooperating. Gregory Tr. at 221:3-222:4; 258:18-259:8.

**Response**: Admitted.

168. On April 27, 2010, Aidala met with Michael Vecchione, Chief of the KCDA Rackets Division ("Rackets"), and later that day met with two detective investigators, who interviewed Chaim Lebovits, another one of Baruch Lebovits's sons. Rackets Memo (Pl. Ex. 14).

**Response**: Admitted.

169. Chaim Lebovits claimed that his family had been approached by Plaintiff and an individual named Simon Taub with an offer to "make the case [against Lebovits] go away" for a fee, and further claimed that a separate effort was being made to extort Meyer Lebovits in respect of abuse that Meyer had perpetrated against one of Taub's sons. *Id.*

**Response**: Admitted.

170. Taub had abandoned the effort as to Meyer Lebovits after it was brought to public attention, *id.*, and reported by Plaintiff to Litwin. Kellner Tr. 3/16/23 (Pl. Ex. 15) at 38:12-39:14.

**Response**: Admitted that the cited record establishes that plaintiff reported Taub's plan to Detective Litwin, but disputed that the cited record establishes that Taub abandoned any such plan or why.

171. On May 5 and 6, 2010, Aidala met with Hynes. KCDA Visitor Log (Pl. Ex. 16).

**Response**: Admitted that the cited record establishes that on May 4, 2010, and May 5, 2010, Aidala is listed as having appointments with Hynes. Disputed that the cited record establishes that the two actually met on those days.

172. Aidala regarded Hynes and Vecchione as friends and mentors. Aidala Tr. (Pl. Ex. 17) at 62:5-19.

**Response**: Admitted.

173. On May 10, 2010, an investigation was formally opened by Rackets. Case Tracking Report (Pl. Ex. 18).

**Response**: Admitted that an investigation was opened on that date.

174. Hynes specified for the Lebovits family and their representatives exactly which kinds of evidence his office would need to arrest Plaintiff. New Yorker article (Pl. Ex. 19) at 22.

**Response**: Disputed. The cited record does not constitute admissible evidence to support this assertion. See Mandal v. City of New York, 02 Civ. 1234 (WHP), 02 Civ. 1367 (WHP), 02 Civ. 6537 (WHP), 2006 U.S. Dist. LEXIS 85216, *3-4 (S.D.N.Y. Nov. 26, 2006) ("newspaper articles containing quoted remarks are hearsay within hearsay -- they contain out of court statements by the quoted individual, within a document that is itself an out of court statement. Newspaper articles are usually inadmissible hearsay") (citing In re Columbia Sec. Litig., 155 F.R.D. 466, 474 (S.D.N.Y. 1984) ("Often, when offered to prove that certain statements were made, newspaper and magazine articles are held inadmissible as hearsay."); McAllister v. New York City Police Dep't, 49 F. Supp. 2d 688, 705 (S.D.N.Y. 1999) ("Newspaper articles are hearsay . . . and . . . are not admissible evidence."); Holmes v. Gaynor, 313 F. Supp. 2d 345, 358 (S.D.N.Y. 2004) (holding newspaper article inadmissible on hearsay grounds)).

175. On May 24, 2010, Meyer Lebovits met with a Rackets detective investigator and told her about his recorded conversation with Plaintiff. Rackets Memo 5/25/10 (Pl. Ex. 20).

**Response**: Admitted.

176. In June 2010, Rackets obtained a translation of the recorded conversation prepared by Rina Neeman. Neeman Translation (Pl. Ex. 21).

**Response**: Admitted.

177. According to the translation, Plaintiff stated that he did not want to drop his son's case; was asked, "So you want to settle?" by Meyer Lebovits; responded "No! Not settle"; and stated that he wanted Baruch Lebovits to plead guilty in respect of his son. *Id.* at 24-25.

**Response**: Admitted that the quoted statements are included within the cited record, but disputed that same establishes that plaintiff "stated that he wanted Baruch Lebovits to plead guilty in respect to his son."

178. Gregory prepared a memorandum dated June 3, 2010, addressed to Jaus, in which Gregory stated her belief that M.T.'s "decision to no longer cooperate with the case was caused by pressure from Hasidic Community," and noted that her office had been informed by various individuals that M.T. had been paid to drop out of the case. Gregory Memo (Pl. Ex. 22) at 2.

**Response**: Admitted, but further note that the cited record also makes clear that there was no evidence that M.T. had been paid to drop out of the case.

179. On July 7, 2010, Taub was arrested. Rackets Memo 7/20/10 (Pl. Ex. 23).

**Response**: Disputed that the cited record support this assertion – specifically it does not indicate whether anyone was arrested including Taub.

180. According to the KCDA review of Plaintiff's case in 2014, "there is not a scintilla of evidence which indicates that Kellner engaged in any conversation, meeting, or any other activity that would link him to Taub's plot." ADA O'Donnell 3/4/14 Memo (Pl. Ex. 24) at 3.

**Response**: Admitted that as of that time, that was the conclusion reached by the writer of

said memo.

181. Robert Mladinich, a private investigator, was hired by counsel for Lebovits. Aidala Tr. (Pl. Ex. 17) at 73:11-14.

**Response**: Admitted.

182. In affidavits affirmed before Mladinich, M.T. claimed that Plaintiff paid him $10,000 to falsely allege he had been abused by Baruch Lebovits (Pl. Ex. 25), and Moshe Friedman claimed that Plaintiff asked him to negotiate on his behalf with the Lebovits family (Pl. Ex. 26).

**Response**: Admitted.

183. Jaus sought and received approval from Feinstein and Hynes to dismiss the cases against Lebovits relating to M.T. and P.K. Feinstein Tr. (Pl. Ex. 6) at 49:8-50:11; 53:19-54:13.

**Response**: Admitted.

184. The Sex Crimes Bureau ("Sex Crimes") prosecutors were constrained to dismiss the charges against Lebovits relating to M.T. after "he became uncooperative under highly suspect circumstances" and "later recanted his claims of [Lebovits's] sexual abuse." ADA Anthea Bruffee Tr. (Pl. Ex. 27) at 82:5-83:11.

**Response**: Admitted.

185. On August 6, 2010, at a meeting with Vecchione and counsel for Lebovits, Batsidis was given various affidavits, including the M.T. and Friedman affidavits, and an affidavit from Sholem Weisner (Pl. Ex. 28), at the time a known con man (New York Post article, Pl. Ex. 29), who claimed Y.R. told him that Y.R. and Plaintiff were engaged in an effort to extort money from Lebovits, and that Y.R. had falsified the extent of his abuse. Batsidis Timeline (Pl. Ex. 30) at 7.

**Response**: Disputed that the cited record establishes that Sholem Weisner was either a con

man or known as such to anyone referenced herein as the assertion is based on inadmissible hearsay. See Response to ¶ 174. Otherwise admitted that on said date the individuals referenced herein received the various affidavits referenced which included the statements referenced.

186. Batsidis was instructed by Vecchione to contact Mladinich and schedule interviews for Friedman, which occurred on August 13, 2010, and M.T., which occurred on September 15, 2010. *Id.*

**Response**: Admitted.

187. Batsidis subsequently noted that Plaintiff's case had been "resurrected by the Lebovits lawyers with the affidavits they gave us and their investigator was escorting witnesses and potential witnesses to Kings County District Attorney's Office." *Id.* at 21-22.

**Response**: Admitted.

188. On November 24, 2010, Rackets received a translation by Ruth Kohn of the recorded conversation between Plaintiff and Meyer Lebovits. *Id.* at 9; Kohn Translation (Pl. Ex. 31).

**Response**: Admitted.

189. On November 29, 2010, Vecchione instructed Batsidis to "have [Detective Green-Jones] coordinate with Bob [Mladinich]" to "come up with [Y.R]." Vecchione Email (Pl. Ex. 32).

**Response**: Admitted that the cited record establishes that Vecchione emailed Batsidis the following: "Nick – FYI Have Stephanie coordinate with Bob to see if we can come up with this guy. Thanks." Disputed to the extent that plaintiff relies on the cited record to establish who specifically is mentioned in the quoted statement.

190. On December 1, 2010, Y.R. was interviewed by Rackets "regarding allegations that

he lied at the Baruch Lebovits trial," and stated that he was abused by Lebovits; was not paid for his testimony; and that his testimony was truthful. Rackets Memo 12/2/10 (Pl. Ex. 33).

**Response**: Admitted.

191. Weisner was told by Rackets to continue his interactions with Y.R. Meyer Lebovits Interview Notes 2/25/14 (Pl. Ex. 34) at 11.

**Response**: Admitted.

192. A trip to Florida was arranged, on which Y.R. was lured with the pretense of making a movie about his life, where he was subjected to videotaped efforts to implicate Plaintiff and undermine the Lebovits conviction. O'Donnell Memo 3/4/14 (Pl. Ex. 24) at 2.

**Response**: Admitted that as of the date of the cited exhibit, such information was known by the author of same.

193. Photographs were provided to Rackets of the Florida trip. Det. Green-Jones Tr. at 79:10-80:20 (Pl. Ex. 35).

**Response**: Admitted that photographs were provided, but note that the cited record does not establish by whom.

194. On January 20, 2011, Aidala sent Vecchione a draft copy of papers in support of a motion to vacate the Lebovits conviction. Aidala Email (Pl. Ex. 36).

**Response**: Admitted.

195. Sex Crimes was not made aware of the planned motion. Bruffee Tr. (Pl. Ex. 27) at 228:12-22.

**Response**: Admitted that the witness in question was not aware of the planned motion. Disputed insofar as this assertion suggests the entire bureau of "Sex Crimes" was not made

aware of the planned motion – a suggestion not supported but the cited record.

196. On March 15, 2011, counsel for Lebovits met with Vecchione and Batsidis and provided them with purported excerpts from the Florida tapes. Batsidis Timeline (Pl. Ex. 30) at 10; Florida Tape Excerpts (Pl. Ex. 37).

**Response**: Admitted that the cited record establishes that a meeting took place on March 15, 2011, between Batsidis, Vecchione, Arthur Aidala, Alan Dershowitz and Nathan Dershowitz in Vecchione's office. Disputed insofar as the cited record does not establish what was provided to Batsidis and Vecchione let alone that they were specifically provided with purported excerpts from "the Florida tapes."

197. On March 16, 2011, counsel for Lebovits sent Sex Crimes a copy of an application for his release on bail pending appeal of his conviction. Bruffee Email (Pl. Ex. 38).

**Response**: Admitted that on March 16, 2011, Nathan Dershowitz sent an email to Anthea Bruffee with the subject heading of "Baruch Lebovits" and purportedly with attachments entitled "Bail.Affirmation in support.pdf; Bail.Exhibits to Affirmation.pdf; Bail.Notice of Application.pdf; Bail. Order Show Cause.pdf; Bail. RADI form.pdf." Disputed, however, that the cited record establishes specifically that papers were in fact attached and if so, what those papers pertained to. Additionally, from the cited record it cannot be gleaned that what was attached, if anything, constituted, with respect to Lebovits, "a copy of an application for his release on bail pending appeal of his conviction."

198. Shortly after Sex Crimes received a copy of the bail application and became aware of the existence of the Florida tapes, meetings were arranged with Feinstein and Hynes to challenge the false narrative about the Lebovits conviction being advanced through Rackets. Bruffee Tr. (Pl.

Ex. 27) at 41:17-44:11; Jaus Tr. (Pl. Ex. 39) at 157:7-159:2.

**Response**: Disputed that the cited record supports this assertion. According to the cited record, at some unknown time, there was a meeting involving Hynes, Brunfee, Jaus and Vecchione in response to information that had come to light suggesting that victim number 3 may have recanted his statement previously implicating Lebovits who had since been convicted. During said meeting, Brunfee explained that she and the "trial people" believed Lebovits to in fact be guilty while Vecchione explained his belief that there was an issue with what victim number 3 originally reported. At the conclusion of this meeting, it was decided that Vecchione's department was going to look into it further.

199. Hynes asked Vecchione to attend the meeting. Bruffee Tr. at 44:12-16.

**Response**: Admitted that cited record establishes that Hynes stated in sum and substance, "where is the Rackets Bureau Chief, Mike Vecchione. We can't have a meeting without him too" which lead to Vecchione attending the meeting. Disputed insofar as the cited record does not specifically establish that Hynes asked Vecchione to attend the meeting.

200. Hynes directed Vecchione to continue Rackets' investigation into Y.R. Jaus Tr. at 157:7-15.

**Response**: Disputed. According to the cited record, a meeting took place to discuss who was going to look into the information that had come to light that victim number 3 may have recanted and at the conclusion of said meeting, it was decided that "Rackets was going to look into it." The cited record does not establish, however, that Hynes directed that result or anything for that matter.

201. There was never a time that Feinstein believed that M.T. and Y.R. were not genuine

victims of Lebovits. Feinstein Tr. (Pl. Ex. 6) at 56:7-57:15.

**Response**: Admitted that the cited record accurately reflects the personal beliefs of the witness in question.

202. On March 24, 2011, after Batsidis interviewed Y.R. again, Vecchione told Batsidis that a decision had been made to "indict [Plaintiff] & see if Y.R. comes round." Batsidis Tr. (Pl. Ex. 40) at 172:2-173:5.

**Response**: Disputed that the cited record establishes that indict pertains to the indictment of plaintiff and that any "decision had been made." Admitted, that on said date, after Batsidis interviewed victim number 3 a second time, Vecchione told Batsidis "indict and see if and it is victim number three comes around."

203. The Grand Jury evidence in Plaintiff's case consisted of testimony from four witnesses: M.T., Friedman, Meyer Lebovits, and Gregory. Grand Jury Evidence (Pl. Ex. 41).

**Response**: Admitted that those were the four witnesses who testified before the Grand Jury in Plaintiff's case and further note that the Grand Jury presentation also included the introduction of two exhibits both of which constituted transcripts.

204. The 2009 recorded conversation between Plaintiff and Meyer Lebovits was not provided to the Grand Jury. *Id.*

**Response**: Admitted that said evidence was not explicitly provided as an exhibit to the Grand Jury according to the cited record. However, from the cited record, it is unclear what transcripts were provided as exhibits.

205. The PPI memorandum (Pl. Ex. 8) and the Goldstein report (Pl. Ex. 9) were not disclosed to the Grand Jury. *Id.*

**Response**: Admitted.

206. Meyer Lebovits testified that Plaintiff sent him various "messengers" to demand that the Lebovits family pay him off in return for which Plaintiff would ensure that P.K., Y.R., and M.T. would not testify against him at trial, and that, during the recorded conversation in May 2009, Plaintiff re-iterated this demand and stated that Y.R. and M.T. "will not come to testify if I give him the money that he is asking for." Lebovits Testimony (Pl. Ex. 42) at 19:4-21:6.

**Response**: Admitted.

207. On April 12, 2011, after the Grand Jury voted to indict Plaintiff, he was arrested and taken into custody. Vecchione Email (Pl. Ex. 43); Batsidis Timeline (Pl. Ex. 30) at 11.

**Response**: Admitted.

208. On April 14, 2011, Justice Barry Kamins, administrative judge for the criminal courts of New York City, emailed Hynes to let him know that he had spoken with Justice Leventhal, before whom Lebovits had made a successful application for release on bail pending his appeal, and Justice DiMango, the trial judge. Hynes Email (Pl. Ex. 44).

**Response**: Admitted that the cited record establishes that on April 14, 2011, Justice Barry Kamins sent an email to Hynes, ccing Amy Feinstein, advising them that he had spoken to Judges Leventhal and DiMango. Disputed insofar as the cited record makes no specific reference to Lebovits having made a successful application for release on bail pending his appeal.

209. In September 2011, ADA Bruffee sent a proposed opposition to an application by Lebovits to expand the conditions of his bail to Feinstein; expressed the hope that she could convince Hynes to oppose the application; and asked for permission to refer to Dr. Goldstein's

report since "[Lebovits's] admissions in the report are highly relevant to the threat he poses to the community, should the court give him unrestricted access." Bruffee Tr. (Pl. Ex. 27) at 103:9-104:15; Bruffee Emails (Pl. Ex. 45).

**Response**: Disputed insofar as the cited record does not establish that anything was in fact attached to the emails referenced. Otherwise admitted.

210. By letter dated July 2, 2013, counsel for Plaintiff sought disclosure of information from the KCDA about Lebovits's willingness, prior to M.T.'s non-cooperation, to plead guilty in respect of offenses committed against M.T. in exchange for an agreeable disposition, noting that "the withholding of information to this effect would constitute a grave violation of your Brady obligations" and "would show knowledge on the part of your office that [M.T.] was a genuine victim of Baruch Lebovits and that, when he testified to the contrary in front of the Grand Jury that indicted my client as a result, he committed perjury." Kellner Letter (Pl. Ex. 46).

**Response**: Admitted that such a letter was sent.

211. Hynes was personally involved in drafting a response to the letter, which included personally making revisions. ADA Joe Alexis Email (Pl. Ex. 47).

**Response**: Admitted that the cited record indicates that Hynes had some unknown revisions to same without indication of which area specifically. Disputed insofar as the cited record does not establish that Hynes personally made them himself.

212. The responsive letter dated July 5, 2013 (Pl. Ex. 48) stated only that counsel for Lebovits "informally" proposed a non-jail disposition.

**Response**: Disputed on the grounds that this assertion is misleading. According to the cited record, "ADA Gregory recalls that Mr. Aidala, informally and unsuccessfully,

occasionally broached with her a possible disposition based on a plea to a misdemeanor in return for a probated sentence. Following the dismissal of all misdemeanor counts, ADA Gregory further recalls, Mr. Aidala informally and again unsuccessfully proposed a non-jail disposition if his client were to plead to a single felony count." Id. at p. 3. To the extent counsel for Lebovits may have "formally" proposed a non-jail disposition to the Court, the cited record does not address that possibility only focusing on what may have been communicated directly to ADA Gregory based upon her recollection as of July 5, 2013.

213. The existence of the PPI memorandum, the Dr. Goldstein report, and letter from Lebovits's treating psychiatrist were not disclosed in the July 5, 2013 letter. *Id.*

**Response**: Admitted.

214. The KCDA also failed to disclose that Rackets, in the fall of 2012, "were made aware of allegations that the Leibovits family paid [M.T.] to testify in the [Kellner] grand jury," and that they obtained, in October 2012, proof of monthly payments to M.T.'s father made by Zalman Ashkenazi, a brother of Beryl Ashkenazi, who was the sole defense witness at Lebovits's trial. Batsidis Email 6/19/13 (Pl. Ex. 49); Checks (Pl. Ex. 50); Batsidis Tr. 207:16-208:25.

**Response**: Disputed that the cited record establishes that the KCDA "failed to disclose" anything.

215. On March 7, 2014, following a review of Plaintiff's case after Hynes was voted out of office in 2013, the case was dismissed. Court Transcript (Pl. Ex. 60).

**Response**: Admitted and further note that the stated basis for dismissal had absolutely nothing to do with the PPI memorandum or the revelations purportedly contained therein.

Dated: New York, New York
October 31, 2024

**MURIEL GOODE-TRUFANT**
Acting CORPORATION COUNSEL OF THE CITY OF NEW YORK
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 356-3527/2486

/s/
By: ______________________________
Brian Francolla
Hannah Faddis
*Senior Counsels*
Special Federal Litigation Division

cc: all counsel of record