UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X
SAMUEL KELLNER,

Plaintiff,

Docket No.
17-cv-1268

- against -

THE CITY OF NEW YORK and PATRICIA L. HYNES, Administrator of the ESTATE OF CHARLES J. HYNES,

Defendants.

-------------------------------------------X

Held via Zoom videoconference

June 29, 2022
1:14 p.m.

DEPOSITION of ARTHUR AIDALA, Non-party Witness, taken by Plaintiff, pursuant to Federal Rules of Civil Procedure, and Subpoena, held at the above-noted time and place, before Kyra Kustin, a Stenotype Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

LAW OFFICE OF NIALL MACGIOLLABHUI
Attorneys for Plaintiff
171 Madison Avenue, Suite 305
New York, New York 10016

BY: NIALL MACGIOLLABHUI, ESQ.

CORPORATION COUNSEL OF THE CITY OF NEW YORK
Attorneys for Defendants
CITY OF NEW YORK and PATRICIA L. HYNES, AS ADMINISTRATOR OF THE ESTATE OF CHARLES J. HYNES
100 Church Street
New York, New York 10007

BY: SUSAN P. SCHARFSTEIN, ESQ.

AIDALA, BERTUNA & KAMINS
Attorneys for Non-Party Witness
546 5th Avenue, 6th Floor
New York, New York 10036

BY: IMRAN H. ANSARI, ESQ.

ARTHUR AIDALA

A R T H U R A I D A L A,

Non-Party Witness, having first been duly sworn by the Notary Public, was examined and testified as follows:

THE REPORTER: Can I have your name with the spelling, please.

THE WITNESS: Arthur -- A-r-t-h-u-r -- middle initial is L, as in Louis, last name is Aidala -- A-i-d-a-l-a.

THE REPORTER: And your address, please.

THE WITNESS: My residential address?

MR. ANSARI: I would request that we just -- we place the firm address.

MR. MACGIOLLABHUI: That's fine. No problem.

THE WITNESS: 946 Fifth Avenue, New York, New York, 10036.

THE REPORTER: Thank you.

EXAMINATION

BY MR. MACGIOLLABHUI:

Q Good afternoon again, Mr. Aidala. As I

think you may know, my name is Niall MacGiollabhui. I represent --

A Excuse me. Could you do that again? Could you do the last name part again.

Q MacGiollabhui. There will be a test at the end of the deposition. You have to spell it.

A All right. I appreciate that.

Q I represent -- as I think you know, I represent Sam Kellner, who's the plaintiff in this action. We're here this afternoon for me to ask you a number of questions in relation to it. I'm going to run first with you through some preliminaries that I ask pretty much at the start of each --

MS. SCHARFSTEIN: Niall, can I just make a comment for the record before you go ahead.

MR. MACGIOLLABHUI: Yes.

MS. SCHARFSTEIN: Okay. So I just want to note my objection to your recording the deposition by Zoom, which I believe is improper pursuant to rules 28 and 30 of the federal rules of civil procedure.

ARTHUR AIDALA

As before, we can go forward subject to the objection with the understanding that you are not going to retain the video, use it for any purposes in connection with this -- litigating this case, such as for summary judgment or trial, and you're not going to share it with your client or anyone else. That is -- meaning that you won't provide copies, although your client may listen to the audio with you.

As agreed, you'll give me notice if your plans in that regard change so that before you use the recording for any other purpose, I'll have an opportunity to raise any issues with the Court.

MR. MACGIOLLABHUI: Agreed.

MR. ANSARI: I'll join in that objection to the extent that I'm representing Mr. Aidala as a non-party witness here and reserve the right to make any application or motion to the

Court in that regard.

MR. MACGIOLLABHUI: That's fine. And as Susan indicated, I'm not retaining the video of it. I'm simply retaining the audio. And if I intend to share it with anybody or share a copy of it with anybody, use it for any purpose, I'll give both of you advance notice of my intention to do so.

Q So returning to our questions, Mr. Aidala, as I think I was saying, there are a couple of preliminary questions I run through at the start of every deposition. I'm going to do the same with you.

The first is that if there's any question that I ask that you don't understand, let me know, and I will try and rephrase it in a way that is understandable. Otherwise, I'll assume that you've understood the question and answered accordingly. Fair enough?

A Yes, sir.

Q Are you under the influence of any medication or other substance that would affect your ability today to give accurate and truthful

testimony?

A No, sir.

Q Is there any other reason -- medical, physical, or otherwise -- that would prevent you from giving truthful and accurate testimony today?

A No, sir.

Q Have you ever been convicted of a crime?

A No, sir.

Q Have you ever testified before under oath?

A Yes, sir.

Q One occasion? Or more than one occasion?

A More than one occasion.

Q Excuse me?

A More than one occasion.

Q And in a civil or criminal context? Or both?

A Both.

Q In a civil context, have you testified on one occasion or one prior occasion or more than one prior occasion?

ARTHUR AIDALA

A I believe just one prior occasion.
Q And what was the nature of that case?
A It was a really, really delightful experience when I was going through a divorce proceeding.
Q I see. Can I ask you to summarize your educational background for me.
A I graduated law school.
Q Where did you graduate from?
A City University of New York School of Law.
Q And when was that?
A 1992.
Q And afterwards, am I right in believing that you went to work for the Brooklyn DA's office?
A I had a little hiatus. I didn't get a job right away. I worked on a congressional campaign for Sal Albanese who was running for congress in Brooklyn and Staten Island. And then after I passed the bar exam, I was offered a position at the Brooklyn DA's office.
Q And Mr. Albanese, am I right in believing that a number of years later, you ran

for what was his city council seat?

A Absolutely.

Q And now, that was '97, was it?

A Yeah. It's the 25-year anniversary. We're going to have a party September 9 if you want to come.

Q Now other than Mr. Albanese's campaign, did you work -- or have you worked on other political campaigns?

A Yes. I worked -- well, I probably worked on more campaigns than I can remember. I worked on several of Sal Albanese's campaigns. I worked on several of Dominic Recchia's campaigns. I worked on several of Lou Fiddler's campaigns. I worked on one -- no -- several of Joe Hynes's campaigns. I guess that's it in terms of actually, like, hitting the ground and being a worker.

Q Now in terms of Mr. Hynes, how many of his campaigns did you work on? Do you remember?

A I worked very strongly on his 1994 campaign when he ran for attorney general. Like, I took a leave of absence from the office and, you know, had to turn in my shield and, you know,

be a civilian again and work on his campaign for six weeks, I think. And then I don't think he really had a real competitive campaign again -- at least one that I was involved with until -- I guess it was 2013.

Q Did he run against John Sampson one year?

A Yeah. I mean, I was -- I think I was involved around some fundraising activity, but you asked me about working on campaigns.

Q Right.

A You know, I'm thinking about standing on subway stops and handing out, you know, pamphlets and going door to door and going canvassing and carrying petitions. And that's what I did for the other people who I spoke about.

Q I understand. So at the time he ran against Sampson, you weren't involved to the same extent in that campaign.

A I -- I have zero recollection of that. I probably was involved in some sort of fundraising -- fundraising aspect of it, but I don't have any recollection of, you know,

ARTHUR AIDALA

specifically working on Election Day or anything like that.

Q And did you have the role of campaign manager for any of Mr. Hynes's campaigns?

A No.

Q For any of the campaigns, did you have a formal position within the campaign structure?

MR. ANSARI: Objection to form.

MS. SCHARFSTEIN: Objection.

A In 1994, there was a Brooklyn campaign headquarters on Coney Island Avenue, and myself and an elder gentlemen by the name of Angelo Morelli, we were primarily responsible for that headquarters. Angelo was, like, the early shift from, like, 9 to 3, and I was, like, from 3 to 9.

Q And Mr. Morelli, did he also take a leave of absence from the DA's office at that time?

A Yes, he did.

Q And both of you, after the campaign, returned to the office, right?

A That is correct.

Q And -- now in terms of Mr. Hynes, did you occupy any position within a not-for-profit

organization that was in his name?

MR. ANSARI: Objection to form.

A Yeah. You're ringing a bell. Maybe for five minutes there was something called the Hynes Associates, I want to say, but I don't have any recollection. I -- well, I totally forgot about that, but yeah.

There was something called the Hynes Association that I believe someone formed as a 501(c)(3), but I don't remember us doing anything with that. I don't remember if we ever had an event or not. We had a lot of alumni events, KCDA alumni, but I don't know if we actually ever did a Hynes Associates event. I really don't remember.

Q And do you recall an organization by the name of the Charles Hynes Foundation?

A I don't.

Q Now the time you ran for Mr. Albanese's old seat, did you leave the DA's office to do that?

A Yes. I resigned March, and I started my campaign in the next month.

Q And I think I'm right in saying that

after the campaign, you didn't return to the DA's office.
A That is correct.
MS. SCHARFSTEIN: Objection to the form.
Q Okay. What did you do next in terms of work?
A In terms of work. I eventually wound up at my current Brooklyn office, 8118 13th Avenue and got a little desk there and started telling people I'm a lawyer.
Q And when you went into practice or into private practice, did you start out as a solo practitioner?
A Yes, sir.
Q And there then came a point where you entered a partnership with one or more attorneys, right?
A That would be correct.
Q And who was your first partner?
A That would be my wife.
Q And now the city council election in '97, was that the only time you ran for election?
A That is correct.

ARTHUR AIDALA

Q Did you ask anybody to find the missing 108 votes for you?

A There was -- there were two recounts. Actually, the night of the election, the third person in the race called me to congratulate me and tell me that I won, and I said I don't know. I think you may want to recount the votes. You probably know him. Mr. Cody.

Q Well, if you're Irish in New York, you cannot but know Cody.

A Exactly.

Q I'm going to direct your attention now -- I'm going to share my screen with you -- to your representation of Baruch Lebovits. And let me see if I can share the screen with you.

Can you see my screen? It has -- there's a single page document. It has part 11 status sheet at the top. Do you see that?

A Yes, sir.

Q Okay. So in terms of your representation of Baruch Lebovits, you didn't represent him at his arraignment when he was first arrested in 2008, right?

MR. ANSARI: Objection to form.

ARTHUR AIDALA

A I -- I don't believe so, but -- I wouldn't be shocked if I did, but I don't believe so.

Q Okay. Well, I'm going to show you what will be marked Plaintiff's 197. It's a status sheet from the Brooklyn DA's office dated June 16, 2008. The defendant in question is Baruch Lebovits, and you see to the right, it lists the defense attorneys as yourself and Elizabeth Johnson. Do you see that?

A Correct.

MR. ANSARI: Niall, I'm just going to request that when you mark an exhibit for identification, although yes, you have e-mailed me the PDFs, that before you start questioning my client, that you scroll down and allow my client to see the whole document --

MR. MACGIOLLABHUI: Sure.

MR. ANSARI: -- prior to -- because we just received the PDFs. We don't have them printed out, of course. I appreciate that courtesy.

MR. MACGIOLLABHUI: No. That's

fine. Absolutely.
Q Let me -- what I'll do is this. If you feel the need, Mr. Aidala, I can actually turn the cursor over to you if you need to scroll it by yourself.
A I was actually trying to do that.
Q Okay. Let me do that. Let me do that. Let me see if I can --
A Take your jacket off. Make yourself at home.
Q All right. See if you have it there.
A Let's see. Does it work? Do that. Yeah. Something happened. Hold on. I don't want to do that. Okay. Bail status. You got all of this. Does not have to decide yet. Okay. Yeah. Okay. I'm ready to go.
Q Very good. Now when you were retained by Mr. Lebovits, do you recall, was he at that time already represented by Ms. Johnson? Or did Ms. Johnson come either at the same time as you or at some subsequent time?
A I do not recall. And Ms. Johnson worked for a lawyer named Larry Goldman who was involved, definitely, in the case. I remember

ARTHUR AIDALA

meeting with them and -- and being very -- they were very, very, very involved, but I don't remember what came first. Or I should say who came first. I'm going to guess that they did, but I don't know the answer to that question.

Q And having looked at this particular exhibit, fair to say, though, that on June 16, 2008, you were one of the attorneys representing Mr. Lebovits?

A That is fair to say.

Q I'm going to show you now a number of other status sheets. They were marked at prior depositions. I think the exhibit numbers are 8, 9, and 11. Let me see if I can find them for you. Okay.

So I'm going to start on number 8. It's -- as I indicated, it was marked at a prior deposition as Plaintiff's Exhibit 8. It's a status sheet dated October 8, 2008, with regard to Baruch Lebovits. And you should still have control of the cursor if you want to scroll down and review that.

A Okay.

Q And I'm going to ask you to scroll down

to the bottom of it. And do you see the handwriting up a little bit from there? Let me see if I can -- okay.

So you see where I have the cursor there where it indicates defense counsel wants time to talk to ADA? Do you see that?

A Yeah.

Q And you see that the next date is indicated as November 18, 2008.

A Okay.

Q So I'm going to direct your attention now to what was previously marked as Plaintiff's Exhibit 9. It's another status sheet. This one is dated November 18, 2008. Again, it relates to Baruch Lebovits. And I'm going to ask you to review this particular document, too.

A Okay. Okay.

Q And if you -- so if you see the portion that's entitled essential facts.

A Okay.

Q And you see there's a reference to Complaining Witness One who's identified as a 20-year-old male, and then Complaining Witness Two is identified as a 16-year-old male. And we

had, off record, discussed the naming convention we're using in this case. And it corresponds in terms of numbers on this status sheet in that Victim Number One in this case is Complaining Witness Number One, and Victim Number Two is Complaining Witness Number Two.

When I refer to Victim Number One and Victim Number Two, do you know who, specifically, I'm referring to?

MS. SCHARFSTEIN: Objection.

A No.

Q I'm sorry. I didn't catch the answer.

A No.

MR. MACGIOLLABHUI: Well, let me just go off the record for a moment.

(A discussion was held off the record.)

MR. MACGIOLLABHUI: Let me state for purposes of the record, we had discussed the naming convention that has been used to this point because the witnesses to this point have been either current ADAs or former ADAs. And we used a naming convention such

ARTHUR AIDALA

that they didn't run afoul of the civil rights law as it pertains to identifying sex crimes victims.

That particular law does not apply to me, nor does it apply to Mr. Aidala. So I'm going to, for purposes of my examination of him, use the names -- the actual names of the victims.

MS. SCHARFSTEIN: Yeah. I -- are you finished, Niall?

MR. MACGIOLLABHUI: Yes.

MS. SCHARFSTEIN: Do you want to go ahead, Mr. Ansari, because I have to object to that.

MR. ANSARI: Susan, lay your objection for the record, then I'm going to query Niall regarding something.

MS. SCHARFSTEIN: I'm sorry. I didn't hear you.

MR. ANSARI: You can lay your objection for the record, then I'll speak.

MS. SCHARFSTEIN: Okay. I'll go

ARTHUR AIDALA

ahead first, then.

So Niall, I don't think I can participate that-- in that, at least not without the Court's authorization. So at this point, I would have to ask that we either adjourn the deposition or take a break and try to reach the judge.

I don't really think that's necessary because I think there are other ways to go about this. For example, you could just ask Mr. Aidala if he has an understanding of who is referenced in -- as Complaining Witness Number One or we can go off the record and have a conversation about it and see if we can resolve it with the witness so that he has an adequate understanding of what his testimony is going to be.

In addition to that, the basis for my objection was that in formulating your question, you were basically testifying about what the document says

and informing the witness of what your interpretation is, and that's not -- in my view -- a proper question. He can testify based on the document, based on his review, but he can't testify based on your interpretation.

At least in my view, that's objectionable, and I'm going to have to put that on the record. And there's a risk that at a later date, the judge will say that testimony is not adequate or admissible. So --

MR. MACGIOLLABHUI: Susan, I always appreciate your speaking objections, as you know. So thanks for yet another one. However --

MS. SCHARFSTEIN: That's not a speaking objection.

MR. MACGIOLLABHUI: I do think, nonetheless, the two other suggestions are well made.

So we'll go off the record and try and see if we can be on the same page as to who we're referring to. And if

ARTHUR AIDALA

that doesn't work, I'll try and ask the questions -- I do respect, Susan, the position you're in. So I'll try and ask the questions in such a way that we maintain the naming convention without having to call the judge.

So let's go off the record again, first of all, and see if that works.

(A discussion was held off the record.)

MR. MACGIOLLABHUI: Let's go back on the record. And Ms. Kustin, I'll get you just to read back the last question.

(The requested portion of the transcript was read back by the reporter.)

Q Let me ask a different question. So Mr. Aidala, when you assumed representation of Mr. Lebovits, he was accused of sexually abusing two different children; correct?

MR. ANSARI: Objection to form.

MS. SCHARFSTEIN: Objection.

A I believe it was only two, and then

maybe somewhere down the line, a third one came in.

Q Okay. And one of the initial two was my client's son, right? Or one of my client's sons.

MR. ANSARI: Objection to form.

MS. SCHARFSTEIN: Objection.

A I'm not a hundred percent sure of that.

Q And now in terms of this particular status sheet -- so this is November 18 of 2008, so Plaintiff's No. 9. And you see before you -- I think it's the last line that you can see which reads defense counsel and ADA are still working on possible disposition. Do you see that?

A Yes.

Q And now isn't it, in fact, the case that while there were two complainants, meaning before the superseding indictment, that you, along with other defense counsel, were trying to work out a disposition with the ADA in the case?

MR. ANSARI: Objection to form.

MS. SCHARFSTEIN: Objection.

A I am assuming so, based on my typical practice and the practice of the industry and

what's written here, but I don't have any specific recollection of any specific conversations or actions that were taken during this period of time.

Q Okay. And do you recall who the ADA in the case was?

A I believe it was Ms. Gregory through the entire matter. Take away my privileges here? No. I see it says -- I think it's Ms. Gregory the whole time.

Q Okay. Now in terms of communications with the DA's office concerning the case -- so at this time, this was in 2008 -- were you communications solely with Ms. Gregory? Or were there other communications?

MS. SCHARFSTEIN: Objection.

Q By which I mean communications with other people within the office concerning the case.

MS. SCHARFSTEIN: Objection.

A I -- I don't remember. I know -- you know, I know Ms. Gregory didn't have the title that she does now being, like, a supervisor. Or I think she was some form of a supervisor. I

don't remember on this particular case. I mean, I know I've met supervisors of the Sex Crimes Bureau there. I don't know if I met with anyone besides Ms. Gregory on this particular case.

Q Okay. Do you recall her supervisor at that time being Rhonnie Jaus?

A Yes.

Q And do you recall a meeting that you and Larry Goldman had with Ms. Gregory and Rhonnie Jaus concerning this case?

A I -- I can't say I remember Larry being in a meeting. I know I've spoken to Rhonnie on many occasions, but I have no clear recollection about it being in this case. And as I said earlier, I mean, I know Larry was very, very involved. I just don't recall a meeting with the four people in the DA's office.

Q In terms of this particular case, so Baruch Lebovits, do you recall meeting with or being part of a meeting with Rhonnie Jaus?

A I don't remember specifically. As I said, I know I met with Rhonnie and -- on cases. You know, I've had many cases there, but I can't say yeah, I remember when, you know, I sat down

with Rhonnie and Miss and Larry Goldman. I don't remember that. I'm not saying it didn't happen. I'm just saying I don't remember.

Q Okay. Let me show you now what was previously marked as Plaintiff's 11. Again, it's a status sheet. This one is dated December 8, 2008. And I'm go to ask you to -- well, you should still have control of the cursor. So if you would review that, please.

A Okay.

Q And you see that there's mention of -- mention in it, I should say, of the indictment having been superseded?

A Yes, sir.

Q And after the superseding indictment, there were three complainants in the cases against Mr. Lebovits, right?

A Correct.

Q And in terms of the line you see just above next date which reads defense counsel and ADA are still working on possible disposition, do you have any recollection as you sit here today of doing that?

MR. ANSARI: Objection to form.

ARTHUR AIDALA

A When you say doing that, you mean working on a disposition?

Q Right. At that -- around that particular time.

A I don't have a specific recollection of doing that.

Q Well, do you have a recollection -- you know what? Let me show you another exhibit. I'm going to show you what was previously marked as Plaintiff's Exhibit 12. Again, it's another status sheet. This one is dated February 4 of 2009, and I'll ask you to review that particular document.

A Okay. Yeah. I see it.

Q And now at this point in time -- so this is February of 2009 -- it's a number of months after the superseding indictment. And fair to say that at this point in time, there are still three complainants in the cases against Mr. Lebovits?

A Correct.

Q And if you scroll down again to the bottom of the page.

A Yes.

ARTHUR AIDALA

Q Do you see where it reads disposition talks continue between ADA and defense counsels, plural. People's offer remains jail.
Do you see that?
A Yes.
Q So do you recall around that time -- so this is February of 2009 -- that you and your co-counsel were trying to obtain a non-jail disposition for Mr. Lebovits?
MR. ANSARI: Objection to form.
MS. SCHARFSTEIN: Objection.
MR. ANSARI: Objection to the extent that it calls for attorney work product conversations between my client and his co-counsel. Objection also to the extent that it would implicate attorney-client privilege.
MR. MACGIOLLABHUI: Let me clarify in terms of the scope of the question and ask him.
Q I'm purely focused on your interactions with the DA's office. So when I ask whether you were, along with your co-counsel, trying to obtain a non-jail disposition for your client,

ARTHUR AIDALA

I'm focused solely on whatever exchanges may have taken place with the DA's office. I'm not asking about anything beyond that.

A I have no specific recollection of any meetings or conversations or correspondence with the DA's office about the disposition, but I'm sure I was seeking a disposition.

Q Was it true you were seeking a disposition -- true you were seeking a non-jail disposition? Or just a disposition.

A Counselor, I'm always seeking a non-jail disposition.

Q I'm going to show you now what was previously marked as Plaintiff's Exhibit 150, and I'm going to ask you to review this document. It's a somewhat longer document, this one. It's a memorandum along with -- I think it's two exhibits. So you may take a little time to review this, but I'll ask you to do so.

MS. SCHARFSTEIN: Niall, if you haven't already, could you put the number of the exhibit on the record.

MR. MACGIOLLABHUI: Yeah. I think I've done so already. It's

ARTHUR AIDALA

Plaintiff's 150.

MS. SCHARFSTEIN: Okay. Great. Thanks.

A Do you need me to read the doctor's reports, also?

Q No.

A Okay. So I've reviewed Mr. Goldman's document.

Q Now let me do this, just bear with me a moment. I'm going to print off a copy for myself so that you can maintain control over the cursor.

A Sure. How are you doing Mr. Ansari? You need a break or anything?

Q So I'm going to bring you up to -- I think it's the second page. Or, actually, I should say the first page.

This is a memorandum that was prepared by your office, along with Mr. Goldman's office in 2009, right?

A It was prepared by Mr. Goldman's office.

Q And I'm going to scroll down to the second page and, in particular, the introduction portion. It was submitted to the Court at that

time in an effort to obtain a non-jail disposition for Mr. Lebovits, right?

A Yes.

Q And a copy of it was given to the District Attorney's office, right?

A I don't know that. I'm not sure about that. It says in -- it says in camera, confidential memorandum on the front.

Q Right. But you have, fair to say, prepared PPIs on behalf of other clients, right?

A Yes. I have. I did not have anything to do with the preparation of this document.

Q Right. But in general if a PPI is submitted to the Court on behalf of a particular client, a copy of it is given to the District Attorney's office, right?

MR. ANSARI: Objection.

MS. SCHARFSTEIN: Objection.

A Typically, yes, but the ones that I would submit wouldn't say in camera, confidential, if I'm submitting it to the Court and the DA's office.

Q Well, if you see the -- again, the introduction portion of it, and you see the

second paragraph which reads: This application is submitted with the further understanding that any statement or admission in it is excluded from use by the District Attorney in the event of trial.

Would that indicate to you that a copy of it was given to the District Attorney's office?

MS. SCHARFSTEIN: Objection.

A I mean, not necessarily. I mean, you know, it if it fell into the hands of the DA's office by mistake by some sort of clerical error, maybe -- then maybe that's why that's in there.

But again, I just don't - what's throwing me off is this whole in camera. Typically when something's in camera, it means that only one side -- or at least in my experience, that the judge is looking at it, and the other side is not looking at it. But...

MR. ANSARI: I want to say that the document also speaks for itself in the event -- to the extent that the first paragraphs says this application is submitted to the Court.

ARTHUR AIDALA

Q So let me -- let me ask you this, Mr. Aidala. Is this your first time seeing this document?

A No. In my life? No. Is it the first time seeing it since 14 years ago or 13 -- yes.

Q And let me scroll down to page 6. And I -- you'll see the portion underneath the title -- and I'm quoting -- the defendant's recognition of his problem.

A Yes.

Q I'm going to read the third sentence, which is as follows: At this first meeting with counsel, somewhat surprisingly to counsel, he fully admitted the extent of his guilt to the allegations of the indictment and, indeed, candidly told us about other incidents.

Were you present at that meeting?

A I do not believe so. I believe that was between him and other counsel. Now you've refreshed my recollection that I was not the first lawyer on the case and that Mr. Goldman and Ms. Johnson were the first lawyers on the case, and I came in thereafter.

Q You had indicated in your prior answer

that Mr. Goldman's office had prepared this document, right?
A Yes.
Q Did you have any input in the preparation of the document?
A I don't believe -- I have no recollection of having any input whatsoever. I'm assuming I -- I read it before I allowed my name to be put on it, but I didn't -- I don't believe I wrote one word here.
Q Now I'm going to scroll down a bit further to the conclusion portion, and in particular, the last paragraph. You see that one?
A The one that starts for these and other reasons discussed in this memorandum --
Q Right.
A Imposition of a sentence of probation with conditions such as regular therapy and monitoring is the appropriate sentence for Mr. Lebovits.
Q That particular paragraph, does that refresh your recollection as to, in and around May of 2009, seeking a non-jail disposition for

ARTHUR AIDALA

Mr. Lebovits?

A Absolutely.

Q I'm going to show you now what we previously marked as Plaintiff's --

(Technical disruption.)

MR. ANSARI: I'm sorry. You broke up, Niall.

MR. MACGIOLLABHUI: Excuse me. I'm going to show your client what was previously marked as Plaintiff's 22.

Q This is another status sheet. I think it's the last of them dated July 21 of 2009 in regard to Baruch Lebovits. And Mr. Aidala, I'll ask you to review that particular document.

A Okay.

Q And I'm going to ask you to -- I'm going to scroll down to the bottom of the document. You will see there's a handwritten notation on the right that reads July 30 of 2009, and then Thursday, meet with defense counsel and RJ.

Do you see that?

A Yes, I do.

Q Do you recall in and around this

time -- so July or August of 2009 -- meeting at the DA's office with Ms. Gregory and Rhonnie Jaus?

A I do not have a clear recollection of that.

Q Well...

A Again, I'm not saying it didn't happen. I'm just saying, like, I don't remember being there. I don't remember a room that I was in. I don't remember any conversations that we had.

Q In terms your efforts to secure a non-jail disposition on behalf of Mr. Lebovits up to this point -- so this is July of 2009 -- those efforts, at least to this point, had not been successful, right?

A I'm assuming -- well, no. I know that's correct. They were never successful.

Q And fair to say that you were told either by Ms. Gregory or Ms. Jaus that a non-jail disposition in the case of Baruch Lebovits would require approval from the 19th floor in the DA's office?

MR. ANSARI: Objection to form.

MS. SCHARFSTEIN: Objection.

ARTHUR AIDALA

A That, I have no recollection of. I mean, Rhonnie Jaus was a very, very senior person there. So -- she was a senior person there when I worked there. She had the ability to make major decisions. So I don't -- I think Rhonnie Jaus would be the be all end all of something like this.

Q Is that speculation on your part? Or do you have a specific recollection?

A A hundred percent speculation.

Q Now at this point in time -- so this is July of 2009 -- there were still three complainants in the cases against Mr. Lebovits, right?

A Correct.

Q And at a subsequent point in time, one of the complainants who we have identified as Victim Number One stopped cooperating with the prosecution of Baruch Lebovits, right?

MS. SCHARFSTEIN: Objection.

A I -- I don't remember.

Q I'm going to show you now -- let me just close some of these exhibits. I'm going show you what will be marked Plaintiff's

Exhibit 202, and I'm going to ask you to review this document. It's an excerpt from the transcript of one of the days of trial of Baruch Lebovits in March of 2010, specifically March 4, 2010.

And the portion I want you to look at is -- it's page 284, the portion where you are shown speaking to the Court through the end of that portion, which is on page 285. So the bottom of 284 through 285. If you could review that, please.

MS. SCHARFSTEIN: Niall, is this the document you said was too long to e-mail? Because this is one I didn't receive. I received, I think, all the others.

MR. MACGIOLLABHUI: Yeah. Maybe. Let me see. I'll try and e-mail this again to you, Susan.

MS. SCHARFSTEIN: Okay. Thanks.

Q You can let me know, Mr. Aidala, whenever you're finished.

A Yeah. I read it all.

Q All right. Right on. So having read

that particular portion I pointed your attention to, does that refresh your recollection as to a particular time in the case when Victim Number One stopped cooperating with the District Attorney's office?

MS. SCHARFSTEIN: Objection.

A It appears that way, according to the -- the transcript I just read.

Q Well, when you say it appears that way, do you not recall that?

A I don't recall. I really don't recall.

Q Well, John Lonuzzi. In 2009, did you know an attorney by the name John Lonuzzi?

A Yes, I did.

Q And how was it that you knew him at that time?

A Mostly through the Bar Association.

Q This is the Brooklyn Bar Association?

A Yes, sir.

Q And had you and he ever appeared together in the same case?

A No. Not that I have any recollection of.

Q And do you have any knowledge as to how

ARTHUR AIDALA

he came to represent Victim Number One?

A No.

Q Did you -- Victim Number One, did you ever meet him in person?

A Did I ever meet who in person?

Q Victim Number One.

MR. ANSARI: Objection to form. And before you answer, Niall, I just want to clarify. You asked the question whether my client had appeared with John Lonuzzi in any case. What -- you're speaking particularly as to my client? Or our firm? And what timeframe? Because he may need to correct the record. Just...

MR. MACGIOLLABHUI: Him, personally. Not your firm. Mr. Aidala, personally. And there's no timeframe. At any --

You know what? Let me put a timeframe on it. Either in 2009 or earlier.

MR. ANSARI: Okay. Thank you.

A No. Not to the best of my

ARTHUR AIDALA

recollection.
Q And did you ever meet with Mr. Lonuzzi in connection with Victim Number One?
A Not to the best of my recollection.
Q Do you know of an organization by the name of DROR? And I'll spell it for you. D-R-O-R.
A Yes, I do.
Q And what do you know of that organization?
A They're a charitable neighborhood organization, I believe based out of Brooklyn, helping people who seem to have some sort of criminal -- well, the part that I know is that they help people who have criminal issues. They may have a bigger base than that, but that's what I'm involved in. Or I should say that's what I know them for.
Q And do you know someone by the name of Chaim Hersh Freund?
A Well, I don't know the middle name, but I know -- yes. Mr. Chaim Freund, yes.
Q Who is he?
A He is one of the people who is involved

ARTHUR AIDALA

with that organization. He helps people in this community who are in need of help.

Q And that organization, has it, in the past, ever assisted in paying your fees with regard to representing particular individuals?

MR. ANSARI: I'm going to object to the question.

MR. MACGIOLLABHUI: Let me do this. Let me withdraw it and maybe ask it a different way.

Q To your knowledge, Mr. Aidala, does this particular organization, DROR, does it help with paying the legal fees of criminal defendants?

MR. ANSARI: I'm going to object to the question, and...

A It -- I mean, it may. It may. I -- you know, I know them more -- to be honest with you -- helping people who are -- for people who are incarcerated and making sure they get Kosher meals and appropriate religious items when they're incarcerated. But I can't tell you I'm intimately involved with the workings of DROR.

Q Well, you were honored by them in 2015,

right?

A Yeah. Well, I trust you on the date, but yes. I was honored by them.

Q And why were you, in particular, honored?

A I think it was a combination of charm, good looks, charisma. Things of those -- those were the qualities they were looking for.

Q Apart from the obvious reasons, any other reasons?

A You know, I -- they often pick my brain on a pro bono basis about various legal topics. And I think I've been -- I mean, my office also in Brooklyn is very close to Boro Park. So I'm an active supporter of the community, the general community of Brooklyn and that area.

So -- I mean, I don't really know what the qualifications were for getting that award, but I was honored to be recognized.

Q Have they -- and again, I'm not asking about any case in which either the organization or an individual connected to the organization was a client either of yours or of your firm's. But in relation to other people, have DROR ever

ARTHUR AIDALA

assisted with regard to the payment of your legal fees?

MR. ANSARI: Objection. I'm going to instruct my client not to answer to the extent that it's seeking information possibly into relationships between my client, our firm, and clients of the firm.

And whatever agreement as to payment -- and I'm speaking vaguely here because the question is rather vague and nonspecific and seeking information I believe which seems to be outside of the scope of this litigation.

But to the extent that it's seeking any information regarding any retaining agreements or anything like that, I would object, and I would instruct my client not to answer.

MR. MACGIOLLABHUI: So that I understand the objection correctly, my understanding is that if a third party pays legal fees, that information is

not privileged. Is it -- is the objection on the basis that that information is, in fact, privileged?

MR. ANSARI: Niall, I wouldn't agree. And perhaps if you want to cite some case law, I'm happy to peruse it, but I won't agree that that's entirely correct.

But -- and if you want to, we can mark it for a ruling. And if you want to make an application to the Court and the Court decides that my client needs to answer that question, then just as we have so amicably scheduled this date, you know, perhaps an interrogatory to a non-party or coming back to posit that question via Zoom, I would consider it. But it would require a Court ruling before we start --

MR. MACGIOLLABHUI: That's fair enough. I'm not going to force the issue at this point, but let me make a suggestion, and you can make of it what

ARTHUR AIDALA

you will.

If, for example, the answer is no -- meaning that DROR have never assisted in the payment of legal fees -- then that resolves the issue as far as I'm concerned. And, you know, we can move on, and there's no reason to bring it to the Court's attention.

Obviously if the answer is other than no, that's a different matter. I don't know if you want to have an opportunity to speak to your client and see if that's a way in which he's in a position to answer the question or not, I'll leave it entirely up to you.

MR. ANSARI: Okay. Why don't we -- you know, I need to -- so why don't we take a five-minute break.

MR. MACGIOLLABHUI: That's fine.

MR. ANSARI: And we can reconvene. It seems like a good time to do that.

MR. MACGIOLLABHUI: That's a good idea. So we're at 2:32 now or 2:33. We'll come back, say, 2:40.

MR. ANSARI: Yeah. That's fine.

MS. SCHARFSTEIN: Okay.

MR. MACGIOLLABHUI: Is that enough time for everybody? Or you want to do a little longer?

MS. SCHARFSTEIN: It's fine for me.

(A recess was taken at 2:33 p.m.)

Q Mr. Aidala, the organization that we were discussing, DROR, have they ever assisted in the payment of your legal fees on behalf of somebody that wasn't affiliated with the organization?

MR. ANSARI: Objection --

MS. SCHARFSTEIN: Objection.

MR. ANSARI: -- to form, but you can answer.

A I don't believe so.

Q Now do you know an attorney by the name of Rob Aiello?

A Robert Aiello?

Q Yes.

A The great Robert Aiello from Queens?

Q Is there more than one?

ARTHUR AIDALA

A Well, I guess -- yes. I know him very, very well.

Q Did there come a time where he represented one of the alleged victims of Baruch Lebovits?

A I have zero recollection of that.

Q I'm going to show you now what was marked at a prior deposition as -- let me see -- I think it's Plaintiff's -- here we are -- 48. I will -- this is not a document you need to review. I will represent to you that it's a transcript of a conversation that occurred between my client, Sam Kellner, and Meyer Lebovits in 2009.

Is this a document that you have seen before?

A Can I see it? Can I see more than just that first paragraph?

Q Yeah. Let me give you control. Okay. You should have control of the cursor there.

MR. ANSARI: This was previously marked, you said, as 48?

MR. MACGIOLLABHUI: 48. Yeah.

MR. ANSARI: Can you e-mail this

to me?

MR. MACGIOLLABHUI: No. This one is too big to e-mail. I'll figure out a different way to send it to you.

MR. ANSARI: And what is the -- what is the genesis, if you will, of this document?

MR. MACGIOLLABHUI: It was produced to the parties by the Brooklyn DA's office in this case.

A I really don't remember seeing this.

Q Well...

A I'm scrolling through it, but I can't say there's anything that I -- okay. So tell me what you would like me to do.

Q So my question for you is do you recall seeing this document before?

A I don't.

Q Do you recall a conversation that occurred between Meyer Lebovits and my client, Sam Kellner, that was recorded by Meyer Lebovits in 2009?

A Vaguely.

Q Well, do you recall providing the DA's

ARTHUR AIDALA

office with a transcript of that conversation?

A Vaguely.

Q Let me do this. Let me see if I can take the cursor back from you and show you a different exhibit. This exhibit was previously marked as Plaintiff's 21. And I'm going to ask you to review.

It's an affidavit of yours dated August 10 of 2011, and I'll ask you to review that document.

MR. ANSARI: Niall, did you e-mail this one to me?

MR. MACGIOLLABHUI: No, I didn't. I wasn't planning on using it, but I will.

A Okay. I read it.

Q Having reviewed that particular document, does that refresh your recollection as to a recording that was made by Meyer Lebovits of a conversation between him and Sam Kellner in 2009?

A Yes.

Q And do you recall in 2009 that you discussed this particular recording with

ARTHUR AIDALA

Ms. Gregory?

A Yes.

Q And do you recall discussing it with anyone else within the DA's office?

A According to this, I discussed it with Mike Vecchione.

Q Right. Well, I believe according to your affidavit, your affidavit refers to a conversation you had with him the following year. That's 2010. So in terms of maybe better differentiating the time period. So the first one -- the first time period that is before the Lebovits trial, you recall discussing the recording with Ms. Gregory before the trial, right?

A I mean, I don't recall a specific conversation, but yes. I recall that I brought it to her attention.

Q Right. And before the trial, do you recall bringing it to the attention of anyone else within the DA's office?

A I do not recall it.

Q Now after the trial, you brought it to the attention of Mr. Vecchione, right?

ARTHUR AIDALA

A Correct.

Q Now I'm going to show you now what is going to be marked as Plaintiff's 199. This is an excerpt from the transcript of an appearance on October 3, 2011, in the Baruch Lebovits case.

And the portion I want you to review is -- let me see. From -- well, you're free to review the whole thing if you'd like, but the part I'm interested in is from page 43, the last paragraph where you're speaking through page 45 where you finish speaking. So if you could review that part.

So the part that begins Your Honor, let me just clarify one thing and just throw this out there. Do you see that?

A Yeah.

Q So if you could just review from that part through -- I think it's about the middle of page 45.

MS. SCHARFSTEIN: Niall, the beginning of the transcript isn't available? Or the end of it?

MR. MACGIOLLABHUI: It is all available, but I think it's about 70 or

ARTHUR AIDALA

80 pages.

MS. SCHARFSTEIN: Okay. So Mr. Aidala isn't going to have the ability to review it in context.

MR. MACGIOLLABHUI: If he wants to read all 80 pages, all he has to do is ask.

MS. SCHARFSTEIN: Okay. I'll just note my objection.

MR. ANSARI: Niall, you're not marking the whole transcript?

MR. MACGIOLLABHUI: No, I'm not. And I'm happy -- I'm happy to provide you with a copy of the whole thing, but the transcript touches on many, many different things. This is the only thing I'm interested in. At least for --

MR. ANSARI: To the extent that this may be used -- this is an exhibit that is accompanying deposition testimony, but yes. To sort of cherry pick a certain area of a longer transcript, then...

MR. MACGIOLLABHUI: You want me to do this, Imran? I can put the full transcript in as a separate exhibit, if you'd like. You can put it in. I'll e-mail it to you.

MR. ANSARI: Listen, it's not my case, but to the extent my client is involved, just for the record here, the whole transcript should be marked.

MR. MACGIOLLABHUI: Okay. Well, I'll e-mail it to you.

MR. ANSARI: I'm in the interest of moving this along and limiting my client's involvement in both time and substance to the extent that he is involved as a non-party, because he is a non-party here.

So I would request that the entire transcript be marked as an exhibit. So therefore the deposition transcript has that exhibit in total, and therefore in the future, if there's any reason that we need to cite to other areas of that transcript to clarify or whatnot -- or

even both of you as litigants here --

MR. MACGIOLLABHUI: That's fine. Imran, I have no problem with that. So I'll put in the full transcript as 199, and I'll make this 199A.

MR. ANSARI: Okay. And obviously I'm waiting until you question my client to make any objection that may arise out of the whole transcript not being marked. Or not being referred to, I should say.

MR. MACGIOLLABHUI: Okay. And again, it's definitely at least 70 pages, so I'm happy to provide it either to you or to your client, but -- you know, it's going to take some time to go through it. You let me know.

MS. SCHARFSTEIN: I just want to clarify. I don't have any objection to that procedure. My objection specifically is that the witness is being asked a question based on a portion of a document. And the -- it's an object to the form to the extent

ARTHUR AIDALA

that the answer may be colored or may be misleading by the fact that he hasn't reviewed the entire document.

And so I would object to that answer being used in any way against my client.

MR. MACGIOLLABHUI: Okay.

Q So Mr. Aidala, having reviewed the portion I pointed your attention to, I'm going to focus your attention on -- I think it's the second paragraph of page 44, the first line of which reads: Your Honor, the first people we go to is the FBI.

Do you see that?

A Yeah.

Q And the we in this case is you and Alan Dershowitz, right?

A Yeah.

MS. SCHARFSTEIN: Objection.

A It was really -- it was Dershowitz who made that call.

Q And -- now the Lebovits trial is in March 2010, right?

A That is correct.

ARTHUR AIDALA

Q And then the sentencing is the following month in April.

A I believe so.

Q And then the issue with regard to Simon Taub arises shortly thereafter, right?

MS. SCHARFSTEIN: Objection.

A I don't remember.

Q Okay. So I'm going to show you now what was previously marked as Plaintiff's 23. It's a log from the DA's office. And I'm going to point you to -- I think it's a couple of entries in particular. You're going to have to bear with me because I have to find and magnify it.

Okay. So there's two in particular. You'll see where my cursor is, and I'm running from left to right. So it's Charles Hynes, Arthur Aidala, Esq., 19th floor. The date is May 4 2010, and the text to the right reads Arthur Aidala has an appointment with Mr. Hynes.

And then there's a second entry that I wanted to direct your attention to. Again, it reads, from left to right, Charles Hynes, Arthur Aidala, Esq., 19th floor, May 5, 2010. And the

ARTHUR AIDALA

text to the right of that is Mr. Aidala has an appointment with Mr. Hynes.

Now these meetings in May of 2010, those are meetings that -- or at least you had one meeting around this time with Mr. Hynes, right?

A According to the document before me.

Q Right. Well, isn't it the case that you met with Mr. Hynes following the conviction and sentencing of Mr. Lebovits?

MR. ANSARI: Objection to form.

A I have zero recollection.

Q Well, I'm going to point you back to that particular transcript excerpt. Do you see the line that reads -- and it's the second paragraph of page 44. The line that reads: And I compliment Joe Hynes and his office tremendously because they easily could have closed the door in our faces, and they didn't.

Do you see that?

A Yes.

Q So isn't it the case that following the conviction and sentencing of Mr. Lebovits, that you met with a number of people from the DA's

office, including Mr. Hynes?

MR. ANSARI: Objection to form.

MS. SCHARFSTEIN: Objection.

A I do not have a specific recollection of meeting with Joe Hynes. I have a specific recollection of meeting with Michael Vecchione and Alan Dershowitz.

Q Well, isn't it the case that one of the people that you called in the DA's office was John O'Mara around this time?

MR. ANSARI: Objection.

A John O'Mara?

MS. SCHARFSTEIN: Objection.

Q Was there an ADA in the Brooklyn DA's office who was head of the Conviction Review Unit by the name of John O'Mara?

A Correct.

Q And didn't you call him about the Baruch Lebovits case after the conviction and sentencing?

A I --

MR. ANSARI: Objection to form.

A I have no recollection of that whatsoever, of talking to John O'Mara about this

case. I mean, I know who John O'Mara is, but I would not -- I'd be more surprised if I spoke to him, but -- I have no recollection.

Q I'm going to point your attention now to page 45 and the portion where you're speaking on the record and the two sentences that read -- and I quote -- obviously it's no secret that I have a relatively amicable relationship with the District Attorney's office. I called people there who I knew would at least listen to me.

Do you see that?

A Yes, sir.

Q So the people you called, who were they?

A I -- I have the -- I have a distinct recollection of -- I don't have a distinct recollection of calling anyone. I have a distinct recollection of being in a meeting in Michael Vecchione's office with Alan Dershowitz.

Q And do you recall a meeting in Mr. Vecchione's office in connection with the Baruch Lebovits case prior to the meeting that included Mr. Dershowitz?

A I don't.

ARTHUR AIDALA

Q Now the --
A Well, let me -- let me clarify that.
Q Okay.
A Mike Vecchione is a -- is a friend, a mentor. I can think of a lot of terms to describe him. So, you know, I had been to his office several -- on several occasions. So I don't have a recollection of going there one time with Dershowitz, but I have a recollection of going there to speak to him about the Lebovits case one time. And that particular time is with Professor Dershowitz.
Q And DA Hynes, obviously who's now passed, but would you describe him, too, as a mentor to you?
A Yes.
Q As a friend?
A Yes.
Q Now Mr. Vecchione, as it happens, has already been deposed in this case. Have you spoken to Mr. Vecchione about the testimony he gave?
MR. ANSARI: Objection to form.
A Not specifically. Just that he was

ARTHUR AIDALA

deposed in this -- in this case.

Q And he testified that he went on vacation with you to Italy a number of times; is that correct?

A Yeah.

MS. SCHARFSTEIN: Objection.

A Well, Italy and Sicily.

Q Important distinction, right?

A Absolutely. I want the record to be clear.

Q And Mr. Hynes, did you ever go on vacation with him?

MR. ANSARI: Objection to form.

A No.

Q Now the meeting that occurred with Mr. Vecchione at which Mr. Dershowitz was present, what do you recall of that meeting?

A Well, the reason why I remember it so clearly is it was kind of a big deal walking down the hallway of the DA's office with Alan Dershowitz next to me. I also remember an ADA referring to him as Professor Dershowitz, which was the first time I ever heard him called Professor while we were hanging out. I was,

ARTHUR AIDALA

like, maybe that's what I should be calling him.

Then I just remember us sitting in Mr. Vecchione's office. I believe Mr. Vecchione had a picture on his wall of Ebbets Field. It was something that struck up a conversation about Brooklyn, and there was a lot of chitchat and informal conversation about Brooklyn.

And, you know, Professor Dershowitz basically made his case as to an extortion plot and asked Mr. Vecchione to look into it. And, you know, any more detail more than that, I do not remember.

Q And the ADA who referred to him as Professor, who was that?

A I want to say that was Joseph Alexis.

Q And ADA Alexis, was he present at his particular meeting?

A No.

Q Other than you, Mr. Dershowitz, and Mr. Vecchione, was anyone else present?

A I don't know. You know, I don't know the answer to that question if there was an investigator there or not.

Q Do you recall ADA Nick Batsidis being

present?

A I don't recall him being present at that meeting.

Q Now you said that Mr. Dershowitz made a case in terms of an extortion plot concerning Baruch Lebovits, right?

A Well, I think it was more Meyer than Baruch, but yes. It wasn't about Baruch. It was about his children.

Q And at that point in time, had Simon Taub already been arrested?

A I -- I do not know. I don't remember.

Q Well, do you remember Simon Taub was arrested, also, for an alleged extortion plot concerning one of Baruch Lebovits's children?

A I do.

Q Now the meeting that you had including Mr. Dershowitz, do you recall that Mr. Dershowitz either was on a cruise around that time or was supposed to be on a cruise around that time?

A I have --

MS. SCHARFSTEIN: Objection.

A No. I know nothing about a cruise and Mr. Dershowitz.

ARTHUR AIDALA

Q Well, do you recall what time of year the meeting took place?
A I do not.
Q Do you recall that Mr. Dershowitz came to the meeting -- or when he came to the meeting or when he agreed to come to the meeting, Mr. Hynes was expected to be there?
A I -- I don't believe Mr. Hynes was expected to be there.
Q Well, do you recall ever meeting with Mr. Hynes in connection with Baruch Lebovits?
A I do not recall ever meeting with Mr. Hynes regarding Baruch Lebovits.
Q Do you know if Mr. Dershowitz ever met with him in connection with Baruch Lebovits?
A I know there was some interaction between Mr. Hynes and Professor Dershowitz. When, where, and whether I was there, I don't know the answers to those questions.
Q Meaning you don't recall?
A I don't recall. I recall that there was some interaction, whether it was in person or on the telephone. But I recall there was some communication. I don't know whether I was there

or not.
Q Well, prior to Mr. Dershowitz's involvement in the case, do you recall any interaction between you and Mr. Hynes?
A No. I mean --
MR. ANSARI: Regarding -- I'm sorry, Niall. Regarding -- you have to specify and be more clear. Regarding --
Q Regarding Baruch Lebovits.
A Yeah. I have no recollection of going to Mr. Hynes on this case.
Q And are you saying it didn't happen? Or that you can't recall one way or another?
MR. ANSARI: Objection to form.
A I only remember two cases ever going to Mr. Hynes on, maybe three, and Baruch Lebovits is not -- I mean, it was a big deal to see Joe Hynes on a case. And in his whole tenure there, I remember going in there three times, and Baruch Lebovits was not one of the three times that I went up there to see...
Q What are the cases you remember?
MR. ANSARI: Objection to form.

ARTHUR AIDALA

A One was a lawyer who was a severe addict, and he got caught with drugs. And the offer was jail. And I wanted to get a program, and I did.

One was a guy who was a DWI, and he hit two people and killed them. And Mr. -- I walked into his room, and Mr. Hynes said I know what you're here about. You can tell your client you came to see me, and I'm not doing anything. You gotta get an offer from the judge. And he did nothing.

And the third one was a case where there was a plea with one lawyer, and I went in, and he yelled at me, Mr. Hynes, that I couldn't come in and see him when there was already a plea on a case unless I had, like, newly-discovered information or new things. And I did. I had something that he didn't know about. And so the offer went from, like -- I don't know -- two to four to, like, one to three or something like that. Or two to six to one to three. Those were the only three cases I could remember.

Q And the third of those cases, what was the nature of that particular case?

A I want to say it was a form of larceny having to do with cars, but, you know, we're dealing with a long time ago now.

Q Now in relation to the Baruch Lebovits case, and in particular following the conviction and sentencing, Mr. Vecchione was in contact with Mr. Hynes in connection with the case, right?

MR. ANSARI: Objection to form and to the extent that this will cause my client testify about someone else's actions.

MS. SCHARFSTEIN: Objection.

MR. MACGIOLLABHUI: Let me rephrase the question.

Q To your knowledge following the conviction and sentencing of Baruch Lebovits, was Mr. Vecchione in contact with Mr. Hynes concerning the case?

MS. SCHARFSTEIN: Objection.

A Regarding Baruch Lebovits? No.

Q What about regarding Sam Kellner?

MR. ANSARI: Objection to form. Can you --

MS. SCHARFSTEIN: Objection.

MR. ANSARI: -- rephrase the question in whole, Niall?

MR. MACGIOLLABHUI: Yeah.

So I'm going -- Ms. Kustin, I'll ask you just to read back the first of the two questions.

(The requested portion of the transcript was read back by the reporter.)

MR. MACGIOLLABHUI: Okay. So let me ask another question in relation to my client.

Q To your knowledge, Mr. Aidala, was Mr. Vecchione in contact with Mr. Hynes with regard to Sam Kellner at any time?

A I don't know.

Q Well, did Mr. Vecchione at any time tell you that he was in contact with Mr. Hynes with regard to Sam Kellner?

A I don't have a specific recollection of that conversation.

Q Well, isn't it the case that the investigation that Mr. Vecchione and Rackets carried out into Sam Kellner required the

ARTHUR AIDALA

approval of Mr. Aidala -- excuse me -- Mr. Hynes?

MS. SCHARFSTEIN: Objection.

A I don't know. Mr. Vecchione would know. I don't know.

Q Your testimony is that he never indicated to you whether or not his office's investigation of Sam Kellner required Mr. Hynes's approval?

A I'm just --

MR. ANSARI: Objection.

MS. SCHARFSTEIN: Objection.

MR. ANSARI: Objection to the extent it mischaracterizes my client's testimony.

A I'm saying I don't remember Mr. Vecchione telling me Mr. Hynes has to do that or Mr. Hynes has to approve that or Mr. Hynes has to be in this meeting or that meeting. You know...

Q Well, isn't it the case that when you went to the DA's office following the conviction and sentencing of Baruch Lebovits and asked that office to investigate Sam Kellner, that you were aware that in order for that to happen, it had to

ARTHUR AIDALA

be approved by Mr. Hynes?

MS. SCHARFSTEIN: Objection.

MR. ANSARI: Objection to form.

A I -- I don't remember that. I'm not saying it's not true. I just don't remember being told, and Mike Vecchione didn't have that authority.

Q Now following the conviction and sentencing of Mr. Lebovits, did Mr. Goldman and Ms. Johnson remain in the case as counsel?

MR. ANSARI: Objection to form.

A I mean, I know they left at some point. I don't exactly know at what point in the representation they left. It was -- I guess it was after the sentencing, and then the family retained Alan Dershowitz to do the appeal.

Q And did -- to your knowledge, did he -- this is Mr. Dershowitz -- ask that you be kept on?

A Yes.

Q I'm going to show you now what was marked at a prior deposition as Plaintiff's 131. I'm going to ask you to review this document. It's a two-page document. And you can review as

much of it as you want, but I'm going to only ask you about the first two or three paragraphs.

MR. ANSARI: I'm sorry. Niall, you e-mailed me this?

MR. MACGIOLLABHUI: Yeah, I did.

MR. ANSARI: This is exhibit what?

MR. MACGIOLLABHUI: 131.

MR. ANSARI: 131. Thank you.

A Okay.

Q And now Mr. Mladinich is an investigator that you hired in connection with the Baruch Lebovits case, right?

A Yes.

Q How did you know Mr. Mladinich at that time?

A I don't remember. I mean, I had used -- actually, I can't even say that. I don't remember. I don't remember if this is the first case I used him on or if I had used him in the past.

Q I'm going to show you now what was previously marked as Plaintiff's 36A.

MR. ANSARI: I see a 36A.

MR. MACGIOLLABHUI: Yes. That's

ARTHUR AIDALA

it.

Q I'm going to ask you to review this document, Mr. Aidala. It's called an affirmation. There's actually two of them. They're called affirmations. They're actually affidavits. They're identical, except that one of them, I think, has an additional paragraph, meaning paragraph 6.

So I'll ask you just to review those, if you would.

A Okay. I read them.

Q Now these are two affidavits -- withdrawn.

Prior to today, have you seen either of those two affidavits before?

A Prior to --

MS. SCHARFSTEIN: Objection.

A Prior to today?

Q Yeah.

A I don't remember. I -- I don't remember if I have or I have not.

Q And isn't it the case that these two affidavits were obtained by Mr. Mladinich in connection with the Baruch Lebovits case?

ARTHUR AIDALA

MR. ANSARI: Objection to form.

A It appears that way. Yes.

Q And prior to -- you see the date on both of them -- I think it's July 22 of 2010. Let me just see if that's, in fact, the case. Yeah.

Prior to that date -- and the period I'm interested in is following the trial and conviction of Mr. Lebovits up until July 22 of 2010 -- had you spoken to Mr. Lonuzzi in connection with his client, who we're referring to as Victim Number One?

A I don't know.

Q Well, do you recall whether or not -- withdrawn.

Do you know whether or not Mr. Lonuzzi was aware beforehand that his client was meeting with your private investigator?

MS. SCHARFSTEIN: Objection.

MR. ANSARI: Objection to the form.

A I did not know that. I don't know if -- what Mr. Lonuzzi knew or didn't know.

Q And if I recall your prior answer

correctly, your testimony is that you don't remember whether or not you spoke with Mr. Lonuzzi prior to these affidavits being obtained.

MS. SCHARFSTEIN: Objection.

MR. ANSARI: Objection.

A Correct. I don't know -- I don't remember the dates that I spoke to Mr. Lonuzzi.

Q Now in these affidavits, Victim Number One is saying or stating that he wasn't an actual victim of Baruch Lebovits, right?

MS. SCHARFSTEIN: Objection.

A That's what written on the page.

Q And if I can return your attention to Plaintiff's Exhibit 150, and in particular the part I showed you before, which is page 6, and the sentence that reads: At his first meeting with counsel, somewhat surprisingly to counsel, he -- meaning Baruch Lebovits -- fully admitted the extent of his guilt to the allegations of the indictment and, indeed, candidly told us about other incidents.

Isn't it the case that at the time that the affidavits were obtained -- and this is

ARTHUR AIDALA

Plaintiff's 36A -- that those affidavits were obtained from Victim Number One that you knew that Victim Number One was, in fact, an actual victim of Baruch Lebovits?

MR. ANSARI: Objection --

MS. SCHARFSTEIN: Objection.

MR. ANSARI: -- to form, and objection to the extent that the prior testimony of my client regarding the exhibit you just showed was on the screen -- and I don't recall the actual number. But it was the PPI.

My client's already testified that he had no involvement in the drafting --

MR. MACGIOLLABHUI: Excuse me. No speaking objections.

MR. ANSARI: No, Niall --

MR. MACGIOLLABHUI: You put your objection on the record. You're making a speaking objection now.

MR. ANSARI: No. No. No. We've been cordial, but you're not going to mute me. That's where problems happen.

MR. MACGIOLLABHUI: You're not allowed to make speaking objections.

MR. ANSARI: You're not going to mute me, Niall. I will make it on the record if I feel, and then you can object to it later. Your objection is noted.

But my client has already testified that he had, A, no part in writing that PPI; B, was not even present at that meeting that you have now just referred to in that document. And now looking at the affidavits that you have on the screen, he's also stated that he doesn't recall at least being involved in drafting or any part of these affidavits, and also they speak for themselves.

So you're --

MR. MACGIOLLABHUI: Mr. Ansari, you're not allowed to make speaking objections. That's what you're doing. So you can continue as long as you like, but it's wholly inappropriate.

ARTHUR AIDALA

MR. ANSARI: We can go back and forth about not making speaking objections. We both do it. You know, but I'm putting my -- my client's position on the record.

He's here as a non-party, but the problem with the question is that it's -- it's rotten from the root because he's already testified that he didn't have, A, any part in drafting that PPI; and, B, he was not present at the meeting with the portion of that PPI that you're referring to.

MR. MACGIOLLABHUI: Are you instructing him not to answer the question?

MR. ANSARI: He could answer the question, but now with that framework and context and my speaking objection. You're objection to my speaking objection is noted for the record, and I'll allow my client to answer.

MS. SCHARFSTEIN: Okay. I just want to note my objection to the

ARTHUR AIDALA

question, as well.

MR. MACGIOLLABHUI: You want to make a speaking objection, too, Susan? Or --

MS. SCHARFSTEIN: I'm not even going to respond to that, Niall.

MR. MACGIOLLABHUI: Okay.

Q Mr. Aidala, isn't it the case that when your investigator, Mr. Mladinich, obtained these affidavits from Victim Number One, that you knew that he was, in fact, an actual victim of Baruch Lebovits?

MS. SCHARFSTEIN: Objection.

MR. ANSARI: Objection for the reasons I stated previously, and also objection to form.

A That is not true.

Q Well, what part of it is not true?

MR. ANSARI: Objection to form.

A My client never made any admissions to me of any wrongdoing.

Q Your client is Baruch Lebovits?

A Correct.

Q Well, let me return your attention

to --

A If you're looking where you just pointed me to, it said at his first meeting with counsel. And I believe I said earlier you refreshed my recollection that I was not his first lawyer.

I came in somewhat in the middle or whatever. I don't know about the middle of the case, but when the case had already proceeded. I definitely was not there at the first meeting with counsel.

Q Okay. But I'm not asking you whether you were there. I'm saying to you that you were aware that he had admitted to Mr. Goldman and Ms. Johnson -- and I'm quoting from the memo -- the extent of his guilt to the allegations of the indictment. You were aware of that, right?

MR. ANSARI: I'm going to object --

MS. SCHARFSTEIN: Objection.

MR. ANSARI: -- to the form. I'm go to object because my client has already stated on the record that he had no part in the drafting of the PPI

that you're referring to or has already testified that he wasn't present at the initial meetings that is referred to in this PPI.

So there's two areas that cause problems here with that question.

MR. MACGIOLLABHUI: Okay. Well, if you're instructing him not to answer, let me know. Otherwise, I'm going to ask him to answer the question.

MR. ANSARI: Okay. Niall, also the form of the question. You know, it's sort of like you're suggesting -- and I understand that you can have some leeway with leading questions here at a deposition, but I have an objection to the form of the question, also.

MR. MACGIOLLABHUI: Okay. Well, are you instructing him not to answer?

MR. ANSARI: Well, why don't you posit or rephrase the question, and I'll revisit it.

MR. MACGIOLLABHUI: The question

is --

MR. ANSARI: You have to also do it with the context that you've already elicited testimony from my client, and I'm not going to say it again, but -- you know, as to this document, he wasn't present at the initial meetings.

He's already also testified that his client at that time made no admission of guilt to him. So perhaps these questions are best suited to someone who may have been the drafter of this document or present at that meeting.

MR. MACGIOLLABHUI: Okay. Again, are you instructing him not to answer the question?

MR. ANSARI: Well, I gotta hear the question again. You gotta to rephrase it because --

MR. MACGIOLLABHUI: Ms. Kustin, I'll ask you just to read back the question, please.

MR. ANSARI: Niall, I can't tell

ARTHUR AIDALA

you how to do your deposition, but why don't you just -- just ask it again. It will speed things along.

MR. MACGIOLLABHUI: No. I'm not going to do that. I'm not going to ask the question again. I've already asked it.

MR. ANSARI: Again, that's your prerogative. Why don't you just re-ask it so we don't bother the court reporter to read back what can simply be stated again.

(The requested portion of the transcript was read back by the reporter.)

MS. SCHARFSTEIN: I just wanted to make sure that my objection is noted, as well.

MR. ANSARI: You're asking whether -- again, this document. If you want to take the text from this document that you marked as an exhibit that I don't think my client can even authenticate for you, he stated he

ARTHUR AIDALA

didn't draft it. He wasn't present at the meeting, and that's the part you're referring to. So he can't testify to something that he doesn't know.

You're -- so there's a problem with the question.

MR. MACGIOLLABHUI: Okay. All of this is going to the judge, so keep talking as much as you'd like.

MR. ANSARI: It's fine.

MR. MACGIOLLABHUI: This is all going to the judge. This is --

MR. ANSARI: And I welcome that because --

MR. MACGIOLLABHUI: Keep going. Keep going.

MR. ANSARI: That's fine, Niall. That's fine. You have to --

MR. MACGIOLLABHUI: So let me ask another question.

Q Mr. Aidala. Mr. Aidala, weren't you aware that -- and again, I'm referring your attention to what has previously been marked as Plaintiff's Exhibit 150, and I'm quoting from the

document. Were you aware that Mr. Lebovits had -- quote/unquote -- fully admitted the extent of his guilt and the allegations of the indictment to Mr. Goldman and Ms. Johnson?

MR. ANSARI: Objection. Asked and answered. You can answer.

MS. SCHARFSTEIN: Objection.

A I read this at some point in the proceedings. I don't have any -- again, as I said, my client -- I would think I would remember if he fully admitted it to me. So he never fully admitted it to me. I don't remember having any conversations with Mr. Goldman or Ms. Johnson about any admissions of our client.

Q So is it your testimony that you forgot that he admitted abusing Victim Number One to Mr. Goldman and Ms. Johnson?

MS. SCHARFSTEIN: Objection.

MR. ANSARI: Objection to form. Objection to the mischaracterization of my client's testimony completely.

You can answer if you understand the question.

A Well, if you really parse the words, he

ARTHUR AIDALA

fully admitted the extent of his guilt. So he admitted the extent. The extent could have been very minimal. The extent of his guilty could have been there's 12 TPOs, and I did one TPO. So I don't know what the extent of his guilt was.

Q Well, isn't it the case that you obtained affidavits from Victim Number One in July 2010 where Victim Number One stated that he had never been abused at all by Mr. Lebovits?

A But there were --

MR. ANSARI: Objection to form.

A I didn't obtain -- I didn't obtain anything. But there were also, at this particular time, I believe, of this writing -- I don't know if there were two victims or three victims.

MR. ANSARI: Niall, I don't think you want my client to speculate or guess, so I'm going to actually get it on the record.

Please don't speculate or guess. If you don't remember, you don't remember. If you don't recall, you don't recall. I think all counsel who

ARTHUR AIDALA

are actually counsel to litigants in this party would want that, also.

Q Is it your testimony that you were not aware at any time that Baruch Lebovits had admitted abusing Victim Number One?

MS. SCHARFSTEIN: Objection.

A I don't remember.

Q I'm going to show you now what was previously marked as Plaintiff's 56. And I'm going to close a few of the other ones. This is a one-page document. It's an affidavit by someone by the name of Moshe Friedman, dated July 15, 2010.

And my question once you're finished reviewing this is whether you recall seeing this document on a prior occasion.

A I don't recall seeing it.

Q Well, the -- the person whose affidavit it is, Moshe Friedman, do you know who that is?

A There -- I know, like, three or four Moshe Friedmans in that community. So I'm not exactly sure which one -- of which we speak.

Q Well, do you know a person who's also referred to as Moshe Gabbai.

ARTHUR AIDALA

MR. MACGIOLLABHUI: And that's, Court Reporter, G-a-b-b-a-i.

A No.

Q Do you know a Moshe Friedman that you had proposed using as a character witness at the trial of Baruch Lebovits?

MR. ANSARI: Objection to form.

A I have the name, but I don't have the face. So I can't tell you that I would --

Q Well --

A -- know who that is.

Q Do you recall a Moshe Friedman who you alleged had been approached by Sam Kellner in an attempt to extort either Baruch Lebovits or his family?

MR. ANSARI: Objection to form.

A As I said, I know the person's name. I just can't picture what they look like right now.

Q Well, in terms of the allegations set forth in this affidavit, do you recall any of those allegations being made in connection with either Baruch Lebovits or Sam Kellner?

A Yes.

Q What do you recall of them?

ARTHUR AIDALA

A I just recall that -- I recall the general -- the gist of what's in this affidavit. About -- you know, Baruch doesn't have money, but he let his sons pay.

Q And these allegations were brought to your attention at a particular point in time, right?

A Obviously.

MS. SCHARFSTEIN: Objection.

MR. ANSARI: Objection to form.

Q Indeed. Well, let me ask you the question in a better way. Prior to the date of this affidavit, so July 15, 2010, were -- do you recall these allegations being brought to your attention?

MS. SCHARFSTEIN: Objection.

A I don't remember when they were brought to my attention.

Q Let me see if I can pull up -- now I'm going to direct your attention to -- back to Plaintiff's Exhibit 21, and the final paragraph, which is paragraph 9. I'll ask you just to -- to review that paragraph.

A Okay.

ARTHUR AIDALA

Q My question is do you recall that recordings were made of the person we're referring to in this case as Victim Number Three in Florida by a person by the name of Sholem Weisner?
A Can you just repeat the question.
Q Yes. Do you recall that recordings were made of the person we're referring to in this case as Victim Number Three in Florida by another person by the name of Sholem Weisner?
A Yes. I do recall that.
Q And the -- if you look at paragraph 9, Sholem Weisner is the person who is referred to in that photograph as SW; correct?
A I believe that's correct.
Q And you see in your affirmation there, you indicate that there was an agreement whereby his name would not be revealed if he came forward, right?
A Correct.
Q Now how did that agreement come about?
A I don't remember.
Q Well, do you recall that it was Michael Vecchione that entered into the agreement on

behalf of the DA's office?

MR. ANSARI: Objection to form.

MS. SCHARFSTEIN: Objection.

MR. ANSARI: Niall, I just have -- listen, I have to say it on the record. Just -- you know, my client will answer he doesn't remember, and then you testify. Then you're questioning -- your next question is more like testimony, rather than a question.

You seem to -- if you have knowledge, yourself, it's not appropriate for you to then place information or facts on the record as the questioner, rather than getting or eliciting it from the witness, himself.

MR. MACGIOLLABHUI: That's what form objections are there for.

MR. ANSARI: But you'll have a -- a tainted, you know, transcript. You know, I'm sure you want something that you can use.

MR. MACGIOLLABHUI: I think I'm going to be able to use this. Don't

worry about it.

MR. ANSARI: Okay.

A Could you repeat the question.

Q Yes. Mr. Aidala, good news is we're almost -- we're almost finished.

But my question is do you recall that it was Michael Vecchione who entered into that agreement with regard to Sholem Weisner on behalf of the District Attorney's office?

A I do not recall.

Q I'm going to show you now what has been marked as Plaintiff's 185. I'm going to ask you to review this document. It's quite a lengthy one, in that it's -- the first page is an e-mail from you to Mr. Vecchione, and then there is a number of attachments to it.

So I'll ask you to review the documents, if you would. While you're doing that, I'm going to print a copy for myself.

A How much of this do you want me to read, sir?

Q I'm not going to ask you detailed questions. So if you want to just, as it were, review it in such a way that you're familiar with

the individual documents that form the attachments. I'm not going to ask you questions about the contents of the documents.

A Okay.

Q So do you recall sending this e-mail to Mr. Vecchione in January of 2011?

A No.

Q And the e-mail has attached to it a draft 440.10 motion on behalf of your client, Baruch Lebovits, right?

MS. SCHARFSTEIN: Objection.

A It appears so. Yes.

Q And before you sent the e-mail to Mr. Vecchione, do you recall telling him on any occasion that you and your co-counsel were preparing a 440.10 motion on behalf of Baruch Lebovits?

MR. ANSARI: Objection to form.

A I want to make sure. The e-mail that you have me looking at, it has no content; correct?

Q Right.

A I don't have any recollection about me having any conversation with him about it.

ARTHUR AIDALA

Q And --

A Who's Zachary Sider?

MR. ANSARI: Who's Zachary Sider.

A Zachary Sider who's on my e-mail chain or whatever. This e-mail. I'm guessing he's someone who's an investigator or something.

Q Right. I can tell you that that's the form in which e-mails were produced to us by the DA's office. So Mr. Sider is one of the people within the office who's in charge of making the production. That's why you see his name on the top.

Now isn't it the case that at this time which is January of 2011, Baruch Lebovits was still incarcerated?

A I -- yeah. I believe so. I know he got out for Passover, which is usually April. So I believe that would be correct.

Q Now did the Brooklyn DA's office tell you that they obtained recordings of calls that Mr. Lebovits made while he was incarcerated in 2010 and 2011?

MR. ANSARI: Objection to form.

A I have no recollection of that.

ARTHUR AIDALA

Q And presumably you're not aware that those recordings were disclosed in the context of this lawsuit.

A I have no knowledge of that.

Q Okay. Isn't it the case that in January 2011, that Mr. Lebovits was pressing hard for this motion to be made on his behalf?

MR. ANSARI: Objection to form.

MS. SCHARFSTEIN: Objection.

A I have -- the only recollection I have of speaking to Baruch Lebovits was when he got transferred from one facility in prison to another. When he got off the bus, one of the guards grabbed him by his beard and called him a Nazi and beat him pretty bad. You know, making all kinds of anti-Semitic remarks and making fun of him. But they beat him up really bad.

And the family called me hysterical, and I left the office where I'm seated right now and drove to the prison. And I saw him beaten, and I spoke to some of the authorities there to try to get him some protection because he needed protection from -- not from the inmates, from the guards.

Besides that, I don't know if I spoke to Baruch Lebovits until the day he was released pending with bail after his case was reversed.

Q Was it your understanding that he had been attacked because he was Jewish? Or because he had raped little children?

A No. No. It was a hundred percent because he was Jewish. It was all about Jews calling him Hitler boy, Hitler boy, Nazi boy, grabbing him by his Payis, grabbing him by his beard. It had nothing to do with why he was there.

Q Now isn't it the case that the 440 motion was delayed to allow for the DA's office to first indict Sam Kellner?

MR. ANSARI: Objection to form.

A I have no recollection as to that.

Q And isn't it the case that Mr. Vecchione, after he received this draft from you, made certain suggestions to you as to how its content could be improved?

MS. SCHARFSTEIN: Objection.

MR. ANSARI: Objection.

A I have no recollection of that. I

ARTHUR AIDALA

don't believe that happened. I don't believe that would ever happen.

Q Well, did Mr. Vecchione agree on behalf of his office that if Baruch Lebovits delayed his 440 motion until after Sam Kellner was indicted, that the DA's office would not claim that the motion was untimely made?

MS. SCHARFSTEIN: Objection.

A I -- I don't have a recollection of that, and I don't think that would even be accurate. The timeliness of it. I don't have any recollection of having any substantive conversations with Michael Vecchione about legal strategy from my behalf on this case or any case, for that matter.

Q Well, other than discussing Ebbets Field and the Dodgers and Brooklyn, do you recall any conversation that you had with Mr. Vecchione in relation to Baruch Lebovits or in relation to Sam Kellner?

A I remember being very quiet, and I remember Alan Dershowitz making the case to Mr. Vecchione about why they should open an investigation into extortion of Meyer Lebovits.

ARTHUR AIDALA

And probably Meyer and Chaim, the two brothers.

Q And in terms of this case being made by Mr. Dershowitz, who was the case being made against?

A I don't remember if it was -- I don't remember who it was.

Q Well, you recall it was being made against my client, right?

A I -- you know, because the curve ball that you threw to me that -- you know, I forgot all of these names, quite frankly. I even forgot Taub was arrested. So I don't remember if we were going in there to talk about Taub or we were going in there to talk about Kellner.

Q Okay. Let me show you two documents that are going to be marked as 199 and 200. Actually, let me correct that. I have the numbers wrong. It's actually 200 and 201.

So I'm going to ask you to look at 201 to begin with. It's a subpoena that was issued by plaintiff in this case to your office seeking documents that are set out in Exhibit -- or Schedule A, I should say.

A Okay.

ARTHUR AIDALA

Q And then so that's 201. And I'm going to ask you to look at 200, as well, which is a letter that you wrote in response.

A Okay.

Q Now as of now, does your office use billing software?

A No. Well, I take that back. Certain aspects of my office uses billing software, but usually the civil side. Not usually -- the civil side uses billing software. The criminal side does not.

Q And on the criminal side, how do you bill clients typically?

A Typically it's on a flat-fee retainer.

Q And when you bill in that manner, do you send them statements with details of the work you have done and the hours you have expended?

A Only upon the rare request.

Q And Baruch Lebovits, was that a -- were you retained on a flat-fee basis?

A I was.

Q And in terms of being retained by him, were you retained a second time after the conviction and sentencing?

ARTHUR AIDALA

MR. ANSARI: Objection to form.
A I believe I was.
Q And that second time, was that on a flat-fee basis?
A Yeah.
Q Were you retained separately or in conjunction with Mr. Dershowitz?
MR. ANSARI: Objection to form.
A They were -- they would be two separate retainers, meaning he had his own, and I had my own retainer.
Q I'm going to show you now what was previously marked as Plaintiff's 193, I believe. I'm going to ask you to review this document. It's a letter dated May 21, 2013.
A Okay.
Q Is this a letter you've seen before?
A Yeah. I guess so. I believe --
MR. ANSARI: Don't guess.
A I believe I've seen this letter before. I mean, it rings a bell.
Q Well, did you play any part in organizing the writing of this letter?
MS. SCHARFSTEIN: Objection.

ARTHUR AIDALA

A My recollection -- the simple answer to your question is, I believe, yes. I was more of a coordinator than -- it wasn't my idea. It was, I believe, Alan Dershowitz's idea. Either Alan or Brafman.

Q I'm going to show you now two exhibits. They were previously marked Plaintiff's 192B and 192C. You'll see that -- if you review the two of them, you'll see that it's -- they're both e-mail chains, and the difference between them lies on the first page, in that beyond the first page, they're the same.

So I'll ask you to -- if you wish to review the entire document, that's fine, but I'm only going to ask you about the exchanges on the first page on each. I'll let you review whatever you want of it.

A Okay.

Q And if you scroll to the top of that particular exhibit. So this is 192B. And this is an e-mail at the very top that Mr. Vecchione sent to you on July 9, 2013, right?

A July 9. Yes.

Q Did he tell you why he was sending it

to you?

A I don't remember. I mean, I know how much bullshit is in this thing. I think that's a legal term. I know it's all orchestrated by Arnie Kriss, who was Mike Vecchione's law partner, and they had a horrible breakup. And Arnie Kriss also wanted to be the Brooklyn DA and ran against Joe Hynes and came in fourth place in a four-person race.

And he's been jealous of me and everything around me for a very long time. And I know most of the crap in here is just -- like, he -- the Baruch Lebovits case did not get reversed in the Appellate Division because of the Kellner case. It got reserved because they hid evidence from me. So -- I mean, it's just full of lies, but I guess that's politics for you by disgruntled, jealous, envious people.

Q Well, are there any lies in there about the Jabbar Collins case, to your knowledge?

A I don't know anything about the Jabbar Collins case.

Q Let me...

A But I know you know that the Lebovits

case didn't get reversed because of the Kellner indictment. I know you know that.

Q Well, I do know that. You also know that you used the Keller case to get him out on bail pending that decision, right?

MR. ANSARI: Objection to form.

MS. SCHARFSTEIN: Objection.

A I don't recall.

Q Well, in terms of that bail application -- so this was right after Sam Kellner was indicted -- who appeared on behalf of Baruch Lebovits in support of that application?

MR. ANSARI: Objection to form.

A Do you mean at the Appellate Division?

Q Right.

A Alan -- excuse me. Alan Dershowitz, Nathan Dershowitz, and myself.

Q And who, in particular, made the argument?

A Mostly Nathan Dershowitz, and I chimed in.

Q And do you recall the judge before whom the argument was made?

A Yes. John Levanthal.

ARTHUR AIDALA

Q And the application, meaning the bail application, was originally made about a month before Kellner was indicted, right?

A I don't know the answer to that question.

Q Well, do you recall how it was that Justice Leventhal was assigned to the case?

A Yes. We requested he be assigned to the case. When you're doing bail pending appeal in the second department, you get to choose which judge you want to make the argument before.

Q Let me show you 192C. Again, it is -- it's the same as -- I don't know if you reviewed this one, too, but it's the same, I believe, as 192B, except for the three e-mails at the top of the first page.

A I don't -- I don't know who Shackone is, by the way.

Q What about Morty Matz? Do you know who he is?

A He's a legend.

Q Beyond that?

A Yes. I know him. I know him very well.

ARTHUR AIDALA

Q And what about George Arzt?
A Yes. I know George Arzt.
Q And at this particular time, so July of 2013, did Mr. Arzt have a position in Mr. Hynes's reelection campaign?
A I don't know.
Q Well, you see the first e-mail, and the third sentence, I'll read it. Quote/unquote -- Artie is calling Arzt in the morning to coordinate because Arzt is going to have my comments on the Times article and the minutes.
Do you see that?
A Yeah. I know Arzt and Hynes have a relationship that go back decades. I just didn't know if there was an official -- if he had an official role or not. I thought Jerry Schmetterer was the -- had more to do with the media stuff, but I don't know the answer.
Q Well, Jerry Schmetterer was -- he was employed by the DA's office, right?
A At one point, yes.
Q He wasn't supposed to be working on the campaign, right?
A I don't -- at some point I know he took

a leave of absence. I just don't know when it was.

Q And at this particular time, so July of 2013, were you -- did you do anything on behalf of Mr. Hynes's reelection campaign?

MR. ANSARI: Objection to form.

MS. SCHARFSTEIN: Objection.

A I have no recollection, but there wasn't a lot of fear that he was going -- that his election was in danger. So I don't think I was going to destroy the -- my summer. So I have no recollection of working on his campaign in July of 2013.

Q Well, do you recall working on it at all? So this is the campaign to have him reelected in 2013.

A Yeah. I remember working on Election Day.

Q And let me ask you. Mr. Vecchione, did he send you the transcript of his deposition in this case?

A No.

Q Do you know someone by the name of Beryl Ashkenazi?

ARTHUR AIDALA

A 15 minutes ago, I would have said no, but you just refreshed my recollection by showing me some of the transcripts. So yeah. He was someone actually involved in some of the trial.

Q He was the witness in respect of whom the DA's office withheld Rosario material, right?

MS. SCHARFSTEIN: Objection.

MR. ANSARI: Objection to form.

A I really don't remember if that was because of him or if it was because of Rubenstein, himself. I don't remember.

Q Well, he was the sole witness you called at the trial, right?

A I believe that's accurate.

Q Do you know someone by the name of Zalman Ashkenazi, who's his brother?

A No.

Q Were you aware at any time that either Beryl Ashkenazi or Zalman Ashkenazi had made payments to Victim Number One or his family?

A No.

MR. ANSARI: Objection to form.

A No.

Q I'm going to show you -- I think this

is the final exhibit. It's a Brooklyn Eagle article dated September 11, I believe, 2015.

And I'm going to ask you -- do you see the particular photograph that has you at the middle?

A You mean the one with the hat and the beard?

Q Yeah.

A I don't think that's me.

Q Well, let me ask you this. The person who's standing -- as we're looking at the photograph -- to the right with the hat and the beard. So standing in the photograph immediately to your left, do you know who that person is?

A Yeah. That's my nephew, Nicholas.

Q The person behind Nicholas.

A That would be Chaim Freund. Look, I was very consistent. Even here, I said I don't know if I deserve the honor. I think I told that to you earlier today.

Q That's true.

A And it also says that they help people who are incarcerated. I think I said that earlier today, as well. So I like to hear I'm

very consistent.

Q Well, the thing I'll remember is your humility.

MR. MACGIOLLABHUI: Very well. I think that is it. No more questions. Thank you, Mr. Aidala.

A All right. God bless. Zai gezunt.

MR. ANSARI: Thank you, Niall.

MR. MACGIOLLABHUI: Susan?

MS. SCHARFSTEIN: I don't have any questions for the witness. Thank you for your time, though.

MR. MACGIOLLABHUI: Very well. I think -- give me a moment. I just want to make sure I have all the exhibits in. I think I do.

MS. SCHARFSTEIN: Niall, can you fill in the missing exhibit. I don't think I received them all.

MR. MACGIOLLABHUI: Yeah. I'll do that. And Imran, I'll send you, as well -- what I'll do is I'll put everything into Google drive for both of you, including that complete

transcript. I think it's 199.

So I'll put that in as 199, and the one that I referred to as 199 previously, I'll change the designation of that to 199A. Okay.

So I think that's everything. Again, Mr. Aidala, thank you. Imran, thank you, too. And enjoy the rest of your day.

MR. ANSARI: Yeah. I just want to -- on the record, since there was some question as to the protective order, to the extent I can, I think we have to revisit that perhaps after this --

MR. MACGIOLLABHUI: That's fine.

MR. ANSARI: I request that this be deemed confidential pursuant to the protective order.

And if it doesn't allow that -- because I was under the impression based on our e-mail back and forth that there was a protective order that one could avail themselves to designate a

ARTHUR AIDALA

transcript confidential -- then I would reserve my right to -- I guess I would have to intervene and make a motion before the Court to -- for confidentiality or for a protective order governing this deposition.

MR. MACGIOLLABHUI: I'll leave that with you. I'll say that the extent of our exchange about the protective order was you asked me whether there was one, and I sent it to you. We didn't have any -- I don't think we spoke at all.

So everything is by e-mail, but I will leave that with you, and you can let me know if you want to do something in relation to it.

As I said previously, I think the only context in which we've used the protective order so far is in relation to document discovery. It definitely hasn't been used in relation to depositions, but -- you know, I'll leave it with you.

ARTHUR AIDALA

You can let me know if you want to use it or if you're open to do something else. And I guess we'll deal with it at that time.

MR. ANSARI: Yeah. I don't -- there may not be any issues, but just for preservation on the record right now, I would request that it be treated confidential to the extent that it can be right now. And if not, I would approach the Court and make an application.

MR. MACGIOLLABHUI: Again, just in regards to the record, I'm not going to agree to that, but if you want to follow up by e-mail and say whatever it is you want to say, I'll, you know, address it that time.

MS. SCHARFSTEIN: Well, Niall --

MR. MACGIOLLABHUI: I can tell you this, that -- you know, the next step in this will be for me to get the transcript and to -- you know what? I'll give you an opportunity. I'm

ARTHUR AIDALA

assuming you want a copy of the transcript.

MR. ANSARI: Yeah, of course. I would think you would have to send it to me regardless if I would like to or my client would like to avail himself of the errata sheet.

MR. MACGIOLLABHUI: I think -- just for purposes of being in federal court, I think the rule is you have to request it, otherwise you have to pay for it. But I wouldn't want to put you through that expense.

MR. ANSARI: No. I'm requesting it.

MR. MACGIOLLABHUI: So what I'm going to do is I'll send it to you once I get it, and then once you have it -- I'm not going to -- obviously nothing is going to happen between now and then.

Once you get it, you can let me know if you want to do something in terms of confidentiality, and we'll

address it at that time.

MS. SCHARFSTEIN: Niall, my interest in this is that if things are going to be held as confidential, I want them to be marked so there's no inadvertency. So can we put something on the cover page of the transcript to just indicate that this issue is at least under discussion?

MR. MACGIOLLABHUI: No. I'm not going to do that. Absolutely not. No. I'm not agreeing to anything in terms of confidentiality unless --

MS. SCHARFSTEIN: I'm not --

MR. MACGIOLLABHUI: I have to. Unless I have to.

MS. SCHARFSTEIN: I'm not saying that you should. I'm not saying that you should consider it and there shouldn't be further discussion.

MR. MACGIOLLABHUI: There's nothing going on -- there's nothing going on the cover. Let me tell you that. Nothing.

ARTHUR AIDALA

MS. SCHARFSTEIN: I'm just concerned that --

MR. MACGIOLLABHUI: Nothing.

MS. SCHARFSTEIN: -- if I use the transcript in a Court submission, I or someone in my office may inadvertently submit it without filing it under seal, and it's just that inadvertency that I'm trying to avoid.

MR. MACGIOLLABHUI: Susan. Susan, we don't have the transcript yet. When we get the transcript, I will send it to both Imran and to you, and we'll address it at that time.

MS. SCHARFSTEIN: But then it's too late to mark the transcript. That's --

MR. MACGIOLLABHUI: It's not getting marked. There's no basis to mark it. I'm not marking it.

MS. SCHARFSTEIN: All right. Look, I'm not going to argue with you about it. What you're saying makes absolutely no sense. People -- a

document, if it's provisionally confidential or it might be --

MR. MACGIOLLABHUI: It's not -- that's the point, Susan. It's not provisionally confidential.

MS. SCHARFSTEIN: So you're --

MR. MACGIOLLABHUI: There's nothing right now. There's nothing right now.

MS. SCHARFSTEIN: Well, if counsel for the witness has said that he wants to review his options, you're going to -- not going to agree to at least temporarily hold it as confidential --

MR. MACGIOLLABHUI: No. I'm not agreeing to anything. I don't have the transcript yet. So, you know --

MR. ANSARI: Niall, I mean --

MR. MACGIOLLABHUI: He can do what he wants in the meantime, but as of now, I'm not agreeing to anything. I'm not saying I won't --

MS. SCHARFSTEIN: Well, then I can't -- I can't assure anyone that

ARTHUR AIDALA

there won't be an inadvertency if the confidential -- if the transcript is ultimately confidential and it's not marked appropriately.

So I'll just say that, and that's my position, and I'll leave it at that.

MR. ANSARI: I mean, can we just be a little straightforward and candid, rather than, you know, dance around words.

Do either of you have any intention of using this transcript in any public filing in the -- in the short term? Like, Niall, if you get a rough of it or something? I mean, I'd like to know.

MR. MACGIOLLABHUI: No. I mean, Imran, I don't foresee it being used until we get to summary judgment. So --

MR. ANSARI: And I'm not involved in your case. I'm not in your case.

MR. MACGIOLLABHUI: Right.

MR. ANSARI: I don't want to be in

ARTHUR AIDALA

your case. My client doesn't want to be in your case --

MR. MACGIOLLABHUI: Right.

MR. ANSARI: -- to the extent we don't have to, so how far along are you guys? When does that happen.

MR. MACGIOLLABHUI: We're going to finish up discovery the end of July. So we have about another month of that.

Look, Imran, I have no problem -- I don't want to sound sort of discourteous. It's just that I don't want the transcript marked in any way. But if I intend to use it for any purpose, I'm going to give you a heads up. You know, I have no problem doing that.

But the thing is I don't plan to use this any different to any other transcript, which is why I don't want it marked any differently, which is I expect to be using most, if not all of them, when we come to summary judgement, as you would in the normal

ARTHUR AIDALA

course of things.

You know, if in the meantime you think there's a basis to treat it differently, we'll address it at that time. And I'm not saying I won't agree to it, but I'm not agreeing to something at this point in time.

MS. SCHARFSTEIN: I think you're misunderstanding what I'm saying.

MR. MACGIOLLABHUI: No. I'm not misunderstanding, Susan.

MS. SCHARFSTEIN: I think -- I think I'm not --

MR. MACGIOLLABHUI: I'm not --

MS. SCHARFSTEIN: -- talking about whether or not something is ultimately confidential or not. I'm talking about marking things so there's no inadvertency. Because if the Court later decides that it's going to approve a confidentiality designation, you're not going to have a choice. So all I'm saying that --

MR. MACGIOLLABHUI: How about

ARTHUR AIDALA

this --

MS. SCHARFSTEIN: Are you ever going to let me finish a sentence?

MR. MACGIOLLABHUI: Finish your sentence.

MS. SCHARFSTEIN: My point is just that if there's a possibility that it's going to be designated confidential, we should take appropriate precautions so that there's no inadvertency in the future.

That doesn't mean it's ultimately confidential or not confidential. It just means the documents are marked so people don't make mistakes in their handling.

MR. MACGIOLLABHUI: How about this? If it does get designated as confidential at a future point, then I'll agree to have it marked as such, but I'm not agreeing --

MS. SCHARFSTEIN: So you're going to go back to the reporter, ask them to issue another copy with a confidential

ARTHUR AIDALA

marking on it?

MR. MACGIOLLABHUI: It's a PDF document. It's not hard to do. But I'm not doing it ahead of time.

MS. SCHARFSTEIN: All right. So we'll just leave it that it's your burden to do that and make sure that the appropriately-marked copies are distributed to everyone who has --

MR. MACGIOLLABHUI: Listen, Susan. You know, we all have obligations if something is marked confidential to treat it accordingly. I'll take care of my own --

MS. SCHARFSTEIN: I'm not --

MR. MACGIOLLABHUI: -- obligations. I'm not responsible to yours.

MS. SCHARFSTEIN: -- discussing anything further. Have a nice day.

MR. ANSARI: All right, everyone. Have a nice day. Thank you.

(TIME NOTED: 4:34 p.m.)

(Plaintiff's Exhibits 197 through

ARTHUR AIDALA

202 were marked for identification at the conclusion of the deposition.)

______________________
ARTHUR AIDALA

Subscribed and sworn to
Before me this _____ day
Of ______________, 2022.
_______________________
NOTARY PUBLIC

ARTHUR AIDALA

INDEX


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| A. Aidala | Mr. MacGiollabhui | 3 |


EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Plaintiff 197 | Part 11 Status Sheet, 6/16/08, 1 page. | 123 |
| Plaintiff 198 | Brooklyn Daily Eagle article, 9/11/15, 3 pages. | 123 |
| Plaintiff 199 | Transcript, 10/3/11, 74 pages. | 123 |
| Plaintiff 199A | Transcript excerpt, 10/3/11, 4 pages. | 123 |
| Plaintiff 200 | 1/10/22 letter, 1 page. | 123 |
| Plaintiff 201 | Subpoena to produce documents, 3 pages. | 123 |
| Plaintiff 202 | Transcript excerpt, 3/4/10, 3 pages. | 123 |

ARTHUR AIDALA

CERTIFICATION

STATE OF NEW YORK )
) SS
COUNTY OF SUFFOLK

I, KYRA KUSTIN, a stenotype reporter and Notary Public within and for the State of New York, do hereby certify;

That the witness whose Examination Before Trial is hereinbefore set forth was duly sworn by me;

That such Examination Before Trial is a true and accurate record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 18th day of July, 2022.

K. Kustin
______________________
KYRA KUSTIN

**A**

**A-i-d-a-l-a** 3:11
**A-r-t-h-u-r** 3:9
**ability** 6:25 38:5 54:5
**able** 92:25
**above-noted** 1:17
**absence** 9:24 11:18 107:2
**absolutely** 9:3 16:2 36:3 63:10 115:12 116:25
**abused** 87:10
**abusing** 23:21 86:17 88:6
**accompanying** 54:22
**accurate** 6:25 7:6 98:12 108:15 125:13
**accused** 23:21
**action** 4:11 125:16
**actions** 25:4 69:12
**active** 44:16
**activity** 10:10
**actual** 20:9 76:11 77:4,12 80:12
**ADA** 18:7 24:14,21 25:6 27:22 29:3 60:15 63:22 64:14 64:17,25
**ADAs** 19:24,24
**addict** 68:3
**addition** 21:22
**additional** 74:8
**address** 3:12,15,17 113:19 115:2 116:15 120:5
**adequate** 21:19 22:12
**adjourn** 21:7
**Administrator** 1:7 2:10
**admissible** 22:13
**admission** 33:4 83:11
**admissions** 80:21 86:15
**admitted** 34:15 76:20 81:15 86:3 86:12,13,17 87:2 87:3 88:6
**advance** 6:9
**affect** 6:24
**affidavit** 51:9 52:9 52:9 88:12,19 89:21 90:3,14
**affidavits** 74:7,13 74:16,24 76:4,10 76:25 77:2 78:14 78:18 80:11 87:8
**affiliated** 48:13
**affirmation** 74:5 91:17
**affirmations** 74:6
**afoul** 20:2
**afternoon** 3:25 4:11
**ago** 34:6 69:4 108:2
**agree** 46:6,8 98:4 113:16 117:14 120:6 121:21
**agreed** 5:14,20 66:7
**agreeing** 115:13 117:17,22 120:7 121:22
**agreement** 45:10 91:18,22,25 93:9
**agreements** 45:19
**ahead** 4:18 20:14 21:2 122:5
**Aidala** 1:14 2:14 3:1,10,25 4:1 5:1 5:23 6:1,12 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1,4 17:1 18:1 19:1 20:1,6 21:1,13 22:1 23:1 23:20 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1,3 35:1 36:1,14 37:1 38:1 39:1,22 40:1 41:1,19 42:1 43:1 43:12 44:1 45:1 46:1 47:1 48:1,10 49:1 50:1 51:1 52:1 53:1 54:1,4 55:1 56:1 57:1,9 58:1,19,21,25 59:1,2 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1,14 71:1,2 72:1 73:1 74:1,4 75:1 76:1 77:1 78:1 79:1 80:1,9 81:1 82:1 83:1 84:1 85:1,22 85:22 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1,5 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1,7 111:1,8 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1,7 124:1,3 125:1
**Aiello** 48:21,22,24
**Alan** 57:17 60:8 61:20 63:21 72:17 98:23 102:5,5 104:17,17
**Albanese** 8:20,24
**Albanese's** 9:8,13 12:20
**Alexis** 64:16,17
**allegations** 34:16 76:21 81:17 86:4 89:20,22 90:6,15
**alleged** 49:5 65:15 89:14
**allow** 15:18 79:23 97:15 111:21
**allowed** 35:9 78:3 78:22
**alumni** 12:13,14
**amicable** 61:9
**amicably** 46:15
**Angelo** 11:13,15
**anniversary** 9:5
**Ansari** 2:17 3:16 5:21 11:9 12:3 14:25 15:13,21 20:14,16,22 23:23 24:7,22 27:25 29:11,13 31:13 32:18 33:21 36:7 37:24 41:8,24 43:7,16 45:4 46:5 47:17,21 48:2,15 48:17 49:22,25 50:6 51:12 54:11 54:20 55:7,13 56:7 59:12 60:3 60:12,23 62:24 63:14 67:7,16,25 69:9,23 70:2 71:11,13 72:4,12 73:4,7,9,24 75:2 75:21 76:7 77:6,8 77:19,23 78:4,21 79:2,18 80:15,20 81:19,22 82:13,22 83:3,19,25 84:9 84:20 85:11,14,18 86:6,20 87:12,18 89:8,17 90:11 92:3,5,20 93:3 94:19 95:4,24 96:9 97:17,24 101:2,9,20 104:7 104:14 107:7 108:9,23 110:9 111:11,18 113:6 114:4,15 117:19 118:8,22,25 119:5 122:22
**answer** 17:6 19:13 34:25 41:9 45:5 45:21 46:14 47:3 47:10,15 48:18 57:2,6 64:23 75:25 79:16,18,23 82:10,11,21 83:17 86:7,23 92:7 102:2 105:5 106:19
**answered** 6:21 86:7
**answers** 66:20
**anti-Semitic** 96:17
**anybody** 6:7,8 14:2
**Apart** 44:10
**appeal** 72:17 105:10
**appearance** 53:5
**appeared** 40:21 41:11 104:12
**appears** 40:8,10 75:3 94:13
**Appellate** 103:15 104:15
**application** 5:25 33:2,24 46:12 104:11,13 105:2,3 113:13
**apply** 20:5,6
**appointment** 58:21 59:3
**appreciate** 4:8 15:24 22:15
**approach** 113:12
**approached** 89:14
**appropriate** 35:21 43:22 92:14 121:10
**appropriately** 118:5
**appropriately-m...** 122:9
**approval** 37:22 71:2,9
**approve** 71:18 120:22
**approved** 72:2
**April** 58:3 95:18
**area** 44:17 54:24
**areas** 55:24 82:6
**argue** 116:23
**argument** 104:20 104:24 105:12
**arises** 58:6
**Arnie** 103:6,8

**arraignment** 14:23
**arrested** 14:24 65:12,15 99:13
**Arthur** 1:14 3:1,8 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1,19,20,24 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1,7 124:1 125:1
**article** 106:12 109:3 124:7
**Artie** 106:10
**Arzt** 106:2,3,5,10 106:11,14
**Ashkenazi** 107:25 108:17,20,20
**asked** 10:11 41:10 56:23 64:11 71:23 84:7 86:6 112:11
**asking** 30:3 44:21 81:13 84:20
**aspect** 10:24
**aspects** 100:9
**assigned** 105:8,9
**assisted** 43:5 45:2 47:5 48:11
**Associates** 12:6,15
**Association** 12:10 40:18,19
**assume** 6:20
**assumed** 23:20
**assuming** 24:24 35:9 37:17 114:2
**assure** 117:25
**attached** 94:9
**attachments** 93:17 94:3
**attacked** 97:6
**attempt** 89:15
**attention** 14:13 18:12 40:2 47:9 52:19,21,25 57:10 57:11 58:23 61:5 76:15 80:25 85:24 90:7,16,19,21
**attorney** 9:23 29:14 33:5 40:14 48:20
**Attorney's** 32:6,17 33:8 40:6 61:10 93:10
**attorney-client** 29:18
**attorneys** 2:4,9,15 13:18 15:10 17:9
**audio** 5:12 6:6
**August** 37:2 51:9
**authenticate** 84:25
**authorities** 96:22
**authority** 72:8
**authorization** 21:5
**avail** 111:25 114:7
**available** 53:23,25
**Avenue** 2:5,15 3:20 11:12 13:11
**avoid** 116:10
**award** 44:19
**aware** 71:25 75:18 81:15,18 85:23 86:2 88:5 96:2 108:19

**B**

**B** 78:11 79:12
**back** 23:12,14,17 46:18 47:25 51:5 59:14 70:6,9 79:2 83:23 84:12,15 90:21 100:8 106:15 111:23 121:24
**background** 8:8
**bad** 96:16,18
**bail** 16:15 97:4 104:6,10 105:2,10
**ball** 99:10
**bar** 8:22 40:18,19
**Baruch** 14:15,22 15:8 17:21 18:16 26:20 36:14 37:21 38:20 39:4 49:5 53:6 60:20 61:23 65:7,9,9,16 66:12 66:14,16 67:11,18 67:21 69:5,17,21 71:23 73:13 74:25 76:12,20 77:5 80:12,23 88:5 89:7,15,23 90:4 94:11,17 95:15 96:12 97:3 98:5 98:20 100:20 103:14 104:13
**base** 42:17
**based** 22:5,5,6 24:24 42:13 56:23 111:23
**basically** 21:24 64:10
**basis** 21:22 44:13 46:3 100:21 101:5 116:20 120:4
**Batsidis** 64:25
**bear** 31:10 58:14
**beard** 96:15 97:12 109:8,14
**beat** 96:16,18
**beaten** 96:21
**beginning** 53:22
**begins** 53:14
**behalf** 32:11,15 37:13 48:12 92:2 93:9 94:10,17 96:8 98:4,15 104:12 107:5
**believe** 4:23 8:2 12:10 15:2,3 23:25 25:8 34:19 34:19 35:7,10 42:13 45:14 48:19 52:8 58:4 64:4 66:9 81:5 87:15 91:16 95:17,19 98:2,2 101:3,14 101:19,21 102:3,5 105:15 108:15 109:3
**believing** 8:15,25
**bell** 12:4 101:22
**BERTUNA** 2:14
**Beryl** 107:25 108:20
**best** 41:25 42:5 83:12
**better** 52:11 90:13
**beyond** 30:4 102:12 105:23
**big** 50:4 63:20 67:19
**bigger** 42:17
**bill** 100:14,16
**billing** 100:7,9,11
**bit** 18:3 35:12
**bless** 110:8
**blood** 125:16
**bono** 44:13
**Boro** 44:15
**bother** 84:11
**bottom** 18:2 28:24 36:18 39:11
**boy** 97:10,10,10
**Brafman** 102:6
**brain** 44:12
**break** 21:8 31:14 47:19
**breakup** 103:7
**bring** 31:15 47:9
**bringing** 52:21
**broke** 36:7
**Brooklyn** 8:16,21 8:23 11:11 13:10 15:7 40:19 42:13 44:15,17 50:10 60:15 64:7,8 95:20 98:18 103:8 109:2 124:7
**brother** 108:17
**brothers** 99:2
**brought** 52:18,24 90:6,15,18
**bullshit** 103:4
**burden** 122:8
**Bureau** 26:4
**bus** 96:14

**C**

**C** 2:2
**call** 23:7 57:22 60:19
**called** 12:5,9 14:6 60:10 61:10,14 63:24 74:4,6 96:15,19 108:14
**calling** 61:18 64:2 97:10 106:10
**calls** 29:14 95:21
**camera** 32:8,21 33:16,17
**campaign** 8:20 9:8 9:23 10:2,4,21 11:4,8,11,21 12:24 13:2 106:6 106:24 107:6,13 107:16
**campaigns** 9:10,12

9:13,14,15,17,21 10:11 11:5,7
**candid** 118:9
**candidly** 34:17 76:22
**canvassing** 10:16
**care** 122:14
**carried** 70:25
**carrying** 10:16
**cars** 69:3
**case** 5:7 8:3 16:25 19:3,5 24:17,21 25:7,13,20 26:2,5 26:11,15,19 34:22 34:23 37:21 40:4 40:22 41:12 44:22 46:7 50:11 53:6 55:8 57:17 59:9 59:23 60:9,20 61:2,23 62:12,21 63:2 64:10 65:6 67:4,13,20 68:13 68:17,25 69:6,8 69:19 70:23 71:21 72:11 73:13,20 74:23,25 75:6 76:24 80:9 81:10 81:10 87:7 91:4 91:10 95:14 96:6 97:4,14,19 98:15 98:15,23 99:3,4 99:22 103:14,16 103:21,23 104:2,5 105:8,10 107:22 118:23,23 119:2,3
**cases** 26:23,24 27:17 28:20 38:14 67:17,24 68:23,24
**catch** 19:13
**caught** 68:3
**cause** 69:10 82:6
**certain** 54:24 97:21 100:8
**CERTIFICATION** 125:2
**certify** 125:8,15
**Chaim** 42:21,23 99:2 109:18
**chain** 95:5
**chains** 102:11
**change** 5:15 111:5
**character** 89:6
**charge** 95:11
**charisma** 44:8
**charitable** 42:12
**Charles** 1:7 2:10 12:18 58:18,24
**charm** 44:7
**cherry** 54:23
**children** 23:22 65:10,16 97:7
**chimed** 104:21
**chitchat** 64:7
**choice** 120:23
**choose** 105:11
**Church** 2:11
**cite** 46:6 55:24
**city** 1:7 2:8,9 8:11 9:2 13:23
**civil** 1:16 4:24 7:20 7:23 20:2 100:10 100:10
**civilian** 10:2
**claim** 98:7
**clarify** 29:19 41:10 53:15 55:25 56:20 62:3
**clear** 26:14 37:5 63:11 67:9
**clearly** 63:20
**clerical** 33:13
**client** 5:9,12 15:18 15:19 29:15,25 32:16 36:10 41:11 41:14 44:24 45:5 45:8,21 46:13 47:13 49:14 50:21 55:8 56:9,16 57:7 68:9 69:11 70:13 75:12,18 77:10 78:9 79:23 80:21 80:23 81:23 83:5 83:10 84:24 86:11 86:15 87:19 92:7 94:10 99:9 114:7 119:2
**client's** 24:5,5 55:15 71:14 77:14 79:5 86:22
**clients** 32:11 45:9 100:14
**close** 38:24 44:15 88:11
**closed** 59:20
**co-counsel** 29:9,16 29:24 94:16
**Cody** 14:9,11
**Collins** 103:21,23
**colored** 57:2
**combination** 44:7
**come** 9:7 16:21 47:25 49:4 66:7 68:16 91:22 119:24
**coming** 46:17
**comment** 4:17
**comments** 106:12
**communication** 66:25
**communications** 25:12,15,16,18
**community** 43:3 44:16,17 88:22
**competitive** 10:4
**complainants** 24:18 27:17 28:20 38:14,18
**Complaining** 18:23 18:24 19:5,7 21:15
**complete** 110:25
**completely** 86:22
**compliment** 59:18
**concerned** 47:7 116:3
**concerning** 25:13 25:19 26:11 65:6 65:16 69:19
**conclusion** 35:13 123:3
**conditions** 35:20
**Coney** 11:12
**confidential** 32:9 32:22 111:19 112:2 113:10 115:5 117:3,6,15 118:3,4 120:18 121:9,14,14,20,25 122:13
**confidentiality** 112:6 114:25 115:14 120:22
**congratulate** 14:6
**congress** 8:21
**congressional** 8:19
**conjunction** 101:8
**connected** 44:23
**connection** 5:6 42:4 61:22 66:12,16 69:8 73:12 74:25 75:12 89:22
**consider** 46:19 115:20
**consistent** 109:19 110:2
**contact** 69:7,18 70:15,19
**content** 94:21 97:22
**contents** 94:4
**context** 7:20,23 54:5 79:20 83:4 96:3 112:20
**continue** 29:3 78:24
**control** 17:22 27:9 31:12 49:20,21
**convention** 19:2,21 19:25 23:6
**conversation** 21:17 49:13 50:20 51:2 51:21 52:10,18 64:6,8 70:22 94:25 98:19
**conversations** 25:4 29:15 30:6 37:11 86:14 98:14
**convicted** 7:9
**conviction** 59:10,24 60:16,20 69:6,17 71:22 72:9 75:10 100:25
**cooperating** 38:19 40:5
**coordinate** 106:11
**coordinator** 102:4
**copies** 5:11 122:9
**copy** 6:8 31:11 32:5 32:16 33:7 54:15 93:20 114:2 121:25
**cordial** 77:24
**CORPORATION** 2:8
**correct** 11:23 13:4 13:20,25 15:12 23:22 27:19 28:22 37:18 38:16 41:16 46:9 53:2 57:25 60:18 63:5 76:8 80:24 91:15,16,21 94:22 95:19 99:18
**correctly** 45:23 76:2
**correspondence** 30:6
**corresponds** 19:3
**council** 9:2 13:23
**counsel** 2:8 18:6 24:14,20 27:21 34:14,14,20 36:21 72:11 76:19,19 81:5,12 87:25 88:2 117:11
**Counselor** 30:12
**counsels** 29:3
**COUNTY** 125:4
**couple** 6:13 58:12
**course** 15:23 114:4 120:2
**court** 1:2 5:19 6:2 31:25 32:15,22 33:25 39:9 46:12 46:13,20 84:11 89:3 112:5 113:12 114:11 116:6 120:20
**Court's** 21:5 47:9
**courtesy** 15:24
**cover** 115:8,24
**crap** 103:13
**crime** 7:10

**crimes** 20:4 26:3
**criminal** 7:20 42:15 42:16 43:14 100:11,13
**cruise** 65:20,21,24
**current** 13:10 19:24
**cursor** 16:5 17:22 18:5 27:9 31:12 49:21 51:5 58:17
**curve** 99:10

**D**

**D** 3:2
**D-R-O-R** 42:8
**DA** 62:14 103:8
**DA's** 8:16,23 11:18 12:21 13:2 15:7 25:13 26:18 29:23 30:3,7 32:23 33:12 37:3,22 50:11,25 52:5,22 58:11 59:25 60:10 60:15 63:21 71:22 92:2 95:10,20 97:15 98:7 106:21 108:7
**Daily** 124:7
**dance** 118:10
**danger** 107:11
**date** 18:9 22:11 27:21 44:3 46:16 58:19 75:4,8 90:13
**dated** 15:7 17:20 18:15 27:7 28:12 36:13 51:9 88:13 101:16 109:3
**dates** 76:9
**day** 11:2 97:3 107:19 111:10 122:21,23 123:10 125:20
**days** 39:4
**deal** 63:20 67:19 113:4
**dealing** 69:4
**decades** 106:15
**December** 27:7
**decide** 16:16
**decides** 46:13 120:21
**decision** 104:6
**decisions** 38:6
**deemed** 111:19
**defendant** 15:8
**defendant's** 34:9
**defendants** 1:8 2:9 43:15
**defense** 15:10 18:6 24:14,20 27:21 29:3 36:21
**definitely** 16:25 56:14 81:11 112:22
**delayed** 97:15 98:5
**delightful** 8:4
**department** 105:11
**deposed** 62:21 63:2
**deposition** 1:14 4:7 4:22 6:14 17:19 21:7 49:9 54:22 55:21 72:23 82:18 84:2 107:21 112:7 123:3
**depositions** 17:14 112:24
**Dershowitz** 57:18 57:21 60:8 61:20 61:24 62:10,13 63:17,22,23 64:9 64:20 65:5,19,19 65:25 66:5,15,18 72:17,19 98:23 99:4 101:8 104:17 104:18,21
**Dershowitz's** 67:3 102:5
**describe** 62:7,15
**DESCRIPTION** 124:6
**deserve** 109:20
**designate** 111:25
**designated** 121:9 121:19
**designation** 111:5
120:22
**desk** 13:11
**destroy** 107:12
**detail** 64:12
**detailed** 93:23
**details** 100:17
**difference** 102:11
**different** 23:19,22 43:11 47:11 50:5 51:6 54:17 119:20
**differentiating** 52:12
**differently** 119:22 120:5
**direct** 14:13 18:12 58:23 90:21
**disclosed** 96:3
**discourteous** 119:13
**discovery** 112:22 119:9
**discussed** 19:2,21 35:17 51:25 52:6
**discussing** 48:11 52:4,14 98:17 122:20
**discussion** 19:17 23:10 115:10,21
**disgruntled** 103:19
**disposition** 24:15 24:21 27:22 28:3 29:2,10,25 30:7,8 30:10,11,11,13 32:3 35:25 37:13 37:21
**disruption** 36:6
**distinct** 61:16,17,19
**distinction** 63:9
**distributed** 122:10
**District** 1:2,2 32:6 32:16 33:5,8 40:5 61:10 93:10
**Division** 103:15 104:15
**divorce** 8:5
**Docket** 1:5
**doctor's** 31:5
**document** 14:18
15:19 18:17 21:25 22:5 28:14 30:16 30:17 31:9 32:13 33:22 34:4 35:3,6 36:15,19 39:3,14 49:11,16 50:8,18 51:11,19 56:24 57:4 59:8 72:24 72:25 74:4 78:13 83:7,14 84:21,23 86:2 88:12,17 93:14 101:15 102:15 112:22 117:2 122:4
**documents** 93:19 94:2,4 99:16,23 121:15
**documents,123** 124:11
**Dodgers** 98:18
**doing** 12:11 27:24 28:2,7 31:13 68:10 78:23 93:19 105:10 119:17 122:5
**Dominic** 9:14
**door** 10:15,15 59:20
**draft** 85:2 94:10 97:20
**drafter** 83:13
**drafting** 77:16 78:17 79:11 81:25
**drive** 110:24
**DROR** 42:7 43:13 43:24 44:25 47:4 48:11
**drove** 96:21
**drugs** 68:3
**duly** 3:3 125:10
**DWI** 68:6

**E**

**E** 2:2,2
**e-mail** 39:15,19 49:25 50:4 51:12 55:6,12 93:15 94:6,9,14,20 95:5 95:6 102:11,22 106:8 111:23 112:15 113:17
**e-mailed** 15:16 73:5
**e-mails** 95:9 105:16
**Eagle** 109:2 124:7
**earlier** 26:16 41:23 81:5 109:21,25
**early** 11:15
**easily** 59:19
**EASTERN** 1:2
**Ebbets** 64:5 98:17
**educational** 8:8
**effort** 32:2
**efforts** 37:12,15
**either** 16:21 19:24 21:7 37:20 41:22 44:22,24 56:16 65:20 74:15 89:15 89:23 102:5 108:19 118:12
**elder** 11:13
**election** 11:2 13:23 13:24 14:5 107:11 107:18
**elicited** 83:5
**eliciting** 92:17
**Elizabeth** 15:10
**else's** 69:11
**employed** 106:21
**enjoy** 111:9
**entered** 13:18 91:25 93:8
**entire** 25:9 55:19 57:4 102:15
**entirely** 46:8 47:16
**entitled** 18:20
**entries** 58:13
**entry** 58:22
**envious** 103:19
**errata** 114:8
**error** 33:13
**Esq** 2:6,12,17 58:19 58:25
**essential** 18:20
**ESTATE** 1:7 2:10
**event** 12:13,15 33:5 33:23

**events** 12:13
**eventually** 13:9
**everybody** 48:5
**evidence** 103:17
**exactly** 14:12 72:14 88:23
**exam** 8:22
**examination** 3:23 20:8 124:3 125:9 125:12
**examined** 3:4
**example** 21:13 47:3
**excerpt** 39:3 53:5 59:15 124:9,12
**exchange** 112:10
**exchanges** 30:2 102:16
**excluded** 33:4
**excuse** 4:4 7:18 36:9 71:2 77:17 104:17
**exhibit** 15:15 17:8 17:14,19 18:14 28:9,11 30:15,23 39:2 51:6,6 54:21 55:4,20,22 73:7 76:16 77:11 84:23 85:25 90:22 99:23 102:21 109:2 110:19
**exhibits** 30:19 38:24 102:7 110:16 122:25 124:5
**expect** 119:23
**expected** 66:8,10
**expended** 100:18
**expense** 114:14
**experience** 8:5 33:19
**extent** 5:22 10:21 29:14,17 33:23 34:15 45:6,17 54:20 55:8,16 56:25 69:10 71:14 76:21 77:9 81:17 86:3 87:2,3,3,4,6 111:14 112:10 113:10 119:5
**extort** 89:15
**extortion** 64:10 65:6,15 98:25

**F**

**face** 89:10
**faces** 59:20
**facility** 96:13
**fact** 24:17 46:4 57:3 75:6 77:4 80:12
**facts** 18:20 92:15
**fair** 6:21 17:8,11 28:19 32:10 37:19 46:22
**familiar** 93:25
**family** 72:16 89:16 96:19 108:21
**far** 47:7 112:21 119:6
**FBI** 57:14
**fear** 107:10
**February** 28:12,17 29:8
**federal** 1:15 4:24 114:10
**feel** 16:4 78:6
**fees** 43:5,14 45:3,25 47:6 48:12
**fell** 33:12
**Fiddler's** 9:15
**Field** 64:5 98:18
**Fifth** 3:20
**figure** 50:4
**filing** 116:8 118:14
**fill** 110:19
**final** 90:22 109:2
**find** 14:2 17:15 58:14
**fine** 3:18 6:3 16:2 47:20 48:2,7 56:3 85:11,18,19 102:15 111:17
**finish** 53:12 119:9 121:4,5
**finished** 20:11 39:23 88:15 93:6
**firm** 3:17 41:14,18 45:8,9
**firm's** 44:24
**first** 3:3 4:13 6:16 13:21 14:24 17:4 17:5 21:2 23:9 31:17 33:24 34:3 34:5,13,22,23 49:19 52:12,13 57:12,13 63:24 70:6 73:3,19 76:18 81:4,7,11 93:15 97:16 102:12,12,17 105:17 106:8
**five** 12:5
**five-minute** 47:19
**flat-fee** 100:15,21 101:5
**floor** 2:15 37:22 58:19,25
**Florida** 91:5,10
**focus** 57:11
**focused** 29:22 30:2
**follow** 113:17
**following** 52:10 58:3 59:10,23 69:6,16 71:22 72:9 75:9
**follows** 3:5 34:13
**force** 46:23
**foresee** 118:19
**forgot** 12:7 86:16 99:11,12
**form** 11:9 12:3 13:6 14:25 23:23 24:7 24:22 25:25 27:25 29:11 37:24 41:8 48:17 56:25 59:12 60:3,23 62:24 63:14 67:16,25 69:2,9,23 72:4,12 75:2,22 77:8 80:17,20 81:22 82:14,19 86:20 87:12 89:8,17 90:11 92:3,19 94:2,19 95:9,24 96:9 97:17 101:2 101:9 104:7,14 107:7 108:9,23
**formal** 11:8
**formed** 12:10
**former** 19:24
**formulating** 21:23
**forth** 79:3 89:21 111:23 125:10
**forward** 5:2 91:20
**Foundation** 12:18
**four** 26:18 68:21 88:21
**four-person** 103:10
**fourth** 103:9
**framework** 79:19
**frankly** 99:12
**free** 53:8
**Freund** 42:21,23 109:18
**Friedman** 88:13,20 89:5,13
**Friedmans** 88:22
**friend** 62:5,18
**front** 32:9
**full** 55:3 56:5 103:17
**fully** 34:15 76:20 86:3,12,12 87:2
**fun** 96:17
**fundraising** 10:10 10:24,24
**further** 33:3 35:13 115:21 122:21 125:15
**future** 55:23 121:12 121:20

**G**

**G-a-b-b-a-i** 89:3
**Gabbai** 88:25
**general** 9:23 32:14 44:16 90:3
**genesis** 50:7
**gentlemen** 11:13
**George** 106:2,3
**getting** 44:19 92:16 116:20
**gezunt** 110:8
**gist** 90:3
**give** 5:14 6:9,25 49:20 110:15 113:25 119:16
**given** 32:5,16 33:8 125:13
**giving** 7:6
**go** 4:18 5:2 16:17 19:16 20:14,25 21:12,16 22:23 23:8,12 27:8 56:18 57:13 63:12 79:2 81:23 106:15 121:24
**God** 110:8
**going** 4:13 5:4,9 6:14 8:5 9:6 10:15 10:15 14:13,14 15:5,13 17:5,12 17:17,25 18:12,16 20:7,18 21:21 22:9 28:10 30:14 30:16 31:11,15,23 34:12 35:12 36:4 36:10,17,18 38:23 38:24 39:2 43:7 43:16 45:4 46:23 49:8 51:7 53:3,4 54:4 56:17 57:10 58:9,11,13 59:14 61:5 62:9,11 67:12,17,21 70:5 72:22,24 73:2,22 74:3 77:24 78:4 80:7 81:19 82:11 83:6 84:6,6 85:9 85:13,16,17 87:20 88:9,11 90:21 92:25 93:12,13,20 93:23 94:3 99:14 99:15,17,20 100:2 101:13,15 102:7 102:16 106:11 107:10,12 108:25 109:4 113:15 114:18,20,21 115:5,12,23,24 116:23 117:13,14

119:8,16 120:21 120:23 121:4,9,23
**Goldman** 16:24 26:10 27:2 34:22 72:10 81:15 86:5 86:14,18
**Goldman's** 31:8,19 31:21 35:2
**good** 3:25 16:18 44:8 47:22,23 93:5
**Google** 110:24
**gotta** 68:11 83:19 83:20
**governing** 112:7
**grabbed** 96:15
**grabbing** 97:11,11
**graduate** 8:10
**graduated** 8:9
**great** 31:3 48:24
**Gregory** 25:8,10,15 25:23 26:5,10 37:3,20 52:2,15
**ground** 9:18
**guards** 96:15,25
**guess** 9:17 10:6 17:5 49:2 72:15 87:20,22 101:19 101:20 103:18 112:3 113:4
**guessing** 95:6
**guilt** 34:15 76:21 81:17 83:11 86:4 87:2,6
**guilty** 87:4
**guy** 68:6
**guys** 119:7

**H**

**H** 2:17 3:2
**hallway** 63:21
**hand** 125:20
**handing** 10:14
**handling** 121:17
**hands** 33:12
**handwriting** 18:3
**handwritten** 36:19
**hanging** 63:25
**happen** 27:3 37:8 67:14 71:25 77:25 98:3 114:21 119:7
**happened** 16:14 98:2
**happens** 62:20
**happy** 46:7 54:14 54:14 56:15
**hard** 96:7 122:4
**hat** 109:7,13
**head** 60:16
**headquarters** 11:12,15
**heads** 119:16
**hear** 20:21 83:19 109:25
**heard** 63:24
**held** 1:10,16 19:17 23:10 115:5
**help** 42:16 43:3,13 109:23
**helping** 42:14 43:20
**helps** 43:2
**hereinbefore** 125:10
**hereunto** 125:19
**Hersh** 42:21
**hiatus** 8:18
**hid** 103:16
**hired** 73:12
**hit** 68:6
**Hitler** 97:10,10
**hitting** 9:18
**hold** 16:14 117:15
**home** 16:11
**honest** 43:19
**honor** 53:14 57:13 109:20
**honored** 43:25 44:4 44:6,20
**horrible** 103:7
**hours** 100:18
**humility** 110:4
**hundred** 24:9 38:11 97:8
**Hynes** 1:7,7 2:9,10 9:20 11:24 12:6,9 12:15,18 58:18,21 58:24 59:3,6,10 59:18 60:2,6 62:14 63:12 66:8 66:9,12,14,18 67:5,13,18,19 68:8,15 69:8,18 70:15,19 71:2,17 71:18,18 72:2 103:9 106:14
**Hynes's** 9:16 11:5 71:8 106:5 107:6
**hysterical** 96:19

**I**

**idea** 47:24 102:4,5
**identical** 74:7
**identification** 15:15 123:2
**identified** 18:23,25 38:18
**identifying** 20:4
**immediately** 109:14
**implicate** 29:17
**Important** 63:9
**Imposition** 35:19
**impression** 111:22
**improper** 4:23
**improved** 97:22
**Imran** 2:17 55:3 56:4 110:22 111:8 116:14 118:19 119:11
**inadvertency** 115:7 116:9 118:2 120:20 121:11
**inadvertently** 116:7
**inappropriate** 78:25
**incarcerated** 43:21 43:23 95:16,22 109:24
**incidents** 34:17 76:23
**included** 61:24
**including** 60:2 65:18 110:25
**INDEX** 124:2
**indicate** 33:7 91:18 115:9
**indicated** 6:4 17:18 18:10 34:25 71:7
**indicates** 18:6
**indict** 97:16
**indicted** 98:6 104:12 105:4
**indictment** 24:19 27:13,16 28:18 34:16 76:22 81:18 86:5 104:3
**individual** 44:23 94:2
**individuals** 43:6
**industry** 24:25
**influence** 6:23
**informal** 64:8
**information** 45:7 45:14,18,25 46:4 68:18 92:15
**informing** 22:2
**initial** 3:9 24:4 82:4 83:8
**inmates** 96:24
**input** 35:5,8
**instruct** 45:5,21
**instructing** 79:16 82:9,21 83:17
**intend** 6:6 119:15
**intention** 6:10 118:13
**interaction** 66:17 66:23 67:5
**interactions** 29:22
**interest** 55:13 115:4
**interested** 53:10 54:18 75:9 125:17
**interpretation** 22:3 22:7
**interrogatory** 46:17
**intervene** 112:4
**intimately** 43:24
**introduction** 31:24 32:25
**investigate** 71:24
**investigation** 70:24 71:8 98:25
**investigator** 64:24 73:12 75:19 80:10 95:7
**involved** 10:5,10,20 10:23 16:25 17:3 26:17 42:18,25 43:24 55:9,17 78:17 108:5 118:22
**involvement** 55:15 67:4 77:15
**Irish** 14:10
**Island** 8:21 11:12
**issue** 46:24 47:6 58:5 115:9 121:25
**issued** 99:21
**issues** 5:18 42:16 113:7
**Italy** 63:4,8
**items** 43:22

**J**

**J** 1:7 2:10
**Jabbar** 103:21,22
**jacket** 16:10
**jail** 29:4 68:4
**January** 94:7 95:15 96:7
**Jaus** 26:7,11,21 37:4,20 38:3,7
**jealous** 103:11,19
**Jerry** 106:17,20
**Jewish** 97:6,9
**Jews** 97:9
**job** 8:19
**Joe** 9:16 59:18 60:6 67:19 103:9
**John** 10:7 40:13,14 41:12 60:11,13,17 60:25 61:2 104:25
**Johnson** 15:11 16:20,21,23 34:23 72:11 81:16 86:5 86:14,18

**join** 5:21
**Joseph** 64:16
**judge** 21:9 22:11 23:7 33:19 68:11 85:9,13 104:23 105:12
**judgement** 119:25
**judgment** 5:8 118:20
**July** 36:13,20 37:2 37:14 38:13 75:5 75:10 87:9 88:14 90:14 102:23,24 106:4 107:4,14 119:9 125:20
**June** 1:11 15:7 17:8
**Justice** 105:8

**K**

**KAMINS** 2:14
**KCDA** 12:14
**keep** 85:9,16,17
**Keller** 104:5
**Kellner** 1:4 4:10 49:14 50:22 51:21 69:22 70:16,20,25 71:8,24 89:14,23 97:16 98:6,21 99:15 103:16 104:2,12 105:4
**kept** 72:19
**killed** 68:7
**kind** 63:20
**kinds** 96:17
**knew** 40:16 61:11 75:24 77:3 80:11
**know** 4:2,9 6:18 9:25,25 10:13,14 10:25 12:14 14:7 14:9,11 17:6 19:9 22:16 25:22,23,23 26:3,4,13,16,23 26:24,25 28:9 32:7 33:12 37:17 39:22 40:14 41:21 42:6,10,15,19,20 42:22,23 43:19,19 44:12,18 46:16 47:7,12,18 48:20 49:2 56:17,18 61:2 62:7 64:9,12 64:22,22,22 65:13 65:24 66:15,17,20 66:25 68:8,19,20 69:3 70:17 71:4,5 71:5,20 72:13,14 73:15 75:14,17,23 75:23,24 76:8 79:4 81:9 82:10 82:14 83:7 85:5 87:6,16 88:20,21 88:24 89:5,12,18 90:4 92:7,21,22 95:17 96:16 97:2 99:10,11 103:3,5 103:13,22,25,25 104:3,3,4,4 105:5 105:14,18,20,24 105:24 106:3,7,14 106:16,19,25 107:2,24 108:16 109:15,20 112:17 112:24 113:2,18 113:22,24 114:24 117:18 118:10,17 119:17 120:3 122:12
**knowledge** 40:25 43:12 69:16 70:14 72:18 92:13 96:5 103:21
**Kosher** 43:21
**Kriss** 103:6,8
**Kustin** 1:17 23:13 70:5 83:22 125:6 125:22
**Kyra** 1:17 125:6,22

**L**

**L** 1:7 2:9 3:2,9
**larceny** 69:2
**Larry** 16:24 26:10 26:12,16 27:2
**late** 116:17
**law** 2:4 8:9,12 20:3 20:5 46:7 103:6
**lawsuit** 96:4
**lawyer** 13:12 16:24 34:22 68:2,14 81:7
**lawyers** 34:23
**lay** 20:16,22
**leading** 82:17
**leave** 9:24 11:18 12:21 47:16 107:2 112:8,16,25 118:7 122:7
**Lebovits** 14:15,22 15:9 16:19 17:10 17:21 18:16 23:21 26:20 27:18 28:21 29:10 32:3 35:22 36:2,14 37:13,21 38:14,20 39:5 49:6,15 50:21,22 51:20 52:14 53:6 57:23 59:11,24 60:20 61:23 62:11 65:7 66:12,14,16 67:11,18,22 69:5 69:17,21 71:23 72:10 73:13 74:25 75:10 76:12,20 77:5 80:13,23 86:2 87:10 88:5 89:7,15,23 94:11 94:18 95:15,22 96:7,12 97:3 98:5 98:20,25 100:20 103:14,25 104:13
**Lebovits's** 65:16
**leeway** 82:17
**left** 58:18,24 72:13 72:15 96:20 109:15
**legal** 43:14 44:13 45:2,25 47:5 48:12 98:14 103:5
**legend** 105:22
**lengthy** 93:14
**let's** 16:13 23:8,12
**letter** 100:4 101:16 101:18,21,24 124:10
**Leventhal** 104:25 105:8
**lies** 102:12 103:18 103:20
**life** 34:5
**limiting** 55:14
**line** 24:2,13 27:20 57:12 59:16,17
**listen** 5:12 55:7 61:11 92:6 122:11
**lists** 15:9
**litigants** 56:2 88:2
**litigating** 5:7
**litigation** 45:16
**little** 8:18 13:11 18:3 30:19 48:6 97:7 118:9
**log** 58:11
**long** 39:14 69:4 78:24 103:12
**longer** 30:17 48:6 54:24
**Lonuzzi** 40:13,14 41:12 42:3 75:11 75:17,24 76:4,9
**look** 39:7 64:11 89:19 91:13 99:20 100:3 109:18 116:23 119:11
**looked** 17:7
**looking** 33:19,20 44:9 78:14 81:3 94:21 109:12
**looks** 44:8
**lot** 12:13 62:6 64:7 107:10
**Lou** 9:15
**Louis** 3:10

**M**

**MacGiollabhui** 2:4 2:6 3:18,24 4:3,6 4:19 5:20 6:3 15:20,25 19:15,19 20:12 22:14,20 23:12 29:19 30:24 36:9 39:18 41:17 43:9 45:22 46:22 47:20,23 48:4 49:24 50:3,9 51:14 53:24 54:6 54:13 55:2,11 56:3,13 57:8 69:14 70:4,11 73:6,8,25 77:17 77:20 78:2,21 79:15 80:3,8 82:8 82:20,25 83:16,22 84:5 85:8,12,16 85:20 89:2 92:18 92:24 110:5,10,14 110:21 111:17 112:8 113:14,21 114:9,17 115:11 115:16,22 116:4 116:11,19 117:4,8 117:16,20 118:18 118:24 119:4,8 120:11,15,25 121:5,18 122:3,11 122:17 124:3
**Madison** 2:5
**magnify** 58:14
**maintain** 23:6 31:12
**major** 38:6
**making** 43:21 77:21 79:3 95:11 96:16,17 98:23
**male** 18:24,25
**manager** 11:5
**manner** 100:16
**March** 12:23 39:5,5 57:24
**mark** 15:14 46:11 116:17,21
**marked** 15:6 17:13 17:18 18:13 27:6 28:10 30:15 36:5 36:11 38:25 49:9 49:23 51:7 53:4 55:10,20 56:11 58:10 72:23 73:23 84:23 85:24 88:10 93:13 99:17 101:14 102:8

115:6 116:20 118:5 119:14,22 121:15,21 122:13 123:2
**marking** 54:12 116:21 120:19 122:2
**marriage** 125:17
**material** 108:7
**matter** 25:9 47:11 98:16 125:18
**Matz** 105:20
**meals** 43:22
**mean** 10:9 25:18 26:2,16 28:2 33:11,11 38:3 43:18 44:14,18 52:17 61:2 67:6 67:19 72:13 73:17 101:22 103:3,17 104:15 109:7 117:19 118:8,16 118:18 121:13
**meaning** 5:10 24:18 47:4 66:21 74:9 76:20 101:11 105:2
**means** 33:17 121:15
**media** 106:19
**medical** 7:4
**medication** 6:24
**meet** 36:21 41:5,6 42:3
**meeting** 17:2 26:9 26:13,17,20,21 34:13,18 37:2 59:6 60:6,7 61:19 61:21,23 63:16,18 64:18 65:4,18 66:3,6,6,7,11,13 71:19,19 75:18 76:18 78:12 79:13 81:4,11 83:15 85:3
**meetings** 30:6 59:4 59:5 82:4 83:8
**memo** 81:16
**memorandum** 30:18 31:18 32:9 35:17
**mention** 27:12,13
**mentor** 62:6,16
**met** 26:3,4,23 59:10 59:25 66:15
**Meyer** 49:14 50:21 50:22 51:20 65:8 98:25 99:2
**Michael** 60:7 61:20 91:24 93:8 98:14
**middle** 3:9 42:22 53:19 81:8,9 109:6
**Mike** 52:7 62:5 72:7 103:6
**minimal** 87:4
**minutes** 12:5 106:12 108:2
**mischaracterizati...** 86:21
**mischaracterizes** 71:14
**misleading** 57:3
**missing** 14:2 110:19
**mistake** 33:13
**mistakes** 121:16
**misunderstanding** 120:10,12
**Mladinich** 73:11,15 74:24 80:10
**moment** 19:16 31:11 110:15
**money** 90:4
**monitoring** 35:21
**month** 12:24 58:3 105:3 119:10
**months** 28:18
**Morelli** 11:14,17
**morning** 106:10
**Morty** 105:20
**Moshe** 88:13,20,22 88:25 89:5,13
**motion** 5:25 94:10 94:17 96:8 97:15 98:6,8 112:4
**move** 47:8
**moving** 55:14
**mute** 77:25 78:5

**N**

**N** 2:2
**name** 3:7,10 4:2,5 11:13 12:2,18 35:9 40:14 42:7 42:20,22 48:20 60:17 88:13 89:9 89:18 91:5,11,19 95:12 107:24 108:16
**named** 16:24
**names** 20:8,9 99:12
**naming** 19:2,21,25 23:6
**Nathan** 104:18,21
**nature** 8:3 68:25
**Nazi** 96:16 97:10
**necessarily** 33:11
**necessary** 21:11
**need** 16:4,5 31:5,14 41:15 43:3 47:18 49:11 55:24
**needed** 96:23
**needs** 46:13
**neighborhood** 42:12
**nephew** 109:16
**never** 37:18 47:4 71:6 80:21 86:12 87:10
**new** 1:2,7,19 2:5,5 2:8,9,11,11,16,16 3:21,21 8:11 14:10 68:18 125:3 125:7
**newly-discovered** 68:17
**news** 93:5
**Niall** 2:4,6 4:2,16 15:13 20:11,18 21:3 30:21 36:8 39:13 41:9 46:5 51:12 53:21 54:11 67:8 70:3 73:4 77:19 78:5 80:7 82:13 83:25 85:18 87:18 92:5 110:9 110:18 113:20 115:3 117:19 118:15
**nice** 122:21,23
**Nicholas** 109:16,17
**Nick** 64:25
**night** 14:5
**non-jail** 29:9,25 30:10,13 32:2 35:25 37:13,20
**non-party** 1:14 2:15 3:3 5:23 46:17 55:17,18 79:7
**nonspecific** 45:13
**normal** 119:25
**not-for-profit** 11:25
**Notary** 1:18 3:4 123:13 125:7
**notation** 36:20
**note** 4:21 54:10 79:25
**noted** 78:8 79:22 84:18 122:24
**notice** 5:14 6:10
**November** 18:10,15 24:11
**number** 4:12 8:25 17:12,17 19:5,6,6 19:7,8,9 21:16 28:17 30:23 38:19 40:4 41:2,4,7 42:4 59:25 63:4 75:13 76:10 77:3,4,13 80:11 86:17 87:8 87:9 88:6 91:4,10 93:17 108:21 124:6
**numbers** 17:14 19:4 99:19

**O**

**O'Mara** 60:11,13 60:17,25 61:2
**oath** 7:13
**object** 20:15 43:7 43:16 45:20 56:25 57:5 78:7 81:20 81:23
**objection** 4:21 5:3 5:22 11:9,10 12:3 13:5 14:25 19:11 20:17,23 21:23 22:19 23:23,24 24:7,8,22,23 25:17,21 27:25 29:11,12,13,16 32:18,19 33:10 37:24,25 38:21 40:7 41:8 45:4,23 46:3 48:15,16 54:10 56:9,20,21 57:20 58:7 59:12 60:3,4,12,14,23 62:24 63:7,14 65:23 67:16,25 69:9,13,20,23,25 71:3,11,12,13 72:3,4,12 74:18 75:2,20,21 76:6,7 76:13 77:6,7,9,21 77:22 78:7 79:20 79:21,22,25 80:4 80:14,15,17,20 81:21 82:18 84:18 86:6,8,19,20,21 87:12 88:7 89:8 89:17 90:10,11,17 92:3,4 94:12,19 95:24 96:9,10 97:17,23,24 98:9 101:2,9,25 104:7 104:8,14 107:7,8 108:8,9,23
**objectionable** 22:9
**objections** 22:16 77:18 78:3,23 79:4 92:19
**obligations** 122:12 122:18
**obtain** 29:9,25 32:2 87:13,13

**obtained** 74:24 76:5,25 77:3 80:10 87:8 95:21
**obvious** 44:10
**obviously** 47:10 56:7 61:8 62:14 90:9 114:20
**occasion** 7:15,16,17 7:19,24,24,25 8:2 88:17 94:16
**occasions** 26:14 62:8
**occupy** 11:25
**occurred** 49:13 50:21 63:16
**October** 17:20 53:6
**offer** 29:4 68:4,11 68:20
**offered** 8:22
**office** 2:4 8:17,23 9:24 11:18,22 12:21 13:3,10 15:7 25:13,19 26:18 29:23 30:3 30:7 31:19,19,22 32:6,17,23 33:9 33:13 35:2 37:3 37:23 40:6 44:14 50:11 51:2 52:5 52:22 58:11 59:18 60:2,10,16 61:10 61:20,22 62:8 63:21 64:4 71:22 71:24 92:2 93:10 95:10,11,20 96:20 97:15 98:5,7 99:22 100:6,9 106:21 108:7 116:7
**office's** 71:7
**official** 106:16,17
**okay** 4:20 13:7 14:21 15:5 16:8 16:15,16,17 17:16 17:24 18:4,11,18 18:18,21 20:25 24:4 25:6,12 26:6 27:5,11 28:15 31:3,8 36:16 39:21 41:24 47:17 48:3 49:20 50:15 51:17 54:3,9 55:11 56:7,13 57:8 58:9,16 62:4 70:11 73:10 74:12 79:24 80:8 81:13 82:8,13,20 83:16 85:8 90:25 93:3 94:5 96:6 99:16 99:25 100:5 101:17 102:19 111:6
**old** 12:21
**once** 88:15 114:18 114:19,23
**one-page** 88:12
**ones** 32:20 88:11
**open** 98:24 113:3
**opportunity** 5:18 47:13 113:25
**options** 117:13
**orchestrated** 103:5
**order** 71:25 111:14 111:20,24 112:7 112:11,21
**organization** 12:2 12:17 42:6,11,13 43:2,4,13 44:22 44:23 48:10,14
**organizing** 101:24
**originally** 105:3
**outcome** 125:18
**outside** 45:15

**P**

**P** 2:2,2,12
**p.m** 1:12 48:9 122:24
**page** 14:18 22:24 28:24 31:16,17,24 34:7 39:8,10 53:10,11,20 57:12 59:17 61:6 76:14 76:17 93:15 102:12,13,17 105:17 115:8 124:3,6,7,10
**pages** 54:2,7 56:15 124:8,9,10,11,12
**pamphlets** 10:15
**paragraph** 33:2 35:14,23 49:19 53:11 57:12 59:17 74:8,9 90:22,23 90:24 91:13
**paragraphs** 33:24 73:3
**Park** 44:15
**parse** 86:25
**part** 4:5 14:18 26:21 38:9 42:15 53:10,13,14,19 76:17 78:10,17 79:11 80:19 81:25 85:3 101:23 124:6
**participate** 21:4
**particular** 17:7 18:17 20:5 24:10 26:2,5,19 28:5,13 31:24 32:15 35:14 35:23 36:15 40:2 40:4 43:6,13 44:5 51:18,25 58:13,16 59:15 62:12 64:18 68:25 69:6 76:16 87:15 90:7 102:21 104:19 106:4 107:4 109:5
**particularly** 41:13
**parties** 50:10 125:16
**partner** 13:21 103:7
**partnership** 13:18
**party** 9:6 45:24 88:3
**passed** 8:22 62:15
**Passover** 95:18
**PATRICIA** 1:7 2:9
**pay** 90:5 114:12
**paying** 43:5,14
**Payis** 97:11
**payment** 45:2,11 47:5 48:12
**payments** 108:21
**pays** 45:25
**PDF** 122:3
**PDFs** 15:16,22
**pending** 97:4 104:6 105:10
**people** 10:17 13:12 25:19 26:18 42:14 42:16,25 43:2,20 43:20 44:25 57:13 59:25 60:10 61:10 61:14 68:7 95:10 103:19 109:23 116:25 121:16
**People's** 29:4
**percent** 24:9 38:11 97:8
**period** 25:5 52:12 52:13 75:8
**person** 14:6 38:3,4 41:5,6 66:23 88:19,24 91:3,5,9 91:11,14 109:11 109:15,17
**person's** 89:18
**personally** 41:18,19
**pertains** 20:3
**peruse** 46:7
**petitions** 10:16
**photograph** 91:15 109:5,13,14
**physical** 7:5
**pick** 44:12 54:24
**picture** 64:5 89:19
**place** 1:17 3:17 30:3 66:3 92:14 103:9
**plaintiff** 1:5,15 2:4 4:10 99:22 124:6 124:7,8,9,10,11 124:12
**Plaintiff's** 15:6 17:19 18:13 24:12 27:6 28:11 30:15 31:2 36:5,11 38:25 49:10 51:7 53:4 58:10 72:23 73:23 76:16 77:2 85:25 88:10 90:22 93:13 101:14 102:8 122:25
**plan** 119:19
**planning** 51:15
**plans** 5:15
**play** 101:23
**plea** 68:14,16
**please** 3:7,13 27:10 39:12 83:24 87:22
**plot** 64:10 65:6,15
**plural** 29:4
**point** 13:17 19:22 19:23 21:6 28:16 28:19 37:14,15 38:12,17 46:24 58:12 59:14 61:5 65:11 72:13,14 86:9 90:7 106:22 106:25 117:5 120:8 121:7,20
**pointed** 40:2 57:10 81:4
**political** 9:10
**politics** 103:18
**portion** 18:19 23:16 31:25 32:25 34:8 35:13 39:7,8,10 40:2 53:7 56:24 57:10 61:6 70:8 79:13 84:14
**posit** 46:18 82:23
**position** 8:23 11:8 11:25 23:4 47:15 79:6 106:5 118:7
**possibility** 121:8
**possible** 24:15 27:22
**possibly** 45:7
**PPI** 32:14 77:13 78:11 79:12,14 81:25 82:5
**PPIs** 32:11
**practice** 13:13,14 24:25,25
**practitioner** 13:15
**precautions** 121:10
**preliminaries** 4:14

**preliminary** 6:13
**preparation** 32:13 35:6
**prepared** 31:18,21 32:11 35:2
**preparing** 94:17
**prerogative** 84:10
**present** 34:18 63:18 64:17,21 65:2,3 78:12 79:12 82:3 83:8,14 85:2
**preservation** 113:8
**pressing** 96:7
**presumably** 96:2
**pretty** 4:14 96:16
**prevent** 7:5
**previously** 18:13 27:6 28:10 30:15 36:5,11 49:22 51:6 58:10 73:23 80:16 85:24 88:10 101:14 102:8 111:5 112:19
**primarily** 11:14
**print** 31:11 93:20
**printed** 15:23
**prior** 7:24,25 8:2 15:21 17:13,18 34:25 49:9 61:23 67:3 72:23 74:15 74:17,19 75:4,8 75:25 76:4 77:9 88:17 90:13
**prison** 96:13,21
**private** 13:14 75:19
**privilege** 29:18
**privileged** 46:2,4
**privileges** 25:9
**pro** 44:13
**probably** 9:11 10:23 14:9 99:2
**probation** 35:19
**problem** 3:19 34:10 56:4 79:8 85:6 119:11,17
**problems** 77:25 82:7
**procedure** 1:16 4:25 56:21
**proceeded** 81:10
**proceeding** 8:6
**proceedings** 86:10
**produce** 124:11
**produced** 50:10 95:9
**product** 29:15
**production** 95:12
**Professor** 62:13 63:23,25 64:9,15 66:18
**program** 68:4
**proper** 22:4
**proposed** 89:6
**prosecution** 38:20
**protection** 96:23,24
**protective** 111:13 111:20,24 112:6 112:11,21
**provide** 5:11 54:14 56:15
**providing** 50:25
**provisionally** 117:2 117:6
**public** 1:18 3:4 118:14 123:13 125:7
**pull** 90:20
**purely** 29:22
**purpose** 5:17 6:9 119:16
**purposes** 5:6 19:20 20:7 114:10
**pursuant** 1:15 4:23 111:19
**put** 22:10 30:22 35:10 41:21 55:3 55:5 56:5 77:20 110:23 111:3 114:13 115:7
**putting** 79:5

**Q**

**qualifications** 44:19
**qualities** 44:9
**Queens** 48:24
**query** 20:18
**question** 6:17,20 15:8 17:6 21:24 22:4 23:15,19 29:20 41:11 43:8 43:17 45:12 46:14 46:18 47:15 50:17 56:8,23 64:23 69:15 70:3,12 79:8,17,19 80:2 82:7,12,14,19,23 82:25 83:18,20,24 84:7 85:7,21 86:24 88:15 90:13 91:2,7 92:10,11 93:4,7 102:3 105:6 111:13
**questioner** 92:16
**questioning** 15:17 92:9
**questions** 4:12 6:11 6:13 23:3,5 66:20 70:7 82:17 83:12 93:24 94:3 110:6 110:12
**quiet** 98:22
**quite** 93:14 99:12
**quote** 61:8
**quote/unquote** 86:3 106:9
**quoting** 34:9 81:16 85:25

**R**

**R** 2:2 3:2,2
**race** 14:6 103:10
**Rackets** 70:24
**raise** 5:18
**ran** 8:25 9:23 10:19 12:20 13:24 103:9
**raped** 97:7
**rare** 100:19
**re-ask** 84:10
**reach** 21:8
**read** 23:14,17 31:5 34:12 35:9 39:24 39:25 40:9 51:17 54:7 61:7 70:6,9 74:12 83:23 84:12 84:15 86:9 93:22 106:9
**reads** 24:14 27:21 29:2 33:2 36:20 57:13 58:20,24 59:16,17 76:18
**ready** 16:17
**real** 10:4
**really** 8:4,4 10:4 12:15 21:10 40:12 44:18 50:12 57:21 86:25 96:18 108:10
**reason** 7:4 47:8 55:23 63:19
**reasons** 35:17 44:10,11 80:16
**recall** 12:17 16:19 16:23 25:6 26:6,9 26:17,20 29:7 36:25 40:11,12,12 50:17,20,25 51:24 52:4,14,17,18,21 52:23 61:21 63:18 64:25 65:3,19 66:2,5,11,13,21 66:22,22,24 67:4 67:15 75:15,25 77:12 78:16 87:24 87:25 88:16,18 89:13,21,25 90:2 90:2,15 91:2,8,12 91:24 93:7,11 94:6,15 98:18 99:8 104:9,23 105:7 107:15
**Recchia's** 9:14
**receive** 39:16
**received** 15:22 39:16 97:20 110:20
**recess** 48:9
**recognition** 34:10
**recognized** 44:20
**recollection** 10:22 10:25 12:7 25:3 26:14 27:23 28:6 28:8 30:5 34:21 35:8,24 37:5 38:2 38:10 40:3,23 42:2,5 49:7 51:19 59:13 60:5,7,24 61:4,17,18,19 62:9,10 67:12 70:21 81:6 94:24 95:25 96:11 97:18 97:25 98:10,13 102:2 107:9,13 108:3
**reconvene** 47:21
**record** 4:17 19:2,16 19:18,20 20:17,23 21:16 22:10,23 23:8,11,13 30:23 41:16 55:9 61:7 63:10 77:21 78:6 79:6,22 81:24 87:21 92:6,15 111:12 113:8,15 125:13
**recorded** 50:22
**recording** 4:22 5:16 51:20,25 52:15
**recordings** 91:3,8 95:21 96:3
**recount** 14:8
**recounts** 14:4
**reelected** 107:17
**reelection** 106:6 107:6
**refer** 19:8
**reference** 18:22
**referenced** 21:15
**referred** 56:11 64:14 78:13 82:4 88:25 91:14 111:4
**referring** 19:10 22:25 63:23 75:12 79:14 82:2 85:4 85:23 91:4,9
**refers** 52:9
**refresh** 35:24 40:3 51:19
**refreshed** 34:21 81:6 108:3

**regard** 5:15 6:2 17:20 36:14 43:6 45:2 58:5 70:16 70:20 93:9
**regarding** 20:18 45:18 66:14 67:7 67:8,10,11 69:21 69:22 77:10
**regardless** 114:6
**regards** 113:15
**regular** 35:20
**related** 125:15
**relates** 18:15
**relation** 4:12 44:25 69:5 70:12 98:20 98:20 112:18,21 112:23
**relationship** 61:9 106:15
**relationships** 45:7
**relatively** 61:9
**released** 97:3
**religious** 43:22
**remain** 72:11
**remains** 29:4
**remarks** 96:17
**remember** 9:12,21 12:11,12,16 16:25 17:4 25:22 26:2 26:12,22,25 27:3 27:4 37:9,10,11 38:22 50:12 58:8 63:19,22 64:3,13 65:13,14 67:17,21 67:24 68:23 71:16 72:5,6 73:17,19 73:19 74:21,22 76:3,9 86:11,13 87:23,24 88:8 90:18 91:23 92:8 98:22,23 99:6,7 99:13 103:3 107:18 108:10,12 110:3
**repeat** 91:7 93:4
**rephrase** 6:18 69:15 70:2 82:23 83:21
**reporter** 1:18 3:6 3:12,22 23:18 70:10 84:12,16 89:3 121:24 125:6
**reports** 31:6
**represent** 4:3,9,10 14:23 41:2 49:12
**representation** 14:15,22 23:20 72:15
**represented** 16:20 49:5
**representing** 5:23 17:9 43:6
**request** 3:16 15:14 55:19 100:19 111:18 113:9 114:12
**requested** 23:16 70:8 84:14 105:9
**requesting** 114:15
**require** 37:22 46:20
**required** 70:25 71:8
**reserve** 5:24 112:3
**reserved** 103:16
**residential** 3:14
**resigned** 12:23
**resolve** 21:18
**resolves** 47:6
**respect** 23:3 108:6
**respond** 80:7
**response** 100:4
**responsible** 11:14 122:18
**rest** 111:9
**retain** 5:5
**retained** 16:18 72:17 100:21,23 100:24 101:7
**retainer** 100:15 101:12
**retainers** 101:11
**retaining** 6:5,6 45:19
**return** 13:2 76:15 80:25
**returned** 11:22
**returning** 6:11
**revealed** 91:19
**reversed** 97:4 103:15 104:2
**review** 17:23 18:17 22:6 27:10 28:13 30:16,20 36:15 39:2,11 49:12 51:8,10 53:7,9,13 53:18 54:5 60:16 72:24,25 74:3,10 90:24 93:14,18,25 101:15 102:9,15 102:17 117:13
**reviewed** 31:8 51:18 57:4,9 105:14
**reviewing** 88:16
**revisit** 82:24 111:15
**Rhonnie** 26:7,11,13 26:21,23 27:2 37:3 38:3,6
**right** 4:8 5:24 8:15 8:19,24 10:12 11:22 12:25 13:19 14:24 15:9 16:12 24:5 27:18 28:4 31:20 32:3,6,10 32:11,14,17 35:3 35:18 36:20 37:16 38:15,20 39:25,25 44:2 52:8,16,20 52:25 57:18,24 58:6,18,20,24 59:2,7,9 63:9 65:7 69:8 73:13 76:12 81:18 89:19 90:8 91:20 94:11,23 95:8 96:20 99:9 102:23 104:6,11 104:16 105:4 106:21,24 108:7 108:14 109:13 110:8 112:3 113:8 113:11 116:22 117:9,10 118:24 119:4 122:6,22
**rights** 20:3
**ringing** 12:4
**rings** 101:22
**risk** 22:11
**RJ** 36:22
**Rob** 48:21
**Robert** 48:22,24
**role** 11:4 106:17
**room** 37:10 68:8
**root** 79:9
**Rosario** 108:7
**rotten** 79:9
**rough** 118:16
**Rubenstein** 108:12
**rule** 114:11
**rules** 1:16 4:23,24
**ruling** 46:11,20
**run** 4:13 6:13 10:7 20:2
**running** 8:20 58:17

**S**

**S** 2:2
**Sal** 8:20 9:13
**Sam** 4:10 49:14 50:22 51:21 69:22 70:16,20,25 71:8 71:24 89:14,23 97:16 98:6,21 104:11
**Sampson** 10:7,20
**SAMUEL** 1:4
**sat** 26:25
**saw** 96:21
**saying** 6:12 12:25 27:3,4 37:8,9 67:14 71:16 72:6 76:11 81:14 115:18,19 116:24 117:23 120:6,10 120:24
**says** 21:25 25:10 32:8,8 33:24 109:23
**SCHARFSTEIN** 2:12 4:16,20 11:10 13:5 19:11 20:10,13,20,25 22:18 23:24 24:8 24:23 25:17,21 29:12 30:21 31:3 32:19 33:10 37:25 38:21 39:13,21 40:7 48:3,7,16 53:21 54:3,9 56:19 57:20 58:7 60:4,14 63:7 65:23 69:13,20,25 71:3,12 72:3 74:18 75:20 76:6 76:13 77:7 79:24 80:6,14 81:21 84:17 86:8,19 88:7 90:10,17 92:4 94:12 96:10 97:23 98:9 101:25 104:8 107:8 108:8 110:11,18 113:20 115:3,15,18 116:2 116:5,16,22 117:7 117:11,24 120:9 120:13,16 121:3,7 121:23 122:6,16 122:20
**Schedule** 99:24
**scheduled** 46:15
**Schmetterer** 106:18,20
**school** 8:9,11
**scope** 29:20 45:15
**screen** 14:14,16,17 77:12 78:15
**scroll** 15:18 16:5 17:22,25 28:23 31:23 34:7 35:12 36:18 102:20
**scrolling** 50:14
**seal** 116:8
**seat** 9:2 12:21
**seated** 96:20
**second** 31:16,24 33:2 57:12 58:22 59:16 100:24 101:4 105:11
**secret** 61:8
**secure** 37:12
**see** 8:7 14:16,17,19

15:9,11,19 16:9 16:12,13 17:15 18:2,4,5,7,9,19,22 21:18 22:24 23:9 24:12,13,15 25:10 27:12,20 28:15 29:2,5 32:24,25 34:8 35:14 36:19 36:23 39:19 47:14 49:9,18,18 51:4 53:8,16 57:15 58:17 59:15,21 61:12 67:19,23 68:10,16 73:24 75:4,6 90:20 91:17 95:12 102:9 102:10 106:8,13 109:4
**seeing** 34:3,6 50:12 50:18 88:16,18
**seeking** 30:8,9,10 30:12 35:25 45:6 45:13,18 99:22
**seen** 49:16 74:15 101:18,21
**send** 50:5 100:17 107:21 110:22 114:5,18 116:13
**sending** 94:6 102:25
**senior** 38:3,4
**sense** 116:25
**sent** 94:14 102:23 112:12
**sentence** 34:12 35:19,21 76:18 106:9 121:4,6
**sentences** 61:7
**sentencing** 58:2 59:11,24 60:21 69:7,17 71:23 72:10,16 100:25
**separate** 55:4 101:10
**separately** 101:7
**September** 9:6 109:3
**set** 89:20 99:23
125:10,19
**severe** 68:2
**sex** 20:4 26:3
**sexually** 23:21
**Shackone** 105:18
**share** 5:9 6:7,7 14:14,16
**sheet** 14:19 15:7 17:20 18:14 19:4 24:11 27:7 28:12 36:12 114:8 124:6
**sheets** 17:13
**shield** 9:25
**shift** 11:15
**shocked** 15:3
**Sholem** 91:5,11,14 93:9
**short** 118:15
**shortly** 58:6
**show** 15:5 17:12 27:5 28:9,10 30:14 36:4,10 38:23,25 49:8 51:5 53:3 58:9 72:22 73:22 88:9 93:12 99:16 101:13 102:7 105:13 108:25
**showed** 76:17 77:11
**showing** 108:3
**shown** 39:9
**Sicily** 63:8
**side** 33:18,20 100:10,11,11,13
**Sider** 95:3,4,5,10
**Simon** 58:5 65:11 65:14
**simple** 102:2
**simply** 6:5 84:12
**single** 14:18
**sir** 6:22 7:3,8,11,14 13:16 14:20 27:15 40:20 61:13 93:22
**sit** 27:23
**sitting** 64:3
**six** 10:3 68:22
**software** 100:7,9,11
**sole** 108:13
**solely** 25:15 30:2
**solo** 13:14
**somebody** 48:13
**something's** 33:17
**somewhat** 30:17 34:14 76:19 81:8
**son** 24:5
**sons** 24:6 90:5
**sorry** 19:13 20:20 36:7 67:8 73:4
**sort** 10:23 33:13 42:14 54:23 82:15 119:12
**sound** 119:12
**speak** 20:24 47:13 62:11 78:19 88:23
**speaking** 22:15,19 39:9 41:13 45:11 53:11,12 61:6 77:18,22 78:3,22 79:3,20,21 80:4 96:12
**speaks** 33:22
**specific** 25:3,3 28:6 30:5 38:10 52:17 60:5,6 70:21
**specifically** 11:2 19:9 26:22 39:5 56:22 62:25
**specify** 67:9
**speculate** 87:19,22
**speculation** 38:9,11
**speed** 84:4
**spell** 4:7 42:7
**spelling** 3:7
**spoke** 10:17 61:3 76:3,9 96:22 97:2 112:14
**spoken** 26:13 62:22 75:11
**SS** 125:3
**standing** 10:13 109:12,14
**start** 4:14 6:14 13:14 15:17 17:17 46:21
**started** 12:23 13:11
**starts** 35:16
**state** 1:19 19:19 125:3,7
**stated** 78:16 80:16 81:24 84:13,25 87:9
**statement** 33:4
**statements** 100:17
**Staten** 8:21
**STATES** 1:2
**stating** 76:11
**status** 14:19 15:6 16:15 17:13,20 18:14 19:4 24:11 27:7 28:12 36:12 124:6
**stenotype** 1:18 125:6
**step** 113:22
**stopped** 38:19 40:5
**stops** 10:14
**straightforward** 118:9
**strategy** 98:15
**Street** 2:11
**strongly** 9:22
**struck** 64:6
**structure** 11:8
**stuff** 106:19
**subject** 5:3
**submission** 116:6
**submit** 32:21 116:8
**submitted** 31:25 32:15 33:3,25
**submitting** 32:22
**subpoena** 1:16 99:21 124:11
**Subscribed** 123:9
**subsequent** 16:22 38:17
**substance** 6:24 55:16
**substantive** 98:13
**subway** 10:14
**successful** 37:16,18
**SUFFOLK** 125:4
**suggesting** 82:15
**suggestion** 46:25
**suggestions** 22:21 97:21
**Suite** 2:5
**suited** 83:12
**summarize** 8:7
**summary** 5:8 118:20 119:24
**summer** 107:12
**superseded** 27:14
**superseding** 24:19 27:16 28:18
**supervisor** 25:24 25:25 26:6
**supervisors** 26:3
**support** 104:13
**supporter** 44:16
**supposed** 65:21 106:23
**sure** 15:20 24:9 30:8 31:13 32:7 43:21 84:18 88:23 92:22 94:20 110:16 122:8
**surprised** 61:3
**surprisingly** 34:14 76:19
**Susan** 2:12 6:4 20:16 22:14 23:3 39:20 80:4 110:10 116:11,11 117:5 120:12 122:11
**SW** 91:15
**sworn** 3:4 123:9 125:11

**T**

**T** 3:2
**tainted** 92:21
**take** 11:17 16:10 21:8 25:9 30:19 47:19 51:5 56:17 84:22 100:8 121:10 122:14
**taken** 1:15 25:4 30:3 48:9
**talk** 18:7 99:14,15
**talking** 60:25 85:10 120:16,18

**talks** 29:3
**Taub** 58:6 65:12,14 99:13,14
**Technical** 36:6
**telephone** 66:24
**tell** 14:7 43:23 50:15 68:9 70:19 83:25 89:10 95:8 95:20 102:25 113:21 115:24
**telling** 13:12 71:17 94:15
**temporarily** 117:15
**tenure** 67:20
**term** 103:5 118:15
**terms** 9:17,20 11:24 13:7,9 14:21 19:4 24:10 25:12 26:19 27:20 29:20 37:12 52:11 62:6 65:6 89:20 99:3 100:23 104:10 114:25 115:13
**test** 4:6
**testified** 3:5 7:12,23 63:3 77:14 78:10 79:10 82:3 83:9
**testify** 22:5,6 69:11 85:4 92:9
**testifying** 21:25
**testimony** 7:2,6 21:20 22:12 54:23 62:22 71:6,15 76:2 77:10 83:5 86:16,22 88:4 92:11 125:13
**text** 58:20 59:2 84:22
**thank** 3:22 41:24 73:9 110:7,9,12 111:8,9 122:23
**thanks** 22:16 31:4 39:21
**that--** 21:4
**therapy** 35:20
**thing** 53:9,15 54:15 54:18 103:4 110:3 119:19
**things** 44:8 54:17 68:18 84:4 115:4 120:2,19
**think** 4:2,9 6:12 10:3,3,9 12:25 14:8 17:14 21:3 21:10,11 22:20 24:13 25:10,25 30:18,24 31:16 36:12 38:6 39:16 44:7,14 49:10 53:19,25 57:11 58:12 62:6 65:8 74:8 75:5 84:24 86:11 87:18,25 92:24 98:11 103:4 107:11 108:25 109:10,20,24 110:6,15,17,20 111:2,7,14 112:14 112:19 114:5,9,11 120:4,9,13,14
**thinking** 10:13
**third** 14:5 24:2 34:12 45:24 68:13 68:24 106:9
**thought** 106:17
**three** 27:17 28:20 38:13 67:18,21,22 68:21,22,23 73:3 87:16 88:21 91:4 91:10 105:16
**threw** 99:11
**throw** 53:15
**throwing** 33:16
**Thursday** 36:21
**time** 1:17 10:19 11:19 12:20 13:24 16:20,21,22 18:7 25:5,11,14 26:7 28:5,16,19 29:7 30:19 32:2 34:3,6 37:2 38:12,17 40:4,17 47:22 48:5 49:4 52:12 52:13 55:15 56:17 59:6 60:11 62:9 62:12,12 63:24 65:11,20,21 66:2 69:4 70:16,18 73:16 76:24 83:10 87:15 88:5 90:7 95:14 100:24 101:4 103:12 106:4 107:4 108:19 110:13 113:5,19 115:2 116:15 120:6,8 122:5,24
**timeframe** 41:15,20 41:22
**timeliness** 98:12
**times** 63:4 67:21,22 106:12
**title** 25:23 34:9
**today** 6:25 7:7 27:23 74:15,19 109:21,25
**told** 34:17 37:19 72:7 76:22 109:20
**top** 14:19 95:13 102:20,22 105:16
**topics** 44:13
**total** 55:22
**totally** 12:7
**touches** 54:16
**TPO** 87:5
**TPOs** 87:5
**transcript** 23:17 39:4 40:9 49:13 51:2 53:5,22 54:12,16,25 55:4 55:10,20,21,25 56:5,10 59:15 70:9 84:15 92:21 107:21 111:2 112:2 113:24 114:3 115:8 116:6 116:12,13,17 117:18 118:3,13 119:14,21 124:8,9 124:12
**transcripts** 108:4
**transferred** 96:13
**treat** 120:4 122:14
**treated** 113:9
**tremendously** 59:19
**trial** 5:8 33:6 39:4 52:14,15,20,24 57:23 75:9 89:7 108:5,14 125:10 125:12
**true** 30:9,10 72:6 80:18,19 109:22 125:13
**trust** 44:3
**truthful** 6:25 7:6
**try** 6:18 21:8 22:23 23:2,4 39:19 96:23
**trying** 16:7 24:20 29:9,24 116:10
**turn** 9:25 16:4
**two** 14:4 18:25 19:6 19:7,9 22:21 23:22,25 24:4,18 30:18 58:16 61:7 67:17 68:7,20,22 70:7 73:3 74:5,13 74:16,23 82:6 87:16 99:2,16 101:10 102:7,9
**two-page** 72:25
**typical** 24:24
**typically** 32:20 33:17 100:14,15

U

**U** 3:2
**ultimately** 118:4 120:17 121:13
**underneath** 34:8
**understand** 6:17 10:19 45:23 82:16 86:23
**understandable** 6:19
**understanding** 5:4 21:14,20 33:3 45:24 97:5
**understood** 6:20
**Unit** 60:16
**UNITED** 1:2
**University** 8:11
**untimely** 98:8
**use** 5:5,16 6:8 20:8 33:5 92:23,25 100:6 113:3 116:5 119:15,20
**uses** 100:9,11
**usually** 95:18 100:10,10

V

**vacation** 63:4,13
**vague** 45:13
**vaguely** 45:11 50:24 51:3
**various** 44:13
**Vecchione** 52:7,25 60:7 62:5,20,22 63:17 64:4,11,21 69:7,18 70:15,18 70:24 71:4,17 72:7 91:25 93:8 93:16 94:7,15 97:20 98:4,14,19 98:24 102:22 107:20
**Vecchione's** 61:20 61:22 64:4 103:6
**victim** 19:5,6,8,9 38:19 40:4 41:2,4 41:7 42:4 75:13 76:10,12 77:3,4,5 80:11,12 86:17 87:8,9 88:6 91:4 91:10 108:21
**victims** 20:4,9 49:5 87:16,17
**video** 5:5 6:5
**videoconference** 1:10
**view** 22:4,8
**votes** 14:3,8

W

**waiting** 56:8
**walked** 68:7
**walking** 63:20
**wall** 64:5

**want** 4:21 9:7 12:6 14:8 16:15 17:22 20:13 33:21 39:7 41:10 46:6,10,11 47:12 48:5 53:7 55:2 56:19 63:10 64:16 69:2 73:2 79:25 80:3 84:22 87:19 88:3 92:22 93:21,24 94:20 102:18 105:12 110:15 111:11 112:17 113:2,16 113:18 114:2,13 114:24 115:6 118:25 119:2,12 119:14,21
**wanted** 58:23 68:4 84:17 103:8
**wants** 18:6 54:6 117:12,21
**wasn't** 48:13 51:15 65:9 76:11 82:3 83:8 85:2 102:4 106:23 107:10
**way** 6:19 23:5 40:8 40:10 43:11 47:14 50:5 57:6 67:15 75:3 90:13 93:25 105:19 119:14 125:17
**ways** 21:12
**we'll** 22:23 47:25 113:4 114:25 116:14 120:5 122:7
**we're** 4:11 9:6 19:3 22:25 47:24 69:3 75:12 91:3,9 93:5 93:6 109:12 119:8
**we've** 77:23 112:20
**weeks** 10:3
**Weisner** 91:6,11,14 93:9
**welcome** 85:14
**went** 8:16 13:13 63:3 67:23 68:14 68:20 71:22
**weren't** 10:20 85:22
**whatnot** 55:25
**whatsoever** 35:8 60:25
**WHEREOF** 125:19
**wholly** 78:25
**wife** 13:22
**wish** 102:14
**withdraw** 43:10
**withdrawn** 74:14 75:16
**withheld** 108:7
**witness** 1:15 2:15 3:3,8,14,20 5:24 18:23,24 19:6,7 21:15,19 22:2 56:22 89:6 92:17 108:6,13 110:12 117:12 124:3 125:9,14,19
**witnesses** 19:23
**won** 14:7
**word** 35:11
**words** 86:25 118:11
**work** 8:16 9:9,21 10:2 13:8,9 16:13 23:2 24:21 29:14 100:17
**worked** 8:19 9:9,11 9:12,13,14,15,16 9:22 16:24 38:5
**worker** 9:19
**working** 10:11 11:2 24:14 27:22 28:3 106:23 107:13,15 107:18
**workings** 43:24
**works** 23:9
**worry** 93:2
**wouldn't** 15:3 32:21 46:5 114:13
**wound** 13:9
**writing** 78:11 87:15 101:24
**written** 25:2 76:14
**wrong** 99:19
**wrongdoing** 80:22
**wrote** 35:11 100:4

**X**

**X** 1:3,9

**Y**

**yeah** 9:5 10:9 12:4 12:8 16:14,17 18:8 20:10 26:25 28:15 30:24 39:18 39:24 44:3 48:2 49:20,24 53:17 57:16,19 63:6 67:12 70:4 73:6 74:20 75:7 95:17 101:6,19 106:14 107:18 108:4 109:9,16 110:21 111:11 113:6 114:4
**year** 10:8 52:10 66:2
**years** 8:25 34:6
**yelled** 68:15
**York** 1:2,7,19 2:5,5 2:8,9,11,11,16,16 3:21,21 8:11 14:10 125:3,8

**Z**

**Zachary** 95:3,4,5
**Zai** 110:8
**Zalman** 108:17,20
**zero** 10:22 49:7 59:13
**Zoom** 1:10 4:22 46:18

**0**

**1**

**1** 124:7,10
**1/10/22** 124:10
**1:14** 1:12
**10** 51:10
**10/3/11** 124:8,9
**100** 2:11
**10007** 2:11
**10016** 2:5
**10036** 2:16 3:21
**108** 14:3
**11** 14:18 17:15 27:6 109:3 124:6
**12** 28:11 87:5
**123** 124:6,7,8,9,10 124:12
**13** 34:6
**131** 72:23 73:8,9
**13th** 13:10
**14** 34:6
**15** 88:14 90:14 108:2
**150** 30:15 31:2 76:16 85:25
**16** 15:8 17:8
**16-year-old** 18:25
**17-cv-1268** 1:6
**171** 2:5
**18** 18:10,15 24:11
**185** 93:13
**18th** 125:20
**192B** 102:8,21 105:16
**192C** 102:9 105:13
**193** 101:14
**197** 15:6 122:25 124:6
**198** 124:7
**199** 53:4 56:5 99:17 111:2,3,4 124:8
**1992** 8:14
**1994** 9:22 11:11
**199A** 56:6 111:6 124:9
**19th** 37:22 58:19,25

**2**

**2:32** 47:24
**2:33** 47:24 48:9
**2:40** 47:25
**20-year-old** 18:24
**200** 99:17,19 100:3 124:10
**2008** 14:24 15:8 17:9,20 18:10,15 24:11 25:14 27:8
**2009** 28:13,17 29:8 31:20 35:25 36:13 36:20 37:2,14 38:13 40:13 41:22 49:15 50:23 51:22 51:24
**201** 99:19,20 100:2 124:11
**2010** 39:5,6 52:11 57:24 58:20,25 59:4 75:5,11 87:9 88:14 90:14 95:23
**2011** 51:10 53:6 94:7 95:15,23 96:7
**2013** 10:6 101:16 102:23 106:5 107:5,14,17
**2015** 43:25 109:3
**202** 39:2 123:2 124:12
**2022** 1:11 123:11 125:20
**21** 36:13 51:7 90:22 101:16
**22** 36:11 75:5,10
**23** 58:10
**25-year** 9:5
**28** 4:24
**284** 39:8,11
**285** 39:10,11
**29** 1:11

**3**

**3** 11:16,16 53:6 124:3,8,11,12
**3/4/10** 124:12
**30** 4:24 36:20
**305** 2:5
**36A** 73:23,24 77:2

**4**

**4** 28:12 39:5 58:20 124:10
**4:34** 122:24
**43** 53:10
**44** 57:12 59:17
**440** 97:14 98:6

**440.10** 94:10,17
**45** 53:11,20 61:6
**48** 49:10,23,24

**5**

**5** 58:25
**501(c)(3)** 12:11
**546** 2:15
**56** 88:10
**5th** 2:15

**6**

**6** 34:7 74:9 76:17
**6/16/08** 124:7
**6th** 2:15

**7**

**70** 53:25 56:15
**74** 124:9

**8**

**8** 17:14,17,19,20 27:7
**80** 54:2,7
**8118** 13:10

**9**

**9** 9:6 11:16,16 17:15 18:14 24:12 90:23 91:13 102:23,24
**9/11/15** 124:8
**946** 3:20
**97** 9:4 13:24