UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------X
SAMUEL KELLNER,

Plaintiff,

Docket No.
17-cv-1268

- against -

THE CITY OF NEW YORK and PATRICIA L. HYNES, Administrator of the ESTATE OF CHARLES J. HYNES,

Defendants.

--------------------------------------------X

Held via Zoom videoconference

May 20, 2022
9:38 a.m.

DEPOSITION of MICHAEL F. VECCHIONE, Non-party Witness, taken by Plaintiff, pursuant to Federal Rules of Civil Procedure, and Subpoena, held at the above-noted time and place, before Kyra Kustin, a Stenotype Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

LAW OFFICE OF NIALL MACGIOLLABHUI
Attorneys for Plaintiff
171 Madison Avenue, Suite 305
New York, New York 10016

BY: NIALL MACGIOLLABHUI, ESQ.

CORPORATION COUNSEL OF THE CITY OF NEW YORK
Attorneys for Defendants
CITY OF NEW YORK and PATRICIA L. HYNES,
AS ADMINISTRATOR OF THE ESTATE OF
CHARLES J. HYNES
100 Church Street
New York, New York 10007

BY: SUSAN P. SCHARFSTEIN, ESQ.

MICHAEL F. VECCHIONE

MR. MACGIOLLABHUI: Let me just say for the record -- so I just pressed record there, and I understand, Susan, you're going to make a record.

MS. SCHARFSTEIN: Okay. Do you want to go ahead and swear the witness.

M I C H A E L F. V E C C H I O N E,

Non-Party Witness, having first been duly sworn by the Notary Public, was examined and testified as follows:

THE REPORTER: Can I have your name with the spelling, please.

THE WITNESS: Michael, middle initial F., last name Vecchione. V, as in Victor, e-c-c-h-i-o-n-e.

THE REPORTER: And your address, please.

THE WITNESS: 31-01 --

MS. SCHARFSTEIN: Wait. Wait. You're using my address.

THE WITNESS: That's right. Sorry. Thank you, Susan.

Corporation counsel's address. So that's 100 Church, New York, New York.

MICHAEL F. VECCHIONE

THE REPORTER: Thank you.

MS. SCHARFSTEIN: If you need the zip, it's 10007.

THE REPORTER: Thank you.

MS. SCHARFSTEIN: Okay. So I'm just going to make a few preliminary comments for the record.

First, we're going to reserve our right to review and sign the transcript. Second, I understand that Mr. MacGiollabhui is using a Zoom feature to record this deposition by audio and video, and I assume that, as before, his intention is to preserve the audio recording and not the video.

So I'm going to note my objection to that, as I believe it's improper pursuant to Rules 28 and 30 of the federal rules of civil procedure, but we're going to go ahead subject to that objection based on the agreement that plaintiff's counsel is not going to give a copy of the audio to anyone, including his client, and he's not

MICHAEL F. VECCHIONE

going to share it with anyone other than the plaintiff.

And that if anything changes in that regard, he is going to give me notice in advance so that I can raise any issues with the Court.

MR. MACGIOLLABHUI: Correct. So the feature records both audio and video, but I'm only maintaining the audio. And also, if I intend to give a copy of it to anybody -- I think I mentioned on the last occasion, I haven't. My client hasn't, to this point, viewed it, but --

MS. SCHARFSTEIN: You mean listened to it.

MR. MACGIOLLABHUI: Excuse me. Listened to it, I should say. He hasn't listened to it. If he does listen to it, obviously that's between me and him. If, however, I intend to provide a copy of it to anybody, including him, I will give you advance notice.

MICHAEL F. VECCHIONE
MS. SCHARFSTEIN: Okay. So let's go ahead, please.
EXAMINATION
BY MR. MACGIOLLABHUI:
Q Mr. Vecchione, good morning again. As I think you know, my name is Niall MacGiollabhui. I represent Sam Kellner in this matter, and I'll be asking you a number of questions in relation to his lawsuit. Now in that regard, I'm going to run through a few preliminary matters with you.
The first is if there's a question that I ask that you don't understand, I'll ask you to let me know so that I can rephrase it in a way that is understandable to you. Otherwise I'll assume that you have understood the question and answered accordingly. Fair enough?
A Okay.
Q The second is are you under the influence of any medications or any other substance that would affect your ability today to give accurate and truthful testimony?
A No.
Q Is there any other reason -- whether physical or medical or otherwise -- that would

MICHAEL F. VECCHIONE

affect your ability today to give truthful and accurate testimony?

A No.

Q Have you testified before under oath in a civil proceeding?

A A deposition. Yes.

Q On one occasion? Or more than one occasion?

A One occasion. No. Two occasions. Same case, two different occasions.

Q Was that the Jabbar Collins case?

A Yes.

Q In relation to that case, did you testify under oath in court?

A There was no court. There was no proceeding in court. The answer is no, I did not.

Q Well, there was a -- he had two separate actions. He a 1983 action, but before that, he had a habeas corpus action, right?

A I don't remember, but the bottom line is I didn't testify in court.

Q Well, did you appear before Judge Irizary at any point?

MICHAEL F. VECCHIONE

A No.

Q Can you give me a brief summary of your educational background --

MS. SCHARFSTEIN: Objection.

Q -- by which I mean college.

MS. SCHARFSTEIN: Objection. You can go ahead if you understand the question. If you need to ask for clarification --

A Okay.

MS. SCHARFSTEIN: -- at any point, you should do that.

A Yes. I have a bachelor of arts degree from St. John's University.

Q And a JD from Hofstra, right?

A Correct.

Q You were in the first class. Am I right in understanding?

A Correct.

Q And now also am I correct in understanding you joined the Brooklyn DA's office out of Hofstra or straight out of Hofstra as your first job?

A Yes.

MICHAEL F. VECCHIONE

Q That was around 1973?

A Yes.

Q And how long were you -- did you work for the Brooklyn DA's office at that time? Meaning that I know there came a later time when you left.

MS. SCHARFSTEIN: Objection to the form.

A I worked up until 1980. I left the DA's office in or around the spring of 1980.

Q And could you give me a, again, brief summary of your time there in terms of the positions you had. And I don't need everything. What I would ask for is any position of a -- where you acted in a supervisory capacity.

A No. I don't have any. I did not operate in a supervisory capacity. I had been promoted to the deputy chief of the Sex Crimes Bureau, but I never served in that position because I left the office before taking over or getting into that position.

Q So at that -- during that particular time when you worked in the office, did you, aside from not taking up that particular

MICHAEL F. VECCHIONE

position, did you work at all in Sex Crimes?
A No.
Q So you leave around 1980. You go to work, I believe, for the NYPD?
A Yes.
Q For the advocate's office?
A I was the department advocate. Yes.
Q How long did you hold that position?
A Two years.
Q And what did you do next?
A I opened up my own law practice with a colleague, and -- that's what I did. I opened up a law practice.
Q Was that Arnold Kriss?
A Yes.
Q And how long were you and he partners?
A Until nineteen -- the end of 1990.
Q And you returned, I believe, to the Brooklyn DA's office January '92, right?
A Yes.
Q And during that interim period, so 1990 to the beginning of '92, what did you do at that particular time?
A I was a lawyer. I -- I did my own

MICHAEL F. VECCHIONE

practice.

Q You were a solo practitioner?

A Yes.

Q Now what position did you hold when you returned to the office -- or the Brooklyn DA's office in early '92?

A I started out as the -- I started out -- when I got the position, I was hired as a -- as a trial attorney for one of the -- for the trial zones, but I never served in that position. Before I got the to the office, I had been promoted to the deputy chief of the Homicide Bureau.

Q And then you were subsequently promoted, or soon afterwards, to chief, right? Chief of the Homicide Bureau, that is.

A Yes. It was called the trial cadre at the time, but it was the chief of the Homicide Bureau. Yes.

Q Approximately how long did you hold that position for?

A Until 1995 when I became chief of trials.

Q And how long did you hold that

MICHAEL F. VECCHIONE

particular position for?

A Until 2001 when I became chief of the Rackets Division.

Q Now when you became chief of the Rackets Division, was it a division at that point? Or was it still a bureau?

A Rackets Division.

Q No. I know that, but had it been, at some earlier point in time, a bureau, meaning Rackets Bureau, rather than Rackets Division?

A Before I got to it?

Q Yeah.

A I -- I guess. I don't remember.

Q I guess what I'm asking is this. When you got to it, it was a division at that point.

A Rackets Division. Yes.

Q Now you wrote a book, it was in 2015, called Crooked Brooklyn.

A What was the year? What did you say?

Q Around 2015.

A I don't remember the year, but yes. I wrote a book, Crooked Brooklyn. Correct.

Q In case you're wondering how I know all of this, I read your book.

MICHAEL F. VECCHIONE

A Okay. Thank you.

Q It was good. I enjoyed it.

A Thank you.

Q The Groucho Marx quote, in particular. I very much enjoyed that. So in your book -- I'm just going to quote from it. It said -- or it says -- or you said -- actually, withdrawn.

So that's a book you co-wrote with Jerry Schmetterer, right?

A Correct.

Q But the book is in your voice, right?

A I think so.

Q Withdrawn. Withdrawn. The book is about you, as opposed -- meaning that he helped you write it, but the book is about your time in the DA's office, right?

A Correct.

Q And I'm going to quote just a passage from the book. And this is it: Quote, unquote -- in Rackets, the DAs were investigators and trial attorneys.

What do you mean -- or what did you mean by that?

A They were investigators because they

MICHAEL F. VECCHIONE

investigated cases, and they were trial attorneys because they tried the cases they investigated.

Q And the DAs in Rackets, were they different in that regard to DAs elsewhere within the office?

A Not --

MS. SCHARFSTEIN: Objection.

A -- necessarily. There were -- I believe there were parts of the office that did the same thing.

Q Meaning that did their own investigations, as well as prosecutions?

A Yeah. So participated in investigations conducted by law enforcement, and then prosecuted the cases.

Q And in terms of the investigations that were carried out by Rackets, would they typically -- in terms of law enforcement, would they typically involve outside personnel?

MS. SCHARFSTEIN: Objection.

Q Meaning law enforcement from outside of Rackets.

MS. SCHARFSTEIN: Objection.

A Okay. Are you saying outside? Is that

MICHAEL F. VECCHIONE

the word you're using?

Q Yes.

A Okay. There are -- there were cases that were brought to us from -- or came to us from outside the DA's office. Yes.

Q And fair to say, though, that the majority of cases that were prosecuted by Rackets arose from investigations that were carried out by Rackets, as well?

A That were what?

Q That were carried out.

MS. SCHARFSTEIN: Objection.

A I don't understand the question.

Q Meaning that the prosecutions that were conducted by Rackets, is it fair to say that most of them arose from investigations that were also carried out by Rackets?

A No. I wouldn't --

MS. SCHARFSTEIN: Objection.

A I wouldn't say most.

Q What would you say?

A I would say --

MS. SCHARFSTEIN: Objection.

A -- that there were some cases that were

MICHAEL F. VECCHIONE

carried on internally -- I'm sorry. That started out with Rackets, and there were cases that came to us from outside the Rackets Division and outside the DA's office.

Q Okay. Now did Rackets -- you, personally, did it hold particular appeal to you working within Rackets, as opposed to elsewhere within the office?

MS. SCHARFSTEIN: Objection.

A I -- I'll answer that yes, but I really don't understand what that means. But the --

Q I --

A I enjoyed my time in Rackets. I enjoyed my time as head of the Homicide Bureau. I enjoyed my time as chief of trials. So...

Q Well, let me ask it in this way. Rackets was somewhere you always wanted to end up, right?

A Yes.

Q When you joined Brooklyn DA's office.

A Yes.

Q Why was -- why was that?

A Well, because it was a -- as what I just said. There were investigation aspects to

it, there were trial aspects to it, and the cases were, you know, potentially very interesting. So that's why.

Q Okay. And -- all right. So what I'm going to do now is I'm going to pull up a number of exhibits. Let me do that, and then I'm going to share my screen with you. I think most -- most of these are documents that I shared with your counsel. I think it was last Friday. So I'm assuming -- let me ask you this.

Did you have an opportunity in the last week to review certain documents?

A Yes.

MS. SCHARFSTEIN: Objection.

Q Okay. Let me share my screen with you. Okay. Can you see that particular document?

A I can.

Q This is a document that was marked Plaintiff's 97 at a prior deposition. I'm going to ask you, Mr. Vecchione, just to review this particular document. I don't know if you have it. It's one of the ones that was provided to your counsel.

MS. SCHARFSTEIN: Niall, I think

MICHAEL F. VECCHIONE
it would be better if you could give him the mouse and let him scroll through --
MR. MACGIOLLABHUI: That's fine.
MS. SCHARFSTEIN: -- on the screen share.
MR. MACGIOLLABHUI: Okay. Let me do that.
Q So you should have control there, Mr. Vecchione, over the mouse which will allow you to scroll down through the document. There you are.
A Okay. What's the question?
Q So the question is that document describes a meeting that occurred, amongst other things, on April 27, 2010, right?
A That's what it says.
Q Well, do you recall on April 27, 2010, meeting in your office with Arthur Aidala?
A I don't recall a date, but I recall a meeting with Arthur Aidala in my office. Yes.
Q Okay. And what do you recall that meeting was about?
A Came to me to discuss an investigation

that potentially we could open regarding his -- individuals who he believed were either or were extorting -- potentially extorting his client's family, had bribed witnesses, and had interfered with witnesses in a trial that he had conducted.

Q And the trial involved a defendant by the name of Baruch Lebovits, right?

A I know that now. Yes.

Q Well, did you not know it at that time?

A No. I didn't know -- I didn't know Baruch Lebovits from a hole in the wall. He came to me and told me about the case, and we looked into the investigation.

Q So fair to say that that meeting was the first time you heard the name Baruch Lebovits?

MS. SCHARFSTEIN: Objection.

A Okay. I can't tell you that because I may have read about a -- a very large sentence that was given by Judge DiMango, and I think it was him. So I'm not sure, but that's what he came in to ask me about.

Q Let me ask the question a different way. Was that the first time you and Mr. Aidala

MICHAEL F. VECCHIONE

discussed the case of Baruch Lebovits?

A Yes.

Q Now let me show you now what has been marked was marked at a prior deposition as Plaintiff's 168. Again, you should still have control of the mouse. I'm going to ask you to look -- I'm on -- I think it's page 2, and you'll see around halfway down the page, there's a heading -- quote, unquote -- additional background.

And I'm going to ask you to just look at the two paragraphs underneath that heading. Do you see the heading?

A Yes.

MS. SCHARFSTEIN: Okay. I just want to note an objection. Mr. Vecchione should be able to review the entire document in context. So I would just suggest you give him the mouse and let him scroll through it and read what he thinks he needs to read.

MR. MACGIOLLABHUI: That's fine. He has the mouse, and I can represent this is one of the documents that I

MICHAEL F. VECCHIONE

provided last week.

Q But Mr. Vecchione, take your time to review what you want. But I can tell you that I'm going to be asking you about the two paragraphs there that I mentioned underneath the heading additional background.

A Okay. I have just one question. Whose document is this? Who -- who authored this?

Q If you scroll up to the top, it should have that. Scroll up to the very top. There you go.

A Okay. Okay. Ask the question. What is it you wanted to ask?

Q Scroll down to where I indicated before. Keep going. All right. Do you see the part there that begins after Baruch Lebovits was convicted? Do you see that?

A I do.

Q And where it indicates that Mr. Aidala had asked the KCDA Conviction Integrity Unit to review the case, do you see that?

A I see it.

Q When Mr. Aidala met with you in April of 2010, did he tell you at that time that before

MICHAEL F. VECCHIONE

meeting with you, he had asked ADA O'Mara to review the case?

A I actually don't recall, but my -- I don't believe so, but I really don't recall with any certainty.

Q Okay. Now when he met with you -- and this is April 27, 2010 -- to your knowledge, had he already spoken with DA Hynes about the --

A I don't have no idea.

Q -- case?

A I have no idea.

Q Now -- but there did come a time shortly thereafter where you, he, and DA Hynes met, right? About this case.

A It's not correct.

Q Well, isn't it the case that in early May 2010, that Mr. Aidala met with Mr. Hynes about this case?

A I have no idea.

Q Well, did you -- so this is in April and May of 2010. Did you, at that time, speak to DA Hynes about the case?

A I don't recall.

Q Well, when is the first time you recall

MICHAEL F. VECCHIONE

speaking to DA Hynes about --

A I have no recollection of when I first spoke to him.

Q Now I'm going to show you -- let me ask you this. Mr. Aidala, he is a friend of yours; correct?

A Yes.

MS. SCHARFSTEIN: Objection.

Q And when did you first get to know him?

A Well, I came back to the office in 1992. It was sometime after that. I don't recall the date.

Q Do you remain friends to this day?

A Correct.

Q Okay. Let me show you -- so this has been marked as Plaintiff's 181. This is not a document that I had sent, but it's from your book, Crooked Brooklyn. I'll ask you just to look at that and identify the picture that you're seeing. And you can scroll down if you'd like.

A Identify it how? The people in it?

Q Yes.

A Aidala, Petrosino, Judge Alito, and me, going from left to right.

MICHAEL F. VECCHIONE

Q And if you could scroll down. You know what? Let me scroll down for you.

A Okay.

Q And you described Mr. Aidala there as your dear friend, right?

A Correct. I do.

Q And remains -- I don't want to belabor this, but remains your dear friend to this day?

A That's what I said.

MS. SCHARFSTEIN: What was the question?

Q I said he remains your dear friend to this day?

MS. SCHARFSTEIN: You're referring to Mr. Aidala?

MR. MACGIOLLABHUI: Correct.

MS. SCHARFSTEIN: Okay.

A I already answered that. I answered yes.

Q And when he met with you in April of 2010, he was your dear friend at that time, too, right?

A Yes.

Q And let me show you now what has been

marked as -- or will be marked, I should say, as Plaintiff's 182. And I'm going to ask you to look at that particular photograph and identify the people in it.

A Left to right, me, Detective Thomas Dades, Joe Ponzi, who was the chief investigator of the Brooklyn DA's office, and Aidala.

Q This was taken around 2001, right?

A Don't remember.

Q Do you remember what the occasion was?

A Yes. Tommy Dades, I think, was honored or promoted to first-grade detective. I think that's what it was, but I'm not a hundred percent sure.

Q Okay.

MS. SCHARFSTEIN: Niall, can I just request that you send me any additional exhibits after we're done here today.

MR. MACGIOLLABHUI: Of course.

Q Detective Dades, how did you happen to know him?

A He's a detective in the Brooklyn -- he was a detective in Brooklyn, the 68 Precinct, and

MICHAEL F. VECCHIONE

then we moved to intel, and he and I worked several cases together.

Q What was called the mafia cops case, was that one of the cases you worked together?

A Yes.

Q As of today, what's your relationship with Detective Dades? I'm assuming --

A We're still friends.

Q Is he -- is he still working for the NYPD? Or is he --

A No. He's retired.

Q Now in terms of cases you prosecuted, there was another case with a defendant by the name of DeVecchio. Do you remember that particular case?

A I do.

Q Mr. DeVecchio was a former FBI agent, right?

A He was.

Q Do you recall with regard to that case that the matter had been scheduled for trial, and you had asked for an adjournment because, I believe, at that time you had bronchitis?

MS. SCHARFSTEIN: Objection. Is

MICHAEL F. VECCHIONE

there a question?

MR. MACGIOLLABHUI: I'm asking does he recall.

A Do I recall that I had bronchitis and asked for an adjournment?

Q Right.

A Yes. I do recall that. I think it was -- yes.

Q You recall the name of the judge?

A I know he's deceased now. I don't remember.

Q Was it Judge Reichbach?

A Reichbach. Correct.

MR. MACGIOLLABHUI: And let me just spell that for the reporter. I think it's R-e-i-c-h-b-a-c-h. And DeVecchio is D-e-V-e-c-c-h-i-o.

Q I'm quoting again from your book. Quote, unquote -- I was hoping -- this is in and around the time you asked for that particular adjournment. Quote, unquote -- I was hoping to take a vacation at a villa my good friend Arthur Aidala had rented in Italy.

Do you remember that?

MICHAEL F. VECCHIONE

A Yes.

Q And at a subsequent point, again in the book, you indicate that you obtained the adjournment -- and again I'm quoting -- and then flew off to Italy with Artie -- A-r-t-i-e -- and his family and a few other friends.

Do you remember that?

A Yes.

Q And --

A Are you asking do I remember the flight? Or do I remember writing that in the book?

Q No. I'm asking do you remember the vacation.

A Yes.

Q And in terms of the few other friends that were there, anybody else from the Brooklyn DA's office?

A Let me think about which trip this was. There was -- I think there was a former detective who's now deceased, Doug LaVien. There might have been another colleague of mine, Dino Amoroso, but I'm not a hundred percent certain if that was the trip that he was on.

MICHAEL F. VECCHIONE

Q Let me ask you this --
A I don't remember.
Q That's fine. I take it from your answer, nonetheless, that you went on vacation on more than one occasion with Mr. Aidala, right?
A That's correct.
Q And approximately how many times over the years have you gone on vacation with him?
A Three, I think.
Q Were the vacations all in Italy?
A Those were, yes. Those vacations.
Q What do you mean those were?
A The ones that I just told you about, the three, were in Italy. Yes.
Q I see. Were there other ones outside of Italy?
A Not that I can remember.
Q Okay. Other than Mr. Amoroso, do you recall -- and the detective you had mentioned who's now deceased, do you recall anyone else from the Brooklyn DA's office who was on any one of these vacations?
A Another colleague of ours who's also deceased now, named Angelo Morelli.

MICHAEL F. VECCHIONE

Q Anyone else?

A I don't remember.

Q Now Mr. Aidala also had a good relationship -- so this is -- the period I'm talking about is back April and May of 2010 -- with DA Hynes, right?

MS. SCHARFSTEIN: Objection.

A I would say so, but I don't know how to characterize it. They -- you know, they knew each other. Yes.

Q Well, Mr. Aidala worked on Mr. or DA Hynes's political campaigns, right?

A Yes. I don't know which ones, but I believe that he did at least one that I know of. Yes.

Q Okay. And did you work on any of DA Hynes's campaigns at any time?

A I did not.

Q During the 80s when you were in private practice up until the beginning of '92, did you work on any political campaigns?

A Yes. I worked on Ed Koch's gubernatorial campaign when he was running for governor.

MICHAEL F. VECCHIONE

Q This is against Mario Cuomo?

A Yes.

Q Any other campaign?

A Not that I can remember.

Q So I'm going to point you now to what was marked at a previous deposition as Plaintiff's 23. I'm going to try and -- so this is a visitor log from the Brooklyn DA's office. I'm going to try and magnify it so that you can see it a little more clearly than how it appears at the moment, so just bear with me a moment, and let me do that.

So I'm going to point you to -- and I'm going to use my cursor to hopefully point you to the right place. Do you see there's an entry here that -- and I'm running from left to right. So there's Charles Hynes, Arthur Aidala, 19th floor. The date is May 4 of 2010, and 3:00 in the afternoon. And then this text to the right that reads Arthur Aidala has an appointment with Mr. Hynes. Do you see that?

A I do.

Q And I'm going to point you to an entry about ten spaces down from that. And again it

MICHAEL F. VECCHIONE

reads, from left to right, Charles Hynes, Arthur Aidala, 19th floor. The date is May 5, 2010, and again, the text is Mr. Aidala has an appointment with Mr. Hynes. Do you see that?

A I do.

Q And were you aware in April and May of 2010 that Mr. Aidala had met with Mr. Hynes?

A No.

Q Now going back to the DD5 that I showed you to begin with -- so this is Plaintiff's 97. I'm going to show you that again. Do you see that?

A Okay.

Q So you had indicated, I believe, in your earlier answer -- and I'm going to paraphrase. Again, if I'm mischaracterizing it, feel free to let me know, but you indicated that you had come in to -- quote, unquote -- discuss an investigation that might be opened into a number of people, right?

A A number of people? I never said that, but --

Q Okay. So what did he come in to discuss with you?

MICHAEL F. VECCHIONE

A I told you already.

Q Okay. Well, I'm going to ask you to tell me again.

A His client --

MS. SCHARFSTEIN: Objection. Go ahead.

A Yeah. His client -- he believed that there were people who may have interfered with witnesses. And I'm only paraphrasing what I recall. It's not necessarily the legal terminology. Interfering with witnesses, attempted to bribe them, extorted his client's family. Words to that effect.

Q And do you recall the names -- and again, feel free to look at the DD5. Do you recall the names of the individuals who he claimed had engaged in the conduct you just described there?

A Well, Simon Taub and Kellner.

Q This is Sam Kellner, right?

A Your client.

Q And he had come to you, again, shortly after his client -- this is Mr. Aidala's client, Baruch Lebovits -- had been convicted, right?

MICHAEL F. VECCHIONE

A I don't recall.

MS. SCHARFSTEIN: Objection.

Q Well, have a look there at the DD5. It's the third paragraph, the first bullet point. See if that refreshes your recollection.

A I'm not sure I understand -- what is your question? Why don't you ask the question again.

Q I have asked the question. I said can you look at paragraph 3, the first bullet point --

A I did. I'm looking at it.

Q I'm asking you if it refreshes your recollection.

A What --

MS. SCHARFSTEIN: Objection.

A Of what? I'm asking you what are you asking me to refresh my recollection on? What's the --

Q I asked you -- isn't it the case that his client had just been recently convicted?

A Correct.

Q This is Baruch Lebovits.

A I don't know about recently. I know

MICHAEL F. VECCHIONE

that he said his client was convicted. I don't recall whether he told me when.

Q Well, did he tell you that his client had been wrongfully convicted?

A Don't recall.

Q Do you recall if he told you that at any time?

A Don't recall.

Q Do you recall having a view at any time as to whether Baruch Lebovits had been wrongfully convicted?

A No.

MS. SCHARFSTEIN: Objection.

Q You don't recall?

A You know, you're going to have to ask the question again. You're -- I don't understand how you're asking questions. Are you asking my -- from my -- the workings of my mind? Or --

Q You're the witness. You're the witness, right? I'm asking did you have a view -- do you recall having a view at any time as to whether or not Mr. Lebovits had been wrongfully convicted?

A I never --

MICHAEL F. VECCHIONE

MS. SCHARFSTEIN: Objection.

A I never had that view that I can recall.

Q Okay. And again, I'm not trying to be difficult with you, but I want to understand your answer correctly. So you never recall having the view that Mr. Lebovits had been wrongly convicted. Is that --

A Correct.

MS. SCHARFSTEIN: Objection.

Q And does that answer mean that you may have had that view?

A First of all, you'll have to define for me what you mean by wrongfully convicted.

Q Okay. Well --

A And then perhaps I can then answer it more specifically. Wrongfully convicted could mean many different things.

Q Okay. When I say wrongfully convicted, what do you understand that to mean?

A I don't have an understanding --

MS. SCHARFSTEIN: Objection.

A -- of it since it's your term.

Q Okay. So Mr. Lebovits had been

MICHAEL F. VECCHIONE

convicted of eight counts of sexual abuse at trial, right?

A If you say so. I don't know that.

Q Okay. Well, he had been convicted of multiple counts of sexual abuse of a particular individual at trial, right?

A If you say so.

Q Do you have any recollection of what had been alleged against Mr. Lebovits?

A No.

MS. SCHARFSTEIN: Objection.

Q Do you have any recollection of the fact that Mr. Lebovits was an alleged child molester?

MS. SCHARFSTEIN: Objection.

A Now I do. I'm not sure I did then. I mean, I recall 33 years or 40 years of sentence, but I don't recall -- I don't know if I ever knew the specifics. So ask your question again, and I can -- I'll give you an answer.

Q Okay. Well, were you aware at any time that your office was prosecuting Baruch Lebovits in respect of three different complainants?

A As of when?

MICHAEL F. VECCHIONE

Q As of any time.

MS. SCHARFSTEIN: Objection.

A As of now?

Q Well, let's start with that. As of now.

A Well, I know because I've read all these documents that you sent. So...

Q Okay. So you're aware as of now.

A That he was convicted?

Q No.

A Yes.

Q No. That he was prosecuted by your office in respect of three -- three different complainants.

A I know that --

MS. SCHARFSTEIN: Objection.

A -- because --

MS. SCHARFSTEIN: Let's just go one at a time so the reporter can take everything down. So if you could just pause before you start to answer so that I can object if I need to.

Okay. Objection. Go ahead. Do you recall the question?

MICHAEL F. VECCHIONE

A No.

MS. SCHARFSTEIN: We can have the reporter repeat it back -- read it back if you don't.

(The requested portion of the transcript was read back by the reporter.)

A Okay. I knew that he was prosecuted by my office. I was not aware back then of three different complainants. I know that now.

Q Well, prior to your review of the documents I had sent your counsel about a week ago, were you aware on any prior occasion that Mr. Lebovits had been prosecuted by your office in respect of three different complainants?

A I can't --

MS. SCHARFSTEIN: Objection.

A Okay. I can't answer that with any specificity. I mean, during the course of our investigation of your client and Simon Taub, perhaps the number of people who he was alleged to have or convicted of having done something to may have come up, but I don't have an independent recollection of that as I sit here today.

MICHAEL F. VECCHIONE

Q Okay. Well, as you sit here today, do you have any recollection of holding the view that the criminal acts or alleged criminal acts for which he was convicted at trial may not have occurred?

A I don't recall ever --

MS. SCHARFSTEIN: Objection.

A Sorry. I don't recall ever having that view.

Q Well, let me ask you this. Are you aware of testimony that was previously given in this case by one of your former colleagues, ADA Anthea Bruffee?

MS. SCHARFSTEIN: Objection.

A What's your question?

Q I said are you aware of any of the testimony that she gave in this case?

A Well, you sent a transcript of her deposition, and I read it. Yes.

Q Okay. Well, I didn't send you the transcript, right?

A I have no idea. Someone sent me the transcript.

Q Okay. So you're aware that she

MICHAEL F. VECCHIONE

described a meeting that occurred with DA Hynes and a number of other people, including you, in and around March of 2011, right?
A I know she said that.
MS. SCHARFSTEIN: Objection.
Q What's your recollection of the meeting in March 2011 that she described?
A I have none.
Q And you're aware, too, that she described in the meeting that occurred with you, her, and Rhonnie Jaus at an earlier point in time, right?
A What's your question?
Q I'm asking are you aware that she gave testimony concerning a meeting that occurred prior to March of 2011 that involved her, you, and Rhonnie Jaus?
A Am I aware --
MS. SCHARFSTEIN: Objection.
A -- that she said that?
Q Whether she testified about such a meeting.
A I assume so. Yes. Okay.
Q Well, you read her transcript, so

MICHAEL F. VECCHIONE

you --

A Yes, but I didn't memorize it. Okay? So just ask your question. What's -- what's your question?

Q Well, aren't you aware that she testified that she met with you and Rhonnie Jaus at a point earlier in time than March 2011, and that she put it to you that you were being, in her words, played by the defense attorneys for Baruch Lebovits?

A I was being what?

Q Played. P-l-a-y-e-d.

A So your question --

MS. SCHARFSTEIN: Objection.

A -- is do I recall reading that?

Q Yeah.

A Yes.

Q Okay. Do you recall the meeting that she refers to?

A No.

Q Do you recall any meeting involving either her or Rhonnie Jaus in connection with either the Baruch Lebovits case or the Sam Kellner case?

MICHAEL F. VECCHIONE

A Well, you'll have to break it up. That's two questions. So --
Q Well, start with Baruch Lebovits. Do you recall any meeting that occurred --
A No.
Q -- with either Ms. Bruffee or Ms. Jaus concerning the Baruch Lebovits case?
A No. I don't believe that I ever met with anyone regarding Baruch Lebovits's case, but the answer to your question is no.
Q Okay. So then in relation to Sam Kellner, do you recall any meeting that occurred concerning the Sam Kellner case that involved Rhonnie Jaus?
A No.
Q Do you recall any meeting that occurred concerning the Sam Kellner case that involved Anthea Bruffee?
A No.
Q Do you recall any meeting that occurred involving the Sam Kellner case that involved Amy Feinstein?
A No.
Q Do you recall any meeting that occurred

MICHAEL F. VECCHIONE

concerning the Sam Kellner case that involved DA Hynes?

A Me and Hynes?

Q Yeah.

A Ever?

Q Correct.

A Of course. Yes.

Q Okay. Well, tell me what you recall.

A I recall a meeting in which Hynes called me to his office to tell me that two of my -- that Batsidis and Alexis wanted the Kellner case dismissed. And he asked them to write a memo, and he showed me the memo and asked me, first of all, did I know that they wanted it to be dismissed, and I said no.

Second of all, he showed me the memo and said this memo is not to my liking. It's just -- it's poor, shoddy work. And he said that he didn't like the -- not that he didn't like. He was disappointed that two people who work for him would write a memo of that quality.

And he asked me if I thought there was a triable case, and I said yes, I do. He asked me if it was legally sufficient. I said yes, it

MICHAEL F. VECCHIONE

was. And that was the meeting.
Q And his complaint about the quality of the memo he received from --
A Correct.
Q -- Batsidis and Alexis, was that to do with the way it was written? Or its content?
A He didn't --
MS. SCHARFSTEIN: Objection.
A He did not tell me -- he didn't give me any specifics. He was just disappointed at the quality of their work.
Q And do you recall telling him why, in your view, there was a legally sufficient case at that time against Sam Kellner?
A No. He just asked me those questions, and I gave him two yeses.
Q Was it your understanding that prior to that meeting with you, that he had decided to dismiss the case against Sam Kellner?
A Absolutely not.
Q Now around that time, somebody made a decision to refer Detective Steve Litwin to IAB, right?
A You know, I did not remember that. I

MICHAEL F. VECCHIONE

just read it through the documents that you gave me.

Q Well, you recall it now, right?

A I recall that -- yes. I do recall it now. Yes.

Q And was that a decision that you made?

A It might have been a decision that several of us in Rackets made. I don't recall who made the decision.

Q Well, was DA Hynes aware of that decision being made?

A I didn't --

MS. SCHARFSTEIN: Objection.

A -- tell him.

MS. SCHARFSTEIN: Objection.

A I'm sorry. I didn't tell him. So I don't know if anyone else did.

Q Now prior to that meeting that you described with DA Hynes concerning ADA Batsidis and ADA Alexis, do you recall any meeting with DA Hynes prior to that --

A No.

Q -- concerning the Sam Kellner case?

A No. I don't recall.

MICHAEL F. VECCHIONE

Q Do you recall any subsequent meeting?
A No. I don't recall.
Q Okay. So let me -- I'm going to point you back to Plaintiff's 168, the second paragraph. The first one that's not redacted that begins this memo.
A Yes. I see it.
Q And fair to say that this paragraph, in part, refers to that exchange that you described with DA Hynes concerning the memo that had been written by ADAs Alexis and Batsidis?
A That's not --
MS. SCHARFSTEIN: Objection.
A -- fair to say. I'm sorry, Susan. That is not fair to say.
Q Why is it not fair to say?
A Well, look at the paragraph. It says the memo -- the memo by Batsidis and Alexis, the one referred to in this says January 16, 2014. I had -- and Hynes were out of office at that point, so that could not have been the memo that they were talking about.
Q Okay. So isn't it the case that according to that paragraph, the memo from

MICHAEL F. VECCHIONE

January 16, 2014, refers, in turn, to a recommendation that ADA Alexis and Batsidis had made to DA Hynes with regard to the Kellner case?

MS. SCHARFSTEIN: Objection.

A That's what it says.

Q Right. And you see the line -- and I'm going to read it. Quote, unquote -- it is shameful that former DA Hynes let ADA Vecchione to talk him out of dismissing this case.

Do you see that?

A Yeah. I see it.

Q And is it fair to say that you disagree with the characterization or that characterization of your exchange with former DA Hynes?

A Strenuously --

MS. SCHARFSTEIN: Objection.

A -- disagree.

Q And you see the next line, and I'm going to read -- quote, unquote -- equally reprehensible is Vecchione's decision to have Detective Steven Litwin referred to IAB.

Do you see that?

A I see it.

MICHAEL F. VECCHIONE

Q And again, going back to what I asked you before. Am I correct in understanding that that decision that was made to refer him -- this is Detective Litwin -- was not one that you made by yourself?

A I told you --

MS. SCHARFSTEIN: Objection.

A -- I don't recall. I said it might have been in conjunction with Charles Guria, who was in charge of our law enforcement investigation unit. There may have been other people that I asked about -- I just don't recall, but I was the one who said the words, ultimately, to give the case -- to refer it to IAB, so...

Q Well, do you recall why Detective Litwin was referred to IAB?

A No, I don't.

Q And Detective Litwin, had you had any dealings with him -- meaning dealings of a professional nature -- prior to this point?

MS. SCHARFSTEIN: Objection.

A I don't recall.

Q Well, do you recall if in connection with referring him to IAB, that was the first

MICHAEL F. VECCHIONE

time you had heard the name Detective Steve Litwin?

MS. SCHARFSTEIN: Objection.

A I can't say that.

Q Who's Lauren Hersh?

A Lauren Hersh was an assistant district attorney who was in charge our of Sex Trafficking Unit in the Rackets Division.

Q And did there come a point where she had to resign from the office?

A I don't recall.

MS. SCHARFSTEIN: Objection to that last question.

Q Okay. So I'm still on Plaintiff's 168. I'm going to scroll down a little bit, and do you see -- it's on page 3.

Do you see the paragraph that's under the heading -- and I'm quoting -- the genesis of the Kellner case? Do you see that?

A I see it.

Q And again, I'll defer to what your counsel said earlier, if you want to review more of the document than the part I'm pointing you to, feel free to do that, but this is the

MICHAEL F. VECCHIONE

particular paragraph I want to ask you about.
Do you see the first line or first sentence, I should say, of that paragraph, and I'm going to read it. After the Lebovits family's attempt to implicate Kellner and Taub's extortion plot failed, they were able to have the KCDA refocus its attention on Kellner by bringing a series of affidavits to the KCDA.
Do you see that?
A I see it.
Q Now in terms of Simon Taub, he was arrested at a point in time by your office in connection with the investigation that you carried out; correct?
A Correct.
Q And that was around -- in and around July of 2010, right?
A I don't know.
Q Well, isn't it the case that when he was arrested, Sam Kellner -- around the time he was arrested, Sam Kellner was not arrested, right?
A That's correct.
Q And isn't it the case that prior to

MICHAEL F. VECCHIONE

Mr. Taub's arrest, you had been investigating both Mr. Taub and also Mr. Kellner?

A To the best of my recollection, yes. We knew who Kellner was. In fact, he was on the scene at the arrest of Taub, so...

Q When you say he was on the scene, did you see him?

A No, but one of my detectives saw him and told me about it.

Q This is DI DeBoer?

A Correct.

Q And when you say he told you about it, where exactly did he describe seeing him?

A Across the street from the house where the money was exchanged from -- I think it was a Lebovits kid. One of the sons and Taub.

Q And did he describe Mr. Kellner receiving a phone call at that time?

A I -- I don't understand the question.

Q DI DeBoer, you said he told you that he saw Mr. Kellner across the street, right?

A Right.

Q Did he describe to you Mr. Kellner receiving a phone call at the time?

MICHAEL F. VECCHIONE

A Not that I recall.

Q Well, isn't it the case that Mr. Taub, at that time -- meaning the time of the hand over -- made a phone call to Mr. --

A Don't recall.

Q In terms of DI DeBoer's supposed observation of Mr. Kellner across the street, what significance, if any, did you attach to that?

A That Kellner was smarter than Taub. He stayed away knowing we were going to arrest him and Taub when the money was turned over. That was my impression.

Q So fair to say at that particular time -- this is July of 2010 -- it was your belief that Mr. Kellner was also engaged in attempted extortion of the Lebovits family?

A That's my recollection.

Q And other than the observation you testified about from DI DeBoer, do you recall any other basis for that belief?

A Don't recall.

Q And the observation from DI DeBoer, that was an observation that you read about in

MICHAEL F. VECCHIONE

the papers you reviewed over the past week, right?

MS. SCHARFSTEIN: Objection.

A I don't recall reading that in any papers. They may have been there, but I don't recall if it was in any of the documents. I recall it because I remember that.

Q So fair to say that was a -- you had -- whether or not you read it in papers over the past week, you had or you have an independent recollection of it.

A I have an independent recollection of DeBoer telling me that. Yes.

Q Okay. Is there anything else in connection with either the Taub case or the Kellner case that you have an independent recollection of up to the point of Taub's arrest in July --

MS. SCHARFSTEIN: Objection.

A I can't answer it. I have no recollection.

Q What was Taub arrested for?

A Don't recall.

Q What was he accused of doing?

MICHAEL F. VECCHIONE

A Don't recall.

Q What was Kellner, at that time, accused of doing?

A Don't recall.

Q So again, turning your attention to the first sentence of that particular paragraph, the one I read out to you, and the -- let me, as well, point you to another previously-marked exhibit. Let me see if I can pull it up for you.

So I don't know if you can see this particular document. It was previously marked Plaintiff's 45. I'm going to scroll down to the entry that is dated August 6, 2010. It's entry number 25 on page 6.

Do you see that particular entry?

A I see it.

Q Now do you recall in and around August 6, 2010, meeting with lawyers for the Lebovits family?

A No.

Q You have no recollection of that meeting?

A None, whatsoever.

Q Do you recall at any time receiving

MICHAEL F. VECCHIONE

affidavits from lawyers for Baruch Lebovits?
A You're asking me if I did?
Q Yeah.
A I don't recall anything like that.
Q Okay. I'm going to point you now to what was marked Plaintiff's 36A at a prior deposition, and I'm going to ask you to review this particular document. It's the same -- I can tell you it's the same affidavit in two forms. The difference between them is that one has five paragraphs, and the other one has an additional paragraph six.
So I'm going to ask you to -- I think you still have control of the mouse -- to scroll through that particular document.
A What's your question?
Q Well, I'm going to ask you to scroll through it first.
A Well, it's not working, so I can't scroll through it.
Q All right. Let me see if I can give you control of the cursor.
MS. SCHARFSTEIN: Do you want him to read both documents?

MICHAEL F. VECCHIONE

MR. MACGIOLLABHUI: I want to him to -- yeah. Read or review. However he wishes.

Q You should have control of the -- I'm going to stop it and start again. Okay. You should have it there.

A Okay. What am I looking for here?

Q My question is having reviewed those two documents, do you have any recollection of seeing either of them on a prior occasion?

A No.

Q When I say a prior occasion, I mean prior to the past week.

A No.

Q Did you review these documents in the past week?

A I believe so. It looks familiar, but I can't even say that, quite frankly. It was a lot of documents we went over.

Q Now I take it you're familiar -- you've been informed of the naming convention we're using for a number of the victims in this case.

MS. SCHARFSTEIN: Niall, you should tell him -- if you want to go

MICHAEL F. VECCHIONE

off the record to do it, that's fine.

MR. MACGIOLLABHUI: Okay. Let's go off the record, then.

(A discussion was held off the record.)

(A recess was taken at 10:46 a.m.)

Q Mr. Vecchione, I'm referring you to what was previously marked as Plaintiff's 36A. Now this is an affidavit that -- withdrawn.

These are two versions of an affidavit that was provided to your office in the course of the investigation of Sam Kellner, right?

A If you say so.

Q Well, do you recall, in the course of the Sam Kellner investigation and/or prosecution, receiving an affidavit from the person we're referring to in this case as Victim Number One?

A Who's the you? Me, personally? Or the office?

Q Your office.

A I don't recall.

Q Well, as you sit here today, can you state on what basis you prosecuted -- meaning your office prosecuted -- Sam Kellner?

MICHAEL F. VECCHIONE

MS. SCHARFSTEIN: Objection.

A I don't understand the question.

Q Your office commenced a prosecution of Sam Kellner, right?

A We commenced an investigation, which ultimately lead to an indictment.

Q Okay. And what was Sam Kellner indicted for?

A I don't recall.

Q Do you recall what he was alleged to have done in connection with that indictment?

A In general, attempting to get witnesses to lie about Baruch Lebovits, and also potentially extorting money from the Lebovits family to get witnesses to either not show up or to change their testimony.

That's my best recollection, but I'm not even sure if I'm correct about that. But it had to do with extortion, potential witness tampering, and potential bribery. That's the general -- my general terms that I can use to answer your question.

Q And in terms of the alleged bribery, that was in relation to alleged victims of Baruch

MICHAEL F. VECCHIONE

Lebovits, right?

MS. SCHARFSTEIN: Objection.

A Alleged victim? Baruch Lebovits? What are you talking about?

Q Well, you had indicated in your earlier answer that Mr. Kellner was accused by your office of paying money to one or more witnesses, right?

A It's my best recollection. Yeah.

Q And what's your recollection of -- in terms of what your office alleged of why this money was paid?

A I don't have any recollection.

Q Well, do you recall that your office alleged that Mr. Kellner had paid money to Victim Number One to falsely accuse Baruch Lebovits of sexually abusing him?

A Independent of this document, I don't have a recollection. It was a long time ago.

Q Okay. Well, having reviewed this particular document, so Plaintiff's 36A, do you recall that your office had accused Mr. Kellner of paying Victim Number One to falsely accuse Baruch Lebovits of sexually abusing him?

MICHAEL F. VECCHIONE

A In general --

MS. SCHARFSTEIN: Objection.

A In general, yes.

Q And do you recall whether or not at that time you believed that my client -- this is Sam Kellner -- had, in fact, paid victim --

A The evidence -- the evidence --

MS. SCHARFSTEIN: Objection.

A -- was what it was.

Q Right, but I'm asking about your belief.

A I can't --

MS. SCHARFSTEIN: Objection.

A I can't answer that.

Q And in terms of that evidence, what do you recall that evidence was? Now this is in relation to Victim Number One.

A I don't recall.

Q Now Baruch Lebovits, at the time you were investigating Sam Kellner --

A When you say you, Mr. --

Q Excuse me. You're right.

A Make it clear for the record what the you is because Batsidis did this investigation.

MICHAEL F. VECCHIONE

Q No. I understand.
A Okay.
Q Let me say this. When I say you, I mean your office, but you're right.
A Okay.
Q I'll make it clearer in that regard.
A Go ahead.
Q At the time that your office was investigating Sam Kellner, Mr. Lebovits was incarcerated, right?
A I have no idea.
Q Well, you know that he had been convicted of -- withdrawn.
You know or you knew at that time that he had been convicted of alleged sexual abuse in relation to Victim Number Three, right?
A Incorrect.
Q What's incorrect about what I asked you?
A I don't know what victim. I just knew that Lebovits had been convicted, and I remember reading in the newspaper about the large sentence that was imposed upon him by Judge DiMango.
Q Well, subsequent to reading that news

MICHAEL F. VECCHIONE

report, did there come a time that you learned the identity of the complainant in respect to whom he had been convicted?

A I have no recollection of learning that.

Q Now Alan Dershowitz, you met with him in connection with the investigation of Sam Kellner, right?

A He met with me.

Q Was that his first time meeting with you?

A Ever in life?

Q Yes.

A I -- yes.

Q Approximately how many times did you and he meet in connection with the investigation of Sam Kellner?

A Well, I distinctly remember one time. There may have been a second, but I distinctly remember one time.

Q Well, tell me what you recall of that one time.

A That he came to my office and admired my baseball memorabilia about the Brooklyn

Dodgers.

Q And this memorabilia was in your office, right?

A Yes, it was.

Q At that particular meeting, who else was present?

A I believe Aidala but -- yeah. It was Aidala. It was he and Aidala.

Q And was ADA Batsidis present?

A Don't recall.

Q And other than your memorabilia, do you remember what else you discussed?

A No.

Q I'm going to show you now what was previously marked Plaintiff's 56. And you should still have control of the mouse, but what you're looking at, at the moment, I think is the entire content of the document.

Do you see that?

A Okay. I do.

Q So it's an affidavit from a person by the name of Moshe Friedman. Do you see that?

A Yeah.

Q Moshe Friedman, do you know who that

MICHAEL F. VECCHIONE

is?

A No. Let me just go back. You need to clarify that question. You said do I know who he is.

Q Right.

A Does that mean did I know at some point? Have I learned who he is? Or -- I should -- I'm going to take back my answer and ask you to repeat the question and make it clearer.

Q Okay. Well, I didn't say did. I said do. Do you know who he is?

A As we sit here today?

Q Right.

A I don't know who he is. No.

Q Did you know at some time in the past who he was?

A I don't think I ever knew who he was. I know the name -- I recognize -- remember the name, but I don't remember if I ever was told who he was. I think he might have been a rabbi, but I'm only guessing at this point.

Q Okay. What do you remember of him?

A That he was someone who had information

MICHAEL F. VECCHIONE

against your client.

Q And do you recall what that information was?

A No.

Q In looking at the document that is Plaintiff's 56, does that refresh your recollection as to what the information was?

A It honestly doesn't. It's been a long time.

Q Now do you see the notary stamp at the bottom of the document?

A I do.

Q Do you see that name, Robert Mladinich?

A I do.

Q Do you know who that is?

A Well, I know he was -- he's a former New York City detective, I think, or certainly a New York City cop. I don't know what his rank was.

Q Beyond knowing that he was a former either NYPD cop or detective, do you know anything else about him?

A No. He might be an author. He might have written -- I think he did write a book with

other detective -- I know he wrote something. A book, I think it was, about the NYPD. That, I do know about him.

Q And did he ever write anything about any one of your cases?

A Not to my knowledge.

Q Did he ever, to your knowledge, write about the people we earlier described as the mafia cops?

A Not to my knowledge.

Q Okay. So I'm going to show you now what was marked at a previous deposition as Plaintiff's 63. And I'm going to ask you to review that document. Again, you should still have control --

A Yeah. I've seen it. I remember -- you sent it. Go ahead.

Q Okay. So I'm going to ask you to confirm that that is e-mail correspondence in which you were engaged in November 2010.

MS. SCHARFSTEIN: Objection.

A That's what it says. That's what it says. I don't have an independent recollection of that, but go ahead.

MICHAEL F. VECCHIONE

Q Okay. And the person you refer to in one of these e-mails as Bob is Mr. Mladinich, right?

A I believe so.

Q And is it your testimony that prior to Mr. Mladinich's involvement in this particular matter, that you didn't know him prior to that?

A That's my recollection.

Q And this particular e-mail exchange -- well, withdrawn.

Let me point you to the -- the e-mail at the bottom. So the original e-mail is from Mr. Mladinich to Mr. Aidala, right?

MS. SCHARFSTEIN: Objection.

A It speaks for itself.

Q And then Mr. Aidala forwarded the -- that particular e-mail exchange to you on November 24, right?

A That's what the document says.

Q And the original e-mail is a reference to Victim Number Three, right?

A No idea.

Q Well, do you recall during the course of the investigation of Sam Kellner that Victim

Number Three was interviewed in your office?

A No.

Q Do you recall in the course of the investigation of Sam Kellner that Victim Number One was interviewed in your office?

A A vague recollection, but I can't say that I have a recollection that I could answer any questions about.

Q Well, what do you recall?

A That he was there at some point.

Q Well, did you ever meet with him?

A I seem to have one -- I seem to have a recollection of having met with him one time, but I don't have a specific recollection of what the reason was. I just don't remember, but the answer to your question is I have a recollection of meeting -- of seeing him and then -- and meeting with him. So...

Q And in terms of that recollection, other than you and he, do you recall anyone else being present at that meeting?

A I don't.

Q And do you know somebody, an attorney by the name of John Lonuzzi?

MICHAEL F. VECCHIONE

A Well, I don't know him, but I know that he is involved in this case because I saw his name in the documents.
Q But fair to say you don't know him personally?
A I have no idea who he is. I wouldn't know him if he walked in the room right now.
Q Fair to say, then, you have no recollection of meeting him at any time?
A I don't, except that I believe that he represented Victim Number One. So I'm just assuming that he was there, but I don't recall specifically that he -- that he was. I don't recall who was there.
Q And back in 2010, you were a member of a number of bar associations, right?
A I don't believe so, but if you have -- can refresh my memory.
Q Well, I can't, unfortunately, but --
A Why did you ask that?
Q Well, that's exactly why I asked that. If I knew it already, I wouldn't be asking you.
A Yeah, well --
Q Let me ask you. Did you -- back in

MICHAEL F. VECCHIONE

2010, do you recall attending Brooklyn Bar Association functions or events?
A Ever?
Q Yeah.
A Quite frankly, the answer is no. I don't recall. I was not a member of the Brooklyn Bar Association, if that's what you're asking.
Q What about the --
A Never -- never had been a member of the Brooklyn Bar Association.
Q What associations were you a member of while you were a prosecutor in the DA's office?
A I think I was, at one point, the District Attorney's Association. The state District Attorney's Association.
Q I'm going to point you back to -- I think it was Plaintiff's 181. And this is a picture that was taken at an event organized by the Columbian Lawyer's Association, right?
A That's what it says.
Q Am I correct in understanding you were not a member of that particular association?
A That's correct.
Q What do you know of it?

MICHAEL F. VECCHIONE

A Nothing, other than it's Italian lawyers.

Q Now during the course of your office's investigation of Sam Kellner, did you personally ever have a concern that your office was being manipulated by Baruch Lebovits or his attorneys?

A I can't --

MS. SCHARFSTEIN: Objection.

Q Excuse me?

A I don't recall. If we went to the grand jury, I would have to guess that no is the answer, but I don't recall.

Q Well, do you recall ever having a concern that the actions being taken by your office in relation to Sam Kellner would result in the release from prison of a child molester?

MS. SCHARFSTEIN: Objection.

A No.

Q And other than Anthea Bruffee, do you recall anybody else within your office expressing a concern to you that your office was being manipulated by either Baruch Lebovits or his attorneys?

MS. SCHARFSTEIN: Objection.

MICHAEL F. VECCHIONE

A I can't answer the question because there's an assumption that you made in there or a characterization about Anthea Bruffee that -- so ask the question a different way. I don't know -- you said other than Anthea Bruffee, which assumes that I knew that she expressed that to me, and I don't have any recollection --

Q Mr. Vecchione, this is not a trial. This is not the way it works at a deposition. So if there's an objection to form, your attorney will interpose that objection, but you still have to answer the question.

MS. SCHARFSTEIN: No. No. If he doesn't understand the question --

MR. MACGIOLLABHUI: That's not what he said. He has an objection to the form of the question. He has an attorney. You're going to do that for him. He still has to answer. So I --

MS. SCHARFSTEIN: He can ask you to clarify. You said that at the beginning.

MR. MACGIOLLABHUI: No. Susan, you're not allowed to interpose

MICHAEL F. VECCHIONE

speaking objections, so please --

MS. SCHARFSTEIN: It's not a speaking objection.

MR. MACGIOLLABHUI: It is.

MS. SCHARFSTEIN: You raised it. I said --

MR. MACGIOLLABHUI: He objected to form. He objected to form. That's not his job. That's your job.

MS. SCHARFSTEIN: He said he can't -- I did object, and he said he can't answer the question.

A I can't answer the question.

MS. SCHARFSTEIN: He wants you to rephrase it.

Q Did Anthea Bruffee express a concern to you that your office was being manipulated either by Baruch Lebovits or his attorneys?

A Not that I recall.

Q Did anybody other than Anthea Bruffee express a concern to you that your office was being manipulated by either Baruch Lebovits or his attorneys?

A You just asked the question the same

MICHAEL F. VECCHIONE

way and repeated it. The answer is no. I don't recall any of that -- anything of that nature happening.

Q Do you recall anybody on behalf of Baruch Lebovits telling you that Baruch Lebovits was not guilty of the charges in respect of which he had been convicted at trial?

A Do I recall anyone telling me that?

Q Yeah.

A No.

Q Do you recall anybody telling you that prior to going to trial, that counsel for Baruch Lebovits had tried to reach a disposition with your office?

A No.

Q Do you recall anybody telling you that Baruch Lebovits had seen a psychiatrist in respect of the conduct alleged against him?

A No.

Q Now in the course of your investigation or your office's investigation of Sam Kellner, did you withhold any information from DA Hynes?

A Me, personally?

Q Yeah.

MICHAEL F. VECCHIONE

A No.

Q Now during the course of the investigation, fair to say that you and he -- that's DA Hynes -- discussed the investigation?

A I don't have specific recollections of that, but I wouldn't say that it -- it's out of the ordinary. I don't know how to answer it, quite frankly.

Q Okay. Well, let me show you what will be marked as Plaintiff's 183. This is another document that I think was within the batch that I sent counsel.

A I remember. I remember. I've seen it. Go ahead.

Q So this is e-mail correspondence between you and Mr. Hynes on November 6 of 2010, right?

A Correct.

Q And in terms of your office's prosecution of Simon Taub, do you recall this particular exchange with DA Hynes?

A No.

Q Having reviewed the document, does that refresh your recollection of you and he

communicating with regard to ADA Batsidis?

A No.

Q Now you see the first line of the second e-mail there from you to him -- and I'm going to read it. He's been working under my direct supervision, and he's done a very good job.

Is that, as you sit here today, an accurate statement?

A I don't have a recollection of saying that, but I do -- I was the chief of the Rackets Division, so he worked under me.

Q And did there come a point in time either in the investigation or prosecution of Sam Kellner where your belief changed with regard to the job that ADA Batsidis was doing?

A I can't answer the question. Clarify it.

Q Well, fair to say that in November of 2010, you felt that ADA Batsidis was doing a good job with regard to the prosecution of Simon Taub?

A That's what it says.

Q Well, ADA Batsidis subsequently was the assigned prosecutor with regard to Sam Kellner's

MICHAEL F. VECCHIONE

case, right?

A He was assigned to do the investigation. Correct.

Q And he also presented the case to the grand jury, right?

A My recollection is that that is correct.

Q And at a subsequent point in time, you assigned ADA Alexis to the case, as well.

A Correct.

Q And why was that?

A Well, ADA Alexis had more trial experience. He had been in the office probably around 20 years at that point. And Batsidis, I don't think, had the same -- I know he didn't have the same amount of trial experience. So if this was going to trial, I needed someone with more trial experience to be a part of the trial team.

Q And had you personally tried cases in the past with ADA Alexis?

A Yes.

Q One case? Or more than one case?

A I don't remember.

MICHAEL F. VECCHIONE

Q Was ADA Alexis involved in the prosecution of Mr. DeVecchio?
A Yes.
Q Is there a reason you don't mention ADA Alexis in your book?
MS. SCHARFSTEIN: Objection.
A Are you kidding me? That's a question?
Q Yeah.
A Is there a reason?
Q Yeah.
A I can't answer the question.
Q Well, did you have a falling out with ADA Alexis?
A I can't answer the question.
Q Why not?
A Because I don't know what you're asking me.
Q Well, you heard the question. Did you have a falling out with ADA Alexis?
MS. SCHARFSTEIN: Objection.
A Don't recall.
MR. MACGIOLLABHUI: My apologies.
I have another document I want to print out. I'll just be a moment. Sorry for

MICHAEL F. VECCHIONE

this. Bear with me a second.

(A recess was taken at 11:25 a.m.)

Q My apologies for that interruption. I'm going to pull up what is Plaintiff's -- or what was previously marked or hasn't been marked yet, but will be marked as Plaintiff's 185.

Do you see this document?

A Is that a question?

Q Yeah.

A I see something up here. Yeah. It's a -- looks like an e-mail.

Q Okay. It's an e-mail from Mr. Aidala to you, dated January 20, 2011, right?

A Okay. That's what it says.

Q Well, this is one of the documents you reviewed in the past week, right?

A I have no idea. I don't remember.

Q Well, I'm going to ask you again to review the document now.

A I reviewed it.

Q What is it?

MS. SCHARFSTEIN: Niall, is there more? Or is it just that one e-mail?

MR. MACGIOLLABHUI: No. There are

MICHAEL F. VECCHIONE
attachments. It's a four -- it's a one-page --
MS. SCHARFSTEIN: Do you want him to look at the --
MR. MACGIOLLABHUI: I do.
MS. SCHARFSTEIN: Okay. It's just --
A There's nothing up here, except the first page of the e-mail.
Q But you can scroll down. I will help you.
A You didn't tell me that. Okay. Yes. I've seen -- I know what this is. Go ahead. I've seen -- I saw it during the week. Yes.
Q All right. So isn't it the case that Mr. Aidala, in January 2011, sent you a draft, what is known as 440 motion?
MS. SCHARFSTEIN: Objection. Are you asking him to read based on --
A What's the question? Give me a question. What's the question?
Q I gave it. I gave you --
A You said -- you made a statement that someone sent me something.

MICHAEL F. VECCHIONE

Q No. I said isn't it the case that on January 20 of 2011, Mr. Aidala sent you a draft 440 motion?

A I don't recall ever seeing this, other than during the course of my -- looking at the documents you sent during the preparation time for this deposition.

Q And -- well, do you recall at any time discussing with Mr. Aidala a 440 motion that he intended to make on behalf of his client, Baruch Lebovits?

A No.

Q Now the investigation that you were carrying out into Sam Kellner, that was related to the case your office had against Baruch Lebovits, right?

MS. SCHARFSTEIN: Objection.

A I don't agree with that.

Q Why not?

A It's a -- separate crimes alleged by -- alleged against two individuals who had nothing -- who were not part of the Lebovits case.

Q Isn't it the case that your office and,

in particular, Rackets were investigating whether my client had paid money to Victim Number Three?

A Correct. Well, I don't know about Victim Number Three. I don't remember -- I just told you what I remembered about what our investigation was. Specifically, I don't have a recollection, but if that's what your question is, of course Aidala brought the investigation to us. So...

Q Right. Well, am I right in understanding you recall investigating whether Mr. Kellner had paid money to Victim Number One?

A I don't recall that.

Q Well, do you recall investigating whether he had paid money to Victim Number Three?

A I just told you what my answer is. My answer is I recall the allegations that he paid money to people involved in the Lebovits case. That's what I remember. You give me one, you give me three. I don't recall the names at this point of the individuals who were the beneficiaries of your client's bribery. So...

Q Alleged bribery, right?

A Ask the question.

MICHAEL F. VECCHIONE

Q I said he wasn't convicted of anything, right?

A He was not convicted. Correct.

Q Right. So he had a presumption of innocence then, and it remains to this day, right?

A Is this a legal discussion? Or are you going to ask me questions?

Q No. That's my question to you.

A DA Thompson saw fit to dismiss the case against your client.

Q Well, ADA Alexis and Batsidis recommended that course of action prior to DA Thompson being elected, right?

MS. SCHARFSTEIN: Objection.

Q I don't know if you caught the question.

A I caught the question. You asked me this already, and I gave you an answer to this.

Q Okay. But we're in a civil deposition. This is not -- this is not a trial in criminal court. This is a civil deposition, which means if I ask a question, unless your counsel instructs you not to answer it, you have to

MICHAEL F. VECCHIONE

answer the question.

A As I answered before --

MS. SCHARFSTEIN: Answer the question, and then I have something to say for the record.

A Alexis and Batsidis wanted to dismiss the case at some point. Correct. As I answered now three times.

MS. SCHARFSTEIN: Before we get to the next question, Niall, what you said is not entirely true. If the questions are asked over and over, we can stop the deposition and make a motion for a protective order.

And I don't think it's necessary to get the Court involved in this, but I would just ask you to try to be more considerate of the witness's time, understanding that this is a nonparty witness. He is not a party to this case. And he -- you know, peoples' time has value. Once the question is asked and answered and it's on the record, there's really no reason to

MICHAEL F. VECCHIONE

revisit that territory once or twice or three times again.

MR. MACGIOLLABHUI: That's fine, Susan. And let me just say this, just in terms of making the rest of it as smooth as possible.

I do understand, Mr. Vecchione, that unlike most witnesses, you have very good knowledge of the proper form, for example, in which to ask questions, what's admissible or not, etc., etc. I would simply say this, and I don't mean it in a -- how would I say -- browbeating way, that the rules are somewhat different when it comes to depositions as they are at trial.

So in terms of me asking questions and possibly asking the same question a second time, I'm not doing it to be difficult, but I am entitled to do it. And as Ms. Scharfstein indicated, if there comes a point where I'm going too far with it, she has the option to contact the Court. I don't think we're

MICHAEL F. VECCHIONE

going to get to that. Anyway --

MS. SCHARFSTEIN: Niall, can I also ask, I think your question -- before you ask a specific question, your questions, I think, are still confusing in the sense that your -- they're including --

MR. MACGIOLLABHUI: Susan, listen. I appreciate the commentary, but you know what? Spare me.

MS. SCHARFSTEIN: I want this objection on the record because I --

MR. MACGIOLLABHUI: This is not objection. This is commentary.

MS. SCHARFSTEIN: I want it on the record in case I have to go to the record and the Court, and the Court --

MR. MACGIOLLABHUI: Make your record.

MS. SCHARFSTEIN: -- can read the transcript.

MR. MACGIOLLABHUI: You know, I'm trying to be conciliatory. If you want to take advantage of that, go right

MICHAEL F. VECCHIONE

ahead.

MS. SCHARFSTEIN: I don't view it as taking advantage, but I think your questions are still incorporating the word you, and it's unclear as to whether you're referring specifically to Mr. Vecchione or to the office. So I would just ask that you be a bit clearer so that we can get through this.

MR. MACGIOLLABHUI: Okay. This is what I'm going to do. I'm going to ask the reporter to read back the last question that I asked and see whether or not that's the case.

MS. SCHARFSTEIN: It's not going to change my view, but if you want her to read it, that's fine.

(The requested portion of the transcript was read back by the reporter.)

MR. MACGIOLLABHUI: So we'll get back to the questions, but obviously, Susan, there's no mention of you or

MICHAEL F. VECCHIONE

your office or confusion.
Mr. Vecchione's objection to the question was that he had already answered it. Okay?

MS. SCHARFSTEIN: Okay.

MR. MACGIOLLABHUI: Which I take on board, and I'm going to move on. Because --

MS. SCHARFSTEIN: Okay. Let's please move on.

MR. MACGIOLLABHUI: Right.

Q So now am I correct in my understanding that you disagreed with DA Thompson's decision to dismiss the case, right?

A DA --

MS. SCHARFSTEIN: Objection.

A I don't know what the basis -- and is the you me, personally?

Q Right.

A Or the office?

Q You, personally.

A I don't know what his basis for dismissing it was, so I can't answer that question.

MICHAEL F. VECCHIONE

Q Well, did you and --

A Also, let me add one other thing. And I don't know what happened from the time I left the DA's office and the time that he dismissed the case. So I can't answer the question.

Q Well, you certainly disagreed with the recommendation of ADA Alexis and ADA Batsidis to dismiss the case before.

A As I said --

MS. SCHARFSTEIN: Objection.

A -- before, there was a triable case and a legally sufficient case. That's what I said to the district attorney.

Q Okay. For you, personally, what was the basis of your belief that there was a legally sufficient case?

A I don't recall.

Q What was the basis of your belief that there was a triable case?

A I don't recall.

Q I'm going to show you now what was previously marked as Plaintiff's 76. I believe this was amongst a batch of documents sent to you in the past week.

MICHAEL F. VECCHIONE

Do you see that?

A Yes. Yes. I recall this.

Q Okay.

A I recall seeing it when we discussed -- when Susan and I discussed the case. Yes.

Q Well, in respect of -- withdrawn.

You see the e-mail at the bottom of the first page? So it's the e-mail from Anthea Bruffee to Amy Feinstein on June 22 of 2011. Do you see that e-mail?

A June 22? Or 27?

Q Excuse me. 27th.

A It says -- the subject is Baruch Lebovits stay. Is that what you're referring to?

Q Yeah.

A Okay. I see it. Yes.

Q And you see the second paragraph and the second sentence of which begins just to confirm -- and I'm quoting -- my understanding of the agreement between the defense and Rackets.

Do you see that?

A I see it.

Q And that particular e-mail describes the agreement in question, right?

MICHAEL F. VECCHIONE

A I don't know.

Q Well, you see what it does, in fact, describe. So this is the second sentence in the paragraph. Do you see that?

A No.

Q Did you see where it reads: That we will not make the claim -- we, being the Brooklyn DA's office -- that the post-judgment CPL 440.10 motion brought a year after defendant's conviction is not made with due diligence, i.e., that the motion was not made in a timely fashion after the conviction because our office was then conducting an investigation into the Kellner scheme, correct.

Do you see that?

A I see it.

Q If I scroll up to the top of the document, you'll see that there's an e-mail from Anthea Bruffee to you, again on June 22, 2011, asking you to confirm that the -- quote, unquote -- below agreement, Re, my answer to the CPL 440. Do you see that?

A I see it.

Q And then there's an e-mail back from

MICHAEL F. VECCHIONE

you to her saying -- quote, unquote -- you have it right.

A I see it.

Q So isn't it the case that the agreement that she described between Rackets and defense attorneys for Baruch Lebovits is one that you confirmed?

A I have no recollection of any agreement. And this does not refresh my memory as to any agreement.

Q Now the investigation into Sam Kellner, was that an investigation that was being conducted only by Rackets?

A I don't understand the question.

Q Meaning that the investigation that your office conducted into Sam Kellner, was that conducted -- that investigation conducted solely by Rackets?

MS. SCHARFSTEIN: Objection.

A It's the same question, and I still don't understand it.

Q Well, was anybody from Sex Crimes within your office involved in the investigation into Sam Kellner?

MICHAEL F. VECCHIONE

A Involved in -- again, I don't understand the question. What is -- what's your definition of involved?

Q Well, did you -- during the course of the -- your office's investigation of Sam Kellner, did you discuss the investigation -- you, personally, discuss the investigation with anybody from Sex Crimes?

A I can't recall anything like that.

Q And do you recall providing Sex Crimes with any material connected to the Rackets investigation of Sam Kellner?

A Me, personally? Or Batsidis?

Q Well, let me point you to Exhibit 45 again, and it's entry 36 on page 8. Do you see that particular entry?

A Right.

Q And I'm going to read it: I was instructed by ADA Vecchione -- this is ADA Batsidis -- to supply Sex Crimes with all the affidavits, interviews, and the translated recorded conversation between Meyer and Kellner from 2009.

Do you see that?

MICHAEL F. VECCHIONE

A I see it.

Q Do you recall at any point during the investigation of Sam Kellner providing Sex Crimes with or asking ADA Batsidis to provide Sex Crimes with any written material?

A I have no recollection of it, but it's not unusual if I did. I mean, this says I did. Something we would have done, but I don't have any independent recollection of doing that.

Q Okay. And do you have any recollection of receiving any documents from Sex Crimes with regard to your investigation of --

A Batsidis may have. I don't have -- I certainly didn't get any. I didn't do the investigation. It was Batsidis who was doing it. So if he had contact with Sex Crimes and asked for things, then it would have been sent to him, not to me.

Q Well, during the course of the investigation, can you describe to me the interaction that you would have had with ADA Batsidis.

A If he had --

MS. SCHARFSTEIN: Objection.

MICHAEL F. VECCHIONE

A If he had a question or -- I'm sorry, Susan. You objected.

MS. SCHARFSTEIN: Go ahead.

A If he had a question or wanted some advice or just discuss what was going on, he would have come to me.

Q But wasn't it the case that you were communicating with Mr. Aidala separately to any communications that ADA Batsidis was involved with?

A I don't understand the question.

Q Well, did you -- did you have communications with Mr. Aidala about the investigation into Sam Kellner, separate to any communications that you had with ADA Batsidis?

A Be more specific. I can't answer the question.

Q Well, you were directly supervising ADA Batsidis; correct?

A As I did with probably 25 other assistant DAs working for me.

Q And to your knowledge, did ADA Batsidis communicate with Mr. Aidala?

A Not to my knowledge. I don't recall if

MICHAEL F. VECCHIONE

he did. If he did -- maybe he did. I don't recall.

Q Okay. Well, in relation to your communications with Mr. Aidala, other than the initial meeting in April 27, 2010, and the one you described in your office with regard to the baseball memorabilia, do you remember any other --

A No.

Q -- communications that you had?

A I don't remember any others.

Q What about Mr. Dershowitz? Other than that meeting in your office, do you remember any other communications?

A I do not.

Q Now the investigation that's been carried out by your office into Sam Kellner, was that a Rackets investigation? Or a joint investigation as between Rackets and Sex Crimes?

A It was not a joint investigation.

Q Why was it not a joint investigation?

A Because the investigation was -- they came to us with the allegations, and we opened up an investigation.

MICHAEL F. VECCHIONE

Q Why did you not include Sex Crimes in the investigation?

A There was no reason to include Sex Crimes. When someone comes to us with an investigation, unless there is a reason, then we would do it. But they came to us, and we did the investigation.

Q Yes, but the attorneys for Baruch Lebovits were looking to overturn his conviction, right?

A That has nothing to do with --

MS. SCHARFSTEIN: Objection.

A Yeah. Right. He was looking. I assume that's what a 440 is. So I assume yes.

Q So it did relate to a conviction that Sex Crimes had just obtained, right?

MS. SCHARFSTEIN: Objection.

A In -- in the broadest sense of the word relate, yes.

Q So why didn't you include Sex Crimes within Rackets' investigation of Sam Kellner?

A What's the question?

Q I said why did you not include Sex Crimes in the investigation of Rackets --

MICHAEL F. VECCHIONE

A It's not --

MS. SCHARFSTEIN: Objection.

Q -- into Sam Kellner?

A It's not an efficient way to do the investigation. It was our investigation, and our assistants were going to do the investigation.

Q Isn't it the case that the allegations that Mr. Aidala brought to you were allegations that had been previously brought to Sex Crimes?

A I don't know that. I have no idea. No recollection of that at all.

Q Isn't it the case that prosecutors from Sex Crimes had interacted with Sam Kellner?

A You have to ask them. You have to ask them. I don't know.

Q Isn't it the case that the witnesses, and in particular Victim Number One in your investigation, was also a witness in a case that Sex Crimes were pursuing against Baruch Lebovits?

A A witness --

MS. SCHARFSTEIN: Objection.

A At what point?

Q Well, isn't it the case that -- let me go back to 36A.

MICHAEL F. VECCHIONE

A I see it. It's right in front of me.
Q Yeah. Let me close out a few of these because I have too many open. Okay.
So this is an affidavit. I know it's called an affirmation, but it's a affidavit from Victim Number One, right?
A Okay.
Q And isn't it the case that when Victim Number One swore this particular affidavit, that Sex Crimes were still prosecuting Baruch Lebovits in relation to having abused?
A I don't know that. I don't know.
Q Well, did you become aware at a point in time during the course of your investigation of Sam Kellner that the case against Baruch Lebovits in relation to Victim Number One had been dismissed?
A I don't recall.
Q I'm going to show you now what was marked as Plaintiff's 36C at a prior deposition. Do you see this document? It's a three-page affidavit.
A Yeah, I do. I see it.
Q Is this document you reviewed in the

MICHAEL F. VECCHIONE

past week?

A I believe so.

Q Now Sholem Weisner, the person who swore this affidavit was involved in the Rackets investigation of Sam Kellner, right?

A I don't know.

MS. SCHARFSTEIN: Objection.

A I don't --

Q Well, do you recall ever meeting this individual, Sholem Weisner?

A No, I don't.

Q Do you recall a trip that he took to Florida in connection with the Rackets investigation of Sam Kellner?

A I don't --

MS. SCHARFSTEIN: Objection.

A -- remember.

Q I'm going to show you what will be marked Plaintiff's 184. And I don't believe this is one of the documents I provided in the last week. So let me identify it for you. It's an affirmation from Nathan Dershowitz. It's dated August 16 of 2011, and I'm going to direct your attention at one particular part of it. I

MICHAEL F. VECCHIONE

believe it's page 14, paragraph 34.

Do you see that particular paragraph?

A I do.

Q So I'm going to show you, as well, what will be marked Plaintiff's Exhibit 184A. And I'm going to open that for you, too. And it has an Exhibit tab, Exhibit H, and it's the same affidavit from Sholem Weisner that's referred to in Mr. Dershowitz's affirmation, but I want you to read paragraph 34, if you would.

A I read it.

Q Now Mr. Dershowitz claims that defense counsel for Baruch Lebovits received assurances from you before Mr. Weisner spoke with your office that his name would not be publicly disclosed. Is that an accurate statement?

A I don't recall.

MS. SCHARFSTEIN: Objection.

Q I'm going to show you now what was previously marked as Plaintiff's Exhibit 68. This should have been one of the documents that was provided to you in the past week. And do you recall -- I think you still have control of the mouse.

MICHAEL F. VECCHIONE

Do you recall reviewing this document in the past week?

A No.

Q Meaning it's not a document you reviewed?

A No. I don't recall it. If it's something -- I don't recall. I don't know. It doesn't look familiar to me.

Q Okay. And -- well, do you recall at any time either Mr. Dershowitz or Mr. Aidala providing you with excerpts of a recording that was made of Victim Number Three?

A No.

Q I'm going to point you now to Plaintiff's Exhibit 69. I'm going to identify it as an affidavit from Alan Dershowitz dated April 27, 2011.

Is this a document you reviewed in the past week?

A I believe so, yes. But I'm not -- you know, we went through a lot of documents. So if you gave it over to Susan, then we went through it. But I -- you know, that's the best I can do for you at this point.

MICHAEL F. VECCHIONE

Q Now Mr. Dershowitz, in this particular affidavit, he refers to recordings that were made of Victim Number Three. And he has attached an excerpt from one of those recordings to his affidavit. I'm going to point you to that particular excerpt.
Do you see it?
A I do.
Q And do you recall reading that excerpt at some time in the past?
A No.
Q Do you see paragraph 4 of his affidavit where he says that -- and I'm quoting -- he turned over to the Brooklyn DA's office this excerpt and several other pages of the tape recordings. This assistant DA told me he believed the transcript represented a truthful account.
Do you see that paragraph?
A I do.
Q Did you -- do you recall ever telling Alan Dershowitz that an excerpt of a recording that he provided to your office represented a truthful account?

MICHAEL F. VECCHIONE

A Not me. I don't recall that.

Q Well, when you say you don't recall it, is it that you don't recall whether you told him one way or another? Or --

A I don't recall the entire event. Okay.

Q I'm going to show you now what was previously marked as Plaintiff's 133. Again, this is a document that I provided in the past week. Do you --

A Yes. I recall it.

Q Okay. This is a notice of bail pending appeal application that Baruch Lebovits faxed to your office in -- or sent to your office in March of 2011, right?

A I don't know.

Q Well, prior to your office's indictment of Sam Kellner, do you recall learning that Baruch Lebovits intended to make a bail application?

A No, I don't.

MS. SCHARFSTEIN: Objection.

Q So I'm going to point you now to what would be marked as Plaintiff's 194. It's an excerpt from Ms. Bruffee's deposition. And I've

MICHAEL F. VECCHIONE

put two pages of it on the screen at once. There's six in total. Is that too small? Or is it easier for you to read in that way? Or do you want me to put it back the way it was?

A Depends on what you want me to do with it. Ask your question, and I'll tell you if it's too small if I have to read it, but I can see it.

Q Okay. Well, Ms. Bruffee, in this excerpt, describes a meeting that took place with a number of people, including yourself and DA Hynes. And my question is this.

I want you to review her account of that meeting, and let me know if there's anything in that account that is not accurate.

A I don't recall ever -- I don't recall anything about a meeting in which I was at where she was at with the District Attorney. I don't recall anything about it. I'm not saying it didn't occur. I'm not saying it did occur. I don't recall anything about this, and this does not refresh my recollection.

Q So in her account of this meeting -- and let me see if I can point you to the particular place. Actually, I'm going to point

MICHAEL F. VECCHIONE

you to another exhibit. This is going to be marked as Plaintiff's 195. Again, it's Ms. Bruffee's deposition. It's a two-page excerpt and contains her account of a meeting that occurred with DA Hynes in March 2011, a meeting at which you were present.

And I'm going to ask you to look at the portion on the second page, the paragraph that begins And during that, I remember it because we had the meeting. Do you see that paragraph I'm pointing to?

A I see it. Yes.

Q So I want you to read that paragraph and the one below it that ends I remember that so vividly.

A I read both of them. Go ahead. What's your question?

Q Now the account that Ms. Bruffee gives of the exchange between you and Mr. Hynes where, according to her, you said to DA Hynes -- and this is in respect of Baruch Lebovits -- he might have touched him, but it wasn't what the victim said. And then Hynes saying in return to you, but I thought you said he was an innocent man.

MICHAEL F. VECCHIONE

Is it your testimony today that you don't recall -- withdrawn.

Is it your testimony today that you don't know whether that account from Ms. Bruffee is accurate or not?

A Correct. I don't recall anything about this -- this meeting or this exchange. Nothing. So...

Q Well, do you recall telling DA Hynes at any time during the course of the investigation into Sam Kellner that Baruch Lebovits was an innocent man?

A No.

Q Do you recall at any time telling DA Hynes in the course of your investigation into Sam Kellner that Baruch Lebovits might have touched Victim Number Three, but it wasn't what Victim Number Three said?

A No. No. No. I don't recall anything of that nature.

Q Now I'm going to point you to Plaintiff's 194. Again, this is Ms. Bruffee's deposition and a particular excerpt, and I'm going to ask you to look at page 201 where

MICHAEL F. VECCHIONE

Ms. Bruffee recalls a meeting that occurred in your office with you, Ms. Bruffee, Ms. Jaus, and Ms. Gregory.

And I'm going to ask you to read a portion that has the question: And what was the substance of that conversation? And then Ms. Bruffee's answer.

A I see that.

Q Do you recall an exchange between you and Ms. Bruffee along the lines that she describes in that answer?

A No. No, I don't because it doesn't -- part of her answer makes no sense. Rhonnie asked me to go tell them that he had initiated this prosecution of Kellner. That makes no sense to me, since I'm the person who initiated the prosecution. I didn't need anybody to tell me what I had done, but I don't recall any of this happening.

Q Well, Ms. Bruffee's testimony was that you had called Ms. Jaus and Ms. Gregory to her office -- or to your office, I should say, to tell them that you had initiated an investigation into Sam Kellner. Do you recall doing that?

MICHAEL F. VECCHIONE

A No. No. And it doesn't say that. It says Rhonnie asked me to go tell them that he had initiated this prosecution of Kellner. That is totally nonsensical.

Q Let me read the sentence, just so that we have a common understanding. So I'm reading the paragraph that begins -- this is the first paragraph of the answer. Well, it was much earlier when he -- he, in this case, is you, Mr. Vecchione -- called Rhonnie Jaus and Miss to his office -- again, his is you -- and Rhonnie asked me -- that's Ms. Bruffee -- to go to tell them -- this may be mis-transcribed -- that he had initiated this prosecution of Kellner.

So what she's describing, and she describes this meeting elsewhere in her deposition, is a meeting in your office after you had called Ms. Jaus and Ms. Gregory to let them know that you had initiated a prosecution of Kellner. You're saying you recall no such meeting.

MS. SCHARFSTEIN: Objection.

A Correct.

Q And do you recall at any time calling

MICHAEL F. VECCHIONE

Ms. Jaus to let her know that you had initiated an investigation of Sam Kellner?

A Do I recall that? No.

Q Well, do you recall Ms. Bruffee telling you at any time that she thought your office was being played by the attorney's for Baruch Lebovits?

A No.

Q Are you saying it didn't happen? Or that you don't recall?

A I don't recall it ever happening, but I don't recall.

Q Now I'm going to scroll down towards the bottom of the page. And Ms. Bruffee's testimony -- I'm going to read. I felt like Artie Aidala and these -- and those guys had brought this case to him, even though they knew about it a year ahead of time, it turned out, and waited until there was a conviction in our case and then brought this in so that they could use it to undermine the conviction.

Do you recall either Ms. Bruffee or anybody else making that point to you?

A It doesn't say that they did, but I

don't recall that.

Q Okay. I'm going to show you now what will be marked as Plaintiff's 186. Do you see this document?

A I do.

Q This is an e-mail exchange that occurred between you and DA Hynes on April 12 of 2011, right?

A Yes.

Q Now before the Kellner case was presented to a grand jury, did you inform Mr. Hynes that the intention of Rackets was to present the case?

A I can't have -- I don't have a recollection of that. It wouldn't be unusual for me to have done it, though.

Q I'm going to show you now what will be marked as Plaintiff's 187. It's a two-page document consisting of --

A Yes.

Q -- two e-mails. Do you see that?

A Yes.

Q And this is an e-mail -- and I'm looking at the second page of the document --

MICHAEL F. VECCHIONE

that was sent by Anne Seely to you on April 12 of 2011, right?
A Yes. That's what it says.
Q Well, isn't it the case that after Sam Kellner was indicted, that a press conference was held in your office?
A Well, I don't have an independent recollection of it, but I read something that -- in these papers. It indicates that there was a press conference, but it...
Q Well, in terms of the remarks that DA Hynes gave at that press conference, do you have any recollection as to who prepared those remarks?
A No, I don't, but I can tell you what the practice was in the Rackets Division, if that helps you.
Q Yeah. It does.
A Anne Seely generally prepared the remarks. Then we sent them to the DA for his perusal, and then he did what he -- whatever he would do with them. So...
Q And in terms of the practice within your office, what position did -- and this is

MICHAEL F. VECCHIONE

April 12 of 2011. What position did Ms. Seely hold?

A She was an executive in the Rackets Division. I don't remember what her position -- what her exact title was, but she was someone who had been in Rackets for a very, very long time and was someone who had been around and was a -- was a good writer.

Q And in terms of the practice within Rackets in this regard, would Ms. Seely obtain information about the case from the person who had been assigned to prosecute it?

A That would be the practice. Yes.

Q I'm going to show you now what will be marked as Plaintiff's 188. Again, this is document that you should have seen in the past week.

Do you see it now?

A Yes.

Q And this is an e-mail exchange that occurred between you and then DA Hynes on September 12, 2013, right?

A It's what it says.

Q Well, do you have an independent

recollection of engaging in this correspondence with him?

A I didn't remember this until I -- until I read it.

Q Well, having read it and -- how would you describe your relationship -- your working relationship with DA Hynes during the time you worked in the Brooklyn DA's office?

A You hit it in your question. We had a working relationship. We were work colleagues, and he was my boss, of course.

Q Well, would you characterize it as a good working relationship that you had with him?

A There were times when it was good. There were times when we disagreed. So I guess it was overall a good relationship. Yes.

Q And Amy Feinstein. How would you characterize your working relationship with her over your time in the DA's office?

A Well, almost nonexistent. She was the person who we would go to if we needed to have money approved for investigations and things of that nature, but -- and, you know, Amy and I were friendly. It was, again, work colleagues.

MICHAEL F. VECCHIONE

Q And what about Ms. Jaus?

A Who?

Q Rhonnie Jaus. How would you characterize your working relationship with her?

A Almost nonexistent. We didn't have much of a -- we didn't -- you know, Rackets had Rackets, and she had Sex Crimes.

Q Now at this -- well, not at this time. Not in 2013, but in 2010, was there a practice in the office in terms of executive meetings?

A You'll have to be more specific. I'm not sure I know what you're asking me.

Q Okay. Well, did you attend meetings in 2010 at which Ms. Jaus was present?

A Ever?

Q Yeah.

A Or in that year?

Q In that year.

A I don't recall.

Q Well, was there a regular practice in the office in 2010 of the heads of certain bureaus or divisions within the office meeting on a regular basis with DA Hynes?

A I don't recall that.

MICHAEL F. VECCHIONE

Q Now during your time in Rackets -- withdrawn.

During your time with the DA's office, there was an ADA investigated who was known as the -- quote/unquote -- Undertaker, right?

A The who?

Q The Undertaker.

A You gotta be a little bit more -- give me a little bit more than that. That is something which I'm not very familiar with at this point.

Q Well, in your book -- this is Crooked Brooklyn -- you make reference to an investigation that was carried out into an ADA within your office who was accepting bribes.

Do you remember that?

A The Priest, you mean. Not the Undertaker. He was called Priest. If I used the term Undertaker, I don't know where that came from. Maybe someone else, but I -- yes. I do recall that investigation. Yes.

Q And why was this person called the Priest?

A Because he had the same name as a

MICHAEL F. VECCHIONE

character in a movie in which he was called -- in which the character was called the Priest.

Q And the ADA, what's his name?

A I'm not going to give you that.

Q Well, why not?

A There's no reason to.

Q Well, I'm not -- unless your counsel is instructing you not to answer --

A Well, I'm not answering. Susan, should --

Q If you want to take a moment --

A Should I answer the --

MS. SCHARFSTEIN: Why don't we go off the record, and we'll take a moment. Michael --

MR. MACGIOLLABHUI: Susan, I don't need to be involved in this. This is between you and your client. So I'm happy to go off the record. I don't want to be involved with this. This is between --

MS. SCHARFSTEIN: That's what I'm saying. We'll take a break.

MR. MACGIOLLABHUI: Okay. So what

MICHAEL F. VECCHIONE

time -- 12:20. We'll take five minutes?

MS. SCHARFSTEIN: Yeah. That's fine.

(A recess was taken at 12:20 p.m.)

MS. SCHARFSTEIN: So I'm going to instruct the witness not to answer on the basis that this information that you're seeking reflects an internal investigation of the DA's office, insofar as -- and also a personnel matter. And insofar as we're aware, this information has never been made public.

And so it's my position that the individual involved is -- is entitled to privacy on this issue. And also the DA's office, as well, as it was an internal law enforcement sensitive investigation.

Q Now Mr. Vecchione, the case I was asking you about, that's a case you wrote about in your book with Mr. Schmetterer, right?

A If you say so. I don't recall, but

I -- it wouldn't be unusual. I'll take your word for it.

Q Well, let me read you an excerpt from your book. Over the objections of myself and other senior staff, the District Attorney allowed him to resign, rather than face charges, even though we caught him dead to rights. We always wondered whether it was a case of local politics interfering with justice, as the Undertaker was the nephew of a community political leader.

Do you recall writing that in the book?

A Yes.

Q And the person that's referred to as the Undertaker, is that the same person that you previously referred to as the -- quote/unquote -- Priest?

A Yes.

MS. SCHARFSTEIN: Objection.

A I have to assume so, but I think we used the name Undertaker so that no one could go back, you know, to find out who this was because that name -- I believe that name was just totally made up by myself and Jerry Schmetterer.

Q Now the -- and I'm not going to ask you

MICHAEL F. VECCHIONE

for the name, but the community leader in question, was that a community political leader in Brooklyn?

A No idea. I don't remember.

Q Well, you referred in your book to -- again, I'm going back to the quotation I used -- wondering whether local politics had interfered with justice in relation to a decision that DA Hynes made.

Was that the only occasion that you recall where you had a concern that politics was interfering with justice?

A I don't understand --

MS. SCHARFSTEIN: Objection.

A -- the question, and it's a very broad question. I don't understand it, and -- you know...

Q Isn't it the case that with regard to the person you referred to as the Priest, that in your book you state that it was a concern of yours that DA Hynes's decision not to charge him criminally was possibly a case of -- quote, unquote -- local politics interfering with justice?

MICHAEL F. VECCHIONE

A What I read speaks for itself. What I wrote speaks for itself.

Q Well, aside from having written it, do you have any independent recollection of a concern that you had as to the fact that this individual was allowed to resign instead of facing criminal charges?

A What I wrote speaks for itself.

Q Right, but do you have an independent recollection?

A What I wrote speaks for itself.

Q Right, but I'm not asking about what you wrote. I'm --

A What I wrote speaks for itself.

MR. MACGIOLLABHUI: All right. I think we're going to have to contact the Court if that's --

MS. SCHARFSTEIN: Can I have the question again. Could the reporter read it back, please.

(The requested portion of the transcript was read back by the reporter.)

A Well, I guess the answer to that is no.

MICHAEL F. VECCHIONE

I don't have any independent recollection. So I've answered your question.

Q Right. Now I'm going to -- let me preface it by saying that obviously it was work-related, but I also did enjoy the book, and I'm going to quote from it again. I think this is the last time.

So your previous chief with Rackets was a person by the name of Dennis Hawkins, right?

A Correct.

Q And, again, I'm going to read a quotation from the book, which is as follows: Dennis and I would roll our eyes at some of the suggestions made by the kind of sycophants who knew how to rise in bureaucracy without ever having accomplished anything such as major convictions or having groundbreaking new ideas. We were both disappointed by how much Hynes was influenced by those snide gossip mongers and rumor spreaders who had no record of achievement or ever offered worthwhile ideas.

And my question in relation to the quotation is who, in particular, were you referring to?

MICHAEL F. VECCHIONE

A No recollection.

Q And do you recall attending meetings with DA Hynes at the time when Mr. Hawkins was chief of the Rackets Division?

A I recall that there were meetings. I don't recall specifically what the meetings were about, but yes.

Q Well, at these meetings, do you recall ever being disappointed by who it was that DA Hynes chose to listen to?

MS. SCHARFSTEIN: Objection.

A I don't think I can answer that question. I don't recall anything specific enough to give you an answer.

Q Okay. So I'm going to point you now -- I'm going to share my screen again. Actually, you know what? Let me resume the recording. I had stopped when you spoke to counsel. So I'm going to resume now.

I'm going to share my screen and show you what will be marked as Plaintiff's 189. And do you see that document?

A I do.

Q And this is a -- this is another

MICHAEL F. VECCHIONE

document that you reviewed in the past week, right?

A Yes.

Q And it's e-mail correspondence. And at the top, from Anthea Bruffee to Amy Feinstein, that makes reference to you, right?

A The next line makes reference to me, yes. After the caption at the top. Yes.

Q Right. And it's -- it refers, as well, to opposition papers, to a 440 motion filed by Baruch Lebovits that had been submitted by your office, right?

A It's what it appears to.

Q And it refers to the fact that you had a copy of those papers, and you had read them, right?

A That's what it says.

Q And now what was previously marked as Plaintiff's 75 -- and I want to point you, in particular, to -- let me see -- the affidavit of Detective Litwin. So I think it's page 14. And of that, I want you to look at -- I want you to read paragraphs 4 through 10, if you would.

A Oh, God. Well, I can't do it because

MICHAEL F. VECCHIONE

you're going to have to move it for me. It's not moving.
Q All right. Let me retry it. There you go. You should have control now. Yeah. There you go.
A Hold on one second. Seven months later -- okay. I've read them.
Q And those paragraphs refer to Victim Number One, right?
A If you say so.
Q Well, isn't it the case that -- and I'm going to point you to 9 and 10, in particular -- that Detective Litwin is describing a meeting that he had with Victim Number One?
A Yeah. I see the initials in chapter 10 -- in paragraph 10. Yes.
Q And isn't it the case that Detective Litwin is giving an account of having been told by Victim Number One that he had not retained Mr. Lonuzzi to represent him, and that he had been pressured, was afraid to say what had happened, and was told not to speak to Detective Litwin or to go to the DA's office?
A That's what it says.

MICHAEL F. VECCHIONE

Q And before Sam Kellner was indicted, were you aware of this information?

A I can't answer that. I don't know. I don't remember anything about this.

Q Well, isn't it the case that -- are you saying that you didn't read, at any point prior to the past week, this affidavit from Detective Litwin?

A Yeah. I don't recall ever reading this.

Q Well, doesn't it indicate in the e-mail I showed you, which is Plaintiff's 189, that you had, in fact --

A All it says is Bruffee saying which I -- which he has read. I don't -- I don't recall ever doing that.

Q Let me show you now what was previously marked as Plaintiff's Exhibit 158. And do you see this particular document?

A I do.

Q And it consists of an e-mail exchange involving you on June 20 of 2011, right?

A An e-mail exchange between myself and Bruffee and Batsidis. Yeah.

MICHAEL F. VECCHIONE

Q Right. And Ms. Bruffee is asking about the whereabouts of Victim Number One, right?

MS. SCHARFSTEIN: Objection. By the way, Niall, you said 2011, and the document says 2012.

A Yeah. I don't know what your --

Q Excuse me.

A What are you pointing to? I don't know what you're talking about.

Q Okay. Well, isn't it the case that -- what was the role that Victim Number One played in your office's prosecution of Sam Kellner?

A I don't recall.

Q Well, isn't it the case that according to the indictment, Victim Number One had been paid money by Sam Kellner to falsely accuse Baruch Lebovits of having sexually abused him?

A I don't recall.

Q And isn't it the case that after the indictment was returned, that questions were raised with regard to the credibility of Victim Number One?

A I don't recall.

Q Well, why did ADA Batsidis and

MICHAEL F. VECCHIONE

ADA Alexis recommend to DA Hynes that the case be dismissed?

A I don't recall. I never read the memo that they sent. They didn't involve me in this.

Q I'm going to show you what was marked at a prior deposition as Plaintiff's --

MS. SCHARFSTEIN: Which one?

MR. MACGIOLLABHUI: 79.

MS. SCHARFSTEIN: Okay.

Q It's a DD5 dated May 4 of 2012. Do you see that document?

A I do.

Q This was one of the documents you reviewed in the past week, right?

A Yes.

Q And even though he's -- his name appears in the document, I'm not going to use it to refer to him, but this DD5 relates to Victim Number One, right?

MS. SCHARFSTEIN: Objection.

A Relates to it? Is mentioned in it.

Q Right.

A Yeah.

Q And isn't it the case that this DD5

MICHAEL F. VECCHIONE

contains details with regard to threats that were made or were directed, I should say, at Victim Number One?

A I'm -- I don't understand your question. You're asking me what the content of this e-mail is? Of this DD5 is?

Q Yeah. Let me ask you that question. What is this DD5 about?

A I -- seems to me they're interviewing some -- some witness who claims that Lebovits's daughter brought some -- or did something with Torenheim. Or -- to tell you the truth, you know, I didn't read this very carefully because I don't know anything about this. So...

Q Well --

A Ask me a question, and I'll give you an answer as best I can.

Q Well, you see -- going back to the prior exhibits. This is 158. And you see the e-mail from Ms. Bruffee to you, the second from the top, which reads: Did he get that from anything other than the DD5.

Do you see that?

A I do see it.

MICHAEL F. VECCHIONE

Q And the subject of the e-mail exchange is any news on Victim Number One's whereabouts, right?

MS. SCHARFSTEIN: Objection.

A Yes.

Q And isn't it the case that this e-mail exchange refers to the information contained in this particular DD5 that is --

A I don't -- I don't know the answer to that. It says DD5 in the one before, and this is a DD5. I do not know if this is the DD5 that is referred to by Bruffee.

Q Well, you see the first bullet point on the DD5 --

A I do.

Q -- and I'm not going to use his name. I'm going to use Victim Number One. It reads she is best friends -- this is Ms. Bagimov -- with Victim Number One who fled to Israel out of fear seven months ago. Do you see that?

A I see it.

Q Victim Number One, at this time, was one of the witnesses that you intended to use or that your office intended to use at trial in

MICHAEL F. VECCHIONE

connection with the prosecution of Sam Kellner, right?

A I believe so.

MS. SCHARFSTEIN: Objection.

A I don't recall.

Q Well, do you recall at any point finding out that this particular person, who had testified before the grand jury with regard to Sam Kellner and was expected to be a witness at trial, had gone to Israel?

A No.

MS. SCHARFSTEIN: Objection.

A I don't --

MS. SCHARFSTEIN: Niall, we're not supposed to talk about grand jury, right? You don't have an unsealing order.

MR. MACGIOLLABHUI: So let me rephrase the question and remove the reference to the grand jury.

Q So do you recall, Mr. Vecchione, finding out subsequent to the indictment of Sam Kellner that Victim Number One, who was expected to be a witness at trial, had gone to Israel?

MICHAEL F. VECCHIONE
A I don't recall.
MS. SCHARFSTEIN: Objection.
Q I'm going to show you now what will be marked as Plaintiff's 190. I think this was one of the documents you were sent a week ago. You can let me know, Mr. Vecchione.
Is this a document you reviewed in the past week?
A Yes.
Q And it describes an interview you gave to Hella Winston of the Jewish Week, right?
A That's what it says.
Q To do with the witness intimidation in the ultra-Orthodox community. I think I had a question there. If not, I'll ask another one.
MS. SCHARFSTEIN: Yeah. Ask the question.
A Ask a question. We're just sitting here.
Q I had asked a question. You know, I was trying to do it the French way.
A I gave you an answer. You said is this an interview, and I said that's what it says.
Q All right. So the interview makes

reference -- or at least the article makes reference to you -- and I'm looking at paragraph one of it -- you being a member of -- and I'm quoting -- the DA's new task force to combat witness intimidation in the ultra-Orthodox community.

Do you see that?

A I see it.

Q Were you, in fact, a member of the task force that is referred to in the article?

A I have no idea what task force she's talking about. I don't remember any such task force. So I guess my answer is no. I don't recall.

Q I'm going now to what was previously marked as Plaintiff's 86. Again, this is a document that was sent to you a week ago. I'm going to ask you to review it and tell me whether or not this is a document you reviewed in the past week.

A It was.

Q And the document contains, at the bottom, an e-mail from DA Hynes to you asking for a summary of the evidence against Kellner. And

MICHAEL F. VECCHIONE

the e-mail is dated June 19 of 2013, right?

A That's what it says.

Q And --

A Not -- it doesn't say the evidence. It says a brief summary of the evidence.

Q Right. And ADA Batsidis sent an e-mail to DA Hynes on which you were copied later that day, right?

A That's what it looks like.

Q And I'm going to point you to the second page, the top of the page. The sentence that begins last fall Joe and I were made aware.

Do you see that?

A I see it.

Q And I'll actually read the whole sentence. Last fall Joe and I were made aware of allegations that the Lebovits family paid Victim Number One to testify in the grand jury in the instant case and subsequently sent him to Israel so that he would not be available as a witness at this trial.

Do you see that?

A I do see it.

MS. SCHARFSTEIN: Objection.

MICHAEL F. VECCHIONE

Q So -- now prior to this e-mail being sent, is that information that ADA Alexis and ADA Batsidis provided to you?

A I don't --

MS. SCHARFSTEIN: Objection.

A -- recall. I guess you'd have to ask them. I don't recall.

Q Well, do you recall -- again, prior this e-mail -- being told by anybody that the Lebovits family were alleged to have paid Victim Number One to testify in Mr. Kellner's grand jury?

A I don't recall anything like that.

Q I'm going to show you now what were previously marked as Plaintiff's 82 and 82A, and I'll ask you to look at 82A, in particular. Again, this is a document that was sent within the batch a week ago.

And do you -- do you recall finding out at some point prior to the past week that payments had been made to Victim Number One's family?

A No.

Q Now isn't it the case that at this

MICHAEL F. VECCHIONE

time, your office was accusing Sam Kellner of having made payments to Victim Number One?
A I don't recall.
MS. SCHARFSTEIN: Objection.
Q I'm going to show you now what is going to be marked as Plaintiff's 191, and I don't know if this was a document I sent a week ago. So I'm going to ask you to review this particular document. It consists of two e-mails, and it's a page in length.
A I saw it.
Q You saw it. Okay. And the first e-mail refers to payments being made to Victim Number One's family by a person by the name of Zalman Ashkenazi, right?
A When you say right, are you asking me what's in the document? That's --
Q Yeah.
A -- what it says.
Q Yeah. Well, you see the e-mail at the top, the person who sent the e-mail, Cornelius Gillon, Neil for short. Neil Gillon. Do you see that?
A Yeah.

MICHAEL F. VECCHIONE

Q Do you see that person's name? Is that a person you know of?

A Neil Gillon was in our Financial Investigators division. I think he may have even taken over at some point as the chief after the other guy -- the original chief retired.

Q And you see he makes reference in his e-mail to certain bank records that contained evidence of payments to Victim Number One?

MS. SCHARFSTEIN: Objection.

A Yeah. I -- I see it.

Q And do you see he says I believe -- and again I'm -- let me quote from the document. A record of those payments which were relatively de minimis, I believe was provided to Mike Vecchione.

Do you see that sentence?

A Yeah. I see it.

Q Is that sentence accurate? In that were you, in fact, provided with a record of the payments referred to?

A I don't recall ever seeing those payments until you sent them to Susan in this rule -- this group of documents. And I might

MICHAEL F. VECCHIONE

point out that Gillon says I believe was provided. It doesn't say was provided. But I don't recall seeing those -- those documents until I looked through this stuff with Susan over the last few days.

Q Let me show you now what was previously marked as Plaintiff's 81. And this is an e-mail that was sent by ADA Alexis to you and to ADA Batsidis on August 28, 2012.

Do you see this e-mail?

A I see it.

Q And do you see that it makes reference to Mr. Lonuzzi?

A It does.

Q And that -- Mr. Lonuzzi, at this time, was representing Victim Number One, right?

MS. SCHARFSTEIN: Objection.

A If you say so. August 28, 2012? I don't know.

Q Well, isn't it the case that ADA Alexis is informing you and ADA Batsidis that he had been told by Mr. Lonuzzi that an organization named Mesamche Lev -- and I'll spell that, M-e-s-a-m-c-h-e, L-e-v -- had paid him to

MICHAEL F. VECCHIONE

represent Victim Number One?

A That's what it says.

Q But do you recall receiving this e-mail?

A I do not.

Q Do you recall finding out that Mr. Lonuzzi had been paid by somebody else to represent Victim Number One?

A I do not.

Q Now the payments that had been made to Victim Number One and his family, as you sit here today, do you regard those -- or that information as Brady material with regard to your office's prosecution or then prosecution of Sam Kellner?

MS. SCHARFSTEIN: Objection.

A If that was the case, then I would have turned it over, but I turn over everything. So that's just my -- my -- that had been my practice since I practiced law. So...

Q Well, when you say you turn over everything, what exactly do you mean by that?

A I practiced -- I practiced what the DA ultimately put into practice, which was open file discovery. So...

MICHAEL F. VECCHIONE

Q And what --

A That was my practice.

Q What -- and again, I'm going to go back to the time when Mr. Kellner was being prosecuted. What exactly did that mean, open file discovery?

A I wasn't around when Mr. Kellner was being prosecuted. I left the office in 2013. So I don't know.

Q Okay.

A I can tell you what it meant to me. And what it meant -- and how I took it is that I copied every piece of paper in the file and turned it over to the defense.

Q And -- right. So the period I'm focused upon is from April 2011, which is when Mr. Kellner was indicted, until you left the office, which I understand was the end of 2013 or the beginning of 2014.

A No. It was the middle of December of 2013.

Q Okay. So that's the period I'm focused upon. April '11 to --

A Open file discovery meant I personally

MICHAEL F. VECCHIONE

turned over everything in the file to the defense, unless there was something that needed to be protected, like the information of a confidential witness or something of that nature. And that's what -- how I practiced law at that time. Does that answer your question?

Q Yes, it does. And the prosecutors in Rackets that you supervised, did you instruct them during this period of time -- so April 2011 to December 2013 -- to also follow that practice?

A It was the office practice to provide open file discovery. I can't remember when it was put into a formal document of any kind or an e-mail, but that was the office practice. But to answer your question, the answer is yes.

Q And do you recall in the case of Sam Kellner at any time asking ADA Batsidis whether, in fact, he had complied with this practice of open file discovery?

A No. I don't recall. I don't recall that.

Q Okay. I'm going to show you what -- let me see -- was previously marked as Plaintiff's 93. And I'm going to ask you to --

MICHAEL F. VECCHIONE

first of all, I'll identify it for you. It was a memo that was written by ADA Alexis and ADA Batsidis, dated January 16, 2014, and addressed to then DA Thompson and First Assistant DA Mark Feldman.

And I'm going to ask you to look in particular at page 8. And you see the paragraph that begins -- I think it's the second paragraph on that page -- at the end of the June 26 interview. Do you see that?

A I see it.

Q Okay. So I'm going to ask you to read from that point through the bottom of page 8, and then read page 9, as well.

A Okay. I can't -- I can't move this thing, so...

Q Let me see if I can give you control again. Do you have it now?

A No.

Q All right. Let me try it again. Any luck now? No?

A Correct. No.

Q All right. So I'll scroll down for you. Just tell me when you got to the portion

you can see, and I'll scroll -- continue scrolling.

A Okay. You can scroll it up. To where do you want me to read?

Q So what I want -- I want you to begin reading at the end of the June 26 interview, and then you're going to read the rest to page 8 and page 9. And I think it's the first two paragraphs of page 10.

A Okay. Go ahead. Under ultimately -- stop. Under -- can you go back for a second because I think that this is inaccurate.

Q Okay. What I'm going to do is this.

A Okay. I got you. Ask the questions I -- I --

Q You know what? I'm going to ask you to read it first, and then I'm going to go through it with you and ask you specifically about what's accurate and what's not. So I'll ask --

A Go through it. Go through it.

Q Okay.

A I see -- I see what -- go ahead. I made a mistake. I thought that a date was characterized as something that it wasn't, but go

MICHAEL F. VECCHIONE

ahead. Ask your questions.

Q Okay. So you see where my cursor is, the paragraph that begins ultimately. Ultimately, and then in parentheses, the writers are unsure the precise day Vecchione ordered Executive Assistant DA Charles Guria to refer Detective Litwin to IAB regarding Victim Number One's allegations.

Is that an accurate statement?

A Well, I know that --

MS. SCHARFSTEIN: Objection.

A -- there was a referral -- I'm sorry. I know there was a referral, and more than likely I would have asked Guria because he -- that was his area of expertise. So...

Q Now the next paragraph, the sentence in particular that reads: Batsidis and Alexis were to have no further contact with the former district attorney regarding the Kellner case.

A Right.

Q Is that something you told them?

A Yes. No. It doesn't say with the Kellner case. It says with the district attorney.

MICHAEL F. VECCHIONE

Q Right, but --

A Contact with the district attorney.

Q Regarding the Kellner case.

A Yeah.

Q So my question was that particular sentence, Batsidis and Alexis were to have no further contact with the former district attorney regarding the Kellner case. Is that something that you told them?

A Those words are what I used in context with a very larger picture, but yes.

Q Okay. Now the next portion, so on Monday, July 1, 2013, Victim Number One and Mr. Lonuzzi returned to the KCDA for further questions. Vecchione, Batsidis, and Alexis conducted the questioning.

Do you recall that particular interview on July 1, 2013?

A No.

Q Now you see the paragraph that begins -- and I'm third from the bottom of page 9. After this interview, Batsidis and Alexis were further convinced that Victim Number One was an unreliable witness. Vecchione

disagreed.

Is that an accurate statement?

MS. SCHARFSTEIN: Objection.

A Don't recall.

Q What about the next paragraph? And I'll read it. Batsidis and Alexis restated their belief that the Kellner case should be dismissed. Vecchione disagreed.

Is that an accurate statement?

A Don't recall if that's accurate. I don't recall any of this. Okay? So if you want to keep asking questions if I remember this, you go right ahead.

Q Okay. Well, you see the paragraph down at the bottom of the page where it says Batsidis and Alexis then stated that the Victim Number One interviews were replete with Brady material that must be turned over immediately to Kellner's attorneys. Vecchione initially stated that there was no Brady to be turned over since Victim Number One never recanted the accusation that Kellner paid him to falsely testify against Baruch Lebovits.

Do you recall that exchange taking --

MS. SCHARFSTEIN: Objection.

A Not -- not in the slightest.

Q Well, do you recall at that time any conversation that you had with either ADA Batsidis or ADA Alexis about whether or not certain material in the Kellner case needed to be turned over to Kellner's attorneys?

A I don't recall any conversation, and we had two experienced assistant district attorneys. They know what Brady was and didn't need my input.

Q Did you provide your input?

A I don't recall.

Q I'm going to show you what was previously marked as Plaintiff's 88, and also Plaintiff's 87. So I point you, first of all, to Plaintiff's 87. And I'll ask you -- again, I don't know if this was a document that was provided in the past week, but I'm going to ask you to review the cover letter, which is the first two pages.

MS. SCHARFSTEIN: Can you scroll up a little bit. I want to see the date on the letter.

MICHAEL F. VECCHIONE

A Yeah. That's what I'm looking for. July 5. Go ahead. Scroll. What's -- what's your question? It seems like this is a Brady letter.

Q Right. Do you recall being involved in the preparation --

A No.

Q -- of --

A I don't recall, and this apparently goes against that other paragraph -- never mind. I withdraw that comment. I don't recall. No.

Q Well, do you recall, in terms of this particular Brady disclosure, a conversation about whether or not the bank records that we were discussing earlier that showed payments to Victim Number One's family should be disclosed?

A No recollection of it, whatsoever.

Q I'm going to show you what was previously marked as Plaintiff's 88. And do you see that document?

A I do.

Q And it refers to -- subject is Kellner Brady letter, 7/5 of '13, and it's an e-mail from ADA Alexis to you, ADA Batsidis, and ADA Ferrell.

MICHAEL F. VECCHIONE

And it states: I've worked in the DA's revisions.

Do you see that?

A I see it.

Q Do you recall any input that the DA provided into the letter that I showed you a moment ago, which is Plaintiff's 87?

A No.

Q Do you recall at a subsequent point in time ADA Batsidis or ADA Alexis asking you to be taken off the Kellner case?

A Ask it -- I wasn't on the Kellner case.

Q Right, but you were the boss of Rackets at that time, right?

A You asked me if they asked me to take myself off the --

Q No. No. Maybe I asked it in a -- in a misleading way. The question I was asking is do you recall either of them asking you to remove either one of them from the case?

A I recall their reluctance to go forward. I don't remember specifically them asking me to get off the case. If they did, obviously it didn't work since they were still on

the case when Thompson took over. So...

Q Well, isn't it the case that before Thompson took over, they were reassigned from Rackets?

A I don't know.

Q Well, do you recall there was an article that appeared in the New York Post that described an argument that took place between you and ADA Alexis following which ADA Alexis was reassigned from Rackets?

A I have no clue as to what you're talking about.

Q Okay. I'm going to show you now -- I'm going to show you now what will be marked as Plaintiff's 192A. Do you see this particular document?

A I see it.

Q And this is an e-mail exchange that involved you on July 9 of 2013, right?

MS. SCHARFSTEIN: Objection.

A Yeah.

Q And do you recall this e-mail exchange?

A No.

Q Now Alan Dershowitz, other than in

MICHAEL F. VECCHIONE

connection with the Sam Kellner case, have you had any other professional dealings with him?
A Not that I can recall.
Q And he wrote a letter on your behalf to the editor of ProPublica, right?
A He did.
Q And did you ask him to do that?
A I did not.
Q Do you know who asked him to do it?
A I do not.
Q And what about Ben Brafman. Did you have dealings with him during your time in the Brooklyn DA's office?
A Yes, and outside of the DA's office when I was in private practice.
Q Did you ask him to write a letter on your behalf to the editor of ProPublica?
A I did not.
Q I'm going to show you what was -- or what will be marked as Plaintiff's 193 and ask you to look at that document. Again, I don't know if it's one that was sent to you.
A Oh, my God.
MS. SCHARFSTEIN: What's the

MICHAEL F. VECCHIONE

number in this one, Niall?

MR. MACGIOLLABHUI: 193.

Q I'm going to ask you to review it, and my question is whether you have seen that letter before.

A Of course --

MS. SCHARFSTEIN: I don't have this one, so can we read it together.

MR. MACGIOLLABHUI: Yeah. What I'll do, Susan, is I'll e-mail it to you, if you want.

MS. SCHARFSTEIN: Okay.

MR. MACGIOLLABHUI: I don't know, Susan, if you're still reading or --

MS. SCHARFSTEIN: I'm ready. Do you have a question?

MR. MACGIOLLABHUI: Yeah. The question was simply -- I was asking Mr. Vecchione to confirm that -- well, I think I asked him had he seen this letter before.

A And I gave you an answer. Of course I saw it.

Q Right. And I think my followup

MICHAEL F. VECCHIONE

question was simply for him to confirm that this was a letter that was sent on his behalf to the editor of ProPublica, dated May 21, 2013.

MS. SCHARFSTEIN: Objection.

A And it speaks for itself. May 21 is right at the top.

Q And do you know who asked for this letter to be sent?

A I already gave you that answer. The answer is no, I don't.

Q So let me return you, then, to 192A, and I'm going move on from that to 192B. Do you see that particular exchange? Again, it's July 9 of 2013.

A You showed this to me already.

Q Right. But the difference here is that this e-mail -- the one at the top is different. This is you forwarding the e-mail that you received from DA Hynes to Arthur Aidala, right?

A That's what it looks like.

Q Well, do you recall why you did that?

A No.

Q Let me point you now to what we marked as Plaintiff's 192C. And I'm going to ask you to

MICHAEL F. VECCHIONE

look at the -- so the e-mail four from the top is one that was in the previous two exhibits.

So I'm going to ask you to look at the top three e-mails. The first one is from you where you make reference to a -- quote/unquote -- inaccurate Times story. Do you see that?

MS. SCHARFSTEIN: Where are you --

A Where am I looking?

Q You're looking at the third e-mail from the top.

A Look how far this shit has gone?

Q Yeah.

A Yeah. Okay.

Q And the question is do you see there's reference to a Times story?

A Yeah.

Q Do you recall what that story was?

A No, but I assume it's the ProPublica story. I don't have a recollection of this.

Q Okay.

A Believe me, this is something that I -- never mind. No. I don't have a recollection.

Q Okay. Let me show you what was previously marked Plaintiff's 89. And I think

MICHAEL F. VECCHIONE

this was one of the documents you were sent in the past week.

Do you recall reading this story in the Times dated July 8 of 2013, written by a reporter by the name of Mosi Secret?

A I saw it. You sent it. Yes.

Q Right. And do you recall having read it in 2013?

A Probably.

Q And I'm going to ask you to read through it now and point out anything that is inaccurate in terms of --

A I'm not going to -- I'm not going to do that. You ask me questions. I'll ask -- I'll answer them.

Q Okay. Do you see in the third paragraph from the bottom and the second paragraph from the bottom on page 2, there's reference to concerns from inside the DA's office -- and I'm quoting -- where some have worried that Mr. Lebovits's lawyer, Arthur L. Aidala, had undue influence.

Do you see that?

A I see that. I have a question, though.

MICHAEL F. VECCHIONE

You showed me the article, but you made reference in the previous documents to some Times story. I don't think one has anything to do with the other, do they?

Q Well, isn't this it the -- let me point you back to --

A I don't -- I don't believe so. The other -- the Times article had to do with ProPublica. I don't -- I don't see anything in this about ProPublica, what you're now showing me.

Q Okay. Let me show you Hynes's e-mail to you. So this is 192B on July 9 of 2013, and you see the second paragraph of his e-mail which begins I still have a pretty good relationship with her. Do you see that?

A I do. Yes.

Q And you see there's a reference to -- quote/unquote -- Mosi Secret's fabrication?

A I see that.

Q And in terms of ProPublica, isn't it the case that the ProPublica article -- I'm going to ask you an obvious question here, but hopefully it will help to move us along.

MICHAEL F. VECCHIONE

That -- the letter that was written to ProPublica was in May of 2013, right?

A I don't remember. If that's what it said, then it said that.

Q Yeah. Let me see if I can...

A What is the -- what is the point? What's the question here?

Q My question is this.

A You asked me about a paragraph in that article by Mosi Secret. I saw it. What's your question?

Q Right. And you see that in Hynes's e-mail to you, he makes reference --

A Yeah.

Q -- to Mosi Secret's fabrication?

A Okay.

Q Right. And I'm pointing you to Mosi Secret's article from the day before. Right? I'm scrolling to the top. You see July 8, 2013?

A Yeah. Yeah. I see it. You asked me if I read the paragraph at the bottom. The concerns come -- okay. Go ahead.

Q Okay. And then you interrupted with a question for me. So that's where we --

MICHAEL F. VECCHIONE

A Okay.

Q -- went off track. We'll get back on track. My question to you is were you aware of concerns within your office at that time, 2013, that Arthur Aidala had undue influence?

A No. I was not aware of gossip. I was not aware. The answer to your question is -- is no.

Q And you see the second to last paragraph which begins Mr. Aidala, who is a campaign contributor to Mr. Hynes and the vice president of --

A Right.

Q Right where it states that Mr. Aidala had boasted to prosecutors -- and I'm quoting -- about his access to and influence with Mr. Hynes and Mr. Vecchione. Do you see that?

A I see it.

Q Now were you aware at that time, apart from reading this in the article, that Mr. Aidala had -- quote/unquote -- boasted to prosecutors about his access to and influence with Mr. Hynes and --

A No.

MICHAEL F. VECCHIONE

Q -- Mr. Vecchione?

A I don't even take that as fact, but no. I was not aware of it.

Q What do you mean you don't even take it as fact?

A This is a -- this is a newspaper article. This is not oath -- testimony under oath. I had no idea if this -- let me stop.

The answer to your question is no. I was not aware of any boasting, and I don't even know any boasting occurred. So, you know...

Q Well --

A Just because someone tells a reporter that this is fact doesn't make it fact.

Q Right. Well, am I right in understanding your answer to be that you don't know whether this is fact or not, as opposed to this being a fabrication?

A No. I think it's a fabrication. If that's what your question is --

Q Yes.

A -- I believe it's a fabrication.

Q And is this a fabrication that you -- as best that you can recall that Mr. Hynes is

MICHAEL F. VECCHIONE

referring to in his e-mail to you?

A Unfortunately, I cannot get into the mind of Charles J. Hynes. So the answer is I have no idea at this point as I sit here what was in Hynes's mind when he wrote that. It could have been that. Maybe there was something else. I don't know. I mean, it can't be a serious question that you ask me to go into Hynes's mind.

Q Well, when he sent you the e-mail, you think he was asking you to go into his mind?

A I don't know what he -- I can read the e-mail for what it says, and it's not the question you asked me. You asked me what did Hynes mean by saying -- by writing that. I have no idea what he meant.

MR. MACGIOLLABHUI: I'm downloading a document here. It may be affecting the connection.

MS. SCHARFSTEIN: We're waiting for you to download the document?

MR. MACGIOLLABHUI: Yeah.

MS. SCHARFSTEIN: Okay.

MR. MACGIOLLABHUI: It'll be a moment.

MICHAEL F. VECCHIONE

(A recess was taken at 1:35 p.m.)

Q All right. So Mr. Vecchione, I'm showing you now an article from the New York Post dated November 11, 2013. It's got a picture of you. The article is entitled Vecchione Kicks Out Two Brooklyn Assistant DAs.

You know what? I thought I had downloaded the full thing, but I hadn't. Bear with me another moment. Sorry about that. I'm going to show it to you -- what I'm going to do is I'm going to show it to you -- let me see if I've done this properly. I'm going to show it to you this way instead. Hopefully this works.

All right. Can you see it there?

A Yeah. I can see it.

Q All right. So I want you to read -- okay. So I want you to read the first two paragraphs. Do you see those? So the first one that begins In a stunning move.

A Okay. What's your question?

Q So this article is going to be marked as Plaintiff's 196. And my question is what's described in the first two paragraphs, is that an accurate account?

MICHAEL F. VECCHIONE

A I don't recall this, but it doesn't sound like it is. First of all, I didn't have the authority to kick people out, as this indicates. That was the DA's job. He made personnel moves. And if anybody under him did, it would have been Amy Feinstein.

So I didn't have the authority to do this. And Josh Saul wrote this, and God knows Josh Saul was challenged in terms of accuracy in his -- in his writing.

Q Well, you see the third paragraph where I think it corresponds to what you just said there where it says that --

A Yeah. I see it.

Q Right. You told them to go speak to Hynes or to speak to Amy Feinstein, right? Meaning that's what it says.

A And what about the words that say get out? Come on. This is a joke, this thing. What's your question?

Q My question is did that happen? Meaning that meeting in your office with Alexis and Batsidis at the end of which you told them, in sum and substance, to get out?

MICHAEL F. VECCHIONE

A I don't recall anything like that.

Q Well, do you have a belief as you sit here today as to whether or not ADA Alexis was a source for Josh Saul?

A I have no clue as to whether that's the case.

Q And have you ever been a source for Josh Saul?

A I don't know what that means.

MS. SCHARFSTEIN: Objection.

Q Meaning that -- have you -- Josh Saul, at that time, was a court reporter for the New York Post, right?

A Ask the Post. I don't know.

Q Well, have you, at any time while you were in the DA's office, spoken to Josh Saul about anything?

A I was -- when I was directed by the public information officer to speak to Josh Saul to answer a question, I would do it.

Q And is that the case with regard to the press, in general? That you only spoke to them if directed to do so?

A Yeah. I didn't -- I didn't have the

MICHAEL F. VECCHIONE

authority just to go out and speak to the press without letting the office know that I was doing it.

Q Well, that seems slightly different than what you said before in that --

A What's -- no. What's different about it?

Q Well, under what circumstances would you speak with the press? What --

A There were many different circumstances. When I was interviewed outside of the courtroom after a trial verdict. When I was -- after a -- after an arraignment. Asking for a comment.

Then some people came into the office asking for a long-form interview over a particular case. They may have come in and asked for a short-form interview or a comment on a particular case. And nine times out of ten, it was with the approval of the public information officer. If he was there, I'd look to him. And he would nod, and I would go ahead and talk.

Q Well, did you ever provide off-the-record information to --

MICHAEL F. VECCHIONE

A I don't -- I don't --

MS. SCHARFSTEIN: Objection.

A It wasn't my practice to -- to help reporters out. So...

Q Well, I don't know if I heard your answer to the question. The question being did you ever provide off-the-record information to reporters?

A I said I don't recall.

Q Okay. I'm going to show you now what was marked at a prior deposition as Plaintiff's 174. I'm going to point you to page 4. And you can see the section -- actually it's not even a section. It's just a single line.

You see where my cursor is, the name Chaim Hirsch Freund?

A I -- I see it. I see it very well. Yes.

Q And this is something that you -- a document that you reviewed, or at least this portion of it, in the past weeks, right?

A I don't know. I don't think so.

Q Well, do you know or did you know

MICHAEL F. VECCHIONE

someone by the name of Chaim Hirsch Freund?
A Absolutely not.
Q You see the text that is to the right of his name -- and I'll quote it -- knows all about money to Vecchione. Do you see that?
A Yes. I can read. Yes.
Q Okay. Do you know -- do you have any idea what that's a reference to?
A Not in the slightest, and I'm -- and I'm insulted by you bringing this up. But go ahead.
Q Well, when you say you're insulted, this is a document from your former office, right?
A I don't know.
Q Okay. Well, let's go through it, if you're going to be insulted. This is a document that was -- do you see -- do you see at the top right, the file name? The R number?
A Yeah. So?
Q What do you understand by an R number in the context of --
A I don't -- I don't understand anything about this. I've never seen a document like this

for the entire time that I was working in the DA's office. Never.

Q Well, the -- well, I'm not asking about the time you were working there. I'm talking about the following year.

A I don't know anything about the following year. I can't answer anything, you know, about the following year.

Q Okay. But you said you're insulted that I brought something up with you. And --

A No. I'm not saying that you brought it up. I'm saying I'm insulted by the comment or the implication. So go ahead. Ask your questions. The sooner we get finished with this, the better off we'll all be. So go ahead.

Q Okay.

A Ask your question.

Q In terms of if I understand you correctly, you're insulted by the suggestion from anybody that you would have taken money improperly while you were working for the Brooklyn DA's office, right?

A That's correct.

Q And my inquiry is into where this

MICHAEL F. VECCHIONE

accusation may have come from and --

A And how in God's name would I know that?

Q Okay. Well, that makes two of us. That's why I'm inquiring.

A Okay. Here's the answer to the question. I don't know.

Q Okay. So did you ever have interactions with an organization that was based in the ultra-Orthodox community in Brooklyn that provided free legal assistance to defendants?

A Not to my knowledge. Not that I can recall. What's the name of it?

Q The name of it -- I'm probably going to mispronounce it, but I'll spell it. It's D-r-o-r, and I believe it's pronounced --

A Never heard of it.

Q -- Dror.

A Never heard of it.

Q Now in terms of the Lebovits family, you met in your office -- or did you -- with two sons of Baruch Lebovits? That's Chaim Lebovits and Meyer Lebovits.

A Okay. Now here's another part. The

MICHAEL F. VECCHIONE

question is unclear because when you say in your office, does that mean in the confines of the Rackets Division? Or in my personal office?

Q No. I mean the DA's office.

A I remember meeting them. Yes. Well, actually, I remember meeting only one. I don't remember -- I don't remember -- and that was Meyer. I don't remember ever meeting the other guy.

Q In terms of Meyer, did you ever meet with him outside of the DA's office?

A No.

Q Did you meet with anybody outside of the DA's office in connection with your office's investigation and later prosecution of Sam Kellner?

A What does that mean? I don't understand.

MS. SCHARFSTEIN: Objection.

Q What it means is this. You had various meetings that occurred in the DA's office in connection with the case, right?

A Yeah.

Q And my question is did you ever meet

MICHAEL F. VECCHIONE

with anybody outside of the office in connection --

A Not that I can recall, and I think I can go even further and say no.

MR. MACGIOLLABHUI: I think that may be it. Let me just check to see that I have gone through all of the exhibits with you that I want to bring in. I believe I have.

That's it. No more questions. And to the extent that there's no more followup, Mr. Vecchione, thank you for your time. I do appreciate it.

MS. SCHARFSTEIN: I don't have any questions for the witness, so I think we're concluded.

(TIME NOTED: 1:55 p.m.)

(Plaintiff's Exhibits 181 through 196 were marked at the conclusion of the deposition.)

(Continued on following page to include Jurat.)

MICHAEL F. VECCHIONE

______________________

MICHAEL F. VECCHIONE

Subscribed and sworn to
Before me this _____ day
Of ______________, 2022.
_______________________
NOTARY PUBLIC

MICHAEL F. VECCHIONE

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| M. Vecchione | Mr. MacGiollabhui | 6 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Plaintiff 181 | Book photo. | 171 |
| Plaintiff 182 | Color photo. | 171 |
| Plaintiff 183 | E-mail 11/6/10, 1 page. | 171 |
| Plaintiff 184 | Dershowitz Affirmation, 8/16/11, 23 pages. | 171 |
| Plaintiff 184A | Exhibit H to Dershowitz Affirmations, 5/4/11, 4 pages. | 171 |
| Plaintiff 185 | E-mail 1/20/11, 46 pages. | 171 |
| Plaintiff 186 | E-mail 4/12/11, 1 page. | 171 |
| Plaintiff 187 | E-mails 4/12/11, 2 pages. | 171 |
| Plaintiff 188 | E-mails 9/12/13, 1 page. | 171 |
| Plaintiff 189 | E-mail 7/18/11, 1 page. | 171 |
| Plaintiff 190 | Jewish Week article, 6/6/12, 3 pages. | 171 |
| Plaintiff 191 | E-mail 3/3/14, 1 page. | 171 |
| Plaintiff 192A | E-mails, 7/9/13, 4 pages. | 171 |
| Plaintiff 192B | E-mails 7/9/13, 4 pages. | 171 |
| Plaintiff 192C | E-mails 7/9/13, 4 pages. | 171 |
| Plaintiff 193 | Letter 5/21/13, 2 pages. | 171 |
| Plaintiff 194 | Bruffee transcript pages 198-203. | 171 |
| Plaintiff 195 | Bruffee transcript pages 43-44. | 171 |
| Plaintiff 196 | New York Post article. | 171 |

MICHAEL F. VECCHIONE

CERTIFICATION

STATE OF NEW YORK )
) SS
COUNTY OF SUFFOLK

I, KYRA KUSTIN, a stenotype reporter and Notary Public within and for the State of New York, do hereby certify;

That the witness whose Examination Before Trial is hereinbefore set forth was duly sworn by me;

That such Examination Before Trial is a true and accurate record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of June, 2022.

______________________

KYRA KUSTIN

## A

**A-r-t-i-e** 28:6
**a.m** 1:12 58:7 80:3
**ability** 6:21 7:2
**able** 20:18 51:7
**above-noted** 1:17
**Absolutely** 45:21 167:3
**abuse** 37:2,6 62:16
**abused** 100:12 128:18
**abusing** 60:18,25
**accepting** 117:16
**access** 159:17,23
**accomplished** 123:17
**account** 104:19,25 106:13,15,23 107:5,19 108:5 126:19 162:25
**accuracy** 163:10
**accurate** 6:22 7:3 77:10 102:17 106:15 108:6 138:20 144:20 145:10 147:3,10 147:11 162:25 174:13
**accusation** 147:22 169:2
**accuse** 60:17,24 128:17
**accused** 54:25 55:3 60:7,23
**accusing** 137:2
**achievement** 123:21
**acted** 9:16
**action** 7:20,21 84:14 174:16
**actions** 7:20 72:15
**acts** 40:4,4
**ADA** 22:2 40:14 46:20,21 48:3,9 64:10 77:2,17,21 77:24 78:10,13,22 79:2,6,14,20 84:13 90:8,8 94:20,21 95:5,23 96:10,16,19,23 117:5,15 118:4 128:25 129:2 135:7 136:3,4 139:9,10,21,22 142:18 143:3,4 148:5,6 149:25,25 149:25 150:11,11 151:10,10 164:4
**ADAs** 47:12
**add** 90:3
**additional** 20:10 21:7 25:19 56:12
**address** 3:17,21,24
**addressed** 143:5
**adjournment** 26:23 27:6,22 28:5
**Administrator** 1:7 2:10
**admired** 63:24
**admissible** 86:12
**advance** 5:6,24
**advantage** 87:25 88:4
**advice** 96:6
**advocate** 10:8
**advocate's** 10:7
**affect** 6:21 7:2
**affidavit** 56:10 58:10,11,17 64:22 100:5,6,10,23 101:5 102:9 103:17 104:3,6,13 125:21 127:8
**affidavits** 51:9 56:2 94:22
**affirmation** 100:6 101:23 102:10 173:8
**Affirmations** 173:9
**afraid** 126:22
**afternoon** 31:20
**agent** 26:18
**ago** 39:14 60:20 131:21 133:6 134:18 136:19 137:8 150:8
**agree** 82:19
**agreement** 4:22 91:21,25 92:22 93:5,10,11
**ahead** 3:7 4:21 6:3 8:8 33:7 38:24 62:8 67:18,25 76:15 81:14 88:2 96:4 107:17 111:19 144:11,23 145:2 147:14 149:3 158:23 165:23 167:12 168:14,16
**Aidala** 18:20,22 19:25 21:20,24 22:18 23:6,24 24:5,16 25:8 27:24 29:6 30:4 30:12 31:18,21 32:3,4,8 64:8,9,9 68:14,17 80:13 81:17 82:3,10 83:9 96:9,14,24 97:5 99:9 103:11 111:17 154:20 156:23 159:6,11 159:15,21
**Aidala's** 33:24
**Alan** 63:7 103:17 104:23 151:25
**Alexis** 44:12 45:6 46:21 47:12,19 48:3 78:10,13,22 79:2,6,14,20 84:13 85:7 90:8 129:2 136:3 139:9 139:21 143:3 145:18 146:7,16 146:24 147:7,17 148:6 149:25 150:11 151:10,10 163:23 164:4
**Alito** 23:24
**allegations** 83:18 97:24 99:8,9 135:18 145:9
**alleged** 37:10,14 39:22 40:4 59:11 59:24,25 60:4,12 60:16 62:16 75:19 82:21,22 83:24 136:11
**allow** 18:11
**allowed** 73:25 120:6 122:7
**Amoroso** 28:24 29:19
**amount** 78:17
**Amy** 43:22 91:10 115:18,24 125:6 163:7,17
**and/or** 58:16
**Angelo** 29:25
**Anne** 113:2,20
**answer** 7:17 16:11 29:5 32:16 36:7 36:12,17 37:21 38:22 39:19 43:11 54:21 59:23 60:7 61:15 65:9 69:8 69:17 71:6 72:13 73:2,13,20 74:13 74:14 75:2 76:8 77:18 79:12,15 83:17,18 84:20,25 85:2,4 89:24 90:6 92:22 96:17 109:8 109:12,14 110:9 118:9,13 119:8 122:25 124:13,15 127:4 130:18 131:10 133:23 134:14 142:7,16 142:16 153:23 154:10,11 156:16 159:8 160:10,17 161:4 164:21 166:7 168:8 169:7
**answered** 6:17 24:19,19 85:3,8 85:24 89:5 123:3
**answering** 118:10
**Anthea** 40:14 43:19 72:20 73:4,6 74:17,21 91:9 92:20 125:6
**anybody** 5:12,23 28:18 72:21 74:21 75:5,12,17 93:23 94:9 109:18 111:24 136:10 163:6 168:21 170:14 171:2
**Anyway** 87:2
**apart** 159:20
**apologies** 79:23 80:4
**apparently** 149:10
**appeal** 16:7 105:13
**appear** 7:24
**appeared** 151:8
**appears** 31:11 125:14 129:18
**application** 105:13 105:20
**appointment** 31:21 32:4
**appreciate** 87:10 171:14
**approval** 165:21
**approved** 115:23
**approximately** 11:21 29:8 63:16
**April** 18:17,19 21:24 22:8,21 24:21 30:6 32:7 97:6 103:18 112:8 113:2 114:2 141:17,24 142:10
**area** 145:16
**argument** 151:9
**Arnold** 10:15
**arose** 15:9,17
**arraignment** 165:14
**arrest** 52:2,6 53:12 54:18
**arrested** 51:13,21 51:22,22 54:23
**Arthur** 18:20,22 27:23 31:18,21 32:2 154:20 156:22 159:6

**article** 134:2,11 151:8 157:2,9,23 158:11,19 159:21 160:8 162:4,6,22 173:13,18
**Artie** 28:6 111:17
**arts** 8:14
**Ashkenazi** 137:16
**aside** 9:25 122:4
**asked** 21:21 22:2 26:23 27:6,21 34:10,21 44:13,14 44:23,24 45:16 49:2,13 62:19 70:22 74:25 84:19 85:13,24 88:15 95:17 109:14 110:3,13 133:21 145:15 150:16,16 150:18 152:10 153:21 154:8 158:10,21 161:14 161:14 165:18
**asking** 6:9 12:15 21:5 27:3 28:11 28:14 34:14,18,19 35:18,18,21 41:15 56:3 61:11 70:23 71:8 79:17 81:20 86:18,19 92:21 95:5 116:13 119:23 122:13 128:2 130:6 134:24 137:17 142:18 147:13 150:11,19,20,24 153:19 161:11 165:14,17 168:4
**aspects** 16:25 17:2
**assigned** 77:25 78:3 78:10 114:13
**assistance** 169:12
**assistant** 50:7 96:22 104:17 143:5 145:7 148:10 162:7
**assistants** 99:7
**association** 71:3,8 71:11,15,16,20,23
**associations** 70:17 71:12
**assume** 4:14 6:16 41:24 98:15,15 120:20 155:19
**assumes** 73:7
**assuming** 17:11 26:8 70:13
**assumption** 73:3
**assurances** 102:14
**attach** 53:9
**attached** 104:4
**attachments** 81:2
**attempt** 51:6
**attempted** 33:13 53:18
**attempting** 59:13
**attend** 116:14
**attending** 71:2 124:3
**attention** 51:8 55:6 101:25
**attorney** 11:10 50:8 69:24 73:11,19 90:14 106:18 120:6 145:20,25 146:3,8
**attorney's** 71:15,16 111:7
**attorneys** 2:4,9 13:22 14:2 42:10 72:7,24 74:19,24 93:7 98:9 147:20 148:8,10
**audio** 4:14,16,24 5:9,11
**August** 55:14,19 101:24 139:10,19
**author** 66:24
**authored** 21:9
**authority** 163:4,8 165:2
**available** 135:21
**Avenue** 2:5
**aware** 32:7 37:22 38:9 39:10,14 40:12,17,25 41:10 41:15,19 42:6 46:11 100:14 119:13 127:3 135:13,17 159:4,7 159:8,20 160:4,11

**B**

**bachelor** 8:14
**back** 23:11 30:6 32:10 39:4,4,7,10 47:5 49:2 65:3,9 70:16,25 71:17 88:14,21,24 92:25 99:25 106:5 120:22 121:7 122:21,23 130:19 141:4 144:12 157:7 159:3
**background** 8:4 20:11 21:7
**Bagimov** 131:19
**bail** 105:12,19
**bank** 138:9 149:15
**bar** 70:17 71:2,8,11
**Baruch** 19:8,12,16 20:2 21:17 33:25 34:24 35:11 37:23 42:11,24 43:4,8 43:10 56:2 59:14 59:25 60:4,17,25 61:20 72:7,23 74:19,23 75:6,6 75:13,18 82:11,16 91:14 93:7 98:9 99:20 100:11,16 102:14 105:13,19 107:22 108:12,17 111:7 125:12 128:18 147:24 169:23
**baseball** 63:25 97:8
**based** 4:22 81:20 169:10
**basis** 53:22 58:24 89:18,23 90:16,19 116:24 119:9
**batch** 76:12 90:24 136:19
**Batsidis** 44:12 45:6 46:20 47:12,19 48:3 61:25 64:10 77:2,17,21,24 78:15 84:13 85:7 90:8 94:14,21 95:5,14,16,23 96:10,16,20,23 127:25 128:25 135:7 136:4 139:10,22 142:18 143:4 145:18 146:7,16,23 147:7 147:16 148:6 149:25 150:11 163:24
**bear** 31:12 80:2 162:9
**beginning** 10:23 30:21 73:23 141:20
**begins** 21:17 47:7 91:19 107:10 110:8 135:13 143:9 145:4 146:22 157:16 159:11 162:20
**behalf** 75:5 82:11 152:5,18 154:3
**belabor** 24:8
**belief** 53:17,22 61:12 77:16 90:16 90:19 147:8 164:3
**believe** 4:18 10:5 10:19 14:10 22:5 26:24 30:15 32:15 43:9 57:18 64:8 68:5 70:11,18 90:23 101:3,20 102:2 103:21 120:23 132:4 138:13,16 139:2 155:22 157:8 160:23 169:17 171:10
**believed** 19:3 33:8 61:6 104:18
**Ben** 152:12
**beneficiaries** 83:23
**best** 52:4 59:18 60:10 103:24 130:18 131:19 160:25
**better** 18:2 168:16
**Beyond** 66:21
**bit** 50:16 88:9 117:9,10 148:24
**blood** 174:16
**board** 89:8
**boasted** 159:16,22
**boasting** 160:11,12
**Bob** 68:3
**book** 12:18,23,25 13:6,9,12,14,16 13:20 23:19 27:19 28:4,13 66:25 67:3 79:6 117:13 119:24 120:5,12 121:6,21 123:6,13 173:6
**boss** 115:12 150:14
**bottom** 7:22 66:12 68:13 91:8 111:15 134:24 143:14 146:22 147:16 156:18,19 158:22
**Brady** 140:14 147:18,21 148:11 149:4,14,24
**Brafman** 152:12
**break** 43:2 118:24
**bribe** 33:13
**bribed** 19:5
**bribery** 59:21,24 83:23,24
**bribes** 117:16
**brief** 8:3 9:12 135:6
**bring** 171:9
**bringing** 51:8 167:11
**broad** 121:16
**broadest** 98:19
**bronchitis** 26:24 27:5
**Brooklyn** 8:22 9:5 10:20 11:6 12:19

12:23 16:21 23:19 25:8,24,25 28:18 29:22 31:9 63:25 71:2,7,11 92:8 104:15 115:9 117:14 121:4 152:14 162:7 168:23 169:11
**brought** 15:5 83:9 92:10 99:9,10 111:18,21 130:12 168:11,12
**browbeating** 86:15
**Bruffee** 40:14 43:7 43:19 72:20 73:4 73:6 74:17,21 91:10 92:20 106:9 107:19 108:5 109:2,3,11 110:13 111:5,23 125:6 127:15,25 128:2 130:21 131:13 173:16,17
**Bruffee's** 105:25 107:4 108:23 109:8,21 111:15
**bullet** 34:5,11 131:14
**bureau** 9:20 11:14 11:17,20 12:7,10 12:11 16:15
**bureaucracy** 123:16
**bureaus** 116:23

**C**

**C** 2:2 3:8,8,8
**cadre** 11:18
**call** 52:19,25 53:5
**called** 11:18 12:19 26:4 44:11 100:6 109:22 110:11,19 117:19,23 118:2,3
**calling** 110:25
**campaign** 30:24 31:4 159:12
**campaigns** 30:13 30:18,22
**capacity** 9:16,18
**caption** 125:9
**carefully** 130:14
**carried** 14:18 15:9 15:12,18 16:2 51:15 97:18 117:15
**carrying** 82:15
**case** 7:11,12,14 12:24 19:13 20:2 21:22 22:3,11,15 22:17,19,23 26:4 26:14,16,21 34:21 40:13,18 42:24,25 43:8,10,14,18,22 44:2,13,24 45:14 45:20 46:24 47:24 48:4,10 49:15 50:20 51:20,25 53:3 54:16,17 57:23 58:18 70:3 78:2,5,10,24,24 81:16 82:2,16,24 82:25 83:19 84:11 85:8,22 87:17 88:16 89:15 90:6 90:9,12,13,17,20 91:6 93:5 96:8 99:8,13,17,19,24 100:9,16 110:10 111:18,20 112:11 112:14 113:5 114:12 119:22,23 120:9 121:19,23 126:12,18 127:6 128:11,15,20 129:2,25 131:7 135:20 136:25 139:21 140:17 142:17 145:20,24 146:4,9 147:8 148:7 150:12,13 150:21,24 151:2,3 152:2 157:23 164:7,22 165:18 165:20 170:23
**cases** 14:2,3,16 15:4 15:8,25 16:3 17:2
26:3,5,13 67:6 78:21
**caught** 84:17,19 120:8
**certain** 17:13 28:24 116:22 138:9 148:7
**certainly** 66:18 90:7 95:15
**certainty** 22:6
**CERTIFICATION** 174:2
**certify** 174:8,15
**Chaim** 166:18 167:2 169:23
**challenged** 163:10
**change** 59:17 88:18
**changed** 77:16
**changes** 5:4
**chapter** 126:17
**character** 118:2,3
**characterization** 48:14,15 73:4
**characterize** 30:10 115:13,19 116:5
**characterized** 144:25
**charge** 49:11 50:8 121:22
**charges** 75:7 120:7 122:8
**Charles** 1:7 2:10 31:18 32:2 49:10 145:7 161:4
**check** 171:7
**chief** 9:19 11:13,16 11:17,19,23 12:3 12:5 16:16 25:7 77:12 123:9 124:5 138:6,7
**child** 37:14 72:17
**chose** 124:11
**Church** 2:11 3:25
**circumstances** 165:9,12
**City** 1:7 2:8,9 66:18 66:19
**civil** 1:16 4:20 7:6
84:21,23
**claim** 92:8
**claimed** 33:18
**claims** 102:13 130:11
**clarification** 8:10
**clarify** 65:4 73:22 77:18
**class** 8:18
**clear** 61:24
**clearer** 62:7 65:11 88:10
**clearly** 31:11
**client** 4:25 5:14 33:5,8,22,24,24 34:22 35:2,4 39:21 61:6 66:2 82:11 83:3 84:12 118:19
**client's** 19:4 33:13 83:23
**close** 100:3
**clue** 151:12 164:6
**co-wrote** 13:9
**colleague** 10:13 28:23 29:24
**colleagues** 40:13 115:11,25
**college** 8:6
**Collins** 7:12
**Color** 173:7
**Columbian** 71:20
**combat** 134:5
**come** 22:13 32:19 32:24 33:23 39:24 50:10 63:2 77:14 96:7 158:23 163:20 165:18 169:2
**comes** 86:16,23 98:5
**commenced** 59:4,6
**comment** 149:12 165:15,19 168:13
**commentary** 87:10 87:15
**comments** 4:8
**common** 110:7
**communicate** 96:24
**communicating** 77:2 96:9
**communications** 96:10,14,16 97:5 97:11,15
**community** 120:11 121:2,3 133:15 134:7 169:11
**complainant** 63:3
**complainants** 37:24 38:15 39:11 39:16
**complaint** 45:3
**complied** 142:19
**concern** 72:6,15,22 74:17,22 121:12 121:21 122:6
**concerning** 41:16 43:8,14,18 44:2 46:20,24 47:11
**concerns** 156:20 158:23 159:5
**conciliatory** 87:24
**concluded** 171:17
**conclusion** 171:20
**conduct** 33:18 75:19
**conducted** 14:15 15:16 19:6 93:14 93:17,18,18 146:17
**conducting** 92:14
**conference** 113:6 113:11,13
**confidential** 142:5
**confines** 170:3
**confirm** 67:20 91:20 92:21 153:20 154:2
**confirmed** 93:8
**confusing** 87:7
**confusion** 89:2
**conjunction** 49:10
**connected** 94:12
**connection** 42:23 49:24 51:14 54:16 59:12 63:8,17

101:14 132:2 152:2 161:19 170:15,23 171:3
**considerate** 85:19
**consisting** 112:20
**consists** 127:22 137:10
**contact** 86:25 95:17 122:17 145:19 146:3,8
**contained** 131:8 138:9
**contains** 107:5 130:2 134:23
**content** 45:7 64:19 130:6
**context** 20:19 146:11 167:23
**continue** 144:2
**Continued** 171:22
**contributor** 159:12
**control** 18:10 20:7 56:15,23 57:5 64:17 67:16 102:24 126:5 143:18
**convention** 57:22
**conversation** 94:23 109:7 148:5,9 149:14
**convicted** 21:18 33:25 34:22 35:2 35:5,12,24 36:9 36:15,18,20 37:2 37:5 38:10 39:23 40:5 62:14,16,22 63:4 75:8 84:2,4
**conviction** 21:21 92:11,13 98:10,16 111:20,22
**convictions** 123:18
**convinced** 146:24
**cop** 66:19,22
**copied** 135:8 141:14
**cops** 26:4 67:10
**copy** 4:24 5:12,23 125:16
**Cornelius** 137:22
**Corporation** 2:8 3:24
**corpus** 7:21
**correct** 5:8 8:17,20 8:21 12:23 13:11 13:18 22:16 23:7 23:15 24:7,17 27:14 29:7 34:23 36:10 44:7 45:5 49:3 51:15,16,24 52:12 59:19 71:22 71:24 76:19 78:4 78:8,11 83:4 84:4 85:8 89:13 92:15 96:20 108:7 110:24 123:11 143:23 168:24
**correctly** 36:7 168:20
**correspondence** 67:20 76:16 115:2 125:5
**corresponds** 163:13
**counsel** 2:8 4:23 17:10,24 39:13 50:23 75:13 76:13 84:24 102:14 118:8 124:19
**counsel's** 3:24
**counts** 37:2,6
**COUNTY** 174:4
**course** 25:21 39:20 44:8 58:12,15 68:24 69:4 72:4 75:21 76:3 82:6 83:9 84:14 94:5 95:20 100:15 108:11,16 115:12 153:7,23
**court** 1:2 5:7 7:15 7:16,17,23 84:23 85:17 86:25 87:18 87:18 122:18 164:13
**courtroom** 165:13
**cover** 148:21
**CPL** 92:9,23
**credibility** 128:22
**crimes** 9:19 10:2 82:21 93:23 94:9 94:11,21 95:4,5 95:12,17 97:20 98:2,5,17,21,25 99:10,14,20 100:11 116:8
**criminal** 40:4,4 84:22 122:8
**criminally** 121:23
**Crooked** 12:19,23 23:19 117:13
**Cuomo** 31:2
**cursor** 31:15 56:23 145:3 166:17

**D**

**D-e-V-e-c-c-h-i-o** 27:18
**D-r-o-r** 169:17
**DA** 22:9,14,23 23:2 30:7,13,18 41:2 44:3 46:11,20,22 47:11 48:4,9,16 75:23 76:5,22 84:11,15 89:14,16 104:17 106:12 107:6,21 108:10 108:16 112:8 113:13,21 114:22 115:8 116:24 121:10,22 124:4 124:11 129:2 134:24 135:8 140:23 143:5,6 145:7 150:6 154:20
**DA's** 8:22 9:5,11 10:20 11:6 13:17 15:6 16:5,21 25:8 28:19 29:22 31:9 71:13 90:5 92:9 104:15 115:9,20 117:4 119:11,19 126:24 134:5 150:2 152:14,15 156:20 163:5 164:17 168:3,23 170:5,12,15,22
**Dades** 25:7,12,22 26:8
**DAs** 13:21 14:4,5 96:22 162:7
**date** 18:21 23:13 31:19 32:3 144:24 148:25
**dated** 55:14 80:14 101:23 103:17 129:11 135:2 143:4 154:4 156:5 162:5
**daughter** 130:12
**day** 23:14 24:9,14 84:6 135:9 145:6 158:19 172:9 174:20
**days** 139:6
**DD5** 32:10 33:16 34:4 129:11,19,25 130:7,9,23 131:9 131:11,12,12,15
**de** 138:16
**dead** 120:8
**dealings** 49:20,20 152:3,13
**dear** 24:6,9,13,22
**DeBoer** 52:11,21 53:21,24 54:14
**DeBoer's** 53:7
**deceased** 27:11 28:22 29:21,25
**December** 141:21 142:11
**decided** 45:19
**decision** 45:23 46:7 46:8,10,12 48:22 49:4 89:14 121:9 121:22
**defendant** 19:7 26:14
**defendant's** 92:10
**defendants** 1:8 2:9 169:12
**defense** 42:10 91:21 93:6 102:13 141:15 142:3
**defer** 50:22
**define** 36:14
**definition** 94:4
**degree** 8:14
**Dennis** 123:10,14
**department** 10:8
**Depends** 106:6
**deposition** 1:14 4:13 7:7 17:20 20:5 31:7 40:20 56:8 67:13 73:10 82:8 84:21,23 85:14 100:21 105:25 107:4 108:24 110:18 129:7 166:12 171:21
**depositions** 86:17
**deputy** 9:19 11:13
**Dershowitz** 63:7 97:13 101:23 102:13 103:11,17 104:2,23 151:25 173:8,9
**Dershowitz's** 102:10
**describe** 52:14,18 52:24 92:4 95:21 115:7
**described** 24:5 33:19 41:2,8,11 46:20 47:10 67:9 93:6 97:7 151:9 162:24
**describes** 18:16 91:24 106:10 109:12 110:17 133:11
**describing** 110:16 126:14
**DESCRIPTION** 173:6
**details** 130:2
**detective** 25:6,13 25:22,24,25 26:8 28:21 29:20 45:23

48:23 49:5,16,19 50:2 66:18,22 67:2 125:22 126:14,18,23 127:8 145:8
**detectives** 52:9
**DeVecchio** 26:15 26:18 27:18 79:3
**DI** 52:11,21 53:7,21 53:24
**difference** 56:11 154:17
**different** 7:11 14:5 19:24 36:19 37:24 38:14 39:11,16 73:5 86:16 154:18 165:5,7,11
**difficult** 36:6 86:21
**diligence** 92:11
**DiMango** 19:21 62:24
**Dino** 28:23
**direct** 77:7 101:24
**directed** 130:3 164:19,24
**directly** 96:19
**disagree** 48:13,19
**disagreed** 89:14 90:7 115:16 147:2 147:9
**disappointed** 44:21 45:11 123:19 124:10
**disclosed** 102:17 149:17
**disclosure** 149:14
**discovery** 140:25 141:7,25 142:13 142:20
**discuss** 18:25 32:19 32:25 94:7,8 96:6
**discussed** 20:2 64:13 76:5 91:5,6
**discussing** 82:10 149:16
**discussion** 58:5 84:8
**dismiss** 45:20 84:11 85:7 89:15 90:9
**dismissed** 44:13,16 90:5 100:18 129:3 147:8
**dismissing** 48:10 89:24
**disposition** 75:14
**distinctly** 63:19,20
**district** 1:2,2 50:7 71:15,16 90:14 106:18 120:6 145:20,24 146:3,8 148:10
**division** 12:4,6,6,8 12:11,16,17 16:4 50:9 77:13 113:17 114:5 124:5 138:5 170:4
**divisions** 116:23
**Docket** 1:5
**document** 17:17,19 17:22 18:12,15 20:19 21:9 23:18 50:24 55:12 56:9 56:16 60:19,22 64:19 66:6,12 67:15 68:20 76:12 76:24 79:24 80:8 80:20 92:19 100:22,25 103:2,5 103:19 105:9 112:5,20,25 114:17 124:23 125:2 127:20 128:6 129:12,18 133:8 134:18,20 134:23 136:18 137:8,10,18 138:14 142:14 148:19 149:21 151:17 152:22 161:18,21 166:22 167:14,18,25
**documents** 17:9,13 20:25 38:8 39:13 46:2 54:7 56:25 57:10,16,20 70:4 80:16 82:7 90:24 95:12 101:21 102:22 103:22 129:14 133:6 138:25 139:4 156:2 157:3
**Dodgers** 64:2
**doing** 54:25 55:4 77:17,21 86:20 95:10,16 109:25 127:17 165:3
**Doug** 28:22
**download** 161:21
**downloaded** 162:9
**downloading** 161:18
**draft** 81:17 82:3
**Dror** 169:19
**due** 92:11
**duly** 3:10 174:10

**E**

**E** 2:2,2 3:8,8,8
**e-c-c-h-i-o-n-e** 3:16
**e-mail** 67:20 68:10 68:12,13,18,21 76:16 77:5 80:12 80:13,24 81:10 91:8,9,11,24 92:19,25 112:7,24 114:21 125:5 127:12,22,24 130:7,21 131:2,7 134:24 135:2,7 136:2,10 137:14 137:21,22 138:9 139:8,11 140:5 142:15 149:24 151:19,23 153:11 154:18,19 155:2 155:10 157:13,15 158:14 161:2,10 161:13 173:7,10 173:11,12,14
**e-mails** 68:3 112:22 137:10 155:5 173:11,12,14,15 173:15
**earlier** 12:10 32:16 41:12 42:8 50:23 60:6 67:9 110:10 149:16
**early** 11:7 22:17
**easier** 106:4
**EASTERN** 1:2
**Ed** 30:23
**editor** 152:6,18 154:4
**educational** 8:4
**effect** 33:14
**efficient** 99:5
**eight** 37:2
**either** 19:3 42:23 42:24 43:7 54:16 57:11 59:16 66:22 72:23 74:18,23 77:15 103:11 111:23 148:5 150:20,21
**elected** 84:15
**ends** 107:15
**enforcement** 14:15 14:19,22 49:11 119:20
**engaged** 33:18 53:17 67:21
**engaging** 115:2
**enjoy** 123:6
**enjoyed** 13:3,6 16:14,15,16
**entire** 20:19 64:18 105:6 168:2
**entirely** 85:12
**entitled** 86:21 119:17 162:6
**entry** 31:16,24 55:14,14,16 94:16 94:17
**equally** 48:21
**ESQ** 2:6,12
**ESTATE** 1:7 2:10
**event** 71:19 105:6
**events** 71:3
**evidence** 61:8,8,16 61:17 134:25 135:5,6 138:10
**exact** 114:6
**exactly** 52:14 70:22 140:22 141:6
**Examination** 6:4 173:3 174:9,12
**examined** 3:10
**example** 86:11
**excerpt** 104:5,7,10 104:16,23 105:25 106:10 107:5 108:24 120:4
**excerpts** 103:12
**exchange** 47:10 48:15 68:10,18 76:22 107:20 108:8 109:10 112:7 114:21 127:22,24 131:2,8 147:25 151:19,23 154:14
**exchanged** 52:16
**Excuse** 5:18 61:23 72:10 91:13 128:8
**executive** 114:4 116:11 145:7
**exhibit** 55:10 94:15 102:6,8,8,21 103:16 107:2 127:19 173:9
**exhibits** 17:7 25:19 130:20 155:3 171:9,19 173:5
**expected** 132:10,24
**experience** 78:14 78:17,19
**experienced** 148:10
**expertise** 145:16
**express** 74:17,22
**expressed** 73:7
**expressing** 72:21
**extent** 171:12
**extorted** 33:13
**extorting** 19:4,4 59:15
**extortion** 51:7 53:18 59:20
**eyes** 123:14

**F**

**F** 1:14 3:1,8,15 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1,6 173:1 174:1
**fabrication** 157:20 158:16 160:19,20 160:23,24
**face** 120:7
**facing** 122:8
**fact** 37:14 52:5 61:7 92:3 122:6 125:15 127:14 134:10 138:21 142:19 160:3,6,15,15,18
**failed** 51:7
**fair** 6:17 15:7,16 19:15 47:9,15,16 47:17 48:13 53:15 54:9 70:5,9 76:4 77:20
**fall** 135:13,17
**falling** 79:13,20
**falsely** 60:17,24 128:17 147:23
**familiar** 57:18,21 103:9 117:11
**family** 19:5 28:7 33:14 53:18 55:20 59:16 135:18 136:11,23 137:15 140:12 149:17 169:21
**family's** 51:6
**far** 86:24 155:12
**fashion** 92:12
**faxed** 105:13
**FBI** 26:18
**fear** 131:20
**feature** 4:13 5:9
**federal** 1:16 4:20
**feel** 32:18 33:16 50:25
**Feinstein** 43:23 91:10 115:18 125:6 163:7,17
**Feldman** 143:6
**felt** 77:21 111:16
**Ferrell** 149:25
**file** 140:24 141:7,14 141:25 142:2,13 142:20 167:20
**filed** 125:11
**Financial** 138:4
**find** 120:22
**finding** 132:8,23 136:20 140:7
**fine** 18:5 20:23 29:4 58:2 86:4 88:19 119:5
**finished** 168:15
**first** 3:9 4:9 6:12 8:18,24 19:16,25 22:25 23:3,10 34:5,11 36:14 44:15 47:6 49:25 51:3,3 55:7 56:19 63:11 77:4 81:10 91:9 110:8 131:14 137:13 143:2,5 144:9,18 148:17 148:22 155:5 162:18,19,24 163:3
**first-grade** 25:13
**fit** 84:11
**five** 56:11 119:2
**fled** 131:20
**flew** 28:6
**flight** 28:12
**floor** 31:19 32:3
**Florida** 101:14
**focused** 141:17,23
**follow** 142:11
**following** 151:10 168:6,8,9 171:22
**follows** 3:11 123:13
**followup** 153:25 171:13
**force** 134:5,11,12 134:14
**form** 9:9 73:11,18 74:9,9 86:10
**formal** 142:14
**former** 26:18 28:21 40:13 48:9,15 66:17,21 145:19 146:8 167:14
**forms** 56:10
**forth** 174:10
**forward** 150:23
**forwarded** 68:17
**forwarding** 154:19
**four** 81:2 155:2
**frankly** 57:19 71:6 76:9
**free** 32:18 33:16 50:25 169:12
**French** 133:22
**Freund** 166:18 167:2
**Friday** 17:10
**Friedman** 64:23,25
**friend** 23:6 24:6,9 24:13,22 27:23
**friendly** 115:25
**friends** 23:14 26:9 28:7,17 131:19
**front** 100:2
**full** 162:9
**functions** 71:3
**further** 145:19 146:8,15,24 171:5 174:15

**G**

**general** 59:13,22,22 61:2,4 164:23
**generally** 113:20
**genesis** 50:19
**getting** 9:22
**Gillon** 137:23,23 138:4 139:2
**give** 4:24 5:5,11,24 6:22 7:2 8:3 9:12 18:2 20:20 37:21 45:10 49:15 56:22 81:21 83:20,21 117:9 118:5 124:15 130:17 143:18
**given** 19:21 40:12 174:13
**gives** 107:19
**giving** 126:19
**go** 3:7 4:21 6:3 8:8 10:4 21:12 33:6 38:19,24 57:25 58:4 62:8 65:3 67:18,25 76:15 81:14 87:17,25 96:4 99:25 107:17 109:15 110:3,13 115:22 118:14,20 120:21 126:5,6,24 141:4 144:11,12 144:18,21,21,23 144:25 147:14 149:3 150:22 158:23 161:9,11 163:16 165:2,23 167:11,17 168:14 168:16 171:5
**God** 125:25 152:24 163:9
**God's** 169:3
**goes** 149:11
**going** 3:5 4:7,9,17 4:21,23 5:2,5 6:10 13:7,19 17:6,6,7 17:20 20:7,12 21:5,16 23:5,25 25:3 31:6,8,10,14 31:15,24 32:10,12 32:16 33:3 35:16 47:4 48:8,21 49:2 50:16 51:5 53:12 55:13 56:6,8,14 56:18 57:6 64:15 65:9 67:12,14,19 71:17 73:19 75:13 77:6 78:18 80:5 80:19 84:9 86:23 87:2 88:13,13,17 89:8 90:22 94:19 96:6 99:7 100:20 101:19,24 102:5,7

102:20 103:15,16 104:6 105:7,23 106:25 107:2,8 108:22,25 109:5 111:14,16 112:3 112:18 114:15 118:5 119:7 120:25 121:7 122:17 123:4,7,12 124:16,17,20,21 126:2,13 129:6,18 130:19 131:17,18 133:4 134:16,19 135:11 136:15 137:6,6,9 141:4 142:23,25 143:7 143:13 144:8,14 144:17,18 148:15 148:20 149:19 151:14,15 152:20 153:4 154:13,25 155:4 156:11,14 156:14 157:23 162:11,11,12,13 162:22 166:11,13 167:18 169:15
**good** 6:6 13:3 27:23 30:4 77:7,21 86:10 114:9 115:14,15,17 157:16
**gossip** 123:20 159:7
**gotta** 117:9
**governor** 30:25
**grand** 72:12 78:6 112:12 132:9,16 132:21 135:19 136:12
**Gregory** 109:4,22 110:19
**Groucho** 13:5
**groundbreaking** 123:18
**group** 138:25
**gubernatorial** 30:24
**guess** 12:14,15 72:12 115:16 122:25 134:14 136:7
**guessing** 65:23
**guilty** 75:7
**Guria** 49:10 145:7 145:15
**guy** 138:7 170:10
**guys** 111:17

**H**

**H** 3:8,8 102:8 173:9
**habeas** 7:21
**halfway** 20:9
**hand** 53:4 174:20
**happen** 25:22 111:10 163:22
**happened** 90:4 126:23
**happening** 75:4 109:20 111:12
**happy** 118:20
**Hawkins** 123:10 124:4
**head** 16:15
**heading** 20:10,13 20:14 21:7 50:19
**heads** 116:22
**heard** 19:16 50:2 79:19 166:6 169:18,20
**held** 1:10,16 58:5 113:7
**Hella** 133:12
**help** 81:11 157:25 166:4
**helped** 13:15
**helps** 113:18
**hereinbefore** 174:10
**hereunto** 174:19
**Hersh** 50:6,7
**hired** 11:9
**Hirsch** 166:18 167:2
**hit** 115:10
**Hofstra** 8:16,23,23
**hold** 10:9 11:5,21 11:25 16:7 114:3 126:7
**holding** 40:3
**hole** 19:12
**Homicide** 11:13,17 11:19 16:15
**honestly** 66:9
**honored** 25:12
**hopefully** 31:15 157:25 162:14
**hoping** 27:20,22
**house** 52:15
**hundred** 25:14 28:24
**Hynes** 1:7,7 2:9,10 22:9,14,18,23 23:2 30:7 31:18 31:22 32:2,5,8 41:2 44:3,4,10 46:11,20,22 47:11 47:21 48:4,9,16 75:23 76:5,17,22 106:12 107:6,20 107:21,24 108:10 108:16 112:8,13 113:13 114:22 115:8 116:24 121:10 123:19 124:4,11 129:2 134:24 135:8 154:20 159:12,17 159:23 160:25 161:4,15 163:17
**Hynes's** 30:13,18 121:22 157:13 158:13 161:6,9

**I**

**i.e** 92:11
**IAB** 45:23 48:23 49:15,17,25 145:8
**idea** 22:10,12,20 40:23 62:12 68:23 70:7 80:18 99:11 121:5 134:12 160:9 161:5,16 167:9
**ideas** 123:18,22
**identify** 23:20,22 25:4 101:22 103:16 143:2
**identity** 63:3
**immediately** 147:19
**implicate** 51:6
**implication** 168:14
**imposed** 62:24
**impression** 53:14
**improper** 4:18
**improperly** 168:22
**inaccurate** 144:13 155:7 156:13
**incarcerated** 62:11
**include** 98:2,4,21 98:24 171:23
**including** 4:25 5:24 41:3 87:8 106:11
**incorporating** 88:5
**incorrect** 62:18,19
**independent** 39:24 54:11,13,17 60:19 67:24 95:10 113:8 114:25 122:5,10 123:2
**INDEX** 173:2
**indicate** 28:4 127:12
**indicated** 21:15 32:15,18 60:6 86:22
**indicates** 21:20 113:10 163:5
**indicted** 59:9 113:6 127:2 141:18
**indictment** 59:7,12 105:17 128:16,21 132:23
**individual** 37:7 101:11 119:17 122:7
**individuals** 19:3 33:17 82:22 83:22
**influence** 6:20 156:23 159:6,17 159:23
**influenced** 123:20
**inform** 112:12
**information** 65:25 66:3,8 75:23 114:12 119:9,14 127:3 131:8 136:3 140:13 142:4 164:20 165:21,25 166:8
**informed** 57:22
**informing** 139:22
**initial** 3:15 97:6
**initially** 147:20
**initials** 126:16
**initiated** 109:15,17 109:24 110:4,15 110:20 111:2
**innocence** 84:6
**innocent** 107:25 108:13
**input** 148:12,13 150:6
**inquiring** 169:6
**inquiry** 168:25
**inside** 156:20
**insofar** 119:12,13
**instant** 135:20
**instruct** 119:8 142:9
**instructed** 94:20
**instructing** 118:9
**instructs** 84:25
**insulted** 167:11,13 167:18 168:10,13 168:20
**Integrity** 21:21
**intel** 26:2
**intend** 5:11,22
**intended** 82:11 105:19 131:24,25
**intention** 4:15 112:13
**interacted** 99:14
**interaction** 95:22
**interactions** 169:10
**interested** 174:17
**interesting** 17:3
**interfered** 19:5 33:9 121:8
**interfering** 33:12

120:10 121:13,24
**interim** 10:22
**internal** 119:10,20
**internally** 16:2
**interpose** 73:12,25
**interrupted** 158:24
**interruption** 80:4
**interview** 133:11 133:24,25 143:11 144:7 146:18,23 165:17,19
**interviewed** 69:2,6 165:12
**interviewing** 130:10
**interviews** 94:22 147:18
**intimidation** 133:14 134:6
**investigated** 14:2,3 117:5
**investigating** 52:2 61:21 62:10 83:2 83:12,15
**investigation** 16:25 18:25 19:14 32:20 39:21 49:12 51:14 58:13,16 59:6 61:25 63:8,17 68:25 69:5 72:5 75:21,22 76:4,5 77:15 78:4 82:14 83:7,9 92:14 93:12,13,16,18,24 94:6,7,8,13 95:4 95:13,16,21 96:15 97:17,19,20,21,22 97:23,25 98:3,6,8 98:22,25 99:6,6,7 99:19 100:15 101:6,15 108:11 108:16 109:24 111:3 117:15,22 119:11,21 170:16
**investigations** 14:13,15,17 15:9 15:17 115:23
**investigator** 25:7
**investigators** 13:21 13:25 138:5
**involve** 14:20 129:5
**involved** 19:7 41:17 43:14,18,22 44:2 70:3 79:2 83:19 85:17 93:24 94:2 94:4 96:10 101:5 118:18,21 119:17 149:6 151:20
**involvement** 68:7
**involving** 42:22 43:22 127:23
**Irizary** 7:25
**Israel** 131:20 132:11,25 135:20
**issue** 119:18
**issues** 5:7
**It'll** 161:24
**Italian** 72:2
**Italy** 27:24 28:6 29:11,15,17

**J**

**J** 1:7 2:10 161:4
**Jabbar** 7:12
**January** 10:20 47:20 48:2 80:14 81:17 82:3 143:4
**Jaus** 41:12,18 42:7 42:23 43:7,15 109:3,22 110:11 110:19 111:2 116:2,4,15
**JD** 8:16
**Jerry** 13:10 120:24
**Jewish** 133:12 173:13
**job** 8:24 74:10,10 77:8,17,22 163:5
**Joe** 25:7 135:13,17
**John** 69:25
**John's** 8:15
**joined** 8:22 16:21
**joint** 97:19,21,22
**joke** 163:20
**Josh** 163:9,10 164:5,9,12,17,20
**judge** 7:24 19:21 23:24 27:10,13 62:24
**July** 51:18 53:16 54:19 146:14,19 149:3 151:20 154:14 156:5 157:14 158:20
**June** 91:10,12 92:20 127:23 135:2 143:10 144:7 174:20
**Jurat** 171:23
**jury** 72:12 78:6 112:12 132:9,16 132:21 135:19 136:13
**justice** 120:10 121:9,13,25

**K**

**KCDA** 21:21 51:8 51:9 146:15
**keep** 21:16 147:13
**Kellner** 1:4 6:8 33:20,21 42:25 43:13,14,18,22 44:2,12 45:15,20 46:24 48:4 50:20 51:6,8,21,22 52:3 52:5,18,22,24 53:8,11,17 54:17 55:3 58:13,16,25 59:5,8 60:7,16,23 61:7,21 62:10 63:9,18 68:25 69:5 72:5,16 75:22 77:16 82:15 83:13 92:14 93:12 93:17,25 94:7,13 94:23 95:4 96:15 97:18 98:22 99:4 99:14 100:16 101:6,15 105:18 108:12,17 109:16 109:25 110:4,15 110:21 111:3 112:11 113:6 127:2 128:13,17 132:2,10,24 134:25 137:2 140:15 141:5,8,18 142:18 145:20,24 146:4,9 147:8,23 148:7 149:23 150:12,13 152:2 170:17
**Kellner's** 77:25 136:12 147:19 148:8
**kick** 163:4
**Kicks** 162:6
**kid** 52:17
**kidding** 79:8
**kind** 123:15 142:14
**knew** 30:10 37:19 39:9 52:5 62:15 62:21 65:19 70:23 73:7 111:18 123:16
**know** 6:7,14 9:6 12:9,24 17:3,22 19:9,10,11,11 23:10 24:2 25:23 27:11 30:9,10,14 30:15 32:18 34:25 34:25 35:16 37:4 37:19 38:7,16 39:11 41:5 44:15 45:25 46:18 51:19 55:11 62:13,15,21 64:25 65:4,7,13 65:16,17,20 66:16 66:17,19,22 67:2 67:4 68:8 69:24 70:2,2,5,8 71:25 73:6 76:8 78:16 79:17 81:14 83:4 84:17 85:22 87:11 87:23 89:18,23 90:4 92:2 99:11 99:16 100:5,13,13 101:7 103:8,22,24 105:16 106:14 108:5 110:20 111:2 115:24 116:7,13 117:20 120:22 121:18 124:18 127:4 128:7,9 130:14,15 131:10,12 133:7 133:21 137:7 138:3 139:20 141:10 144:17 145:11,14 148:11 148:19 151:6 152:10,23 153:14 154:8 160:12,12 160:18 161:8,12 162:8 164:10,15 165:3 166:6,24,25 166:25 167:8,16 168:7,9 169:3,8
**knowing** 53:12 66:21
**knowledge** 22:8 67:7,8,11 86:10 96:23,25 169:13
**known** 81:18 117:5
**knows** 163:9 167:5
**Koch's** 30:23
**Kriss** 10:15
**Kustin** 1:18 174:6 174:22
**Kyra** 1:17 174:6,22

**L**

**L** 1:7 2:9 3:8 156:22
**L-e-v** 139:25
**large** 19:20 62:23
**larger** 146:12
**Lauren** 50:6,7
**LaVien** 28:22
**law** 2:4 10:12,14 14:15,19,22 49:11 119:20 140:20 142:6
**lawsuit** 6:10
**lawyer** 10:25 156:22
**Lawyer's** 71:20
**lawyers** 55:19 56:2 72:3

**lead** 59:7
**leader** 120:11 121:2 121:3
**learned** 63:2 65:8
**learning** 63:5 105:18
**leave** 10:4
**Lebovits** 19:8,12,17 20:2 21:17 33:25 34:24 35:11,23 36:8,25 37:10,14 37:23 39:15 42:11 42:24 43:4,8 51:5 52:17 53:18 55:20 56:2 59:14,15 60:2,4,17,25 61:20 62:10,22 72:7,23 74:19,23 75:6,6,14,18 82:12,17,23 83:19 91:15 93:7 98:10 99:20 100:11,17 102:14 105:13,19 107:22 108:12,17 111:8 125:12 128:18 135:18 136:11 147:24 169:21,23,23,24
**Lebovits's** 43:10 130:11 156:22
**left** 9:7,10,21 23:25 25:6 31:17 32:2 90:4 141:9,18
**legal** 33:11 84:8 169:12
**legally** 44:25 45:14 90:13,16
**length** 137:11
**let's** 6:2 38:5,19 58:3 89:10 167:17
**letter** 148:21,25 149:5,24 150:7 152:5,17 153:5,22 154:3,9 158:2 173:16
**letting** 165:3
**Lev** 139:24
**lie** 59:14
**life** 63:13
**liking** 44:18
**line** 7:22 48:7,20 51:3 77:4 125:8 166:16
**lines** 109:11
**listen** 5:21 87:9 124:11
**listened** 5:17,19,20
**little** 31:11 50:16 117:9,10 148:24
**Litwin** 45:23 48:23 49:5,17,19 50:3 125:22 126:14,19 126:24 127:9 145:8
**local** 120:9 121:8 121:24
**log** 31:9
**long** 9:4 10:9,17 11:21,25 60:20 66:9 114:7
**long-form** 165:17
**Lonuzzi** 69:25 126:21 139:14,16 139:23 140:8 146:15
**look** 20:8,12 23:20 25:4 33:16 34:4 34:11 47:18 81:5 103:9 107:8 108:25 125:23 136:17 143:7 152:22 155:2,4,12 165:22
**looked** 19:13 139:5
**looking** 34:13 57:8 64:18 66:6 82:6 98:10,14 112:25 134:3 149:2 155:9 155:10
**looks** 57:18 80:12 135:10 154:21
**lot** 57:19 103:22
**luck** 143:22

**M**

**M** 3:8 173:3
**M-e-s-a-m-c-h-e** 139:25
**MacGiollabhui** 2:4 2:6 3:2 4:12 5:8 5:18 6:5,7 18:5,8 20:23 24:17 25:21 27:3,15 57:2 58:3 73:16,24 74:5,8 79:23 80:25 81:6 86:4 87:9,14,19 87:23 88:12,23 89:7,12 118:17,25 122:16 129:9 132:19 153:3,10 153:14,18 161:17 161:22,24 171:6 173:3
**Madison** 2:5
**mafia** 26:4 67:10
**magnify** 31:10
**maintaining** 5:10
**major** 123:17
**majority** 15:8
**making** 86:6 111:24
**man** 107:25 108:13
**manipulated** 72:7 72:23 74:18,23
**March** 41:4,8,17 42:8 105:14 107:6
**Mario** 31:2
**Mark** 143:6
**marked** 17:19 20:5 20:5 23:17 25:2,2 31:7 55:12 56:7 58:9 64:16 67:13 76:11 80:6,6,7 90:23 100:21 101:20 102:6,21 105:8,24 107:3 112:4,19 114:16 124:22 125:19 127:19 129:6 133:5 134:17 136:16 137:7 139:8 142:24 148:16 149:20 151:15 152:21 154:24 155:25 162:22 166:12 171:20
**marriage** 174:17
**Marx** 13:5
**material** 94:12 95:6 140:14 147:18 148:7
**matter** 6:8 26:22 68:8 119:13 174:18
**matters** 6:11
**mean** 5:16 8:6 13:23,24 29:13 36:12,15,19,21 37:18 39:20 57:13 62:5 65:7 86:13 95:8 117:18 140:22 141:6 160:5 161:8,15 170:3,5,18
**meaning** 9:6 12:10 13:15 14:12,22 15:15 49:20 53:4 58:24 93:16 103:5 163:18,23 164:12
**means** 16:12 84:23 164:10 170:21
**meant** 141:12,13,25 161:16
**medical** 6:25
**medications** 6:20
**meet** 63:17 69:12 170:11,14,25
**meeting** 18:16,20 18:22,24 19:15 22:2 41:2,7,11,16 41:23 42:19,22 43:5,13,17,21,25 44:10 45:2,19 46:19,21 47:2 55:19,23 63:11 64:6 69:18,19,22 70:10 97:6,14 101:10 106:10,14 106:17,23 107:5,7 107:11 108:8 109:2 110:17,18 110:22 116:23 126:14 163:23 170:6,7,9
**meetings** 116:11,14 124:3,6,7,9 170:22
**member** 70:16 71:7 71:10,12,23 134:4 134:10
**memo** 44:14,14,17 44:18,22 45:4 47:7,11,19,19,22 47:25 129:4 143:3
**memorabilia** 63:25 64:3,12 97:8
**memorize** 42:3
**memory** 70:19 93:10
**mention** 79:5 88:25
**mentioned** 5:13 21:6 29:20 129:22
**Mesamche** 139:24
**met** 21:24 22:7,15 22:18 24:21 32:8 42:7 43:9 63:7,10 69:14 169:22
**Meyer** 94:23 169:24 170:9,11
**Michael** 1:14 3:1 3:14 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1

62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 118:16 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1,6 173:1 174:1
**middle** 3:14 141:21
**Mike** 138:16
**mind** 35:19 149:11 155:23 161:4,6,9 161:11
**mine** 28:23
**minimis** 138:16
**minutes** 119:3
**mis-transcribed** 110:14
**mischaracterizing** 32:17
**misleading** 150:19
**mispronounce** 169:16
**mistake** 144:24
**Mladinich** 66:14 68:3,14
**Mladinich's** 68:7
**molester** 37:15 72:17
**moment** 31:12,12 64:18 79:25 118:12,16 150:8 161:25 162:10
**Monday** 146:14
**money** 52:16 53:13 59:15 60:8,13,16 83:3,13,16,19 115:23 128:17 167:6 168:21
**mongers** 123:20
**months** 126:7 131:21
**Morelli** 29:25
**morning** 6:6
**Moshe** 64:23,25
**Mosi** 156:6 157:20 158:11,16,18
**motion** 81:18 82:4 82:10 85:14 92:10 92:12 125:11
**mouse** 18:3,11 20:7 20:21,24 56:15 64:17 102:25
**move** 89:8,11 126:2 143:16 154:13 157:25 162:20
**moved** 26:2
**moves** 163:6
**movie** 118:2
**moving** 126:3
**multiple** 37:6

**N**

**N** 2:2 3:8
**name** 3:13,15 6:7 19:8,16 26:15 27:10 50:2 64:23 65:20,21 66:14 69:25 70:4 102:16 117:25 118:4 120:21,23,23 121:2 123:10 129:17 131:17 137:15 138:2 156:6 166:17 167:2,5,20 169:3 169:14,15
**named** 29:25 139:24
**names** 33:15,17 83:21
**naming** 57:22
**Nathan** 101:23
**nature** 49:21 75:3 108:21 115:24 142:5
**necessarily** 14:9 33:11
**necessary** 85:16
**need** 4:3 8:9 9:14 38:23 65:3 109:18 118:18 148:11
**needed** 78:18 115:22 142:3 148:7
**needs** 20:22
**Neil** 137:23,23 138:4
**nephew** 120:11
**never** 9:20 11:11 32:22 35:25 36:3 36:7 71:10,10 119:14 129:4 147:22 149:11 155:23 167:25 168:3 169:18,20
**new** 1:2,7,19 2:5,5 2:8,9,11,11 3:25 3:25 66:18,19 123:18 134:5 151:8 162:4 164:13 173:18 174:3,7
**news** 62:25 131:3
**newspaper** 62:23 160:7
**Niall** 2:4,6 6:7 17:25 25:17 57:24 80:23 85:11 87:3 128:5 132:15 153:2
**nine** 165:20
**nineteen** 10:18
**nod** 165:23
**Non-party** 1:15 3:9
**nonexistent** 115:21 116:6
**nonparty** 85:20
**nonsensical** 110:5
**notary** 1:18 3:10 66:11 172:12 174:7
**note** 4:17 20:17
**NOTED** 171:18
**notice** 5:6,25 105:12
**November** 67:21 68:19 76:17 77:20 162:5
**number** 6:9 17:6 32:21,22 39:22 41:3 55:15 57:23 58:18 60:17,24 61:18 62:17 68:22 69:2,5 70:12,17 83:3,5,13,16 99:18 100:7,10,17 103:13 104:4 106:11 108:18,19 126:10,15,20 128:3,12,16,23 129:20 130:4 131:3,18,20,23 132:24 135:19 136:12,22 137:3 137:15 138:10 139:17 140:2,9,12 145:8 146:14,24 147:17,22 149:17 153:2 167:20,22 173:6
**NYPD** 10:5 26:11 66:22 67:3

**O**

**O** 3:8
**O'Mara** 22:2
**oath** 7:5,15 160:8,9
**object** 38:23 74:12
**objected** 74:8,9 96:3
**objection** 4:17,22 8:5,7 9:8 14:8,21 14:24 15:13,20,24 16:10 17:15 19:18 20:17 23:9 26:25 30:8 33:6 34:3,17 35:14 36:2,11,23 37:12,16 38:3,17 38:24 39:18 40:8 40:15 41:6,20 42:15 45:9 46:14 46:16 47:14 48:5 48:18 49:8,22 50:4,13 54:4,20 59:2 60:3 61:3,9 61:14 67:22 68:15 72:9,18,25 73:11 73:12,17 74:4 79:7,21 81:19 82:18 84:16 87:13 87:15 89:3,17 90:11 93:20 95:25 98:13,18 99:3,22 101:8,17 102:19 105:22 110:23 120:19 121:15 124:12 128:4 129:21 131:5 132:5,13 133:3 135:25 136:6 137:5 138:11 139:18 140:16 145:12 147:4 148:2 151:21 154:5 164:11 166:3 170:20
**objections** 74:2 120:5

**observation** 53:8 53:20,24,25
**obtain** 114:11
**obtained** 28:4 98:17
**obvious** 157:24
**obviously** 5:21 88:24 123:5 150:25
**occasion** 5:13 7:8,9 7:10 25:11 29:6 39:14 57:11,13 121:11
**occasions** 7:10,11
**occur** 106:20,20
**occurred** 18:16 40:6 41:2,11,16 43:5,13,17,21,25 107:6 109:2 112:8 114:22 160:12 170:22
**off-the-record** 165:25 166:8
**offered** 123:22
**office** 2:4 8:22 9:5 9:11,21,24 10:7 10:20 11:6,7,12 13:17 14:6,10 15:6 16:5,9,21 18:20,22 23:11 25:8 28:19 29:22 31:9 37:23 38:14 39:10,15 44:11 47:21 50:11 51:13 58:12,20,21,25 59:4 60:8,12,15 60:23 62:5,9 63:24 64:4 69:2,6 71:13 72:6,16,21 72:22 74:18,22 75:15 78:14 82:16 82:25 88:8 89:2 89:21 90:5 92:9 92:13 93:17,24 97:7,14,18 102:16 104:15,24 105:14 105:14 109:3,23 109:23 110:12,18 111:6 113:7,25 115:9,20 116:11 116:22,23 117:4 117:16 119:11,19 125:13 126:24 131:25 137:2 141:9,19 142:12 142:15 152:14,15 156:21 159:5 163:23 164:17 165:3,16 167:14 168:3,23 169:22 170:3,4,5,12,15 170:22 171:2
**office's** 72:4 75:22 76:20 94:6 105:17 128:13 140:14 170:15
**officer** 164:20 165:22
**Oh** 125:25 152:24
**okay** 3:6 4:6 6:2,18 8:11 13:2 14:25 15:4 16:6 17:5,16 17:17 18:8,14,23 19:19 20:16 21:8 21:13,13 22:7 23:16 24:4,18 25:16 29:19 30:17 32:14,24 33:3 36:5,16,20,25 37:5,22 38:9,24 39:9,19 40:2,21 40:25 41:24 42:3 42:19 43:12 44:9 47:4,24 50:15 54:15 56:6 57:6,8 58:3 59:8 60:21 62:3,6 64:21 65:12,24 67:12,19 68:2 76:10 80:13 80:15 81:7,13 84:21 88:12 89:5 89:6,10 90:15 91:4,17 95:11 97:4 100:4,8 103:10 105:6,12 106:9 112:3 116:14 118:25 124:16 126:8 128:11 129:10 137:13 141:11,23 142:23 143:13,16 144:4,11,14,15,22 145:3 146:13 147:12,15 151:14 153:13 155:14,21 155:24 156:17 157:13 158:17,23 158:24 159:2 161:23 162:18,21 166:11 167:8,17 168:10,17 169:5,7 169:9,25
**once** 85:23 86:2 106:2
**One's** 131:3 136:22 137:15 145:9 149:17
**one-page** 81:3
**ones** 17:23 29:14,16 30:14
**open** 19:2 100:4 102:7 140:24 141:6,25 142:13 142:20
**opened** 10:12,13 32:20 97:24
**operate** 9:18
**opportunity** 17:12
**opposed** 13:15 16:8 160:18
**opposition** 125:11
**option** 86:24
**order** 85:15 132:18
**ordered** 145:6
**ordinary** 76:8
**organization** 139:23 169:10
**organized** 71:19
**original** 68:13,21 138:7
**outcome** 174:18
**outside** 14:20,22,25 15:6 16:4,5 29:16 152:15 165:12 170:12,14 171:2
**overall** 115:17
**overturn** 98:10

**P**

**P** 2:2,2,12
**P-l-a-y-e-d** 42:13
**p.m** 119:6 162:2 171:18
**page** 20:8,9 50:17 55:15 81:10 91:9 94:16 102:2 107:9 108:25 111:15 112:25 125:22 135:12,12 137:11 143:8,10,14,15 144:8,9,10 146:23 147:16 156:19 166:14 171:22 173:3,6,7,11,12 173:12,14
**pages** 104:16 106:2 148:22 173:8,10 173:10,11,13,14 173:15,15,16,17 173:18
**paid** 60:13,16 61:7 83:3,13,16,18 128:17 135:18 136:11 139:25 140:8 147:23
**paper** 141:14
**papers** 54:2,6,10 113:10 125:11,16
**paragraph** 34:5,11 47:6,9,18,25 50:18 51:2,4 55:7 56:13 91:18 92:5 102:2,3,11 104:13 104:20 107:9,11 107:14 110:8,9 126:17 134:3 143:8,9 145:4,17 146:21 147:6,15 149:11 156:18,19 157:15 158:10,22 159:11 163:12
**paragraphs** 20:13 21:6 56:12 125:24 126:9 144:10 162:19,24
**paraphrase** 32:17
**paraphrasing** 33:10
**parentheses** 145:5
**part** 21:17 47:10 50:24 78:19 82:23 101:25 109:14 169:25
**participated** 14:14
**particular** 9:23,25 10:24 12:2 13:5 16:7 17:17,22 25:4 26:16 27:21 37:6 51:2 53:15 55:7,12,16 56:9 56:16 60:22 64:6 68:7,10,18 71:23 76:22 83:2 91:24 94:17 99:18 100:10 101:25 102:3 104:2,7 106:25 108:24 123:24 125:21 126:13 127:20 131:9 132:8 136:17 137:9 143:8 145:18 146:6,18 149:14 151:16 154:14 165:18,20
**parties** 174:16
**partners** 10:17
**parts** 14:10
**party** 85:21
**passage** 13:19
**PATRICIA** 1:7 2:9
**pause** 38:22
**paying** 60:8,24
**payments** 136:22 137:3,14 138:10 138:15,22,24 140:11 149:16
**pending** 105:12
**people** 23:22 25:5 32:21,22 33:9

39:22 41:3 44:21
49:13 67:9 83:19
106:11 163:4
165:16
**peoples'** 85:22
**percent** 25:14
28:24
**period** 10:22 30:5
141:16,23 142:10
**person** 58:17 64:22
68:2 101:4 109:17
114:12 115:22
117:23 120:14,15
121:20 123:10
132:8 137:15,22
138:3
**person's** 138:2
**personal** 170:4
**personally** 16:7
58:19 70:6 72:5
75:24 78:21 89:19
89:22 90:15 94:8
94:14 141:25
**personnel** 14:20
119:12 163:6
**perusal** 113:22
**Petrosino** 23:24
**phone** 52:19,25
53:5
**photo** 173:6,7
**photograph** 25:4
**physical** 6:25
**picture** 23:20 71:19
146:12 162:5
**piece** 141:14
**place** 1:17 31:16
106:10,25 151:9
**plaintiff** 1:5,15 2:4
5:3 173:6,7,7,8,9
173:10,11,11,12
173:12,13,14,14
173:15,15,16,16
173:17,18
**plaintiff's** 4:23
17:20 20:6 23:17
25:3 31:8 32:11
47:5 50:15 55:13
56:7 58:9 60:22
64:16 66:7 67:14
71:18 76:11 80:5
80:7 90:23 100:21
101:20 102:6,21
103:16 105:8,24
107:3 108:23
112:4,19 114:16
124:22 125:20
127:13,19 129:7
133:5 134:17
136:16 137:7
139:8 142:25
148:16,17,18
149:20 150:8
151:16 152:21
154:25 155:25
162:23 166:13
171:19
**played** 42:10,13
111:7 128:12
**please** 3:13,18 6:3
74:2 89:11 122:21
**plot** 51:7
**point** 5:15 7:25
8:12 12:7,10,16
28:3 31:6,14,15
31:24 34:5,12
41:12 42:8 47:4
47:22 49:21 50:10
51:13 54:18 55:9
56:6 65:8,23
68:12 69:11 71:14
71:17 77:14 78:9
78:15 83:22 85:8
86:23 94:15 95:3
99:23 100:14
103:15,25 104:6
105:23 106:24,25
108:22 111:24
117:12 124:16
125:20 126:13
127:7 131:14
132:7 135:11
136:21 138:6
139:2 143:14
148:17 150:10
154:24 156:12
157:6 158:7 161:5
166:13
**pointing** 50:24
107:12 128:9
158:18
**political** 30:13,22
120:11 121:3
**politics** 120:9 121:8
121:12,24
**Ponzi** 25:7
**poor** 44:19
**portion** 39:6 88:20
107:9 109:6
122:22 143:25
146:13 166:23
**position** 9:15,20,22
10:2,9 11:5,9,12
11:22 12:2 113:25
114:2,5 119:16
**positions** 9:14
**possible** 86:7
**possibly** 86:19
121:23
**Post** 151:8 162:4
164:14,15 173:18
**post-judgment**
92:9
**potential** 59:20,21
**potentially** 17:3
19:2,4 59:15
**practice** 10:12,14
11:2 30:21 113:17
113:24 114:10,14
116:10,21 140:19
140:24 141:3
142:11,12,15,19
152:16 166:4
**practiced** 140:20
140:23,23 142:6
**practitioner** 11:3
**Precinct** 25:25
**precise** 145:6
**preface** 123:5
**preliminary** 4:7
6:11
**preparation** 82:7
149:7
**prepared** 113:14,20
**present** 64:7,10
69:22 107:7
112:14 116:15
**presented** 78:5
112:12
**preserve** 4:15
**president** 159:13
**press** 113:6,11,13
164:23 165:2,10
**pressed** 3:3
**pressured** 126:22
**presumption** 84:5
**pretty** 157:16
**previous** 31:7 67:13
123:9 155:3 157:3
**previously** 40:12
55:12 58:9 64:16
80:6 90:23 99:10
102:21 105:8
120:16 125:19
127:18 134:16
136:16 139:7
142:24 148:16
149:20 155:25
**previously-marked**
55:9
**Priest** 117:18,19,24
118:3 120:17
121:20
**print** 79:24
**prior** 17:20 20:5
39:12,14 41:17
45:18 46:19,22
49:21 51:25 56:7
57:11,13,14 68:6
68:8 75:13 84:14
100:21 105:17
127:7 129:7
130:20 136:2,9,21
166:12
**prison** 72:17
**privacy** 119:18
**private** 30:20
152:16
**probably** 78:14
96:21 156:10
169:15
**procedure** 1:16
4:20
**proceeding** 7:6,17
**professional** 49:21
152:3
**promoted** 9:19
11:13,16 25:13
**pronounced** 169:17
**proper** 86:10
**properly** 162:13
**ProPublica** 152:6
152:18 154:4
155:19 157:10,11
157:22,23 158:3
**prosecute** 114:13
**prosecuted** 14:16
15:8 26:13 38:13
39:9,15 58:24,25
141:6,9
**prosecuting** 37:23
100:11
**prosecution** 58:16
59:4 76:21 77:15
77:22 79:3 109:16
109:18 110:4,15
110:20 128:13
132:2 140:15,15
170:16
**prosecutions** 14:13
15:15
**prosecutor** 71:13
77:25
**prosecutors** 99:13
142:8 159:16,22
**protected** 142:4
**protective** 85:15
**provide** 5:23 95:5
142:12 148:13
165:24 166:8
**provided** 17:23
21:2 58:12 101:21
102:23 104:24
105:9 136:4
138:16,21 139:3,3
148:20 150:7
169:12
**providing** 94:11
95:4 103:12
**psychiatrist** 75:18
**public** 1:18 3:10

119:15 164:20 165:21 172:12 174:7
**publicly** 102:16
**pull** 17:6 55:10 80:5
**pursuant** 1:15 4:19
**pursuing** 99:20
**put** 42:9 106:2,5 140:24 142:14

**Q**

**quality** 44:22 45:3 45:12
**question** 6:12,16 8:9 15:14 18:14 18:15 19:24 21:8 21:13 24:12 27:2 34:8,8,10 35:17 37:20 38:25 40:16 41:14 42:4,5,14 43:11 50:14 52:20 56:17 57:9 59:3 59:23 65:4,10 69:17 73:2,5,13 73:15,18 74:13,14 74:25 77:18 79:8 79:12,15,19 80:9 81:21,22,22 83:8 83:25 84:10,18,19 84:24 85:2,5,11 85:23 86:19 87:4 87:5 88:15 89:4 89:25 90:6 91:25 93:15,21 94:3 96:2,5,12,18 98:23 106:7,12 107:18 109:6 115:10 121:3,16 121:17 122:20 123:3,23 124:14 130:6,8,17 132:20 133:16,18,19,21 142:7,16 146:6 149:4 150:19 153:5,17,19 154:2 155:15 156:25 157:24 158:8,9,12 158:25 159:4,8 160:10,21 161:9 161:14 162:21,23 163:21,22 164:21 166:7,7 168:18 169:8 170:2,25
**questioning** 146:17
**questions** 6:9 35:18 43:3 45:16 69:9 84:9 85:12 86:11 86:18 87:6 88:5 88:24 128:21 144:15 145:2 146:16 147:13 156:15 168:15 171:11,16
**quite** 57:19 71:6 76:9
**quotation** 121:7 123:13,24
**quote** 13:5,7,19,20 20:10 27:20,22 32:19 48:8,21 92:21 93:2 121:23 123:7 138:14 167:5
**quote/unquote** 117:6 120:16 155:6 157:20 159:22
**quoting** 27:19 28:5 50:19 91:20 104:14 134:5 156:21 159:16

**R**

**R** 2:2 167:20,22
**R-e-i-c-h-b-a-c-h** 27:17
**rabbi** 65:22
**Rackets** 12:4,6,8,11 12:11,17 13:21 14:4,18,23 15:8 15:10,16,18 16:3 16:4,6,8,14,18 46:9 50:9 77:12 83:2 91:21 93:6 93:14,19 94:12 97:19,20 98:25 101:5,14 112:13 113:17 114:4,7,11 116:7,8 117:2 123:9 124:5 142:9 150:14 151:5,11 170:4
**Rackets'** 98:22
**raise** 5:6
**raised** 74:6 128:22
**rank** 66:19
**reach** 75:14
**read** 12:25 19:20 20:22,22 38:7 39:4,7 40:20 41:25 46:2 48:8 48:21 51:5 53:25 54:10 55:8 56:25 57:3 77:6 81:20 87:21 88:14,19,21 94:19 102:11,12 106:4,8 107:14,17 109:5 110:6 111:16 113:9 115:5,6 120:4 122:2,21,23 123:12 125:16,24 126:8 127:7,16 129:4 130:14 135:16 143:13,15 144:5,8,18 147:7 153:9 156:8,11 158:22 161:12 162:17,18 167:7
**reading** 42:16 54:5 62:23,25 104:10 110:7 127:10 144:7 153:15 156:4 159:21
**reads** 31:21 32:2 92:7 130:22 131:18 145:18
**ready** 153:16
**really** 16:11 22:5 85:25
**reason** 6:24 69:16 79:5,10 85:25 98:4,6 118:7
**reassigned** 151:4 151:11
**recall** 18:19,21,21 18:23 22:4,5,24 22:25 23:13 26:21 27:4,5,8,10 29:20 29:21 33:11,15,17 34:2 35:3,6,7,9,10 35:15,22 36:4,7 37:18,19 38:25 40:7,9 42:16,19 42:22 43:5,13,17 43:21,25 44:9,10 45:13 46:4,5,5,9 46:21,25 47:2,3 49:9,13,16,23,24 50:12 53:2,6,21 53:23 54:5,7,8,24 55:2,5,18,25 56:5 58:15,22 59:10,11 60:15,23 61:5,17 61:19 63:22 64:11 66:3 68:24 69:4 69:10,21 70:13,15 71:2,7 72:11,13 72:14,21 74:20 75:3,5,9,12,17 76:21 79:22 82:5 82:9 83:12,14,15 83:18,21 90:18,21 91:3,5 94:10,11 95:3 96:25 97:3 100:19 101:10,13 102:18,24 103:2,7 103:8,10 104:10 104:22 105:2,3,4 105:6,11,18 106:16,16,19,21 108:3,7,10,15,20 109:10,19,25 110:21,25 111:4,5 111:11,12,13,23 112:2 116:20,25 117:22 119:25 120:12 121:12 124:3,6,7,9,14 127:10,17 128:14 128:19,24 129:4 132:6,7,22 133:2 134:15 136:7,8,9 136:14,20 137:4 138:23 139:4 140:4,7 142:17,21 142:21 146:18 147:5,11,12,25 148:4,9,14 149:6 149:10,12,13 150:6,10,20,22 151:7,23 152:4 154:22 155:18 156:4,8 160:25 163:2 164:2 166:10 169:14 171:4
**recalls** 109:2
**recanted** 147:22
**received** 45:4 102:14 154:20
**receiving** 52:19,25 55:25 58:17 95:12 140:4
**recess** 58:7 80:3 119:6 162:2
**recognize** 65:20
**recollection** 23:3 34:6,15,19 37:9 37:13 39:25 40:3 41:7 52:4 53:19 54:12,13,18,22 55:22 57:10 59:18 60:10,11,14,20 63:5 66:8 67:24 68:9 69:7,8,14,15 69:17,20 70:10 73:8 76:25 77:11 78:7 83:8 93:9 95:7,10,11 99:12 106:22 112:16 113:9,14 115:2 122:5,11 123:2 124:2 149:18 155:20,23
**recollections** 76:6
**recommend** 129:2
**recommendation** 48:3 90:8

**recommended** 84:14
**record** 3:3,4,5 4:8 4:13 58:2,4,6 61:24 85:6,25 87:13,17,18,20 118:15,20 123:21 138:15,21 174:13
**recorded** 94:23
**recording** 4:16 103:12 104:23 124:18
**recordings** 104:3,5 104:17
**records** 5:9 138:9 149:15
**redacted** 47:6
**refer** 45:23 49:4,15 68:2 126:9 129:19 145:7
**reference** 68:21 117:14 125:7,8 132:21 134:2,3 138:8 139:13 155:6,16 156:20 157:2,19 158:14 167:9
**referral** 145:13,14
**referred** 47:20 48:23 49:17 102:9 120:14,16 121:6 121:20 131:13 134:11 138:22
**referring** 24:15 49:25 58:8,18 88:7 91:15 123:25 161:2
**refers** 42:20 47:10 48:2 104:3 125:10 125:15 131:8 137:14 149:23
**reflects** 119:10
**refocus** 51:8
**refresh** 34:19 66:7 70:19 76:25 93:10 106:22
**refreshes** 34:6,14
**regard** 5:5 6:10 14:5 26:21 48:4 62:7 77:2,16,22 77:25 95:13 97:7 114:11 121:19 128:22 130:2 132:9 140:13,14 164:22
**regarding** 19:2 43:10 145:8,20 146:4,9
**regular** 116:21,24
**Reichbach** 27:13 27:14
**relate** 98:16,20
**related** 82:15 174:15
**relates** 129:19,22
**relation** 6:9 7:14 43:12 59:25 61:18 62:17 72:16 97:4 100:12,17 121:9 123:23
**relationship** 26:7 30:5 115:7,8,11 115:14,17,19 116:5 157:16
**relatively** 138:15
**release** 72:17
**reluctance** 150:22
**remain** 23:14
**remains** 24:8,9,13 84:6
**remarks** 113:12,15 113:21
**remember** 7:22 12:14,22 25:10,11 26:15 27:12,25 28:8,11,12,14 29:3,18 30:3 31:5 45:25 54:8 62:22 63:19,21 64:13 65:20,21,24 67:17 69:16 76:14,14 78:25 80:18 83:5 83:20 97:8,12,14 101:18 107:10,15 114:5 115:4 117:17 121:5 127:5 134:13 142:13 147:13 150:23 158:4 170:6,7,8,8,9
**remembered** 83:6
**remove** 132:20 150:20
**rented** 27:24
**repeat** 39:4 65:10
**repeated** 75:2
**rephrase** 6:14 74:16 132:20
**replete** 147:18
**report** 63:2
**reporter** 1:18 3:12 3:17 4:2,5 27:16 38:20 39:4,8 88:14,22 122:20 122:24 156:5 160:14 164:13 174:6
**reporters** 166:5,9
**reprehensible** 48:22
**represent** 6:8 20:24 126:21 140:2,9
**represented** 70:12 104:18,24
**representing** 139:17
**request** 25:18
**requested** 39:6 88:20 122:22
**reserve** 4:9
**resign** 50:11 120:7 122:7
**respect** 37:24 38:14 39:16 63:3 75:7 75:19 91:7 107:22
**rest** 86:6 144:8
**restated** 147:7
**result** 72:16
**resume** 124:18,20
**retained** 126:20
**retired** 26:12 138:7
**retry** 126:4
**return** 107:24 154:12
**returned** 10:19 11:6 128:21 146:15
**review** 4:10 17:13 17:21 20:18 21:4 21:22 22:3 39:12 50:23 56:8 57:3 57:16 67:15 80:20 106:13 134:19 137:9 148:21 153:4
**reviewed** 54:2 57:9 60:21 76:24 80:17 80:21 100:25 103:6,19 125:2 129:15 133:8 134:20 166:22
**reviewing** 103:2
**revisions** 150:3
**revisit** 86:2
**Rhonnie** 41:12,18 42:7,23 43:15 109:14 110:3,11 110:12 116:4
**right** 3:22 4:10 7:21 8:16,19 10:20 11:16 13:10,12,17 16:19 17:5 18:17 19:8 21:16 22:15 23:25 24:6,23 25:6,9 26:19 27:7 29:6 30:7,13 31:16,17,20 32:2 32:21 33:21,25 35:21 37:3,7 40:22 41:4,13 45:24 46:4 48:7 51:18,23 52:22,23 54:3 56:22 58:13 59:5 60:2,9 61:11 61:23 62:5,11,17 63:9 64:4 65:6,15 68:4,14,19,22 70:8,17 71:20 76:18 78:2,6 80:14,17 81:16 82:17 83:11,11,24 84:3,5,7,15 87:25 89:12,15,20 91:25 93:3 94:18 98:11 98:14,17 100:2,7 101:6 105:15 112:9 113:3 114:23 117:6 119:24 122:10,13 122:16 123:4,10 125:3,7,10,13,17 126:4,10 127:23 128:2,3 129:15,20 129:23 131:4 132:3,17 133:12 133:25 135:2,7,9 137:16,17 139:17 141:16 143:21,24 145:21 146:2 147:14 149:6 150:14,15 151:20 152:6 153:25 154:7,17,20 156:8 158:3,13,18,19 159:14,15 160:16 160:16 162:3,15 162:17 163:16,17 164:14 166:23 167:4,15,20 168:23 170:23
**rights** 120:8
**rise** 123:16
**Robert** 66:14
**role** 128:12
**roll** 123:14
**room** 70:8
**rule** 138:25
**rules** 1:16 4:19,20 86:15
**rumor** 123:21
**run** 6:11
**running** 30:24 31:17

**S**

**S** 2:2
**Sam** 6:8 33:21 42:24 43:12,14,18 43:22 44:2 45:15 45:20 46:4 51:21

51:22 58:13,16,25 59:5,8 61:7,21 62:10 63:8,18 68:25 69:5 72:5 72:16 75:22 77:15 77:25 82:15 93:12 93:17,25 94:6,13 95:4 96:15 97:18 98:22 99:4,14 100:16 101:6,15 105:18 108:12,17 109:25 111:3 113:5 127:2 128:13,17 132:2 132:10,23 137:2 140:15 142:17 152:2 170:16
**SAMUEL** 1:4
**Saul** 163:9,10 164:5 164:9,12,17,20
**saw** 52:9,22 70:3 81:15 84:11 137:12,13 153:24 156:7 158:11
**saying** 14:25 77:11 93:2 106:19,20 107:24 110:21 111:10 118:24 123:5 127:7,15 161:15 168:12,13
**says** 13:8 18:18 47:18,20 48:6 67:23,24 68:20 71:21 77:23 80:15 91:14 95:8 104:14 110:3 113:4 114:24 125:18 126:25 127:15 128:6 131:11 133:13,24 135:3,6 137:20 138:13 139:2 140:3 145:24 147:16 161:13 163:14,18
**scene** 52:6,7
**Scharfstein** 2:12 3:6,20 4:3,6 5:16 6:2 8:5,7,12 9:8 14:8,21,24 15:13 15:20,24 16:10 17:15,25 18:6 19:18 20:16 23:9 24:11,15,18 25:17 26:25 30:8 33:6 34:3,17 35:14 36:2,11,23 37:12 37:16 38:3,17,19 39:3,18 40:8,15 41:6,20 42:15 45:9 46:14,16 47:14 48:5,18 49:8,22 50:4,13 54:4,20 56:24 57:24 59:2 60:3 61:3,9,14 67:22 68:15 72:9,18,25 73:14,21 74:3,6 74:11,15 79:7,21 80:23 81:4,7,19 82:18 84:16 85:4 85:10 86:22 87:3 87:12,16,21 88:3 88:17 89:6,10,17 90:11 93:20 95:25 96:4 98:13,18 99:3,22 101:8,17 102:19 105:22 110:23 118:14,23 119:4,7 120:19 121:15 122:19 124:12 128:4 129:8,10,21 131:5 132:5,13,15 133:3 133:17 135:25 136:6 137:5 138:11 139:18 140:16 145:12 147:4 148:2,23 151:21 152:25 153:8,13,16 154:5 155:8 161:20,23 164:11 166:3 170:20 171:15
**scheduled** 26:22
**scheme** 92:15
**Schmetterer** 13:10 119:24 120:24
**screen** 17:8,16 18:6 106:2 124:17,21
**scroll** 18:3,12 20:21 21:10,11,15 23:21 24:2,3 50:16 55:13 56:15,18,21 81:11 92:18 111:14 143:24 144:2,4 148:23 149:3
**scrolling** 144:3 158:20
**second** 4:11 6:19 44:17 47:5 63:20 77:5 80:2 86:20 91:18,19 92:4 107:9 112:25 126:7 130:21 135:12 143:9 144:12 156:18 157:15 159:10
**Secret** 156:6 158:11
**Secret's** 157:20 158:16,19
**section** 166:14,15
**see** 17:17 20:9,14 21:16,18,22,23 29:16 31:11,16,22 32:5,12 34:6 47:8 48:7,11,12,20,24 48:25 50:17,18,20 50:21 51:3,10,11 52:8 55:10,11,16 55:17 56:22 64:20 64:23 66:11,14 77:4 80:8,11 88:15 91:2,8,11 91:17,18,22,23 92:3,5,7,16,17,19 92:23,24 93:4 94:16,25 95:2 100:2,22,24 102:3 104:8,13,20 106:8 106:24 107:11,13 109:9 112:4,22 114:19 124:23 125:21 126:16 127:20 129:12 130:19,20,24,25 131:14,21,22 134:8,9 135:14,15 135:23,24 137:21 137:23 138:2,8,12 138:13,18,19 139:11,12,13 142:24 143:8,11 143:12,18 144:2 144:23,23 145:3 146:21 147:15 148:24 149:21 150:4,5 151:16,18 154:14 155:7,15 156:17,24,25 157:10,15,17,19 157:21 158:6,13 158:20,21 159:10 159:18,19 162:12 162:15,16,19 163:12,15 166:14 166:17,19,19 167:4,6,19,19 171:7
**seeing** 23:21 52:14 57:11 69:18 82:5 91:5 138:23 139:4
**seeking** 119:10
**Seely** 113:2,20 114:2,11
**seen** 67:17 75:18 76:14 81:14,15 114:17 153:5,21 167:25
**send** 25:18 40:21
**senior** 120:6
**sense** 87:7 98:19 109:14,16
**sensitive** 119:20
**sent** 23:18 38:8 39:13 40:19,23 67:18 76:13 81:17 81:25 82:3,7 90:24 95:18 105:14 113:2,21 129:5 133:6 134:18 135:7,20 136:3,18 137:8,22 138:24 139:9 152:23 154:3,9 156:2,7 161:10
**sentence** 19:20 37:18 51:4 55:7 62:23 91:19 92:4 110:6 135:12,17 138:18,20 145:17 146:7
**separate** 7:20 82:21 96:15
**separately** 96:9
**September** 114:23
**series** 51:9
**serious** 161:8
**served** 9:20 11:11
**set** 174:10,19
**seven** 126:7 131:21
**Sex** 9:19 10:2 50:8 93:23 94:9,11,21 95:4,5,12,17 97:20 98:2,4,17 98:21,24 99:10,14 99:20 100:11 116:8
**sexual** 37:2,6 62:16
**sexually** 60:18,25 128:18
**shameful** 48:9
**share** 5:2 17:8,16 18:7 124:17,21
**shared** 17:9
**shit** 155:12
**shoddy** 44:19
**Sholem** 101:4,11 102:9
**short** 137:23
**short-form** 165:19
**shortly** 22:14 33:23
**show** 20:4 23:5,16 24:25 32:12 59:16 64:15 67:12 76:10 90:22 100:20 101:19 102:5,20 105:7 112:3,18 114:15 124:21 127:18 129:6

133:4 136:15 137:6 139:7 142:23 148:15 149:19 151:14,15 152:20 155:24 157:13 162:11,12 162:13 166:11
**showed** 32:10 44:14,17 127:13 149:16 150:7 154:16 157:2
**showing** 157:11 162:4
**sign** 4:10
**significance** 53:9
**Simon** 33:20 39:21 51:12 76:21 77:22
**simply** 86:13 153:19 154:2
**single** 166:15
**sit** 39:25 40:2 58:23 65:14 77:9 140:12 161:5 164:3
**sitting** 133:19
**six** 56:13 106:3
**slightest** 148:3 167:10
**slightly** 165:5
**small** 106:3,8
**smarter** 53:11
**smooth** 86:7
**snide** 123:20
**solely** 93:18
**solo** 11:3
**somebody** 45:22 69:24 140:8
**somewhat** 86:16
**sons** 52:17 169:23
**soon** 11:16
**sooner** 168:15
**sorry** 3:23 16:2 40:9 46:17 47:15 79:25 96:2 145:13 162:10
**sound** 163:3
**source** 164:5,8
**spaces** 31:25
**Spare** 87:11
**speak** 22:22 126:23 163:16,17 164:20 165:2,10
**speaking** 23:2 74:2 74:4
**speaks** 68:16 122:2 122:3,9,12,15 154:6
**specific** 69:15 76:6 87:5 96:17 116:12 124:14
**specifically** 36:18 70:14 83:7 88:7 124:7 144:19 150:23
**specificity** 39:20
**specifics** 37:20 45:11
**spell** 27:16 139:24 169:16
**spelling** 3:13
**spoke** 23:4 102:15 124:19 164:23
**spoken** 22:9 164:17
**spreaders** 123:21
**spring** 9:11
**SS** 174:3
**St** 8:15
**staff** 120:6
**stamp** 66:11
**start** 38:5,22 43:4 57:6
**started** 11:8,8 16:2
**state** 1:19 58:24 71:15 121:21 174:3,7
**stated** 147:17,20
**statement** 77:10 81:24 102:17 145:10 147:3,10
**states** 1:2 150:2 159:15
**stay** 91:15
**stayed** 53:12
**stenotype** 1:18 174:6
**Steve** 45:23 50:2
**Steven** 48:23
**stop** 57:6 85:13 144:12 160:9
**stopped** 124:19
**story** 155:7,16,18 155:20 156:4 157:3
**straight** 8:23
**street** 2:11 52:15,22 53:8
**Strenuously** 48:17
**stuff** 139:5
**stunning** 162:20
**subject** 4:21 91:14 131:2 149:23
**submitted** 125:12
**Subpoena** 1:16
**Subscribed** 172:8
**subsequent** 28:3 47:2 62:25 78:9 132:23 150:10
**subsequently** 11:15 77:24 135:20
**substance** 6:21 109:7 163:25
**sufficient** 44:25 45:14 90:13,17
**SUFFOLK** 174:4
**suggest** 20:20
**suggestion** 168:20
**suggestions** 123:15
**Suite** 2:5
**sum** 163:25
**summary** 8:3 9:13 134:25 135:6
**supervised** 142:9
**supervising** 96:19
**supervision** 77:7
**supervisory** 9:16 9:18
**supply** 94:21
**supposed** 53:7 132:16
**sure** 19:22 25:15 34:7 37:17 59:19 116:13
**Susan** 2:12 3:4,23 47:15 73:24 86:5 87:9 88:25 91:6 96:3 103:23 118:10,17 138:24 139:5 153:11,15
**swear** 3:7
**swore** 100:10 101:5
**sworn** 3:10 172:8 174:11
**sycophants** 123:15

**T**

**tab** 102:8
**take** 21:3 27:23 29:4 38:20 57:21 65:9 87:25 89:7 118:12,15,24 119:2 120:2 150:16 160:3,5
**taken** 1:15 25:9 58:7 71:19 72:15 80:3 119:6 138:6 150:12 162:2 168:21
**talk** 48:10 132:16 165:23
**talking** 30:6 47:23 60:5 128:10 134:13 151:13 168:5
**tampering** 59:21
**tape** 104:16
**task** 134:5,10,12,13
**Taub** 33:20 39:21 51:12 52:3,6,17 53:3,11,13 54:16 54:23 76:21 77:22
**Taub's** 51:6 52:2 54:18
**team** 78:20
**tell** 19:19 21:4,25 33:4 35:4 44:9,11 45:10 46:15,17 56:10 57:25 63:22 81:13 106:7 109:15,18,24 110:3,13 113:16 130:13 134:19 141:12 143:25
**telling** 45:13 54:14
75:6,9,12,17 104:22 108:10,15 111:5
**tells** 160:14
**ten** 31:25 165:20
**term** 36:24 117:20
**terminology** 33:12
**terms** 9:13 14:17,19 26:13 28:17 51:12 53:7 59:22,24 60:12 61:16 69:20 76:20 86:6,18 113:12,24 114:10 116:11 149:13 156:13 157:22 163:10 168:19 169:21 170:11
**territory** 86:2
**testified** 3:11 7:5 41:22 42:7 53:21 132:9
**testify** 7:15,23 135:19 136:12 147:23
**testimony** 6:22 7:3 40:12,18 41:16 59:17 68:6 108:2 108:4 109:21 111:16 160:8 174:13
**text** 31:20 32:4 167:4
**thank** 3:23 4:2,5 13:2,4 171:13
**thing** 14:11 90:3 143:17 162:9 163:20
**things** 18:17 36:19 95:18 115:23
**think** 5:12 6:7 13:13 17:8,10,25 19:21 20:8 25:12 25:13 27:8,17 28:20,21 29:10 52:16 56:14 64:18 65:19,22 66:18,25 67:3 71:14,18 76:12 78:16 85:16

86:25 87:4,6 88:4 102:24 120:20 122:17 123:7 124:13 125:22 133:5,15 138:5 143:9 144:9,13 153:21,25 155:25 157:4 160:20 161:11 163:13 166:24 171:4,6,16
**thinks** 20:22
**third** 34:5 146:22 155:10 156:17 163:12
**Thomas** 25:6
**Thompson** 84:11 84:15 143:5 151:2 151:4
**Thompson's** 89:14
**thought** 44:23 107:25 111:6 144:24 162:8
**threats** 130:2
**three** 29:10,15 37:24 38:14,14 39:10,16 62:17 68:22 69:2 83:3,5 83:16,21 85:9 86:3 103:13 104:4 108:18,19 155:5
**three-page** 100:22
**time** 1:17 9:5,6,13 9:24 10:24 11:19 12:10 13:16 16:14 16:15,16 19:10,16 19:25 21:3,25 22:13,22,25 24:22 26:24 27:21 30:18 35:8,10,22 37:22 38:2,20 41:13 42:8 45:15,22 50:2 51:13,21 52:19,25 53:4,4 53:16 55:3,25 60:20 61:6,20 62:9,15 63:2,11 63:19,21,23 65:17 66:10 69:14 70:10 77:14 78:9 82:7,9 85:19,23 86:20 90:4,5 100:15 103:11 104:11 108:11,15 110:25 111:6,19 114:7 115:8,20 116:9 117:2,4 119:2 123:8 124:4 131:23 137:2 139:16 141:5 142:7,10,18 148:4 150:11,15 152:13 159:5,20 164:13 164:16 168:2,5 171:14,18
**timely** 92:12
**times** 29:8 63:16 85:9 86:3 115:15 115:16 155:7,16 156:5 157:3,9 165:20
**title** 114:6
**today** 6:21 7:2 25:20 26:7 39:25 40:2 58:23 65:14 77:9 108:2,4 140:13 164:4
**told** 19:13 29:14 33:2 35:3,7 49:7 52:10,13,21 65:21 83:6,17 104:17 105:4 126:19,23 136:10 139:23 145:22 146:10 163:16,24
**Tommy** 25:12
**top** 21:10,11 92:18 125:6,9 130:22 135:12 137:22 154:7,18 155:2,5 155:11 158:20 167:19
**Torenheim** 130:13
**total** 106:3
**totally** 110:5 120:23
**touched** 107:23 108:18
**track** 159:3,4
**Trafficking** 50:8
**transcript** 4:11 39:7 40:19,22,24 41:25 87:22 88:21 104:18 122:23 173:16,17
**translated** 94:22
**triable** 44:24 90:12 90:20
**trial** 11:10,11,18 13:22 14:2 17:2 19:6,7 26:22 37:3 37:7 40:5 73:9 75:8,13 78:13,17 78:18,19,19 84:22 86:17 131:25 132:11,25 135:22 165:13 174:10,12
**trials** 11:24 16:16
**tried** 14:3 75:14 78:21
**trip** 28:20,25 101:13
**true** 85:12 174:13
**truth** 130:13
**truthful** 6:22 7:2 104:18,25
**try** 31:8,10 85:18 143:21
**trying** 36:5 87:24 133:22
**turn** 48:2 140:18,21
**turned** 53:13 104:15 111:19 140:18 141:15 142:2 147:19,21 148:8
**turning** 55:6
**twice** 86:2
**two** 7:10,11,19 10:10 20:13 21:5 43:3 44:11,21 45:17 56:10 57:10 58:11 82:22 106:2 112:22 137:10 144:9 148:10,22 155:3 162:7,18,24 169:5,22
**two-page** 107:4 112:19
**typically** 14:19,20

**U**

**ultimately** 49:14 59:7 140:24 144:11 145:4,5
**ultra-Orthodox** 133:15 134:6 169:11
**unclear** 88:6 170:2
**undermine** 111:22
**underneath** 20:13 21:6
**understand** 3:4 4:11 6:13 8:8 15:14 16:12 34:7 35:17 36:6,21 52:20 59:3 62:2 73:15 86:8 93:15 93:22 94:3 96:12 121:14,17 130:5 141:19 167:22,24 168:19 170:19
**understandable** 6:15
**understanding** 8:19,22 36:22 45:18 49:3 71:22 83:12 85:20 89:13 91:20 110:7 160:17
**understood** 6:16
**Undertaker** 117:6 117:8,19,20 120:10,15,21
**undue** 156:23 159:6
**unfortunately** 70:20 161:3
**unit** 21:21 49:12 50:9
**UNITED** 1:2
**University** 8:15
**unquote** 13:21 20:10 27:20,22 32:19 48:8,21 92:22 93:2 121:24
**unreliable** 146:25
**unsealing** 132:17
**unsure** 145:6
**unusual** 95:8 112:16 120:2
**use** 31:15 59:22 111:21 129:18 131:17,18,24,25

**V**

**V** 3:8,15
**vacation** 27:23 28:15 29:5,9
**vacations** 29:11,12 29:23
**vague** 69:7
**value** 85:23
**various** 170:21
**Vecchione** 1:14 3:1 3:15 4:1 5:1 6:1,6 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1,21 18:1,11 19:1 20:1,18 21:1 21:3 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1,9 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1,8 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1,9 74:1 75:1 76:1 77:1 78:1 79:1 80:1

81:1 82:1 83:1 84:1 85:1 86:1,8 87:1 88:1,8 89:1 90:1 91:1 92:1 93:1 94:1,20 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 110:11 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1,22 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1,22 133:1,7 134:1 135:1 136:1 137:1 138:1,17 139:1 140:1 141:1 142:1 143:1 144:1 145:1,6 146:1,16 146:25 147:1,9,20 148:1 149:1 150:1 151:1 152:1 153:1 153:20 154:1 155:1 156:1 157:1 158:1 159:1,18 160:1,2 161:1 162:1,3,6 163:1 164:1 165:1 166:1 167:1,6 168:1 169:1 170:1 171:1 171:13 172:1,6 173:1,3 174:1
**Vecchione's** 48:22 89:3
**verdict** 165:13
**versions** 58:11
**vice** 159:12
**victim** 58:18 60:4 60:16,24 61:7,18 62:17,21 68:22,25 69:5 70:12 83:3,5 83:13,16 99:18 100:7,9,17 103:13 104:4 107:23 108:18,19 126:9 126:15,20 128:3 128:12,16,22 129:19 130:3 131:3,18,20,23 132:24 135:18 136:11,22 137:3 137:14 138:10 139:17 140:2,9,12 145:8 146:14,24 147:17,21 149:16
**victims** 57:23 59:25
**Victor** 3:16
**video** 4:14,16 5:10
**videoconference** 1:10
**view** 35:10,22,22 36:3,8,13 40:3,10 45:14 88:3,18
**viewed** 5:15
**villa** 27:23
**visitor** 31:9
**vividly** 107:16
**voice** 13:12

**W**

**Wait** 3:20,20
**waited** 111:20
**waiting** 161:20
**walked** 70:8
**wall** 19:12
**want** 3:7 20:17 21:4 24:8 36:6 50:23 51:2 56:24 57:2 57:25 79:24 81:4 87:12,16,24 88:18 102:10 106:5,6,13 107:14 118:12,21 125:20,23,23 144:5,6,6 147:12 148:24 153:12 162:17,18 171:9
**wanted** 16:18 21:14 44:12,15 85:7 96:5
**wants** 74:15
**wasn't** 84:2 96:8 107:23 108:18 141:8 144:25 150:13 166:4
**way** 6:14 16:17 19:25 45:7 73:5 73:10 75:2 86:15 99:5 105:5 106:4 106:5 128:5 133:22 150:19 162:14 174:17
**we'll** 88:23 118:15 118:24 119:2 159:3 168:16
**we're** 4:9,21 25:19 26:9 57:22 58:17 84:21 86:25 119:13 122:17 132:15 133:19 161:20 171:17
**week** 17:13 21:2 39:13 54:2,11 57:14,17 80:17 81:15 90:25 101:2 101:22 102:23 103:3,20 105:10 114:18 125:2 127:8 129:15 133:6,9,12 134:18 134:21 136:19,21 137:8 148:20 156:3 173:13
**weeks** 166:23
**Weisner** 101:4,11 102:9,15
**went** 29:5 57:20 72:11 103:22,23 159:3
**whatsoever** 55:24 149:18
**whereabouts** 128:3 131:3
**WHEREOF** 174:19
**Winston** 133:12
**wishes** 57:4
**withdraw** 149:12
**withdrawn** 13:8,14 13:14 58:10 62:14 68:11 91:7 108:3 117:3
**withhold** 75:23
**witness** 1:15 3:7,9 3:14,19,22 35:20 35:21 59:20 85:21 99:19,21 119:8 130:11 132:10,25 133:14 134:6 135:21 142:5 146:25 171:16 173:3 174:9,14,19
**witness's** 85:19
**witnesses** 19:5,6 33:10,12 59:13,16 60:8 86:9 99:17 131:24
**wondered** 120:9
**wondering** 12:24 121:8
**word** 15:2 88:6 98:19 120:2
**words** 33:14 42:10 49:14 146:11 163:19
**work** 9:4 10:2,5 30:17,22 44:19,21 45:12 115:11,25 150:25
**work-related** 123:6
**worked** 9:10,24 26:2,5 30:12,23 77:13 115:9 150:2
**working** 16:8 26:10 56:20 77:6 96:22 115:7,11,14,19 116:5 168:2,5,22
**workings** 35:19
**works** 73:10 162:14
**worried** 156:22
**worthwhile** 123:22
**wouldn't** 15:19,21 70:7,23 76:7 112:16 120:2
**write** 13:16 44:13 44:22 66:25 67:5 67:8 152:17
**writer** 114:9
**writers** 145:5
**writing** 28:12 120:12 161:15 163:11
**written** 45:7 47:12 66:25 95:6 122:4 143:3 156:5 158:2
**wrongfully** 35:5,11 35:24 36:15,18,20
**wrongly** 36:8
**wrote** 12:18,23 67:2 119:23 122:3 122:9,12,14,15 152:5 161:6 163:9

**X**

**X** 1:3,9

**Y**

**yeah** 12:13 14:14 33:8 42:17 44:5 48:12 56:4 57:3 60:10 64:8,24 67:17 70:24 71:5 75:10,25 79:9,11 80:10,11 91:16 98:14 100:3,24 113:19 116:17 119:4 126:5,16 127:10,25 128:7 129:24 130:8 133:17 137:19,21 137:25 138:12,19 146:5 149:2 151:22 153:10,18 155:13,14,17 158:6,15,21,21 161:22 162:16 163:15 164:25 167:21 170:24
**year** 12:20,22 92:10 111:19 116:18,19 168:6,8,9
**years** 10:10 29:9 37:18,18 78:15
**yeses** 45:17
**York** 1:2,7,19 2:5,5 2:8,9,11,11 3:25

3:25 66:18,19 151:8 162:4 164:14 173:18 174:3,8

**Z**

**Zalman** 137:16
**zip** 4:4
**zones** 11:11
**Zoom** 1:10 4:12

**0**

**1**

**1** 146:14,19 173:7 173:11,12,12,14
**1/20/11** 173:10
**1:35** 162:2
**1:55** 171:18
**10** 125:24 126:13 126:17,17 144:10
**10:46** 58:7
**100** 2:11 3:25
**10007** 2:11 4:4
**10016** 2:5
**11** 141:24 162:5
**11/6/10** 173:7
**11:25** 80:3
**12** 112:8 113:2 114:2,23
**12:20** 119:2,6
**13** 149:24
**133** 105:8
**14** 102:2 125:22
**158** 127:19 130:20
**16** 47:20 48:2 101:24 143:4
**168** 20:6 47:5 50:15
**16th** 174:20
**17-cv-1268** 1:6
**171** 2:5 173:6,7,7,8 173:9,10,11,11,12 173:12,13,14,14 173:15,15,16,16 173:17,18
**174** 166:13
**181** 23:17 71:18 171:19 173:6
**182** 25:3 173:7
**183** 76:11 173:7
**184** 101:20 173:8
**184A** 102:6 173:9
**185** 80:7 173:10
**186** 112:4 173:11
**187** 112:19 173:11
**188** 114:16 173:12
**189** 124:22 127:13 173:12
**19** 135:2
**190** 133:5 173:13
**191** 137:7 173:14
**192A** 151:16 154:12 173:14
**192B** 154:13 157:14 173:15
**192C** 154:25 173:15
**193** 152:21 153:3 173:16
**194** 105:24 108:23 173:16
**195** 107:3 173:17
**196** 162:23 171:20 173:18
**1973** 9:2
**198-203** 173:17
**1980** 9:10,11 10:4
**1983** 7:20
**1990** 10:18,22
**1992** 23:12
**1995** 11:23
**19th** 31:18 32:3

**2**

**2** 20:8 156:19 173:11,16
**20** 1:11 78:15 80:14 82:3 127:23
**2001** 12:3 25:9
**2009** 94:24
**201** 108:25
**2010** 18:17,19 21:25 22:8,18,22 24:22 30:6 31:19 32:3,8 51:18 53:16 55:14,19 67:21 70:16 71:2 76:17 77:21 97:6 116:10,15,22
**2011** 41:4,8,17 42:8 80:14 81:17 82:3 91:10 92:20 101:24 103:18 105:15 107:6 112:9 113:3 114:2 127:23 128:5 141:17 142:10
**2012** 128:6 129:11 139:10,19
**2013** 114:23 116:10 135:2 141:9,19,22 142:11 146:14,19 151:20 154:4,15 156:5,9 157:14 158:3,20 159:5 162:5
**2014** 47:20 48:2 141:20 143:4
**2015** 12:18,21
**2022** 1:11 172:10 174:20
**21** 154:4,6
**22** 91:10,12 92:20
**23** 31:8 173:8
**24** 68:19
**25** 55:15 96:21
**26** 143:10 144:7
**27** 18:17,19 22:8 91:12 97:6 103:18
**27th** 91:13
**28** 4:19 139:10,19

**3**

**3** 34:11 50:17 173:13
**3/3/14** 173:14
**3:00** 31:19
**30** 4:19
**305** 2:5
**31-01** 3:19
**33** 37:18
**34** 102:2,11
**36** 94:16
**36A** 56:7 58:9 60:22 99:25
**36C** 100:21

**4**

**4** 31:19 104:13 125:24 129:11 166:14 173:10,14 173:15,15
**4/12/11** 173:11,11
**40** 37:18
**43-44** 173:18
**440** 81:18 82:4,10 92:23 98:15 125:11
**440.10** 92:9
**45** 55:13 94:15
**46** 173:10

**5**

**5** 32:3 149:3
**5/21/13** 173:16
**5/4/11** 173:9
**56** 64:16 66:7

**6**

**6** 55:14,15,19 76:17 173:3
**6/6/12** 173:13
**63** 67:14
**68** 25:25 102:21
**69** 103:16

**7**

**7/18/11** 173:12
**7/5** 149:24
**7/9/13** 173:14,15,15
**75** 125:20
**76** 90:23
**79** 129:9

**8**

**8** 94:16 143:8,14 144:8 156:5 158:20
**8/16/11** 173:8
**80s** 30:20
**81** 139:8
**82** 136:16
**82A** 136:16,17
**86** 134:17
**87** 148:17,18 150:8
**88** 148:16 149:20
**89** 155:25

**9**

**9** 126:13 143:15 144:9 146:23 151:20 154:14 157:14
**9/12/13** 173:12
**9:38** 1:12
**92** 10:20,23 11:7 30:21
**93** 142:25
**97** 17:20 32:11