UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
SAMUEL KELLNER,

Case No. 17-cv-1268 (NRM) (MHH)

Plaintiff,

-against-

THE CITY OF NEW YORK and
PATRICIA L. HYNES, administrator
of the Estate of CHARLES J. HYNES,

Defendants.
-----------------------------------------------------------------------X Date of Service: Sept. 19, 2025

**SUR-REPLY MEMORANDUM OF LAW**
**IN FURTHER OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NIALL MACGIOLLABHUÍ, ESQ.
LAW OFFICE OF
NIALL MACGIOLLABHUÍ
Attorneys for the Plaintiff
171 Madison Avenue, Suite 305
New York, NY 10016
(646) 850-7516

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 2

I. The Pre-Pleading Information ........ 2

II. Grand Jury Evidence: Fraud, Perjury, or other Bad Faith Conduct ........ 5

III. Hynes' Personal Knowledge ........ 10

IV. The Friedman and Weisner Affidavits ........ 12

V. Absolute Immunity ........ 15

CONCLUSION ........ 17

# TABLE OF AUTHORITIES

**Cases**

*Buckley v. Fitzsimmons*,
509 U.S. 259 (1993) .......... 15-16

*Defalco v. MTA Bus Co.*,
788 F. App'x 43 (2d Cir. 2019) .......... 13

*Imbler v. Pachtman*,
424 U.S. 409 (1976) .......... 15

*McGee v. Doe*,
568 F. App'x 32 (2d Cir. 2014) .......... 13

*Simon v. City of New York*,
727 F.3d 167 (2d Cir. 2013) .......... 15-16

*Singer v. Fulton Cly. Sheriff*,
63 F.3d 110 (2d Cir. 1995) .......... 13

*Smith v. Garretto*,
147 F.3d 91 (2d Cir. 1998) .......... 16

*Warney v. Monroe Cnty*,
587 F.3d 113 (2d Cir. 2009) .......... 16

This Sur-Reply Memorandum of Law is submitted, pursuant to Order of the Court dated August 27, 2025, in further opposition to Defendants' motion for summary judgment.

**PRELIMINARY STATEMENT**

On August 27, 2025, Plaintiff was directed to file a sur-reply limited to the following topics:

(1) What specific evidence, with citations to the record, supports Plaintiff's claim that members of the Kings County District Attorney's Office knew or should have known, prior to Plaintiff's indictment by the grand jury, that the evidence presented to the grand jury was secured by fraud, perjury, or other bad faith conduct, or with reckless disregard for the possibility of fraud, perjury, or other bad faith conduct.

(2) What evidence supports Plaintiff's claim that District Attorney Hynes had personal knowledge of the facts cited by Plaintiff in connection with (1) above, or otherwise establishes his personal involvement in the KCDA's allegedly false, perjurious, or bad faith presentation to the grand jury.

(3) Further argument in support of Plaintiff's claim that the Pre-Pleading Information ([104] Declaration in Opposition, Exhibit 8) submitted to KCDA by Baruch Lebovits's lawyers should have led the KCDA generally and District Attorney Hynes specifically to the conclusion that the allegations against Plaintiff in M.T.'s affidavit ([104] Declaration in Opposition, Exhibit 25) were false and/or unreliable.

(4) Assuming, arguendo, that the Court were to agree with Plaintiff that evidence presented to the grand jury with respect to M.T.'s allegations against Plaintiff was false or unreliable, why the information set forth in the affidavits of Moshe Friedman and Sholem Weisner ([104] Declaration in Opposition, Exhibits 26 & 28) was not independently sufficient to establish probable cause, based on what was known to the KCDA at that time, particularly in light of the presumption of probable cause following the grand jury's indictment.

(5) Any additional authorities or argument that support Plaintiff's claim that District Attorney Hynes's decisions to authorize a criminal investigation into Plaintiff and to authorize his staff to seek an indictment are not shielded by absolute immunity.

Plaintiff addresses each of these issues in order below, except that he begins with item 3, namely the Pre-Pleading Information topic, since it informs the responses to topics 1 and 2, respectively.

## ARGUMENT

### I. The Pre-Pleading Information

The Pre-Pleading Information consists of two principal documents: a submission from counsel for Baruch Lebovits, dated May 4, 2009, entitled "In Camera Confidential Memorandum in Support of Defendant's Pre-Pleading Application Concerning Sentence" (the "PPI Memo"), and a report from Dr. Robert Lloyd Goldstein, dated April 29, 2009, following his psychiatric examination of Baruch Lebovits.

The opening sentence of the PPI Memo reads as follows:

> This application is submitted to the Court in support of the defendant's request that the Court … *accept the defendant's plea of guilty to the top count or counts*, or even the entire indictment, and agree to sentence him to a term of probation not involving incarceration, but with required psychiatric treatment.

PPI Memo (Dkt No. 113), at 1 (emphasis added). The Memo continues with a brief procedural history of the cases against Baruch Lebovits, beginning with his arrest in March 2008 "on two separate complaints: one involving a single incident with respect to [Plaintiff's son], another involving a number of alleged incidents with respect to [M.T.]," and his subsequent indictment "in an instrument dated April 1, 2008, which included allegations concerning both victims: sodomy in

the second degree and other crimes against [M.T.] and sexual abuse in the third degree and endangering the welfare of a child (both misdemeanors) against [Plaintiff's son]." *Id.* at 2. Lebovits thereafter successfully moved to dismiss certain of the charges relating to M. T. as time-barred and to sever the remaining charges relating to M.T. from the two charges related to Plaintiff's son. *Id.* On December 5, 2008, a superseding indictment was returned, which "added felony allegations concerning [Y.R.] to those involving [M.T.]." *Id.* The superseding indictment—identified in the PPI Memo caption as no. 11393/2008 and the one "before [the state court]" (*id.*)—contains 27 top counts of Sodomy in the Second Degree relating *solely* to M.T. *See* Ind. No. 11393/2008 (Dkt No. 104-3). The same 27 counts appeared in the original indictment. *See* Ind. No. 2600/2008 (Dkt No. 104-2). Thus, in its opening sentence, the PPI Memo makes clear that Baruch Lebovits is asking the state court to accept his plea of guilty to sodomy in the second degree with respect to M.T.

Lebovits' acceptance of his guilt is conveyed as follows:

> He candidly admits his involvement in some (but not all) of the conduct described in the indictment. In addition, he candidly has volunteered that there were some other incidents, none with a child younger than the victims here.

PPI Memo at 4. Thus, even taking Lebovits' denial of guilt as to some of the alleged conduct at face value, he unequivocally admits to sexually abusing both M.T. and Y.R., i.e., "the victims here." A further admission of guilt is as follows: "At his first meeting with counsel, somewhat surprisingly to counsel, he fully admitted the extent of his guilt to the allegations of the indictment and indeed candidly told us about other incidents." *Id.* at 6. At the time of this meeting, as set forth in the above procedural history, Lebovits was alleged to have abused Plaintiff's son on a single occasion and to have abused M.T. on multiple occasions over a number of years. The

allegations relating to Y.R. had yet to emerge. Thus, once again, Lebovits is unequivocally admitting to sexually abusing M.T.

The PPI Memo draws in large part from Dr. Goldstein's report. It too refers to the allegations in the superseding indictment and describes Lebovits's conduct in respect of them:

> Mr. Lebovits is currently accused of multiple counts of charges of Sodomy, Criminal Sexual Act, Sexual Misconduct, Sexual Abuse, and Endangering the Welfare of a Child. The victims were underage boys. The sexual acts were all consensual, without force or coercion. Mr. Lebovits's deviate sexual behavior was compulsive in nature. He had difficulty resisting temptation and controlling his sexual impulses at the time. The relief and gratification his behavior afforded him were short-lived and quickly followed by extreme guilt, contrition, and depression at his loss of control.

Dr. Goldstein Report (Dkt No. 104-9) at 4-5. The report continues: "Mr. Lebovits is extremely remorseful about his deviate sexual conduct. He is very contrite about his behavior in the instant offense and has intense feelings of guilt." *Id.* at 5. Thus, the report is also unequivocal that Lebovits is admitting to sexually abusing both M.T. and Y.R., i.e., the "victims [who] were underage boys."

In the affidavit which served to initiate Plaintiff's malicious prosecution in August 2010, M.T. stated that Plaintiff instructed him to falsely accuse Lebovits as follows: "I testified two times that Baruch Lebovits raped me by putting his penis in my anus, but Baruch Lebovits never molested me." *See* M.T. Affidavit (Dkt. No. 104-25), ¶¶ 2-3. The statement that "Baruch Lebovits never molested" is false. There is simply no (non-fantastical) possibility that Baruch Lebovits asked the state court to accept his plea of guilty to Sodomy in the Second Degree in relation to M.T., and submitted a PPI in support of that request containing multiple admissions that

he sexually abused M.T., unless Baruch Lebovits did in fact sexually abuse M.T.

**II. Grand Jury Evidence: Fraud, Perjury, or other Bad Faith Conduct**

The case against Plaintiff presented to the grand jury in 2011 had four witnesses: M.T., Meyer Lebovits, Moshe Friedman and ADA Miss Gregory (who provided background information about the Baruch Lebovits prosecution). Pl. Rule 56.1 Stmt. (Dkt. No. 112), ¶ 203. M.T. repeated the claim in his affidavit that Plaintiff paid him to falsely testify that he had been abused by Baruch Lebovits; Meyer Lebovits claimed that Plaintiff tried to extort his family from March 2008 through May 2009 by sending various "messengers" to demand pay-offs in return for which the victims of Baruch Lebovits would not testify against him at trial; and Friedman claimed that Plaintiff asked him to also act as an emissary in furtherance of this scheme in March or April 2009. *See* Grand Jury Testimony (Dkt No. 117-1). Thus, the evidence presented to the grand jury had two components: (1) M.T.'s claim of being paid by Plaintiff to falsely accuse Lebovits and (2) the alleged extortion scheme directed by Plaintiff against the Lebovits family.

With regard to M. T.'s claim, multiple members of KCDA—including Hynes—knew that it was false prior to Plaintiff's indictment in 2011 because of the effort by Baruch Lebovits two years earlier to plead guilty to abusing M.T. in return for a non-jail disposition. In 2009, the KCDA plea offer in relation to M.T. was for Lebovits to plead guilty to Sodomy in the Second Degree in exchange for a recommended sentence of 2⅓ to 7 years. Pl. Rule 56.1 Stmt., ¶¶ 148, 151. Former KCDA Chief Assistant Amy Feinstein testified at her deposition that the plea offer was personally approved by Hynes: "Q. That was an offer that he approved, right? A. Correct." *Id.* ¶ 152; Feinstein Tr. (Dkt No. 104-6) at 84:15-17. In February 2009, counsel for Lebovits advised the state court that he wished to submit a PPI. *Id.* ¶ 149. He provided the PPI to

ADA Gregory, who discussed it with KCDA Sex Crimes Bureau Chief Rhonnie Jaus. *Id.* ¶¶ 157-158. The offer did not change after the PPI was submitted. *Id.* ¶ 159. Feinstein testified that, while she was not privy to his rationale, Hynes was personally unwilling to reduce the offer to a non-jail disposition as follows:

> Q. Isn't it the case the Mr. Hynes was not persuaded by the arguments set forth in [the PPI Memo] to why Mr. Lebovits should receive a non-jail offer?
>
> Ms. Scharfstein: Objection.
>
> A. The offer didn't change, I don't know whether he was -- what his state of mind was at the time.

*Id.* ¶ 160; Feinstein Tr. at 85:7-14.

Multiple members of KCDA—again, including Hynes—also knew that M.T.'s sudden non-cooperation with the Lebovits prosecution in 2009 had been secured by means of intimidation. In November 2009, M.T. told ADA Gregory that he was ready to testify at Lebovits's trial, which was due to begin the following month. *Id.* ¶ 161. Later that month, Gregory and NYPD Detective Steven Litwin each received a call from an attorney named John Lonuzzi (who was also Moshe Friedman's personal attorney), informing them that M.T. was no longer cooperating with the Lebovits prosecution. *Id.* ¶¶ 162-163. Gregory testified at her deposition that, while she couldn't recall the specific conversation, she spoke to Hynes (and to Feinstein) prior to Lebovits's trial in March 2010 about Lonuzzi's call and M.T.'s non-cooperation. *Id.* ¶ 164; Gregory Tr. (Dkt No. 104-7) at 259:10-260:3. Some months prior to the trial, M.T. called Litwin and asked to meet him; at a meeting the next day, he told Litwin that "someone else had retained Mr. Lonuzzi but that he did not know who"; that "he had been pressured and that he was afraid to say what had happened"; and "had been told not to talk to [Litwin] or to go to the District Attorney's Office."

*Id.* ¶ 165; Litwin Affidavit (Dkt No. 104-11), ¶¶ 9-10. Litwin wanted M.T.'s "non-cooperation to be investigated by him or by an ADA but [Sex Crimes Bureau Chief] Rhonnie [Jaus] said no." *Id.* ¶ 166. After Lebovits was found guilty at trial of sexually abusing Y.R., Hynes met with Gregory, Jaus, and Feinstein; they discussed the trial and the remaining cases against Lebovits, and Hynes was again told that M.T. was no longer cooperating. *Id.* ¶ 167; Gregory Tr. at 258:18-259:8. Gregory later prepared a memorandum, dated June 3, 2010, addressed to Jaus, in which she stated her belief that M.T.'s "decision to no longer cooperate with the case was caused by pressure from [the] Hasidic Community" and noted that KCDA had been informed by various individuals that M.T. had been paid to drop out of the case. *Id.* ¶ 178.

On August 4, 2010, the case against Lebovits relating to M.T. was dismissed, after Jaus sought and received approval from Feinstein and Hynes. *Id.* ¶ 183; KCDA Status Sheet (Dkt No. 104-61). According to the Sex Crimes prosecutors, they were constrained to dismiss the charges against Lebovits relating to M.T. after "he became uncooperative under highly suspect circumstances" and "later recanted his claims of [Lebovits's] sexual abuse." *Id.* ¶ 184. Feinstein testified that personal approval from Hynes to dismiss a KCDA case was required "on cases that the DA had an interest in, cases that had garnered a great deal of press coverage, in almost all homicide cases." Feinstein Tr. at 50:12-22. Asked whether the same procedure was followed in M.T.'s case, "in terms of Mr. Hynes being made aware of the circumstances of that particular case at the time approval was being sought," Feinstein responded: "It would have been -- I don't have a specific recollection, but yes, he would have been brought up to date." *Id.* at 53:19-54:13.

Thus, multiple members of KCDA knew that M.T.'s claim in July 2010 (and subsequent grand jury testimony) that he had been paid by Plaintiff to falsely accuse Baruch

Lebovits was itself false. Furthermore, multiple members of KCDA, knowing of the circumstances in which M.T. ended his cooperation with the Lebovits prosecution in 2009, either should have known or recklessly disregarded the possibility that his subsequent "recantation" of his accusations against Lebovits and replacement with the claim against Plaintiff was false.

With regard to the second component of the grand jury testimony—namely, the allegations that Plaintiff was attempting to extort the Lebovits family from March 2008 through May 2009—they too were known to be false. Obviously, their provenance alone made them highly dubious. Meyer Lebovits was Baruch Lebovits's son and Moshe Friedman, his cousin, was proposed by Lebovits as a character witness at trial to attest to his reputation in the community "of being an upstanding family man, heterosexual man." *See* Trial Tr. 3/3/10 (Dkt No. 104-64) at 5. Their allegations against Plaintiff, apart from being blatantly self-serving, were entirely uncorroborated. Moreover, in the PPI Memo, dated May 4, 2009, even though counsel for Lebovits complained bitterly on his behalf about Plaintiff—specifically, that "[his] arrest in March 2008, which did not hit the newspapers, is nonetheless widely known in the community, mainly because it was spread by [Plaintiff]" (PPI Memo at 5)—there is not the slightest hint that Plaintiff was engaged in an extortion scheme; yet, Meyer Lebovits claimed it had been ongoing for the preceding 14 months.

Indeed, Meyer Lebovits claimed that his allegations *were* corroborated by means of the conversation he surreptitiously recorded with Plaintiff in May 2009; according to his grand jury testimony, Plaintiff discussed his use of "messengers" to carry out his extortion "plan" and stated that Y.R. and M.T. "will not come to testify if I give him the money that he is asking for." *See* Grand Jury Tr. (Dkt No. 117-2) at 19:4-21:6. According to the resulting KCDA indictment,

in this conversation, Plaintiff "did reiterate the terms and conditions of his demand for a monetary payment previously conveyed to Meyer Lebovits through the co-conspirators in return for defendant's guarantee that the complaining witnesses would not testify against Baruch Lebovits." *See* Indictment (Dkt No. 100-13), count 1, overt act 9. A translation of the conversation (which was mainly in Yiddish) was first received by KCDA in June 2010 and a second translation obtained in November 2010 (because the first translator was unavailable to testify as a witness). *See* Pl. Rule 56.1 Stmt., ¶¶ 176, 188. Far from corroborating Myer Lebovits's allegations, the translation reveals that his grand jury testimony about its contents was blatantly false. It also reveals the allegations of an extortion scheme to be wholly false.

Plaintiff previously cited the internal KCDA review of Plaintiff's case in 2014 for its detailed account of how Meyer Lebovits's entire grand jury testimony is contradicted by the translation and quoted Plaintiff's emphatic statement during their conversation that he did *not* want to be paid to drop his son's case and instead wanted Baruch Lebovits to plead guilty. *See* Pl. Opp. Memo (Dkt No. 111) at 20-21. ADA Batsidis, the prosecutor who presented the case against Plaintiff to the grand jury, stated the following in an internal memorandum he co-authored with his colleague ADA Alexis about the (second) translation: "During this 156-page transcript, Kellner never demands any money. Neither Kellner nor Meyer mention that Kellner has brought witnesses forward to falsely accuse Baruch of any crime." *See* Batsidis-Alexis Memo (Dkt. 104-55) at 4. The first of these statements not only contradicts Meyer Lebovits's grand jury testimony; it squarely contradicts the resulting allegation in Plaintiff's indictment that, in his conversation with Meyer Lebovits, Plaintiff "did reiterate the terms and conditions of his demand for a monetary payment." Thus, the evidence presented to the grand jury with respect to Plaintiff's alleged

extortion scheme was also known by members of KCDA to be false.

**III. Hynes' Personal Knowledge**

With respect to the first component of the grand jury evidence, Hynes knew that M.T.'s claim of being paid by Plaintiff to falsely accuse Baruch Lebovits was false. As detailed in the prior section, he personally approved the KCDA plea offer to Baruch Lebovits. He knew that Lebovits wanted to plead guilty in relation to M.T. in return for a non-jail disposition and that Lebovits submitted the PPI in support of this request; in response to which Hynes was unwilling to reduce the offer. Hynes' personal involvement in both Lebovits and Kellner prosecutions after Plaintiff was indicted further supports this conclusion. Indeed, the email sent by Sex Crimes ADA Anthea Bruffee to Chief Assistant Feinstein in September 2011—to which she attached a proposed opposition to an application by Lebovits to expand the conditions of his bail, expressed the hope that Feinstein could convince Hynes to oppose the application, and asked for permission to refer to Dr. Goldstein's report since "[Lebovits's] admissions in the report are highly relevant to the threat he poses to the community, should the court give him unrestricted access"—suggests clearly that the contents of the PPI were widely known to KCDA members, including Hynes. *See* Pl. Rule 56.1 Stmt., ¶ 209. With regard to Plaintiff's prosecution, Hynes' personal involvement in preparing a response to Plaintiff's request in 2013 for disclosure of information about Lebovits's willingness, prior to M.T.'s non-cooperation, to plead guilty in exchange for an agreeable disposition—which described the effort by counsel was for Lebovits as merely "informal" and concealed the existence of the PPI—points damningly to Hynes' personal knowledge that M.T.'s claim was false and his determination to keep proof of that falsity hidden from Plaintiff. *Id.* at ¶¶ 210-213.

Hynes also knew that M.T. had been forced to end his cooperation with the Lebovits prosecution in 2009. Again, as detailed in the prior section, he was made personally aware by ADA Gregory prior to Lebovits' trial in March 2010 that M.T was no longer cooperating and was told again shortly after the trial concluded. At the present summary judgment stage, it must be inferred that not only was he made aware of M.T.'s non-cooperation but that he was also made aware of its circumstances. Furthermore, Hynes personally approved dismissal of the case against Lebovits relating to M.T. on August 4, 2010 (two day before M.T.'s affidavit was used to "resurrect" the investigation into Plaintiff). Chief Assistant Feinstein testified that personal approval from Hynes would only have been forthcoming after he had been "brought up to date" with the underlying circumstances of M.T.'s case. Thus, even aside from knowing that Lebovits wanted to plead guilty in relation to M.T. and had submitted the PPI in support of that request, Hynes's personal knowledge of the circumstances in which M.T. ended his cooperation with the Lebovits prosecution in 2009 meant that he also either should have known or recklessly disregarded the possibility that M.T.'s subsequent "recantation" of his accusations against Lebovits and replacement with the claim against Plaintiff was false.

With respect to the second component of the grand jury evidence against Plaintiff, i.e., the alleged extortion scheme directed by Plaintiff against the Lebovits family, the extent of Hynes' personal knowledge that the evidence was false is less clear. Hynes' point of contact about the case was KCDA Rackets Bureau Chief Michael Vecchione. However, Vecchione testified that, other than a meeting with Hynes in 2013—about which his testimony is demonstrably suspect, *see* Pl. Rule 56.1 Stmt., ¶ 90—he couldn't recall any prior or subsequent meetings with Hynes and had no "specific recollections" of what they discussed "during the course of the

investigation" into Plaintiff. *See* Vecchione Tr. (Dkt No. 109-2), at 46:19-47:3; 76:3-9. Plaintiff suggests that Vecchione's almost complete lack of recollection is convenient and incredible, particularly in light of what the 2014 internal KCDA review described as his "shameful" role in still pursuing the prosecution of Plaintiff after the assigned prosecutors recommended to Hynes that the case be dismissed (*see* ADA O'Donnell Memo (Dkt No. 104-54) at 1).

Nonetheless, what is indisputable as to Hynes's personal knowledge is that the extortion scheme allegations had been made, and the translation of the recorded conversation between Plaintiff and Meyer Lebovits was in KCDA's possession, long before the investigation into Plaintiff was "resurrected" by means of M.T.'s affidavit in August 2010. Thus, having authorized the initial investigation into Plaintiff, and its resumption following receipt of M.T.'s affidavit, Hynes would have known that probable cause did not previously exist in August 2010 for Plaintiff's prosecution on the basis of Meyer Lebovits's allegations. Moreover, since Hynes knew that M.T. was a genuine victim of Lebovits, he would also have known that the Lebovits family manufactured a false affidavit. That meant that, even if Hynes was not personally familiar with the translated contents of the recorded conversation between Plaintiff and Meyer Lebovits, he should either have known or else he recklessly disregarded the possibility that Plaintiff was being falsely accused of engaging in an extortion scheme (as well as being falsely accused with regard to M.T). In other words, the various allegations cannot be parsed separately; since they all originated from the same corrupt source, they all bear the same stench of falsity.

**IV. The Friedman and Weisner Affidavits**

The affidavits of Moshe Friedman and Sholem Weisner are not independently sufficient to establish probable cause. First of all, neither affidavit is independent of the false

evidence manufactured by the Lebovits family. Weisner, at the time of the investigation into Plaintiff, was a known "con man" working for (and being paid by) the Lebovits family in effort to undermine Y.R.'s credibility and the Lebovits conviction. *See* Pl. Rule 56.1 Stmt., ¶ 185. Friedman, as above noted, was Baruch Lebovits's cousin, whom he proposed as a character witness at his trial. Thus, their evidence is likewise tainted; notwithstanding, neither of their affidavits comes close to establishing probable cause. While a witness's report of a crime will often suffice to establish probable cause, that is not the case where, as here, there are "circumstances that raise doubt as to the [witness's] veracity." *Defalco v. MTA Bus Co.*, 788 F. App'x 43, 46 (2d Cir. 2019) (summary order) (quoting *Singer v. Fulton Cly. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)); *see also, e.g.*, *McGee v. Doe*, 568 F. App'x 32, 38 (2d Cir. 2014) (summary order) ("We must consider in combination the facial weaknesses of Galindo's statement with all of the other information possessed by the police defendants before making the arrest.").

In the affidavit Weisner supplied to the Lebovits family, he claimed that Y.R. told him that "he had a "guilty conscience" about making a case against Baruch Lebovits"; that "[c]omrnuity pressure from "powerful people" was forcing him to go forward with the complaint"; that "he had picked up bigger money from [Plaintiff] and Mark Appel"; and that "Appel bought him a computer and in the past Appel gave him bigger money." *See* Weisner Aff. (Dkt No. 104-28), ¶ 5. According to Weisner, Y.R. told him he "proceeded with the case because he received these payments," and asked Weisner "to contact the Lebovits family to ask them to pay him not to proceed" and "to get involved because he did not trust [Plaintiff] and was afraid [Plaintiff] would keep all the money." *Id.* ¶ 9. Weisner's allegations are all uncorroborated hearsay. Even taken at face value, they do not establish probable cause because they contradict those upon which

Plaintiff's prosecution was based; Y.R. supposedly wanted Weisner to contact the Lebovits family with a request for payment not to proceed and did not want Plaintiff to be involved, whereas Plaintiff was alleged to have "controlled" Y.R. The affidavit, in which Weisner also indicates that Y.R. admitted to making false allegations of abuse, is a transparently fraudulent attempt to impugn Y.R.'s credibility. When Y.R. was subsequently interviewed by KCDA, he completely denied Weisner's claims: "[Y..R.] stated that everything he testified to at both the Grand Jury and trial regarding Baruch Lebovits was true. He also stated unequivocally that he was molested by Baruch Lebovits and at no time did he accept money for his testimony." *See* KCDA memo 12/2/10 (Dkt No. 104-33). Unlike Y.R., Weisner was utterly unworthy of belief.

Friedman, in his affidavit, stated the following: "I was approached at my office by a man named Mr. Kellner, who wanted me to negotiate with the Lebovits family to ensure that the charges against Baruch Lebovits never went to court and "all went away."" *See* Friedman Aff. (Dkt No. 104-26), ¶ 1. According to Friedman, Plaintiff stated that he "controlled all of these cases" and that "only a misdemeanor happened" regarding sexual activity." *Id.* ¶¶ 2-3. The affidavit is missing the most basic details. It does not indicate when the alleged meeting took place; what cases Plaintiff supposedly controlled; or to what case (or cases) "only a misdemeanor happened" is in reference. Indeed, the affidavit does not even mention Plaintiff's son. On August 13, 2010, Friedman was interviewed by KCDA and stated that the meeting occurred "[a]round March or April of 2009"; that Plaintiff told Friedman "he wanted to settle [his son's] case for $250,000 and was negotiating a deal" with the Lebovits family; and that "his son's case is only a misdemeanor, but that he could bring in another boy ([Y.R.]), who is a dope addict and drop-out but has a bad history." *See* KCDA memo 8/13/10 (Dkt No. 100-5). These allegations, which were

repeated to the grand jury, are obviously false. In March or April 2009, Plaintiff could not "bring in" Y.R. for the simple reason that Y.R. was already "in" for many months; after Plaintiff had arranged for him to meet with Detective Litwin, he testified before the grand jury that returned a superseding indictment against Lebovits in November 2008. *See* Pl. Rule 56.1 Stmt., ¶¶ 144-145. Moreover, the absence from Friedman's account of any reference to M.T. is glaring and telling. The reason is obvious: by the time Friedman produced his affidavit and met with KCDA, M.T. had long since ended his cooperation with the Lebovits prosecution. Lebovits had been convicted in March 2010 as a result of Y.R.'s testimony. Thus, Friedman's account was obviously tailored to the present needs of the Lebovits family, which meant that M.T (who was still cooperating with the prosecution in March and April 2009) was inexplicably missing from it; or at least it would have been inexplicable if Friedman was not so obviously peddling falsehoods.

## V. Absolute Immunity

In the seminal case of *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), the Supreme Court held that a prosecutor is entitled to absolute immunity for "acts undertaken ... in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State," but that "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Id.* at 273 (citation omitted). The former functions are "intimately associated with the judicial phase of the criminal process," *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976), and "include deciding whether to bring charges and presenting a case to a grand jury or a court, along with the tasks generally considered adjunct to those functions, such as witness preparation, witness selection, and issuing subpoenas." *Simon v.*

*City of New York*, 727 F.3d 167, 171 (2d Cir. 2013) (citation omitted). However, "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Buckley*, 509 U.S. at 273-274 (citation and quotation omitted). Thus, "[a]lthough all investigative activity could be considered in some sense to be "preparing for the initiation of judicial proceedings," the Supreme Court has sought to draw a line between those preparatory steps that a prosecutor takes to be an effective advocate of a case already assembled and those investigative steps taken to gather evidence." *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (quoting *Buckley*, 509 U.S. at 273). Ultimately, the Second Circuit instructs that the determination as to whether a prosecutor is functioning in a prosecutorial or an investigative role "depends chiefly on whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate." *Warney v. Monroe Cnty.*, 587 F.3d 113, 123 (2d Cir. 2009).

Hynes authorized the initial investigation into Plaintiff in May 2010, and the resumption of that investigation in August 2010, based on M.T.'s fabricated affidavit; he is not entitled to absolute immunity for that conduct, which forms the basis of Plaintiff's malicious prosecution claim, because it occurred during the investigatory (rather than judicial) phase of the criminal process. During that period, there was neither pending nor in preparation a court proceeding, nor would there be for another eight months. The investigative phase continued through March 2011, when the decision was made to seek an indictment. *See* Pl. Rule 56.1 Stmt., ¶ 202. Plaintiff does not dispute that Hynes is entitled to absolute immunity for that decision.

.

**CONCLUSION**

For the foregoing reasons, and the reasons in Plaintiff's Memorandum of Law in Opposition, Defendants' motion for summary judgment should be denied.

Dated: New York, New York
September 19, 2025

Niall MacGiollabhui

NIALL MACGIOLLABHUÍ, ESQ.
LAW OFFICE OF NIALL MACGIOLLABHUÍ
171 Madison Avenue, Suite 305
New York, NY 10016
(646) 850-7516