UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
——————————————————————X
SAMUEL KELLNER,

                    Plaintiff,                **MEMORANDUM & ORDER**

    -against-                  17-cv-1268 (NRM) (MMH)

THE CITY OF NEW YORK and PATRICIA L. HYNES, *Administrator of the Estate of Charles J. Hynes*,

                    Defendants.
——————————————————————X

**NINA R. MORRISON**, United States District Judge:

Plaintiff Samuel Kellner brings this case for malicious prosecution and conspiracy against the estate of former Kings County District Attorney Charles J. Hynes pursuant to 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution. Kellner also brings a *Monell* municipal liability claim against the City of New York, alleging that Hynes, as the elected District Attorney, acted in his capacity as a municipal policymaker for the City.

In 2008, Kellner, a member of the Satmar Hasidic community in Brooklyn, New York, accused Baruch Lebovits, a prominent figure in the Satmar community, of sexually abusing Kellner's son. Lebovits was indicted on charges relating to Kellner's son and other alleged sexual abuse victims in the Satmar community and, eventually, convicted of abusing one of the victims.

Shortly after this conviction, members of Lebovits's family and legal defense team approached Hynes with accusations that Kellner had manufactured false allegations against Lebovits in order to extort his wealthy family. Kellner alleges

1

that Hynes knew these accusations by the Lebovits family were likely false and, moreover, knew that Lebovits had in fact committed the crimes for which he had been convicted.    However, Kellner alleges that Hynes nonetheless entered into a conspiracy with the Lebovits family to investigate Kellner with the goal of producing false evidence that Hynes could use to prosecute Kellner.  Kellner alleges that Hynes did this for an unlawful purpose: to clear Lebovits's name and secure the support of the Lebovits family, whose wealth and influence Hynes sought to shore up support among the politically powerful Satmar community for his upcoming reelection campaign.  While Kellner was indicted for an alleged extortion conspiracy, Lebovits was released on bail and his conviction was vacated.  However, Lebovits ultimately pled guilty to eight counts of criminal sexual act in the third degree rather than face a retrial.  And in March 2014, shortly after Hynes lost his bid for reelection, the new District Attorney dismissed the charges against Kellner.

Defendants have moved for summary judgment, arguing that Kellner's malicious prosecution and conspiracy claims fail as a matter of law and that Hynes, who at all relevant times acted in his capacity as an elected state prosecutor, is entitled to absolute prosecutorial immunity or, at a minimum, qualified immunity. Defendants further argue that, because the claims against Hynes fail, the claims against the City fail as well.  Plaintiff counters that there are disputed issues of fact precluding summary judgment and that an array of pre-indictment conduct attributed to Hynes as part of the alleged Section 1983 conspiracy and malicious

prosecution places Plaintiff's claims within the limited exceptions to prosecutorial immunity that exist under current law.

The Court has reviewed the extensive summary judgment record as well as the parties' submissions. For the reasons set forth below, the Court finds that (1) genuine issues of material fact preclude summary judgment, and (2) if a jury were to find in Kellner's favor on certain key disputed facts, and agree with Kellner about the reasonable inferences to be drawn from those facts, Hynes would not be entitled to either absolute immunity or qualified immunity. Accordingly, Defendants' motion is DENIED.

## FACTUAL BACKGROUND

The facts below are drawn from the summary judgment record and are either undisputed or presented in the light most favorable to Kellner as the non-moving party.

### I.    Abuse Allegations Against Baruch Lebovits and His Prosecution

Plaintiff Samuel Kellner is a member of the Brooklyn Satmar Hasidic Orthodox Jewish community. Kellner Dep. dated Jan. 25 and 30, 2023, Pl. Ex. 1 ("Kellner Dep. 1") at 24:7–27:9,[1] ECF No. 104-1.[2]   Understanding the complex

_____

[1] Pincites to deposition and court transcripts are to the original pages and lines, not to the ECF pagination.

[2] Defendants dispute that the record establishes Kellner is Hasidic. *See* Def. Resp. to Pl. Rule 56.1 Statement ("Def. Reply 56.1 Statement") ¶ 135, ECF No. 107. While it is true that the record evidence before the Court does not expressly confirm that Kellner is a member of the Satmar Hasidic Orthodox community, the record

circumstances of his prosecution by the Kings County District Attorney's Office ("KCDA") requires some context involving the prosecution of Baruch Lebovits — the man Kellner accused of molesting his son — for sexual abuse within the Satmar Hasidic Jewish community in Brooklyn.

In 2008, Kellner's wife told him that their son, P.K. (or "Victim 2"), had recently been sexually abused by Baruch Lebovits. Kellner Dep. 1 at 152:4–153:9. Kellner brought his son to the KCDA, where he reported the abuse. *Id.* at 174:13–175:10. Subsequently, Kellner was put in contact with New York Police Department ("NYPD") Detective Steven Litwin, who interviewed P.K. and asked Kellner if he could locate any other victims in the Satmar community. *Id.* at 184:12–186:18. Kellner was advised that the KCDA would not proceed with charges arising out of his son's complaint because the alleged offense was a misdemeanor, Baruch Lebovits was 60 years old, and a prosecution was unlikely to result in jail time. Kellner Dep. dated Jan. 25, 2023, Def. Ex. W ("Kellner Dep. 2") at 175:21–177:19, ECF No. 100-23. Kellner did not want P.K. to testify at trial if he was the only witness and was concerned that his son would have to reveal what had happened to him if cross-examined at trial. Kellner Dep. dated Jan 30, 2023, Def. Ex. G ("Kellner Dep. 3") at

_____

includes, among other references to the Satmar community, a submission by Kellner's attorney in his criminal case which refers to Kellner's community as "the Satmar Hasidic community." MacGiollabhui Affirmation dated July 26, 2013, Pl. Ex. 51 ("MacGiollabhui Affirmation") ¶ 10, ECF No. 104-51. Kellner's membership in the Satmar Hasidic community permeates every aspect of this case, and Defendants have not adduced evidence that tends to disprove Kellner's membership in that community. Accordingly, the Court will treat Kellner's membership in the community as an undisputed fact for purposes of this motion. *See* F.R.C.P. 56(c)(3), (e)(2).

256:2–13, 326:21–327:24, ECF No. 100-7; Pl. Resp. to Def. Rule 56.1 Statement ("Pl. 56.1 Statement") ¶¶ 46–47, ECF No. 103.  Through the Williamsburg Va'ad HaTznius (a "modesty committee" which receives reports of sexual impropriety in the Brooklyn Satmar community), Kellner learned of another potential victim, M.T. (or "Victim 1"). Kellner Dep. 1 at 162:8–163:6, 186:19–187:25.  Kellner referred M.T. to Det. Litwin. *Id.* at 196:18–197:11.

On April 1, 2008, the KCDA indicted Baruch Lebovits on charges relating to the alleged abuse of M.T. and P.K.  Lebovits Indictment No. 2600/2008, Pl. Ex. 2 ("Lebovits Indictment"), ECF No. 104-2.  Following Lebovits's indictment, Kellner learned of a third potential victim, Y.R. (or "Victim 3").  Kellner Dep. 1 at 188:10–22. In November 2008, the KCDA brought a superseding indictment against Lebovits, including charges relating to the abuse of Y.R.  Lebovits Indictment No. 11393/2008, Pl. Ex. 3 ("Lebovits Superseding Indictment"), ECF No. 104-3.  Both indictments were signed by Charles J. Hynes, the then-District Attorney ("DA") of Kings County. Lebovitz Indictment at 25;[3] Lebovits Superseding Indictment at 27.

Baruch Lebovits was, at that time, a prominent member of the Satmar Hasidic community.  His family — which included, among other children, his sons Chaim and Meyer — had access to significant financial resources.  During the course of his prosecution, Baruch Lebovits was represented by six lawyers — Arthur Aidala, Alan Dershowitz, Amy Adelson, Nathan Dershowitz, Lawrence Goldman, and Elizabeth Johnson.  Lebovits Pre-Pleading Memorandum Signature Page, Def. Ex. P at 2, ECF

---

[3] All page references are to ECF pagination unless otherwise noted.

No. 100-16; Lebovits Reply Memorandum of Law Cover Page, Def. Ex. Q at 1, ECF No. 100-17.

Through the winter of 2008 and spring and summer of 2009, Lebovits and the KCDA engaged in plea negotiations. A status sheet compiled by the KCDA and dated November 18, 2008 indicates that the KCDA prepared a plea offer; it is reasonable to infer the offer was made to Lebovits. *See* KCDA Status Sheet 11/18/2008, Pl. Ex. 4, ECF No. 104-4. This plea offer remained the same following the superseding indictment, except that Lebovits would have been required to also enter a plea to one of the counts relating to Y.R. Gregory Dep. dated Feb. 23, 2022, Pl. Ex. 7 ("Gregory Dep. 1") at 90:2–91:18, ECF No. 104-7. DA Hynes approved this plea offer to Lebovits. Feinstein Dep. dated Apr. 26, 2022, Pl. Ex. 6 ("Feinstein Dep.") at 84:4–84:17, ECF No. 104-6.[4] In February 2009, attorney Arthur Aidala, defense counsel for Lebovits, advised the court that Lebovits intended to submit a Pre-Pleading Information ("PPI"). Court Tr. dated Feb. 24, 2009, Pl. Ex. 5 at 4, ECF No. 104-5. A PPI is a document submitted to the court in an effort to obtain an improved plea offer when a criminal defendant intends to plead guilty. Feinstein Dep. at 79:22–81:3.

Plaintiff obtained an unredacted version of the PPI in discovery and filed it with this Court under seal. *See* Letter Mot. to File Under Seal, ECF No. 105 (Oct. 31,

---

[4] Though the deposition transcript does not indicate that "the offer" about which Chief Assistant District Attorney ("Chief ADA") Amy Feinstein testified is the same as the offer indicated on the 11/18/2008 Status Sheet, and Defendants dispute that the offers were the same, *see* Def. Reply 56.1 Statement ¶ 152, Defendants have not introduced evidence of any other plea offers made to Baruch Lebovits. It is thus reasonable to infer that the offer Chief ADA Feinstein referenced as approved by DA Hynes is the same offer indicated in the Status Sheet.

2024); PPI Memo dated May 4, 2009, Pl. Ex. 8 ("Unredacted PPI Memo"), ECF No. 113. The PPI Memo prepared by attorneys Goldman, Johnson, and Aidala stated that Lebovits "candidly admits his involvement in some (but not all) of the conduct described in the indictment." Unredacted PPI Memo at 4.[5] The PPI Memo further stated that, "[a]t [Lebovits's] first meeting with counsel, somewhat surprisingly to counsel, *he fully admitted the extent of his guilt to the allegations of the indictment* and indeed *candidly told us about other incidents.*" *Id.* at 6 (emphasis added). The PPI Memo contains the caveat that "any statement or admission in it is excluded from use by the District Attorney in the event of trial." *Id.* at 1 (citing *People v. Crosby*, 387 N.Y.S.2d 362 (N.Y. Sup. Ct., Bronx Cnty. 1976) and N.Y. Crim. Proc. L. § 310.50(1)[6]). Moreover, while the PPI Memo makes reference to P.K., M.T., and Y.R., and the charges stemming from Lebovits's abuse of each, the Memo also notes that the charges relating to P.K. had been severed from the charges relating to M.T. and Y.R. *Id.* at 2. Accordingly, the PPI Memo (and the admissions it contains) appears to reference unlawful sexual conduct directed towards M.T. and Y.R., as well as other unspecified victims. The PPI Memo does not indicate the precise unlawful conduct to which Lebovits admitted but does indicate Lebovits's willingness to plead guilty "to the top count or counts, or even the entire indictment" in exchange for a sentence of

---

[5] References to the Unredacted PPI Memo used the document's original pagination.

[6] This citation to Section 310.50(1), the provision concerning the form of jury verdicts, appears to be in error. *See* N.Y. Crim. Proc. L. § 390.50(1) (concerning confidentiality of pre-sentence reports and memoranda).

"a term of probation not involving incarceration, but with required psychiatric treatment." *Id.* at 1.

Also in the record is a report by Dr. Robert L. Goldstein, a clinical psychiatrist who performed an evaluation of Lebovits in April 2009. Goldstein Report dated Apr. 29, 2009, Pl. Ex. 9 ("Goldstein Report"), ECF No. 104-9. This report references an admission by Lebovits of "deviate sexual behavior" with "underage boys," though the report does not contain the names of any of the victims. Goldstein Report at 5–6. The PPI and its supporting documentation were provided to the KCDA and discussed among KCDA staff. Gregory Dep. 1 at 97:2–98:22, 102:25–103:13, 105:22–106:5.

The PPI did not result in a change in the plea offered to Lebovits, as DA Hynes remained personally unwilling to reduce the offer to a non-jail disposition. Feinstein Dep. at 84:19–85:14.

## II.    Initial Extortion Allegations Against Kellner

On May 5, 2009, defense counsel for Baruch Lebovits informed Assistant District Attorney ("ADA") Miss Gregory, a supervisor of the KCDA's Sex Crimes Special Victims Bureau who was prosecuting Lebovits, and the court presiding over the Lebovits trial of extortion allegations that had recently been made against Kellner. Gregory Affirmation dated July 8, 2011, Pl. Ex. 10 ("Gregory Affirmation") ¶ 2, ECF No. 104-10. Lebovits's counsel claimed "that Kellner had approached [Lebovits's] family and told them that he would have all of the criminal cases against [Lebovits] dropped in exchange for $250,000." *Id.* ¶ 3. Defense counsel also claimed that Kellner had repeated the same offer to the Satmar rabbi and, as ADA Gregory

8

recalled it, "[o]ne of the defense attorneys noted that Kellner had stated that all of the victims were telling the truth, but that they needed the money." *Id.* At that time, defense counsel "had not yet decided how they were going to proceed, but [] they were considering their options, including bringing the matter to the attention of the Kings County District Attorney's Office Rackets Division." *Id.* ¶ 4. The presiding judge granted an adjournment until June 17, 2009 to investigate these allegations. *Id.*

Several days later, ADA Gregory heard from one of Lebovits's defense counsel "that Kellner had approached [Lebovits's] son, [Meyer], in person on May 6, 2009 and over the phone on May 7, 2009." *Id.* ¶ 5. Defense counsel also represented that "Kellner allegedly told [Meyer] that he could make the case go away." Gregory Affirmation ¶ 5. On June 17, 2009, the presiding judge granted another adjournment until July 21 to investigate these claims. *Id.* ¶ 6. On July 21, "[d]efense counsel informed [ADA Gregory] and the court that they had decided that, at that time, the defense were not going to go to law enforcement with the allegations against Kellner." *Id.* ¶ 7.

### III.    M.T.'s Recantation

In November 2009, M.T. informed ADA Gregory that he was prepared to testify against Lebovits at trial, which was due to begin the following month. Gregory Affirmation ¶ 11. ADA Gregory had taken steps to secure the cooperation of M.T. for Lebovits's prosecution. Gregory Dep. dated Feb. 23, 2022, Def. Ex. N ("Gregory Dep. 2") at 240:5–20, ECF No. 100-14. However, later in November 2009, ADA Gregory and Det. Litwin each received a call from an attorney named John Lonuzzi, who

claimed that he represented M.T. and that M.T. would no longer cooperate with the Lebovits prosecution or testify if called at Lebovits's trial.  Gregory Affirmation ¶ 12; Litwin Aff. dated July 7, 2011, Pl. Ex. 11 ("Litwin Aff.") ¶ 8, ECF No. 104-11.

ADA Gregory discussed attorney Lonuzzi's representation of M.T. and M.T.'s non-cooperation with Chief ADA Feinstein.  Gregory Dep. 1 at 259:10–260:3.  ADA Gregory attempted to contact M.T. through attorney Lonuzzi and arranged multiple appointments through Lonuzzi to meet with M.T., but each of these appointments was cancelled.  Gregory Dep. 2 at 148:15–149:17; Gregory Affirmation ¶ 12.  ADA Gregory's office also served subpoenas to obtain M.T.'s attendance, but M.T. did not comply with these subpoenas.  Gregory Affirmation ¶ 13.  Without M.T.'s testimony, there was insufficient evidence to try the case arising from M.T.'s allegations against Lebovits.  Gregory Dep. 2 at 240:11–17.

ADA Gregory prepared a memorandum, addressed to Sex Crimes Bureau Chief Rhonnie Jaus, expressing her belief that M.T.'s "decision to no longer cooperate with the case was caused by pressure from [the] Hasidic Community."  Gregory Memorandum dated June 3, 2010, Pl. Ex. 22 ("Gregory Memo") at 3, ECF No. 104-22.[7]  ADA Gregory also noted that, while "[t]here is no evidence at this point that

---

[7] The Court considers the various KCDA memoranda put into the summary judgment record by Plaintiff as likely admissible under the hearsay exception for public records.  *See* Fed. R. Evid. 803(8)(A)(iii), (B) ("A record or statement of a public office [is not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness] if . . . it sets out . . . in a civil case . . . factual findings from a legally authorized investigation [and] the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."); *Moskowitz v. Am. Express Co.*, No. 19-CV-566 (NGG) (JRC), 2025 WL 2494378, at *11 (E.D.N.Y. Aug. 29, 2025) ("To be admissible under Rule 803(8)(A)(iii), the proffered evidence

[M.T.] was paid [apparently by Lebovits's supporters] to drop out of the case . . ., [the KCDA] has been contacted by various individuals who believe that is the case." *Id.*

For his part, Det. Litwin received a call from M.T. "some months later and before [Lebovits's] trial" in which M.T. stated that he had not retained attorney Lonuzzi and "that someone else had." Litwin Aff. ¶ 9. M.T. arranged to meet with Det. Litwin the next day and stated that "his family could not know that he had contacted [Litwin]" because "[h]is father did not want him to talk to [Litwin]." *Id.* At their meeting, M.T. repeated that "he had not retained [attorney Lonuzzi]" and stated "that someone else had retained [Lonuzzi] but that he did not know who had done so." *Id.* ¶ 10. M.T. further stated that "he had been pressured and that he was afraid to say what had happened" and "that he had been told not to talk to [Litwin] or to go to the District Attorney's Office." *Id.* According to a subsequent KCDA internal review of the Lebovits and Kellner cases conducted by ADA Kevin O'Donnell, Det.

---

must (1) contain factual findings (2) based upon an investigation made pursuant to legal authority."); *United States v. Klein*, No. 16-CR-442 (JMA), 2017 WL 1316999, at *3 (E.D.N.Y. Feb. 10, 2017) ("The Supreme Court has held that a public record containing 'factually based conclusions or opinions' may be admissible under Rule 803(8) based, among other things, on recognition 'that factual findings includes conclusions or opinions that flow from a factual investigation.'" (citation modified) (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 162–63 (1988))); *Revlon, Inc. v. Carson Prods. Co.*, 602 F. Supp. 1071, 1079 (S.D.N.Y. 1985), *aff'd*, 803 F.2d 676 (Fed. Cir. 1986) ("Admissibility under this provision is within the broad discretion of the district court and courts have interpreted it quite liberally." (citation omitted)); *cf. Moskowitz*, 2025 WL 2494378, at *11 ("The unreviewed findings of an agency are admissible as evidence under Rule 803(8)(A)(iii) as factual findings from a legally authorized investigation by a public office." (citation modified) (quoting *Cortes v. MTA New York City Transit*, 802 F.3d 226, 232 (2d Cir. 2015))). The portions of these memoranda describing the activities of members of the KCDA would likely also be admissible under this hearsay exception. *See* Fed. R. Evid. 803(8)(A)(i) (excepting records of a public office setting out "the office's activities" from the rule against hearsay).

Litwin "wanted [M.T.'s] non-cooperation to be investigated (by him or by an ADA) [but Sex Crimes Bureau Chief] Rhonnie [Jaus] said no."  Kevin O'Donnell Notes, Pl. Ex. 13 ("O'Donnell Notes") at 15, ECF No. 104-13; *see also* O'Donnell Dep. dated Apr. 22, 2022, Def. Ex. AA at 20:14–21:10, ECF No. 100-27.

## IV.    Lebovits's Conviction

Baruch Lebovits was tried and found guilty of crimes against Y.R. on March 8, 2010.  Batsidis Dep. dated Mar. 23, 2022, Def. Ex. A ("Batsidis Dep. 1") at 40:12–41:7, ECF No. 100-1;[8] Hynes Sentencing Letter to Justice DiMango dated Mar. 25, 2010, Def. Ex. O ("Hynes Sentencing Letter") at 1, ECF No. 100-15.  DA Hynes, through ADA Gregory, characterized Lebovits's conviction as establishing that, "[f]rom May 2, 2004 through February 22, 2005, [Lebovits], an adult man, sexually assaulted [Y.R.], then a sixteen year old boy, on multiple occasions by putting his mouth on the penis of the boy."  Hynes Sentencing Letter at 1.  Hynes sought a sentence of ten and two-thirds to thirty-two years of incarceration for Lebovits.  *Id.* at 2.  Lebovits was sentenced on April 12, 2010.  *See People v. Lebovits*, 942 N.Y.S.2d 638, 639 (N.Y. App. Div. 2012) (noting the "judgment of the Supreme Court, Kings County (DiMango, J.), rendered April 12, 2010, convicting [Lebovits] of criminal sexual act in the third degree (eight counts), upon a jury verdict, and imposing sentence"); Rachel Aviv, *The Outcast*, The New Yorker (Nov. 10, 2014), Pl. Ex. 19 ("New Yorker Article") at 18,

---

[8] Page 41 of the Batsidis deposition, which is cited in Defendant's Rule 56.1 Statement for the fact of Lebovits's conviction, appears to be missing in the record. The parties, however, agree that Lebovits was convicted of at least one crime against Y.R.  *See* Pl. 56.1 Statement ¶ 48.

ECF No. 104-19 (stating that Justice DiMango "sentenced Lebovits to the maximum penalty on eight counts, to run consecutively, for a total of up to thirty-two years").

On an unclear date after Lebovits's conviction, DA Hynes met with ADA Gregory, Sex Crimes Bureau Chief Jaus, Chief ADA Feinstein, and possibly others to discuss the trial and the remaining cases against Lebovits. Gregory Dep. 1 at 221:3–222:4. At this meeting, Hynes was told that M.T. was no longer cooperating with the KCDA. *Id.* at 258:18–259:8. At some point thereafter, ADA Gregory and Bureau Chief Jaus sought and received approval from Chief ADA Feinstein and DA Hynes to dismiss the charges against Lebovits relating to his alleged abuse of M.T. and P.K. Feinstein Dep. at 49:8–50:11, 53:19–54:13. The Sex Crimes Bureau prosecutors were constrained to dismiss the charges against Lebovits relating to M.T. after "[M.T.] became uncooperative under highly suspect circumstances" and "later recanted his claims of [Lebovits's] sexual abuse." Bruffee Dep. dated Apr. 14, 2022, Pl. Ex. 27 ("Bruffee Dep.") at 82:5–83:11, ECF No. 104-27.

## V.    Beginning of the Investigation into Samuel Kellner

On April 27, 2010, Baruch Lebovits's lead defense attorney, Arthur Aidala, met with ADA Michael Vecchione, Chief of the KCDA Rackets Division ("Rackets"), and Detective Investigator ("DI") Stephanie Green-Jones in Vecchione's office to discuss a potential extortion investigation. Vecchione Dep. dated May 20, 2022 ("Vecchione Dep.") at 18:19–19:9, ECF No. 109-2; Green-Jones Memorandum dated Apr. 30, 2010, Pl. Ex. 14 ("Rackets Memo") at 1, ECF No. 104-14. Later that same day, DI Green-Jones and Assistant Chief Investigator ("ACI") George Terra met with attorney

Aidala and Chaim Lebovits, one of Baruch Lebovits's sons, at Aidala's office.  Rackets Memo at 2.  There, Green-Jones and Terra interviewed Chaim Lebovits.  *Id.*  Chaim Lebovits claimed that his family had been approached by a man name Simon Taub and Kellner with an offer to "make the case [against Baruch Lebovits] go away" for a fee.[9]  *Id.*  Chaim Lebovits also stated this his brother Meyer Lebovits, another son of Baruch Lebovits, had also been approached by Taub, who attempted to extort him with respect to abuse allegedly committed by Meyer.  *Id.*  Taub had not succeeded in his alleged attempted extortion before Chaim Lebovits approached the KCDA, and Green-Jones and Terra encouraged Chaim to continue communicating with Taub.  *Id.* at 2–3.

Chaim continued emailing with Taub and provided updates to DI Green-Jones — including reporting to the KCDA that "Guess he [Taub] doesn't have Kellner yet" and "Looks like he [Taub] is having problems to 'deliver' [Kellner]."  Kevin O'Donnell Memorandum dated Mar. 4, 2014, Pl. Ex. 24 ("O'Donnell Memorandum") at 4, ECF No. 104-24 (alternation in original); O'Donnell Notes at 4.  At some point, Kellner learned of Taub's plan and reported it to Det. Litwin.  Kellner Dep. dated Mar. 16, 2023, Pl. Ex. 15 ("Kellner Dep. 4") at 38:12–39:14, ECF No. 104-15.

---

[9] The record is not explicit on which case Taub and Kellner alleged promised to make go away, but DI Green-Jones's memo contains a reference to "[o]ne of Kelner's [sic] sons also ha[ving] a case alleging that Baruch Lebovits molested him.  (This case has not been brought to trial yet.)."  Rackets Memo at 2.  It is reasonable to infer that "the case" referenced in this allegation is P.K.'s allegation against Baruch Lebovits.

On May 4 and 5, 2010, attorney Aidala held two meetings with DA Hynes at the KCDA.  KCDA Appointments Log, Pl. Ex. 16, ECF No. 104-16.[10]  Five days later, on May 10, 2010, Rackets opened an investigation targeting Taub and Kellner, with ADA Vecchione assigned to the investigation.  Case Tracking Report, Pl. Ex. 18, ECF No. 104-18.

At the time it was opened, the investigation focused on the allegations that "Target Taub approached Meyer Lebovits alleging that one of Target Kelner's [sic] children was molested by Meyer Lebovits but that if Meyer Lebovits gave Target Taub an unspecified amount of money, Target Taub would make the case go away . . . ."  *Id.*  Following a wire and sting operation, in which Chaim and Meyer Lebovits delivered $75,000 to Taub, Taub was arrested on July 7, 2010.  Green-Jones Debriefing Memorandum dated July 20, 2010, Pl. Ex. 23 ("Debriefing Memo"), ECF No. 104-23.[11]

As to the claims against Kellner, ADA Nicholas Batsidis was assigned to investigate.  Batsidis Dep. 1 at 204:5–9; Vecchione Dep. at 77:24–78:4.  ADA

---

[10] DA Hynes also had appointments to meet with attorney Aidala on July 28, 2011 and with attorney Alan Dershowitz on March 6, 2012.  KCDA Appointments Log.  These are the only appointments scheduled with DA Hynes personally as indicated on this appointments log.  *See id.*

[11] Defendants dispute the date of Taub's arrest and point out, correctly, that this Debriefing Memo does not state that Taub was arrested during the wire operation it documents.  *See* Def. Reply 56.1 Statement ¶ 179.  However, the record contains other references in KCDA-produced documents to July 7, 2010 as the date of Taub's arrest.  *See* O'Donnell Notes at 4 ("7/7/10 . . . $75K delivered to Taub . . . 7/7/10 . . . Taub arrested").  Moreover, Defendants have not adduced evidence that tends to disprove Plaintiff's assertion that Taub was arrested on July 7.  Accordingly, it is reasonable to infer that this is the date of Taub's arrest.

Vecchione supervised the investigation. Batsidis Dep. 1 at 211:13–14. ADA Joseph Alexis had also been assigned to the investigation by May 2012. Batsidis Dep. 1 at 204:5–9, 211:10–12.

## VI.    Affidavits and Interviews Implicating Samuel Kellner

On May 24, 2010, Meyer Lebovits met with DI Green-Jones and claimed that Kellner had demanded money from him to get rid of all three criminal cases against Baruch Lebovits. Green-Jones Interview Memorandum dated May 25, 2010, Pl. Ex. 20 ("Lebovits Interview Memo") at 2–3, ECF No. 104-20. A witness, Rabbi Mandel, also reported to ADA Batsidis that Meyer Lebovits had told him that Meyer was forced to give money to Kellner and wanted to memorialize the fact that he was paying the money through a third party. Batsidis Dep. at 154:16–155:18. Rabbi Mandel told Batsidis that he had prepared a document in or around January 2009 to memorialize Meyer Lebovits's statement. *Id.* at 155:4–8.

On June 2, 2010, attorney Aidala hired Robert Mladinich, a private investigator. Aidala Dep. dated June 29, 2022 ("Aidala Dep.") at 73:11–14, ECF No. 109-1; Mladinich Aff. dated Jan. 3, 2011, Pl. Ex. 36 ("Mladinich Aff.") at 19, ECF No. 104-36 at 19–20. In June and July 2010, Mladinich notarized three affidavits, using the KCDA's caption for Baruch Lebovits's criminal prosecution. The first was by an individual named Sholem Weisner. Weisner Aff. dated June 22, 2010, Pl. Ex. 28 ("Weisner Aff."), ECF No. 104-28. Weisner claimed that Y.R. told him that Kellner and Y.R. were engaged in an effort to extort money from the Lebovits family in exchange for Y.R.'s not proceeding with the case. *Id.* ¶¶ 5, 9–10. Weisner also implied

that Y.R. told him that Y.R. had falsified or embellished the extent of Baruch Lebovits's abuse. *Id.* ¶¶ 4–6, 8–11.

The second affidavit was by a rabbi named Moshe Friedman. Friedman Aff. dated July 15, 2010, Pl. Ex. 26 ("Friedman Aff."), ECF No. 104-26. Friedman claimed that Kellner asked Friedman to "negotiate with the Lebovits family to ensure that the charges against Baruch Lebovits never went to court and 'all went away'" in exchange for money. *Id.* at 2. Friedman also claimed that Kellner stated that he "controlled all of these cases." *Id.* Friedman further claimed that, when he asked Kellner why he was pursuing the case, Kellner stated "Baruch doesn't have money but his son has money. I need to get money. I am not making a living. I have to get this money." *Id.*

The third affidavit was affirmed by M.T. M.T. Aff. dated July 22, 2010, Pl. Ex. 25 ("M.T. Aff."), ECF No. 104-25. M.T. claimed that Kellner paid him $10,000 to falsely allege that he had been abused by Baruch Lebovits. *Id.* at 2.

At a meeting with ADA Vecchione and counsel for Baruch Lebovits, ADA Batsidis received various affidavits, including the affidavits of Weisner, Friedman, and M.T. Batsidis Timeline dated Aug. 2013, Pl. Ex. 30 ("Batsidis Timeline") at 2, ECF No. 104-30. Vecchione subsequently instructed Batsidis to contact Mladinich and schedule interviews for Friedman and M.T. *Id.* Mladinich "personally delivered" Sholem Weisner and other witnesses to be interviewed by DI Green-Jones. Mladinich Aff. at 19.

Friedman met with ADA Batsidis and KCDA investigators on August 13, 2010. Batsidis Timeline at 2; Green-Jones Interview Memorandum dated Aug. 13, 2010, Def. Ex. E ("Friedman Interview Memo"), ECF No. 100-5. At this meeting, Friedman was shown a copy of his affidavit and stated that it was true and accurate. Friedman Interview Memo at 1. During the interview, Friedman reiterated the statements from his affidavit and added more information. He newly claimed that Kellner told him he was having business problems; that Kellner's son had problems in school and needed a tutor, but Kellner had no money; that Kellner stated that he "controlled" Y.R.; that Friedman advised Kellner not to try and extort the Lebovits family; that Kellner stated he was receiving money from "some people in Monroe, New York . . . based on whether Baruch Lebovits stayed in prison"; and that Kellner intended to demand $250,000 from the Lebovits family. *Id.* at 1–2.

M.T., accompanied by attorney Lonuzzi, met with ADA Batsidis and DI Green-Jones on September 15, 2010 under a proffer agreement. Batsidis Timeline at 3. During this interview, M.T. stated, among other things, that Kellner came to his home on or around March 11, 2008 and asked whether M.T. had ever been molested, to which M.T. answered yes; that Kellner asked M.T. whether Baruch Lebovits had molested him, to which M.T. responded no; that Kellner told M.T., if anyone asked, to say that he was molested by Baruch Lebovits; that Kellner told M.T. he had a job for him and gave him $500 in cash; that Kellner brought M.T. to Det. Litwin and told M.T. to tell Litwin that Baruch Lebovits molested him; that M.T. lied by identifying Baruch Lebovits as the man who molested him despite knowing that he was not; that

M.T. received approximately $100 per week from Kellner, totaling approximately $10,000; that Y.R. had told M.T. that he, too, had received money and regretted starting the Lebovits prosecution; and that M.T. came forward because he was shocked when he learned about Baruch Lebovits's lengthy prison sentence. Green-Jones Memorandum dated Sep. 16, 2010, Def. Ex. L ("M.T. Interview Memo") at 1–2, ECF No. 100-12.

ADA Batsidis subsequently noted "that the Kellner case was resurrected by the Lebovits lawyers with the affidavits they gave [the KCDA] and [Lebovits's] investigator [] escorting witnesses and potential witnesses [against Kellner] to [the] KCDA." Batsidis Timeline at 16–17. ADA Batsidis further stated that the Kellner case had four elements: (1) Rabbi Moshe Friedman's statement, (2) Meyer Lebovits's statement, (3) M.T.'s statement, and (4) a May 2009 recorded conversation between Kellner and Meyer Lebovits. Batsidis Dep. at 218:17–219:6.

## VII. Translations of a May 2009 Conversation Between Kellner and Meyer Lebovits

During the May 24, 2010 meeting between Meyer Lebovits and DI Green-Jones, Meyer told her about a conversation he had with Kellner the previous year, in May 2009. Lebovits Interview Memo at 2–3. Meyer Lebovits recorded the conversation. Pl. 56.1 Statement ¶¶ 18, 20. Kellner and Meyer Lebovits conducted the conversation in Hungarian Yiddish and some Hebrew. Green-Jones Interview Memorandum dated Aug. 1, 2013, Def. Ex. F ("Hikind Interview Memorandum"), ECF No. 100-6; Kellner Dep. 3 at 428:10–430:13. In June 2010, Rackets obtained a written translation of a transcript of the recorded conversation that was prepared by

Rina Neeman in 2009.  Neeman Translation dated June 6, 2009, Pl. Ex. 21 ("Neeman Trans."), ECF No. 104-21; Batsidis Dep. 1 at 102:21–103:18.  On November 24, 2010, Rackets obtained a second translation of the recorded conversation prepared by Ruth Kohn.  Batsidis Timeline at 4; Kohn Translation, Pl. Ex. 31 ("Kohn Trans."), ECF No. 104-31; Pl. 56.1 Statement ¶ 22.

The Neeman translation contains an exchange between Kellner and Meyer Lebovits wherein they discuss Kellner's son's sexual abuse allegations against Baruch Lebovits.  Neeman Trans. at 26–27.  The full Neeman translation is 54 pages long, and this exchange takes place approximately halfway through the transcript. The translated, transcribed exchange proceeds as follows, with slight alteration for clarity:

> Kellner: "[I]t's my son who is a misdemeanor."
>
> Meyer Lebovits: "So what, what do you want to be done? You're not talking to the point."
>
> Kellner: "What should be done? I don't know, what do you mean, what should be done?"
>
> Meyer: "And besides, what do you want from me? It was you who got them into this situation. Take it out, so much the better. If you go out, your son is out. Then only [M.T.] remains."
>
> Kellner: "One moment, but after all I cannot drop it."
>
> Meyer: "But you don't want to go to trial!"
>
> Kellner: "But after all my child was treated unjustly!"
>
> Meyer: "True!"
>
> Kellner: "I don't want to drop it! The person who comes and says, young man, I in fact did break into your home…"
>
> Meyer: "So you want to settle?"
>
> Kellner: "No! Not settle. [Extended metaphor involving a hypothetical home break in]. And now you say, if you don't back out, I will fix you."

Meyer: "Who wants to fix you?"

Kellner: "If not, I have to go to trial. Do you know what happens if your father pleads guilty for a misdemeanor? Do you know what'll happen? He walks. Your father walks."

Meyer: "Who didn't want to plead guilty for a misdemeanor?"

Kellner: "What do you mean. Your father wanted to go to trial with a misdemeanor."

Meyer: "That's a lie! After all both cases were joined."

Kellner: "What you mean? The two cases were divide [redacted]"

Meyer: "Well, he wanted to plead guilty for, for… he wanted to plead guilty."

Kellner: "No! He wanted to plead guilty for [M.T.], and everything together. But if he pleads guilty for my son, he walks."

Meyer: "But he wanted to plead guilty. I don't know what you're talking about?"

Kellner: "He did not want to."

Meyer: "Yes he did!"

Kellner: "If he wanted, then why didn't he plead guilty?"

Meyer: "He wanted to plead guilty, but they didn't want to compromise on what they wanted."

Kellner: "Aaaaah. This means he wanted to plead guilty, and he wanted ten years probation, and if not, then no."

Meyer: "Yes."

Kellner: "That's the whole story. Ah, I know about it."

*Id.*

The Kohn translation contains a substantially similar exchange. Kohn Trans. at 69–73. Kohn uses various symbols in the translation, including "[UI]" where the recording is unintelligible, "[OV]" where there are overlapping voices, "//" where there is an interruption, "[brackets]" for translator's comments, and *italics* where the speakers used English in the original recording. *Id.* at 2. The full Kohn translation

is 161 pages long, and this exchange takes place a little less than halfway through the transcript.  The exchange in the Kohn translation proceeds as follows, again with slight alteration (in **bold brackets**) for clarity:

> Kellner: "After all, my kid [UI] is a *misdemeanor*."
>
> Meyer Lebovits: "[OV] So you want... What have you, what have you [UI]? [Loud noises] What do you want to [UI]?"
>
> Kellner: "What should I do?"
>
> Meyer: "[OV][UI]?"
>
> Kellner: "[OV] I know. What do you mean, what should we do?"
>
> Meyer: "Well, tell me. Anyway, what did you accomplish? You filed it after all. Take it out [UI] he'll come out, your son will come out. **[Redacted]** will be out."
>
> Kellner: "[Whispers very softly:] It has to be filed three times [UI]. In case I'm not [UI]. [UI] your father was finally reminded, so I have to drop it... //"
>
> Meyer: "You will not drop it, so let's understand. Common sense [UI]."
>
> Kellner: "[OV] Yes. After all, my child was hurt."
>
> Meyer: "True."
>
> Kellner: "So I should not drop it! Here I... The... The person that comes and says, 'Young man. I did break into your home... //'"
>
> Meyer: "[OV] I thought [UI] that we'll settle it, we'll settle the matter... //"
>
> Kellner: "[OV] No, not settle. **[Extended metaphor involving a hypothetical home break in]** Now you're saying, 'Oh, if you don't back off, I'll fix you.'"
>
> Meyer: "Who wants to fix you? Am I saying... //"
>
> Kellner: "[OV] [UI] to bring you guys to trial, [UI]. [Loud noises]."
>
> Meyer: "[OV] So I must defend myself, I must defend myself."
>
> Kellner: "*Right. But* do you know what happens if your father [UI] on a *misdemeanor*? Do you know what happens? He walks."
>
> Meyer: "No."

Kellner: "Your father walks. Should you father… //"

Meyer: "[OV] [UI] something like that."

Kellner: "[OV] Now. What does it mean… //"

Meyer: "Who didn't want [UI]?"

Kellner: "[OV] What do you mean? *Right*. Your father wanted to go to *trial* on the *misdemeanor*."

Meyer: "It's a lie."

Keller: "What do you mean? But what's the thing? They assigned both *cases*… //"

Meyer: "[OV] That's what there was, two *cases*."

Kellner: "The two *cases* were separated… //"

Meyer: "[OV] That's what there was, two *cases* together. //"

Kellner: "The two *cases* were separated. //"

Meyer: "He didn't want to go to *trial* [UI]. //"

Kellner: "[OV] **[Redacted] [Redacted]** //"

Meyer: "[OV] He wanted to plead *guilty* to a, to a, to… to a *mis*… He wanted to plead *guilty*. //"

Kellner: "No, He just wanted to plead *guilty* to a *misdemeanor* in the **[redacted]** case <u>and</u> to everything together. If he had just my son, if he were to plead *guilty* for my son – he would walk."

Meyer: "He did want to plead *guilty*, I don't understand what you're talking about."

Kellner: "He did not want to. //"

Meyer: "He did."

Kellner: "He wanted [UI]. //"

Meyer: "[OV] He wanted to plead *guilty*. //"

Kellner: "And?"

Meyer: "And they didn't wan… They didn't give him what he wanted."

Kellner: "That's right. That means he wanted to plead *guilty* to whatever he wanted. Approximately ten years *probation* and no whatchamacallit."

Meyer: "Yes."

Kellner: "Yes. This is the whole story. I know about that."

*Id.* at 69–73.

At his deposition, ADA Batsidis agreed that there were times when it was "difficult for [him] to parse or understand[] the evidence because of language barriers" and "difficult for [him] to understand the evidence because it depended to some extent on the cultural mores of the orthodox community." Batsidis Dep. 1 at 247:22–248:2, 249:5–13." Batsidis also claimed that, upon review, he initially found the meaning of Kohn's translation unclear. *Id.* at 219:7–11. Batsidis then reviewed the translation with Meyer Lebovits line by line. *Id.* at 219:12–17.

### VIII. Y.R. Does Not Recant His Allegations Against Baruch Lebovits

On November 24, 2010, ADA Vecchione received an email from attorney Aidala indicating that Mladinich had identified Y.R.'s residence. Emails dated Nov. 24 and Nov. 29, 2010, Pl. Ex. 32 at 2, ECF No. 104-32. On November 29, 2010, ADA Vecchione forwarded this email to ADA Batsidis with instructions to "[h]ave [DI] Stephanie [Green-Jones] coordinate with Bob [Mladinich] to see if we can come up with [Y.R.]" *Id.* KCDA then interviewed Y.R. on December 1, 2010 "regarding allegations that he lied at the Baruch Lebovits trial." Green-Jones Memorandum dated Dec. 2, 2010, Pl. Ex. 33 at 2, ECF No. 104-33. At this interview, Y.R. "stated that everything he testified to at both the Grand Jury and trial regarding Baruch Lebovits was true" and "stated unequivocally that he was molested by Baruch Lebovits and at no time did he accept money for his testimony." *Id.*

24

At his deposition, Vecchione testified that he "never had [the] view that [he] can recall" that Baruch Lebovits was wrongfully convicted and that he did not "recall ever having [the] view" that the crimes of child sexual abuse for which Baruch Lebovits was convicted at trial did not occur.  Vecchione Dep. at 35:10–36:4, 40:2–10.

According to notes documenting the 2014 KCDA internal review of the Kellner prosecution, Meyer Lebovits stated that at this point, "Sholom [sic] Weisner came forward" and the "DA told him to continue to have interactions w[ith] [Y.R.] to see what he could find out."  Kevin O'Donnell Interview Notes dated Feb. 25, 2014, Pl. Ex. 34 ("O'Donnell Interview Notes") at 12, ECF No. 104-34.  Thereafter, "the Lebovits family arranged for [Y.R.] to be taken to Florida" on false pretenses: specifically, "under the guise of making a documentary film related to sexual abuse victims."  O'Donnell Memorandum at 3;[12] *see also* Green-Jones Dep. dated Mar. 24, 2022, Pl. Ex. 35 ("Green-Jones Dep.") at 80:17–20, ECF No. 104-35.

While in Florida, Weisner interviewed Y.R. on video.  During those interviews, Y.R. "was plied with drugs and alcohol and filmed answering questions about Samuel Kellner as well as his victimization at the hands of Baruch Lebovits."  O'Donnell Memorandum at 3.  A transcription was provided to the KCDA, apparently by attorneys Aidala and Alan Dershowitz.  *See* Batsidis Timeline at 5 ("I [ADA Batsidis] along with ADA Vecchione met with Arthur Aidala, Alan Dershowitz and Nathan Dershowitz in ADA Vecchione's office [on March 15, 2011].");  Faxed Tr. dated Mar.

---

[12] Defendants admit the factual accuracy of the memorandum on this point but observe that the cited evidence establishes only that, "as of the date of the cited exhibit, such information was known by the author of same."  Def. Reply 56.1 Statement ¶ 192.

15, 2011, Pl. Ex. 37 ("Y.R. Recording Tr.") at 2, ECF No. 104-37 ("Excerpts of [Y.R.] Recording Given by A. Dershowitz [and] Aidala."). The KCDA was also provided with photographs taken in Florida. Green-Jones Dep. at 79:10–80:20; *see also* Def. Reply 56.1 Statement ¶ 193.

After these documents were provided to the KCDA, ADA Vecchione called Bureau Chief Jaus and informed her that, "after the [Baruch Lebovits] sentencing[,] the victim in our case from the trial . . . may have recanted and there was a tape." Jaus Dep. dated Apr. 8, 2022, Pl. Ex. 39 ("Jaus Dep.") at 157:16–158:2, ECF No. 104-39. Bureau Chief Jaus first met with ADAs Vecchione, Gregory, and Bruffee before, "later that day or maybe the next day," meeting with DA Hynes. *Id.* at 158:14–16. At this meeting, they "discussed what was going on and that Mike [Vecchione]'s [Rackets] department was going to look into it." *Id.* at 158:16–18; *see also id.* at 157:7–15. Bureau Chief Jaus recalled that, "[u]ltimately I think the victim [Y.R.] said he did *not* recant." *Id.* at 158:13–14 (emphasis added).

On March 21, 2011, ADA Batsidis interviewed M.T. again in connection with the Kellner investigation. Batsidis Dep. dated Mar. 23, 2022, Pl. Ex. 40 ("Batsidis Dep. 2") at 173:10–14, ECF No. 104-40; Batsidis Timeline at 5. On March 24, 2011, ADA Batsidis conducted a second interview of Y.R. Batsidis Dep. 2 at 172:2–17; Batsidis Timeline at 5.

Following this interview, ADA Vecchione told Batsidis to "indict and see if [Y.R.] comes around." Batsidis Dep. 2 at 172:18–173:5; *see also* Def. Reply 56.1 Statement ¶ 202. ADA Batsidis recalls these being the final two interviews before

Kellner was indicted. Batsidis Dep. 2 at 173:18–21; *see also* Batsidis Timeline at 5 ("Conferenced [on March 24, 2011] with ADA Vecchione proceed to grand jury.").

## IX.    Kellner is Indicted and Arrested

ADA Batsidis presented the case against Kellner to a grand jury on March 29, 30, and 31, and April 7, 2011. Batsidis Timeline at 5; *see generally* Grand Jury Tr., Pl. Ex. 41 ("Grand Jury Tr."), ECF No. 104-41. This evidence consisted of the following: testimony of ADA Gregory, Grand Jury Tr. at 2–12;[13] testimony of Meyer Lebovits, *id.* at 13–31; testimony of Moshe Friedman, *id.* at 32–38; testimony of M.T., *id.* at 39–45; and two transcripts of court proceedings in the Baruch Lebovits criminal trial. *Id.* at 40, 46–47. In his grand jury testimony, Meyer Lebovits claimed that, in the recorded May 2009 conversation, Kellner demanded money from Meyer and stated that Y.R. and M.T. "will not come to testify if [Meyer] [gave] him the money that he is asking for." *Id.* at 27–29. Batsidis did not present a transcript of the May 2009 conversation itself; nor did he present Baruch Lebovits's 2009 PPI in which Lebovits's counsel represented to the KCDA that he had admitted to child sexual abuse and was prepared to plead guilty to some, and potentially all, of the charges in the indictment on the counts involving Y.R. and M.T. The third affiant against Kellner, Sholem Weisner, did not testify before the grand jury. *See generally* Grand Jury Tr.

The grand jury voted to indict Kellner on April 11, 2011. Kellner Indictment No. 2538/2011, Def. Ex. M ("Kellner Indictment"), ECF No. 100-13; Pl. 56.1 Statement

---

[13] Citations to this grand jury transcript use ECF pagination.

¶ 36.  Kellner was indicted on one count of conspiracy in the fourth degree, five counts of attempted grand larceny in the second degree by extortion, two counts of perjury in the first degree, and two counts of criminal solicitation in the fourth degree.  *See generally* Kellner Indictment.  On April 12, 2011, Kellner was arrested.  Batsidis Timeline at 6; Pl. 56.1 Statement ¶ 39.  Following Kellner's arrest, ADA Vecchione emailed DA Hynes, stating, "Boss, Kellner is in custody.  See you in the morning."  Email dated Apr. 12, 2011, Pl. Ex. 43 ("Vecchione Email") at 2, ECF No. 104-43.  DA Hynes responded, "Great."  *Id.*

After Kellner's indictment, Hynes held a press conference where he stated, "child abuse has to be prosecuted vigorously, but we also have to be very, very careful about false complaints."  Amended Compl. ("Am. Compl.") ¶ 44, ECF No. 14 (Oct. 2, 2017);[14] Batsidis Timeline at 6.  Kellner was arraigned on April 13, 2011.  Batsidis Timeline at 6.

---

[14] Defendants cite Plaintiff's Amended Complaint and a 2013 affirmation by Plaintiff's counsel for the fact that "[a] news conference attended by Hynes took place after plaintiff's arrest."  Def. Rule 56.1 Statement ("Def. 56.1 Statement") ¶ 40, ECF No. 101.  While the record does not conclusively establish the content of DA Hynes's statements at the press conference, for purposes of this motion, the Court will accept Plaintiff's version of the statements as fact in light of Defendants' general willingness to rely upon Plaintiff's representations and specific failure to dispute Plaintiff's allegations.  The Court also notes that the record elsewhere supports Plaintiff's version of DA Hynes's statements.  New Yorker Article at 27 ("At a press conference that morning, [DA] Hynes announced the charges while standing beside an easel with a large photograph of Kellner's face on it.  He told a room full of reporters that 'child abuse has to be prosecuted vigorously, but we also have to be very, very careful about false complaints.'"); *see also United States v. Arevalo-Chavez*, No. 22-CR-429 (JMA) (AYS), 2025 WL 1952438, at *2 (E.D.N.Y. July 16, 2025) (citing a *New Yorker* article for the content of a politician's statement to the media).

X.    **Baruch Lebovits's Conviction is Vacated and He Ultimately Pleads Guilty to Sexually Abusing Y.R.**

Before Kellner was indicted, on January 20, 2011, attorney Aidala forwarded an email to ADA Vecchione containing draft papers in support of a N.Y. Crim. Proc. L. § 440.10 motion to vacate Baruch Lebovits's conviction. Email and Attachments dated Jan. 20, 2011, Pl. Ex. 36 ("Aidala Email and Attachments") at 2, ECF No. 104-36. These draft motion papers included the Sholem Weisner, Moshe Friedman, and M.T. affidavits accusing Kellner of seeking to extort the Lebovits family. *Id.* at 14–18. At her deposition, ADA Bruffee testified that she was not aware of Aidala sending this draft motion to Vecchione. Bruffee Dep. at 228:12–22.

On March 16, 2011, Nathan Dershowitz, one of Baruch Lebovits's defense counsel, sent an email to ADA Bruffee concerning Lebovits's application for bail pending appeal of his criminal conviction. Email dated Mar. 16, 2011, Pl. Ex. 38 at 2, ECF No. 104-38. Following this email, ADA Bruffee first met with Chief ADA Feinstein and subsequently met with DA Hynes concerning the bail application. Bruffee Dep. at 41:17–43:20. ADA Bruffee testified that she "had the impression . . . that the 19th floor [*i.e.*, DA Hynes] was getting information that maybe Mr. Lebovits wasn't guilty as convicted." *Id.* at 43:21–24. At her deposition, ADA Bruffee explained why she requested this meeting:

> I asked [Chief ADA Feinstein] if she would cause a meeting with the D.A. to be created at which the . . . trial people would talk to Mr. Hynes and explain that we believed that Mr. Lebovits in fact was guilty and in fact had done the same thing to other people. Just so that he had kind of our side of the story.

*Id.* at 44:3–11. At the beginning of this meeting, DA Hynes stated, "where is the Rackets Bureau Chief, Mike Vecchione" — who had been tapped by Hynes to lead the extortion investigation into Kellner — and informed the Sex Crimes lawyers that "[w]e can't have a meeting without him too." *Id.* at 44:12–16. ADA Vecchione then "came down" for the meeting. *Id.* at 44:16. ADA Bruffee testified that, at the meeting, Vecchione said, "well, [Lebovits] might have touched him, but it wasn't what the victim said." *Id.* at 44:17–19. ADA Bruffee "vividly" recalled that Hynes asked, "but I thought you [*i.e.*, Vecchione] said he was an innocent man." Bruffee Dep. at 44:19–21. Bruffee further testified that "Mr. Hynes was surprised [and] maybe got a different view of the case after that." *Id.* at 44:24–25.

On April 14, 2011, two days after Kellner's arrest, the Hon. Barry Kamins, administrative judge for the criminal courts of New York City, emailed DA Hynes and Chief ADA Feinstein *ex parte* regarding Baruch Lebovits's potential release on bond pending appeal. Email dated Apr. 14, 2011, Pl. Ex. 44 at 2, ECF No. 104-44. Justice Kamins stated that "[Justice John M.] Leventhal will put in his order that in the event there is an application with respect to a violation of the terms of the house arrest, the application will be made to [Justice] DiMango [*i.e.*, the judge who sentenced Lebovits]." *Id.* Justice Kamins also requested, "Please do not mention this to anyone until [Justice] Leventhal issues his order." *Id.* DA Hynes responded, "Of course." *Id.* On April 15, 2011, Justice Leventhal issued an order granting Lebovits's N.Y. Crim. Proc. L. § 460.50 motion for a stay of execution of a judgment and releasing

Lebovits on bail and house arrest. *People v. Lebovits*, No. 2010-03777, 2011 N.Y. Slip Op. 70203(U), 2011 WL 1448937 (N.Y. App. Div. Apr. 15, 2011).

In September 2011, Lebovits sought to modify the conditions of his bond. Bruffee Dep. at 104:14–15. ADA Bruffee sent an email to Chief ADA Feinstein with a draft opposition to the bail modification. *Id.* at 103:9–104:15; Emails dated Sep. 19 and Sep. 20, 2011, Pl. Ex. 45 ("Bruffee Emails") at 3–5, ECF No. 104-45. Bruffee also forwarded these emails to ADA Gregory and stated, "Let's hope she [*i.e.,* Chief ADA Feinstein] can convince the DA." Bruffee Emails at 2. Bruffee specifically asked Chief ADA Feinstein for permission "to refer to [Lebovits's] 2009 psychiatric report [that was included with his PPI] and submit it to the App. Div. under seal." *Id.* at 5. Bruffee believed that "[Lebovits's] admissions in the report are highly relevant to the threat he poses to the community, should the court give him unrestricted access." *Id.*

On October 3, 2011, at a conference in chambers in the Lebovits criminal proceeding, Lebovits's defense counsel discussed the impact of the allegations against Kellner on Lebovits's prosecution. Court Tr. dated Oct. 3, 2011, Pl. Ex. 65 ("Lebovits Conference Tr."), ECF No. 104-65. Attorney Aidala accused Kellner of attempting to extort the Lebovits family by threatening, "if you don't give us the money for your brother, what we did to your father we are going to do to your brother." *Id.* at 44:4–6. Aidala explained to Justice DiMango:

> Your Honor, the first people we go to is the FBI. They move on a different speed. At that point, I mean, we had to make a decision. It is very odd. And I compliment Joe Hynes and his office tremendously because they easily could have closed the door on our faces and they didn't. They sat. They listened. They evaluated. They put their top people on it and they may [sic] a decision like everybody else does in any

domestic violence, "Do you believe him or do you believe her?  Do you believe her or do you believe him?"  And they came to the conclusion that they believed this guy, Taub.

I didn't have that name, Taub, before any of this.  I never had Taub.  I had Kellner, Kellner, Kellner.  This was Taub.  The only thing we knew about was a wealthy man that was written on a piece of paper.  I didn't know anything about a guy named Taub.  All of a sudden Malcolm [sic] Taub comes up.  Everything unfolds.  Your Honor, he said something before, "We are trying to confuse you."  We didn't look for this. . . .

This came in a panic phone call to us, "Artie, you have to help us.  They are going to arrest my brother.  They are going to make up charges against my brother the way that they did to my father.  Help, help, help."  I called the greatest lawyer maybe in the nation.  He calls the FBI.  They don't help him very much, quite frankly.  What else do we do?  Obviously, it's no secret that I have a relatively amicable relationship with the District Attorney's office.  I called people there who I knew would at least listen to me.  They listened, but they took action.  It's a brand new set of facts.  This is a new person asking a new person for money on another thing.

*Id.* at 44:7–45:13.

Justice DiMango questioned the relevance of these allegations against Kellner to the Lebovits prosecution, to which Aidala responded, "If there were tapes where Taub says, 'I controlled Kellner who controlled [Y.R.] and that's why your father is in jail,' that's irrelevant?"  *Id.* at 45:14–20.  Justice DiMango then questioned whether these allegations would be admissible in Lebovits's case.  *Id.* at 45:21–22.  Attorney Nathan Dershowitz responded, "First of all, Kellner is a witness.  He takes the fifth.  We have an inference," followed by attorney Alan Dershowitz, who responded, "We cross-examine [Y.R.]."  *Id.* at 45:23–25.

On April 24, 2012, the Appellate Division, Second Department reversed Lebovits's conviction and ordered a new trial.  *People v. Lebovits*, 942 N.Y.S.2d 638, 640 (N.Y. App. Div. 2012).  The court concluded that "the evidence was legally

sufficient to establish the defendant's guilt beyond a reasonable doubt" and that "the verdict of guilt was not against the weight of the evidence." *Id.* at 641. However, the court found "that the Supreme Court improvidently exercised its discretion in declining to grant a mistrial," identifying several prejudicial errors by the prosecution and the court that required Lebovits be tried again. *Id.* at 641–42.

In November 2013, Hynes lost his race for reelection as District Attorney. Vivian Yee, *Thompson Defeats Hynes, Again, for Brooklyn District Attorney*, N.Y. Times (Nov. 5, 2013), https://www.nytimes.com/2013/11/06/nyregion/thompson-claims-victory-over-hynes-again-for-brooklyn-district-attorney.html [https://perma.cc/3CDV-7BCU]. The newly elected District Attorney continued the office's prosecution of Lebovits. In May 2014, Lebovits pled guilty to eight counts of criminal sexual act in the third degree, the same charges on which he was convicted in his criminal trial as to Y.R.'s allegations. Andrew Keshner, *Brooklyn Man Pleads Guilty to Child Sex Abuse Charges*, N.Y. L.J. (May 21, 2014), https://www.bloomberglaw.com/product/blaw/document/X7IG3G9S000000 [https://perma.cc/44CR-N6UF]. Pursuant to a plea agreement, he was sentenced to a term of two years with credit for time served. Stephanie Clifford, *Brooklyn Cantor Is Sentenced to 2 Years for Sexual Abuse*, N.Y. Times (July 9, 2014), https://www.nytimes.com/2014/07/10/nyregion/brooklyn-cantor-sentenced-to-2-years-for-sexual-abuse.html [https://perma.cc/4WT6-5P66].

## XI.    Developments in Kellner's Prosecution, the Subsequent KCDA Review, and Dismissal of the Charges Against Plaintiff

Kellner's prosecution continued for nearly three years, from April 2011 through March 2014. O'Donnell Memorandum at 2; Def. Reply 56.1 Statement ¶ 215.

On March 23, 2012, ADA Batsidis, ADA Bruffee, and Det. Litwin interviewed Y.R. Memorandum from ADAs Alexis and Batsidis dated Jan. 16, 2024, Pl. Ex. 55 ("Alexis/Batsidis Memorandum") at 6, ECF No. 104-55. During this interview, Y.R. stated that, in 2008, Beryl Ashkenazi[15] offered to pay him not to testify against Baruch Lebovits before withdrawing the offer. *Id.* Y.R. also represented that Kellner "urged [Y.R.] not to take any of Beryl Ashkenazi's money," "promised [Y.R.] that [Kellner] would help [Y.R.] get a bigger payment in the future," and "urged [Y.R.] to continue participating in the Lebovits prosecution." *Id.* Y.R. also reported a rumor that M.T. "backed out of testifying at the Lebovits trial due to Lebovits family pressure and because his lawyer [*i.e.*, attorney Lonuzzi] was paid $5,000." *Id.* at 7.

On May 4, 2012, DI Green-Jones and KCDA DI Jeannette Sbordone interviewed Natalie Bagimov, a mutual friend of M.T. and Y.R. whom Y.R. had mentioned during his interview. *Id.* at 6–7. Bagimov stated that M.T. "informed her that one of Baruch Lebovits'[s] daughters warned [M.T.] that if he testified against her father, the Lebovits family would insure that [M.T.] would be charged with

---

[15] Beryl Ashkenazi testified as a defense witness in Baruch Lebovits's criminal trial. Alexis/Batsidis Memorandum at 10; *see also* Court Tr. dated Mar. 3, 2010, Pl. Ex. 64 at 4:10–5:7, ECF No. 104-64 (discussing Ashkenazi as a defense witness, with attorney Aidala making an offer of proof that, "within the last 12 to 14 months[, Ashkenazi] had a conversation with the complainant [*i.e.*, Y.R.] whereby the complainant in sum and substance admitted to [Ashkenazi] that [Y.R.] was going to try to make money by accusing Mr. Lebovits of these crimes").

molesting two boys." *Id.* at 7.  Bagimov also stated that "[t]hese Lebovits family threats caused [M.T.] to stop cooperating with the Lebovits prosecution." Alexis/Batsidis Memorandum at 7.  Bagimov further stated that M.T. had "fled to Israel" approximately seven months earlier.  *Id.*

In August and September 2012, the KCDA subpoenaed "flight records and bank records relating to [M.T.'s] travel between Israel and the United States."  *Id.* ADA Batsidis subsequently informed DA Hynes that "[a] review of said records indicates clearly that Zalman Ashkenazi, a Lebovits family ally and the brother of Beryl Ashkenazi[,] a defense witness in the Leibovits [sic] trial, paid for [M.T.'s] travel expenses."  Email dated June 19, 2013, Pl. Ex. 49 ("Batsidis Email") at 3, ECF No. 104-49.  In October 2012, ADA Batsidis further learned that Zalman Ashkenazi was making payments to M.T.'s father.  Batsidis Dep. 2 at 207:16–208:25; *see also* Def. Reply 56.1 Statement ¶ 214 (leaving this fact undisputed).

Following these revelations, ADAs Batsidis and Alexis "decided that they needed to personally confront [M.T.] with this information" and arranged with attorney Lonuzzi for M.T. to return from Israel for an interview.  Alexis/Batsidis Memorandum at 8.  "Batsidis and Alexis informed [ADA] Vecchione and [DA] Hynes of these developments."  *Id.*  On June 19, 2013, Batsidis emailed Hynes directly, responding to a request made earlier that day by Hynes for "a brief summary of the evidence against Kelner [sic]" to date.  Batsidis Email at 2–3.

On June 26, 2013, ADAs Batsidis and Alexis interviewed M.T. "in order to assess [M.T.] as a witness, and to discuss whether or not [M.T.] ever stated that his

initial sexual molestation accusations against Baruch were in fact true." Alexis/Batsidis Memorandum at 8. During this interview, M.T. "restated that Kellner paid him to falsely accuse Baruch of sexual molestation." *Id.* M.T. also stated that Kellner brought him to see Det. Litwin and that, when initially going to see Det. Litwin, M.T. "anticipated that Steve Litwin would give [M.T.] a badge and a gun and allow [M.T.] to aid Litwin in his police work." *Id.* M.T. further stated that he informed Det. Litwin that "a man named Kraus was his true molester" and claimed that, upon hearing this, "Litwin told [M.T.] that he wasn't going to arrest Kraus, but would instead arrest Baruch and falsely accuse him of this crime." *Id.*

M.T. also claimed that Det. Litwin showed M.T. "Baruch's passport photo, informed [M.T.] of the address of the temple where the molestation took place, advised [M.T.] as to the dates when the molestation took place," and coached M.T. as to the content of his testimony. *Id.* M.T. also disclosed "recent significant psychiatric history" and told Batsidis and Alexis "that he used drugs and alcohol very heavily during the relevant time period." *Id.* After initially denying knowing Zalman Ashkenazi, M.T. "admitted knowing Zalman Ashkenazi, stated that Zalman Ashkenazi is his brother's Rabbi, and added that Zalman Ashkenazi is paying for his airfare to and from Israel, his apartment and school fees in Israel, and his attorney's fees." Alexis/Batsidis Memorandum at 9. M.T. also stated "that he wasn't sure who molested him and stated that Baruch could have molested him, but that he wasn't sure" and "acknowledged telling other people on several occasions that Baruch molested him." *Id.* at 8–9.

"Shortly after this interview," ADAs Batsidis and Alexis met with and briefed DA Hynes. *Id.* at 9. Batsidis and Alexis shared their belief that M.T. was not a reliable witness and that the case against Kellner should be dismissed. *Id.* DA Hynes initially agreed and directed Batsidis and Alexis "to prepare a closing memo by Monday July 1, 2013." *Id.*

On June 27, 2013, Batsidis and Alexis discussed the case with ADA Vecchione and shared their views on M.T.'s unreliability and the Kellner prosecution. *Id.* Vecchione disagreed with their view that M.T.'s allegations against Det. Litwin should not be reported to the NYPD's Internal Affairs Bureau ("IAB") and later directed Executive ADA Charles Guria to refer Det. Litwin to the IAB. Alexis/Batsidis Memorandum at 9.

On June 28, 2013, Vecchione "informed Batsidis and Alexis that there was a change in course," that "[t]he Kellner case was not going to be dismissed." *Id.* Vecchione also instructed that "Batsidis and Alexis were to have no further contact with [DA Hynes] regarding the Kellner case." *Id.*

At his deposition, ADA Vecchione testified as to a meeting he held with DA Hynes about Batsidis's and Alexis's recommendation that the Kellner case be dismissed. Vecchione Dep. at 43:25–45:12. Vecchione testified:

> I recall a meeting in which Hynes called me to his office to tell me that two of my -- that Batsidis and Alexis wanted the Kellner case dismissed. And he asked them to write a memo, and he showed me the memo and asked me, first of all, did I know that they wanted it to be dismissed, and I said no. Second of all, he showed me the memo and said this memo is not to my liking. It's just -- it's poor, shoddy work. And he said that he didn't like the -- not that he didn't like. He was disappointed that two people who work for him would write a memo of that quality. And

he asked me if I thought there was a triable case, and I said yes, I do. He asked me if it was legally sufficient. I said yes, it was. And that was the meeting.

*Id.* at 44:10–45:2.

After ADA Vecchione's meeting with Hynes, at Vecchione's request, M.T. came once more to the KCDA on July 1, 2013 to be interviewed by Vecchione, Batsidis, and Alexis. Alexis/Batsidis Memorandum at 9. At this interview, M.T. "repeated that Kellner paid him to falsely testify against Baruch Lebovits." *Id.* During this interview, M.T. stated that his uncle paid for his flight to Israel and that two rabbis gave him money and paid his rent and school fees in Israel. *Id.* at 10. M.T. initially stated that he flew to Israel because his family had arranged a possible marriage for him but subsequently stated "that he really went to Israel because he was accused of child molestation" and his family "arranged for him to flee to Israel until the accusations in America were resolved." *Id.* M.T. also initially represented that "he barely knew Zalman Ashkenazi" but subsequently stated that "he has known Zalman Ashkenazi since he was a child, and that he knows the entire Ashkenazi family." *Id.* M.T. then "acknowledged that Zalman Ashkenazi paid for several of his flights between the United States and Israel, and that he needed Zalman Ashkenazi's permission to return to the U.S. when he was in Israel." *Id.* M.T. further stated that Kellner promised to arrange a wedding for M.T. in exchange for falsely accusing Baruch Lebovits but, when pressed, could not remember specific dates and times, "stat[ing] that he could not clearly remember because of his heavy drug and alcohol use." Alexis/Batsidis Memorandum at 10. M.T. stated that his relationship with

38

Kellner cooled after Kellner did not pay him as promised.  *Id.*  Finally, M.T. stated that he had "never at any time seen Baruch."  *Id.*

After this interview, ADAs Batsidis and Alexis "were further convinced that [M.T.] was an unreliable witness" and "restated their belief that the Kellner case should be dismissed."  *Id.*  ADA Vecchione disagreed.  *Id.*  Batsidis and Alexis made *Brady* disclosures related to the July 1, 2013 M.T. interview to Kellner's defense counsel in court on July 8, 2013.  *Id.* at 11.

On July 17, 2013, Batsidis, Alexis, and DI Jones-Green met with New York State Assemblyman Dov Hikind in his offices.  Alexis/Batsidis Memorandum at 11; *see generally* Hikind Interview Memorandum.  Hikind stated that he "was very fluent in the Hungarian Yiddish dialect that Kellner and Meyer [Lebovits] spoke during the taped 2009 conversation" and that, "after listening to the conversation, he is convinced that Kellner was not extorting the Lebovits family."  Alexis/Batsidis Memorandum at 11.

On July 24, 2013, DA Hynes appeared on a radio program to comment on the case against Kellner.  Pl. 56.1 Statement ¶ 41.  Hynes stated, "I believe there was a substantial effort by Mr. Kellner to gain money by making up stories.  I think we have a substantial case."  Am. Compl. ¶ 50.[16]

At some point between January 2013 and July 26, 2013, officials at KCDA became aware that Moshe Friedman, one of the grand jury witnesses against Kellner,

---

[16] As with the 2011 press conference, Defendants cite to Plaintiff's Amended Complaint as evidence of Hynes's appearance on this radio program.  For the same reasons discussed *supra*, for purposes of this motion, the Court will credit Plaintiff's version of Hynes's statements on the radio program, as well.

was Baruch Lebovits's first cousin. O'Donnell Memorandum at 5 ("The second reason [that Friedman's testimony is suspect] is that Friedman is Baruch Lebovits'[s] first cousin. This fact, never disclosed by Friedman, was brought to the attention of the KCDA by Kellner's attorney as well as by media accounts of the Kellner case."); MacGiollabhui Affirmation ¶ 44; Hella Winston, *Abuse Whistleblower Battling Both Haredi Community, DA*, The Jewish Week (Jan. 14, 2013), MacGiollabhui Affirmation Ex. B at 32, ECF 104-51 at 28–38.

On July 29, 2013, Kellner's defense counsel served ADAs Batsidis and Alexis with a motion to dismiss the indictment in the interest of justice. Alexis/Batsidis Memorandum at 11. Following receipt of the motion, Batsidis and Alexis informed ADA Vecchione that they each "believed that the case should be dismissed" and each "asked to be taken off the case." *Id.* In early August 2013, Executive ADA Monique Ferrell was assigned to the case. *Id.* at 12.

Hynes was defeated in the Democratic primary election for District Attorney on September 10, 2013. Vivian Yee, *Challenger Wins Primary for Brooklyn District Attorney*, N.Y. Times (Sep. 10, 2013), https://www.nytimes.com/2013/09/11/nyregion/challenger-wins-primary-for-brooklyn-district-attorney.html [https://perma.cc/Q27X-SFDH]. The following day (September 11, 2013), Kellner withdrew his motion to dismiss the indictment, and Executive ADA Ferrell informed Batsidis and Alexis that "she would no longer work on the Kellner matter." Alexis/Batsidis Memorandum at 12. Kellner's case was adjourned until November 11, 2013 — one week after the general election for District Attorney, in which Hynes continued to seek reelection,

this time as a Republican.  *Id.*; Vivian Yee, *Thompson Defeats Hynes, Again, for Brooklyn District Attorney*, N.Y. Times (Nov. 5, 2013), https://www.nytimes.com/2013/11/06/nyregion/thompson-claims-victory-over-hynes-again-for-brooklyn-district-attorney.html [https://perma.cc/3CDV-7BCU].

After Hynes' defeat in the general election, ADA O'Donnell was assigned to review Kellner's prosecution.  O'Donnell Dep. at 20:14–21:10.  On March 4, 2014, O'Donnell compiled a memorandum of his findings and conclusions.  *See generally* O'Donnell Memorandum.  In his memorandum, O'Donnell formally recommended dismissing Kellner's prosecution in the interest of justice.  O'Donnell Memorandum at 2.  On March 7, 2014, O'Donnell made an unopposed motion on behalf of the KCDA to dismiss the case against Kellner, which was granted.  Court Tr. dated Mar. 7, 2014, Pl. Ex. 60 ("Dismissal Tr.") at 5:15–16, 10:16–17, ECF No. 104-60

## PROCEDURAL BACKGROUND

Kellner initiated the instant suit on March 6, 2017.  Compl., ECF No. 1.  The Hon. Margo K. Brodie, who was then presiding over this case, held a pre-motion conference on Defendants' anticipated motion to dismiss and granted Kellner leave to file an amended complaint.  Dkt. Order dated Aug. 31, 2017.  Kellner then filed his Amended Complaint on October 2, 2017.  Am. Compl.  Defendants' motion to dismiss was fully briefed on July 2, 2018.  Def. Mot. to Dismiss, ECF No. 19; Def. Mem. in Supp., ECF No. 20; Pl. Mem. in Opp'n, ECF No. 21; Def. Reply in Supp., ECF No. 22.

On March 4, 2019, Defendants filed a Suggestion of Death, informing the Court that Defendant Charles J. Hynes had died.  ECF No. 25.  Judge Brodie stayed the

case pending Kellner's filing a motion for substitution as to Charles Hynes.  Min. Entry dated Mar. 19, 2019.  Kellner filed an unopposed motion to substitute party on November 30, 2020, ECF No. 36, which was granted, substituting Patricia L. Hynes, administrator of the estate of Charles J. Hynes, for the deceased Defendant Hynes.  Dkt. Order dated Dec. 16, 2020.

While discovery was ongoing, Judge Brodie denied Defendants' motion to dismiss.  *Kellner v. City of New York*, No. 17-CV-1268 (MKB), 2021 WL 4251343 (E.D.N.Y. Sep. 17, 2021).  Judge Brodie first evaluated the extent to which DA Hynes's alleged conduct was shielded by prosecutorial immunity.  *Id.* at *6–9.  Judge Brodie concluded that, accepting certain allegations by Kellner as true for purposes of the motion, his claims were not barred by prosecutorial immunity, specifically finding "that Hynes is not protected by absolute immunity for (1) his decision to exclude the Sex Crimes Bureau and Detective Litwin from the investigation into Plaintiff; (2) encouraging Weisner to make YR 'crack,' or (3) counseling the Lebovits family on what evidence to obtain against Plaintiff," *id.* at *8, and that "Hynes [cannot] rely on absolute immunity to shield him from liability arising from his statements to the media," *id.* at *9.  Judge Brodie also denied Defendants' motion to dismiss Plaintiff's malicious prosecution claim, *id.* at *11–13, his Section 1983 conspiracy claim, *id.* at *14, and his *Monell* claim, *id.* at *18–19.  Judge Brodie further denied the motion to dismiss on grounds of qualified immunity.  *Id.* at *15.

This case was reassigned from Judge Brodie to this Court on November 28, 2022, while discovery was still ongoing. Dkt. Entry dated Nov. 28, 2022. Discovery was completed on June 13, 2023. Dkt. Order dated June 13, 2023.

Following several motions for extension of time, Defendants' motion for summary judgment was fully submitted on October 31, 2024. Def. Mot. for Summ. J., ECF No. 98; Def. Mem. in Supp. ("Def. Mem."), ECF No. 99; Def. Decl. in Supp., ECF No. 100; Pl. Mem. in Opp'n ("Pl. Mem."), ECF No. 102; Pl. Decl. in Opp'n, ECF No. 104; Def. Reply in Supp. ("Def. Reply"), ECF No. 106.

The Court subsequently ordered supplemental briefing from Kellner on certain issues, and directed the parties to file sealed, unredacted copies of certain exhibits and other documents for the Court's review. Dkt. Order dated Aug. 6, 2025 (unredacted exhibits); Dkt. Order dated Aug. 27, 2025 (supplemental briefing).

Oral argument was held before the Court on October 9, 2025. Min. Entry dated Oct. 10, 2025. At oral argument, the Court requested that Kellner file under seal certain additional documents referenced at argument, which Kellner did on October 14, 2025. Pl. Letter re PPI, ECF No. 120.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d

Cir. 2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).  A fact is material "when its resolution 'might affect the outcome of the suit under the governing law.'" *SCW W. LLC v. Westport Ins. Corp.*, 856 F. Supp. 2d 514, 521 (E.D.N.Y. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In considering a summary judgment motion, the Court "is required to view the record in the light most favorable to the party against which summary judgment is contemplated and to resolve all ambiguities and draw all factual inferences in favor of that party." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178 (2d Cir. 2008).

"The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact." *Thorpe v. City of New York*, No. 19-CV-5995 (CM) (RWL), 2021 WL 3811238, at *4 (S.D.N.Y. Aug. 25, 2021).  "Once such a showing has been made, the non-moving party must present 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)).  "The party opposing summary judgment 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). "Finally, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant." *Id.*

## DISCUSSION

### I.    Prosecutorial Immunity

As a preliminary matter, the Court must consider what alleged conduct by then-District Attorney Hynes could establish his liability, given the protections generally afforded to prosecutors under the doctrine of absolute prosecutorial immunity. "The doctrine of absolute immunity applies broadly to shield a prosecutor from liability for money damages (but not injunctive relief) in a § 1983 lawsuit, even when the result may be that a wronged plaintiff is left without an immediate remedy." *Anilao v. Spota*, 27 F.4th 855, 863 (2d Cir. 2022). It provides immunity from suit for "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Id.* at 864 (quoting *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995)). The Second Circuit has recognized that absolute immunity protects even "reprehensible" prosecutorial misconduct committed in the course of performing the advocacy function. *See id.* at 867 (collecting cases); *see also Kellner*, 2021 WL 4251343, at *6 ("Such immunity attaches regardless of any allegations that the prosecutor's actions were undertaken with an improper state of mind or improper motive." (citation modified) (quoting *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005))).

But prosecutorial immunity is not without its limits. Absolute prosecutorial immunity extends only to "'acts undertaken in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State.'" *Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) (citation modified) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). By contrast,

"a prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Id.* (citation modified); *see also Van de Kamp v. Goldstein*, 555 U.S. 335, 341 (2009) ("[P]rosecutorial actions that are 'intimately associated with the judicial phase of the criminal process' . . . are absolutely immune from liability in § 1983 lawsuits . . . ." (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976))).

"[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Simon v. City of New York*, 727 F.3d 167, 172 (2d Cir. 2013) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)). In assessing whether a defendant is covered by absolute immunity for acts taken while serving as a prosecutor, the court "take[s] a 'functional approach,' examining 'the nature of the function performed, not the identity of the actor who performed it.'" *Id.* at 171 (quoting *Buckley*, 509 U.S. at 269); *see also Flagler v. Trainor*, 663 F.3d 543, 547 (2d Cir. 2011) ("[I]mmunity is not a function of the prosecutor's *title*. Rather, it attaches to prosecutorial functions that are intimately associated with initiating or presenting the State's case." (citing *Kalina v. Fletcher*, 522 U.S. 118, 125 (1997))). As a general matter, immunity will lie where the conduct at issue involves a prosecutor's decisions concerning "whether to present a case to the grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present." *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (quoting *Imbler*, 424

46

U.S. at 431 n.33); *see also Simon*, 727 F.3d at 171 (noting that the immunity extends to prosecutors' decisions to bring charges and present a case to a grand jury, "along with the tasks generally considered adjunct to those functions, such as witness preparation, witness selection, and issuing subpoenas").

Absolute immunity does not extend, however, to "administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." *Warney v. Monroe Cnty.*, 587 F.3d 113, 121 (2d Cir. 2009) (quoting *Buckley*, 509 U.S. at 273). "Although all investigative activity could be considered in some sense to be 'preparing for the initiation of judicial proceedings,' the Supreme Court has sought to draw a line between those preparatory steps that a prosecutor takes to be an effective advocate of a case already assembled and those investigative steps taken to gather evidence." *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (quoting *Buckley*, 509 U.S. at 273). "The Supreme Court has identified evaluating evidence and interviewing witnesses as falling on the absolute immunity side of the line, leaving 'searching for the clues and corroboration' that might lead to a recommendation for an arrest on the qualified immunity side." *Giraldo*, 694 F.3d at 166 (citation modified) (quoting *Smith*, 147 F.3d a 94). For example, "investigative acts that are entitled to only qualified immunity are those undertaken in the phase of law enforcement that involves the gathering and piecing together of evidence for indications of criminal activities and determination of the perpetrators." *Id.* (citing *Smith*, 147 F.3d at 94); *see also Simon*, 727 F.3d at 172 ("Investigation, arrest, and detention have historically and by

precedent been regarded as the work of police, not prosecutors, and 'they do not become prosecutorial functions merely because a prosecutor has chosen to participate.'" (quoting *Day v. Morgenthau*, 909 F.2d 75, 77–78 (2d Cir. 1990))).

Moreover, the Supreme Court has expressly excluded certain types of conduct from the shield of absolute prosecutorial immunity. These include "fabricating evidence during the preliminary investigation of a crime," *Buckley*, 509 U.S. at 261, and "[c]omments to the media," since they "have no functional tie to the judicial process" and do "not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions," *id.* at 277–78.

On Defendants' earlier motion to dismiss, Judge Brodie considered the factual allegations in Kellner's Amended Complaint and concluded that "Plaintiff's allegations concerning Hynes' involvement in his prosecution relate to Hynes' (1) collection and fabrication of evidence against Plaintiff, and (2) media statements about Plaintiff, none of which are entitled to absolute immunity." *Kellner*, 2021 WL 4251343, at *8. Defendants do not contest that "those allegations, if supported by evidence, consisted of actions that would not be entitled to absolute immunity." Def. Mem. at 23 (citing *Kellner*, 2021 WL 4251343, at *8). Instead, Defendants contend that Kellner's case, following discovery, suffers from evidentiary failings. They argue that Kellner "[lacks] any argument, let alone admissible evidence, to establish that Hynes was involved in [malicious preindictment] 'conduct,' assuming it even occurred, or that he played any role whatsoever in any investigatory phase." Def. Reply at 9. Defendants further argue that the record and Kellner's opposition papers

48

are "devoid of any admissible evidence [or] argument for what specifically Hynes did." *Id.*

For his part, Kellner asserts that his claims "are based on conduct that occurred during the investigatory (rather than judicial) phase of the criminal process," during which "Hynes was performing investigative functions normally performed by the police." Pl. Mem. at 35. Specifically, Kellner seeks to hold Hynes liable for his alleged decisions (1) to "authorize[] the initial investigation into Kellner in May 2010" and (2) to "[resume] that investigation in August 2010, based on M.T.'s fabricated affidavit." Pl. Sur-Reply in Opp'n ("Pl. Sur-Reply") at 19, ECF No. 119 (Sep. 19, 2025). Kellner contends that "[t]he investigative phase continued through March 2011, when the decision was made to seek an indictment," and acknowledges that "Hynes is entitled to absolute immunity for that decision [to indict]." *Id.*

As further explained below, the Court concludes that the alleged conduct that forms the basis for Kellner's Section 1983 conspiracy and malicious prosecution claims is outside the advocacy function of a prosecutor, and is therefore not subject to prosecutorial immunity. The Court outlines that evidence below, as it considers whether the record raises genuine issues of material fact precluding summary judgment on those claims.

## II. Section 1983 Conspiracy

Kellner alleges that "Hynes and his co-conspirators, by manufacturing fabricated evidence from Meyer Lebovits, Moshe Friedman, and [M.T.], deliberately brought about [Kellner's] prosecution." Am. Compl. ¶ 57. Following discovery,

Kellner's claim that Hynes conspired with members of the Lebovits family, Lebovits's lawyers, and members of his own staff to fabricate evidence against Kellner remains the cornerstone of his malicious prosecution claim — factual allegations that overlap considerably with those that underlie his Section 1983 conspiracy claim.

The Court first turns to whether the summary judgment record raises a genuine issue as to whether DA Hynes was personally involved in an alleged conspiracy to prosecute Kellner based on evidence that Hynes knew to be false, fabricated, or otherwise wholly unreliable. "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). Moreover, "a plaintiff alleging a § 1983 conspiracy claim must prove an actual violation of [his] constitutional rights." *Knopf v. Esposito*, 803 F. App'x 448, 453 (2d Cir. 2020) (quoting *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)).

The Second Circuit has underscored that, "[w]hile conclusory allegations of a § 1983 conspiracy are insufficient[,] . . . such conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn*, 200 F.3d at 72 (citation modified) (citation omitted). "But 'while they need not produce direct evidence of a meeting of the minds, the plaintiff must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective.'" *Gordon v. Emmanuel*,

No. 15-CV-2439 (CBA) (SJB), 2018 WL 4688935, at *9 (E.D.N.Y. Sep. 28, 2018) (quoting *Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 421 (4th Cir. 1996) and citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997)). "The evidence must 'reasonably lead to the inference that [the defendants] positively or tacitly came to mutual understanding to try to accomplish a common and unlawful plan.'" *Id.* (quoting *Hinkle*, 81 F.3d at 421).

### a. Kellner's Allegations and the Positions of the Parties

In his Amended Complaint, Kellner alleges that, "[i]n April 2010, shortly after the sentencing of Baruch Lebovits, Hynes entered into an agreement with members of the Lebovits family, Moshe Friedman, ADA Michael Vecchione, and others, to work together to undermine the conviction by means of manufacturing 'evidence' against [Kellner] (of soliciting false testimony and attempted extortion) and thereby inducing his prosecution." Am. Compl. ¶ 55. Kellner further alleges that "[t]he conspirators pursued an 'investigation,' directed by Hynes and Vecchione" and that Hynes "played a direct role in the subsequent efforts to turn [Y.R.] against [Kellner], and recant the testimony of sexual abuse upon which Lebovits was convicted, even as [Hynes's] office was outwardly defending the conviction on appeal." *Id.* Kellner further alleges that "Hynes directly participated in the conspiracy from the outset, and continued his participation throughout, in person and via his lieutenant, Vecchione," and that "Hynes and Vecchione met on numerous occasions with their co-conspirators in the Brooklyn District Attorney's office, after the initial meetings on April 14 and April 27, 2010, to plot the course of the conspiracy. *Id.* ¶ 56.

Defendants assert that "Plaintiff's conspiracy theory fails because he has not developed evidentiary proof that Hynes acted with others to undermine the Lebovits's conviction by prosecuting plaintiff for soliciting false testimony and attempted extortion without probable cause." Def. Mem. at 26. They argue that "Plaintiff can offer no evidence to support that Hynes 'directed' an 'investigation' or played a 'direct role' in any efforts to do so, such as by 'manufacturing' evidence against plaintiff or seeking to undermine the conviction of Lebovits." *Id.* They further argue that Kellner has failed to adduce evidence "that Hynes coordinated with the Lebovits family to influence victims to recant or witnesses to change their stories," "counseled the family of Lebovits . . . on what evidence to obtain," or "coordinated a pay-off by the family to Y.R." *Id.* Ultimately, Defendants assert that Kellner "fails to point to any admissible evidence that would establish a conspiracy under § 1983." Def. Reply at 9.

For his part, Kellner contends that "[t]here is clear evidence of Hynes's involvement in the violation of Plaintiff's constitutional rights." Pl. Mem. at 29. Kellner points to the record evidence of meetings between Lebovits's attorneys and Vecchione and Hynes in April and May 2010, *id.*, as well as the March 2011 meeting between ADA Bruffee and Hynes following Baruch Lebovits's application for bail pending appeal, *id.* at 17, 31–32. Kellner also argues Hynes "authorized the initial investigation into Plaintiff in May 2010, and the resumption of that investigation in August 2010." *Id.* at 32. Kellner further asserts that "Hynes knew that M.T. was a genuine victim of Lebovits," and thus, "he would also have known that the Lebovits

family manufactured a false affidavit" from M.T. purporting to recant those allegations.  Pl. Sur-Reply at 15.

### b. Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiff's Section 1983 Conspiracy Claim

Viewed in the light most favorable to Kellner, the record before this Court contains sufficient evidence for a reasonable jury to conclude that (1) DA Hynes conspired with others to maliciously prosecute Kellner using evidence that Hynes knew was false; (2) the object of this conspiracy was to inflict an unconstitutional injury upon Plaintiff; and (3) at least one overt act was undertaken in furtherance of the conspiracy.  Kellner has also adduced sufficient evidence from which a reasonable jury could find that the conspiracy caused a violation of his constitutional rights.  Accordingly, the Court denies Defendants' motion for summary judgment as to Kellner's Section 1983 conspiracy claim.

### i. Circumstantial Evidence of the Existence of a Conspiratorial Agreement

Kellner alleges that the conspiracy began during several meetings that took place approximately two months after Baruch Lebovits was convicted of sexual abuse.  Attorney Aidala met with ADA Vecchione on April 27, 2010.  Shortly thereafter, Aidala was granted two back-to-back meetings with DA Hynes himself, on May 4 and 5, 2010.[17]

---

[17] Defendants argue that the record evidence, specifically the KCDA Appointments Log, does not establish that Aidala and Hynes actually met on these dates.  Def. Reply 56.1 Statement ¶ 171.  However, Aidala has not disputed that these

Standing alone, the existence of these meetings would be insufficient circumstantial evidence to support an inference of a conspiratorial agreement.  *See Anilao*, 27 F.4th at 871 (dismissing as "little more than speculation" plaintiffs' contention that, "[b]ecause [an ADA] met with all the witnesses who testified in the grand jury proceedings," the ADA must have conspired with a private party for him to lie to the grand jury); *id.* ("Speculation aside, the plaintiffs fail to point to any admissible evidence that could lead a reasonable juror to conclude that [the ADA or the DA] conspired with [a private party] to fabricate evidence.").  But Kellner has adduced additional circumstantial evidence that raises his assertion beyond mere speculation.

For example, five days after Aidala's second meeting with Hynes, the KCDA opened a criminal investigation into Kellner.  The record contains evidence from which a reasonable jury could infer that Hynes personally authorized this investigation.  Aidala Dep. at 72:6–8 (deposition testimony of Aidala that "I just don't remember being told [that Hynes approved the investigation]," but agreeing that "Mike Vecchione didn't have th[e] authority" to do so on his own).  A reasonable jury could also infer, based on close temporal proximity between the two events and the broader context in which the investigation began, that Hynes's decision to launch the investigation arose from an agreement reached between Hynes and Aidala at their meeting(s).

meetings took place; at his deposition, he claimed only that he presently has "zero recollection" of the meetings with Hynes.  Aidala Dep. at 58:9–59:13.  On this record, a jury could reasonably infer that Aidala's meetings with Hynes did, in fact, take place on the dates recorded in the Appointments Log.

The conduct of the Lebovits family and their legal team after the May 2010 meetings could also support the inference that the meeting produced some kind of agreement between Hynes and Aidala. Chaim Lebovits brought his allegations concerning the May 2009 recorded conversation to KCDA on April 27, 2010, shortly after Baruch's conviction — yet the KCDA only interviewed Meyer Lebovits about these allegations on May 20, 2010, after the Hynes/Aidala meetings on May 4 and 5. Similarly, Aidala only hired Mladinich to investigate the allegations that Kellner sought to use false accusations against Baruch to extort the Lebovits family on June 2, 2010 (*i.e.*, after the meetings with Hynes), despite the fact that Lebovits's defense counsel had raised these allegations against Kellner more than a year earlier, during a May 5, 2009 court conference in Baruch's criminal proceeding.

The interactions between the KCDA and Mladinich could similarly support an inference of a conspiratorial agreement. After receiving the Weisner, Friedman, and M.T. affidavits notarized by Mladinich, and after receiving an email from Aidala indicating that Mladinich (the private investigator retained by then-convicted sex offender Baruch Lebovits) was surveilling Y.R. (the victim of Baruch's sexual abuse whose testimony had resulted in Baruch's conviction earlier that year), ADA Vecchione instructed ADA Batsidis and DI Green-Jones on November 29, 2010 to work with Mladinich to "come up" with Y.R. so that Y.R. could be interviewed in relation to the Kellner investigation. At oral argument, Kellner's counsel characterized this conduct as the KCDA improperly "outsourcing" its investigation into Kellner to the Lebovits defense team. A reasonable jury could agree.

Numerous aspects of the KCDA investigation into Y.R. could also lead a reasonable jury to infer the existence of a conspiracy to implicate Kellner and clear Baruch's name.  Y.R. stated unequivocally at his December 1, 2010 interview that he was a genuine victim of Baruch and that no one paid him to testify.  Earlier that year, a jury had credited Y.R.'s testimony and convicted Baruch of sexually abusing Y.R. at his criminal trial.  Yet, according to Meyer Lebovits during his interview with ADA O'Donnell, "[the] DA told [Sholem Weisner] to continue to have interaction with Y.R. to see what he could find out" — at which point Weisner and the Lebovits family arranged for Y.R. to travel to Florida, where he was pressured on tape to implicate Kellner (but did not do so).  A jury could conclude from Meyer's statements that DA Hynes was personally involved in the efforts to secure a recantation from Y.R. Moreover, after the "Florida tapes" were presented to the KCDA by the Lebovits defense team and characterized as a recantation, Hynes personally met with Bureau Chief Jaus and ADAs Vecchione, Bruffee, and Gregory to discuss this development. Despite Y.R.'s repeated refusals to recant, including while under extreme pressure in Florida, the meeting with Hynes ended with the decision that Vecchione and the Rackets division would continue investigating Y.R.   ADA Batsidis subsequently interviewed Y.R. once more, where he again refused to recant.  Perhaps most notably, after that interview, Vecchione told Batsidis to "indict and see if [Y.R.] comes around." This was the final investigative interview conducted before Kellner was indicted.  A jury could certainly conclude that Vecchione's instruction was a reference to indicting Kellner.

From these facts, a reasonable jury could also infer that an improper goal on the part of Hynes and one of his top deputies, Vecchione, motivated the investigation into Kellner. Vecchione testified at his deposition that he did not recall ever believing that Baruch Lebovits was wrongfully convicted — that is, that Vecchione never believed that Lebovits did *not* sexually abuse Y.R. This fact, together with the persistent interviews of Y.R. and Vecchione's comment that Batsidis should indict Kellner to see if Y.R. "comes around," could lead a jury to conclude that the true goal of the investigation into and eventual prosecution of Kellner was to apply pressure to Y.R. to recant and clear Baruch's name, for reasons unrelated to Lebovits's actual innocence — *i.e.*, to shore up political support for Hynes from the influential Lebovits family and its allies in the Satmar Hasidic community.

Moreover, a jury could conclude from the record that (1) Hynes was made personally aware of the suspicious circumstances of M.T.'s recantation at the time the charges against Baruch Lebovits relating to M.T. were dropped and (2) Hynes was personally aware of the contents of Baruch's PPI, which included not only Baruch's willingness to plead guilty to the "top count or counts, or even the entire indictment" as to M.T. and Y.R. but also general admissions of compulsive, unlawful sexual conduct with minors. His decisions to accept M.T.'s allegations and authorize an investigation into Kellner and to direct or permit Vecchione's Rackets division to apply investigative pressure to Y.R. suggest a willingness to disregard Baruch's admissions that he abused one or both criminal complainants. In light of Hynes's

knowledge, a reasonable jury could conclude that Hynes's goal in investigating Kellner was to inflict upon him an unconstitutional injury.

A jury could also conclude from the record that Hynes was personally involved in this investigation from its inception. The record supports that attorney Aidala met with Hynes immediately prior to when the investigation was launched and that Hynes alone had the power to authorize that investigation. Meyer's comment that the "DA" encouraged Sholem Weisner to continue pressuring Y.R. could be interpreted by a reasonable factfinder as Meyer indicating Hynes's personal involvement in the creation and procurement of the "Florida tapes." Further, it is undisputed that Hynes personally met with members of his office to discuss Y.R., after KCDA received the "Florida tapes" and shortly before Vecchione's statement that Batsidis should "indict and see if [Y.R.] comes around." The record also reflects Hynes's personal involvement in the case through Vecchione's April 12, 2011 email to him (stating "Boss, Kellner is in custody"), Hynes's response ("Great"), and Hynes's statements at the press conference on April 13, 2011, the day of Kellner's arraignment.[18]

Finally, a jury could conclude from the record that multiple overt acts were undertaken in furtherance of the alleged conspiracy, both by Hynes and his purported co-conspirators. The initial meetings where Hynes allegedly counseled the Lebovits

---

[18] While post-indictment conduct, like the decision to indict, is generally shielded by absolute prosecutorial immunity, statements to the media are not. *Buckley*, 509 U.S. at 277–78. These post-indictment statements could lead a reasonable jury to conclude that Hynes was personally invested and involved in Kellner's prosecution and, as discussed *infra*, that Hynes had initiated that prosecution with actual malice.

legal team on what evidence to obtain could be one. Hynes's authorizing the investigation into Kellner, and the concomitant commitment of KCDA resources to gathering evidence, could also constitute an overt act. The production of the M.T., Friedman, and Weisner affidavits by the Lebovits legal team and their subsequent delivery to KCDA could be another. So could the effort in Florida to pressure Y.R. to recant and implicate Kellner, allegedly outsourced to the Lebovits defense team at Hynes's personal direction. Finally, the March 2011 decision to continue the KCDA's investigatory interviews with Y.R. and see if Kellner's indictment might induce Y.R. to "come[] around" and recant could be yet another.

The facts of this case contrast strongly with those of *Cooper v. City of New York*, where the court granted summary judgment and dismissed plaintiff's Section 1983 conspiracy to fabricate evidence claim. No. 17-CV-1517 (RPK) (RLM), 2022 WL 4468168 (E.D.N.Y. Sep. 26, 2022), *aff'd*, No. 22-2792-CV, 2024 WL 1107923 (2d Cir. Mar. 14, 2024) (summary order). The district court disagreed with plaintiff's contention "that a conspiracy can be inferred from several alleged deficiencies regarding the City Defendants' investigation" because "those allegations are either unsupported by the record or fail to support an inference of conspiracy." 2022 WL 4468168, at *6. The investigative conduct at issue included (1) an officer's "decision not to include [plaintiff's] allegation [against another office] in a particular form"; (2) "officers credit[ing] one account over another, without more"; (3) "officers' failure to remember the name of the canvassing officer"; (4) a "reporting discrepancy [between two officers' reports] which, if anything, suggests the absence of coordination"; and

(5) plaintiff's unsubstantiated allegation that "officers attempted to downplay his injuries." *Id.* at *7. The *Cooper* Court concluded that this amounted to "little more than speculation" of a conspiracy to fabricate evidence. *Id.* The Second Circuit agreed that "the alleged deficiencies and inconsistencies that could arguably give rise to a constitutional violation related to the police investigation are not supported in the record and fail to reasonably suggest a conspiracy to violate [plaintiff's] constitutional rights." 2024 WL 1107923, at *2.

In the instant case, the alleged discrepancies, inconsistencies, and irregularities Kellner cites to support his conspiracy claim are sufficient to survive summary judgment. Drawing reasonable inferences from a broad array of circumstantial evidence, a jury could find that DA Hynes conspired with Vecchione and the Lebovits family and legal team to manufacture extortion charges against Kellner in order to compel Y.R. to recant and, ultimately, clear Baruch Lebovits's name and criminal record.

Moreover, this is not a case where Kellner seeks to rely solely on circumstantial evidence. As discussed below, the record also contains direct evidence which, if admitted at trial, a reasonable jury could rely upon to find for Kellner on his conspiracy claim.

### ii. Potential Direct Evidence of the Existence of a Conspiratorial Agreement

Kellner cites a 2014 article in *The New Yorker* magazine by Rachel Aviv titled "The Outcast" as direct support for his claim that "Hynes specified for the Lebovits family and their representatives exactly which kinds of evidence his office would need

to arrest Plaintiff."  Pl. 56.1 Statement ¶ 174.  The relevant section of the article reads:

> [B]ut the Lebovits family was still confident that they could prove that Kellner was an extortionist.  Chaim [Lebovits] told me that Hynes specified for his lawyers exactly which kinds of evidence they would need to arrest Kellner.  'They said that, if you can provide A, B, C, D, E, and F, then we will move in with the indictment,' Chaim said. (Hynes, through his lawyer, declined to comment for this story.)"

New Yorker Article at 23.

Before considering whether Chaim Lebovits's statements show the existence of a conspiracy to maliciously prosecute Kellner, the Court must first resolve the dispute as to whether the statements are admissible at summary judgment.

## 1. Admissibility of the *New Yorker* Article

Defendants contend that this evidence is inadmissible.  Def. Reply 56.1 Statement ¶ 174.  They point to caselaw from this circuit holding that "newspaper articles containing quoted remarks are hearsay within hearsay — they contain out of court statements by the quoted individual, within a document that is itself an out of court statement," and are therefore "usually inadmissible" for the truth of the matter asserted.  *Mandal v. City of New York*, No. 02-CV-1234 (WHP), 2006 WL 3405005, at *1 (S.D.N.Y. Nov. 26, 2006); *see also In re Columbia Sec. Litig.*, 155 F.R.D. 466, 474 (S.D.N.Y. 1994) ("Often, when offered to prove that certain statements were made, newspaper and magazine articles are held inadmissible as hearsay."); *Holmes v. Gaynor*, 313 F. Supp. 2d 345, 358 n.1 (S.D.N.Y. 2004) ("The newspaper article, however, is hearsay and inadmissible for proving the truth of the matters asserted therein.").

61

Defendants are correct that newspaper and magazine articles, such as the one Kellner cites, present hearsay issues.  And this particular article presents multiple levels of out-of-court statements: (1) the article itself, restating (2) Chaim's statement, restating (3) the lawyers' statement that either Hynes himself or someone else in the KCDA specified to them what evidence would be needed to secure an indictment.

### a. Admissibility of Chaim's Statement

However, "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."  Fed. R. Evid. 805.  As to print media specifically, "newspaper articles need not be excluded from evidence when they contain admissions by a party opponent under Rule 801, provided the article is a recorded recollection under Rule 803(5), or falls within the 'residual exception' of Rule 807."  *Mandal*, 2006 WL 3405005, at *2.

Here, neither the party opponent exception nor the recorded recollection exception applies to Chaim's statement to the *New Yorker*.  Chaim is not a party to this suit, and so his statement cannot be offered against the estate of DA Hynes.  *See* Fed. R. Evid. 801(d)(2)(A).  Nor was Chaim's statement to the *New Yorker* made "during and in furtherance of" the purported conspiracy.  *See* Fed. R. Evid. 801(d)(2)(E).  The recorded recollection exception cannot apply because Chaim has not testified to a lack of recollection. *See* Fed. R. Evid. 803(5); *Jacobson v. Deutsche Bank, A.G.*, 206 F. Supp. 2d 590, 597 (S.D.N.Y. 2002) ("A necessary predicate of [Rule 803(5)], however, is that there be a 'witness' with an 'insufficient recollection.'"), *aff'd*, 59 F. App'x 430 (2d Cir. 2003).

However, the *New Yorker* article may be admissible for Chaim's statement if it qualifies for the residual exception of Rule 807. Under this rule, once the proponent provides the required written notice, *see* Fed. R. Evid. 807(b), a statement is excluded from the rule against hearsay under the following conditions:

(1) The statement is supported by sufficient guarantees of trustworthiness (in light of the totality of circumstances under which it was made and evidence, if any, corroborating the statement); and

(2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid 807(a). "[T]he trial court has broad discretion in assessing the probity and trustworthiness of evidence." *In re Columbia Sec. Litig.*, 155 F.R.D. at 475.

Here, the Court finds that the requirements of Rule 807 are satisfied and that Chaim's statement is admissible for purposes of this motion. First, as to the "guarantees of trustworthiness" accompanying the statement, a long line of courts has noted *The New Yorker*'s "sterling reputation for accuracy and the existence of its fabled fact-checking department." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 282 (S.D.N.Y. 2013) (quoting *Masson v. New Yorker Mag., Inc.*, 960 F.2d 896, 902 (9th Cir. 1992)), *aff'd*, 807 F.3d 541 (2d Cir. 2015), and *aff'd*, 622 F. App'x 67 (2d Cir. 2015); *see also Sidis v. F-R Pub. Corp.*, 113 F.2d 806, 810 (2d Cir. 1940) ("The New Yorker articles limit themselves to the unvarnished, unfictionalized truth."). Courts in this circuit routinely reference *New Yorker* articles for direct quotations and factual background. *See, e.g.*, *Ligon v. City of New York*, 736 F.3d 118, 127 (2d Cir. 2013) (quoting a statement by a judge's former law clerk in a *New Yorker* article in a decision reassigning the case from that judge on remand), *vacated in part on other*

*grounds*, 743 F.3d 362 (2d Cir. 2014); *Dakus v. Koninklijke Luchtvaart Maatschappij, N.V.*, No. 22-CV-7962 (RA), 2024 WL 4265646, at *1 (S.D.N.Y. Sep. 23, 2024) (reproducing a *New Yorker* quote from "a highly prolific class action attorney"); *Arevalo-Chavez*, 2025 WL 1952438, at *2, *4, *10 (citing the *New Yorker* for quotes and factual background); *Fairstein v. Netflix, Inc.*, No. 20-CV-8042 (PKC), 2023 WL 6125631, at *18 (S.D.N.Y. Sep. 19, 2023) (quoting a declaration, which in turn cited a *New Yorker* article, for the statement of a party opponent); *Shah v. Stanley*, No. 03-CV-8761 (RJH), 2004 WL 2346716, at *4 (S.D.N.Y. Oct. 19, 2004) (citing a *New Yorker* article to explain a potential conflict of interest on the part of a defendant), *aff'd sub nom., Shah v. Meeker*, 435 F.3d 244 (2d Cir. 2006), *abrogated on other grounds by Merck & Co. v. Reynolds*, 559 U.S. 633 (2010).[19]

The Court also notes that Rachel Aviv is a well-respected journalist whose reporting has been favorably cited in this district. *See, e.g.*, *United States v. R.V.*, 157 F. Supp. 3d 207, 225 (E.D.N.Y. 2016) (citing Aviv's reporting in *The New Yorker* on child pornography and the internet). The quoted section indicates that DA Hynes was provided an opportunity to refute or otherwise comment on Chaim's statement, which he declined to do, indicating Aviv abided by best journalistic practice and bolstering the Court's evaluation of the article's trustworthiness.

---

[19] The Court emphasizes that its decision should not be construed as holding that articles in *The New Yorker* are necessarily trustworthy in all cases and may always be admitted under the residual exception of Rule 807. Rather, the magazine's reputation is one of several factors leading the Court to conclude, for purposes of this summary judgment motion only, that this particular statement attributed to Chaim carries sufficient guarantees of trustworthiness to be admitted.

Second, as to corroborating evidence, the record before the Court, viewed in the light most favorable to Kellner, tends to establish that the Lebovits legal team met with Hynes shortly before they began producing to KCDA the affidavits and witnesses that would eventually lead to Kellner's indictment.  In other words, a reasonable jury could find that the parties proceeded to do precisely what Chaim claimed they did in the *New Yorker* article.  For purposes of this summary judgment motion only, this evidence is sufficient, in light of the totality of the circumstances, to assure the Court of the trustworthiness of Chaim's statement as quoted in the article. *See In re Columbia Sec. Litig.*, 155 F.R.D. at 475 ("Newspaper and magazine articles, however, may nevertheless be introduced into evidence if they are bolstered by supporting evidence that confers some circumstantial guarantees of trustworthiness upon them.").

Importantly, as to whether Chaim's statement is "more probative . . . than any other evidence that [Plaintiff] can obtain through reasonable efforts," Fed. R. Evid 807(a)(2), the *New Yorker* article is apparently the only available evidence as to this statement.  Chaim lives in Israel and was not available to be deposed.  *See* Pl. Letter re Deps., ECF No. 109 (Aug. 8. 2025).  The parties confirmed his unavailability at oral argument.  In light of this, and the preliminary guarantees of trustworthiness outlined above, the Court finds that the *New Yorker* article and Chaim's statement therein are likely admissible for trial, and thus may be considered at summary judgment.  *See Mandal*, 2006 WL 3405005, at *3 (admitting newspaper articles under the residual exception, "assuming an adequate foundation is established at trial,"

65

where there was "a compelling need for the evidence contained" within them, "since all senior officials deposed by [p]laintiffs claimed to have no recollection"); *cf. Larez v. City of Los Angeles*, 946 F.2d 630, 643 & n.6 (9th Cir. 1991) (excluding sufficiently trustworthy newspaper articles as not "best evidence" where the defendant who was quoted in the newspapers testified).[20]

### b. Admissibility of the Statement of Chaim's Lawyers

Admitting Chaim Lebovits's statement as quoted in the *New Yorker* article only dispenses with the first two levels of out-of-court statements. For the statement to be admissible for the truth of the matter asserted by Kellner — that "Hynes specified for the Lebovits family and their representatives exactly which kinds of evidence his office would need to arrest Plaintiff," Pl. 56.1 Statement ¶ 174 — Chaim's lawyer's out-of-court statement that "[t]hey said that, if you can provide A, B, C, D, E, and F, then we will move in with the indictment," New Yorker Article at 23, must also be admissible.

The Court concludes that this statement, as recounted by Chaim, is the statement of an alleged coconspirator and therefore not hearsay under Federal Rule of Evidence 801(d)(2)(E). This Rule provides that a statement is not hearsay when it "is offered against an opposing party and . . . [w]as made by the party's coconspirator

---

[20] Plaintiff has provided adequate notice to take advantage of the *New Yorker* article under Rule 807 because Plaintiff's counsel included the article as an exhibit to his October 31, 2024 declaration in opposition to Defendants' motion for summary judgment. Decl. in Opp'n, Ex. 19, ECF No. 104-19. This was far in advance of any prospective trial and gives Defendants "a fair opportunity to meet [the evidence]." Fed. R. Evid. 807(b).

during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).  The Rule further provides that "[t]he statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it."  Fed. R. Evid. 801(d)(2).

Here, the purported statement of the Lebovits lawyer satisfies each of the Rule's requirements.  Kellner alleges that the Lebovits family and their lawyers conspired with DA Hynes and ADA Vecchione to maliciously prosecute Plaintiff using evidence Hynes knew to be false.  This statement by the Lebovits lawyer is thus a statement by one alleged coconspirator offered against another alleged coconspirator (*i.e.*, Hynes) who is an opposing party to this suit.[21]  The statement by the Lebovits lawyers to Chaim, another alleged coconspirator, was made following the alleged initiation of the conspiracy at the May 4 and 5, 2010 meetings between attorney Aidala and Hynes, meaning the statement was made during the course of the alleged conspiracy.  Moreover, Lebovits's lawyers' relaying of Hynes's statement ("if you can provide A, B, C, D, E, and F, then we will move in with the indictment") was in furtherance of the alleged conspiracy, in that it enlisted the Lebovits family in finding

---

[21] While Patricia L. Hynes, as administrator of the estate of Charles J. Hynes, is the technical party here, she was substituted for DA Hynes, following his death, pursuant to Federal Rule of Civil Procedure 25(a)(1).  Pl. Mot. to Substitute Party, ECF 36 (Nov. 30, 2020); Dkt. Order dated Dec. 16, 2020.  "Rule 25(a)(1) allows a representative of a decedent to take [his] place so that litigation in which the decedent is a party can continue and conclude.  The substitute is thus not litigating on his or her own behalf . . . , but rather stands in the shoes of the decedent." *Tankleff v. Cnty. of Suffolk*, No. 09-CV-1207 (JS) (AYS), 2016 WL 3162059, at *2 (E.D.N.Y. June 2, 2016) (citation modified) (citation omitted).  Accordingly, this coconspirator statement may be offered even though the alleged coconspirator, DA Hynes, has died.

and procuring false statements from the witnesses whose claims would eventually lead to the KCDA's indictment of Kellner.

Finally, as detailed *supra*, there is sufficient circumstantial evidence in the record from which a reasonable jury could conclude that a conspiracy existed involving Hynes, the Lebovits family, and the Lebovits defense team to (1) implicate Kellner in an alleged extortion scheme, in order to (2) pressure Y.R. to recant his accusations against Baruch Lebovits, in order to (3) clear Baruch's criminal record and his name. Because Kellner does not need to rely on this statement of the Lebovits lawyers to Chaim alone to establish the existence of the alleged conspiracy or Hynes's alleged participation in it, the statement satisfies the final requirement of Rule 801(d)(2).

Accordingly, this statement is not hearsay and is likely admissible against Hynes. *See Fischl v. Armitage*, 128 F.3d 50, 59 (2d Cir. 1997) (applying Rule 801(d)(2)(E) to admit a coconspirator's statement against correctional officers at the summary judgment stage of a Section 1983 conspiracy case); *see also* 30B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6778 (2025 ed.) (noting that "the [Rule 801(d)(2)(E)] hearsay exemption is 'applicable in both civil and criminal cases, whether or not a conspiracy is charged'" and collecting cases (citations omitted)).

### 2. The *New Yorker* Article Raises a Genuine Issue of Fact as to the Existence of the Alleged Conspiracy

The Court, in concluding its analysis of the *New Yorker* article offered by Kellner, notes that this statement of the Lebovits lawyers, as recounted by Chaim,

does not necessarily establish the existence of a conspiracy to inflict an unconstitutional injury upon Kellner. While a factfinder could conclude from this statement that Hynes was telling the Lebovits legal team, in sum and substance, "if you bring me the following false evidence implicating Kellner, I will indict him," the statement could also be construed as a far more benign explanation to Lebovits's lawyers, specifying the kinds of admissible evidence (as opposed to mere uncorroborated allegations) against a suspect in an extortion case that the KCDA would require before it "move[d] in" with a criminal indictment. The susceptibility of this statement to differing interpretations, however, presents a genuine issue of material fact, the resolution of which is properly reserved for a jury. *See Fairstein*, 2023 WL 6125631, at *18 n.4 (noting that, where "competing inferences can be drawn from . . . [t]he quote in the *New Yorker* piece[,] . . . the reasonable inferences to be drawn from the quote are best left to a jury").

\* \* \*

For the foregoing reasons, genuine issues of material fact preclude summary judgment on Kellner's Section 1983 conspiracy claim. Accordingly, Defendants' motion is denied.

## III. Malicious Prosecution Claim

The Court next turns to Kellner's underlying Fourth Amendment claim under Section 1983 for malicious prosecution. As noted *supra*, "a plaintiff alleging a § 1983 conspiracy claim must prove an actual violation of constitutional rights." *Knopf*, 803 F. App'x at 453 (2d Cir. 2020) (quoting *Singer*, 63 F.3d at 119). Thus, even if a

69

reasonable jury could find that DA Hynes participated in a conspiracy to fabricate evidence, Kellner's entire case would fail if no genuine issues of material fact existed as to the underlying Section 1983 malicious prosecution claim.

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must establish the elements of a malicious prosecution claim under state law." *Alberty v. Hunter*, 144 F.4th 408, 417 (2d Cir. 2025) (citation modified) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010)). "To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello*, 612 F.3d at 161 (citation modified) (citation omitted). "[A] Fourth Amendment claim under § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence. A plaintiff need only show that the criminal prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 49 (2022). "[A]s in all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury." *Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998).

### a. Kellner's Allegations and the Positions of the Parties

Kellner's factual allegations against Hynes as to his malicious prosecution claim overlap with his conspiracy allegations as detailed *supra*. Am. Compl. ¶ 58. Kellner alleges that Hynes, "acting under color of state law, initiated a criminal

70

proceeding against [Kellner], the proceeding terminated in [Kellner's] favor, probable cause did not exist for commencing the proceeding, and Hynes's actions were motived by actual malice." *Id.* ¶ 59. Kellner further alleges that "[t]he indictment against Plaintiff was obtained through fraud, perjury, misrepresentation, falsification and suppression of evidence, and other conduct undertaken in bad faith, by Hynes and his co-conspirators." *Id.* ¶ 60. Finally, Kellner alleges that "Hynes's motivation in initiating and pursuing the investigation and prosecution of Plaintiff was wrong and improper; it was not a desire to see the ends of justice served." *Id.* "As a result, Hynes violated Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments." *Id.* ¶ 59.

Defendants argue that "[t]he evidentiary record is devoid [] of any admissible evidence to establish that [Hynes] personally either initiated or continued a criminal proceeding against [P]laintiff." Def. Mem. at 20. They further contend that Kellner "cannot demonstrate a lack of probable cause for commencing the criminal proceedings," in light of presumption of probable cause created by the grand jury's indictment. *Id.* at 20–22. As to the actual malice requirement, Defendants assert that "[P]laintiff's prosecution was not malicious because it was supported by probable cause." *Id.* at 23. Defendants do not dispute that Kellner's prosecution ended with a termination in his favor.

### b. Genuine Issues of Material Fact Preclude Summary Judgment on Kellner's Section 1983 Malicious Prosecution Claim

Viewed in the light most favorable to Kellner, the record before this Court contains sufficient circumstantial and direct evidence for a reasonable jury to

conclude (1) that DA Hynes was personally involved in the initiation and/or continuation of a criminal proceeding against Kellner (separate and apart from the ultimate decision to indict); (2) that there was a lack of probable cause for the charges; and (3) that actual malice was the motivation for the proceeding. Accordingly, because genuine issues of material fact exist as to whether Hynes violated Kellner's constitutional rights, the Court denies Defendants' motion for summary judgment as to Kellner's Section 1983 malicious prosecution claim.

### i. Genuine Issues as to the Initiation of a Criminal Proceeding and the Personal Involvement of Hynes

The Court has already concluded that the investigative acts undertaken by Hynes, or at Hynes's direction, are not shielded by absolute prosecutorial immunity. The Court has further concluded that genuine issues of material fact preclude summary judgment on Kellner's Section 1983 conspiracy claim. This alleged conspiracy, if found by a jury, could serve as a basis for liability against Hynes. *See Fries v. Barnes*, 618 F.2d 988, 990 (2d Cir. 1980) ("[A] government agent may not escape responsibility by claiming that the violation of the plaintiff's rights was committed by the private person involved in [a Section 1983 conspiracy].").

Upon review of the record in the light most favorable to Kellner, genuine issues of material fact exist as to whether (1) the evidence adduced against Kellner was the result of a conspiracy to maliciously prosecute him and (2) Hynes was personally involved in this alleged conspiracy. A jury's finding that Hynes personally participated in an alleged conspiracy to procure false or wholly unreliable evidence against Kellner in the investigative stage of his prosecution would satisfy the

"initiation" element of a malicious prosecution claim. *See Harris v. Tioga Cnty.*, 663 F. Supp. 3d 212, 241, 241 (N.D.N.Y. 2023) ("[O]btaining false witness statements . . . for the purpose of obtaining probable cause would be sufficient to sustain this claim; *i.e.*, a jury could conclude that [the District Attorney], acting in a pre-indictment investigative capacity, 'initiated' the proceeding against plaintiff in the absence of probably cause and with actual malice."), *appeal dismissed*, No. 23-503, 2024 WL 4179651 (2d Cir. Sep. 13, 2024). Accordingly, summary judgment is inappropriate.

### ii. Genuine Issues as to the Lack of Probable Cause

"Probable cause, in the context of malicious prosecution, has been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021) (citation modified) (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)). "Although probable cause to prosecute is a complete defense to a claim of malicious prosecution, such probable cause must be shown as to each crime charged in the underlying criminal action." *Id.* (first citing *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003), then citing *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991), and *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996)). "[I]n general, 'probable cause is a mixed question of law and fact.'" *Frost v. New York City Police Dep't*, 980 F.3d 231, 243 (2d Cir. 2020) (citation modified) (quoting *Dufort v. City of New York*, 874 F.3d 338, 348 (2d Cir. 2017)). "[U]nder New York law, indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by

73

evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other [] conduct undertaken in bad faith.'" *Savino*, 331 F.3d at 72 (2d Cir. 2003) (quoting *Colon v. City of New York*, 455 N.E.2d 1248, 1251 (N.Y. 1983)).  The plaintiff "bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment."  *Id.* at 73 (citing *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994)).

Here, the Court may not independently resolve the issue of probable cause. Viewing the summary judgment record in the light most favorable to Kellner, there are simply too many genuine issues and disputes of material fact.  *Cf. Frost*, 980 F.3d at 243 ("[W]here there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." (quoting *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007))).  As explained *supra*, a reasonable jury could conclude that Hynes participated in a conspiracy to produce evidence that he knew to be false or fabricated, and that the allegedly false or fabricated evidence was used to initiate and continue Kellner's prosecution.  This would be sufficient to overcome the presumption of probable cause created by the grand jury indictment.

Kellner has also identified evidence, including Baruch's PPI submission to the criminal trial court and the full transcripts of the May 2009 conversation between Kellner and Meyer Lebovits, that could permit a reasonable juror to conclude that Hynes knew that the claims of certain witnesses against Kellner were false. Defendants are correct that, as a general rule, "the KCDA ha[d no] obligation to

present this evidence to the grand jury even assuming it was exculpatory in nature." Def. Mem. at 21 (collecting cases).  However, Kellner does not argue that either the PPI or the 2009 transcript should have been presented as exculpatory evidence to the grand jury.  Rather, as to the PPI, Kellner argues that it is offered to show that Hynes deliberately ignored evidence contradicting the claims in M.T.'s affidavit and impeaching M.T.'s overall veracity.  Pl. Mem. at 24–26; Pl. Sur-Reply at 15.  Kellner offers the recording of the May 2009 conversation for a similar purpose.  Pl. Mem. at 15, 26–27.  The inferences to be drawn from any divergence between Meyer Lebovits's statements to KCDA investigators as to the May 2009 conversation and the translated transcript of the conversation itself — in light of Kellner's allegation that Hynes was counseling the Lebovits family about the evidence they needed to produce against Kellner to justify an indictment — is properly left to the jury.  If a jury were to find that Hynes proceeded with the investigation despite knowing that the primary evidence against Kellner was false, that would defeat the presumption of probable cause created by the eventual grand jury indictment.  *See Kanciper v. Lato*, 989 F. Supp. 2d 216, 225, 233 (E.D.N.Y. 2013) (holding that a plaintiff "set forth sufficient allegations to overcome this presumption" where she alleged, *inter alia*, that a District Attorney "surreptitiously decided to investigate whether [she] committed any crimes," despite "knowing that the DA's Office had already determined that probable cause did not exist" (citation modified)).

In essence, Kellner alleges that Hynes coached the Lebovits defense team on what evidence to procure against Kellner, and was personally aware that the

evidence that was eventually brought to him was false, fabricated, or otherwise wholly unreliable.  Nonetheless, Kellner argues, Hynes used this evidence, knowing that it was baseless and ignoring exculpatory evidence, to initiate and continue a criminal investigation into Keller.  *See, e.g.*, *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 35 (E.D.N.Y. 2015) ("[C]ontinued prosecution after facts sufficient to exonerate the accused have been provided may give rise to an action for malicious prosecution under New York law."); *Cox v. Cnty. of Suffolk*, 827 F. Supp. 935, 939 (E.D.N.Y. 1993) (holding that the pre-indictment receipt of exculpatory statements meant defendants "lacked probable cause to continue the prosecution").  This investigation included attempts — both conducted by KCDA investigators, and "outsourced" to the Lebovits defense team, as with the Florida tapes — to pressure Y.R. into making what Hynes allegedly knew would be false statements about Baruch Lebovits's purported innocence.  The record, when viewed in the light most favorable to Kellner, would permit a reasonable jury to conclude (1) that the evidence that Hynes, his KDCA deputies, and the Lebovits team collectively amassed against Kellner was false, and even deliberately fabricated; (2) that Hynes had personal knowledge that the evidence against Kellner was false or, at a minimum, wholly unreliable; and (3) that Hynes himself personally participated in a conspiracy to procure false information for the purpose of securing a baseless indictment of Kellner.

Ultimately, the question of whether Kellner's indictment, which created a presumption of probable cause, was procured by fraud, perjury, or other bad faith conduct during the KCDA's pre-indictment investigation is a genuine issue of

material fact that precludes summary judgment. *See Harris*, 663 F. Supp. 3d at 241, 243 (denying summary judgment and observing the "analytical overlap" where claims for fabrication of evidence, conspiracy, and malicious prosecution are "intertwined").

### iii.  Genuine Issues as to Actual Malice as a Motivation

Under New York law, "malice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff." *Manganiello*, 612 F.3d at 163 (quoting *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996)); *see also Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 423 (S.D.N.Y. 2002) ("Malice means 'that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" (quoting *Nardelli v. Stamberg*, 377 N.E.2d 975, 976 (N.Y. 1978) and *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994))).  "A lack of probable cause generally creates an inference of malice." *Boyd*, 366 F.3d at 78; *see also Chimurenga v. City of New York*, 45 F. Supp. 2d 337, 343–44 (S.D.N.Y. 1999) ("Where, as here, there is a triable issue as to probable cause, there will almost always be a triable issue as to malice, [and t]his is even more the case where, as here alleged, the defendants attempted to falsely create a sham probable cause.").  "Falsifying evidence is sufficient to show malice." *Bailey v. City of New York*, 79 F. Supp. 3d 424, 451 (E.D.N.Y. 2015) (collecting cases).

Here, the existence of disputed fact questions as to probable cause creates a similar issue for trial as to actual malice.  The record contains evidence from which a reasonable jury could conclude that something other than a "desire to see the ends of

justice served" motivated Kellner's prosecution.  Hynes's July 24, 2013 appearance on a radio program to discuss and publicly defend the prosecution's case against Kellner — which occurred less than a month after ADAs Batsidis and Alexis had fully briefed Hynes on developments in the Kellner case that led them to conclude that M.T.'s accusations against Kellner were false or unreliable, prompting Hynes initially to instruct them to prepare a closing memorandum to dismiss the prosecution — could support an inference that Hynes personally had another reason for initiating and continuing the prosecution other than securing a conviction against Kellner.[22] ADA Vecchione's March 24, 2011 instruction to Batsidis that he should "indict and see if [Y.R.] comes around" is evidence from which a jury could conclude that the goal of Kellner's prosecution was to pressure Y.R. into recanting his allegations against Baruch Lebovits.  Moreover, Vecchione's deposition testimony that he did not recall ever believing that Lebovits was wrongfully convicted or that his crimes of conviction

---

[22] Plaintiff has not alleged that Hynes's statements to the media caused the initiation or continuation of his prosecution.  This distinguishes the instant case from *Buckley*, where the plaintiff claimed the prosecutor's allegedly false assertions in public announcements and release of plaintiff's mug shots "inflamed the populace . . . thereby defaming him, resulting in deprivation of his right to a fair trial, and causing the jury to deadlock rather than acquit."  509 U.S. at 276–77.  While a jury could consider Hynes's statements to the media — which are not shielded by absolute prosecutorial immunity — in assessing whether he acted with actual malice in initiating and continuing the investigation that led to Plaintiff's prosecution, these post-indictment media statements cannot themselves serve as the grounds for Hynes's potential liability.  *See Wills v. Schneiderman*, No. 24-CV-2764 (BMC), 2025 WL 2378034, at *3 (E.D.N.Y. Aug. 15, 2025) ("Wills does not allege that Schneiderman's public disparagement of Wills . . . caused him to be prosecuted without probable cause.  Because Wills fails to connect Schneiderman's actions to his alleged malicious prosecution, this claim fails.").

did not occur also permits an inference that the only reason he was pressuring Y.R. to "come around" through Kellner's indictment was in service of an ulterior motive. Because the record contains evidence from which a reasonable juror could conclude that Hynes was in close coordination with Vecchione and his Rackets division throughout Kellner's prosecution, as well as the inference that he was personally directing key aspects of the investigation, these statements by Vecchione could support a jury finding that Hynes acted with actual malice in prosecuting Kellner. These genuine issues of material fact preclude summary judgment.

## IV.    Qualified Immunity

Defendants argue that, even if DA Hynes is not shielded by absolute prosecutorial immunity, he "is entitled to qualified immunity where he may have reasonably relied on information provided by members of the KCDA." Def. Mem. at 25 (citing *Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003)).  Kellner contends that, in addition to not being shielded by absolute immunity, "Hynes is also not entitled to qualified immunity," because "[t]he right to be free from malicious prosecution based on fabricated evidence was clearly established in 2010 and it was not objectively reasonable for Hynes to believe that initiating a prosecution of [Kellner] based on an affidavit from M.T. that Hynes knew to be false did not violate that right."  Pl. Mem. at 35.

In the Second Circuit, "[a] government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's

right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable." *Manganiello*, 612 F.3d at 164 (citation modified) (citations omitted). "Freedom from malicious prosecution is a constitutional right that has long been clearly established." *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003).

Because the constitutional rights here were "clearly established" in 2011, when Kellner was indicted, the only question is whether Hynes's conduct was "objectively legally reasonable." *See Manganiello*, 612 F.3d at 164 ("Only the third aspect of the qualified immunity doctrine was genuinely at issue in the present case . . . ."). "[W]hether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact," and, "[i]f there are unresolved factual issues which prevent an early disposition of the [qualified immunity] defense, the jury should decide these issues on special interrogatories." *Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012) (citation omitted).

As discussed *supra*, the record could permit a reasonable jury to find that Hynes conspired with members of the Lebovits family and legal team to investigate and maliciously prosecute Kellner using manufactured evidence that he knew to be false. A jury could also find otherwise — *i.e.,* that Hynes's decision to open an extortion investigation into Kellner, and the steps he directed others to take during that investigation, were objectively reasonable and lawful ones. These genuine issues of material fact preclude summary judgment on Defendants' qualified immunity defense. *See Harris*, 663 F. Supp. 3d at 246.

### V.    Municipal Liability

Finally, Kellner asserts municipal liability against the City of New York for the alleged conduct of DA Hynes. Am. Compl. ¶¶ 61–64. Specifically, Kellner asserts that, "because Hynes had final decision-making authority in the area of policy that encompassed his tortious conduct, the City of New York is responsible for his actions." *Id.* ¶ 63.

Under the *Monell* theory of municipal liability, "[w]here plaintiffs allege that their rights were deprived . . . by a city employee's single tortious decision or course of action, the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004); *see generally Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (establishing that a municipality may be liable under Section 1983 where its customs or policies deprive individuals of their rights under the Constitution). A single decision may create Section 1983 liability "where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). As to district attorneys, the Second Circuit has held that "the actions of county prosecutors in New York are generally controlled by municipal policymakers for purposes of *Monell*, with a narrow exception . . . being the decision of whether, and on what charges, to prosecute." *Bellamy v. City of New York*, 914 F.3d 727, 759 (2d Cir. 2019).

At oral argument, Defendants conceded that DA Hynes was, at all relevant times, the ultimate decisionmaker for KCDA's investigative functions and, thus, that

the City of New York's *Monell* liability is coextensive with Hynes's individual liability. The Court agrees. Because genuine issues of material fact preclude summary as to Hynes's personal liability, the City is not entitled to summary judgment on the issue of its municipal liability for Hynes's alleged misconduct during the investigative stage of Kellner's prosecution.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is DENIED in its entirety.


        SO ORDERED.

                                                            */s/ Nina R. Morrison*
                                                            NINA R. MORRISON
                                                            United States District Judge

Dated: December 8, 2025
        Brooklyn, New York